# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL RELIGIOUS )
BROADCASTERS and AMERICAN )
FAMILY ASSOCIATION, )
                        )    No. 24-_____
     Petitioners, )
                        )    FCC Order 24-18
     v. )    MB Docket No. 98-204
                        )
FEDERAL COMMUNICATIONS )
COMMISSION and UNITED )
STATES OF AMERICA, )
                        )
     Respondents. )

*U S COURT OF APPEALS RECEIVED MAY 03 2024 FIFTH CIRCUIT*

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 28 U.S.C. § 2341 *et seq.*, 47 U.S.C. § 402, and

Federal Rule of Appellate Procedure 15(a), the National Religious

Broadcasters and the American Family Association (collectively,

"Petitioners"), hereby petition this Court for review of the U.S. Federal

Communications Commission's ("FCC") *Fourth Report and Order, Order on*

*Reconsideration, and Second Further Notice of Proposed Rulemaking* ("Order"),

MB Docket No. 98-204, FCC 24-18 (rel. Feb. 22, 2024). A copy of the Order is

attached as Exhibit A.

This Petition is timely. With limited exceptions not applicable here,

"[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission … shall be brought as provided by and in the manner prescribed in chapter 158 of title 28" of the U.S. Code. 47 U.S.C. § 402(a). Chapter 158 of title 28 in turn provides that "[a]ny party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344. The relevant aspects of the Order—specifically, the *Fourth Report and Order* and *Order on Reconsideration*—were entered in the Federal Register less than 60 days ago on May 3, 2024. *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 89 Fed. Reg. 36705 (May 3, 2024). A copy of the entry is attached as Exhibit B. To date, no court has addressed the validity of the Order.

Jurisdiction is proper because Petitioners are adversely affected by the Order, which can be challenged in a U.S. Court of Appeals under 28 U.S.C. § 2342 and 47 U.S.C. § 402. Venue is also proper because Petitioner American Family Association (Tupelo, Mississippi) has its principal office in this Circuit. *See* 28 U.S.C. § 2343.

Petitioners seek review of the Order on the grounds that it exceeds the FCC's statutory authority, and violates the Constitution and other federal

2

laws, including because:

(1)    the FCC lacked statutory authority to issue the Order under 47 U.S.C. § 334, or any other law, and it is ultra vires;

(2)    the Order violates the equal protection component of the Fifth Amendment and the Free Speech Clause of the First Amendment, and for the same reasons is without lawful authority and ultra vires; and

(3)    the Order is arbitrary and capricious, an abuse of discretion, and otherwise contrary to law.

Petitioners reserve the right to modify, add, or abandon grounds.

Petitioners respectfully request that this Court (1) grant the Petition and hold that the Order is unlawful; (2) vacate, enjoin, and set aside the Order; and (3) provide such other relief as this Court deems appropriate.

Dated:  May 3, 2024

GENE P. HAMILTON
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave SE
  No. 231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

Respectfully submitted,

/s/ Jared M. Kelson
JONATHAN BERRY
R. TRENT MCCOTTER
JARED M. KELSON
  *Counsel of Record*
LAURA B. RUPPALT
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

3

## CERTIFICATE OF SERVICE

I certify that on May 3, 2024, the foregoing Petition for Review was electronically filed with the U.S. Court of Appeals for the Fifth Circuit using the CM/ECF system.

I further certify that I will timely email a copy of the date-stamped Petition to LitigationNotice@fcc.gov. *See* 47 C.F.R. § 1.13(a)(1).

I will also cause a copy of the date-stamped Petition to be sent via certified mail to:

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530

Marlene H. Dortch, Secretary
Federal Communications Commission
Office of the Secretary
45 L Street NE
Washington, DC 20554

Dated: May 3, 2024

Respectfully submitted,

/s/ Jared M. Kelson
JARED M. KELSON
801 17th St NW, Suite 350
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

*Counsel for Petitioners*

# Exhibit A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Review of the Commission's Broadcast and Cable | **)** | MB Docket No. 98-204 |
| Equal Employment Opportunity Rules and Policies | **)** | |
| | **)** | |

**FOURTH REPORT AND ORDER, ORDER ON RECONSIDERATION, AND SECOND**
**FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: February 7, 2024**                    **Released: February 22, 2024**

**Comment Date: (30 days after date of publication in the Federal Register)**
**Reply Comment Date: (45 days after date of publication in the Federal Register)**

By the Commission: Commissioners Starks issuing separate statement.  Commissioners Carr and
Simington dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I.   INTRODUCTION ..................................................................................................................1
II.  BACKGROUND...................................................................................................................4
III. DISCUSSION.....................................................................................................................13
     A. Reinstatement of the Form 395-B Collection ...........................................................14
        1. CIPSEA is Ill-Suited to the Commission's Collection of the Form 395-B Data ....25
        2. Even if FOIA Exemption 4 Applies, the Strong Public Interest in Disclosure
           Outweighs Any Private Interest In Confidential Treatment....................................30
     B. Constitutional Issues .................................................................................................41
     C. The Commission Has Broad Authority to Collect Form 395-B ................................51
IV. ORDER ON RECONSIDERATION ...................................................................................55
V.  SECOND FURTHER NOTICE OF PROPOSED RULEMAKING ......................................60
VI. PROCEDURAL MATTERS.................................................................................................66
VII. ORDERING CLAUSES.......................................................................................................75
APPENDIX A – Final Rules
APPENDIX B – Proposed Rules
APPENDIX C – Final Regulatory Flexibility Act Analysis
APPENDIX D – Initial Regulatory Flexibility Act Analysis

# I.   INTRODUCTION

1.      By this *Fourth Report and Order*, *Order on Reconsideration*, and *Second Further Notice
of Proposed Rulemaking*, we reinstate the collection of workforce composition data for television and

radio broadcasters on FCC Form 395-B[1] as statutorily required by the Communications Act of 1934, as amended (Act).[2] The Commission suspended its requirement that broadcast licensees file Form 395-B, which collects race, ethnicity, and gender information about a broadcaster's employees within specified job categories, more than two decades ago.[3] After a long period of inactivity, the Commission issued a Further Notice of Proposed Rulemaking (*Further Notice*) in July 2021 seeking to refresh the public record regarding the manner in which the Form 395-B data should be collected and maintained.[4] After careful consideration of the record, we reaffirm the Commission's authority to collect this critical information and conclude that broadcasters should resume filing Form 395-B on an annual basis.[5] Given the importance of this workforce information and Congress's expectation that such information would be collected and available, we reinstate this collection in a manner available to the public consistent with the Commission's previous, long-standing method of collecting this data.

2. Our ability to collect and access Form 395-B data is critical because it will allow for analysis and understanding of the broadcast industry workforce, as well as the preparation of reports to Congress about the same.[6] Collection, analysis, and availability of this information will support greater understanding of this important industry. We agree with broadcasters and other stakeholders that workforce diversity is critical to the ability of broadcast stations both to compete with one another and to effectively serve local communities across the country.[7] Without objective and industry-wide data it is impossible to assess changes, trends, or progress in the industry. Consistent with how these data have been collected historically, we will make broadcasters' Form 395-B filings available to the public because we conclude that doing so will ensure maximum accuracy of the submitted data, is consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public, allows us to produce the most useful reports possible for the benefit of Congress and the public, and allows for third-party testing of the accuracy of our data analyses. Thus, with today's action, we restore the process

---

[1] Form 395-B, the broadcast station Annual Employment Report, can be found at https://omb.report/icr/202004-3060-047/doc/100723701.

[2] 47 U.S.C. § 334(a).

[3] *See Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements,* Memorandum Opinion and Order, 16 FCC Rcd 2872 (2001) (*Suspension Order*) (suspending the Equal Employment Opportunity (EEO) outreach program requirements applicable to broadcast licensees, including the requirement that broadcasters annually file a Form 395-B).

[4] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, MB Docket No. 98-204, Further Notice of Proposed Rulemaking, 36 FCC Rcd 12055, 12055, para. 1 (2021) (*Further Notice*). The *Further Notice* sought to refresh a 2004 NPRM. *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Procedures*, Third Report and Order and Fourth Notice of Proposed Rulemaking,19 FCC Rcd 9973, 9975, 9978, paras. 4, 13 (2004) (*Third Report and Order and Fourth NPRM*), *pet. for recon. pending*.

[5] Section 73.3612 of the Commission's rules provides that "[e]ach licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395–B." 47 CFR § 73.3612. We note that the filing requirements of section 73.3612 do not apply to Low Power FM Stations.

[6] *See*, *e.g.*, *Implementation of the Commission's Equal Employment Opportunity Rules*, Report, 9 FCC Rcd 6276 (1994) (reporting on trends in the employment of minorities and women in the broadcast and cable sectors in accordance with section 22(g) of the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-385 § 22, 106 Stat. 1460 (1992) (1992 Cable Act)); *see also* Letter from The Leadership Conference on Civil and Human Rights (the Leadership Conference) et al. to Jessica Rosenworcel, Chair, FCC (Sept. 29, 2022) at 1.

[7] *See*, *e.g.*, National Association of Broadcasters (NAB) Comments at 6 (noting that a diverse, equitable, and inclusionary workforce enables stations to leverage the various experiences and strengths of their staff to produce content that reflects the needs and interests of their local communities); *see also* The Leadership Conference Comments at 2.

of giving broadcasters, Congress, and ourselves the data needed to better understand the workforce composition in the broadcast sector.[8]  We find further that continuing to collect this information in a transparent manner is consistent with a broader shift towards greater openness regarding diversity, equity, and inclusion across both corporate America[9] and government.[10]

3.      We also address a pending petition for reconsideration from 2004 regarding our use of Form 395-B data.[11]  Finally, we seek to refresh the record on the reinstatement of the collection of FCC Form 395-A, which concerns the workforce composition of multichannel video programming distributors (MVPDs).[12]

## II.      BACKGROUND

4.      For more than 50 years, the Commission has administered regulations governing the EEO responsibilities of broadcast licensees.[13]  At their core, the Commission's EEO rules prohibit employment discrimination on the basis of race, color, religion, national origin, or sex, and require broadcasters to provide equal employment opportunities.[14]  In addition to broadly prohibiting employment discrimination, the Commission's rules also require that all but the smallest of broadcast licensees develop and maintain an EEO program.  Specifically, the Commission requires each broadcast station that is part of an employment unit of five or more full-time employees to establish, maintain, and carry out a positive continuing program to ensure equal opportunity and nondiscrimination in employment policies and practices.[15]  In addition, the Commission historically collected workforce employment data from

---

[8] *See, e.g., 1996 Broadcast and Cable Employment Report*, Public Notice, 1997 WL 411346, at 1 (July 24, 1997) and *1997 Broadcast and Cable Employment Report*, Public Notice, 1998 WL 327045, at 1 (June 23, 1998).  Both reports show the breakdown of employees at broadcast stations in terms of race, ethnicity, and gender.

[9] Large media companies have begun to make publicly available copies of their EEO-1 forms, which are filed with the Equal Employment and Opportunity Commission, or variations thereof.  *See, e.g.*, Disney EEO-1 Form, https://impact.disney.com/app/uploads/Current/FY22-Workforce-Diversity-Dashboard.pdf ; Comcast EEO-1 Form, https://cmcsa.gcs-web.com/static-files/1d6d3ef6-d2d4-4c13-b452-7917b90e0032, Fox Corporation EEO-1 Form, https://media.foxcorporation.com/wp-content/uploads/prod/2023/11/29230427/2022-EEO-1-Consolidated-Report.pdf; Paramount Workforce Demographics, https://www.paramount.com/inclusion-2021/our-culture.  Similarly, tech companies are making information about the composition of their workforces publicly available.  *See, e.g.*, Inclusion & Diversity, Apple, https://www.apple.com/diversity/ (last visited Dec.15, 2023); Our Workplace, Google, https://diversity.google/commitments/ (last visited Dec. 15, 2023); Meta Diversity Report, https://about.fb.com/news/2022/07/metas-diversity-report-2022/(last visited Dec. 15, 2023); Corporate Social Responsibility, Intel, https://www.intel.com/content/www/us/en/diversity/diversity-at-intel.html (last visited Dec. 15, 2023).  *See also* Kavya Vaghul, Just Over Half of the Largest U.S. Companies Share Workforce Diversity Data as Calls for Transparency from Investors and Regulators Grow, JUST Capital (Feb. 6, 2022), https://justcapital.com/reports/share-of-largest-us-companies-disclosing-race-and-ethnicity-data-rises/.

[10] There is movement towards more open access to data collected by federal agencies, as shown in the Foundations for Evidence Based Policymaking Act, which directs agencies to account for their data collections and to make such data available in readable formats to support government transparency and evidence-based rulemaking.  Foundations for Evidence Based Policymaking Act of 2018, Pub. L. 115-435 § 202(c), 132 Stat. 5529 (2019), *codified as* 44 U.S.C § 3506(b)(6).

[11] *See Order on Reconsideration, infra* at Section IV; *see also* Joint Petition of the State Broadcasters Associations for Reconsideration and/or Clarification of Third Report and Order and Fourth NPRM, MM Docket No. 98-204, at 2-3 (filed July 23, 2004), https://www.fcc.gov/ecfs/document/5511438304/1 (State Associations 2004 Petition).

[12] *See Second Further Notice of Proposed Rulemaking, infra* Section V.

[13] *See Further Notice*, 36 FCC Rcd at 12056, para. 2 (citing *Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Employment Practices*, Docket No. 18244, Rm 1144, Report and Order, 18 FCC 2d 240 (1969)).

[14] 47 CFR § 73.2080(a).

[15] 47 CFR § 73.2080.  Among other things, the Commission's EEO recruitment rules require an employment unit to

(continued....)

broadcasters through the annual submission of Form 395-B.

5.        Between 1970 and 1992, the Commission, pursuant to its public interest authority, required broadcasters to submit annual employment reports listing the composition of the broadcasters' workforce in terms of race, ethnicity, and gender.[16]  In 1992, after finding that, among other things, "increased numbers of females and minorities in positions of management authority in the cable and broadcast television industries advances the Nation's policy favoring diversity in the expression of views in the electronic media,"[17] Congress amended the Act, affirming the Commission's authority in this area. Specifically, Congress added a new section 334, which required the Commission to maintain its existing EEO regulations and forms as applied to television stations.[18]  These forms included the Commission's collection of workforce diversity information from broadcasters on Form 395-B.[19]  Submission of Form

---

use recruitment sources for each full-time vacancy that, in its reasonable and good faith judgment, are sufficient to disseminate information widely about the job opening.  47 CFR § 73.2080(c)(1)(i).  Broadcasters must use a three-pronged approach to ensure broad outreach regarding employment opportunities:  (1) widely disseminate information concerning each full time (30 hours or more) job vacancy, except for a vacancy filled in exigent circumstances; (2) provide vacancy notices to recruiting organizations that request them; and (3) depending upon the size of the unit and market in which it operates, complete two or four of the longer-term recruitment initiatives enumerated in the rule within a two-year period.  47 CFR § 73.2080(c).  In 2017, in response to a broadcaster petition that received wide support from the industry, the Commission updated its EEO policy to allow online job postings to be used as a sole means of advertising a vacancy to satisfy the "wide dissemination" prong of the recruitment rules.  *See Petition for Rulemaking Seeking to Allow the Sole Use of Internet Sources for FCC EEO Recruitment Requirement*, MB Docket No. 16-410, Declaratory Ruling, 32 FCC Rcd 3685 (2017).

[16] In 1969, when the Commission adopted rules prohibiting broadcast stations from discriminating against any person in employment on the basis of race, color, religion, or national origin, and requiring stations to maintain a program designed to ensure equal opportunity in every aspect of station employment, the Commission relied on sections 4(i), 303, 307, 308, 309, and 310 of the Act.  *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies,* MM Docket No. 98-204, Second Report and Order and Third Notice of Proposed Rulemaking, 17 FCC Rcd 24018, 24028, para. 28 (2002) (*Second Report and Order and Third NPRM*); *see also id.*, 17 FCC Rcd at 24030, para. 31.

[17] 1992 Cable Act, *codified as* 47 U.S.C. § 334(a).

[18] 47 U.S.C. § 334.  Section 334(a) of the Act states that "except as specifically provided in this section, the Commission shall not revise (1) the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080) as such regulations apply to television broadcast station licensees and permittees; or (2) the forms used by such licensees and permittees to report pertinent employment data to the Commission."  47 U.S.C. § 334(a).  Section 334(c) authorizes the Commission to make only "nonsubstantive technical or clerical revisions" to the regulations described in Section 334(a) "as necessary to reflect changes in technology, terminology, or Commission organizations."  47 U.S.C. § 334(c).  Congress's action did not supplant the Commission's existing public interest authority, but rather ratified its authority to act in this area.  As the Commission stated in the *Second Report and Order and Third NPRM*, when discussing the companion requirement for MVPDs in Section 634, 47 U.S.C. § 554, the "legislative history of Section 634 makes it unmistakably clear that Congress believed that the Commission already possessed authority to regulate EEO practices of mass media entities – broadcast as well as cable."  *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24030-31, para. 33; *see also Second Report and Order and Third NPRM*, 17 FCC Rcd at 24030-31, paras. 31-35 (describing a similar, earlier congressional action ratifying EEO rules promulgated by the Commission prior to 1984).  The *Second Report and Order and Third NPRM* also found additional evidence of congressional ratification of the Commission's authority to promulgate EEO rules in the 1992 Cable Act.  *See Second Report and Order and Third NPRM,* 17 FCC Rcd at 24031-33, paras. 36-39.

[19] *See* 1992 Cable Act.  While section 334 of the Act did not codify the Commission's previously existing EEO requirements for radio broadcast licensees, the Commission has found that Congress ratified the Commission's authority to promulgate EEO rules for radio as well as television licensees.  *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*; *Termination of EEO Streamlining Proceeding*, MM Docket Nos. 98-204, 96-16, Notice of Proposed Rulemaking, 13 FCC Rcd 23004, 23014-15, para. 28 (1998) (*1998 NPRM*); *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies,* MM

(continued....)

395-B, however, was subsequently suspended in 2001 following two decisions by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacating certain aspects of the Commission's EEO rules.[20]

6.      With its decision in 1998, the D.C. Circuit in *Lutheran Church-Missouri Synod v. FCC* (*Lutheran Church*) reversed and remanded a Commission action finding that a broadcast licensee had failed to make adequate efforts to recruit minorities.[21] The court found the Commission's EEO outreach rules, which required comparison of the race and sex of a station's full-time employees with the overall availability of minorities and women in the relevant labor force, to be unconstitutional.[22] Specifically, the court concluded that the use of broadcaster employee data to assess EEO compliance in the context of a license renewal pressured broadcasters to engage in race-conscious hiring in violation of the equal protection component of the Due Process Clause of the Fifth Amendment of the Constitution.[23] The court applied strict constitutional scrutiny in reaching its decision, finding that standard of review was applicable to racial classifications imposed by the federal government. And pursuant to that standard, it determined that the Commission's stated purpose of furthering programming diversity was not compelling, nor were its EEO rules narrowly tailored to further that interest.[24] The court made clear, however, that "[i]f the regulations merely required stations to implement racially neutral recruiting and hiring programs, the equal protection guarantee would not be implicated."[25] In reaching its decision, the court referenced the Form 395-B only tangentially in its analysis.[26]

7.      On remand, the Commission crafted new EEO rules requiring that broadcast licensees undertake an outreach program to foster equal employment opportunities in the broadcasting industry.[27] The Commission also reinstated the requirement that broadcasters annually file employment data on Form 395-B with the Commission,[28] which it had suspended after *Lutheran Church*.[29] In adopting these revised rules and reinstating the information collection, the Commission vowed to no longer use workforce composition data when reviewing license renewal applications or assessing compliance with EEO program requirements.[30] Rather, the Commission stated that going forward it would only use this

---

Docket Nos. 98-204, 96-16, Report and Order*,* 15 FCC Rcd 2329, 2344-45, paras. 38-39 (2000) (*First Report and Order*), *recon denied,* 15 FCC Rcd 22548 (2000), *reversed and remanded in part on other grounds sub nom. MD/DC/DE Broadcasters Ass'n v. FCC,* 236 F.3d 13 (2001) (*MD/DC/DE Broadcasters*), *pet. for reh'g denied*, 253 F.3d 732 (D.C. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002).

[20] *See Suspension Order*, 16 FCC Rcd at 2872.

[21] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 347-48 (D.C. Cir. 1998) (*Lutheran Church*), *pet. for reh'g denied*, 154 F.3d 487, *pet. for reh'g en banc denied*, 154 F.3d 494 (D.C. Cir. 1998).

[22] *Id.* at 352-53.

[23] *Id.* at 349-56.

[24] *Id.* at 350-351 (citing *Adarand Constructors Inc. v. Pena*, 515 U.S. 200 (1995)). The Court stated that it also could not uphold the Commission's action under rational basis scrutiny, which requires only that a regulation have a substantial relation to the government interest it furthers. *Id.* at 356.

[25] *Id.* at 351. In response to the Commission's rehearing petition, the D.C. Circuit reiterated that it had not held that a regulation "encouraging broad outreach to, as opposed to the actual hiring of, a particular race would necessarily trigger strict scrutiny." *Id.* at 492.

[26] *Id.* at 352-53.

[27] *See First Report and Order*, 15 FCC Rcd at 2363-93, paras. 76-161.

[28] *Id.* at 2394-97, paras. 163-171.

[29] *Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports and Program Reports*, 13 FCC Rcd 21998 (1998).

[30] *First Report and Order*, 15 FCC Rcd at 2332, 2395, paras. 6, 165.

information "to monitor industry employment trends and report to Congress,"[31] and codified that position in the governing regulations contained in section 73.3612.[32]

8.      Following adoption of the new EEO outreach rules, which offered licensees two "Options" for establishing an EEO program, several state broadcaster associations challenged the revised EEO rules.  Upon review, the D.C. Circuit in *MD/DC/DE Broadcasters Associations v. FCC* (*MD/DC/DE Broadcasters*) found that one element of the new rule, namely Option B, which allowed broadcasters to design their own outreach programs but required reporting of the race and sex of each *applicant*, was constitutionally invalid.[33]  The court determined that Option B violated the equal protection component of the Due Process Clause of the Fifth Amendment because, by examining the number of applicants and investigating any broadcasters with "few or no" minority applicants, the Commission "pressured" broadcasters to focus resources on recruiting minorities.[34]  Because the court found that Option B was not severable from Option A of the rule, it vacated the entire EEO outreach rule.[35]

9.      Although the D.C. Circuit in *MD/DC/DE Broadcasters* vacated and remanded the Commission's revised EEO outreach rules, it did not rule on the validity or constitutionality of Form 395-B.  Nor did the court specifically identify Form 395-B or the collection of workforce diversity data as a core part of the rule at issue in its analysis.[36]  The court's only mention of the collection of workforce data was in the Background section of its decision.[37]  Thus, notably, in neither *Lutheran Church* nor *MD/DC/DE Broadcasters* did the D.C. Circuit find the collection of workforce composition data itself to be invalid on constitutional or any other grounds.[38]  After the decision, the Commission suspended its EEO rules in 2001, including Form 395-B, in order to analyze the effects of *MD/DC/DE Broadcasters* on the Commission's rules.[39]

10.      On November 20, 2002, the Commission released its *Second Report and Order and Third NPRM*, establishing new race-neutral EEO rules, eliminating the Option B rule previously invalidated by the court.[40]  The Commission's new EEO rules, which remain in place today,[41] were divorced from any data concerning the composition of a broadcaster's workforce or applicant pool.  The Commission explained that the annual employment report is "unrelated to the implementation and enforcement of our EEO program" and "data concerning the entity's workforce is no longer pertinent to the administration of

---

[31] *Id.*

[32] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies and Termination of the EEO Streamlining Proceeding*, MM Docket Nos. 98-204, 96-16, Memorandum Opinion and Order, 15 FCC Rcd 22548, 22560, 22575, para. 40, App. B (2000) (*2000 Reconsideration Order*); *see* 47 CFR § 73.3612 Note ("Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the Equal Employment Opportunity requirements of § 73.2080.").

[33] *MD/DC/DE Broadcasters*, 236 F.3d at 17.

[34] *Id.* at 18-21.  The court found the rule was not narrowly tailored because investigations were not predicated on a finding of past discrimination or reasonable expectation of future discrimination.  *Id.* at 21-22.

[35] *Id*. at 22-23.

[36] *Id.*

[37] *Id.* at 17.

[38] *See Further Notice*, 36 FCC Rcd at 12057, para. 4 (citing *Suspension Order*, 16 FCC Rcd at 2872).

[39] *See Suspension Order*, 16 FCC Rcd at 2872.

[40] *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24043-53, 24074, paras. 72-105, 180.

[41] 47 CFR § 73.2080 (requiring, inter alia, that broadcast licensees widely recruit for each full-time vacancy at their stations using recruitment sources that, in the licensee's reasonable and good faith judgment, are sufficient to widely disseminate information about the job opening).

our EEO outreach requirements."[42]  The Commission, however, deferred action on issues relating to the annual employment report form, in part because it needed to incorporate new standards for classifying data on race and ethnicity adopted by the Office of Management and Budget (OMB) in 1997.[43]

11.        On June 4, 2004, the Commission released its *Third Report and Order and Fourth NPRM* readopting the requirement that broadcasters file Form 395-B.[44]  In addition, the Commission readopted the Note to section 73.3612 of its rules that it had previously adopted in 2000, stating that the data collected would be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of a broadcaster's compliance with the EEO rules.[45]  The Commission stated that it did not "believe that the filing of annual employment reports will unconstitutionally pressure entities to adopt racial or gender preferences in hiring,"[46] but it acknowledged the concerns raised by broadcasters and sought comment on whether data reported on the Form 395-B should be kept confidential.[47]  Accordingly, while the Commission acted at that time to adopt revised regulations regarding the filing of Form 395-B and updated the form, the requirement that broadcasters once again submit the form to the Commission remained suspended until the agency further explored the issue of whether employment data could, or should, remain confidential.[48]

12.        Given the passage of time since the *Third Report and Order and Fourth NPRM*, the Commission released a *Further Notice* on July 26, 2021, seeking to refresh the 2004 record with regard to Form 395-B.[49]  The *Further Notice* asked for additional input on relevant developments in the law relating to public disclosure of employment data, as well as the practical and technical limitations associated with implementing a system that could afford varying degrees of station-level anonymity.[50] Interested parties filed comments, including public interest organizations and representatives of the

---

[42] *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24067-68, 24072, paras. 159, 173.

[43] *Id.* at 24024-25, 24074, paras. 17, 180.  The Commission's decision in January 2001 to suspend the filing of Form 395-B remained in effect at the time of the *Second Report and Order and Third NPRM*.

[44] *See Third Report and Order and Fourth NPRM,* 19 FCC Rcd at 9975, para. 4.  The Commission allowed a one-time filing grace period "until a date to be determined in the Commission's Order addressing the issues raised in the *Fourth Notice of Proposed Rulemaking. . . .*"  *Id.* at 9978, para. 13.  Because such an order had not been adopted before today, the Commission has not resumed collecting the Form 395-B.

[45] 47 CFR § 73.3612 Note ("Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the Equal Employment Opportunity requirements of § 73.2080.").

[46] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9976, para. 9.

[47] *See id.* at 9973, 9979, paras. 14-17.

[48] *See id.* at 9978, para. 13; *see also* 47 CFR §§ 73.3612, 76.1802.  Although the requirement to file the forms on an annual basis remained suspended after 2004, the Commission regularly sought approval from the Office of Management and Budget (OMB) for the collection of information on Form 395-B, consistent with the Paperwork Reduction Act.  The Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (1995).  OMB has recently approved the information collection for Form 395-B through August 31, 2026.  Under the terms of OMB's approval, the Commission "should not initiate using or collecting information with . . . Form 395-B until [it] decides whether the data collected from each form will be held confidential or not on an individual basis.  Following such a decision, the Commission should consult with OMB prior to initiating usage of these forms to determine whether the decision regarding confidentiality results in a substantive change to the collections warranting formal review by OMB of the proposed revisions."  *See* OMB Control Number: 3060-0390, https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202304-3060-010 (last visited Dec. 7, 2023).

[49] *See Further Notice*, 36 FCC Rcd at 12061, para. 11.

[50] *See id.* at 12062-63, paras. 14-16.

broadcast industry.[51]  Their arguments range from asking that Form 395-B data be made publicly available to contending that reinstating the form would amount to an unconstitutional violation of race-based protections.  Many of these assertions largely reiterate arguments addressed in the Commission's earlier orders, including whether the filing requirement constitutes unconstitutional pressure, the ramifications of the D.C. Circuit rulings, the directives of section 334, and the potential substitutability of the Equal Employment Opportunity Commission's (EEOC) EEO-1 form.[52]

## III.    DISCUSSION

13.    Consistent with the Commission's authority pursuant to section 334, as well as the public interest provisions of the Act, we reinstate the collection of FCC Form 395-B.[53]  In doing so, we affirm the Commission's prior determination that the earlier court decisions in no way invalidated our authority to collect this data, which remains critical for analyzing industry trends and making reports to Congress.  Further, we find that reinstatement of this information collection on a publicly available basis is consistent with the protections afforded to broadcasters by the Constitution and relevant case law, as detailed further below.  The clear separation of this information collection from the Commission's long-standing EEO program requirements mitigates any concerns that might be raised by the broadcasters as to the collection of this workforce data.  In addition, the Commission's unequivocal statement that it will not use station-specific employment data for the purpose of assessing a licensee's compliance with the EEO regulations and the codification of that same stricture further underscore the dissociation between the EEO requirements and the form's data.

### A.    Reinstatement of the Form 395-B Collection

14.    The Commission has a public interest in collecting Form 395-B in order to report on and analyze employment trends in the broadcast sector and also to compare trends across other sectors regulated by the Commission.  In taking this action today, we note that Congress has long authorized the Commission to collect this data[54] and that the Commission is uniquely positioned to undertake such a collection.[55]  While the National Association of Broadcasters (NAB) and others have evinced an interest in improving the level of diversity in the broadcasting industry workforce,[56] the lack of industry-wide employment data over the last 22 years makes it difficult to measure the extent of any such progress.  While we do not anticipate that this more than two-decade long gap in data can ever be filled, with the reinstatement of this information collection the Commission can ensure that the lack of data persists no further, thereby providing it, the industry, Congress, and the public with a better understanding of, or insight into, the full scope of the broadcast industry workforce.  Accordingly, in this Order, we reinstate

---

[51] The EEO Supporters, the Leadership Conference, and the Foster Garvey Coalition filed comments in support of Form 395-B.  NAB, the State Broadcasters Associations (State Associations), and the Center for Workplace Compliance (CWC) oppose the form's reinstatement.

