# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL RELIGIOUS BROADCASTERS, AMERICAN FAMILY ASSOCIATION, AND TEXAS ASSOCIATION OF BROADCASTERS,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,

*Respondents.*

## ON PETITION FOR REVIEW OF AN ORDER OF THE
## FEDERAL COMMUNICATIONS COMMISSION

## BRIEF OF THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., ASIAN AMERICANS ADVANCING JUSTICE | AAJC, NATIONAL WOMEN'S LAW CENTER, OFFICE OF COMMUNICATIONS OF THE UNITED CHURCH OF CHRIST, INC., NATIONAL PARTNERSHIP FOR WOMEN AND FAMILIES, THE GLOBAL BLACK ECONOMIC FORUM, LATINOJUSTICE PRLDEF, NATIONAL CENTER FOR LESBIAN RIGHTS & SOUTHERN POVERTY LAW CENTER AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS

Janai S. Nelson
  *President & Director-Counsel*
NAACP LEGAL DEFENSE & EDUCATIONAL
  FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

Noah Baron
Alizeh Ahmad
ASIAN AMERICANS ADVANCING JUSTICE-
  AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036

Jin Hee Lee
Michaele N. Turnage Young
  *Counsel of Record*
Amalea Smirniotopoulos
Kacey Mordecai
Avatara Smith-Carrington
NAACP LEGAL DEFENSE & EDUCATIONAL
  FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
mturnageyoung@naacpldf.org
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

CERTIFICATE OF INTERESTED PERSONS ..................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................1

ARGUMENT ..................................................................................3

    I.    Introduction .........................................................................3

    II.   The Mere Collection and Disclosure of Demographic Information Does Not Violate Equal Protection. ...............................................................5

        a. Collection of Demographic Data is Consistent with Equal Protection Guarantees. ...........................................................5

        b. Petitioners' Speculative Presumption that a Licensee Will Use Demographic Data Unlawfully Has No Merit. ..................................10

    III.  The FCC's Publication of Demographic Data Does Not Implicate the Broadcasters' Free Speech Rights, But Even If It Did, Form 395-B Would Comply with the First Amendment. ......................................................12

    IV.  The Government Operations Exception Applies, But Even If It Did Not, And Even If Petitioners Hadn't Waived Any Challenge To the FCC's Conclusions Here, Form 395-B Disclosures Are Akin To Commercial Speech. .................................................................................14

        a. Data About Workforce Composition is Uncontroversial and Factual. ...........................................................................15

        b. The FCC's Disclosure of Demographic Data Promotes Transparency and the Marketplace of Ideas. .........................................17

CONCLUSION .................................................................................19

CERTIFICATE OF SERVICE ..............................................................21

CERTIFICATE OF COMPLIANCE ...........................................................21

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ...................................................................13–15

*Caulfield v. Bd. of Ed. of City of New York*,
583 F.2d 605 (2d Cir. 1978) ...................................................................6

*Central Hudson Gas Elec. v. Public Serv. Comm'n*,
447 U.S. 557 (1980) ...................................................................14, 18

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) ...................................................................16

*Columbia Broad. v. Democratic Comm.*,
412 U.S. 94 (1973) ...................................................................14

*Doe v. Reed*,
561 U.S. 186 (2010) ...................................................................18

*Duarte v. City of Lewisville, Tex.*,
858 F.3d 348 (5th Cir. 2017) ...................................................................5

*Duffy v. Wolle*,
123 F.3d 1026 (8th Cir. 1997) ...................................................................11

*EEOC v. ACORN*,
83 F.3d 418 (5th Cir. 1996) ...................................................................15

*Ensley Branch NAACP v. Seibels*,
31 F.3d 1548 (11th Cir. 1994) ...................................................................11

*Florida Bar v. Went For It, Inc.*,
515 U.S. 618 (1995) ...................................................................13

*Free Speech Coal. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) ...................................................................13, 15, 17

*Lutheran Church-Missouri Synod v. F.C.C.*,
141 F.3d 344 (D.C. Cir. 1998) ...................................................................7, 12

*MD/DC/DE Broad. Ass'n v. F.C.C.*,
    236 F.3d 13 (D.C. Cir. 2001) ....................................................................8, 9