[52] *See generally Second Report and Order and Third NPRM*, 17 FCC Rcd at 24026-74, paras. 21-181; *see also First Report and Order,* 15 FCC Rcd at 2336-58, 2394-97, paras. 20-64, 163-71; *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9974-77, paras. 3-10.

[53] 47 U.S.C. §§ 334(a), 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 403.

[54] *See* 47 U.S.C. § 334; *see also Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9974, para. 3 (stating that "[the Commission is] directed by statute to require the submission of such reports by broadcast television stations . . ."); *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24030, para. 31 (stating that Congress ratified the Commission's authority to collect broadcast workforce data).

[55] *See* American Federation of Television and Radio Artists Comments at 21 (filed April 15, 2002) (acknowledging that the reporting of industry employment trends is a valuable public resource and that the Commission is well-positioned to maintain and disseminate data on the demographics of employment in broadcasting); *see also* Asian Americans Advancing Justice -AAJC et al. Supp. Comments at 15-16 (filed Aug. 10, 2022) (AAJC et al. *Ex Parte*) (describing the inadequacy of private sector employment surveys for meeting the Commission's purposes).

[56] NAB Comments at 6-10.

collection of Form 395-B in the manner described below and require the form to be submitted in an electronic format.[57]  Once submitted, the form will be accessible to the public via the Commission's website.

15.      Reinstating the collection of the Form 395-B data in a publicly available format, as they were collected prior to 2001, remains the best approach for achieving our ultimate goal of preparing meaningful and accurate analyses of workforce trends in the broadcast industry.  First, public disclosure will increase the likelihood that erroneous data will be discovered and corrected, and it will incentivize stations to file accurate data to avoid third-party claims that submitted data is incorrect.[58]  Whether intentionally or inadvertently, a station might misreport its data or misidentify the racial, ethnic, or gender group for particular employees.  Individuals or entities with a connection to the station will be in a position to correct such errors if the data are made public.  Second, making the Form 395-B data publicly available is consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public.[59]  Third, making the data public bolsters our ability to conduct analyses of trends across different communications sectors,[60] within individual sectors, and by region or market, without being unnecessarily hampered by concerns about inadvertent disclosures of identifiable information.  We believe the utility of our reports is greatly enhanced by our ability to "slice, dice, and display" granular data about the broadcast sector.[61]  Our ability to produce the most meaningful reports possible for Congress rests, in turn, on the ability to produce the most granular reports possible (e.g., the number of employees in a particular demographic group in a specific job category among a certain class of stations [AM, FM, TV, etc.] in a specific geographic area).  If we were required, however, to keep confidential the underlying station-specific data, we would feel compelled to report our findings at a more general, and thus less useful, level to avoid the risk of inadvertently facilitating any reverse engineering of station-

---

[57] As CWC noted in the record, the version of Form 395-B that the Commission referenced in the *Further Notice* was outdated.  CWC Comments at 6-7.  *See Further Notice*, 36 FCC Rcd at 12055, para. 1 n.1.  The *Further Notice* inadvertently provided a link to the 2000 version of the form, but the Commission made minor revisions to the form in 2008 to conform its racial/ethnicity classifications and employment categories to the updated classifications and categories that the EEOC had made to the EEO-1 form.  *See Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9977-78, para. 12 (stating that the Commission would wait to revise its form until the EEOC had finalized the EEO-1 form to comply with OMB's updated racial classification standards); *see also Media Bureau Seeks Comment on Possible Changes to FCC Forms 395-A and 395-B*, Public Notice, 23 FCC Rcd 5441 (MB 2008) (seeking comment on incorporating the EEOC's revised racial and employment categories into FCC Forms 395-A and 395-B).  Examples of conforming edits made to the updated form include  allowing employees to identify as being of two or more races, and the form differentiates senior level officials from mid-level officials.  The correct version of the form that we reinstate, and which has OMB approval, can be found at https://omb report/icr/202004-3060-047/doc/100723701.

[58] *See* National Organization of Women (NOW) et al. 2004 Comments at 10 (asserting that "requiring filers to disclose their identity will help insure the accuracy of the data").

[59] *See* The OPEN Government Data Act, Pub. L. No. 115-435 (2019) §§ 201-202, Title II of the Foundations for Evidence-Based Policymaking Act of 2018, 44 U.S.C. § 3501(2), (4) (setting forth the goals to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "improve the quality and use of Federal information to strengthen decision-making, accountability, and openness in Government and society").

[60] Form 395-A for MVPDs, if its collection is reinstituted, contains similar fields to the Form 395-B.  *See Second Further Notice of Proposed Rulemaking, infra* at Section V.

[61] Consequently, we also reject NAB's claim that the Commission's goal of issuing reports and analyzing trends would not be hindered through confidential treatment of the data.  *See* NAB Comments at 4 (claiming that collecting Form 395-B data on an anonymous, aggregated basis "would have no effect on the FCC's ability to fulfill its expressed, permitted purposes for the data, namely, to 'monitor industry employment trends and report to Congress'").

specific information.  This problem would be especially acute in smaller markets, where the identity of stations could be discerned more easily.

16.    In addition, allowing public access to datasets allows others to review the accuracy of an agency's data analyses and to question its methods for data collection with the benefit of actual datasets.[62] We find this level of transparency to be consistent with the overall trend toward making government data more accessible, and we note that many government agencies collect and publish demographic data as part of their analysis of markets, trends, and other factors.[63]  The *Further Notice* sought comment on the logistics associated with collecting and maintaining the Form 395-B data completely anonymously, or where station specific information is available to the Commission, but not to the public.[64]  Only one commenter addressed this issue by stating that the Commission's Licensing and Management System (LMS) enables the shielding of certain exhibits attached forms.[65]  Irrespective of whether LMS can shield station-attributable data, we conclude for the reasons stated above that maintaining this data in a publicly available format is the most appropriate policy.

17.    While broadcasters have expressed concerns with how the form's data might be used if publicly disclosed, such concerns have been addressed by the Commission's repeated statements on the appropriate use of such data and its amendment of the rules to prohibit use of the data to assess a broadcaster's compliance with Commission EEO rules.  Notwithstanding the Commission's statements and actions, broadcasters were troubled in 2004 by comments made at that time by the National Organization of Women (NOW) et al. positing that public disclosure of employment data would enable "citizens . . . to work closely with their local broadcaster to ensure that stations are meeting their needs and to resolve any problems with the companies in their communities."[66]  Broadcasters pointed to those comments as evidence that third parties would misuse Form 395-B data to pressure stations to engage in preferential hiring practices.[67]  As an initial matter, as the Commission has committed to previously and we reiterate here again, we will quickly and summarily dismiss any petition, complaint, or other filing submitted by a third party to the Commission based on Form 395-B employment data.[68]  We also note that any attempt by a non-governmental third party to use the publicly available Form 395-B data to pressure stations in a non-governmental forum would not implicate any constitutional rights of the station. In any event, we find such concerns to be speculative.  Despite the public availability of Form 395-B data for more than 20 years prior to 2001, the record contains no evidence of use of such data in this manner. Nonetheless, we encourage broadcasters to bring to the Commission's attention any evidence that a third party has misused or attempted to misuse Form 395-B employment data.  If evidence of such misuse of

---

[62] OMB has stated that, "[t]o operate efficiently and effectively, the Nation relies on the flow of objective, credible statistics to support the decisions of individuals, households, governments, businesses, and other organizations." OMB, Proposals from the Federal Interagency Working Group for Revision of the Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity, 82 Fed. Reg. 12242, 12243 (2017).

[63] *See, e.g.,* U.S. Bureau of Labor Statistics, Labor force characteristics by race and ethnicity, 2020 (Nov. 2021), https://www.bls.gov/opub/reports/race-and-ethnicity/2020/home.htm; National Institutes of Health, NIH RCDC Inclusion Statistics Report, https://report.nih.gov/RISR/#/; U.S. Department of Education, The 2020-21 Civil Rights Data Collection, https://ocrdata.ed.gov/ (last visited Nov. 30, 2023); U.S. Department of Commerce, National Telecommunications and Information Administration, Digital Nation Data Explorer (Oct. 5, 2022), https://www.ntia.doc.gov/data/digital-nation-data-explorer (includes race, ethnicity, and gender among other data).

[64] *Further Notice*, 36 FCC Rcd at 12063, paras. 16-17.

[65] State Associations Reply at 17.

[66] NOW et al. 2004 Comments at 5-7.

[67] NAB 2004 Reply at 5-7, 9-10; Virginia Association of Broadcasters 2004 Reply at 4-6 (stating that what the Commission may not do directly, "it also may not do indirectly through a 'wink and nod' with third-party interest groups"); *see also* State Associations 2004 Reply at 2-5, 8-14; *but see* NOW et al. 2004 Reply at 4-8 (contending that broadcasters had not shown that the data would be used in ways that would violate equal protection).

[68] *See infra* para. 45.

the data emerges, the Commission can reconsider its approach to collection of the Form 395-B data. Based on the record before us, we find no basis to conclude that the demographic data on a station's annual Form 395-B filing would lead to undue public pressure. We find broadcasters' concerns with the public collection and availability of this workforce data to be overstated, outweighed by the promotion of data accuracy and other benefits of public disclosure noted above, and therefore not an impediment to our reinstatement of this collection.

18.     Consistent with the limitations placed on our use of the Form 395-B data, we reject the EEO Supporters' recommendation that the Enforcement Bureau use the data as evidence when investigating a discrimination claim against a station.[69] We find that such use does not comport with the Commission's public interest goal behind collection of this data. The Commission has stated previously, and we reiterate here, that "we will summarily dismiss any petition filed by a third party based on Form 395-B employment data" and "will not use this data as a basis for conducting audits or inquiries."[70]

19.     Some broadcasters have raised a concern that the Commission could decide at a later date to waive its rule regarding how the Form 395-B data can be used.[71] We believe that the combination of the Commission's consistent position over two decades about how this data may be used, the established principle that "an agency is bound by its own regulations,"[72] our rejection of the EEO Supporters' proposed contrary use, and our determination in the attached *Order on Reconsideration* should assuage concerns on this point. We will not further delay reinstatement of the form based on unfounded conjecture about what the Commission may or may not do in the future.

20.     Further, we reject the argument that we should retain Form 395-B data on a confidential basis given the EEOC's confidential treatment of similar employment data collected on its EEO-1 form.[73] Unlike the Commission, the EEOC's authorizing statute specifically limits its ability to make its collected data publicly available.[74] In the Civil Rights Act of 1964, which created the EEOC, Congress included a provision making it unlawful for an EEOC officer or employee to disclose such information.[75] However, when Congress adopted section 334 in 1984, despite the fact that in the preceding 20 years Congress had not lifted the prohibition on public disclosure by the EEOC, Congress imposed no such limitation for publishing the broadcast workforce data collected by the Commission. Indeed, when Congress adopted section 334 in 1984, the Commission had been collecting broadcast workforce data and making it available publicly for decades, a practice Congress endorsed in passing Section 334 without any limitation on public disclosure. In addition, the manner in which the two agencies may use their data differs significantly. The EEOC may use its EEO-1 data for investigatory and enforcement purposes,[76]

---

[69] *See* EEO Supporters Comments at 3-4.

[70] *2000 Reconsideration Order*, 15 FCC Rcd at 22558-59, para. 35.

[71] State Associations Reply at 12.

[72] *Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017).

[73] *See* CWC Comments at 9-11.

[74] 42 U.S.C. § 2000e-8(e).

[75] Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 264, § 709(e) (1964) (providing that "[i]t shall be unlawful for any officer or employee of the [EEOC] to make public in any manner whatever any information obtained by the [EEOC] pursuant to its authority under this section prior to the institution of any proceeding under this title involving such information").

[76] *See* EEO-1 Component 1 Data Collection, U.S. Equal Emp. Opportunity Comm'n, https://www.eeoc.gov/employers/eeo-1-data-collection (last visited Nov. 27, 2023) (stating that the filing of EEO-1 reports is required under section 709(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 29 CFR 1602.7-.14 and 40 CFR 60-1.7(a)); *see also* Frequently Asked Questions: EEO-1 Component 1 Data Collection, U.S. Equal Emp. Opportunity Comm'n, https://eeocdata.org/pdfs/EEO-1%20Component%201%20FAQ.pdf (last visited Nov. 27, 2023) (stating that "[the data] may not be made public by
(continued….)

but by contrast, we will not use Form 395-B data for enforcement purposes.

21.        Some commenters assert that the Commission should rely on other data sources in lieu of Form 395-B.[77] Yet, section 334(a) of the Act states that "except as specifically provided in this section, the Commission shall not revise . . . the forms used by [television broadcast station] licensees and permittees to report pertinent employment data to the Commission."[78]  Pursuant to section 334 of the Act, we may change the form's provisions only "to make nonsubstantive technical or clerical revisions . . . as necessary to reflect changes in technology, terminology, or Commission organization."[79]  As we discuss further below, the alternative data sources suggested by commenters would both violate the section 334 prohibition on changes to the form and impede our general public interest goal of providing useful reports about employment in the broadcast sector.

22.        In particular, we continue to reject the proposal, initially made nearly two decades ago and dismissed by the Commission at that time as being inadequate, to rely on the EEOC's EEO-1 form in lieu of Form 395-B.[80]  We reaffirm the Commission's prior conclusion that the EEO-1 form is not an appropriate substitute for Form 395-B, as the two forms differ greatly in the data they collect.[81]  First, unlike the EEO-1, Form 395-B distinguishes between full and part-time employees, consistent with our other employment data collections, providing a more comprehensive picture of the broadcast industry workforce.  Second, and more importantly, reliance on the EEO-1 form would significantly reduce the amount of employment data available to the Commission as the vast majority of broadcast licensees do not file an EEO-1 form.  While the Form 395-B collection applies to *all* broadcast station employment units with five or more full-time employees, the submission of an EEO-1 form is required only for entities with 100 or more employees.  In 2004, in response to the same proposal to substitute the EEO-1 form for Form 395-B, the Commission calculated that the EEOC data "would not include 6,592 employment units (79%) out of a total of 8,395 units and would exclude 136,993 full-time employees (84%) out of the 163,868 full-time employees in broadcasting working at employment units employing five or more full-

---

the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 Component 1 data"); EEOC Data Collection, U.S. Equal Emp. Opportunity Comm'n at 6, https://eeocdata.org/ (last visited Nov. 27, 2023) (stating that "[EEOC] processes employer information data that are used by the EEOC to investigate charges of discrimination against private employers . . ." and that "[t]he data are used for a variety of purposes including enforcement, self-assessment by employers, and research").

[77] State Associations Reply at 8-10 (suggesting the use of employment information collected by the EEOC and the Radio Television Digital News Association (RTDNA)); NAB Comments at 23-24 (arguing that the Commission should use broadcasters' EEO-1 filings instead of requiring Form 395-B); CWC Comments at 6 (asking the Commission to explore the possibility of using data already collected on the EEO-1 form before deciding to reinstate Form 395-B).

[78] 47 U.S.C. § 334(a)(2).  Even NAB has noted that "Section 334(a) may bar the Commission from making major changes to its EEO forms . . . ."  NAB Comments at 18.

[79] 47 U.S.C. § 334(c).

[80] State Associations Reply at 9 (asking the Commission to utilize already existing EEO-1 aggregate data); NAB Comments at 23-24 (asking the Commission to let those broadcasters that are required to file form EEO-1 with the EEOC to submit that data to the Commission in lieu of Form 395-B); CWC Comments at 6 (asking the Commission to consider using publicly available aggregate EEO-1 data, and also suggesting that the EEOC and the Commission work together to produce a Special Report on Broadcasting).

[81]  In 2004, various commenters contended that Form 395-B is unnecessary because the Commission could obtain statistically relevant information from reviewing EEO-1 alone.  The Commission considered and rejected this argument in the *Third Report and Order and Fourth NPRM.  Third Report and Order and Fourth NPRM,* 19 FCC Rcd at 9977, para. 10 (rejecting the suggestion that the Commission rely on EEO-1 data and finding that the two forms differ in the data they collect and that the EEO-1 data would not provide the information specified by Congress in sections 334 and 634 of the Act).

time employees."[82]  Consequently, we determine that replacing Form 395-B either partly or wholly with the EEO-1 form does not constitute a permitted non-substantive modification of the form itself under section 334.  Nor would such a substitution meet our public interest goal of providing a comprehensive report of employment in the broadcast sector and comparing employment trends across our regulatees.  For the reasons provided above, we conclude that the EEO-1 form is an unsatisfactory replacement for Form 395-B.[83]

23.     Similarly, we find to be inapposite the suggestion to use the Radio Television Digital News Association (RTDNA) diversity survey as a substitute for the Form 395-B collection.[84]  As an initial matter, the RTDNA data pertains only to TV and radio newsrooms and not to the full spectrum of the broadcast industry workforce covered by Form 395-B.[85]  Moreover, the RTDNA survey ultimately is based on valid responses from those broadcasters that *choose* to participate in the survey, and, hence, the pool of participants is essentially a self-selected one.[86]  By contrast, *all* broadcast station employment units with five or more full-time employees must file the Form 395-B.  Consequently, substituting Form 395-B with the RTDNA survey would be inconsistent with the section 334 prohibition on changes and would provide a less complete view of the broadcast sector.

24.     Since we have determined that the benefits of making these reports public outweigh the speculative harm from doing so in light of the clear policy of the Commission about how they may and may not be used, we see no reason to afford them confidentiality.  We note, however, that there is a question whether they would in fact warrant confidential treatment under the Freedom of Information Act (FOIA) or whether the Commission could satisfy the requirements of the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA).  The *Further Notice* sought comment on the

---

[82] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9977, para. 10.  The Commission derived these calculations based on data collected from the Form 395-B filings submitted in 2000.  *Id.* at 9977, para. 10 n.34.  In 2004, when the Commission reinstated the Form 395-B, although it deferred recommencement of the form's collection, the Commission sought to reduce filing burdens by permitting broadcasters to file only one Form 395-B for all commonly-owned stations in the same market that share at least one employee.  *Id.* at 9977, para. 10.  We reaffirm this procedural practice.

[83] Given our determination above about the lack of substitutability between Form 395-B and the EEO-1 form, we find there is no benefit in using EEO-1 data or attempting to work with the EEOC to produce a "Special Report" in lieu of collecting information on the Form 395-B.  *See* CWC Comments at 6; NAB Comments at 23-24; State Associations Reply at 9.

[84] *See* State Associations Reply at 9-10.

[85] *See, e.g.*, RTDNA, *Local News Diversity Reaches Records, but Representation Gap Shrinks Slowly* (June 23, 2021), https://www.rtdna.org/news/local-news-diversity-reaches-records-but-representation-gap-shrinks-slowly (referring only to the employment makeup of broadcast television and radio newsrooms in the presentation of demographic data).

[86] *See id.* (explaining that the survey responses represent only 75.1% of all non-satellite television stations and 2,310 radio stations out of a random sample of 3,379 radio stations).

potential applicability of the CIPSEA[87] or the FOIA exemptions[88] to the Form 395-B data collection. As discussed below, the record and our own analysis demonstrate that CIPSEA is ill-suited for an agency such as the Commission. Similarly, the Form 395-B data does not fit neatly within FOIA Exemption 4, and in any event Exemption 4 does not prevent the Commission from disclosing information after an appropriate balancing of the interests. Accordingly, for the reasons discussed below, we find neither CIPSEA nor FOIA affords an appropriate basis to collect Form 395-B information in a confidential manner.

### 1.    CIPSEA is Ill-Suited to the Commission's Collection of the Form 395-B Data

25.    The Commission sought comment on CIPSEA in 2004 and again in 2021, in particular, seeking to explore whether the confidentiality afforded by CIPSEA to government-collected data could apply to the Form 395-B data.[89] Commenters responding in 2004 disagreed regarding CIPSEA's applicability.[90] When the Commission initially sought comment in 2004, the statute was barely two years old and relatively untested.[91] Given the passage of time and the desire to obtain as complete a record as possible, the Commission sought comment anew on CIPSEA in 2021. The *Further Notice* sought input regarding the potential avenues under CIPSEA to collect and maintain data on a confidential basis.[92] The

---

[87] *See* E-Government Act of 2002, Pub. L. No. 107-347, §§ 501-504, 116 Stat. 2899, Title V (2002). OMB is responsible for the implementation of CIPSEA, which seeks to harmonize the confidentiality processes across federal agencies that collect data for statistical purposes. OMB has issued detailed guidance that must be followed when invoking CIPSEA. *See* OMB, Implementation Guidance for Title V of the E-Government Act, Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA), Notice of Decision, 72 Fed. Reg. at 33362 (June 15, 2007) (OMB 2007 Guidance) (noting that CIPSEA "establish[es] a uniform policy for all Federal statistical collections . . . reduc[ing] public confusion, uncertainty, and concern about the treatment of confidential statistical information by different Federal agencies"). In 2018, Congress reauthorized CIPSEA under the Foundations for Evidence-Based Policymaking Act, enhancing security requirements for statistical agencies tasked with sharing data with other agencies or publicly disclosing certain data assets. *See* Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435, §§ 301-303, 132 Stat. 5529, 5544-5556, Title III (2019). In August 2023, OMB issued a notice of proposed rulemaking for new regulations that would provide further direction to statistical agencies and units, as well as to their parent agencies "to enable, support, and facilitate statistical agencies and units in carrying out four fundamental responsibilities . . . ." OMB has yet to adopt finalized rules pursuant to this proceeding. *See* OMB, Fundamental Responsibilities of Recognized Statistical Agencies and Units, Notice of Proposed Rulemaking, 88 Fed. Reg. 56708 (Aug. 18, 2023).

[88] *See* 5 U.S.C. § 552(b)(4) (providing that the disclosure requirements of FOIA do not apply to "trade secrets and commercial or financial information obtained from a person and privileged or confidential").

[89] *See Further Notice*, 36 FCC Rcd at 12065, para. 21; *see also Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 14-17.

[90] Broadcasters argued that CIPSEA authorizes the Commission to collect Form 395-B filings on a confidential basis and that doing so would be good public policy. NAB 2004 Comments at 2-11; State Associations 2004 Comments at 11-13; Virginia Association of Broadcasters 2004 Reply at 2-5. On the other hand, NOW et al. contended that neither CIPSEA nor the Communications Act permits the use of CIPSEA for Form 395-B filings. They argued further that confidential treatment would not serve CIPSEA's purpose of promoting public confidence in an agency's pledge of confidentiality, given that the Commission never made such a pledge with respect to Form 395-B, nor would it serve important policy objectives, such as ensuring the accuracy of Form 395-B data. NOW et al. 2004 Comments at 3-11; *but see* NAB 2004 Reply at 1-3 (arguing that nothing in CIPSEA "would preclude a federal agency from updating its policies to invoke the statute and grant confidentiality to information that it previously disclosed to the public").

[91] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 14-17.

[92] *Further Notice*, 36 FCC Rcd at 12065, para. 21 (seeking comment on the application of CIPSEA, including whether the Commission or one of its subordinate offices or bureaus could qualify as a federal "statistical agency or unit"; whether the agency could avail itself of CIPSEA's provision as a non-statistical agency; or whether it could coordinate with another entity for collection of data).

two comments in 2021 addressing CIPSEA provide insufficient discussion or analysis.[93] As discussed further below, we find that CIPSEA is not an appropriate fit for the Commission's Form 395-B data collection.

26. NAB suggests that the Commission could utilize any one of CIPSEA's three approaches for confidential collection and retention of the Form 395-B data: (1) have the Commission's Office of Economics and Analytics (OEA) seek recognition as a "Federal statistical agency or unit"[94] pursuant to CIPSEA and have OEA alone collect and analyze the Form 395-B data, which would then be released in conformance with the CIPSEA confidentiality protections; (2) have the Commission collect this data independently as a "nonstatistical agency" or "unit;" or (3) as a nonstatistical agency or unit, enter into an agreement with an already recognized "Federal statistical agency or unit" and have that agency collect the data on behalf of the Commission.[95] While NAB asserts that these approaches are "reasonable mechanism[s]" for safeguarding Form 395-B data,[96] it does not specify how its proposals could be satisfied under the requirements established in OMB's 2007 Guidance.[97] For example, NAB does not discuss how the Commission, or even a subpart of the Commission, could qualify as a "statistical agency or unit" given that OMB accords that designation only when the *predominant* activities of the agency or unit are the use of information for statistical purposes.[98] The Commission plainly does not fit that description. Furthermore, NAB does not address the costs and burdens involved with applying for and obtaining from OMB the designation needed for CIPSEA protection. Nor does it address the cost and burdens associated with adherence to CIPSEA and whether the benefit of retaining the Form 395-B data in conformance with CIPSEA outweighs these costs and burdens. Below, we address these points.

27. Contrary to NAB's suggestion, our detailed review of CIPSEA, OMB's 2007 Guidance, and examples of other agencies that have obtained designation as a "statistical agency or unit" demonstrates that neither the Commission nor OEA would qualify for such a designation. An agency, or agency unit, seeking such a designation must demonstrate to the OMB Chief Statistician that its activities are "*predominantly* the collection, compilation, processing, or analysis of information for statistical purposes."[99] Although OEA conducts significant data analyses,[100] its activities do not meet the "predominantly" standard laid out by OMB.[101] Rather, OEA's regular work also includes administrative,

---

[93] *See* State Associations Reply at 16 (providing two sentences on how this complex and still relatively new statutory construct could apply); NAB Comments at 19-22 (repeating the three CIPSEA options laid out in the *Further Notice* and stating that each might be possible without analyzing how these approaches might work in practice).

[94] *See* OMB 2007 Guidance, 72 FR at 33364. OMB defines statistical purpose as "the description, estimation, or analysis of the characteristics of groups, without identifying the individuals or organizations that comprise such groups," and nonstatistical purpose to include "any administrative, regulatory, law enforcement, adjudicatory, or other purpose that affects the rights, privileges, or benefits of a particular respondent." *Id.*

[95] NAB Comments at 19-22.

[96] NAB Reply at 7.

[97] *See* OMB 2007 Guidance, 72 FR 33362-77.

[98] *Id.* at 33364, 33368. In their 2004 comments, NAB and the State Associations focus on the statistical nature and purpose of Form 395-B data, without addressing the issue of whether the Commission, or its sub-part, could qualify as a statistical agency or unit. NAB 2004 Comments at 3-7; State Associations 2004 Comments at 11-12; *see also* State Associations 2004 Reply at 5-7.

[99] OMB 2007 Guidance, 72 FR at 33374 (emphasis added).

[100] NAB Comments at 21.

[101] OMB 2007 Guidance, 72 FR at 33364-65; *see also* 44 U.S.C. § 3572(e) (providing that "A statistical agency or unit may designate agents, by contract or by entering into a special agreement containing the provisions required under section 3561(2) for treatment as an agent under that section, who may perform exclusively statistical activities, subject to the limitations and penalties described in this subchapter.").

regulatory, and adjudicative functions, as well as the administration of the Commission's various spectrum auctions.[102]  For these reasons, we determine OEA could not satisfy the requirements for "statistical agencies or units" and, therefore, this approach is not a viable option.

28.     NAB next suggests that the Commission could collect the Form 395-B data as a "nonstatistical agency" pursuant to CIPSEA,[103] provided it complied with CIPSEA's restriction preventing nonstatistical agencies from using "agents," including contractors, to collect or use the protected information, and if it ensured that only internal agency staff had access to the protected information.[104]  NAB identifies no agency that has successfully invoked this provision of CIPSEA in the more than 20 years since the passage of the act.  Nor have we been able to identify one.  As discussed in the *Further Notice*, the Commission relies extensively on information technology (IT) contractors to develop and maintain electronic filing systems, assist filers with questions, and compile reports and other information based on data in Commission forms.[105]  Moreover, the Commission currently relies on multiple IT contracts to maintain and operate its systems.  Therefore, it would be extremely complex and burdensome from an administrative perspective to bring functions in-house solely for one form.  For these reasons, we find that collecting Form 395-B data as a nonstatistical agency under CIPSEA is not a viable option.

29.     We similarly find that the final approach under CIPSEA, namely that the Commission, acting as a "nonstatistical agency," partner with a "statistical agency," which would collect the Form 395-B data on the Commission's behalf, is not a realistic—or even workable—one.  Our detailed review of CIPSEA and OMB's 2007 Guidance shows that this is a complex process involving various logistical steps, as well as significant additional burdens and costs.  Partnering with a "statistical agency" involves identifying a possible partner agency, engaging in negotiations with that agency to establish an agreement for the collection of the data, negotiating and drafting an agreement stipulating the terms associated with collection, processing, and sharing of the Form 395-B data.[106]  Any such agreement would have to

---

[102] *See, e.g.,* 47 CFR §§ 0.21 (a), (b) (the functions of OEA include identifying and evaluating significant communications policy issues, based on the principles and methods of economics and data analysis; and collaborating with and advising other Bureaus and Offices in the areas of economic and data analysis and with respect to the analysis of benefits, costs, and regulatory impacts of Commission policies, rules and policies).

[103] NAB Comments at 21-22.

[104] OMB 2007 Guidance, 72 FR at 33365.  CIPSEA defines "agents" as "contractors and their employees, researchers, and employees of private organizations or institutions of higher learning who have a contract or agreement with the Federal agency."  *Id.*

[105] *Further Notice*, 36 FCC Rcd at 12065, para. 21.  The Commission has outsourced these tasks for decades consistent with a broader federal government initiative to ensure that those jobs that can be conducted in a more economically efficient manner by the private sector through competitive bidding be outsourced.  *See* OMB, OMB Circular No. A-76 Revised, Performance of Commercial Activities (2003), available at https://obamawhitehouse.archives.gov/omb/circulars_a076_a76_incl_tech_correction/ (stating that "The longstanding policy of the federal government has been to rely on the private sector for needed commercial services. To ensure that the American people receive maximum value for their tax dollars, commercial activities should be subject to the forces of competition."); *see also* OMB, Frequently Asked Questions, OMB Circular A-76 https://oma.od nih.gov/forms/A76-fair/Documents/A-76%20FAQ.pdf (last visited Nov. 27, 2023) (noting that the federal government can save billions of dollars by distinguishing between "commercial" and "government" services and allowing competitive bids for "commercial" services).