*Mlynczak v. Bodman*,
    442 F.3d 1050 (7th Cir. 2006) ....................................................................11

*Morales v. Daley*,
    116 F. Supp. 2d 801 (S.D. Tex. 2000) ....................................................7, 15

*Nat'l Ass'n of Mfrs. v. SEC*,
    748 F.3d 359 (D.C. Cir. 2014) ....................................................................16

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ...................................................................14, 17

*Nat'l Inst. Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ....................................................................................15

*Ohralik v. Ohio State Bar Assn.*,
    436 U.S. 447 (1978) ....................................................................................14

*Plumb v. Potter*,
    212 F. App'x. 472 (6th Cir. 2007) ..............................................................11

*R. J. Reynolds Tobacco Co. v. Food & Drug Admin.*,
    96 F.4th 863 (5th Cir. 2024) ..................................................................16, 17

*United States v. State of New Hampshire*,
    539 F.2d 277 (1st Cir. 1976) ....................................................................5, 6

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
    471 U.S. 626 (1985) ....................................................................................17

**Statutes**

7 U.S.C. § 2279-1(c)(1)(a) ................................................................................10

12 U.S.C. § 2803(a) et seq., (b)(4) ....................................................................9

29 C.F.R. § 1602.7 .............................................................................................9

42 U.S.C. § 300kk ..............................................................................................9

42 U.S.C. § 19152(a) ........................................................................9

45 C.F.R. § 1355.40(a), (b)(1) ........................................................9

50 U.S.C. § 3334b(b) ........................................................................9

**Other Authorities**

Br. of the NAACP Legal Def. & Educ. Fund, Inc. as Amicus Curiae in Supp. of Resp't & Intervenor, All. for Fair Bd. Recruitment v. SEC, 85 F.4th 226 (5th Cir. 2023) ........................................................................5

Diversity Wins: How Inclusion Matters 13, McKinsey & Company (May 2020), https://www.mckinsey.com/~/media/mckinsey/featured%20insights/diversity%20and%20inclusion/diversity%20wins%20how%20inclusion%20matters/diversity-wins-how-inclusion-matters-vf.pdf. ..............................................18

Letter from Leadership Conference on Civil & Human Rights to FCC Chair Jessica Rosenworcel 1 (Sept. 29, 2022), https://www.fcc.gov/ecfs/document/10929052325782/1. ...........................19

Rachel Minkin, Diversity, Equity and Inclusion in the Workplace, Pew Research Center (May 17, 2023), https://www.pewresearch.org/social-trends/2023/05/17/diversity-equity-and-inclusion-in-the-workplace/. ........18

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies, pursuant to Fed. R. App. P. 26.1 and 5th Cir. R. 28.2.1, *amici curiae* NAACP Legal Defense and Educational Fund, Inc. ("LDF"), Asian Americans Advancing Justice | AAJC ("Advancing Justice-AAJC"), National Women's Law Center, Office of Communications of the United Church of Christ, Inc., National Partnership for Women and Families, The Global Black Economic Forum, LatinoJustice PRLDEF, National Center for Lesbian Rights and Southern Poverty Law Center are nonprofit, non-partisan corporations. No *amicus curiae* has any parent corporation, nor any publicly held corporation that holds ten percent of their stock. The undersigned counsel of record certifies that, in addition to the persons and entities listed in the parties' Certificate of Interested Persons, the following persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order for this Court to evaluate possible disqualification or recusal.

**Amici Curiae**

NAACP Legal Defense & Educational Fund, Inc.
Asian Americans Advancing Justice | AAJC
National Women's Law Center
The United Church of Christ, Inc.
National Partnership for Women and Families
The Global Black Economic Forum
LatinoJustice PRLDEF
National Center for Lesbian Rights
Southern Poverty Law Center

**Attorneys for Amici Curiae**

Janai Nelson
Jin Hee Lee
Michaele Turnage Young
Amalea Smirniotopoulos
Kacey Mordecai
Avatara Smith-Carrington
Noah Baron
Alizeh Ahmad


Dated: October 4, 2024

*/s/ Michaele N. Turnage Young*
Michaele N. Turnage Young

*Counsel for Amici Curiae*

# INTEREST OF *AMICI CURIAE*[1]

LDF is the nation's first and foremost civil rights law organization. Founded in 1940 under the leadership of Thurgood Marshall, LDF strives to secure equal justice under the law for all people in the United States and to break down barriers that prevent Black people and other people of color from actualizing their basic civil and human rights. Through litigation, LDF seeks to defend and advance the proper interpretation of the constitutional guarantee of equal protection and anti-discrimination laws to ensure that our judicial system champions equality and opportunity.