[106] Under a nonstatistical agency designation, before the Commission may invoke a pledge of confidentiality through another federal statistical agency, the Commission and the willing partnering agency would be required to draft a detailed collection agreement, which would stipulate each party's compliance responsibilities, agent designations, and other security requirements and training certifications, among other things.  OMB 2007 Guidance, 72 FR 33375 § VI.  OMB's 2007 Guidance states further that the nonstatistical agency seeking a partnership with a federal statistical agency should be prepared to provide to the statistical agency with the resources necessary to carry out these responsibilities.  *Id.*

comport with OMB's requirements and might also necessitate OMB review. The Commission would have to compensate any such partner agency for the costs of collecting and storing the data, educate the partner agency about the broadcast sector, and ensure that the information is collected in an appropriate manner. Under this approach, the Commission also would have to designate specific staff who would have permission to access the data and potentially restrict access to just those individuals. Moreover, broadcasters would have the additional burden of familiarizing themselves with a different agency's document filing system. As OMB has not yet issued guidance on such a partnership approach, however, the potential logistical problems going forward are not even fully known. In addition, pursuing the approach of partnering with a "statistical agency" would lead to further delay in reinstituting this collection, which has already lagged for far too long, while also unduly increasing the complexity and cost of the collection. Going forward, such an approach would lend complexity to the process and potentially hamper the Commission's ability to review, analyze, and report on the underlying data on an ongoing basis. Consequently, we conclude that the significant time, complexity, and cost associated with formulating a partnership with a statistical agency outweigh any speculative harm that might arise from public availability of this data.[107]

> **2.    Even if FOIA Exemption 4 Applies, the Strong Public Interest in Disclosure Outweighs Any Private Interest In Confidential Treatment**

30.    The *Further Notice* sought comment on whether any Freedom of Information Act (FOIA) exemptions might apply to our collection of Form 395-B data.[108] Both the Center for Workplace Compliance (CWC) and NAB assert that Form 395-B data reported by broadcasters should not be publicly disclosed because doing so would reveal trade secrets and commercial information to competitors.[109] While FOIA Exemption 4 protects trade secrets and confidential commercial information from mandatory public disclosure by the Commission, its applicability to the information collected on Form 395-B is questionable. Further, even if we were to find FOIA Exemption 4 applicable, the Commission is not compelled to keep data covered by Exemption 4 confidential. The Commission has authority to make records that fall within Exemption 4 public if it determines that the public interest in disclosure outweighs the private interests in preserving the data's confidentiality.[110]

31.    FOIA Exemption 4 protects from mandatory disclosure information that is "obtained from a person," as we recognize would be the case here, and that is both (1) "commercial or financial" in character and (2) "privileged or confidential."[111] In their comments, CWC and NAB assert that Form

---

[107] Given our decision, we need not reach the argument by NOW et al. that section 334 prohibits confidential treatment of Form 395-B filings because, they allege, concealing the identity of the filing party would constitute a substantive revision of the form under the statute. NOW et al. 2004 Comments at 9-10; NOW et al. 2004 Reply at 2-3. *But see* NAB 2004 Comments at 7-8 (arguing that confidential treatment of the filings would not require any change to the forms and "would be nothing more than a 'nonsubstantive technical' revision of the procedure for collecting the reports"); NAB 2004 Reply at 8-9; State Associations 2004 Reply at 7-8.

[108] *Further Notice*, 36 FCC Rcd at 12065-66, para. 22.

[109] CWC Comments at 8. NAB in its Reply reiterates CWC's position. NAB Reply at 5-6.

[110] *See Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations*, 30 FCC Rcd 10360, 10365-67, paras. 13, 15 (2015) (*Charter Order*); *see also* 47 CFR § 0.461(f)(4) ("If it is determined that the Commission has authority to withhold [records requested under the FOIA] from public inspection, the considerations favoring disclosure and non-disclosure will be weighed in light of the facts presented, and the Commission may, at its discretion, grant the request in full or in part, or deny the request."); *FCC v. Schreiber*, 381 U.S. 279, 291-92 (holding that a disclosure authorized by the Commission after balancing the public and private interests under section 4(j) of the Communications Act, 47 U.S.C. § 154(j), is "authorized by law" within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905).

[111] *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019). FOIA Exemption 4 also protects "trade secrets" from mandatory disclosure. 5 U.S.C. § 552(b)(4). Courts have defined a "trade secret" as "a secret,

(continued….)

395-B demographic data are "commercial information."[112]  The case law, however, is not definitive on this question.  Courts have sometimes defined commercial information broadly to include information submitted to an agency in which the submitter has a commercial interest,[113] or to encompass information that has intrinsic commercial value, the disclosure of which would jeopardize a submitter's commercial interests or ongoing operations.[114]  Those definitions might arguably apply to the demographic information of employees.  However, in a recent case very closely on point, *Center for Investigative Reporting v. U.S. Department of Labor* (*Center for Investigative Reporting*), the U.S. District Court for the Northern District of California held that the federal government failed to prove that EEO-1 Consolidated Report (Type 2) employee demographic data were "commercial."[115]  Similar to Form 395-B data, the EEO-1 Type 2 Reports do not include "salary information, sales figures, departmental staffing levels, or other identifying information."[116]  Although the Type 2 Reports "require companies [that do business at two or more physical addresses] to report the total number of employees across all their establishments," whereas the Form 395-B breaks down this information by station employment units, neither form links job categories to specific departments; rather, both require information aggregated by type of job across all departments.  Furthermore, the EEO-1 reports utilize the same job title, gender, and ethnicity categories as the information to be provided in Form 395-B.  Given these similarities between the EEO-1 reports and information to be provided in Form 395-B, *Center for Investigative Reporting* suggests that the Form 395-B data is at least arguably not correctly considered to involve commercial information.

32.     It is likewise not entirely clear whether the data at issue here would be properly considered "privileged or confidential."  Information is confidential within the meaning of Exemption 4

---

commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983); *accord Herrick v. Garvey*, 298 F.3d 1184, 1190 (10th Cir. 2002).  No commenter has explained how the data at issue here could meet that definition, and we conclude that they do not.  Facially, employee demographic information is not a "trade secret" because such employment information does not directly relate to the production and processing of a trade "commodity."  Black's Law Dictionary defines a "commodity" as "[a]n article of trade or commerce."  *Commodity*, Black's Law Dictionary (11th ed. 2019) (stating that the term "embraces only tangible goods, such as products or merchandise, as distinguished from services").  We are not aware of any instance in which the Commission has characterized broadcast programming as a commodity.  And even if radio broadcasting were a commodity, the demographic information of those who produce it is not "used" in its preparation.

[112] CWC Comments at 8; NAB Reply at 5-6.

[113] *See Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  *See also San Juan Citizens All. v. United States Dep't of Interior*, 70 F. Supp. 3d 1214, 1219 (D. Colo. 2014) (adopting the D.C. Circuit's "commercial interest" standard).

[114] *See New York Pub. Interest Research Grp. v. U.S. E.P.A.*, 249 F. Supp. 2d 327, 334 (S.D.N.Y. 2003).  *See also FlightSafety Servs. Corp. v. U.S. Dep't of Labor*, No. CIV.A. 300CV1285P, 2002 WL 368522, at 5 (N.D. Tex. Mar. 5, 2002), *aff'd sub nom. Flightsafety Servs. Corp. v. Dep't of Labor*, 326 F.3d 607, 612 (5th Cir. 2003) (finding, *inter alia*, that raw salary data submitted to the Bureau of Labor Statistics qualified as commercial information).  *But see Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*, 58 F.4th 1255, 1262-69 (D.C. Cir. 2023) (holding that identities of suppliers under government contracts were not commercial information because the information was not commercial in and of itself, regardless of whether its disclosure might have commercial or financial repercussions).

[115] *See Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 776-779 (N.D. Cal. 2019) (holding that information contained in federal contractors' employment diversity [EEO] reports requested from the Department of Labor under FOIA was not "commercial," and thus did not fall under Exemption 4, and further questioning whether the information was "confidential"), *app. dismissed sub nom. Evans v. Synopsys, Inc.*, 34 F.4th 762 (9th Cir. 2022).

[116] *See id.* at 777.

"whenever it is customarily kept private, or at least closely held, by the person imparting it."[117]  What matters is "how [a] particular party customarily treats the information, not how the industry as a whole treats [it]."[118]  Here, CWC acknowledges that "many employers choose to publicly disclose workforce demographic data" in "a variety of forms."[119]  And although CWC distinguishes between Form 395-B data and the EEO-1 data that companies often elect to disclose, we see similarities between the two data sets, as discussed above.

33.      In addition, as discussed further below, we note that commenters have failed to show that competitive harm would result from the collection and public release of the information provided in Form 395-B.  While the Supreme Court held in *Food Marketing Institute* that a showing of competitive harm is not required to protect information from disclosure under Exemption 4, some courts have since declined to allow agencies to withhold information covered by Exemption 4 without showing an articulable harm from disclosure.[120]  These decisions rest on the theory that under the FOIA Improvement Act of 2016— which did not apply to the *Food Marketing Institute* case because it had not yet become effective at the time that case was filed—agencies must produce information otherwise covered by a FOIA exemption unless it is reasonably foreseeable that disclosure would harm an interest protected by the exemption (or disclosure is prohibited by law).[121]  However, the FOIA Improvement Act has alternatively been interpreted in the Exemption 4 context to require no demonstration of harm beyond the loss of confidentiality itself, and therefore the relevance of competitive harm to the Exemption 4 analysis remains an unsettled issue.[122]

34.      Ultimately, however, we need not decide whether Exemption 4 covers the information collected on Form 395-B or assess the relevance of the FOIA Improvement Act.  The Commission has well-established authority under section 4(j) of the Act[123] to publicly disclose even trade secrets or confidential business information if, after balancing the public and private interests at stake, we determine that it is in the public interest to do so.[124]

---

[117] *Argus Leader*, 139 S. Ct. at 2362.  No party argues here that the information on Form 395-B is privileged.

[118] *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001).

[119] CWC Comments at 9.

[120] *See, e.g., Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 235, 241-42 (2d Cir. 2022).  At least one court has rejected that theory, however.  *Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019).

[121] 5 U.S.C. § 552(a)(8)(A)(I); *see Seife*, 43 F.4th at 241-42 ("[T]he interests protected by Exemption 4 are the submitter's commercial or financial interests in information that is of a type held in confidence and not disclosed to any member of the public by the person to whom it belongs.  An agency in a FOIA case can therefore meet the foreseeable harm requirement of the [FOIA Improvement Act] by showing foreseeable commercial or financial harm to the submitter upon release of the contested information."); *see also Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.,* 436 F. Supp. 3d 90, 113 (D.D.C. 2019) (opining that the foreseeable harm requirement applies to Exemption 4 after *Food Marketing Institute,* and that, in order to withhold information covered by the exemption, agencies must explain how disclosure would harm an interest protected by the exemption); *Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, 424 F. Supp. 3d at 780 (acknowledging and engaging in a foreseeable harm analysis under Exemption 4).

[122] *See Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019) (rejecting the argument that the FOIA Improvement Act, in effect, reinstates the competitive harm test the Court overruled in *Food Marketing Institute*).

[123] 47 U.S.C. § 154(j) ("The Commission may conduct its proceedings in such a manner as will best conduce to the proper dispatch of business and to the ends of justice.").

[124] *See Schreiber*, 381 U.S. at 291-92 (holding that a disclosure authorized by the Commission after balancing the public and private interests under section 4(j) of the Communications Act is "authorized by law" within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905); *American Broadband & Telecommunications Company Jeffrey S.*

(continued….)

35.     In assessing the respective interests in the disclosure or non-disclosure of Form 395-B data, we determine that the public interest in disclosing Form 395-B data outweighs broadcasters' claims that such disclosure might cause unspecified harm.  As outlined above, there are significant public interest benefits from public disclosure of Form 395-B data.[125]  Public disclosure of Form 395-B data promotes a more accurate collection and recordation process.  It increases the likelihood that incomplete or inaccurate filings will be discovered and corrected, and it will incentivize stations to file accurate data to avoid third-party claims that submitted data are incorrect.  It is also consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public.[126]  Public disclosure also allows us to produce the most granular reports possible for the benefit of Congress and the public, without being unnecessarily hampered by concerns about inadvertent disclosures of identifiable information.  And public disclosure allows others to review the accuracy of our data analyses and to question our methods for data collection with the benefit of actual datasets.

36.     In contrast to these significant public benefits, CWC and NAB have failed to demonstrate that availability of the Form 395-B data would cause meaningful competitive harm.  For example, CWC asserts that if Form 395-B data were disclosed, a broadcaster's competitors could exploit such information to gain competitive insights into the broadcaster's business practices.[127]  Nothing in the record, however, realistically demonstrates how the public release of Form 395-B data might afford a competitor tangible insights into another broadcaster's business practices that would lead to competitive harm.  CWC and NAB have not provided any actual instances of harm related to the Commission's previous collection and public disclosure of demographic data, but rather largely project a speculative, worst-case scenario.  CWC posits that competitors would be able to draw more detailed insights by comparing published data over a stretch of years; however, we fail to understand how any such result would have a negative commercial impact on broadcasters.[128]  Further, guided in part by the court's

---

*Ansted, Order on Reconsideration*, 35 FCC Rcd 3762, 3764, para. 6 (2020); *Charter Order*, 30 FCC Rcd at 10365-67, paras. 13, 15; *Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission*, GC Docket No. 96-55, Notice of Inquiry and Notice of Proposed Rulemaking, 11 FCC Rcd 12406, 12414-15, para. 15 (1996).

[125] *See supra* paras. 15-16.

[126] *See* Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435, §§ 201-202, 132 Stat. 5529, 5534-44, Title II (2019); 44 U.S.C. § 3501(2), (4) (setting forth the goals to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society").

[127] CWC Comments at 9.

[128] Moreover, the fact that a number of broadcasters have begun to disclose workforce demographic data, albeit not at the level of detail as would be reported on Form 395-B, also calls into question the extent of the competitive harm that would result if that information were to be publicly released.  In this regard, we note the growing availability online of workforce demographic information related to media and broadcast employees.  *See, e.g.,* Hearst 2023 RISE Report, https://www.hearst.com/documents/33329/890300/2023+Hearst+RISE+DE%26I+Overview.pdf/14d1c825-8209-867d-f9dd-10d527d189a6?t=1679517544494 (providing ethnicity and gender percentages); *see also* Tegna 2022 Diversity, Equity & Inclusion Annual Report, https://www.tegna.com/social-responsibility/ (providing ethnicity and gender percentages); Nexstar Media Group, HR Management; Workforce Diversity, Equity, and Inclusion, https://www.nexstar.tv/corporate-social-responsibility/human-resource-management/ (providing ethnicity and gender percentages, in addition to EEO-1 data for separate stations); Gray Television 2022 ESG Report, https://www.responsibilityreports.com/HostedData/ResponsibilityReports/PDF/NYSE_GTN_2022.pdf (providing ethnicity and gender percentages); Sinclair Broadcast Group 2022 ESG Report, https://d2ghdaxqb194v2.cloudfront.net/2732/190259.pdf (providing ethnicity and gender percentages); Cumulus Media 2022 Sustainability Report, https://www.cumulusmedia.com/wp-content/uploads/2022/12/2022-Cumulus-Sustainability-Report.pdf (providing ethnicity and gender percentages).  The varying approaches of broadcasters about whether to, and how to, release employee demographic information on a voluntary basis at least indicates a lack of agreement among broadcasters with respect to their treatment of such information, as well as a lack of consensus on whether they

(continued….)

analysis in *Center for Investigative Reporting*, we remain unconvinced that knowing the number of employees assigned to a particular job title or category in a company without knowing other details—for example, the duties of the employees, the structure of the company, salary information—can provide any significant information to a competitor that results in reasonably foreseeable or substantial competitive harm.[129]

37. We conclude that the public benefits of releasing the information contained in Form 395-B are significant, while the harms would be slight. Thus, balancing the public interests in disclosure against the private interests at stake here, we find that there are strong public interests in favor of disclosure and that, accordingly, section 4(j) authorizes the Commission to publicly disclose Form 395-B data.

38. *Timing of Form Submission*. As directed by section 73.3612 of the Commission's rules, broadcasters will be required to file Form 395-B annually on or before September 30 of each year, after the Order becomes effective.[130] The Commission established the September 30 deadline to align with the deadline for EEO-1 filings to enable licensees and permittees that also file similar data with the EEOC to conserve resources by using the same pay period record information for both filings.[131] Broadcasters may report employment figures from any payroll period in July, August, or September of the relevant year, but that same payroll period must be used in each subsequent year's report by the licensee. Consistent with previous practice, the Form 395-B will be due on or before September 30 of each calendar year. To provide broadcasters adequate notice regarding the details of the electronic filing process, the Media Bureau will issue a Public Notice with instructions about how to submit the filings, prior to the first filing after the Order becomes effective. This Public Notice will provide broadcasters ample time to put into place whatever data collection processes they require, including, for example, the development of employee surveys and instructions for employees regarding which job classification to report. It also will afford the Commission time to create and test an electronic version of Form 395-B.

39. *Identification of Non-Binary Gender Categories*. Finally, in reinstating the collection of Form 395-B, some commenters urge us to incorporate into the form a mechanism that will enable identification of non-binary gender categories.[132] While the EEOC has incorporated a comment box on the EEO-1 form allowing for submission of gender non-binary information, both the EEOC and the Commission traditionally track the definitions and standards on race ethnicity and gender set forth by

---

would suffer any significant competitive harm from the public knowing this information. In addition, the increasing public availability of employee demographic information may cast doubt on whether it can be considered "confidential" under Exemption 4. *See supra* paras. 32-33.

[129] In *Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, the federal district court emphasized that an EEO-1 form for government contractors "does not ask submitting companies to explain how resources are allocated across a company's 'segments.'" *Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, 424 F.Supp.3d at 777. "Rather, the report is organized by job category, such as 'Professionals,' 'Sales Workers,' 'Operatives,' 'Craft Workers,' 'Laborers and Helpers,' etc.," and "does not request demographic information by division, department, or 'segment.'" *Id.* As noted by various commenters in the instant proceeding, Form 395-B uses the same reporting methodology in terms of job categories as the EEO-1. The grid sections of the two forms, where respondents are instructed to enter their workforce data, are identical in that respect, as both forms follow OMB-issued standards on reporting.

[130] 47 CFR § 73.3612. Authority is delegated to the Media Bureau to announce and provide filing instructions before the first window opens. *See* 47 CFR § 0.283.

[131] *1998 Biennial Regulatory Review – Amendment of Sections 73.3612 and 76.77 of the Commission's Rules Concerning Filing Dates for the Commission's Equal Employment Opportunity Annual Employment Reports*, Memorandum Opinion and Order, 13 FCC Rcd 6973, para. 5 (1998) (*1998 Biennial Review Order*) (agreeing with broadcasters that the annual filing deadline should be moved from May to September to avoid unnecessary duplication of efforts).

[132] Foster Garvey Coalition Comments at 3-4; NAB Reply at 7.

OMB and used widely by the federal government.[133]  To date, OMB has not prescribed conclusive classifications to capture non-binary gender data.  Federal guidance, however, recognizes the "need to be flexible and adapt over time" in developing measures to collect such data.[134]  Consistent with that guidance and our record, we believe it is appropriate that the Form 395-B include a mechanism to provide further specificity about broadcaster employees' gender identities.

40.     We find that such an update fits within the latitude granted to the Commission pursuant to section 334(c) of the Act to revise the forms "to reflect changes in . . . terminology."[135]  We also find that the *Further Notice* provided sufficient public notice and opportunity for comment to allow us to incorporate this change to the form.  The *Further Notice* encouraged commenters "to provide any new, innovative, and different suggestions for collecting and handling employment information on Form 395-B" and asked if there were "any other issues or developments that [the Commission] should consider."[136]  We conclude that the suggestion to include within the Form 395-B a mechanism to account for those who identify as gender non-binary is a logical outgrowth from the *Further Notice's* requests for comment.  Accordingly, and after receiving only support for and no opposition to the idea, we will include such a mechanism in the reinstituted Form 395-B.[137]  We delegate to the Media Bureau the authority to implement this change to the Form.

### B.     Constitutional Issues

41.     Reinstatement of the Form 395-B data collection in a publicly available manner is wholly consistent with the equal protection guarantee contained in the Fifth Amendment of the Constitution.[138]  As discussed below, collection of workforce data from broadcast licensees on Form 395-B is race- and gender-neutral, and no race- or gender-based government action flows from collection of the data or its public availability.  Accordingly, collection and publication of Form 395-B data need only be rationally related to a legitimate governmental interest to pass constitutional muster.  Since the Commission has a legitimate public interest in collecting Form 395-B data and doing so on a transparent basis is rationally related to this interest, reinstatement of Form 395-B as we propose is constitutionally permissible.  Finally, we find that the limitations the Commission has placed on its own use of the data obviate the concerns raised in the record about the potential for undue pressure being placed on, or "raised eyebrow" regulation of, broadcasters.

42.     As the court in *Lutheran Church* acknowledged, the Constitution's equal protection

---

[133] *See* OMB, Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58,782 (Oct. 30, 1997) (stating in Background that "For more than 20 years, the current standards in OMB's Statistical Policy Directive No. 15 have provided a common language to promote uniformity and comparability for data on race and ethnicity for the population groups specified in the Directive.").

[134] *Recommendations on the Best Practices for the Collection of Sexual Orientation and Gender Identity Data on Federal Statistical Surveys*, Office of the Chief Statistician of the United States, https://www.whitehouse.gov/wp-content/uploads/2023/01/SOGI-Best-Practices.pdf (last visited Nov. 14, 2023).

[135] 47 U.S.C. § 334(c).  We note that the addition of the "gender non-binary" category is a "non-substantive technical or clerical revision" as required by section 334(c).  The change is consistent with section 334(c) because it provides an option for employees to identify as non-binary, if they so choose, but does not impose any new requirement on stations that did not exist under the prior version of Form 395-B, which already required reporting on gender.

[136] *Further Notice*, 36 FCC Rcd at 12061, 12066, paras. 12, 23.

[137] NAB Reply at 7 (supporting an update to the form to enable the reporting of non-binary options and observing that "[s]uch a change would be consistent with steps by other federal agencies and serve the public interest in accurate data").

[138] U.S. Const. amend. V.

guarantee is not implicated if the regulation at issue is neutral with respect to protected categories.[139]  This standard is satisfied here, because both on its face and in application, the collection of workforce data from broadcast licensees on Form 395-B is race- and gender-neutral.  Regardless of the demographic makeup of a particular broadcast station employment unit, all units with five or more full-time employees are required to file their workforce data with the Commission.  At no point does the Commission use race and gender categories to direct units on whether they must file the form; the number of employees within a given unit is the sole criterion.  Further reflecting the neutrality of the application of the form, all units required to file with the Commission use an identical Form 395-B to report their respective demographic and job category data.  By using employment size as the exclusive factor to direct units to file broadcast workforce data, the completion of the form in this regard is a neutral activity, "devoid of ultimate preferences" for hiring on the basis of race or gender.[140]

43.     Furthermore, there is no race- or gender-based government action that flows from collection of the data or its public availability.  Unlike the collection of this data 20 years ago, there is no connection between the Form 395-B collection at issue here and the EEO program requirements applicable to broadcasters.  The court's finding in *Lutheran Church* that the Commission's rules impermissibly pressured broadcasters to engage in race-conscious hiring decisions stemmed from the set of criteria that the Commission had created in 1980 to determine whether its review of a station's license renewal application should include a closer examination of the station's EEO program.[141]  Under those 1980 screening guidelines, the Commission would review the adequacy of a station's EEO program if minorities and/or women employed by the station were underrepresented as compared to the available workforce.[142]  That requirement to compare the racial composition of a station's workforce with that of the local population, and not the requirement to report employment data that we reinstate today, was the trigger for the court's strict scrutiny in that case.[143]

44.     While the Commission revised the EEO program requirements after the *Lutheran Church* ruling, the *use* of race, ethnicity, and gender information (albeit not Form 395-B data) was still linked to the Commission's EEO program.  The new EEO program allowed stations to choose between two options for their recruiting programs.[144]  In *MD/DC/DE Broadcasters*, the D.C. Circuit struck down the Commission's revised, two-option EEO program because it found that broadcasters proceeding under

---

[139] For example, in the context of employee recruitment, the *Lutheran Church* court stated, "[i]f the regulations merely required stations to implement racially neutral recruiting and hiring programs, the equal protection guarantee would not be implicated."  *See Lutheran Church*, 141 F.3d at 351.

[140] *See, e.g., Sussman v. Tanoue*, 39 F.Supp.2d 13, 27 (D.D.C. 1999) (holding that an FDIC workforce data collection that was part of a greater EEO program, including outreach, recruitment, and self-evaluation components, was constitutional and not deserving of strict scrutiny analysis, because it "falls within the category of programs, those conscious of race but devoid of ultimate preferences . . ."); *see also Lutheran Church*, 141 F.3d at 351 ("[]neither the Supreme Court nor any other court has ever applied strict scrutiny to programs that require nothing more than recruitment, outreach, self-evaluation, and data collection").  As noted below, what triggered strict scrutiny in the *Lutheran Church* case was the comparison of the racial composition of the station's workforce with that of the local population and, where "underrepresentation" of minorities or women was found, requiring broadcasters to take appropriate action where necessary.  *Lutheran Church*, 141 F.3d at 351-52.

[141] *See Lutheran Church*, 141 F.3d at 351-53.

[142] *See id.* at 352-53.  Specifically, stations with five to ten full-time employees would have their EEO program reviewed if minority groups and/or women were not employed on their full-time staffs at a ratio of 50% of their workforce availability overall and 25% in the upper-four Form 395 job categories.  *Id.* at 353.  The same was true for stations with 11 to 49 full-time employees, except that a 50% ratio was required for the upper-four Form 395 job categories.  *Id.*  Stations with fewer than five full-time employees were not required to record EEO programs, and the Commission reviewed the EEO program of all stations with 50 or more full-time employees.  *Id.*

[143] *Id.* at 351-54; *but see* NAB Comments at 11-12 (attempting to link the Form 395-B filing requirement with the court's decision in *Lutheran Church*).

[144] *First Report and Order*, 15 FCC Rcd at 2363-79, paras. 76-122.

Option B of the program were pressured to engage in race-conscious recruiting practices, given that Option B required annual reporting of race, ethnicity, and gender information for each job applicant.[145] The court found that such pressure would lead to outreach programs targeted at minority groups, to the potential disadvantage of non-minority groups, and thus constituted a racial classification that triggered strict scrutiny.[146] Following the court's decision, the Commission suspended both its EEO outreach requirements and its Form 395-B filing requirement.[147]

45. When the Commission later adopted new EEO program requirements, it deferred action on requiring the collection of workforce data, and the Form 395-B data collection has been on hold ever since.[148] Thus, these EEO program requirements have existed independently of Form 395-B for the past 20 years.[149] That the Commission's EEO program continued to operate even as the Form 395-B collection was held in abeyance highlights the separation of these two requirements. And we reiterate that going forward, these two requirements—the filing of annual workforce data and compliance with an EEO program—will continue to be divorced from one another. As the Commission has recognized consistently for more than 20 years, the *Lutheran Church* and *MD/DC/DE Broadcasters* decisions do not prohibit the collection of employment data for the purpose of analyzing industry trends.[150] The Commission concluded more than two decades ago that collecting employment data solely for monitoring purposes would not violate *Lutheran Church*, and we affirm that conclusion.[151] The D.C. Circuit never took issue with the Commission's collection of station-specific employment data from broadcasters and making this data publicly-available. We continue to find the collection of this information to be consistent with the Constitution and the public interest. The Commission has stated unequivocally and emphatically that it will not use the Form 395-B for assessing a licensee's compliance with EEO program requirements. The agency even went so far as to codify that policy in the Code of Federal Regulations, amending section 73.3612 of its rules in 2004 to prohibit explicitly the use of the Form 395-B data for EEO compliance purposes.[152] We reaffirm the

---

[145] *MD/DC/DE Broadcasters*, 236 F.3d at 19-22.

[146] *Id.* at 20-21. The court did not find similar constitutional flaws in Option A but nonetheless struck it down because the Commission had stressed the value of giving broadcasters a choice in compliance actions—and the court's elimination of Option B left broadcasters with no alternative except Option A. *Id.* at 22.

[147] *Suspension Order*, 16 FCC Rcd at 2872, para. 1 & n.1.

[148] *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24024-25, 24077, paras. 17, 198 (deferring action on the form pending the incorporation of OMB's revised race and ethnicity classifications and explaining that such deferral need not delay adoption of the revised EEO rules because "[t]he data collected in the employment reports will be used only to compile trend reports and report to Congress" and "will not be used to determine compliance with the EEO rules").

[149] *See* NAB Comments at 18 (noting that "the form has been suspended for approximately two decades, during which time the FCC has effectively fulfilled its statutory obligations regarding EEO and vigorously enforced its EEO rules").

[150] *See, e.g.*, *1998 NPRM*, 13 FCC Rcd at 23023, para. 49 (stating that "[t]he court in *Lutheran Church* did not conclude that the Commission lacks authority to collect statistical employment data to analyze industry trends, or to prepare annual trend reports" and that "the Commission has broad authority to collect information and prepare reports."); *First Report and Order*, 15 FCC Rcd at 2358, paras. 63-64 (concluding that the Commission has continued authority to require annual employment reports for the purpose of monitoring employment trends); *2000 Reconsideration Order*, 15 FCC Rcd at 22558-60, paras. 35-40 (rejecting the argument that collecting employment data solely for monitoring purposes would violate *Lutheran Church*).

[151] *2000 Reconsideration Order*, 15 FCC Rcd at 22559-60, paras. 36-40 (rejecting the argument that collecting employment data solely for monitoring purposes would violate *Lutheran Church*).

[152] Note to section 73.3612 currently states:

Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to

(continued….)

Commission's previous determination that workforce data collected on Form 395-B will be used only for purposes of analyzing industry trends and reports by the Commission, and that the use of such data to assess an individual broadcast licensee's compliance with our EEO requirements will be prohibited. Moreover, in the attached *Order on Reconsideration*, we grant a previous request filed by the State Broadcasters Associations (State Associations) asking that we modify the prohibition on our use of the form's data to explicitly bar the Commission from employing this data to assess compliance with the nondiscrimination requirement contained in section 73.2080 of our rules.[153]  Our granting of the State Associations' request further demonstrates our commitment to use this data only for industry analysis and reporting.

46.      We disagree with NAB's and the State Associations' assertion that collection or publication of the data on a licensee- or station-attributable basis will still somehow result in unconstitutional "*sub silentio*" pressures or "raised-eyebrow" regulation.[154]  We have stated repeatedly and unequivocally, and codified the proposition in our rules, that we will not use Form 395-B data for any purpose other than for analyzing and reporting trends in the broadcast industry.  Nonetheless, NAB and the State Associations attempt to employ dicta from the D.C. Circuit in *MD/DC/DE Broadcasters* and *Lutheran Church* about implicit pressures by claiming that, despite the limitations the Commission has placed on its own use of the data, third parties may use the data to place improper pressure on a licensee to engage in preferential hiring practices to avoid having frivolous complaints filed against it with the Commission.[155]  As an example, NAB claims that some loan agreements would require broadcasters to disclose even frivolous petitions to their lenders, thereby adding an element of risk to funding acquisitions.[156]  To address this concern, we will make every effort to dismiss as quickly as possible any petitions, complaints, or other filings that rely on a station's Form 395-B filing as the basis of the petition, complaint, or other filing.  Moreover, broadcasters in that situation may apprise lenders of our intent to dismiss such complaints and point to our rule disallowing the use of the data for compliance purposes.