For over five decades, LDF has advocated for racial integration and equality and has worked to eradicate exclusionary practices that are unjust. To that end, LDF has litigated several matters to break down barriers to equal opportunity in education, housing, employment, and other areas that shape the ability of Black people to thrive and reach their full potential. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1 (2023); *Lewis v. Chicago*, 560 U.S. 205 (2010); *Anderson v. Bessemer City*, 470 U.S. 564 (1985); *Pullman-Standard v. Swint*, 456 U.S. 273 (1982); *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975); *Phillips v. Martin Marietta Corp.*, 400 U.S. 542

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no party's counsel authored this brief either in whole or in part, and further, that no party or party's counsel, or person or entity other than *amici curiae*, *amici curiae*'s members, and their counsel, contributed money intended to fund preparing or submitting this brief.

(1971); *Griggs v. Duke Power Co*., 401 U.S. 424 (1971); *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954); *Shelley v. Kraemer*, 334 U.S. 1 (1948).

Asian Americans Advancing Justice | AAJC ("Advancing Justice-AAJC") is a nonprofit, nonpartisan organization that seeks to advance the civil and human rights of Asian Americans and to build an equitable society for all. Advancing Justice-AAJC is a leading expert on issues of importance to the Asian American community, including the census, voting, telecommunications and technology, educational equity, immigrant rights, and anti-racial profiling.

Advancing Justice-AAJC's work on telecommunications and technology has included submitting comments as part of the Federal Communications Commission's (FCC) rulemaking process, including here, detailing the effect proposed rules may have on Asian American communities. Advancing Justice-AAJC has also participated as amicus curiae in many cases touching on these issues, including most recently in *Minnesota Telecom Alliance v. FCC*, No. 24-1179 (8th Cir. 2024).

This brief is also submitted on behalf of *amici curiae* National Women's Law Center, Office of Communications of the United Church of Christ, Inc., National Partnership for Women and Families, The Global Black Economic Forum, LatinoJustice PRLDEF, National Center for Lesbian Rights and Southern Poverty Law Center. *Amici* have a substantial interest in the outcome of this case, which will

affect the ability of the FCC to collect demographic data that is neutral, routine, and essential to the federal government's operations.

## ARGUMENT

### I.    Introduction

Petitioners ask this Court to adopt the radical view that the mere collection and disclosure of demographic data violates the U.S. Constitution because it permits the FCC and the public to ascertain the racial and gender makeup of the broadcasters' workforces. Their novel argument requires the Court to indulge two logical fallacies. First, that the collection and reporting of demographic data from every broadcaster subject to this rule imposes differential treatment. And second, that collection and disclosure of this statistical data subject broadcasters to insurmountable pressure, forcing them to engage in illegal hiring discrimination. The Court should reject these flawed and unsupported arguments from Petitioners.

The FCC's Review of its Broadcast and Cable Equal Employment Opportunity Rules and Policies, Fourth Report and Order, reinstates Form 395-B to collect and publish demographic data related to the race and gender of its licensees' employees.[2] Form 395-B is one part of the broader effort by the federal government to collect data so that it can plan, fund, and evaluate government programs and policies in a manner that fairly serves the needs of all people in the United States.

---

[2] *See* Pet. for Rev., Ex. A ("Fourth Report and Order"), Dkt. No. 1-1.

Absent some impermissible, subsequent action, Form 395-B does not violate equal protection guarantees because the FCC's collection of demographic data is a race- and gender-neutral activity. No court has ever found otherwise.

Petitioners' presumption that such government action is unconstitutional despite the FCC's assurances of no improper, subsequent action, as well as their speculation about possible "pressure campaigns" from third parties, are unfounded. *Id*. at 55. Moreover, Petitioners engage in multiple inferential leaps when suggesting that broadcast licensees will make unlawful employment decisions under such pressure campaigns, ignoring that licensees' continuing compliance with federal law does not oblige companies to engage in illegal hiring discrimination even where accurate statistical reporting indicates an underrepresentation.