47.      Broadcaster groups mistakenly assert that reinstating a public collection of Form 395-B violates D.C. Circuit precedent, which the State Associations argue effectively invalidated the use of the Form 395-B for all purposes.[157]  In arguing that the *Lutheran Church* decision invalidated Form 395-B, however, the State Associations erroneously treat all the EEO requirements in effect at the time of *Lutheran Church* as one inseparable rule that the D.C. Circuit vacated.[158]  The State Associations are

---

Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the equal employment opportunity requirements of § 73.2080.

47 CFR § 73.3612 Note.

[153] *See Order on Reconsideration*, *infra* at Section IV.

[154] *See MD/DC/DE Broadcasters*, 236 F.3d at 19 (stating that "[a] regulatory agency may be able to put pressure upon a regulated firm in a number of ways, some more subtle than others"); *see also Lutheran Church*, 141 F.3d at 353 (stating that statistics reflecting underrepresentation are "often the impetus . . . for the filing of a petition to deny").

[155] NAB Comments at 15; State Associations Reply at 11-12; *see also* NAB 2004 Comments at 8-11; State Associations 2004 Comments at 4-7, 8-11.

[156] NAB Comments at 15; State Associations Reply at 14-15.

[157] State Associations Reply at 6-8.

[158] *Id.* at 6-7.  The State Associations reference reply comments they filed in 2019 in another FCC proceeding.  *See id.* at 6-7, n.13.  In that proceeding, after setting forth their analysis of the D.C. Circuit decisions, the State Associations make the argument that *Lutheran Church* invalidated Form 395-B.  Their argument regarding the form's validity rests on the court's observation that "a hard-edged factor like statistics is bound to be one of the more noticed screening criteria" and likely would attract the attention of third parties in addition to the Commission.  State Associations Reply, MB Docket No. 19-177, at 5-10, 28-30 (Nov. 4, 2019) (quoting *Lutheran Church*, 141 F.3d at 353).  The State Associations repeat their point about third-party attention in this proceeding.  State

(continued….)

incorrect in asserting[159] that the court's finding of unconstitutional pressure when the collection was combined with the then-existing EEO program somehow invalidated the Form 395-B itself for any and all other purposes. In fact, as noted above, what the *Lutheran Church* court found to be problematic was the requirement to compare the racial composition of a station's workforce with that of the local population,[160] and not the requirement to report employment data to the Commission. The court's finding of unconstitutionality did not reach the Commission's use of the form to gather data purely for statistical purposes and without regard to a station's EEO compliance. Indeed, the court did not even speak to the form's use in collecting employment data for the purpose of analyzing industry trends, let alone invalidate it for that purpose.

48.     Furthermore, we reject the suggestion that the finding in the *MD/DC/DE Broadcasters* case somehow casts doubt on the legitimate use of Form 395-B data for industry trend reporting, given that the Form 395-B was not even at issue in that case. The Form 395-B was only mentioned in the background section of that decision, as the collection of the *employee* diversity data was irrelevant to the data at issue in that case (i.e., *applicant* data). Rather, the court found the Commission's revised EEO program problematic because it determined that broadcasters proceeding under one aspect of the program (Option B) could feel pressured to engage in race-conscious recruiting practices, given that Option B required an annual reporting of the race, ethnicity, and gender information for each job applicant.[161]

49.     Therefore, unlike applicant data required under Option B of the former EEO program, the Form 395-B workforce data played no role in assessing a broadcaster's compliance with the recruiting rules at issue in *MD/DC/DE Broadcasters*. In the current situation no unconstitutional use of racial or gender classifications arises from the Commission's collection of annual employee data because we will not use the collection of Form 395-B demographic data for purposes of assessing or enforcing a broadcaster's compliance our EEO rules.[162] Further, we find NAB's argument that the court in *MD/DC/DE Broadcasters* disparaged the use of "outputs" to measure "inputs" to be misplaced.[163] First, as noted above, the court was referring to *applicant* data—i.e., those applying to open job positions at the station—as the output in that case, which was being used to evaluate a broadcaster's outreach efforts and

---

Associations Reply at 6-7. However, the screening criteria under review in *Lutheran Church* were jettisoned two decades ago and are no longer operative. Further, as repeatedly stated throughout this *Order*, the Commission has made it clear that it will dismiss any third-party EEO complaints, petitions, or other filings that rely on Form 395-B data.

[159] *See* State Associations Reply at 6-7 (claiming that the linchpin for both the *Lutheran Church* and *MD/DC/DE Broadcasters* decisions was the Form 395-B itself); *see also* NAB Comments at 11-14 (conflating collection of the form's data with concerns that the D.C. Circuit had about how such data was used).

[160] *Lutheran Church*, 141 F.3d at 351-52.

[161] *MD/DC/DE Broadcasters*, 236 F.3d at 19-20, 21-22.

[162] *2000 Reconsideration Order*, 15 FCC Rcd at 22560, para. 40 (assuring "that data concerning the gender, race and ethnicity of a broadcaster's or cable entity's workforce will be used only for purposes of analyzing industry trends and reporting to Congress, and that it will not be used for the purpose of assessing any aspect of an individual broadcaster's or cable entity's compliance with our EEO rules"); *see also* 47 CFR § 73.3612 Note.

[163] In support, NAB quotes *MD/DC/DE Broadcasters* that "[m]easuring outputs to determine whether readily measurable inputs were used . . . is evidence that the agency with life and death power over the [license (of a broadcaster)] is interested in results, not process, and is determined to get them." NAB Comments at 12-13 (quoting *MD/DC/DE Broadcasters,* 236 F.3d at 19-20). The Court's focus at the time, however, was the incentives such measurement might create for broadcasters to "focus their recruiting efforts upon women and minorities, at least until those groups generate a safe proportion of the licensee's job *applications,*" which, as discussed above, is no longer an element of the Commission's EEO rules. *See MD/DC/DE Broadcasters,* 236 F.3d at 19-20 (emphasis added); *see also* AAJC et al. Ex Parte at 20-23 (arguing that the Commission should "interpret *MD/DC/DE Broadcasters* narrowly and not accede to questionable efforts to extend it").

the success of its EEO program in recruiting potential job applicants.[164]  Employee data—i.e., the composition of the station's workforce, which is captured by the Form 395-B—was not the "output" of concern.  Second, to the extent that employee data might be considered an output, the Commission now explicitly prohibits the use of such data as a tool to measure a broadcaster's "inputs" to its EEO program. Furthermore, the court in *MD/DC/DE Broadcasters* never suggested that the collection of employee data for statistical purposes factored into its analysis regarding the unconstitutionality of the outreach rules.

50.     Based on the above, we conclude that reinstating collection of Form 395-B in a public manner, where the form's data can only be used for reporting and analyzing industry trends, is fully consistent with the determinations in *Lutheran Church* and *MD/DC/DE Broadcasters*.  The proposed action is race- and gender-neutral and crucial to Congress's and the Commission's interest in understanding broadcast employment trends.  Because the Commission is the only entity with the resources and expertise to expeditiously collect and compile this data, it is vital that the agency restart this collection.  With current data, the Commission, Congress, and the general public can better understand developments in the broadcast sector.

51.     Although no commenter raised a First Amendment issue, we clarify that requiring stations to publicly disclose their workforce composition data does not constitute "compelled speech" on matters of race and gender, in violation of the First Amendment.   A requirement to report information to the government fundamentally differs from the typical compelled speech case, which generally involves situations where "the complaining speaker's own message [is] affected by the speech it [is] forced to accommodate."[165]  Conversely, the Form 395-B report requires reporting of factual information to the Commission—the station's own employment figures—to allow the Commission to analyze trends.  There is no message being forced by the government.[166]

52.     Even assuming, *arguendo*, that broadcaster's speech rights are implicated, our Form 395-B requirement is consistent with the First Amendment, as it entails disclosure of "purely factual and uncontroversial" information in a commercial context.[167]  The D.C. Circuit has ruled that government interests in addition to correcting deception can be invoked to sustain a mandate for disclosure of purely factual information in the commercial context.[168]  The *Zauderer* test is satisfied here because disclosure of workforce data is reasonably related to a substantial governmental interest (ensuring maximum accuracy and utility of the data on which the government relies for analysis and reporting purposes), which outweighs the "minimal" interest in not disclosing purely factual, uncontroversial information.[169]  In the

---

[164] *See MD/DC/DE Broadcasters*, 236 F.3d at 19-20.

[165] *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).  *See, e.g., Pac. Gas & Elec. Co. v. Pub. Util. Comm'n*, 475 U.S.1, 20 (1986) (requiring a utility company to distribute a third party's newsletter in its own billing envelopes is unconstitutional); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) (requiring newspapers to publish replies from political candidates is unconstitutional).

[166] *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) (applying strict scrutiny to a law requiring professional fund-raisers to disclose to potential donors the percentage of charitable contributions actually turned over to charity, but explaining that a permissible alternative that would not raise First Amendment concerns would be for the State to collect the same data from fundraisers and then publish it because this would not "burden[] a speaker with unwanted speech during the course of a solicitation").

[167] *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *see also id.* at 652 n. 14.  As noted above, case law is not definitive on the question of whether workforce data constitutes "commercial information," although broadcasters contend it is, and courts have sometimes defined commercial information broadly to include information submitted to an agency in which the submitter has a commercial interest. Order, *supra,* para. 31

[168] *American Meat Inst. v. USDA*, 760 F.3d 18, 20 (D.C. Cir. 2014) (en banc).  Other circuits have also held "under *Zauderer* that the prevention of consumer deception is not the only governmental interest that may permissibly be furthered by compelled commercial speech."  *See, e.g., CTIA-The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 845 (9th Cir. 2019).

[169] *CTIA-The Wireless Association*, 928 F.3d at 845-48.

alternative, even assuming, *arguendo,* that our requirement is subject to heightened First Amendment review, we find that our disclosure requirement satisfies even this higher standard.[170]  The government has a substantial interest in analyzing broadcast industry workforce information to support greater understanding of the broadcast industry and to report to Congress about the same.  Collecting this data and making broadcasters' Form 395-B filings publicly available directly advance this governmental interest because without the data it would be impossible to assess changes, trends, or progress in the industry and making the information public ensures maximum accuracy of the submitted data by increasing the likelihood that erroneous data will be discovered and corrected and incentivizing stations to file accurate data and thereby maximizes the utility of the data.  Moreover, the requirement is not more extensive than is necessary to serve that interest, because the data will be collected in a manner consistent with the Commission's previous, long-standing method of collecting the data and because, as this order has made clear, the data collected will be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of a broadcaster's compliance with the EEO rules.[171]

### C.    The Commission Has Broad Authority to Collect Form 395-B

53.    We find sufficient authority to reinstate the collection of Form 395-B, both pursuant to the public interest provisions of the Act and section 334.[172]  The Commission's adoption of Form 395-B preceded Congress's passage of section 334 by more than two decades.  As discussed above in Section II, the form and the Commission's EEO rules were rooted firmly in the Commission's public interest mandate under the Communications Act.[173]  By codifying the Commission's then existing EEO requirements, as well as the collection of Form 395-B, Congress, in 1992, ratified the Commission's pre-existing authority to adopt such rules and forms.[174]  As the Commission discussed extensively in the

---

[170] *Central Hudson v. Public Service Commission of New York,* 447 U.S. 557, 566 (1980) (requiring the regulation to directly advance the substantial governmental interest asserted, and is not more extensive than is necessary to serve that interest).

[171] We note that requiring stations to submit their own workplace data is not putting any words into broadcasters' mouths and cannot be construed as "mandat[ing] speech that 'a speaker would not otherwise make," such that it might be argued we are imposing "a content-based regulation of speech."  *Riley,* 487 U.S. at 795.  Thus strict scrutiny does not apply here.

[172] *See supra* para. 45 (describing the Commission's legal authority to collect workforce data for industry monitoring purposes independent of its authority to regulate its EEO *program*).

[173] *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24028-29, para. 28 (stating that when the Commission adopted rules in 1969 prohibiting broadcast stations from engaging in employment discrimination and requiring them to maintain a program designed to ensure equal employment opportunities, the Commission drew its authority from its public interest mandate and relied on sections 4(i), 303, 307, 308, 309, and 310 of the Act); *see also id.* at 24030, para. 31 (noting that the Commission had adopted and enforced its EEO rules under its public interest mandate for more than 30 years at that point).

[174] *See id.* at 24030, para. 31 (noting that there is a substantial body of case law establishing the principle that congressional approval and ratification of administrative interpretations of statutory provisions, including those granting jurisdiction to regulate, can be inferred from congressional acquiescence in a long-standing agency policy or practice); *see also id.* at n.62 (citing *Haig v. Agee*, 453 U.S. 280, 300-06 (1981) (long-standing interpretation by the Secretary of State of its power under Passport Act of 1926 as encompassing the power to revoke passports to prevent damage to national security or foreign policy was ratified by congressional acquiescence, even though Secretary exercised power infrequently); *Lorillard v. Pons*, 434 U.S. 575, 580-85 (1978) (Congress is presumed to be aware of administrative and judicial interpretations of a statute and to adopt and ratify those interpretations when it re-enacts a statute without change or incorporates in a new law sections of a prior law that have a settled interpretation); *Zemel v. Rusk*, 381 U.S. 1, 9-13 (1965) (Secretary of State's interpretation of Passport Act of 1926 as authorizing him to impose area restrictions was ratified by Congress when it left untouched the Secretary's broad rulemaking authority when it later enacted legislation relating to passports); *Norwegian Nitrogen Products Co. v. U.S.*, 288 U.S. 294, 313-15 (1933) ("administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful").

*Second Report and Order and Third NPRM* in this proceeding, the limitation imposed by section 334 regarding changes to the Commission's then-existing EEO rules and forms evidenced Congress's approval of the Commission's EEO approach (including the information collection) and its desire to ensure its continuance.[175]  Lawmakers' express endorsement of the rules 30 years ago did not in any way undermine the Commission's pre-existing public interest authority.  Moreover, the Commission also has broad authority under the Communications Act to collect information and prepare reports.[176]

54.     Despite this settled law, the State Associations challenge our authority to reinstate the form's collection, reviving arguments that the Commission rejected 20 years ago.[177]  First, they assert that, rather than a grant of EEO authority, section 334 is a limitation on the Commission's authority to revise its EEO regulations and forms.[178]  They suggest that the Commission is constrained from reinstating Form 395-B because, in setting forth the permissible exceptions to its restriction on EEO changes, Congress did not include, or later add, the situation where some provisions of the EEO rules are deemed unenforceable, as occurred in *Lutheran Church* and *MD/DC/DE Broadcasters*.[179]  Second, the State Associations posit that the Commission is taking inconsistent positions on the current force of section 334.[180]  They argue that, if section 334 is still in force and dictates reinstatement of Form 395-B, then the Commission's current EEO outreach rules violate the statutory provision because those rules have undergone substantial revision.[181]  The State Associations assert that the Commission "cannot have it both ways" by rejecting the constraints of section 334 when it previously revised its EEO rules, but now invoking the same provision to reinstate Form 395-B.[182]

55.     We find that State Associations' assertions unsound as a matter of law and logic.  They disregard the Commission's public interest authority under the Act, which was the underpinning of the Commission's EEO rules and Form 395-B long before the passage of section 334.  Further, the commenters also misconstrue the impact of the court decisions on our section 334 authority.  While the *Lutheran Church* court invalidated elements of the EEO program requirements in effect in 1992, thereby terminating their enforceability, it did not address the constitutionality of section 334 itself.  Moreover, the subsequent decision in *MD/DC/DE Broadcasters* did not imply that the unconstitutionality of the previous regulations rendered section 334 inoperative.

56.     We therefore continue to reject the State Associations' false premise that section 334 was somehow "neutered" by the D.C. Circuit decisions.[183]  Section 334 continues to provide authority for reinstating Form 395-B.  Moreover, as discussed above, we find ample legal authority separate from

---

[175] *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24032, para. 38 (noting that Congress would not have directed the Commission in section 22(g) of the 1992 Cable Act to review the effectiveness of its broadcast and cable EEO policies and regulations then in effect, and recommend whether further legislative action was necessary, had Congress not believed that those policies and regulations were within the Commission's lawful authority).

[176] *See, e.g.*, 47 U.S.C. §§ 154(i) and (k), 303(r), and 403; *see also Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9974, para. 3.

[177] *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24026-35, paras. 21-44.

[178] State Associations Reply at 5-6.

[179] *Id.*; *but see* 47 U.S.C. § 334(c) (allowing the Commission "to revise the regulations described in subsection (a) to make nonsubstantive technical or clerical revisions in such regulations as necessary to reflect changes in technology, terminology, or Commission organization").

[180] *See* State Associations Reply at 6.

[181] *Id.*

[182] *Id.*

[183] *Id.*

section 334 to reinstate collection of the form.[184]

## IV.    ORDER ON RECONSIDERATION

57.    In 2004, the State Associations filed a petition seeking reconsideration of the *Third Report and Order and Fourth NPRM*.[185]  The petition asks the Commission:  (1) to amend the Note to section 73.3612 to, in their view, clarify and strengthen the Commission's pledge to refrain from using Form 395-B data for compliance or enforcement purposes; (2) to address the issue of confidential treatment for Form 395-B; and (3) to issue a Fourth Report and Order resolving issues raised in the *Third Report and Order and Fourth NPRM* and in petitions for reconsideration filed in response to the *Second Report and Order and Third NPRM*.[186]  Numerous parties jointly filed an opposition to the petition.[187]  We hereby grant the State Associations' petition in part, deny it in part, dismiss it in part, and defer it in part.

58.    The State Associations seek an expansion of the Commission's pledge to not use Form 395-B data to assess an individual broadcast licensee's compliance with the EEO rules to read as follows, with their proposed changes shown in italics:

> Note to Section 73.3612:  Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's *or permittee's* compliance with the *nondiscrimination or* equal employment opportunity requirements of Section 73.2080.  *Accordingly, the Commission will not entertain any allegation or showing that a broadcast licensee or permittee has violated any aspect of Section 73.2080 on the basis that the station's workforce does not reflect a certain number of persons of a particular gender, race or ethnicity either overall or in any one or more job categories.*[188]

59.    Based on the record stemming from the State Associations' 2004 petition for reconsideration and the determinations made in the *Fourth Report and Order* above, we find it appropriate to make certain changes to the language of section 73.3612 of our rules.  With regard to the first of the State Associations' proposed changes, the opposing parties do not object to adding the phrase "or permittee's," and we agree to make that change because permittees also are required to file Form 395-B.[189]  We also find that explicitly stating in the rule itself that we will not use Form 395-B data to assess

---

[184] We also find to be spurious State Associations' assertion that the specific language of section 634 of the Act regarding the obligations the Act places on MVPDs regarding their annual employment filing requirements somehow undermines our authority to reinstate the Form 395-B collection, which both preceded the statutory MVPD requirement and our authority for which has been ratified by Congress, as described in Section II above.  *See id.* at 7-8.

[185] Joint Petition of State Broadcasters Associations for Reconsideration and/or Clarification of Third Report and Order and Fourth NPRM, MM Docket No. 98-204, (filed July 23, 2004), https://www.fcc.gov/ecfs/document/5511438304/1 (State Associations 2004 Petition).

[186] *Id.* at 2-3.  The State Associations filed a petition for reconsideration also in 2003 in response to the *Second Report and Order and Third NPRM*, as did the Alaska Broadcasters Association et al. Joint Petition of State Associations for Reconsideration and Clarification, MM Docket No. 98-204, at 20, https://www.fcc.gov/ecfs/document/5508559479/1 (filed Feb. 6, 2003) (State Associations 2003 Petition); Petition of Alaska Broadcasters Association, et al. for Reconsideration, MM Docket No. 98-204, https://www.fcc.gov/ecfs/document/5508736233/1 (filed Feb. 6, 2003).

[187] Opposition of NOW et al. to Petition for Reconsideration and/or Clarification, MM Docket No. 98-204, https://www.fcc.gov/ecfs/document/5511635880/1 (filed Sept. 7, 2004) (NOW et al. Opposition).

[188] State Associations 2004 Petition at 2-3.

[189] *See* NOW et al. Opposition at 2 n.4 (expressing a lack of objection to the phrase "or permittee's").

compliance with both the equal employment opportunity requirements *and nondiscrimination* requirements of section 73.2080 of our rules is consistent with our statements in the *Fourth Report and Order* above and with statements made by the Commission over the past two decades.[190]

60.    While the opponents to this change argue that we should not "categorically limit [our] discretion to use EEO data as one of many factors in assessing a complaint of discrimination," these same opponents also acknowledge that the "Note itself, along with the text of [the] *3rd R&O*, make it plain that the FCC will *not* use annual employment data to assess compliance with the EEO rules of any individual broadcast licensee."[191]  Hence, codifying the limitation is nothing more than memorializing in another form a prohibition that the Commission has had in place for more than 20 years.  This approach minimizes confusion about our position.  We do not, however, see any need to include the final sentence suggested by the State Associations, as we find that it is essentially a repetition of the preceding sentence now that we have added "nondiscrimination or" to the preceding sentence.  Finally, to conform to the publishing conventions of the National Archives and Records Administration's Office of the Federal Register, we will now incorporate what currently appears as a Note to Section 73.3612 into the rule itself. The revised rule will read as follows:

> Each licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395-B. Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of Section 73.2080.

61.    With regard to the State Associations' petition on the issue of confidential treatment of the Form 395-B data, we respond by adopting the *Fourth Report and Order* above, which reinstates the Form 395-B data collection in a public manner.  Most of the remaining issues raised in State Associations' petition for reconsideration of the *Second Report and Order and Third NPRM* are unrelated to the Form 395-B filing requirement and, hence, we defer action on them here because they are beyond the scope of this *Order on Reconsideration*.[192]  We dismiss as moot two specific issues raised in the petition: (1) the ability to recruit via the internet, which the Commission addressed in the intervening time period,[193] and (2) a modification to the effective date of the then new rules.[194]

## V.    SECOND FURTHER NOTICE OF PROPOSED RULEMAKING

62.    Having addressed the issues concerning the reinstatement of the Form 395-B data collection, we now seek, by this Second Further Notice of Proposed Rulemaking (*Second FNPRM*), to

---

[190] *See, e.g., 2000 Reconsideration Order*, 15 FCC Rcd 22548, 22558-59, para. 35 (stating that "we will summarily dismiss any petition filed by a third party based on Form 395-B employment data" and "will not use this data as a basis for conducting audits or inquiries."); *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9976, para. 9.

[191] NOW et al. Opposition at 2.

[192] State Associations 2003 Petition at 14-19 (putting forth arguments related to the Commission's recruitment rules); *id.* at 23-34 (addressing issues related to FCC Forms 396 and 397).  In their 2004 petition, the State Associations urge the Commission to address various issues raised by the State Associations in their 2003 petition. *See* State Associations 2004 Petition at 7-8.

[193] State Associations 2003 Petition at 4-8.  This issue was addressed by the Commission in 2017.  *See Petition for Rulemaking Seeking to Allow the Sole Use of Internet Sources for FCC EEO Recruitment Requirement*, MB Docket No. 16-410, Declaratory Ruling, 32 FCC Rcd 3685 (2017).

[194] State Associations 2003 Petition at 12.

refresh the existing record[195] regarding the statutorily mandated collection of Form 395-A data.[196]  Similar to the Form 395-B collected from broadcasters, Form 395-A seeks to gather workforce composition data from multichannel video programming distributors (MVPDs) on an annual basis.[197]  The Commission suspended the filing of Form 395-A in 2001 in the wake of the *MD/DC/DE Broadcasters* decision that vacated certain aspects of the Commission's EEO requirements for broadcasters.[198]  While the similar requirements for MVPDs have never been challenged, the Commission suspended the collection of both Forms 395-A and B, along with various EEO requirements, in order to analyze the impact of the *MD/DC/DE Broadcasters* decision.[199]  In the *Third Report and Order and Fourth NPRM*, the Commission reinstated Forms 395-A and B pending resolution of questions about confidential collection and use.[200]  As the Commission had not resolved those questions before today, however, the collection of the Form 395-A remained suspended along with the Form 395-B.  Despite that suspension, the Commission from 2004 to 2021 continued to seek OMB approval for the information collection, and during that time, OMB approved both Forms 395-A and B, subject to the agency's resolution of confidentiality issues regarding the forms' collection and use.[201]

63.      We now seek by this *Second FNPRM* to refresh the record stemming from the *Third Report and Order and Fourth NPRM* regarding the collection of MVPD workforce composition data.  Consistent with the analysis provided in the *Fourth Report and Order* above for making Form 395-B data public, we tentatively conclude that the collection of Form 395-A also should be reinstated and made available for public review.  We seek comment as to whether Congress's directive that MVPD operators make Form 395-A available for public inspection at their own facilities would be consistent with our amending our rules to require that MVPD operators instead make Form 395-A publicly available through the Commission-hosted Online Public Inspection File (OPIF).  While section 634(d)(3)(B) of the Act states that a MVPD should make Form 395-A available for public inspection at the MVPD's central office and at every office where five or more full-time employees are regularly assigned to work,[202] section 634(d)(4) of the Act permits the Commission to amend the requirements associated with Form 395-A as needed.[203]  We tentatively conclude that requiring the Form 395-A to be placed in the OPIF would be more efficient for the public that wishes to review such reports, as OPIF provides one online site for such review.  We also tentatively conclude that hosting the reports in OPIF will reduce the burdens placed on MVPDs, as this will relieve the MVPD of maintaining such reports at individual

---

[195] *See Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 14-17.

[196] 47 U.S.C. § 554(d)(3)(A)-(B).

[197] The Multi-Channel Video Programming Distributor Annual Employment Report, Form 395-A can be found at https://omb report/icr/202301-3060-020/doc/128149601.  Pursuant to section 634 of the Communications Act, since 1984 the Commission has required that MVPDs with six or more full-time employees file the FCC Form 395-A. Section 634(d)(3)(A) of the Communications Act requires MVPDs with six or more full-time employees to "file with the Commission an annual statistical report identifying by race, sex, and job title the number of employees in each of [specifically identified full-time and part-time job categories]."  47 U.S.C. § 554 (d)(3)(A).

[198] *Suspension Order*, 16 FCC Rcd at 2872-73.

[199] *Id.*

[200] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 13-17.

[201] We note that although the filing of the Form 395-A has been suspended since 2001, OMB has most recently approved the information collection through January 31, 2026.  *See* Multi-Channel Video Programming Distributor Annual Employment Report, FCC Form 395-A, https://omb.report/icr/202301-3060-020/doc/128149601 (last visited Dec. 15, 2023).

[202] 47 U.S.C. § 554(d)(3)(B).

[203] 47 U.S.C. § 554(d)(4) (stating that the "Commission may amend such rules from time to time to the extent necessary to carry out the provisions of this section.").  *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24025, para. 19 (discussing the Commission's flexibility to modify the MVPD EEO requirements).

central offices, including providing sufficient staffing for such offices. We also tentatively conclude that our proposal to change the location of where the Form 395-A data will be housed from the MVPD's central office to the OPIF website is consistent with the basic intent of section 634(d)(3)(B), which is to ensure that the public has access to the Form 395-A data. We seek comment on these tentative conclusions. Alternatively, if section 634(d)(3)(B) were to be read to compel availability of Form 395-A at MVPD offices, would it be within our authority and consistent with sound policy to additionally require availability through OPIF?

64.     As noted above in the *Order on Reconsideration*, we are modifying section 73.3612 of our rules to specifically state that the Form 395-B data will not be used in assessing any aspect of an individual broadcast licensee's or permittee's compliance with *both* the nondiscrimination and equal employment opportunity requirements of section 73.2080. Despite the slight variation in the underlying statutory authority for the collection of the workforce employment data from MVPDs versus broadcasters, the Commission traditionally has treated both data collections in a similar manner. In this regard, the Commission has imposed the same restrictions on the use of workforce composition data stemming from both Forms 395-A and B.[204] Consequently, we tentatively conclude that section 76.1802 of our rules concerning the MVPD annual employment report should be modified so as to align with the modifications made to section 73.3612 of our rules for broadcasters in the *Order on Reconsideration* above. In the *Order on Reconsideration* above, we incorporated what appears as a Note to section 73.3612 into the rule itself to conform to the publishing conventions of the National Archives and Records Administration's Office of the Federal Register. We seek comment on our tentative conclusion to do the same with regard to the language that currently appears as a Note to section 76.1802, to read as follows:

> Each employment unit with six or more full-time employees shall file an annual employment report on the FCC Form 395-A with the Commission on or before September 30 of each year. Data concerning the gender, race and ethnicity of an employment unit's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual employment unit's compliance with our nondiscrimination or EEO rules for multi-channel video program distributors.

65.     As stated above in the *Fourth Report and Order*, the Form 395-B will include a mechanism to provide further specificity about broadcaster employees' gender identities.[205] We seek comment on whether we should adopt a similar mechanism for the Form 395-A.

66.     We also seek comment on the attendant costs and benefits of any proposals advanced in response to this item.

67.     *Digital Equity and Inclusion.* Finally, the Commission, as part of its continuing effort to advance digital equity for all,[206] including people of color, persons with disabilities, persons who live in

---

[204] *See Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9989, App. B. In that order, the Commission adopted a Note to Section 76.1802, identical to the Note in the relevant EEO rule for broadcasters, stating that the data collected would be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of an employment unit's compliance with the EEO rules for multi-channel video programming distributors. 47 CFR § 73.3612 Note ("Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the Equal Employment Opportunity requirements of § 73.2080."); 47 CFR § 76.1802 Note (same).

[205] *See supra* paras. 39-40.

[206] Section 1 of the Communications Act of 1934 as amended provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to

(continued….)

rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality, invites comment on any equity-related considerations[207] and benefits (if any) that may be associated with the proposals and issues discussed herein. Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility, as well the scope of the Commission's relevant legal authority.

## VI.    PROCEDURAL MATTERS

68.    *Ex Parte Rules - Permit-But-Disclose*. With respect to the *Second Further Notice of Proposed Rulemaking*, this proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[208] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

69.    *Filing Requirements—Comments and Replies*. Pursuant to Sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.145, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: https://apps.fcc.gov/ecfs/.

- Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing. Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commissions Secretary, Office of the Secretary, Federal Communications

---

all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

[207] The term "equity" is used here consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality. *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

[208] 47 CFR § 1.1200 *et seq.*

Commission.

- o Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.U.S.

- o Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street, NE, Washington DC 20554.

- Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19.[209]

- During the time the Commission's building is closed to the general public and until further notice, if more than one docket or rulemaking number appears in the caption of a proceeding, paper filers need not submit two additional copies for each additional docket or rulemaking number; an original and one copy are sufficient.

70. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA)[210] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[211] Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the potential impact of rule and policy changes adopted in the *Fourth Report and Order* on small entities. The FRFA is set forth in Appendix C. We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of rule and policy change proposals on small entities in the *Second Further Notice of Proposed Rulemaking*. The IRFA is set forth in Appendix D. Additionally, we have prepared a Final Regulatory Flexibility Certification (FRFC) certifying that the rule and policy changes contained in the *Order on Reconsideration* will not have a significant economic impact on a substantial number of small entities. The FRFC is set forth in Appendix E.

71. *Paperwork Reduction Act.* Final Paperwork Reduction Act Analysis for Fourth Report and Order and Order on Reconsideration in MB Docket No. 98-204. This Fourth Report and Order and Order on Reconsideration may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. All such changes will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this present document, we have assessed the effects of reinstating the collection of information on Form 395-B from broadcasters with five or more full-time employees and adding language to our rules clarifying that restrictions regarding the Commission's use of the collected data protect broadcast permittees as well as licensees. We find that, with respect to businesses with fewer than 25 employees, the paperwork burden associated with the completion and submission of Form 395-B will be minimal and the collection is necessary to

---

[209] *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Filing*, Public Notice, 35 FCC Rcd 2788 (2020).

[210] *See* 5 U.S.C. § 604. The RFA, 5 U.S.C. §§ 601–612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996).

[211] 5 U.S.C. § 605(b).

serve the purpose of obtaining complete information on employment trends in the broadcast industry. As it is customary for companies to routinely maintain employee information for various purposes, including payroll, broadcasters should not have to engage in extensive research to complete and submit their Form 395-B.

72. *Initial Paperwork Reduction Act Analysis for Second Further Notice of Proposed Rulemaking in MB Docket No. 98-204.* This Second Further Notice of Proposed Rulemaking may contain proposed new or modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on these information collection requirements, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. § 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

73. *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is non-major under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

74. *People with Disabilities.* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice, 202-418-0432 (tty)).

75. *Providing Accountability Through Transparency Act.* The Providing Accountability Through Transparency Act of 2023 requires each agency, in providing notice of a rulemaking, to post online a brief plain-language summary of the proposed rule.[212] Accordingly, the Commission will publish the required summary of this *Second Further Notice of Proposed Rulemaking* on https://www.fcc.gov/proposed-rulemakings.

76. *Additional Information.* For additional information on this proceeding, please contact Christopher Sova of the Media Bureau, Industry Analysis Division, christopher.sova@fcc.gov, (202) 418-1868.

## VII.    ORDERING CLAUSES

77. Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 4(i), 4(k), 303(r), 307, 308, 309, 310, 334, 403, and 634 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 334, 403, and 554, this *Fourth Report and Order, Order on Reconsideration, and* Second *Further Notice of Proposed Rulemaking* **IS ADOPTED**.

78. **IT IS FURTHER ORDERED** that this *Fourth Report and Order and Order on Reconsideration* SHALL BE EFFECTIVE 30 days after publication in the Federal Register. Compliance with section 73.3612 of the Commission's rules, 47 CFR § 73.3612, which may contain new or modified information collection requirements, will not be required until the Office of Management and Budget completes review of any information collection requirements that the Office of Management and Budget determines is required under the Paperwork Reduction Act. The Commission directs the Media Bureau to announce the compliance date for the *Fourth Report and Order and Order on Reconsideration* by subsequent Public Notice.

79. IT IS FURTHER ORDERED that the Joint Petition of the State Broadcasters Associations for Reconsideration and/or Clarification the Third Report and Order and Fourth NPRM, MM Docket No. 98-204 (filed July 23, 2004), is GRANTED IN PART, DENIED IN PART,

---

[212] 5 U.S.C. § 553(b)(4). The Providing Accountability Through Transparency Act of 2023, Pub. L. No. 118-9, 137 Stat. 55 (2023), amended section 553(b) of the Administrative Procedure Act.

DISMISSED IN PART, and DEFERRED IN PART.

80.     IT IS FURTHER ORDERED that the Media Bureau is hereby directed to make the necessary changes to Form 395-B to provide for inclusion of gender non-binary information.

81.     IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking including the Final Regulatory Flexibility Analysis and the Initial Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.

82.     **IT IS FURTHER ORDERED** that the Office of the Managing Director, Performance Program Management, **SHALL SEND** a copy of this Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A)

FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch
Secretary

# APPENDIX A

## Final Rules

The Federal Communications Commission amends Part 73 of Title 47 of the Code of Federal Regulations as follows:

1. Delete Note to Section 73.3612.

2. Revise Section 73.3612 to read as follows:

   Each licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station  with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395-B.  Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of Section 73.2080. Compliance with this section will not be required until this sentence is removed or contains a compliance date, which will not occur until after the Office of Management and Budget completes review of any information collection requirements pursuant to the Paperwork Reduction Act or until after the Office of Management and Budget determines that such review is not required.  The Commission directs the Media Bureau to announce a compliance date for this section 73.3612 by subsequent Public Notice and to cause this section 73.3612 to be revised accordingly.

**APPENDIX B**

**Proposed Rules**

The Federal Communications Commission proposes to amend Part 76 of Chapter 5 of Title 47 of the Code of Federal Regulations (CFR) as follows:

1.  The authority citation for part 76 continues to read as follows:

Authority:  47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

2.  Amend § 76.1802 to read as follows:

Each employment unit with six or more full-time employees shall file an annual employment report on the FCC Form 395-A with the Commission on or before September 30 of each year. Data concerning the gender, race and ethnicity of an employment unit's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual employment unit's compliance with our nondiscrimination or EEO rules for multi-channel video program distributors.

**APPENDIX C**

**Final Regulatory Flexibility Act Analysis**

1.   As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the 2021 *Further Notice of Proposed Rulemaking* (*Further Notice*) to this proceeding.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *Further Notice*, including comment on the IRFA.  The Commission received no comments on the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.

**A.       Need for, and Objectives of, the Report and Order**

2.   This *Fourth Report and Order* reinstates the Commission's annual collection of broadcast workforce composition data by race and gender on FCC Form 395-B.  We will use the collected data to analyze industry trends and make reports to Congress.  Before the form's prolonged suspension beginning in 2001,[3] the Commission made the collected workforce data publicly available.  As stated in the *Fourth Report and Order*, we will continue with the public collection and dissemination of the data, which is in alignment with the public interest.  Other than the inclusion of a mechanism allowing broadcasters to account in the Form 395-B for those employees who identify as gender non-binary, the reinstated collection does not change the form's reporting requirements.  The inclusion of this mechanism, which will allow for accurate data gathering, will incur only a minimal economic impact on a substantial number of small entities.

3.   The reinstatement arrives after a significant period of delay in collection, which created a material gap in workforce composition data to be collected and analyzed by the Commission.  Without the data, the Commission is prevented from analyzing important industry trends and reporting to Congress its analyses on the broadcast sector.  A reinstituted collection of Form 395-B will allow us to carry out the public interest authority of this agency, and to implement section 334 of the Act, which instructs the Commission to collect broadcast workforce data.[4]

**B.       Legal Basis**

4.   The *Fourth Report and Order* is authorized under sections 1, 4(i), 4(k), 303(r), 307, 308, 309, 310, 334, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 334, and 403.

---

[1] *See* 5 U.S.C. § 603. The RFA, see 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996). The SBREFA was enacted as Title II of the Contract With America Advancement Act of 1996 (CWAAA).

[2] 5 U.S.C. § 601(6); *see infra* note 9 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[3] *Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements,* Memorandum Opinion and Order, 16 FCC Rcd 2872 (2001) (*Suspension Order*).

[4] 47 U.S.C. § 334.

C.　　　**Summary of Significant Issues Raised by Public Comments in Response to IFRA**

5.　　　There were no comments in response to IRFA notice.

D.　　　**Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

6.　　　Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[5]　The Chief Counsel did not file any comments in response to the *Further Notice* in this proceeding.

E.　　　**Description and Estimate of the Number of Small Entities to Which the Rules Apply**

7.　　　The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted herein.[6]　The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small government jurisdiction."　In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[7]　A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[8]　Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

8.　　　*Television Broadcasting*.　This industry is comprised of "establishments primarily engaged in broadcasting images together with sound."[9]　These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[10]　These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.　Programming may originate in their own studio, from an affiliated network, or from external sources.　The SBA small business standard for this industry classifies businesses having $41.5 million or less in annual receipts as

---

[5] 5 U.S.C. § 604(a)(3).

[6] 5 U.S.C. § 603(b)(3).

[7] 5 U.S.C. § 601(6); *see infra* note 9 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[8] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." *Id.*

[9] *See* U.S. Census Bureau, *2017 NAICS Definitions, "515120 Television Broadcasting,"* https://www.naics.com/naics-code-description/?code=515120.

[10] *Id.*

small.[11]  2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year.[12]  Of that number, 657 firms had revenue of less than $25,000,000.[13]  Based on this data we estimate that the majority of television broadcasters are small entities under the SBA small business size standard.

9.       As of September 30, 2023, there were 1,377 licensed commercial television stations.[14]  Of this total, 1,258 stations (or 91.4%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates as of September 30, 2023, there were 383 licensed noncommercial educational (NCE) television stations, 380 Class A TV stations, 1,889 LPTV stations and 3,127 TV translator stations.[15]  The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

10.      *Radio Stations*.  This industry is comprised of "establishments primarily engaged in broadcasting aural programs by radio to the public."[16]  Programming may originate in their studio, from an affiliated network, or from external sources.[17]  The SBA small business size standard for this industry classifies firms having $41.5 million or less in annual receipts as small.[18]  U.S. Census Bureau data for 2017 show that 2,963 firms operated in this industry during that year.[19]  Of this number, 1,879 firms operated with revenue of less than $25 million per year.[20]  Based on this data and the SBA's small business size standard, we estimate a majority of such entities are small entities.

---

[11] *See* 13 CFR § 121.201; NAICS Code 515120 (as of 10/1/22 NAICS Code 516120).

[12] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 515120, https://data.census.gov/cedsci/table?y=2017&n=515120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[13] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[14] *Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023) (*October 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[15] *Id.*

[16] U.S. Census Bureau, *2017 NAICS Definitions, "515112 Radio Stations,"* https://www.naics.com/naics-code-description/?code=515112.

[17] *Id.*

[18] *See* 13 CFR § 121.201; NAICS Code 515112 (as of 10/1/22 NAICS Code 516110).

[19] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 515112, https://data.census.gov/cedsci/table?y=2017&n=515112&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.  We note that the US Census Bureau withheld publication of the number of firms that operated for the entire year.

[20] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in the individual categories for less than $100,000, and $100,000 to $249,999 to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in these categories).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher

(continued….)

11.     The Commission estimates that as of September 30, 2023, there were 4,452 licensed commercial AM stations and 6,670 licensed commercial FM radio stations, for a combined total of 11,122 commercial radio stations.[21]  Of this total, 11,120 stations (or 99.98 %) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates that as of September  30, 2023, there were 4,263 licensed noncommercial (NCE) FM radio stations.[22]  The Commission however does not compile, and otherwise does not have access to financial information for these radio stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of radio station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

12.     We note, however, that in assessing whether a business concern qualifies as "small" under the above definition, business (control) affiliations[23] must be included.  Our estimate, therefore, likely overstates the number of small entities that might be affected by our action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, another element of the definition of "small business" requires that an entity not be dominant in its field of operation.  We are unable at this time to define or quantify the criteria that would establish whether a specific radio or television broadcast station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and is therefore possibly over-inclusive.  An additional element of the definition of "small business" is that the entity must be independently owned and operated.  Because it is difficult to assess these criteria in the context of media entities, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and similarly may be over-inclusive.

F.     **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

13.     In this section, we identify the reporting, recordkeeping and other compliance requirements contained in the *Fourth Report and Order* and consider whether small entities are affected disproportionately by any such requirements.  By this *Fourth Report and Order*, broadcasters are required to resume filing Form 395-B, which will be available to the public. The annual filing of Form 395-B will require employment units to upload the form onto the Commission's website.  As recognized by the Office of Management and Budget (OMB), the Commission has estimated in the instructions to Form 395-B that the form's paperwork burden is minimal, taking each response, or form, approximately one hour to complete.[24]  This estimate includes the time to read the instructions, look through existing records, gather and maintain the required data, and actually complete and review the form or response.[25]  Because this *Fourth Report and Order* contains no new reporting or recordkeeping requirements, other than the option of filling in a comment box on a voluntary basis, and only resumes the filing of an existing form,

---

that noted herein.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[21] *Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023) (*October 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[22] *Id.*

[23] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has the power to control both." 13 CFR § 21.103(a)(1).

[24] Form 395-B, the broadcast station Annual Employment Report (including the instructions), can be found at https://omb report/icr/202004-3060-047/doc/100723701.

[25] *Id.*

the reporting, recordkeeping and other compliance requirements of small entities will be no greater than under the current rules.  Additionally, broadcast employment units with less than five full-time employees are exempt from filing statistical data.[26]  Because of this minimal reporting burden and due to the fact that smaller station employment units are exempt, we conclude that small entities will not be disproportionately affected by the *Fourth Report and Order*.

> **G.     Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

14.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[27]

15.     This *Fourth Report and Order* reinstates the collection of broadcaster employment data on Form 395-B.  Collection of the Form 395-B was suspended in 2001 following two decisions by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacating certain aspects of the Commission's equal employment opportunity rules.[28]  This suspension had no relation to the impact of the collection on small entities.  As noted above, the filing requirement of Form 395-B importantly does not apply to broadcast employment units with less than five full-time employees, thereby exempting a large group of smaller entities from the filing requirements.[29]  The *Fourth Report and Order* only leads to a resumption of data collection efforts and imposes no new requirements for which the Commission can find alternatives that would minimize the economic burden on small entities.

> **H.     Report to Congress**

16.     The Commission will send a copy of the *Fourth Report and Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[30]  In addition, the Commission will send a copy of the *Fourth Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  A copy of the *Fourth Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[31]

---

[26] 47 CFR § 73.3612.

[27] *See* 5 U.S.C. § 603(c).

[28] *See Suspension Order*, 16 FCC Rcd at 2872.  At that time, the Commission suspended collection of workforce data from both MVPDs and broadcasters; however, the relevant D.C. Circuit opinions discussed above involved EEO requirements pertaining only to broadcasters.

[29] 47 CFR § 73.3612.

[30] *See* 5 U.S.C. § 801(a)(1)(A).

[31] *See* 5 U.S.C. § 604(b).

## APPENDIX D

## Initial Regulatory Flexibility Act Analysis

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) concerning the possible significant economic impact on small entities of the policies and rules proposed in this Second Further Notice of Proposed Rulemaking (*Second FNPRM*). The Commission requests written public comments on this IRFA. Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments specified in the *Second FNPRM*. The Commission will send a copy of the *Second FNPRM*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2] In addition, the *Second FNPRM* and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### I. Need for, and Objectives of, the Proposed Rules

2. The *Second FNPRM* seeks to refresh the record regarding the Commission's annual collection of broadcaster multichannel video programming distributor (MVPD) composition data by race and gender on FCC Form 395-A.[4] In 2001, the Commission suspended the filing of Form 395-A after a federal court decision vacated certain aspects of the Commission's equal employment opportunity (EEO) requirements for broadcasters.[5] Although the similar requirements for MVPDs have never been challenged, the Commission suspended the collection of both the broadcasters' Form 395-B and the MVPDs' Form 395-A, along with various EEO requirements, in order to analyze the impact of the federal court decision. In 2004, the Commission reinstated Forms 395-A and B pending resolution of questions about confidential collection and use of the forms' data. Today, having resolved the issues related to the confidentiality of the Form 395-B data in the *Fourth Report and Order*, the Commission now seeks public comment on the legal issues pertaining to availability and confidentiality of Form 395-A data.

3. Consistent with the decision in the *Fourth Report and Order* above to make Form 395-B data public, the Commission tentatively concludes in the *Second FNPRM* that the collection of Form 395-A should also be reinstated in the same manner as it was previously with regard to public availability. The Communications Act requires an MVPD to make its Form 395-A available for public inspection at the MVPD's central office and at every office where five or more full-time employees are regularly assigned to work.[6] The Commission has traditionally treated Form 395-A and B data in the same manner with regard to confidentiality. Consequently, the *Second FNPRM* seeks comment on whether instead of (or in addition to) maintaining the Form 395-A at a MVPD's central office, the form should now be maintained on the Commission's website similar to the requirement now established in the *Fourth Report and Order* for broadcasters' Form 395-B. Other than a proposal to include a mechanism in the Form 395-A that would enable MVPDs to account for those employees who identify as gender non-binary, the proposed reinstatement of this collection does not change the form's reporting requirements. We predict

---

[1] 5 U.S.C. § 603. The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

[2] 5 U.S.C. § 603(a).

[3] *Id.*

[4] Form 395-A, the MVPD station Annual Employment Report, can be found at https://omb.report/icr/202301-3060-020/doc/128149601.

[5] *See Suspension Order*, 16 FCC Rcd at 2872. In this order, the Commission suspended the equal employment opportunity outreach program requirements applicable to broadcast licensees and MVPDs, which included the requirement that broadcasters and MVPDs file a Form 395-B and 395-A, respectively, with the Commission on an annual basis.

[6] 47 U.S.C. § 554(d)(3)(B).

that inclusion of this mechanism, which would allow for accurate data gathering, would incur only a minimal economic impact on a substantial number of small entities.

**J.     Legal Basis**

4.      The proposed action is authorized under sections 1, 2(a), 4(i), 4(j), 4(k), 303, 403, and 634(d) of the Communications Act of 1934, as amended 47 U.S.C. §§ 151, 152(a), 154(i), 154(k), 303, 403, and 554(d).

**K.     Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

5.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed revisions, if adopted.[7]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[8]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA).[9]  A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operations; and (3) satisfies any additional criteria established by the SBA.[10]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

6.      Cable Companies and Systems (Rate Regulation). The Commission has developed its own small business size standard for the purpose of cable rate regulation.  Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers nationwide.[11]  Based on industry data, there are about 420 cable companies in the U.S.[12]  Of these, only seven have more than 400,000 subscribers.[13]  In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[14]  Based on industry data, there are about 4,139 cable systems (headends) in

---

[7] 5 U.S.C. § 603(b)(3).

[8] 5 U.S.C. § 601(6); *see infra* note 9 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[9] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." *Id.*

[10] 15 U.S.C. § 632(a)(1)-(2)(A).

[11] 47 CFR § 76.901(d).

[12] S&P Global Market Intelligence, S&P Capital IQ Pro, U.S. MediaCensus, *Operator Subscribers by Geography* (last visited May 26, 2022).

[13] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q* (last visited May 26, 2022); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (April 2022).

[14] 47 CFR § 76.901(c).

the U.S.[15]  Of these, about 639 have more than 15,000 subscribers.[16]  Accordingly, the Commission estimates that the majority of cable companies and cable systems are small.

7.　　　Cable System Operators (Telecom Act Standard).  The Communications Act of 1934, as amended, contains a size standard for a "small cable operator," which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[17]  For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 498,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator.[18]  Based on industry data, only six cable system operators have more than 498,000 subscribers.[19]  Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard.  We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million.[20]  Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

8.　　　Open Video Systems.  The open video system (OVS) framework was established in 1996 and is one of four statutorily recognized options for the provision of video programming services by local exchange carriers.  The OVS framework provides opportunities for the distribution of video programming other than through cable systems.  OVS operators provide subscription services and therefore fall within the SBA small business size standard for the cable services industry, which is "Wired Telecommunications Carriers."[21]  The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small.[22]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[23]  Of this total, 2,964 firms operated with fewer than 250 employees.[24]  Thus, under the SBA size standard the majority of firms in this industry can be considered small.  Additionally, we note that the Commission has certified some OVS operators who

---

[15] S&P Global Market Intelligence, S&P Capital IQ Pro, U.S. MediaCensus, *Operator Subscribers by Geography* (last visited May 26, 2022).

[16] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q* (last visited May 26, 2022).

[17] 47 U.S.C. § 543(m)(2).

[18] *FCC Announces Updated Subscriber Threshold for the Definition of Small Cable Operator*, Public Notice, DA 23-906 (MB 2023) (*2023 Subscriber Threshold PN*).  In this Public Notice, the Commission determined that there were approximately 49.8 million cable subscribers in the United States at that time using the most reliable source publicly available.  *Id.*  This threshold will remain in effect until the Commission issues a superseding Public Notice. *See* 47 CFR § 76.901(e)(1).

[19] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 06/23Q* (last visited Sept. 27, 2023); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (April 2022).

[20] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(e) of the Commission's rules.  *See* 47 CFR § 76.910(b).

[21] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[22] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[23] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[24] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

are now providing service and broadband service providers (BSPs) are currently the only significant holders of OVS certifications or local OVS franchises. The Commission does not have financial or employment information for the entities authorized to provide OVS however, the Commission believes some of the OVS operators may qualify as small entities.

9. Satellite Master Antenna Television (SMATV) Systems, also known as Private Cable Operators (PCOs). SMATV systems or PCOs are video distribution facilities that use closed transmission paths without using any public right-of-way. They acquire video programming and distribute it via terrestrial wiring in urban and suburban multiple dwelling units such as apartments and condominiums, and commercial multiple tenant units such as hotels and office buildings. SMATV systems or PCOs are included in the Wired Telecommunications Carriers' industry which includes wireline telecommunications businesses.[25] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[26] U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[27] Of this total, 2,964 firms operated with fewer than 250 employees.[28] Thus under the SBA size standard, the majority of firms in this industry can be considered small.

10. Direct Broadcast Satellite (DBS) Service. DBS service is a nationally distributed subscription service that delivers video and audio programming via satellite to a small parabolic "dish" antenna at the subscriber's location. DBS is included in the Wired Telecommunications Carriers industry which comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks.[29] Transmission facilities may be based on a single technology or combination of technologies.[30] Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution; and wired broadband internet services.[31] By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[32]

11. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[33] U.S. Census Bureau data for 2017 show that 3,054

---

[25] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[26] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[27] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[28] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[29] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[30] *Id.*

[31] *See id.* Included in this industry are: broadband Internet service providers (*e.g.*, cable, DSL); local telephone carriers (wired); cable television distribution services; long-distance telephone carriers (wired); closed-circuit television (CCTV) services; VoIP service providers, using own operated wired telecommunications infrastructure; direct-to-home satellite system (DTH) services; telecommunications carriers (wired); satellite television distribution systems; and multichannel multipoint distribution services (MMDS).

[32] *Id.*

[33] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

firms operated in this industry for the entire year.[34]  Of this number, 2,964 firms operated with fewer than 250 employees.[35]  Based on this data, the majority of firms in this industry can be considered small under the SBA small business size standard.  According to Commission data however, only two entities provide DBS service - DIRECTV (owned by AT&T) and DISH Network, which require a great deal of capital for operation.[36]  DIRECTV and DISH Network both exceed the SBA size standard for classification as a small business.  Therefore, we must conclude based on internally developed Commission data, in general DBS service is provided only by large firms.

### L.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements

12.      In this section, we identify the reporting, recordkeeping, and other compliance requirements contained in the Second FNPRM and consider whether small entities are affected disproportionately by any such requirements.  To a large degree, the Second FNPRM only seeks to reinstitute the previous reporting, recordkeeping, or compliance requirements for collection of MVPD workforce composition data on Form 395-A, as this collection was previously suspended in 2001.  The Second FNPRM, does, however, seek comment on whether to replace the existing requirement that a MVPD maintain a copy of the Form 395-A at its central office with a requirement that a MVPD instead upload a copy of its Form 395-A to the Commission's website.  Alternatively, if the statute were read to compel availability of Form 395-A at MVPD offices, the Second FNPRM seeks comment on whether it is within our authority and consistent with sound policy to additionally require availability through the OPIF.  So as to harmonize the MVPD requirements with those imposed on broadcasters, the Second FNPRM also seeks comment on whether to modify the Commission's rules so as to include a statement that the Commission will not use the Form 395-A data when assessing compliance with both the nondiscrimination and EEO requirements of its rules.  Currently, the prohibition contained in the Commission's rules only references a restriction on the use of the Form 395-A data for assessing compliance with the EEO rules.  Because the only proposed modification in the Second FNPRM with regard to reporting or recordkeeping obligations is merely a change in the location of where the Form 395-A will be housed (i.e., on the Commission's website rather than (or in addition to) the MVPDs' central office), we do not anticipate a significant change in the compliance burden for small entities.  Additionally, MVPD employment units with less than six full-time employees are exempt from filing the statistical data requested on the form.[37]  Hence, the Commission concludes that small entities will not be disproportionately affected by the *Second FNPRM*.

### M.      Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

13.      The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather

---

[34] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[35] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[36] *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Eighteenth Report,* Table III.A.5, 32 FCC Rcd 568, 595 (2017).

[37] 47 U.S.C. § 554(d).

than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[38]

14.      The Second FNPRM seeks to refresh the record regarding the Commission's annual collection of MVPD workforce composition data by race and gender on Form 395-A.  It would lead to a resumption of this data collection and would propose only to modify one of the locations where the Form 395-A should be retained, by seeking comment on whether an MVPD should retain a copy on the Commission's website in lieu of (or in addition to) at the MVPDs' central office.  To the extent MVPDs were maintaining hard copies of the Form 395-A at their central offices, we anticipate that storing an electronic copy on the Commission's website will minimize the economic burdens on MVPDs.  Where maintenance of a hard copy necessitates the use of MVPD staff time to monitor public access to the Form 395-A, retention of an electronic copy on the Commission's website presents itself as a simple and straightforward process, requiring only a minimal degree of navigating the Commission's database system to upload the information.  Further, as detailed in the Second FNPRM, the collection of MVPD workforce composition data and providing the data for public inspection are required by section 634(d) of the Act.[39]

### N.      Federal Rules that May Duplicate, Overlap, or Conflict with the Second FNPRM

15.      None.

---

[38] *See* 5 U.S.C. § 603(c).

[39] 47 U.S.C. § 554(d).

### APPENDIX E

### Final Regulatory Flexibility Certification Analysis

1.    For the reasons described below, we now certify that the policies and rules adopted in the Order on Reconsideration will not have a significant economic impact on a substantial number of small entities.  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[1]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[2]

2.    In this Order on Reconsideration, we make certain changes to the language of section 73.3612 to clarify our collection and use of Form 395-B data.  We add language to the rule confirming that the collection of Form 395-B data, and restrictions on the use of the data, also applies to broadcast permittees.  The Order on Reconsideration adds an explicit statement to its rules that it will not use Form 395-B data to assess compliance with both the equal employment opportunity requirements and nondiscrimination requirements of section 73.2080.  We find that this statement is consistent with our statements in the Fourth Report and Order and other previous statements made by the Commission over the past two decades.

3.    The changes from the Order on Reconsideration will not have a significant economic impact on a substantial number of small entities because such changes do not alter the type or extent of information collected under Form 395-B.  Rather, the Order on Reconsideration does nothing more than memorialize in another form a prohibition that the Commission has had in place for more than 20 years.  Therefore, we certify that the changes provided in the Order on Reconsideration will not have a significant economic impact on a substantial number of small entities.  The Commission will send a copy of this Order on Reconsideration, including a copy of this Final Regulatory Flexibility Certification, in a report to Congress and the Government Accountability Office pursuant to the Small Business Regulatory Fairness Act of 1996.[3]

---

[1] 5 U.S.C. § 601(6); *see infra* note 2 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[2] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  *Id.*

[3] *See* 5 U.S.C. § 801(a)(1)(A).

## DISSENTING STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:      *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*; Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking; MB Docket No. 98-204.

Today's FCC Order takes two separate actions.

First, it reinstates the federal requirement that broadcasters file a document (known as Form 395-B) every year with the FCC that lists the race and gender of their employees. I would have had no objection here to an FCC decision limited to requiring broadcasters to file Form 395-B data with the agency—after all, Congress passed a statute that directs the FCC to collect this information.[1] The FCC could also have made this data available on an anonymized or otherwise aggregated basis that does not disclose information about specific broadcast stations. Indeed, the Civil Rights Act of 1964 expressly requires that the government keep this type of race and gender data confidential when it is collected by the Equal Opportunity Employment Commission.[2] But instead of confining today's decision to lawful agency action, the FCC chooses a different course—one that violates the Constitution, as the D.C. Circuit has already determined in not one but two separate FCC cases.

In particular, in the second part of today's Order, the FCC decides that it will take the Form 395-B demographic data and publish it on a station-by-station basis—meaning that the FCC will now post a race and gender scorecard for each and every TV and radio broadcast station in the country.[3] In doing so, the FCC caves to the demands of activist groups that have worked for years and across different industries to persuade the federal government to obtain—and most importantly publish—this type of data about individual businesses. This is no benign disclosure regime. The record makes clear that the FCC is choosing to publish these scorecard for one and only one reason: to ensure that individual businesses are targeted and pressured into making decisions based on race and gender. This is the exact same type of pressure that the FCC created in at least two prior cases. In both instances, the D.C. Circuit invalided the FCC's rules because they violated the equal protection guarantees of the Due Process Clause of the Fifth Amendment.[4] The only difference this time around is that the FCC has violated the First Amendment as well.

In the Further Notice portion of today's decision, the FCC proposes to extend this same approach to additional industries.

*            *            *

Let's start with the FCC's record of encouraging this type of discrimination. In *Lutheran Church*, the D.C. Circuit reviewed an earlier FCC effort to use Form 395-B (the same form that is at issue in

---

[1] *See* 47 U.S.C. § 334. Notably, however, federal law prohibits the FCC from making any changes to Form 395-B unless those changes are "nonsubstantive technical or clerical revisions," *id.* at 334(c). Nonetheless, the FCC adds an entirely new category of "gender non-binary" to Form 395-B today. In doing so, the FCC makes no argument that adding this box constitutes a lawful addition that is either a nonsubstantive technical or clerical revision.

[2] Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 264, § 709(e) (1964); *see also* 42 U.S.C. § 2000e-8(e).

[3] The only exception is for stations with four or fewer full-time employees.