Further, contrary to Petitioners' assertions, Form 395-B disclosures do not implicate the First Amendment: their collection and publication involve neither viewpoint nor message. Even if that were not the case, publication of the demographic information in Form 395-B is analogous to permissible commercial disclosures, as it provides only factual and uncontroversial information; which would not merit heightened scrutiny and falls squarely within the types of speech that are encouraged to promote accuracy, transparency, and education.

In actuality, Petitioners seek to shield the collected information from public scrutiny despite the importance of accurate demographic data to the federal

government, investors, the general public, and the industry's various stakeholders for any number of legal, informational, and educational purposes. *See, e.g.*, Br. of the NAACP Legal Def. & Educ. Fund, Inc. as Amicus Curiae in Supp. of Resp't & Intervenor, *All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226 (5th Cir. 2023). *Amici*, therefore, respectfully urge this Court to decline the Petitioners' invitation to prohibit the collection and disclosure of such important statistical data and uphold the FCC's adoption of Form 395-B's data collection requirements.

## II.     The Mere Collection and Disclosure of Demographic Information Does Not Violate Equal Protection.

The collection of demographic information is a race- and gender-neutral activity that does not violate equal protection obligations because there is no differential treatment. *See, e.g.*, *Duarte v. City of Lewisville, Tex.*, 858 F.3d 348, 353 (5th Cir. 2017) (holding that a showing that "'two or more classifications of similarly situated persons were treated differently' under the statute" is required for an equal protection claim). This fact alone is fatal to Petitioners' Fifth Amendment claim.

### A.     Collection of Demographic Data is Consistent with Equal Protection Guarantees.

Courts have long held that data collection is congruent with equal protection guarantees so long as the state does not use the data for impermissible purposes. For example, in *United States v. State of New Hampshire*, the First Circuit rejected an equal protection challenge to mandatory reporting of demographic information to

the Equal Employment Opportunity Commission ("EEOC"). 539 F.2d 277, 280 (1st Cir. 1976). Though New Hampshire contended, as Petitioners do here, that the data might be improperly used, the First Circuit rightfully acknowledged that the "possible and purely hypothetical misuse of data does not require the banning of reasonable procedures to acquire such data." *Id*. The First Circuit emphasized the neutral nature of statistical information, "which only becomes meaningful when it is interpreted." *Id.* Thus, "any positive steps . . . take[n] as a result of [the] interpretation of the data"—not the data itself—remain "subject to law and judicial scrutiny." *Id.* The Second Circuit similarly ruled that "the Constitution itself does not condemn the collection of [employee racial demographic] . . . data," noting any concerns about "overcoming simple racial imbalance [were] premature." *Caulfield v. Bd. of Ed. of City of New York*, 583 F.2d 605, 611 (2d Cir. 1978).

Likewise, the district court in *Morales v. Daley* considered and rejected a Fifth Amendment challenge to the collection of racial demographic data through the decennial census. 116 F. Supp. 2d 801, 814–15 (S.D. Tex. 2000). The court held that there is a salient "distinction between collecting demographic data" to be used by the government to govern, "and governmental use of suspect classifications without a compelling interest." *Id.* at 814. Petitioners' reliance on *Adarand Constructors, Inc. v. Pena* to contend that "a requirement to classify workers by race, alone, triggers Fifth Amendment scrutiny," Pet'rs' Br. at 39, was squarely rejected by the

court in *Morales*, which interpreted *Adarand* to hold only "that equal protection guards against government actions based on race," and specifically noted that it "*does not deal with government collection of data on race.*" *Morales*, 116 F. Supp. 2d at 813 (emphasis added).

Petitioners rely heavily on two decisions, *Lutheran Church* and *MD/DC/DE Broadcasters Association*, which are factually distinct and do not control the matter before this Court. Each of these cases concerned state action that would be taken because of the FCC's interpretation of collected data—not, as here, the collection and disclosure of the data itself.