[4] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1988); *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001); *see also Adarand Constructors Inc. v. Pena*, 515 U.S. 200 (1995) (overruling *Metro Broadcasting, Inc., v. FCC*, 497 U.S. 547 (1990)).

today's decision) as part of a set of agency regulations aimed at influencing broadcasters' hiring practices. As with today's new rules, those FCC regulations did not expressly require broadcasters to hire employees in accordance with fixed quotas.[5] Instead, those earlier FCC rules required broadcasters to compare the composition of their workforce with the availability of minorities and women in its area. On review, the D.C. Circuit found that those rules would operate, in the real world, in a manner that would "oblige stations to grant some degree of preference to minorities in hiring."[6] In particular, the court found that the FCC's approach of mandating the comparison of employees with the general population across race and gender categories operated to "pressure license holders to engage in race-conscious hiring."[7] The D.C. Circuit concluded that the FCC violated the Constitution because its "regulations pressure stations to maintain a workforce that mirrors the racial breakdown of their [area]."[8]

After that appellate court loss, the FCC suspended the relevant regulations and sought comment on a set of replacement rules. Those substitute rules required broadcasters to report the race and sex of each job applicant. The FCC made clear that if the data collected did not demonstrate that a broadcaster's outreach efforts were reaching the entire community, then the FCC expected the broadcaster to modify those efforts and in some cases face an FCC investigation. On appeal, the FCC once again claimed that its regime did not impose any undue pressure on broadcasters to discriminate on the basis of race or gender and only sought to encourage broad outreach on a race- and gender-neutral basis. Focusing on how the rules would operate in the real world, the D.C. Circuit disagreed and struck them down in *MD/DC/DE Broadcasters Association*.[9] The court found that the regulations did more than encourage broad outreach—they made clear that "the agency with life and death power over the licensee is interested in results, not process, and it is determined to get them."[10] The FCC's approach "clearly does create pressure to focus recruiting efforts upon women and minorities" in violation of the Fifth Amendment, the court determined.[11] Ultimately, the court held that those FCC rules created "a race-based classification that is not narrowly tailored to support a compelling governmental interest and is therefore unconstitutional."[12]

The FCC's history of unconstitutional conduct is not a trivial matter. The Supreme Court has stated that "'[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'"[13] Likewise, the Supreme Court has written that racial classifications "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility."[14] For this reason, the Supreme Court has said, "governmental action based on race—a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed."[15]

---

[5] *Lutheran Church*, 141 F.3d at 351.

[6] *Lutheran Church*, 141 F.3d at 351.

[7] *Lutheran Church*, 141 F.3d at 352.

[8] *Lutheran Church*, 141 F.3d at 352.

[9] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 13.

[10] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 19.

[11] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 19.

[12] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 15.

[13] *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

[14] *Shaw v. Reno*, 509 U.S. 630, 643 (1993).

[15] *Adarand*, 515 U.S. at 227 (cleaned up).

Today, for at least the third time now, the FCC once again seeks to pressure broadcasters into making hiring decisions on the basis of race and gender. It does so, as noted above, by requiring broadcasters to publicly disclose, on a station by station basis, a scorecard that lists the racial and gender breakdown of every employee.

As a threshold matter, the FCC argues that its decision merely adopts a disclosure regime and involves no pressure at all on broadcasters to engage in race- or gender-based discrimination. But this argument ignores both the Commission's own history with Form 395-B and the rulemaking record here. Indeed, the FCC Order goes so far as to assert that, "[b]ased on the record before us, we find no basis to conclude that the demographic data on a station's annual Form 395-B filing would lead to undue public pressure."[16]

To the contrary, the record is overflowing with this type of evidence. For instance, one filer states: "We, the undersigned investors, with collective assets under management or advisement of approximately $266 billion, write to urge the . . . [FCC] to require the disclosure of equal opportunity employment statistics among the companies it regulates" because doing so "allows market participants to assess whether companies stand by their public commitments to pursue diversity, equity and inclusion."[17] You don't have to read between the lines on that one. Or, as the D.C. Circuit stated in *Lutheran Church* when it struck down one of the FCC's prior attempts at imposing unconstitutional pressure on broadcasters: "The risk lies not only in attracting the Commission's attention, but also that of third parties."[18] Like those investors, other organizations wrote that publicizing this data would be consistent with President Biden's Executive Order on Advancing Racial Equity and "allow the public to hold these companies accountable."[19] Other commenters made similar points. So the FCC's ostrich-like claim that the record is devoid of any evidence that this public scorecard will be used to pressure broadcasters into making race- and gender-based hiring decisions does not withstand even casual scrutiny; indeed, it only raises additional questions under the law.[20]

But even if the record were more opaque, the FCC would still not be in the clear. As the D.C. Circuit stated in *MD/DC/DE Broadcasters Association*, a "regulatory agency may be able to put pressure upon a regulated firm in a number of ways, some more subtle than others. The Commission in particular has a long history of employing: ['a] variety of *sub silentio* pressures and 'raised eyebrow' regulation . . . all serv[ing] as means for communicating official pressures to the licensee.'"[21] So too here. It is obvious to everyone what is going on—or it should be. By requiring the public disclosure of these race and gender scorecards, the FCC is ensuring that broadcast stations will be targeted by activist groups, media campaigns, and conceivably the government itself—unless those broadcasters hire the right (if

---

[16] Order at para. 17; *see also id.* ("the record contains no evidence of use of such data in this manner").

[17] Letter from Investors to FCC Chairwoman Jessica Rosenworcel, MB Docket Nos. 19-177, 98-204 (Nov. 16, 2022).

[18] *Lutheran Church*, 141 F.3d at 353.

[19] Letter from The Leadership Conference on Civil and Human Rights to FCC Chairwoman Jessica Rosenworcel, MB Docket Nos. 19-177, 98-204 (Sept. 29, 2022).

[20] 5 U.S.C. § 706; *see also Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 42-44 (1983) (noting that agencies have an APA obligation to make reasoned decisions that account for record-based evidence).

[21] *MC/DC/DE Broadcasters Ass'n*, 236 F.3d at 19 (quoting *Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1116 (D.C. Cir. 1978)).

unspecified) mix and type of employees.[22]  In other words, the FCC is standing up the same type of race- and gender-based pressure campaign that the D.C. Circuit invalidated twice before.  It is just doing so in a more roundabout way.  But the bank shot still counts.[23]  Particularly given the FCC's long history here, broadcasters know the message the FCC is delivering and the results it wants to see.  In cases like these, "we are 'not required to exhibit a naiveté from which ordinary citizens are free.'"[24]

This conclusion is only reinforced when one examines the reasons the FCC proffers for requiring the public disclosure of these scorecards—rather than making the data available on an anonymized or non-station-identifiable basis.  It is quite obvious that the FCC's stated rationales are nothing more than pretext.  And none of them establish a government interest sufficient to survive Fifth Amendment review.  Let's go through all three of them.

First, the FCC argues that it is requiring these scorecards to be publicly disclosed because doing so "will increase the likelihood that erroneous data will be discovered and corrected."[25]  But there is no record support at all for the agency's claim that publicizing this data will render it more reliable.  This is not surprising.  After all, how exactly does the FCC anticipate that a member of the public will verify the reported race, ethnicity, and gender of an individual employee—including those that the FCC now says can report as gender non-binary?  It doesn't.  And, in any event, I don't think the FCC should be encouraging the public to engage in that type of conduct.

Second, the FCC argues that publicly disclosing the data is consistent with Congress's goal of maximizing the utility of data an agency collects.[26]  But this argument proves too much.  It says nothing at all about the propriety of disclosing this particular set of data on a station-specific basis in light of the FCC's history of pressuring broadcasters and the agency's own rulemaking record here, which counsels against public disclosure.  Indeed, the FCC's normal practice is not to make all of the data it collects publicly available in the interest of maximizing utility; it makes decisions based on the facts and circumstances relevant to each data set.

Third, the FCC argues that by publicly disclosing all of the data about every covered broadcaster, rather than disclosing it on an anonymous or non-station-identifiable basis, the FCC avoids the problem of accidentally disclosing data about a specific station.[27]  What?  That is like deciding to sink a ship to

---

[22] The FCC makes no claim in this Order—nor could it—that government officials from State AGs to Congress to the FCC itself in a future rulemaking proceeding will not use this data to take action against broadcasters for failing to meet some as-yet undefined hiring targets.  This threat of potential future government action will naturally operate to pressure broadcasters today—pressure that is not materially different than the forms the D.C. Circuit addressed in *Lutheran Church* and *MC/DC/DE Broadcasters Association*.

[23] *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866)) ("'[W]hat cannot be done directly cannot be done indirectly.  The Constitution deals with substance, not shadows,' and the prohibition against racial discrimination is 'levelled at the thing, not the name.'"); *see also Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (cleaned up) ("It is axiomatic that [the government] may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.").

[24] *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2575–76 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2nd Cir. 1977) (Friendly, J.)).

[25] Order at para. 15.

[26] Order at para. 15 (citing The OPEN Government Data Act).

[27] Order at para. 15.  The FCC also proffers an interest in potentially using the data to run unspecified analyses or for drafting yet-to-be-conceived reports.  But that interest is not relevant to the question of posting the data publicly on a

(continued….)

avoid the risk that it might spring a leak. It makes no sense, particularly in light of the fact that the FCC regularly obtains and refrains from inadvertently disclosing a large and wide range of secret, sensitive, and/or confidential data sets.

In other words, the only rationales the FCC offers for deciding to publicly disclose individual broadcasters' race and gender scorecards are pretextual. They only serve to confirm the FCC is acting for the same reasons it did in *Lutheran Church* and in *MD/DC/DE Broadcasters Association*—to pressure broadcasters into making race- and gender-based hiring decisions.

But the Fifth Amendment is not the only portion of the Constitution that the FCC violates today. For similar reasons, today's Order also runs afoul of the First Amendment. By requiring stations to publicly disclose their workforce composition, the Order compels speech on matters of race and gender. Compelled disclosures are typically subject to heightened First Amendment scrutiny. And the exception for disclosures of "purely factual and uncontroversial information"[28] plainly does not apply here because that exception is "limited to cases in which disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[29] The FCC has made no claim that the public disclosure of these scorecards bears any resemblance to consumer protection labels upheld under *Zauderer*.

The Order also flunks heightened First Amendment review, whether intermediate or strict scrutiny. As noted above, the three governmental interests the FCC asserts for publicizing this content ring hollow. They are either generic rationales applicable to any disclosure or unsupported in the record. No other justification can save the Order, for it disclaims a governmental interest in using the data for any other purpose, whether license renewal,[30] EEO compliance,[31] audits,[32] FCC enforcement,[33] or third-party filings.[34] Even if a valid governmental interest existed, disclosure would not be narrowly tailored. The Order provides no reason why publicizing race and gender data on a station-specific basis is necessary for the Commission to conduct analysis or stay abreast of industry trends, at least compared to a less restrictive alternative, like requiring broadcasters to submit the forms to the FCC on a confidential or non-station identifiable basis. In short, the disclosures do not accomplish cognizable governmental interests in a narrowly tailored manner.

We are thus left with one of two possibilities. At worst, the Order pretextually seeks to force broadcasters into making race- and gender-based hiring decisions, a constitutionally offensive rationale that cannot justify any rules. Or at best, Order pursues disclosure for disclosure's sake, which violates the First Amendment.[35]

---

station-by-station basis because the FCC could pursue those interests while keeping the data confidential, anonymized, or aggregated.

[28] *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

[29] *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213 (D.C. Cir. 2012) (cleaned up).

[30] *See* Order at para. 7.

[31] *See* Order at para. 45.

[32] *See* Order at para. 18.

[33] *See* Order at para. 20.

[34] *See* Order at para. 17.

[35] *See, e.g., National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (invalidating abortion-related disclosures in medical facilities); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 524 (D.C. Cir. 2015) (invalidating conflict mineral disclosures); *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996)

(continued….)

*          *          *

It did not have to be this way.  As I conveyed to my Commission colleagues before casting my vote, I would have supported today's decision if it eliminated the public disclosure component and instead required broadcasters to complete and file Form 395-B with the FCC on a non-public or non-station-identifiable basis consistent with the way the Equal Employment Opportunity Commission treats this type of data.  Narrowly tailoring what is made public would have avoided the FCC playing a part in pressuring broadcasters into making hiring decisions on the basis of race and gender in violation of the Fifth Amendment.  And it would have sidestepped a compelled disclosure that runs afoul of the First Amendment.  My suggestions were ultimately rejected, and we are now left with an item that runs headlong into the Constitution.  I dissent.

---

(invalidating hormone labeling requirement for milk) ("[W]e hold that consumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement.").

STATEMENT OF
COMMISSIONER GEOFFREY STARKS

Re:        *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, MB Docket No. 98-204, Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking

A '98 docket number.  A fourth report and order.  Today's item has a long history.  Let me summarize briefly: in 1970, the FCC, under its public interest authority, began requiring broadcasters to submit annual employment reports listing the composition of their workforce in terms of race, ethnicity, and gender.  In 1992, Congress amended the Communications Act to affirm the Commission's authority to do so, specifically requiring the Commission to maintain its existing EEO regulations, including its collection of workforce diversity data on Form 395-B.  In 2001, following a pair of D.C. Circuit decisions, the Commission temporarily suspended its collection of Form 395-B data as it reconsidered its full suite of EEO rules.  But an intended temporary suspension lasted more than 20 years.

Some might pretend that what we do today is a radical break outside of this agency's authority.  It is not.  Quite simply, today we reinstate a longstanding, statutorily-mandated requirement to collect workforce diversity data from broadcasters.

We know how critical it is to have diversity in our media organizations.  It's clear – a successful media organization serves its viewers, listeners, and readers.  And an organization does that by ensuring that its employees, its decisionmakers, reflect those viewers, listeners, and readers, and can speak for and to them.[1]  Let me share an example that hits close to home.  In December 2020, the Kansas City Star issued an apology, acknowledging that over decades through its news coverage the paper had "disenfranchised, ignored, and scorned generations of Black Kansas Citians" and "robbed an entire community of opportunity, dignity, justice and recognition."  The paper explained: "Like most metro newspapers of the early to mid-20th century, The Star was a white newspaper produced by white reporters and editors for white readers and advertisers."[2]  These poignant words capture the harm at issue here.  Certainly, individual employees and candidates are harmed by a hostile work environment.  But whole communities are harmed when they are subjected to content that lacks balance, fairness, or accuracy.

We must get our arms around this issue.  As always with good government, we start with data.  And data is most effective when it is available to everyone.  The rules we reinstate today require broadcasters to file their workforce composition data publicly.  This data will enable the Commission to monitor employment trends in the industry – as we know, a dynamic and fast-changing one – and report to Congress on its learnings.  It will give researchers new workforce composition information to explore.  And it will grant members of the public transparency – a window into their local broadcast station, not just as a programmer, but as an employer.

Ultimately, the strength of this item speaks for itself.  But I am proud to have been a voice for it over the last five years.  I'd like to thank the other voices who have joined with me.  Thank you to

---

[1] *See generally* Alicia W. Stewart, "Why Newsroom Diversity Works," Nieman Reports (June 10, 2015), https://niemanreports.org/articles/why-newsroom-diversity-works/.

[2] Mike Fannin, "The Truth in Black and white: An apology from the Kansas City Star," The Kansas City Star (Dec. 20, 2020), https://www.kansascity.com/news/local/article247928045.html.  Other papers, including the LA Times, have made similar public apologies.  *See* "Editorial: An examination of The Times' failures on race, our apology and a path forward," Los Angeles Times (Sept. 27, 2020), https://www.latimes.com/opinion/story/2020-09-27/los-angeles-timesapology-racism.

Congresswoman Yvette Clarke and Senator Chris Van Hollen, who first raised the urgent need to restart the collection of workforce diversity data in 2019, and who spoke up again last month in a letter to the FCC to ensure we finished the job.  Thank you to the Members of Congress who joined Rep. Clarke and Sen. Van Hollen in that letter, including Senators Ben Ray Luján and Raphael Warnock, Congressional Hispanic Caucus Chair Nanette Diaz Barragán, and Congressional Black Caucus Chair Steven Horsford, along with Reps. Delia C. Ramirez, Eleanor Holmes Norton, Kevin Mullin, André Carson, James P. McGovern, Dan Goldman, Paul D. Tonko, Darren Soto, Frederica S. Wilson, Jim Costa, Marc A. Veasey, Raul Ruiz, M.D., Al Green, Robin L. Kelly, Troy A. Carter, Sr.,  Alma S. Adams, Ph.D., Nydia M. Velázquez, Jerrold Nadler, Bonnie Watson Coleman, Tony Cárdenas, and Sheila Jackson Lee.

Thank you to Chairwoman Rosenworcel, for her support and attention to this proceeding, and to Commissioner Gomez.  And I especially thank the FCC staff who worked diligently to prepare this item. From the Media Bureau: John Bat, James Elustondo, Rosemary Harold, Brendan Holland, Radhika Karmarkar, Jake Riehm, Julie Salovaara, and Chris Sova.  From the Office of General Counsel: Susan Aaron, David Konczal, Joel Rabinovitz, and Jeff Steinberg.  From the Enforcement Bureau: Elizabeth Goldin and Lynn Kalagian.  And from the Office of Economics and Analytics: Zaira Gonzalez, Kenneth Lynch, Kim Markuch, and Andy Wise.

## DISSENTING STATEMENT OF
## COMMISSIONER NATHAN SIMINGTON

Re: *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking; MB Docket No. 98-204

Broadcast has a problem with minority engagement; broadcasters and their trade associations are the first to acknowledge this unfortunate reality. Minority ownership and participation in broadcast has been dismal for years and remains so, not least of which due to Commission leadership's recent scuttling of the largest proposed minority-led purchase of a broadcast station group in history. The Commission should be open to creative solutions to help improve minority participation in broadcast so that broadcast workforces reflect the communities that they serve. So, directionally, I am aligned with my colleagues on efforts to improve minority participation by better understanding the causes of the issue, and by providing policy incentives to solve it.

Had the Commission's Order today moved to collect and aggregate de-identified Form 395-B data from broadcasters for public disclosure, I would have agreed with the majority and voted to approve. Had the Commission today moved to collect attributable Form 395-B data for private Commission review to aid in understanding the demographic contours of the broadcast marketplace and the impact of Commission policy thereon—more akin to the extant data collection practices of the Equal Employment Opportunity Commission—I would have agreed with the majority and voted to approve. I joined one of my colleagues on the Commission in asking for the Order to be reframed to accomplish either. Our suggested edits were rejected in favor of retaining the Order released today. I cannot approve this Order because I do not think it is within our authority to implement: its claims to public interest supporting the public disclosure of attributable 395-B data are specious and undergirded by glassy legal punctilios. Turning to authority: in both *Lutheran Church-Missouri Synod v. Federal Communications Commission* ('*Lutheran Church*') and *MD/DC/DE Broadcasters Associations vs. FCC* ('*MD/DC/DE*'), the central consideration of the D.C. Circuit in determining whether the Commission had violated the Fifth Amendment in its EEO policies was whether its practices, in fact, incentivized race-conscious hiring by *pressuring* a broadcast licensee to engage in such hiring. To the Commission's credit, the drafting of today's Order evinces sensitivity to this issue. It is true that, per this Order, the Commission will not *officially* consider a station's demographic employment profile in any application pertaining to its broadcast license. It is true that, per this Order, the Commission will not *mandate* any particular demographic pattern in hiring in order to satisfy the Commission's EEO requirements. Yet, like Frankenstein's creature, the Commission's reanimation of Form 395-B comes at the cost of its fundamental ungovernability, *viz.*: public disclosure of attributable demographic employment data. The ineluctable question therefore is: ought the Commission to anticipate that its rule requiring public disclosure of such data will *pressure* broadcast licensees to engage in race-conscious hiring practices? If so, is the policy not vulnerable to challenge on constitutional grounds?

My colleagues today argue, in effect if not explicitly, that pressure to engage in race-conscious hiring from *outside* of the Commission by third parties *predictably generated by means of Commission policy* is legally nugatory. The Order contends that, so long as broadcasters are not pressured by the Commission *itself*, pressure from third parties knowingly generated by an instrumentality of Commission policy lacks constitutional valence. Further, the Order contends that concerns over public pressure are merely speculative. I cannot say that I agree with any of that.

The public inarguably pressures every large firm for which employment data are available (and, indeed, even for those firms electing not to publicly disclose employment data) as it relates to "equity" in staffing decisions. Responsive to these issues, some larger broadcasters already raise their hands and elect to disclose demographic employment data. Yet a government policy mandating such disclosure, at a minimum, *implicates* Fifth Amendment guardrails around incentivizing race-conscious hiring practices,

*precisely* due to the widespread and predictable social pressure of which this Commission is, obviously, aware. While it may be true that contending with workforce demographics is a legitimate question of good corporate governance, it does not follow that a *government mandate* to disclose attributable demographic employment data automatically passes constitutional muster so long as the implementing agency takes no official notice of that data. If, predictably, regulatees are pressured to engage in race-conscious hiring as a direct consequence of this Commission's rules, I see no fine distinctions in the law as to the etiology of the pressure immunizing our decision today from constitutional scrutiny. Were the Order subject to strict scrutiny in judicial review—it is at least possible that it will be—I am not convinced that the "collect and disclose" rules we implement today would survive constitutional challenge. *Adarand Constructors, Inc. v. Peña* ('*Adarand'*) and its progeny make it clear that the Commission *may* collect this data. Yet while demographic data collection *simpliciter* does not subject governmental action to strict scrutiny, bear in mind that today's Order is at pains to discuss the social ill at which collection and *disclosure* of attributable demographic employment data is intended to address: minority participation in the broadcast workforce. In other words, when the effective *goal* of demographic data collection and disclosure is to affect the hiring behavior of regulatees (that is, to improve minority participation in the broadcast workforce), and when the only obvious modality of improvement afforded by disclosure of *attributable* demographic employment data not otherwise afforded by disclosure *non-attributable* data is public pressure, may the Commission still seek shelter beneath *Adarand*?

Even if strict scrutiny were *not* to apply, there is no *requirement* that the Commission take a maximalist position as to disclosure. This Commission ought, as a *prudential* matter, to tread lightly where matters of suspect classification arguably are implicated. That is especially true where, as here, the rules we adopt today invite comparison to actions taken by the Commission twice invalidated on Fifth Amendment grounds.

Turning to policy: even were the Commission *not* constitutionally forbidden from taking the step of public disclosure of attributable demographic employment data that it does today, it should not *anyway,* because little or no new information appropriate for *national policy* consideration by this agency will be revealed by its implementation.

Obviously, policy should rely on data: governmental collection and use of statistical data—subject to a variety of scientific infirmities though it often is—is foundational to modern regulatory rulemaking and lawmaking. And, incontrovertibly, it is possible that the collection and use of demographic employment data can be used to aid in making rules and laws. Of greater controversy is whether public analysis of policy-implicated datasets generates good rules and laws—especially as there are many a slip twixt analytical cup and regulatory lip—but let us grant it for argument's sake. It is in no way obvious that, *for the purposes of crafting national policy*, which is inherently *macro*scopic, there is a great enough delta in the informational value to the public data science community of demographic employment data that is attributable to individual stations compared to data that is de-identified so as to justify the publication of the former when the former is so constitutionally fraught. So, as regards the publication of attributable demographic employment data: what policy good is left other than "name and shame" for station owners? What is left other than the fully predictable application of public pressure on individual licensees that this Order waves off as speculative? If the Commission's collection of this data were aimed merely at informing policy, why take the additional step of disclosure we take today? Because the public disclosure of attributable demographic employment data this Order implements predictably serves to increase pressure on broadcast licensees to engage in racially conscious hiring, in violation of the Fifth Amendment and as explained by the D.C. Circuit in both *Lutheran Church* and *MD/DC/DE*, and because I can find no other legitimate purpose for the publication of attributable demographic employment data, I dissent from the Order.

As to the Second Further Notice of Proposed Rulemaking, I see nothing that would vary my thinking as it relates to the collection and disclosure of Form 395-A data, and so I dissent from that portion of the item for identical reasons.

# Exhibit B

days of receiving the notification, OCR, ASFR, or the HHS awarding agency must provide the applicant or recipient with email confirmation acknowledging receipt of the notification. The HHS awarding agency, working jointly with ASFR and OCR, will then work expeditiously to reach a determination of applicant's or recipient's notification request.

(ii) If the notification is received during the pendency of an investigation, the temporary exemption will exempt conduct as applied to the specific contexts, procedures, or services identified in the notification during the pendency of the HHS awarding agency's review and determination, working jointly with ASFR and OCR, regarding the notification request. The notification shall further serve as a defense to the relevant investigation or enforcement activity regarding the applicant or recipient until the final determination of the applicant's or recipient's exemption assurance request or the conclusion of the investigation.

(4) If the HHS awarding agency, working jointly with ASFR and OCR, makes a determination to provide assurance of the applicant's or recipient's exemption from the application of the relevant statutory provision(s) or that modified application of certain provision(s) is required, the HHS awarding agency, ASFR, or OCR, will provide the applicant or recipient the determination in writing, and if granted, the applicant or recipient will be considered exempt from OCR's administrative investigation and enforcement with regard to the application of that provision(s) as applied to the specific contexts, procedures, or services provided. The determination does not otherwise limit the application of any other provision of the relevant statute to the applicant or recipient or to other contexts, procedures, or services.

(5) An applicant or recipient subject to an adverse determination of its request for an exemption assurance may appeal the Department's determination under the administrative procedures set forth at 45 CFR part 81. The temporary exemption provided for in paragraph (f)(3) of this section will expire upon a final decision under 45 CFR part 81.

(6) A determination under paragraph (f) of this section is not final for purposes of judicial review until after a final decision under 45 CFR part 81.

(g) Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be severable from this section and shall not affect the remainder thereof or the application of

the provision to other persons not similarly situated or to other, dissimilar circumstances.

[FR Doc. 2024–08880 Filed 4–30–24; 4:15 pm]

BILLING CODE 4153–01–P

---

# FEDERAL COMMUNICATIONS COMMISSION

**47 CFR Part 73**

**[MB Docket No. 98–204; FCC 24–18; FR ID 216196]**

## Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) adopted a Fourth Report and Order and Order on Reconsideration that reinstitutes the collection of workforce composition data for television and radio broadcasters on FCC Form 395–B, as statutorily required.

**DATES:** This rule is effective June 3, 2024.

**FOR FURTHER INFORMATION CONTACT:** For additional information on this proceeding, please contact Radhika Karmarkar of the Media Bureau, Industry Analysis Division, *Radhika.karmarkar@fcc.gov,* (202) 418–1523.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Fourth Report and Order and Order on Reconsideration ("*Fourth Report and Order*" and "*Order on Reconsideration*"), FCC 24–18, in MB Docket No. 98–204, adopted on February 7, 2024, and released on February 22, 2024. The complete text of this document is available electronically via the search function on the FCC's website at *https://docs.fcc.gov/public/attachments/FCC-24-18A1.pdf.*

*People with Disabilities:* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* (mail to: *fcc504@fcc.gov*) or call the FCC's Consumer and Governmental Affairs Bureau at (202) 418–0530 (voice), (202) 418–0432 (TTY).

## Synopsis

1. By this *Fourth Report and Order* and *Order on Reconsideration,* we reinstate the collection of workforce

composition data for television and radio broadcasters on FCC Form 395–B as statutorily required by the Communications Act of 1934, as amended (Act). The Commission suspended its requirement that broadcast licensees file Form 395–B, which collects race, ethnicity, and gender information about a broadcaster's employees within specified job categories, more than two decades ago. After a long period of inactivity, the Commission published in the **Federal Register** on August 31, 2021, at 86 FR 48610, a Further Notice of Proposed Rulemaking(MB Docket No. 98–204, FCC 21–88, 36 FCC Rcd 12055) (*FNPRM*), seeking to refresh the public record regarding the manner in which the Form 395–B data should be collected and maintained. After careful consideration of the record, we reaffirm the Commission's authority to collect this critical information and conclude that broadcasters should resume filing Form 395–B on an annual basis. Section 73.3612 of the Commission's rules provides that "[e]ach licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395–B." We note that the filing requirements of § 73.3612 do not apply to Low Power FM Stations. Given the importance of this workforce information and Congress's expectation that such information would be collected and available, we reinstate this collection in a manner available to the public consistent with the Commission's previous, long-standing method of collecting this data.

2. Our ability to collect and access Form 395–B data is critical because it will allow for analysis and understanding of the broadcast industry workforce, as well as the preparation of reports to Congress about the same. Collection, analysis, and availability of this information will support greater understanding of this important industry. We agree with broadcasters and other stakeholders that workforce diversity is critical to the ability of broadcast stations both to compete with one another and to effectively serve local communities across the country. Without objective and industry-wide data, it is impossible to assess changes, trends, or progress in the industry. Consistent with how these data have been collected historically, we will make broadcasters' Form 395–B filings available to the public because we

conclude that doing so will ensure maximum accuracy of the submitted data, is consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public, allows us to produce the most useful reports possible for the benefit of Congress and the public, and allows for third-party testing of the accuracy of our data analyses. Thus, with today's action, we restore the process of giving broadcasters, Congress, and ourselves the data needed to better understand the workforce composition in the broadcast sector. We find further that continuing to collect this information in a transparent manner is consistent with a broader shift towards greater openness regarding diversity, equity, and inclusion across both corporate America and government. Large media companies have begun to make publicly available copies of their EEO–1 forms, which are filed with the Equal Employment and Opportunity Commission, or variations thereof. There is also movement towards more open access to data collected by federal agencies, as shown in the Foundations for Evidence Based Policymaking Act, which directs agencies to account for their data collections and to make such data available in readable formats to support government transparency and evidence-based rulemaking. We also address a pending petition for reconsideration from 2004 regarding our use of Form 395–B data.

**Background**

3. For more than 50 years, the Commission has administered regulations governing the EEO responsibilities of broadcast licensees. At their core, the Commission's EEO rules prohibit employment discrimination on the basis of race, color, religion, national origin, or sex, and require broadcasters to provide equal employment opportunities. In addition to broadly prohibiting employment discrimination, the Commission's rules also require that all but the smallest of broadcast licensees develop and maintain an EEO program. Specifically, the Commission requires each broadcast station that is part of an employment unit of five or more full-time employees to establish, maintain, and carry out a positive continuing program to ensure equal opportunity and nondiscrimination in employment policies and practices. In addition, the Commission historically collected workforce employment data from broadcasters through the annual submission of Form 395–B.

4. Between 1970 and 1992, the Commission, pursuant to its public

interest authority, required broadcasters to submit annual employment reports listing the composition of the broadcasters' workforce in terms of race, ethnicity, and gender. In 1992, after finding that, among other things, "increased numbers of females and minorities in positions of management authority in the cable and broadcast television industries advances the Nation's policy favoring diversity in the expression of views in the electronic media," Congress amended the Act, affirming the Commission's authority in this area. Specifically, Congress added a new section 334, which required the Commission to maintain its existing EEO regulations and forms as applied to television stations. The forms included the Commission's collection of workforce diversity information from broadcasters on Form 395–B. Submission of Form 395–B, however, was subsequently suspended in 2001 following two decisions by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacating certain aspects of the Commission's EEO rules.

5. With its decision in 1998, the D.C. Circuit in *Lutheran Church-Missouri Synod* v. *FCC* (*Lutheran Church*) reversed and remanded a Commission action finding that a broadcast licensee had failed to make adequate efforts to recruit minorities. The court found the Commission's EEO outreach rules, which required comparison of the race and sex of a station's full-time employees with the overall availability of minorities and women in the relevant labor force, to be unconstitutional. Specifically, the court concluded that the use of broadcaster employee data to assess EEO compliance in the context of a license renewal pressured broadcasters to engage in race-conscious hiring in violation of the equal protection component of the Due Process Clause of the Fifth Amendment of the Constitution. The court applied strict constitutional scrutiny in reaching its decision, finding that standard of review was applicable to racial classifications imposed by the federal government. And pursuant to that standard, it determined that the Commission's stated purpose of furthering programming diversity was not compelling, nor were its EEO rules narrowly tailored to further that interest. The court made clear, however, that "[i]f the regulations merely required stations to implement racially neutral recruiting and hiring programs, the equal protection guarantee would not be implicated." In reaching its decision,

the court referenced the Form 395–B only tangentially in its analysis.