In *Lutheran Church-Missouri Synod v. F.C.C.*, the D.C. Circuit held that the FCC's guidelines were subject to heightened scrutiny because they required broadcasters to "adopt an affirmative action 'EEO program' targeted to minorities and women" that required them to seek out sources likely to refer female and minority applicants for employment. 141 F.3d 344, 346 (D.C. Cir. 1998). The court reasoned that those FCC regulations "oblige[d] stations to grant some degree of preference to minorities in hiring." *Id*. at 351. The D.C. Circuit reached this conclusion because the FCC intended to take specific action based on the collected data: broadcasters' failure to reach certain "numbers" would trigger "intense review" and potential loss of their licenses. *Id*. at 353. The facts of this case differ significantly because the FCC has neither imposed an affirmative requirement on

broadcasters nor mandated any other actions based on demographic information obtained from data collection. In fact, the FCC has explicitly disclaimed any enforcement associated with the collected data. Importantly, *Lutheran Church* neither addressed nor questioned the constitutionality of the *mere collection and disclosure* of demographic data within Form 395-B and, thus, does not support Petitioners' claim.

Likewise, in *MD/DC/DE Broadcasters Association v. F.C.C.*, the D.C. Circuit found that heightened scrutiny applied where the FCC regulations stated that the FCC would take specific actions in response to disclosed demographic data. 236 F.3d 13, 19 (D.C. Cir. 2001). Specifically, the regulations stated that the FCC would: (a) investigate a broadcaster with few or no female or minority applicants, and (b) require the broadcaster to modify its outreach program if the data showed that it needed to be more inclusive. *Id.* at 19. As with *Lutheran Church*, the facts of this case are not remotely analogous. Because the FCC has disavowed use of Form 395-B data to determine compliance with its EEO Rule, there is no accompanying inducement, threat, expectation, or other action from the agency in connection with the collection and dissemination of that data. Thus, *Lutheran Church* and *MD/DC/DE Broadcasters Association* are inapposite because the crux of the D.C. Circuit's analysis in both cases rested on subsequent action the FCC would take

based on its interpretation of demographic data—not on the collection and disclosure of that data. *See id.* at 22.

Form 395-B is simply one part of a broad effort to collect information and make it publicly available. Indeed, taken to their logical conclusion, Petitioners' arguments would upend the normal functioning of the federal government, as many federal entities require and rely upon the routine collection and dissemination of demographic data. *See, e.g.*, 42 U.S.C. § 300kk (requiring any federally conducted or supported health care or public health program, activity or survey to collect and report data on race, ethnicity and sex); 12 U.S.C. § 2803(a) *et seq.*, (b)(4) (requiring financial institutions that originate or purchase mortgage loans to collect and disclose demographic information about mortgagors and mortgage applicants, including their race and gender); 42 U.S.C. § 19152(a) (requiring federal research agencies to collect demographic information on "applications for merit-reviewed research and development awards made by such agency"); 50 U.S.C. § 3334b(b) (requiring Director of National Intelligence to publish "aggregate demographic data . . . of the workforce of the intelligence community"); 29 C.F.R. § 1602.7 (requiring employers to annually submit workforce demographic information in "Employer Information Report EEO-1"); 45 C.F.R. § 1355.40(a), (b)(1) (requiring that states submit to the Administration for Children and Families race, ethnicity and gender data on the children placed in foster care or adopted and the foster or adoptive

parents); 7 U.S.C. § 2279-1(c)(1)(a) (requiring the Department of Agriculture to compile reports on programs that serve agricultural producers and landowners, including the number of applicants and participants by race, ethnicity, and gender).

In challenging this routine process, Petitioners conflate the FCC's race- and gender-neutral act of collecting and reporting data with a completely separate, speculative act of subsequently using that data in a manner that would be subject to heightened judicial scrutiny. This Court, therefore, should reject Petitioners' novel and unsupported legal arguments.

## B. Petitioners' Speculative Presumption that a Licensee Will Use Demographic Data Unlawfully Has No Merit.

Petitioners have no support in the factual record or the law in presuming that the collection and publication of demographic data will leave broadcasters helpless to resist the urge to engage in unlawful discrimination in hiring. As noted above, the FCC has disavowed any enforcement action with respect to the data collected in Form 395-B. And, contrary to Petitioners' concerns, there is no concerted "pressure campaign" from either the FCC or third parties to persuade broadcasters to engage in unlawful hiring discrimination. *See* Pet'rs' Br. at 37–38.