6. On remand, in the First Report and Order (MM Docket Nos. 98–204, 96–16, FCC 00–20, 15 FCC Rcd 2329) (*First Report and Order*) the Commission crafted new EEO rules requiring that broadcast licensees undertake an outreach program to foster equal employment opportunities in the broadcasting industry. The Commission also reinstated the requirement that broadcasters annually file employment data on Form 395–B with the Commission, which it had suspended after *Lutheran Church.* In adopting these revised rules and reinstating the information collection, the Commission vowed to no longer use workforce composition data when reviewing license renewal applications or assessing compliance with EEO program requirements. Rather, the Commission stated in the 2000 Reconsideration Order (MM Docket Nos. 98–204, 96–16, FCC 00–338, 15 FCC Rcd 22548) (*2000 Reconsideration Order*) that going forward it would only use this information "to monitor industry employment trends and report to Congress," and not to assess any aspect of the individual broadcast licensee's compliance with the Equal Employment Opportunity requirements of § 73.2080 of the Commission's rules. The Commission codified that position in the governing regulations contained in § 73.3612.

7. Following adoption of the new EEO outreach rules, which offered licensees two "Options" for establishing an EEO program, several state broadcaster associations challenged the revised EEO rules. Upon review, the D.C. Circuit in *MD/DC/DE Broadcasters Associations* v. *FCC* (*MD/DC/DE Broadcasters*) found that one element of the new rule, namely Option B, which allowed broadcasters to design their own outreach programs but required reporting of the race and sex of each *applicant,* was constitutionally invalid. The court determined that Option B violated the equal protection component of the Due Process Clause of the Fifth Amendment because, by examining the number of applicants and investigating any broadcasters with "few or no" minority applicants, the Commission "pressured" broadcasters to focus resources on recruiting minorities. Because the court found that Option B was not severable from Option A of the rule, it vacated the entire EEO outreach rule.

8. Although the D.C. Circuit in *MD/DC/DE Broadcasters* vacated and remanded the Commission's revised EEO outreach rules, it did not rule on

the validity or constitutionality of Form 395–B. Nor did the court specifically identify Form 395–B or the collection of workforce diversity data as a core part of the rule at issue in its analysis. The court's only mention of the collection of workforce data was in the Background section of its decision. Thus, notably, in neither *Lutheran Church* nor *MD/DC/DE Broadcasters* did the D.C. Circuit find the collection of workforce composition data itself to be invalid on constitutional or any other grounds. After the decision, the Commission suspended its EEO rules in 2001, including Form 395–B, in order to analyze the effects of *MD/DC/ DE Broadcasters* on the Commission's rules.

9. On November 20, 2002, the Commission released its Second Report and Order and Third NPRM (MM Docket No. 98–204, FCC 02–303, 17 FCC Rcd 24018) (*Second Report and Order and Third NPRM*), establishing new race-neutral EEO rules, eliminating the Option B rule previously invalidated by the court. The Commission's new EEO rules, which remain in place today, were divorced from any data concerning the composition of a broadcaster's workforce or applicant pool. The Commission explained that the annual employment report is "unrelated to the implementation and enforcement of our EEO program" and "data concerning the entity's workforce is no longer pertinent to the administration of our EEO outreach requirements." The Commission, however, deferred action on issues relating to the annual employment report form, in part because it needed to incorporate new standards for classifying data on race and ethnicity adopted by the Office of Management and Budget (OMB) in 1997. The Commission's decision in January 2001 to suspend the filing of Form 395–B remained in effect at the time of the *Second Report and Order and Third NPRM.*

10. On June 4, 2004, the Commission released its Third Report and Order and Fourth NPRM (MM Docket No. 98–204, FCC 04–103, 19 FCC Rcd 9973) (*Third Report and Order and Fourth NPRM*) readopting the requirement that broadcasters file Form 395–B. In addition, the Commission readopted the Note to § 73.3612 of its rules that it had previously adopted in 2000, stating that the data collected would be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of a broadcaster's compliance with the EEO rules. The Commission stated that it did not "believe that the filing of annual employment reports will

unconstitutionally pressure entities to adopt racial or gender preferences in hiring," but it acknowledged the concerns raised by broadcasters and sought comment on whether data reported on the Form 395–B should be kept confidential. Accordingly, while the Commission acted at that time to adopt revised regulations regarding the filing of Form 395–B and updated the form, the requirement that broadcasters once again submit the form to the Commission remained suspended until the agency further explored the issue of whether employment data could, or should, remain confidential. Although the requirement to file the forms on an annual basis remained suspended after 2004, the Commission regularly sought approval from OMB for the collection of information on Form 395–B. OMB most recently approved the information collection for Form 395–B through August 31, 2026, pending the Commission's resolution of whether the data will be confidential.

11. Given the passage of time since the *Third Report and Order and Fourth NPRM*, the Commission released a *FNPRM* on July 26, 2021, seeking to refresh the 2004 record with regard to Form 395–B. The *FNPRM* asked for additional input on relevant developments in the law relating to public disclosure of employment data, as well as the practical and technical limitations associated with implementing a system that could afford varying degrees of station-level anonymity. Interested parties filed comments, including public interest organizations and representatives of the broadcast industry. Their arguments range from asking that Form 395–B data be made publicly available to contending that reinstating the form would amount to an unconstitutional violation of race-based protections. Many of these assertions largely reiterate arguments addressed in the Commission's earlier orders, including whether the filing requirement constitutes unconstitutional pressure, the ramifications of the D.C. Circuit rulings, the directives of section 334, and the potential substitutability of the Equal Employment Opportunity Commission's (EEOC) EEO–1 form.

**Discussion**

12. Consistent with the Commission's authority pursuant to section 334, as well as the public interest provisions of the Act, we reinstate the collection of FCC Form 395–B. In doing so, we affirm the Commission's prior determination that the earlier court decisions in no way invalidated our authority to collect this data, which remains critical for

analyzing industry trends and making reports to Congress. Further, we find that reinstatement of this information collection on a publicly available basis is consistent with the protections afforded to broadcasters by the Constitution and relevant case law, as detailed further below. The clear separation of this information collection from the Commission's long-standing EEO program requirements mitigates any concerns that might be raised by the broadcasters as to the collection of this workforce data. In addition, the Commission's unequivocal statement that it will not use station-specific employment data for the purpose of assessing a licensee's compliance with the EEO regulations and the codification of that same stricture further underscore the dissociation between the EEO requirements and the form's data.

*B. Reinstatement of the Form 395–B Collection*

13. The Commission has a public interest in collecting Form 395–B in order to report on and analyze employment trends in the broadcast sector and also to compare trends across other sectors regulated by the Commission. In taking this action today, we note that Congress has long authorized the Commission to collect this data and that the Commission is uniquely positioned to undertake such a collection. While commenters have evinced an interest in improving the level of diversity in the broadcasting industry workforce, the lack of industry-wide employment data over the last 22 years makes it difficult to measure the extent of any such progress. While we do not anticipate that this more than two-decade long gap in data can ever be filled, with the reinstatement of this information collection the Commission can ensure that the lack of data persists no further, thereby providing it, the industry, Congress, and the public with a better understanding of, or insight into, the full scope of the broadcast industry workforce. Accordingly, in this Order, we reinstate collection of Form 395–B in the manner described below and require the form to be submitted in an electronic format. Once submitted, the form will be accessible to the public via the Commission's website.

14. Reinstating the collection of the Form 395–B data in a publicly available format, as they were collected prior to 2001, remains the best approach for achieving our ultimate goal of preparing meaningful and accurate analyses of workforce trends in the broadcast industry. First, public disclosure will increase the likelihood that erroneous data will be discovered and corrected,

and it will incentivize stations to file accurate data to avoid third-party claims that submitted data is incorrect. Whether intentionally or inadvertently, a station might misreport its data or misidentify the racial, ethnic, or gender group for particular employees. Individuals or entities with a connection to the station will be in a position to correct such errors if the data are made public. Second, making the Form 395–B data publicly available is consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public. Third, making the data public bolsters our ability to conduct analyses of trends across different communications sectors, within individual sectors, and by region or market, without being unnecessarily hampered by concerns about inadvertent disclosures of identifiable information. We believe the utility of our reports is greatly enhanced by our ability to "slice, dice, and display" granular data about the broadcast sector. Our ability to produce the most meaningful reports possible for Congress rests, in turn, on the ability to produce the most granular reports possible (*e.g.,* the number of employees in a particular demographic group in a specific job category among a certain class of stations [AM, FM, TV, etc.] in a specific geographic area). If we were required, however, to keep confidential the underlying station-specific data, we would feel compelled to report our findings at a more general, and thus less useful, level to avoid the risk of inadvertently facilitating any reverse engineering of station-specific information. This problem would be especially acute in smaller markets, where the identity of stations could be discerned more easily.

15. In addition, allowing public access to datasets allows others to review the accuracy of an agency's data analyses and its methods for data collection with the benefit of actual datasets. We find this level of transparency to be consistent with the overall trend toward making government data more accessible, and we note that many government agencies collect and publish demographic data as part of their analysis of markets, trends, and other factors. The *FNPRM* sought comment on the logistics associated with collecting and maintaining the Form 395–B data completely anonymously, or where station specific information is available to the Commission, but not to the public. Only one commenter addressed this issue by stating that the Commission's Licensing

and Management System (LMS) enables the shielding of certain exhibits attached forms. Irrespective of whether LMS can shield station-attributable data, we conclude for the reasons stated above that maintaining this data in a publicly available format is the most appropriate policy.

16. While broadcasters have expressed concerns with how the form's data might be used if publicly disclosed, such concerns have been addressed by the Commission's repeated statements on the appropriate use of such data and its amendment of the rules to prohibit use of the data to assess a broadcaster's compliance with Commission EEO rules. Notwithstanding the Commission's statements and actions, broadcasters were troubled in 2004 by comments made at that time positing that public disclosure of employment data would enable "citizens . . . to work closely with their local broadcaster to ensure that stations are meeting their needs and to resolve any problems with the companies in their communities." Broadcasters pointed to those comments as evidence that third parties would misuse Form 395–B data to pressure stations to engage in preferential hiring practices. As an initial matter, as the Commission has committed to previously and we reiterate here again, we will quickly and summarily dismiss any petition, complaint, or other filing submitted by a third party to the Commission based on Form 395–B employment data. We also note that any attempt by a non-governmental third party to use the publicly available Form 395–B data to pressure stations in a non-governmental forum would not implicate any constitutional rights of the station. In any event, we find such concerns to be speculative. Despite the public availability of Form 395–B data for more than 20 years prior to 2001, the record contains no evidence of use of such data in this manner. Nonetheless, we encourage broadcasters to bring to the Commission's attention any evidence that a third party has misused or attempted to misuse Form 395–B employment data. If evidence of such misuse of the data emerges, the Commission can reconsider its approach to collection of the Form 395–B data. Based on the record before us, we find no basis to conclude that the demographic data on a station's annual Form 395–B filing would lead to undue public pressure. We find broadcasters' concerns with the public collection and availability of this workforce data to be overstated, outweighed by the promotion of data accuracy and other

benefits of public disclosure noted above, and therefore not an impediment to our reinstatement of this collection.

17. Consistent with the limitations placed on our use of the Form 395–B data, we reject the commenter recommendation that the Enforcement Bureau use the data as evidence when investigating a discrimination claim against a station. We find that such use does not comport with the Commission's public interest goal behind collection of this data. The Commission has stated previously in the *2000 Reconsideration Order,* and we reiterate here, that "we will summarily dismiss any petition filed by a third party based on Form 395–B employment data" and "will not use this data as a basis for conducting audits or inquiries."

18. Some commenters have raised a concern that the Commission could decide at a later date to waive its rule regarding how the Form 395–B data can be used. We believe that the combination of the Commission's consistent position over two decades about how this data may be used, the established principle that "an agency is bound by its own regulations," our rejection of a proposed contrary use, and our determination in the attached *Order on Reconsideration* should assuage concerns on this point. We will not further delay reinstatement of the form based on unfounded conjecture about what the Commission may or may not do in the future.

19. Further, we reject the argument that we should retain Form 395–B data on a confidential basis given the EEOC's confidential treatment of similar employment data collected on its EEO–1 form. Unlike the Commission, the EEOC's authorizing statute specifically limits its ability to make its collected data publicly available. In the Civil Rights Act of 1964, which created the EEOC, Congress included a provision making it unlawful for an EEOC officer or employee to disclose such information. However, when Congress adopted section 334 in 1984, despite the fact that in the preceding 20 years Congress had not lifted the prohibition on public disclosure by the EEOC, Congress imposed no such limitation on publishing the broadcast workforce data collected by the Commission. Indeed, when Congress adopted section 334 in 1984, the Commission had been collecting broadcast workforce data and making it available publicly for decades, a practice Congress endorsed in passing section 334 without any limitation on public disclosure. In addition, the manner in which the two agencies may use their data differs significantly. The

EEOC may use its EEO–1 data for investigatory and enforcement purposes, but by contrast, we will not use Form 395–B data for enforcement purposes.

20. Some commenters assert that the Commission should rely on other data sources, including the EEO–1 form, in lieu of Form 395–B. Yet, section 334(a) of the Act states that "except as specifically provided in this section, the Commission shall not revise . . . the forms used by [television broadcast station] licensees and permittees to report employment data to the Commission." Pursuant to section 334 of the Act, we may change the form's provisions only "to make nonsubstantive technical or clerical revisions . . . as necessary to reflect changes in technology, terminology, or Commission organization." As we discuss further below, the alternative data sources suggested by commenters would both violate the section 334 prohibition on changes to the form and impede our general public interest goal of providing useful reports about employment in the broadcast sector.

21. In particular, we continue to reject the proposal, initially made nearly two decades ago and dismissed by the Commission at that time as being inadequate, to rely on the EEOC's EEO–1 form in lieu of Form 395–B. We reaffirm the Commission's prior conclusion that the EEO–1 form is not an appropriate substitute for Form 395–B, as the two forms differ greatly in the data they collect. First, unlike the EEO–1, Form 395–B distinguishes between full and part-time employees, consistent with our other employment data collections, providing a more comprehensive picture of the broadcast industry workforce. Second, and more importantly, reliance on the EEO–1 form would significantly reduce the amount of employment data available to the Commission as the vast majority of broadcast licensees do not file an EEO–1 form. While the Form 395–B collection applies to *all* broadcast station employment units with five or more full-time employees, the submission of an EEO–1 form is required only for entities with 100 or more employees. In 2004, in response to the same proposal to substitute the EEO–1 form for Form 395–B, the Commission calculated that the EEOC data "would not include 6,592 employment units (79%) out of a total of 8,395 units and would exclude 136,993 full-time employees (84%) out of the 163,868 full-time employees in broadcasting working at employment units employing five or more full-time employees." Consequently, we determine that replacing Form 395–B

either partly or wholly with the EEO–1 form does not constitute a permitted non-substantive modification of the form itself under section 334. Nor would such a substitution meet our public interest goal of providing a comprehensive report of employment in the broadcast sector and comparing employment trends across our regulatees. For the reasons provided above, we conclude that the EEO–1 form is an unsatisfactory replacement for Form 395–B. So as to reduce filing burdens, we also reaffirm the procedural practice of permitting broadcasters to file only one Form 395–B for all commonly-owned stations in the same market that share at least one employee.

22. Similarly, we find to be inapposite the suggestion to use the Radio Television Digital News Association (RTDNA) diversity survey as a substitute for the Form 395–B collection. As an initial matter, the RTDNA data pertains only to TV and radio newsrooms and not to the full spectrum of the broadcast industry workforce covered by Form 395–B. Moreover, the RTDNA survey ultimately is based on valid responses from those broadcasters that *choose* to participate in the survey, and, hence, the pool of participants is essentially a self-selected one. By contrast, *all* broadcast station employment units with five or more full-time employees must file the Form 395–B. Consequently, substituting Form 395–B with the RTDNA survey would be inconsistent with the section 334 prohibition on changes and would provide a less complete view of the broadcast sector.

23. Since we have determined that the benefits of making these reports public outweigh the speculative harm from doing so in light of the clear policy of the Commission about how they may and may not be used, we see no reason to afford them confidentiality. We note, however, that there is a question whether they would in fact warrant confidential treatment under the Freedom of Information Act (FOIA) or whether the Commission could satisfy the requirements of the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA). The *FNPRM* sought comment on the potential applicability of the CIPSEA or the FOIA exemptions to the Form 395–B data collection. As discussed below, the record and our own analysis demonstrate that CIPSEA is ill-suited for an agency such as the Commission. Similarly, the Form 395–B data does not fit neatly within FOIA Exemption 4, and in any event Exemption 4 does not prevent the Commission from disclosing information after an appropriate

balancing of the interests. Accordingly, for the reasons discussed below, we find neither CIPSEA nor FOIA affords an appropriate basis to collect Form 395–B information in a confidential manner.

### 1. CIPSEA Is Ill-Suited to the Commission's Collection of the Form 395–B Data

24. The Commission sought comment on CIPSEA in 2004 and again in 2021, in particular, seeking to explore whether the confidentiality afforded by CIPSEA to government-collected data could apply to the Form 395–B data. Commenters responding in 2004 disagreed regarding CIPSEA's applicability. Some commenters argued that CIPSEA authorizes the Commission to collect Form 395–B filings on a confidential basis and that doing so would be good public policy. Other commenters contended that neither CIPSEA nor the Communications Act permits the use of CIPSEA for Form 395–B filings. They further argued that confidential treatment would not serve CIPSEA's purpose of promoting public confidence in an agency's pledge of confidentiality, given that the Commission never made such a pledge with respect to Form 395–B, nor would it serve important policy objectives, such as ensuring the accuracy of Form 395–B data. When the Commission initially sought comment in 2004, the CIPSEA statute was barely two years old and relatively untested. Given the passage of time and the desire to obtain as complete a record as possible, the Commission sought comment anew on CIPSEA in 2021. The *FNPRM* sought input regarding the potential avenues under CIPSEA to collect and maintain data on a confidential basis, but the two comments in 2021 addressing CIPSEA provide insufficient discussion or analysis. As discussed further below, we find that CIPSEA is not an appropriate fit for the Commission's Form 395–B data collection.

25. A commenter suggests that the Commission could utilize any one of CIPSEA's three approaches for confidential collection and retention of the Form 395–B data: (1) have the Commission's Office of Economics and Analytics (OEA) seek recognition as a "Federal statistical agency or unit" pursuant to CIPSEA and have OEA alone collect and analyze the Form 395–B data, which would then be released in conformance with the CIPSEA confidentiality protections; (2) have the Commission collect this data independently as a "nonstatistical agency" or "unit;" or (3) as a nonstatistical agency or unit, enter into an agreement with an already

recognized "Federal statistical agency or unit" and have that agency collect the data on behalf of the Commission. While the commenter asserts that these approaches are "reasonable mechanism[s]" for safeguarding Form 395–B data, it does not specify how its proposals could be satisfied under the requirements established in OMB's 2007 Guidance. For example, the commenter does not discuss how the Commission, or even a subpart of the Commission, could qualify as a "statistical agency or unit" given that OMB accords that designation only when the *predominant* activities of the agency or unit are the use of information for statistical purposes. The Commission plainly does not fit that description. Furthermore, the commenter does not address the costs and burdens involved with applying for and obtaining from OMB the designation needed for CIPSEA protection. Nor does it address the cost and burdens associated with adherence to CIPSEA and whether the benefit of retaining the Form 395–B data in conformance with CIPSEA outweighs these costs and burdens. Below, we address these points.

26. Contrary to the commenter's suggestion, our detailed review of CIPSEA, OMB's 2007 Guidance, and examples of other agencies that have obtained designation as a "statistical agency or unit" demonstrates that neither the Commission nor OEA would qualify for such a designation. An agency, or agency unit, seeking such a designation must demonstrate to the OMB Chief Statistician that its activities are "*predominantly* the collection, compilation, processing, or analysis of information for statistical purposes." Although OEA conducts significant data analyses, its activities do not meet the "predominantly" standard laid out by OMB. Rather, OEA's regular work also includes administrative, regulatory, and adjudicative functions, as well as the administration of the Commission's various spectrum auctions. For these reasons, we determine OEA could not satisfy the requirements for "statistical agencies or units" and, therefore, this approach is not a viable option.

27. The commenter next suggests that the Commission could collect the Form 395–B data as a "nonstatistical agency" pursuant to CIPSEA, provided it complied with CIPSEA's restriction preventing nonstatistical agencies from using "agents," including contractors, to collect or use the protected information, and if it ensured that only internal agency staff had access to the protected information. The commenter identifies no agency that has successfully invoked this provision of CIPSEA in the more

than 20 years since the passage of the act. Nor have we been able to identify one. As discussed in the *FNPRM,* the Commission relies extensively on information technology (IT) contractors to develop and maintain electronic filing systems, assist filers with questions, and compile reports and other information based on data in Commission forms. The Commission has outsourced these tasks for decades consistent with a broader federal government initiative to ensure that those jobs that can be conducted in a more economically efficient manner by the private sector through competitive bidding. Moreover, the Commission currently relies on multiple IT contracts to maintain and operate its systems. Therefore, it would be extremely complex and burdensome from an administrative perspective to bring functions in-house solely for one form. For these reasons, we find that collecting Form 395–B data as a nonstatistical agency under CIPSEA is not a viable option.

28. We similarly find that the final approach under CIPSEA, namely that the Commission, acting as a "nonstatistical agency," partner with a "statistical agency," which would collect the Form 395–B data on the Commission's behalf, is not a realistic—or even workable—one. Our detailed review of CIPSEA and OMB's 2007 Guidance shows that this is a complex process involving various logistical steps, as well as significant additional burdens and costs. Partnering with a "statistical agency" involves identifying a possible partner agency, engaging in negotiations with that agency to establish an agreement for the collection of the data, negotiating and drafting an agreement stipulating the terms associated with collection, processing, and sharing of the Form 395–B data. Any such agreement would have to comport with OMB's requirements and might also necessitate OMB review. The Commission would also have to compensate any such partner agency for the costs of collecting and storing the data, educate the partner agency about the broadcast sector, and ensure that the information is collected in an appropriate manner. Under this approach, the Commission also would have to designate specific staff who would have permission to access the data and potentially restrict access to just those individuals. Moreover, broadcasters would have the additional burden of familiarizing themselves with a different agency's document filing system. As OMB has not yet issued guidance on such a partnership

approach, however, the potential logistical problems going forward are not even fully known. In addition, pursuing the approach of partnering with a "statistical agency" would lead to further delay in reinstituting this collection, which has already lagged for far too long, while also unduly increasing the complexity and cost of the collection. Going forward, such an approach would lend complexity to the process and potentially hamper the Commission's ability to review, analyze, and report on the underlying data on an ongoing basis. Consequently, we conclude that the significant time, complexity, and cost associated with formulating a partnership with a statistical agency outweigh any speculative harm that might arise from public availability of this data.

## 2. Even if FOIA Exemption 4 Applies, the Strong Public Interest in Disclosure Outweighs Any Private Interest In Confidential Treatment

29. The *FNPRM* sought comment on whether any Freedom of Information Act (FOIA) exemptions might apply to our collection of Form 395–B data. Commenters assert that Form 395–B data reported by broadcasters should not be publicly disclosed because doing so would reveal trade secrets and commercial information to competitors. While FOIA Exemption 4 protects trade secrets and confidential commercial information from mandatory public disclosure by the Commission, its applicability to the information collected on Form 395–B is questionable. Further, even if we were to find FOIA Exemption 4 applicable, the Commission is not compelled to keep data covered by Exemption 4 confidential. The Commission has authority to make records that fall within Exemption 4 public if it determines that the public interest in disclosure outweighs the private interests in preserving the data's confidentiality.

30. FOIA Exemption 4 protects from mandatory disclosure information that is "obtained from a person," as we recognize would be the case here, and that is both (1) "commercial or financial" in character and (2) "privileged or confidential." Commenters assert that Form 395–B demographic data are "commercial information." The case law, however, is not definitive on this question. Courts have sometimes defined commercial information broadly to include information submitted to an agency in which the submitter has a commercial interest, or to encompass information that has intrinsic commercial value, the

disclosure of which would jeopardize a submitter's commercial interests or ongoing operations. Those definitions might arguably apply to the demographic information of employees. However, in a recent case very closely on point, *Center for Investigative Reporting* v. *U.S. Department of Labor* (*Center for Investigative Reporting* v. *DOL*), the U.S. District Court for the Northern District of California held that the federal government failed to prove that EEO–1 Consolidated Report (Type 2) employee demographic data were "commercial." Similar to Form 395–B data, the EEO–1 Type 2 Reports do not include "salary information, sales figures, departmental staffing levels, or other identifying information. Although the Type 2 Reports "require companies [that do business at two or more physical addresses] to report the total number of employees across all their establishments," whereas the Form 395–B breaks down this information by station employment units, neither form links job categories to specific departments; rather, both require information aggregated by type of job across all departments. Furthermore, the EEO–1 reports utilize the same job title, gender, and ethnicity categories as the information to be provided in Form 395–B. Given these similarities between the EEO–1 reports and information to be provided in Form 395–B, *Center for Investigative Reporting* suggests that the Form 395–B data is at least arguably not correctly considered to involve commercial information.

31. It is likewise not entirely clear whether the data at issue here would be properly considered "privileged or confidential." Information is confidential within the meaning of Exemption 4 "whenever it is customarily kept private, or at least closely held, by the person imparting it." What matters is "how [a] particular party customarily treats the information, not how the industry as a whole treats [it]." Here, a commenter acknowledges that "many employers choose to publicly disclose workforce demographic data" in "a variety of forms." And although the commenter distinguishes between Form 395–B data and the EEO–1 data that companies often elect to disclose, we see similarities between the two data sets, as discussed above.

32. In addition, as discussed further below, we note that commenters have failed to show that competitive harm would result from the collection and public release of the information provided in Form 395–B. While the Supreme Court held in *Food Marketing Institute* that a showing of competitive

harm is not required to protect information from disclosure under Exemption 4, some courts have since declined to allow agencies to withhold information covered by Exemption 4 without showing an articulable harm from disclosure. These decisions rest on the theory that under the FOIA Improvement Act of 2016—which did not apply to the *Food Marketing Institute* case because it had not yet become effective at the time that case was filed—agencies must produce information otherwise covered by a FOIA exemption unless it is reasonably foreseeable that disclosure would harm an interest protected by the exemption (or disclosure is prohibited by law). However, the FOIA Improvement Act has alternatively been interpreted in the Exemption 4 context to require no demonstration of harm beyond the loss of confidentiality itself, and therefore the relevance of competitive harm to the Exemption 4 analysis remains an unsettled issue.

33. Ultimately, however, we need not decide whether Exemption 4 covers the information collected on Form 395–B or assess the relevance of the FOIA Improvement Act. The Commission has well-established authority under section 4(j) of the Act to publicly disclose even trade secrets or confidential business information if, after balancing the public and private interests at stake, we determine that it is in the public interest to do so.

34. In assessing the respective interests in the disclosure or non-disclosure of Form 395–B data, we determine that the public interest in disclosing Form 395–B data outweighs broadcasters' claims that such disclosure might cause unspecified harm. As outlined above, there are significant public interest benefits from public disclosure of Form 395–B data. Public disclosure of Form 395–B data promotes a more accurate collection and recordation process. It increases the likelihood that incomplete or inaccurate filings will be discovered and corrected, and it will incentivize stations to file accurate data to avoid third-party claims that submitted data are incorrect. It is also consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public. Public disclosure also allows us to produce the most granular reports possible for the benefit of Congress and the public, without being unnecessarily hampered by concerns about inadvertent disclosures of identifiable information. And public disclosure allows others to review the accuracy of our data analyses and to question our

methods for data collection with the benefit of actual datasets.

35. In contrast to these significant public benefits, commenters have failed to demonstrate that availability of the Form 395–B data would cause meaningful competitive harm. For example, a commenter asserts that if Form 395–B data were disclosed, a broadcaster's competitors could exploit such information to gain competitive insights into the broadcaster's business practices. Nothing in the record, however, realistically demonstrates how the public release of Form 395–B data might afford a competitor tangible insights into another broadcaster's business practices that would lead to competitive harm. Commenters have not provided any actual instances of harm related to the Commission's previous collection and public disclosure of demographic data, but rather largely project a speculative, worst-case scenario. A commenter posits that competitors would be able to draw more detailed insights by comparing published data over a stretch of years; however, we fail to understand how any such result would have a negative commercial impact on broadcasters. Moreover, the fact that a number of broadcasters have begun to disclose workforce demographic data, albeit not at the level of detail as would be reported on Form 395–B, also calls into question the extent of the competitive harm that would result if that information were to be publicly released. Further, guided in part by the court's analysis in *Center for Investigative Reporting* v. *United States Department of Labor*, we remain unconvinced that knowing the number of employees assigned to a particular job title or category in a company without knowing other details—for example, the duties of the employees, the structure of the company, salary information—can provide any significant information to a competitor that results in reasonably foreseeable or substantial competitive harm. As noted by various commenters in the instant proceeding, Form 395–B uses the same reporting methodology in terms of job categories as the EEO–1, rather than reporting "demographic information by division, department, or 'segment.'"

36. We conclude that the public benefits of releasing the information contained in Form 395–B are significant, while the harms would be slight. Thus, balancing the public interests in disclosure against the private interests at stake here, we find that there are strong public interests in favor of disclosure and that, accordingly, section 4(j) authorizes the

Commission to publicly disclose Form 395–B data.

37. *Timing of Form Submission.* As directed by § 73.3612 of the Commission's rules, broadcasters will be required to file Form 395–B annually on or before September 30 of each year, after the Order becomes effective. Authority is delegated to the Media Bureau to announce and provide filing instructions before the first window opens. The Commission established the September 30 deadline to align with the deadline for EEO–1 filings to enable licensees and permittees that also file similar data with the EEOC to conserve resources by using the same pay period record information for both filings. Broadcasters may report employment figures from any payroll period in July, August, or September of the relevant year, but that same payroll period must be used in each subsequent year's report by the licensee. Consistent with previous practice, the Form 395–B will be due on or before September 30 of each calendar year. To provide broadcasters adequate notice regarding the details of the electronic filing process, the Media Bureau will issue a Public Notice with instructions about how to submit the filings, prior to the first filing after the Order becomes effective. This Public Notice will provide broadcasters ample time to put into place whatever data collection processes they require, including, for example, the development of employee surveys and instructions for employees regarding which job classification to report. It also will afford the Commission time to create and test an electronic version of Form 395–B.