Even if the demographic makeup of a particular broadcaster's workforce suggests an underrepresentation of certain communities that is indicative of unfair barriers to equal opportunity, it does not—and should not—necessarily follow that the broadcaster will respond by engaging in unlawful hiring discrimination. *See, e.g.*,

*Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) ("Although Taboas was a decisionmaker and the evidence showed that he was philosophically favorable to the hiring of minorities, that does not prove that any particular decision he made was for discriminatory reasons."); *Plumb v. Potter*, 212 F. App'x. 472, 477–78 (6th Cir. 2007) ("[A] jury could find that [the employer] believed that it was good to have more women working at the [company], yet still conclude that [the decisionmaker] did not let that personal belief interfere with her decision whether or not to promote a woman over [the plaintiff]."). Indeed, it would be ironic to assume that a broadcaster—concerned about possible hiring discrimination based on unfair barriers to equal opportunity faced by underrepresented communities—would address that concern by engaging in another form of hiring discrimination.

Moreover, broadcasters can choose from a number of legal options to advance equal opportunity. For example, it is lawful for an employer to "expand the pool of persons under consideration" for a vacancy and thereby work to "ensur[e] diversity in the applicant pool." *Mlynczak*, 442 F.3d at 1058 (citation omitted); *see also Duffy v. Wolle*, 123 F.3d 1026, 1038–39 (8th Cir. 1997) ("An employer's affirmative efforts to recruit minority and female applicants does not constitute discrimination. An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment."); *Ensley Branch NAACP v. Seibels*,

31 F.3d 1548, 1571 (11th Cir. 1994) (characterizing efforts to recruit Black applicants as "race-neutral"). In fact, the D.C. Circuit in *Lutheran Church* specifically declined to rule that mere outreach efforts gave rise to strict scrutiny. *See Lutheran Church*, 154 F.3d at 492 ("That does not mean that any regulation encouraging broad outreach to, as opposed to the actual hiring of, a particular race would necessarily trigger strict scrutiny.").

In sum, no court has suggested that the mere collection and disclosure of demographic data violates the Fifth Amendment's equal protection guarantees. And for good reason. Only government action taken *in response to its interpretation of data* can result in unequal treatment, and Form 395-B's collection and dissemination of demographic data entails no accompanying government inducement, threat, or incentive. Moreover, even if demographic data suggests that individuals from some communities may be encountering barriers to equal employment opportunity, it would be improper for any court to conclude that the broadcaster will respond by engaging in unlawful hiring discrimination. Accordingly, this Court should reject Petitioner's Fifth Amendment arguments and affirm the ruling below.

## III. The FCC's Publication of Demographic Data Does Not Implicate the Broadcasters' Free Speech Rights, But Even If It Did, Form 395-B Would Comply with the First Amendment.

We agree with Respondents that by ignoring the FCC's analysis, Petitioners have waived any challenge to the FCC's conclusion that the data collection does not

compel speech and, in any event, falls within the government operations exception. Resp'ts' Br. at 51.

Petitioners' argument, which the Court need not reach, fails on the merits too. Form 395-B disclosures do not implicate Broadcasters' First Amendment rights: they involve the straightforward publication of statistical data, which entails no viewpoint or message. As in the case of other "disclosure[s] of demographic or similar factual information" to the government, the regulation's goals must be rationally connected to a legitimate state interest, which is easily met here. *Book People, Inc. v. Wong*, 91 F.4th 318, 339 (5th Cir. 2024) (citing *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995)).

Even if that were not so, far from warranting the height of First Amendment protection, the publication of demographic data is more akin to a commercial disclosure subject to a lower standard of scrutiny than that "at the [...] Amendment's core." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995). In fact, multiple industry commenters conceded that the data are "commercial" in nature during the rulemaking process. *See* Pet. for Rev., Ex. A ("Fourth Report and Order"), Dkt. No. 1-1 ¶ 31 & n.112. The "mere disclosure of demographic or similar factual information," *Book People*, 91 F.4th at 339 (discussing government operations exception), is hardly "an integral part of a live, contentious political or moral debate." *Free Speech Coal.*, 95 F.4th at 282. Like compelled commercial

disclosures, Form 395-B promotes the values undergirding the First Amendment by promoting transparency and the free flow of information.