38. *Identification of Non-Binary Gender Categories.* Finally, in reinstating the collection of Form 395–B, some commenters urge us to incorporate into the form a mechanism that will enable identification of non-binary gender categories. While the EEOC has incorporated a comment box on the EEO–1 form allowing for submission of gender non-binary information, both the EEOC and the Commission traditionally track the definitions and standards on race, ethnicity and gender set forth by OMB and used widely by the federal government. To date, OMB has not prescribed conclusive classifications to capture non-binary gender data. Federal guidance, however, recognizes the "need to be flexible and adapt over time" in developing measures to collect such data. Consistent with that guidance and our record, we believe it is appropriate that the Form 395–B include a mechanism to provide further

specificity about broadcaster employees' gender identities.

39. We find that such an update fits within the latitude granted to the Commission pursuant to section 334(c) of the Act to revise the forms "to reflect changes in . . . terminology." We also find that the *FNPRM* provided sufficient public notice and opportunity for comment to allow us to incorporate this change to the form. The *FNPRM* encouraged commenters "to provide any new, innovative, and different suggestions for collecting and handling employment information on Form 395–B" and asked if there were "any other issues or developments that [the Commission] should consider." We conclude that the suggestion to include within the Form 395–B a mechanism to account for those who identify as gender non-binary is a logical outgrowth from the *FNPRM's* requests for comment. Accordingly, and after receiving only support for and no opposition to the idea, we will include such a mechanism in the reinstituted Form 395–B. We delegate to the Media Bureau the authority to implement this change to the Form.

*C. Constitutional Issues*

40. Reinstatement of the Form 395–B data collection in a publicly available manner is wholly consistent with the equal protection guarantee contained in the Fifth Amendment of the Constitution. As discussed below, collection of workforce data from broadcast licensees on Form 395–B is race- and gender-neutral, and no race- or gender-based government action flows from collection of the data or its public availability. Accordingly, collection and publication of Form 395–B data need only be rationally related to a legitimate governmental interest to pass constitutional muster. Since the Commission has a legitimate public interest in collecting Form 395–B data and doing so on a transparent basis is rationally related to this interest, reinstatement of Form 395–B as we propose is constitutionally permissible. Finally, we find that the limitations the Commission has placed on its own use of the data obviate the concerns raised in the record about the potential for undue pressure being placed on, or "raised eyebrow" regulation of, broadcasters.

41. As the court in *Lutheran Church* acknowledged, the Constitution's equal protection guarantee is not implicated if the regulation at issue is neutral with respect to protected categories. This standard is satisfied here, because both on its face and in application, the collection of workforce data from

broadcast licensees on Form 395–B is race- and gender-neutral. Regardless of the demographic makeup of a particular broadcast station employment unit, all units with five or more full-time employees are required to file their workforce data with the Commission. At no point does the Commission use race and gender categories to direct units on whether they must file the form; the number of employees within a given unit is the sole criterion. Further reflecting the neutrality of the application of the form, all units required to file with the Commission use an identical Form 395–B to report their respective demographic and job category data. By using employment size as the exclusive factor to direct units to file broadcast workforce data, the completion of the form in this regard is a neutral activity, "devoid of ultimate preferences" for hiring on the basis of race or gender.

42. Furthermore, there is no race- or gender-based government action that flows from collection of the data or its public availability. Unlike the collection of this data 20 years ago, there is no connection between the Form 395–B collection at issue here and the EEO program requirements applicable to broadcasters. The court's finding in *Lutheran Church* that the Commission's rules impermissibly pressured broadcasters to engage in race-conscious hiring decisions stemmed from the set of criteria that the Commission had created in 1980 to determine whether its review of a station's license renewal application should include a closer examination of the station's EEO program. Under those 1980 screening guidelines, the Commission would review the adequacy of a station's EEO program if minorities and/or women employed by the station were underrepresented as compared to the available workforce. That requirement to compare the racial composition of a station's workforce with that of the local population, and not the requirement to report employment data that we reinstate today, was the trigger for the court's strict scrutiny in that case.

43. While the Commission revised the EEO program requirements after the *Lutheran Church* ruling, the *use* of race, ethnicity, and gender information (albeit not Form 395–B data) was still linked to the Commission's EEO program. The new EEO program allowed stations to choose between two options for their recruiting programs. In *MD/DC/DE Broadcasters,* the D.C. Circuit struck down the Commission's revised, two-option EEO program because it found that broadcasters proceeding under Option B of the program were pressured

to engage in race-conscious recruiting practices, given that Option B required annual reporting of race, ethnicity, and gender information for each job applicant. The court found that such pressure would lead to outreach programs targeted at minority groups, to the potential disadvantage of non-minority groups, and thus constituted a racial classification that triggered strict scrutiny. Following the court's decision, the Commission suspended both its EEO outreach requirements and its Form 395–B filing requirement.

44. When the Commission later adopted new EEO program requirements in the *Second Report and Order and Third NPRM,* it deferred action on requiring the collection of workforce data, and the Form 395–B data collection has been on hold ever since. Thus, these EEO program requirements have existed independently of Form 395–B for the past 20 years. That the Commission's EEO program continued to operate even as the Form 395–B collection was held in abeyance highlights the separation of these two requirements. And we reiterate that going forward, these two requirements—the filing of annual workforce data and compliance with an EEO program—will continue to be divorced from one another. As the Commission has recognized consistently for more than 20 years, the *Lutheran Church* and *MD/DC/DE Broadcasters* decisions do not prohibit the collection of employment data for the purpose of analyzing industry trends. The Commission concluded more than two decades ago in the *2000 Reconsideration Order* that collecting employment data solely for monitoring purposes would not violate *Lutheran Church,* and we affirm that conclusion. The D.C. Circuit never took issue with the Commission's collection of station-specific employment data from broadcasters and making this data publicly available. We continue to find the collection of this information to be consistent with the Constitution and the public interest. The Commission has stated unequivocally and emphatically that it will not use the Form 395–B for assessing a licensee's compliance with EEO program requirements. The agency even went so far as to codify that policy in the Code of Federal Regulations, amending § 73.3612 of its rules in 2004 to prohibit explicitly the use of the Form 395–B data for EEO compliance purposes. We reaffirm the Commission's previous determination that workforce data collected on Form 395–B will be used only for purposes of analyzing industry trends and reports by the Commission, and that the use of such

data to assess an individual broadcast licensee's compliance with our EEO requirements will be prohibited. Moreover, in the attached *Order on Reconsideration,* we grant a previous request filed by the State Associations asking that we modify the prohibition on our use of the form's data to explicitly bar the Commission from employing this data to assess compliance with the nondiscrimination requirement contained in § 73.2080 of our rules. Our granting of the State Associations' request further demonstrates our commitment to use this data only for industry analysis and reporting.

45. We disagree with commenters' assertion that collection or publication of the data on a licensee- or station-attributable basis will still somehow result in unconstitutional "*sub silentio*" pressures or "raised-eyebrow" regulation. We have stated repeatedly and unequivocally, and codified the proposition in our rules, that we will not use Form 395–B data for any purpose other than for analyzing and reporting trends in the broadcast industry. Nonetheless, commenters attempt to employ dicta from the D.C. Circuit in *MD/DC/DE Broadcasters* and *Lutheran Church* about implicit pressures by claiming that, despite the limitations the Commission has placed on its own use of the data, third parties may use the data to place improper pressure on a licensee to engage in preferential hiring practices to avoid having frivolous complaints filed against it with the Commission. As an example, one commenter claims that some loan agreements would require broadcasters to disclose even frivolous petitions to their lenders, thereby adding an element of risk to funding acquisitions. To address this concern, we will make every effort to dismiss as quickly as possible any petitions, complaints, or other filings that rely on a station's Form 395–B filing as the basis of the petition, complaint, or other filing. Moreover, broadcasters in that situation may apprise lenders of our intent to dismiss such complaints and point to our rule disallowing the use of the data for compliance purposes.

46. Broadcaster groups mistakenly assert that reinstating a public collection of Form 395–B violates D.C. Circuit precedent, which the commenters argue effectively invalidated the use of the Form 395–B for all purposes. In arguing that the *Lutheran Church* decision invalidated Form 395–B, however, the commenters erroneously treat all the EEO requirements in effect at the time of *Lutheran Church* as one inseparable rule that the D.C. Circuit vacated. The

commenters are incorrect in asserting that the court's finding of unconstitutional pressure when the collection was combined with the then-existing EEO program somehow invalidated the Form 395–B itself for any and all other purposes. In fact, as noted above, what the *Lutheran Church* court found to be problematic was the requirement to compare the racial composition of a station's workforce with that of the local population, and not the requirement to report employment data to the Commission. The court's finding of unconstitutionality did not reach the Commission's use of the form to gather data purely for statistical purposes and without regard to a station's EEO compliance. Indeed, the court did not even speak to the form's use in collecting employment data for the purpose of analyzing industry trends, let alone invalidate it for that purpose.

47. Furthermore, we reject the suggestion that the finding in the *MD/DC/DE Broadcasters* case somehow casts doubt on the legitimate use of Form 395–B data for industry trend reporting, given that the Form 395–B was not even at issue in that case. The Form 395–B was only mentioned in the background section of that decision, as the collection of the *employee* diversity data was irrelevant to the data at issue in that case (*i.e., applicant* data). Rather, the court found the Commission's revised EEO program problematic because it determined that broadcasters proceeding under one aspect of the program (Option B) could feel pressured to engage in race-conscious recruiting practices, given that Option B required an annual reporting of the race, ethnicity, and gender information for each job applicant.

48. Therefore, unlike applicant data required under Option B of the former EEO program, the Form 395–B workforce data played no role in assessing a broadcaster's compliance with the recruiting rules at issue in *MD/DC/DE Broadcasters.* In the current situation no unconstitutional use of racial or gender classifications arises from the Commission's collection of annual employee data because we will not use the collection of Form 395–B demographic data for purposes of assessing or enforcing a broadcaster's compliance with our EEO rules. Further, we find the commenter argument that the court in *MD/DC/DE Broadcasters* disparaged the use of "outputs" to measure "inputs" to be misplaced. First, as noted above, the court was referring to *applicant* data—*i.e.,* those applying to open job positions at the station—as the output in that case, which was being

used to evaluate a broadcaster's outreach efforts and the success of its EEO program in recruiting potential job applicants. Employee data—*i.e.,* the composition of the station's workforce, which is captured by the Form 395–B—was not the "output" of concern. Second, to the extent that employee data might be considered an output, the Commission now explicitly prohibits the use of such data as a tool to measure a broadcaster's "inputs" to its EEO program. Furthermore, the court in *MD/DC/DE Broadcasters* never suggested that the collection of employee data for statistical purposes factored into its analysis regarding the unconstitutionality of the outreach rules.

49. Based on the above, we conclude that reinstating collection of Form 395–B in a public manner, where the form's data can only be used for reporting and analyzing industry trends, is fully consistent with the determinations in *Lutheran Church* and *MD/DC/DE Broadcasters.* The proposed action is race- and gender-neutral and crucial to Congress's and the Commission's interest in understanding broadcast employment trends. Because the Commission is the only entity with the resources and expertise to expeditiously collect and compile this data, it is vital that the agency restart this collection. With current data, the Commission, Congress, and the general public can better understand developments in the broadcast sector.

50. Although no commenter raised a First Amendment issue, we clarify that requiring stations to publicly disclose their workforce composition data does not constitute "compelled speech" on matters of race and gender, in violation of the First Amendment. A requirement to report information to the government fundamentally differs from the typical compelled speech case, which generally involves situations where "the complaining speaker's own message [is] affected by the speech it [is] forced to accommodate." Conversely, the Form 395–B report requires reporting of factual information to the Commission—the station's own employment figures—to allow the Commission to analyze trends. There is no message being forced by the government.

51. Even assuming, *arguendo,* that broadcaster's speech rights are implicated, our Form 395–B requirement is consistent with the First Amendment, as it entails disclosure of "purely factual and uncontroversial" information in a commercial context. The D.C. Circuit has ruled that government interests in addition to

correcting deception can be invoked to sustain a mandate for disclosure of purely factual information in the commercial context. The *Zauderer* test is satisfied here because disclosure of workforce data is reasonably related to a substantial governmental interest (ensuring maximum accuracy and utility of the data on which the government relies for analysis and reporting purposes), which outweighs the "minimal" interest in not disclosing purely factual, uncontroversial information. In the alternative, even assuming, *arguendo,* that our requirement is subject to heightened First Amendment review, we find that our disclosure requirement satisfies even this higher standard. The government has a substantial interest in analyzing broadcast industry workforce information to support greater understanding of the broadcast industry and to report to Congress about the same. Collecting this data and making broadcasters' Form 395–B filings publicly available directly advance this governmental interest because without the data it would be impossible to assess changes, trends, or progress in the industry and making the information public ensures maximum accuracy of the submitted data by increasing the likelihood that erroneous data will be discovered and corrected and incentivizing stations to file accurate data and thereby maximizes the utility of the data. Moreover, the requirement is not more extensive than is necessary to serve that interest, because the data will be collected in a manner consistent with the Commission's previous, long-standing method of collecting the data and because, as this order has made clear, the data collected will be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of a broadcaster's compliance with the EEO rules.

*D. The Commission Has Broad Authority To Collect Form 395–B*

52. We find sufficient authority to reinstate the collection of Form 395–B, both pursuant to the public interest provisions of the Act and section 334. The Commission's adoption of Form 395–B preceded Congress's passage of section 334 by more than two decades. As discussed above in Section II, the form and the Commission's EEO rules were rooted firmly in the Commission's public interest mandate under sections 4(i), 303, 307, 308, 309, and 310 the Communications Act. By codifying the Commission's then existing EEO requirements, as well as the collection of Form 395–B, Congress, in 1992,

ratified the Commission's pre-existing authority to adopt such rules and forms through congressional acquiescence in a long-standing agency policy. As the Commission discussed extensively in the *Second Report and Order and Third NPRM* in this proceeding, the limitation imposed by section 334 regarding changes to the Commission's then-existing EEO rules and forms evidenced Congress's approval of the Commission's EEO approach (including the information collection) and its desire to ensure its continuance. Lawmakers' express endorsement of the rules 30 years ago did not in any way undermine the Commission's pre-existing public interest authority. Moreover, the Commission also has broad authority under the Communications Act to collect information and prepare reports.

53. Despite this settled law, commenters challenge our authority to reinstate the form's collection, reviving arguments that the Commission rejected 20 years ago in the *Second Report and Order and Third NPRM.* First, they assert that, rather than a grant of EEO authority, section 334 is a limitation on the Commission's authority to revise its EEO regulations and forms. They suggest that the Commission is constrained from reinstating Form 395–B because, in setting forth the permissible exceptions to its restriction on EEO changes, Congress did not include, or later add, the situation where some provisions of the EEO rules are deemed unenforceable, as occurred in *Lutheran Church* and *MD/DC/DE Broadcasters.* Second, commenters posit that the Commission is taking inconsistent positions on the current force of section 334. They argue that, if section 334 is still in force and dictates reinstatement of Form 395–B, then the Commission's current EEO outreach rules violate the statutory provision because those rules have undergone substantial revision. The commenters assert that the Commission "cannot have it both ways" by rejecting the constraints of section 334 when it previously revised its EEO rules, but now invoking the same provision to reinstate Form 395–B.

54. We find commenters' assertions unsound as a matter of law and logic. They disregard the Commission's public interest authority under the Act, which was the underpinning of the Commission's EEO rules and Form 395–B long before the passage of section 334. Further, the commenters also misconstrue the impact of the court decisions on our section 334 authority. While the *Lutheran Church* court invalidated elements of the EEO

program requirements in effect in 1992, thereby terminating their enforceability, it did not address the constitutionality of section 334 itself. Moreover, the subsequent decision in *MD/DC/DE Broadcasters* did not imply that the unconstitutionality of the previous regulations rendered section 334 inoperative.

55. We therefore continue to reject the commenters' false premise that section 334 was somehow "neutered" by the D.C. Circuit decisions. Section 334 continues to provide authority for reinstating Form 395–B. Moreover, as discussed above, we find ample legal authority separate from section 334 to reinstate collection of the form.

## Order on Reconsideration

56. In 2004, the State Associations filed a petition seeking reconsideration of the *Third Report and Order and Fourth NPRM.* The petition asks the Commission: (1) to amend the Note to § 73.3612 of the Commission's rules to, in their view, clarify and strengthen the Commission's pledge to refrain from using Form 395–B data for compliance or enforcement purposes; (2) to address the issue of confidential treatment for Form 395–B; and (3) to issue a Fourth Report and Order resolving issues raised in the *Third Report and Order and Fourth NPRM* and in petitions for reconsideration filed in response to the *Second Report and Order and Third NPRM.* Numerous parties jointly filed an opposition to the petition. We hereby grant the State Associations' petition in part, deny it in part, dismiss it in part, and defer it in part.

57. The State Associations seek an expansion of the Commission's pledge to not use Form 395–B data to assess an individual broadcast licensee's compliance with the EEO rules to read as follows, with their proposed changes shown in italics:

*Note to § 73.3612:* Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's *or permittee's* compliance with the *nondiscrimination or* equal employment opportunity requirements of § 73.2080. *Accordingly, the Commission will not entertain any allegation or showing that a broadcast licensee or permittee has violated any aspect of § 73.2080 on the basis that the station's workforce does not reflect a certain number of persons of a particular gender, race or ethnicity either overall or in any one or more job categories.*

58. Based on the record stemming from the State Associations' 2004

petition for reconsideration and the determinations made in the *Fourth Report and Order* above, we find it appropriate to make certain changes to the language of § 73.3612 of our rules. With regard to the first of the State Associations' proposed changes, the opposing parties do not object to adding the phrase "or permittee's," and we agree to make that change because permittees also are required to file Form 395–B. We also find that explicitly stating in the rule itself that we will not use Form 395–B data to assess compliance with both the equal employment opportunity requirements *and nondiscrimination* requirements of § 73.2080 of our rules is consistent with our statements in the *Fourth Report and Order* above and with statements made by the Commission over the past two decades.

59. While the opponents to this change argue that we should not categorically limit our discretion to use EEO data as one of many factors in assessing a complaint of discrimination, these same opponents also acknowledge that the "Note itself, along with the text of [the] *3rd R&O,* make it plain that the FCC will *not* use annual employment data to assess compliance with the EEO rules of any individual broadcast licensee." Hence, codifying the limitation is nothing more than memorializing in another form a prohibition that the Commission has had in place for more than 20 years. This approach minimizes confusion about our position. We do not, however, see any need to include the final sentence suggested by the State Associations, as we find that it is essentially a repetition of the preceding sentence now that we have added "nondiscrimination or" to the preceding sentence. Finally, to conform to the publishing conventions of the National Archives and Records Administration's Office of the Federal Register, we will now incorporate what currently appears as a Note to § 73.3612 into the rule itself.

60. With regard to the State Associations' petition on the issue of confidential treatment of the Form 395–B data, we respond by adopting the *Fourth Report and Order* above, which reinstates the Form 395–B data collection in a public manner. Most of the remaining issues raised in State Associations' petition for reconsideration of the *Second Report and Order and Third NPRM* are unrelated to the Form 395–B filing requirement and, hence, we defer action on them here because they are beyond the scope of this *Order on Reconsideration.* We dismiss as moot

two specific issues raised in the petition: (1) the ability to recruit via the internet, which the Commission addressed in the intervening time period, and (2) a modification to the effective date of the then new rules.

## Procedural Matters

61. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA) requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the potential impact of rule and policy changes adopted in the *Fourth Report and Order* on small entities. Additionally, we have prepared a Final Regulatory Flexibility Certification (FRFC) certifying that the rule and policy changes contained in the *Order on Reconsideration* will not have a significant economic impact on a substantial number of small entities.

62. *Paperwork Reduction* Act. Final Paperwork Reduction Act Analysis for Fourth Report and Order and Order on Reconsideration in MB Docket No. 98–204. This *Fourth Report and Order* and *Order on Reconsideration* may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. All such changes will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this present document, we have assessed the effects of reinstating the collection of information on Form 395–B from broadcasters with five or more full-time employees and adding language to our rules clarifying that restrictions regarding the Commission's use of the collected data protect broadcast permittees as well as licensees. We find that, with respect to businesses with fewer than 25 employees, the paperwork burden associated with the completion and submission of Form 395–B will be minimal and the collection is necessary

to serve the purpose of obtaining complete information on employment trends in the broadcast industry. As it is customary for companies to routinely maintain employee information for various purposes, including payroll, broadcasters should not have to engage in extensive research to complete and submit their Form 395–B.

63. *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of this *Fourth Report and Order* and *Order on Reconsideration* to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

**Final Regulatory Flexibility Act Analysis (Report & Order)**

64. *Final Regulatory Flexibility Analysis.* As required by the Regulatory Flexibility Act of 1980, as amended (RFA) an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the 2021 Further Notice of Proposed Rulemaking (*FNPRM*) to this proceeding. The Federal Communications Commission (Commission) sought written public comment on the proposals in the *FNPRM,* including comment on the IRFA. The Commission received no comments on the IRFA. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.

*A. Need for, and Objectives of, the Report and Order*

65. This *Fourth Report and Order* reinstates the Commission's annual collection of broadcast workforce composition data by race and gender on FCC Form 395–B. We will use the collected data to analyze industry trends and make reports to Congress. Before the form's prolonged suspension beginning in 2001, the Commission made the collected workforce data publicly available. As stated in the *Fourth Report and Order,* we will continue with the public collection and dissemination of the data, which is in alignment with the public interest. Other than the inclusion of a mechanism allowing broadcasters to account in the Form 395–B for those employees who identify as gender non-binary, the reinstated collection does not change the form's reporting requirements. The inclusion of this mechanism, which will allow for accurate data gathering, will incur only

a minimal economic impact on a substantial number of small entities.

66. The reinstatement arrives after a significant period of delay in collection, which created a material gap in workforce composition data to be collected and analyzed by the Commission. Without the data, the Commission is prevented from analyzing important industry trends and reporting to Congress its analyses on the broadcast sector. A reinstituted collection of Form 395–B will allow us to carry out the public interest authority of this agency, and to implement section 334 of the Act, which instructs the Commission to collect broadcast workforce data.

*B. Legal Basis*

67. The *Fourth Report and Order* is authorized under sections 1, 4(i), 4(k), 303(r), 307, 308, 309, 310, 334, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 334, and 403.

*C. Summary of Significant Issues Raised by Public Comments in Response to IFRA*

68. There were no comments in response to IRFA notice.

*D. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration*

69. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the *FNPRM* in this proceeding.

*E. Description and Estimate of the Number of Small Entities to Which the Rules Apply*

70. The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted herein. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small government jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria

established by the SBA. Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

*F. Description and Estimate of the Number of Small Entities to Which the Rules Apply*

71. The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted herein. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small government jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA. Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

72. Television Broadcasting. This industry is comprised of "establishments primarily engaged in broadcasting images together with sound." These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources. The SBA small business standard for this industry classifies businesses having $41.5 million or less in annual receipts as small. 2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year. Of that number, 657 firms had revenue of less than $25,000,000. Based on this data we estimate that the majority of television broadcasters are small entities under the SBA small business size standard.

73. As of September 30, 2023, there were 1,377 licensed commercial television stations. Of this total, 1,258 stations (or 91.4%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission estimates

as of September 30, 2023, there were 383 licensed noncommercial educational (NCE) television stations, 380 Class A TV stations, 1,889 LPTV stations and 3,127 TV translator stations. The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard. Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

74. *Radio Stations.* This industry is comprised of "establishments primarily engaged in broadcasting aural programs by radio to the public." Programming may originate in their studio, from an affiliated network, or from external sources. The SBA small business size standard for this industry classifies firms having $41.5 million or less in annual receipts as small. U.S. Census Bureau data for 2017 show that 2,963 firms operated in this industry during that year. Of this number, 1,879 firms operated with revenue of less than $25 million per year. Based on this data and the SBA's small business size standard, we estimate a majority of such entities are small entities.

75. The Commission estimates that as of September 30, 2023, there were 4,452 licensed commercial AM radio stations and 6,670 licensed commercial FM radio stations, for a combined total of 11,122 commercial radio stations. Of this total, 11,120 stations (or 99.98%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission estimates that as of September 30, 2023, there were 4,263 licensed noncommercial (NCE) FM radio stations. The Commission however does not compile, and otherwise does not have access to financial information for these radio stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard. Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of radio station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

76. We note, however, that in assessing whether a business concern qualifies as "small" under the above definition, business (control) affiliations must be included. Our estimate, therefore, likely overstates the number of small entities that might be affected by our action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, another element of the definition of "small business" requires that an entity not be dominant in its field of operation. We are unable at this time to define or quantify the criteria that would establish whether a specific radio or television broadcast station is dominant in its field of operation. Accordingly, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and is therefore possibly over-inclusive. An additional element of the definition of "small business" is that the entity must be independently owned and operated. Because it is difficult to assess these criteria in the context of media entities, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and similarly may be over-inclusive.

*G. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

77. In this section, we identify the reporting, recordkeeping and other compliance requirements contained in the *Fourth Report and Order* and consider whether small entities are affected disproportionately by any such requirements. By this *Fourth Report and Order,* broadcasters are required to resume filing Form 395–B, which will be available to the public. The annual filing of Form 395–B will require employment units to upload the form onto the Commission's website. As recognized by the Office of Management and Budget (OMB), the Commission has estimated in the instructions to Form 395–B that the form's paperwork burden is minimal, taking each response, or form, approximately one hour to complete. This estimate includes the time to read the instructions, look through existing records, gather and maintain the required data, and actually complete and review the form or response. Because this *Fourth Report and Order* contains no new reporting or recordkeeping requirements, other than the incorporation of a mechanism to enable identification of gender non-binary categories, and only resumes the filing of an existing form, the reporting, recordkeeping and other compliance requirements of small entities will be no greater than under the current rules. Additionally, broadcast employment units with less than five full-time employees are exempt from filing statistical data. Because of this minimal reporting burden and due to the fact that smaller station employment units are exempt, we conclude that small entities will not be disproportionately affected by the *Fourth Report and Order.*

*H. Steps Taken To Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered*

78. The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.

79. This *Fourth Report and Order* reinstates the collection of broadcaster employment data on Form 395–B. Collection of the Form 395–B was suspended in 2001 following two decisions by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacating certain aspects of the Commission's equal employment opportunity rules. This suspension had no relation to the impact of the collection on small entities. As noted above, the filing requirement of Form 395–B importantly does not apply to broadcast employment units with less than five full-time employees, thereby exempting a large group of smaller entities from the filing requirements. The *Fourth Report and Order* only leads to a resumption of data collection efforts and imposes no new requirements for which the Commission can find alternatives that would minimize the economic burden on small entities.

*I. Report to Congress*

80. The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of this Report & Order and Order on Reconsideration to Congress

and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

## Final Regulatory Flexibility Certification Analysis (Order on Reconsideration)

81. For the reasons described below, we now certify that the policies and rules adopted in the *Order on Reconsideration* will not have a significant economic impact on a substantial number of small entities. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

82. In this *Order on Reconsideration,* we make certain changes to the language of § 73.3612 to clarify our collection and use of Form 395–B data. We add language to the rule confirming that the collection of Form 395–B data, and restrictions on the use of the data, also applies to broadcast permittees. The *Order on Reconsideration* adds an explicit statement to its rules that it will not use Form 395–B data to assess compliance with both the equal employment opportunity requirements and nondiscrimination requirements of § 73.2080. We find that this statement is consistent with our statements in the *Fourth Report and Order* and other previous statements made by the Commission over the past two decades.

83. The changes from the *Order on Reconsideration* will not have a significant economic impact on a substantial number of small entities because such changes do not alter the type or extent of information collected under Form 395–B. Rather, the *Order on Reconsideration* does nothing more than memorialize in another form a prohibition that the Commission has had in place for more than 20 years. Therefore, we certify that the changes provided in the *Order on Reconsideration* will not have a significant economic impact on a substantial number of small entities. The Commission will send a copy of this *Order on Reconsideration,* including a copy of this Final Regulatory Flexibility Certification, in a report to Congress and the Government Accountability Office pursuant to the Small Business Regulatory Fairness Act of 1996.

## Ordering Clauses

84. Accordingly, *it is ordered* that, pursuant to the authority contained in sections 1, 4(i), 4(k), 303(r), 307, 308, 309, 310, 334, 403, and 634 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 334, 403, and 554, this *Fourth Report and Order* and *Order on Reconsideration is adopted.*

85. *It is further ordered* that this *Fourth Report and Order* and *Order on Reconsideration shall be effective* 30 days after publication in the **Federal Register.** Compliance with § 73.3612 of the Commission's rules, 47 CFR 73.3612, which may contain new or modified information collection requirements, will not be required until the Office of Management and Budget completes review of any information collection requirements that the Office of Management and Budget determines is required under the Paperwork Reduction Act. The Commission directs the Media Bureau to announce the compliance date for the *Fourth Report and Order* and *Order on Reconsideration* by subsequent Public Notice.

86. *It is further ordered* that the Joint Petition of the State Broadcasters Associations for Reconsideration and/or Clarification of the Third Report and Order and Fourth NPRM, MM Docket No. 98–204 (filed July 23, 2004), is *granted in part, denied in part, dismissed in part,* and *deferred in part.*

87. *It is further ordered* that the Media Bureau is hereby directed to make the necessary changes to Form 395–B to provide for inclusion of gender non-binary information.

88. *It is further ordered* that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, *shall send* a copy of the *Fourth Report and Order* and *Order on Reconsideration,* including the Final Regulatory Flexibility Analysis and the Initial Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.

89. *It is further ordered* that the Office of the Managing Director, Performance Program Management, *shall send* a copy of this *Fourth Report and Order* and *Order on Reconsideration* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. 801(a)(1)(A).

Federal Communications Commission.

## List of Subjects in 47 CFR Part 73

Radio, Reporting and recordkeeping requirements, Television.

**Marlene Dortch,**
*Secretary.*

## Final Rules

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR part 73 as follows:

## PART 73—RADIO BROADCAST SERVICES

■ 1. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

■ 2. Revise § 73.3612 to read as follows:

### § 73.3612 Annual employment report.

Each licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395–B. Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of § 73.2080. Compliance with this section will not be required until this sentence is removed or contains a compliance date, which will not occur until after the Office of Management and Budget completes review of any information collection requirements pursuant to the Paperwork Reduction Act or until after the Office of Management and Budget determines that such review is not required.

[FR Doc. 2024–09468 Filed 5–2–24; 8:45 am]

**BILLING CODE 6712–01–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 73

**[MB Docket No. 23–380; RM–11968; DA 24–381; FR ID 216242]**

## Television Broadcasting Services Missoula, Montana.

**AGENCY:** Federal Communications Commission.