A. **The Government Operations Exception Applies, But Even If It Did Not, And Even If Petitioners Hadn't Waived Any Challenge To the FCC's Conclusions Here, Form 395-B Disclosures Are Akin To Commercial Speech.**

Even if the data in Form 395-B did implicate the First Amendment, they would be akin to commercial speech and their disclosure by the FCC would comport with the First Amendment. Like commercial speech, the number of employees falling within specified demographic groups is "related solely to the economic interests of the speaker and its audience"—here, the licensing of the airwaves to private enterprises on behalf of the public. *Central Hudson Gas Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980). Like speech proposing a commercial transaction the demographic data in Form 395-B "occurs in an area traditionally subject to government regulation," *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 (1978), as "federal regulation of broadcasting in the public interest has been extensive." *See, e.g.*, *Columbia Broad. v. Democratic Comm.*, 412 U.S. 94, 135 (1973). Lastly, Form 395-B, like commercial speech subject to mandated disclosure, does not implicate the "individual liberty interests guarded by the First Amendment" because it involves no "viewpoint" and "presents little risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001).

**B.    Data About Workforce Composition is Uncontroversial and Factual.**

The FCC simply requires companies to count workers and does not require anyone to express any viewpoint—the quintessential "factual and uncontroversial" disclosure. *Free Speech Coal. v. Paxton*, 95 F.4th 263, 281 (5th Cir. 2024). Statements are "factual and uncontroversial" if the "truth of the statement is not subject to good-faith scientific or evidentiary dispute and . . . not an integral part of a live, contentious political or moral debate." *Id.* at 281–82. All those elements describe the disclosures of demographic data at issue in this case.

*First*, the truth of the disclosures is undisputed, even by Petitioners. *See* Pet'rs' Br. at 48–49.

*Second*, the data at issue here are hardly "an integral part of a live, contentious political or moral debate." *Free Speech Coal.*, 95 F.4th at 282. In contrast to "controversial" disclosures, Form 395-B does not concern a matter of longstanding national debate, but instead merely requests the kind of data that has been collected and disclosed by a myriad public and private entities for generations. *Compare Nat'l Inst. Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768–69 (2018) ("*NIFLA*") *with EEOC v. ACORN*, 83 F.3d 418, 1996 WL 197411, at *4 (5th Cir. 1996) *and Morales v. Daley*, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000). Nor does Form 395-B require Petitioners to read a "government-drafted script" directing others to a competing service they morally oppose, *NIFLA*, 585 U.S. at 763, or contain any moral judgment

about the product or speaker. *See Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 371 (D.C. Cir. 2014) ("*NAM*").

Even assuming that the First Amendment were implicated at all, which it is not, the anodyne disclosure here is more aligned with cigarette warnings, bankruptcy warnings, disclosure of stock buyback rationales, and explanations of social media censorship decisions that this Circuit has held to be truthful and uncontroversial. *R. J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 882 (5th Cir. 2024) (cert petition docketed) (holding that cigarette warnings are uncontroversial commercial speech).

Petitioners would have to contort the term "controversy" to an absurdly abstract and subjective level to render factual data indicating the mere number of Black people and other people of color, women, and nonbinary individuals in the broadcasters' workforce indistinguishable from "issues about race and sex" more generally. Pet'rs' Br. at 49. Such an understanding of "controversy" would vitiate the entire standard, rendering everything "controversial." *See, e.g.*, *Chamber of Com. v. SEC*, 85 F.4th 760, 770 (5th Cir. 2023) (holding that opinions on repurchases of shares were uncontroversial despite Petitioners' contention that it was "one of the most controversial corporate decisions").

Finally, contrary to Petitioners' arguments, a disclosure is not "controversial" because a regulated entity is "reluctant" to provide it, "wish[es] to avoid" making it,

or even themselves object to it. Pet'rs' Br. at 50. Rather, courts have found that even if "the compelled speaker dislikes or disagrees with the message," the speech is not sufficiently controversial to raise First Amendment concerns. *Free Speech Coal.*, 95 F.4th at 282; *accord R.J. Reynolds Tobacco Co.*, 96 F.4th at 881 n.58.

Because workplace composition data is neither the subject of good-faith scientific or evidentiary dispute nor part of a "live, contentious political or moral debate," *Free Speech Coal.*, 95 F.4th at 282, it is a "factual and uncontroversial" disclosure that comports with the First Amendment. *Id.* at 281.

## C. The FCC's Disclosure of Demographic Data Promotes Transparency and the Marketplace of Ideas.

By promoting, rather than restricting, the flow of information, Form 395-B promotes the "First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *Sorrell*, 272 F.3d at 114. The governmental interest in the "discovery of truth" and the "marketplace of ideas" is so significant that it is the basis for upholding not only commercial disclosure requirements, but political disclosure requirements as well. *Id.* The same reasoning applies with equal force here.

Commercial speech receives First Amendment protection primarily because of "the value to consumers of the information such speech provides," *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985), because it "assists consumers and furthers the societal interest in the fullest possible

dissemination of information." *Central Hudson*, 447 U.S. at 561–62. Courts, therefore, have upheld compelled disclosures even in the realm of core political speech, which is a testament to the strength of the public's interest in the free flow of information. *See, e.g.*, *Doe v. Reed*, 561 U.S. 186, 199 (2010) (upholding the compelled disclosure of signatory information on referendum petitions because it "promotes transparency and accountability").

The disclosure of demographic data advances these values in a variety of ways. It enables employees and investors to make educated, economic decisions when deciding whether to work at, finance, or consume their media from a particular broadcaster. For example, a 2020 study showed that demographic information about the ethnicity and gender of staff and leadership teams was relevant to a company's profitability as there is significant correlation between company financial outperformance and diversity.[3] Additionally, approximately 30% of workers consider demographic information about race and gender in the workplace to be important to their decision on where to work.[4] Racial demographic data also enables civil society organizations to "develop a full understanding of how the communities

---

[3] *Diversity Wins: How Inclusion Matters* 13, McKinsey & Company (May 2020), https://www.mckinsey.com/~/media/mckinsey/featured%20insights/diversity%20and%20inclusion/diversity%20wins%20how%20inclusion%20matters/diversity-wins-how-inclusion-matters-vf.pdf.

[4] Rachel Minkin, *Diversity, Equity and Inclusion in the Workplace*, Pew Research Center (May 17, 2023), https://www.pewresearch.org/social-trends/2023/05/17/diversity-equity-and-inclusion-in-the-workplace/.

we represent are faring," [5] particularly as "we face a historically low amount of demographic data"[6] available on important aspects of the communications industry.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully urge this Court to reject Petitioners' challenge to the collection and dissemination of demographic data via Form 395-B.

---

[5] Letter from Leadership Conference on Civil & Human Rights to FCC Chair Jessica Rosenworcel 1 (Sept. 29, 2022),
https://www.fcc.gov/ecfs/document/10929052325782/1.
[6] *Id.* at 2.

Dated: October 4, 2024

Respectfully submitted,

*/s/ Michaele N. Turnage Young*

Janai S. Nelson
  *President & Director-Counsel*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006

Jin Hee Lee
Michaele N. Turnage Young
Amalea Smirniotopoulos
Kacey Mordecai
Avatara Smith-Carrington
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
40 Rector Street, Fifth Floor
New York, NY 10006
(202) 682-1300
mturnageyoung@naacpldf.org

Noah Baron
Alizeh Ahmad
ASIAN AMERICANS ADVANCING JUSTICE-
  AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify on this 4th day of October, 2024, that I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF filing system. I further certify that all participants in this case are registered CM/ECF users and that all service will be accomplished by the appellate CM/ECF system.

/s/ Michaele N. Turnage Young
Michaele N. Turnage Young

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify on this 4th day of October, 2024, that this brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 29(a)(5), 32(a)(5), and 32(f). This brief totals 4,276 words, which abides by the 6,500-word limit for this brief, and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

/s/ Michaele N. Turnage Young
Michaele N. Turnage Young

*Counsel for Amici Curiae*