## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **NATIONAL RELIGIOUS BROADCASTERS; AMERICAN FAMILY ASSOCIATION,** | ) Case No. 24-60219 |
| *Petitioners,* | ) |
| | ) |
| ***v.*** | ) |
| | ) |
| **FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,** | ) |
| *Respondents.* | ) |
| *Consolidated with* | ) |
| **TEXAS ASSOCIATION OF BROADCASTERS,** | ) Case No. 24-60226 |
| *Petitioner,* | ) |
| | ) |
| ***v.*** | ) |
| | ) |
| **FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,** | ) |
| *Respondents.* | ) |

On Petition for Review of an Order of the
Federal Communications Commission
Agency No. 24-18

## JOINT APPENDIX

William Scher
FEDERAL COMMUNICATIONS
  COMMISSION
Office of General Counsel
45 L Street, NE
Washington, DC 20554

*Counsel for Respondent Federal
Communications Commission*

Robert B. Nicholson
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530

*Counsel for Respondent United States
of America*


Jessica T. Nyman
  *Counsel of Record*
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
401 Congress Ave, Suite 1700
Austin, TX 78701
(512) 580-9645
jessica.nyman@pillsburylaw.com

Scott R. Flick
Matthew J. MacLean
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth St NW
Washington, DC 20036
(202) 663-8167
scott.flick@pillsburylaw.com
matthew.maclean@pillsburylaw.com

*Counsel for Petitioner Texas Association
of Broadcasters*

Jonathan Berry
R. Trent McCotter
Jared M. Kelson
  *Counsel of Record*
Laura B. Ruppalt*
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave SE, No. 231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for Petitioners National
Religious Broadcasters and American
Family Association*


* Admitted only in Virginia; practice
limited to matters before federal
agencies and federal courts.

# TABLE OF CONTENTS

TAB                                                            **Page**

1   *Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules & Policies*, MB Docket No. 98-204, Fourth Report and Order and Order on Reconsideration, FCC 24-18 (rel. Feb. 22, 2024) ........................................................JA1

2   *Leadership Conference on Civil & Human Rights Comment*, MB Docket No. 98-204 (Sept. 29, 2022) ........................................JA63

3   *Joint Supplemental Comments of Asian Americans Advancing Justice et al.*, MB Docket No. 98-204 (Aug. 10, 2022) ......................JA66

4   *United Church of Christ Media Justice Ministry Notice of* Ex Parte *Communication*, MB Docket No. 98-204 (Mar. 9, 2022) ..................JA96

5   *Joint Reply Comments of State Broadcasters Ass'ns*, MB Docket No. 98-204 (Nov. 1, 2021).........................................JA104

6   *Reply Comments of Nat'l Ass'n of Broadcasters*, MB Docket No. 98-204 (Nov. 1, 2021).........................................JA124

7   *Comments of the Ctr. for Workplace Compliance*, MB Docket No. 98-204 (Sept. 30, 2021) ......................................JA132

8   *Comments of Nat'l Ass'n of Broadcasters*, MB Docket No. 98-204 (Sept. 30, 2021) ......................................JA143

9   *Review of the Commission's Broadcast & Cable Equal Opportunities Rules & Policies*, Third Report and Order and Fourth Notice of Proposed Rulemaking, 19 FCC Rcd. 9973 (2004) ..........JA169

Tab 1

Federal Communications Commission                    FCC 24-18

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Review of the Commission's Broadcast and Cable | **)** | MB Docket No. 98-204 |
| Equal Employment Opportunity Rules and Policies | **)** | |
| | **)** | |

**FOURTH REPORT AND ORDER, ORDER ON RECONSIDERATION, AND SECOND**
**FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: February 7, 2024**                    **Released: February 22, 2024**

**Comment Date: (30 days after date of publication in the Federal Register)**
**Reply Comment Date: (45 days after date of publication in the Federal Register)**

By the Commission: Commissioners Starks issuing separate statement.  Commissioners Carr and
Simington dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                                    Paragraph #

I.   INTRODUCTION ................................................................................................................1
II.  BACKGROUND .................................................................................................................4
III. DISCUSSION ...................................................................................................................13
     A.  Reinstatement of the Form 395-B Collection .........................................................14
         1.  CIPSEA is Ill-Suited to the Commission's Collection of the Form 395-B Data ...................25
         2.  Even if FOIA Exemption 4 Applies, the Strong Public Interest in Disclosure
             Outweighs Any Private Interest In Confidential Treatment...................................30
     B.  Constitutional Issues ..............................................................................................41
     C.  The Commission Has Broad Authority to Collect Form 395-B ...............................51
IV.  ORDER ON RECONSIDERATION ..................................................................................55
V.   SECOND FURTHER NOTICE OF PROPOSED RULEMAKING .....................................60
VI.  PROCEDURAL MATTERS..............................................................................................66
VII. ORDERING CLAUSES ....................................................................................................75
APPENDIX A – Final Rules
APPENDIX B – Proposed Rules
APPENDIX C – Final Regulatory Flexibility Act Analysis
APPENDIX D – Initial Regulatory Flexibility Act Analysis

# I.   INTRODUCTION

1.        By this *Fourth Report and Order*, *Order on Reconsideration*, and *Second Further Notice
of Proposed Rulemaking*, we reinstate the collection of workforce composition data for television and

radio broadcasters on FCC Form 395-B[1] as statutorily required by the Communications Act of 1934, as amended (Act).[2] The Commission suspended its requirement that broadcast licensees file Form 395-B, which collects race, ethnicity, and gender information about a broadcaster's employees within specified job categories, more than two decades ago.[3] After a long period of inactivity, the Commission issued a Further Notice of Proposed Rulemaking (*Further Notice*) in July 2021 seeking to refresh the public record regarding the manner in which the Form 395-B data should be collected and maintained.[4] After careful consideration of the record, we reaffirm the Commission's authority to collect this critical information and conclude that broadcasters should resume filing Form 395-B on an annual basis.[5] Given the importance of this workforce information and Congress's expectation that such information would be collected and available, we reinstate this collection in a manner available to the public consistent with the Commission's previous, long-standing method of collecting this data.

2.  Our ability to collect and access Form 395-B data is critical because it will allow for analysis and understanding of the broadcast industry workforce, as well as the preparation of reports to Congress about the same.[6] Collection, analysis, and availability of this information will support greater understanding of this important industry. We agree with broadcasters and other stakeholders that workforce diversity is critical to the ability of broadcast stations both to compete with one another and to effectively serve local communities across the country.[7] Without objective and industry-wide data it is impossible to assess changes, trends, or progress in the industry. Consistent with how these data have been collected historically, we will make broadcasters' Form 395-B filings available to the public because we conclude that doing so will maximize accuracy of the submitted data, is consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public, allows us to produce the most useful reports possible for the benefit of Congress and the public, and allows for third-party testing of the accuracy of our data analyses. Thus, with today's action, we restore the process

---

[1] Form 395-B, the broadcast station Annual Employment Report, can be found at https://omb.report/icr/202004-3060-047/doc/100723701.

[2] 47 U.S.C. § 334(a).

[3] *See Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements,* Memorandum Opinion and Order, 16 FCC Rcd 2872 (2001) (*Suspension Order*) (suspending the Equal Employment Opportunity (EEO) outreach program requirements applicable to broadcast licensees, including the requirement that broadcasters annually file a Form 395-B).

[4] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, MB Docket No. 98-204, Further Notice of Proposed Rulemaking, 36 FCC Rcd 12055, 12055, para. 1 (2021) (*Further Notice*). The *Further Notice* sought to refresh a 2004 NPRM. *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Procedures*, Third Report and Order and Fourth Notice of Proposed Rulemaking, 19 FCC Rcd 9973, 9975, 9978, paras. 4, 13 (2004) (*Third Report and Order and Fourth NPRM*), *pet. for recon. pending*.

[5] Section 73.3612 of the Commission's rules provides that "[e]ach licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395–B." 47 CFR § 73.3612. We note that the filing requirements of section 73.3612 do not apply to Low Power FM Stations.

[6] *See*, *e.g.*, *Implementation of the Commission's Equal Employment Opportunity Rules*, Report, 9 FCC Rcd 6276 (1994) (reporting on trends in the employment of minorities and women in the broadcast and cable sectors in accordance with section 22(g) of the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-385 § 22, 106 Stat. 1460 (1992) (1992 Cable Act)); *see also* Letter from The Leadership Conference on Civil and Human Rights (the Leadership Conference) et al. to Jessica Rosenworcel, Chair, FCC (Sept. 29, 2022) at 1.

[7] *See*, *e.g.*, National Association of Broadcasters (NAB) Comments at 6 (noting that a diverse, equitable, and inclusionary workforce enables stations to leverage the various experiences and strengths of their staff to produce content that reflects the needs and interests of their local communities); *see also* The Leadership Conference Comments at 2.

of giving broadcasters, Congress, and ourselves the data needed to better understand the workforce composition in the broadcast sector.[8]  We find further that continuing to collect this information in a transparent manner is consistent with a broader shift towards greater openness regarding diversity, equity, and inclusion across both corporate America[9] and government.[10]

3.    We also address a pending petition for reconsideration from 2004 regarding our use of Form 395-B data.[11]  Finally, we seek to refresh the record on the reinstatement of the collection of FCC Form 395-A, which concerns the workforce composition of multichannel video programming distributors (MVPDs).[12]

## II.    BACKGROUND

4.    For more than 50 years, the Commission has administered regulations governing the EEO responsibilities of broadcast licensees.[13]  At their core, the Commission's EEO rules prohibit employment discrimination on the basis of race, color, religion, national origin, or sex, and require broadcasters to provide equal employment opportunities.[14]  In addition to broadly prohibiting employment discrimination, the Commission's rules also require that all but the smallest of broadcast licensees develop and maintain an EEO program.  Specifically, the Commission requires each broadcast station that is part of an employment unit of five or more full-time employees to establish, maintain, and carry out a positive continuing program to ensure equal opportunity and nondiscrimination in employment policies and practices.[15]  In addition, the Commission historically collected workforce employment data from

---

[8] *See, e.g., 1996 Broadcast and Cable Employment Report*, Public Notice, 1997 WL 411346, at 1 (July 24, 1997) and *1997 Broadcast and Cable Employment Report*, Public Notice, 1998 WL 327045, at 1 (June 23, 1998).  Both reports show the breakdown of employees at broadcast stations in terms of race, ethnicity, and gender.

[9] Large media companies have begun to make publicly available copies of their EEO-1 forms, which are filed with the Equal Employment and Opportunity Commission, or variations thereof.  *See, e.g.*, Disney EEO-1 Form, https://impact.disney.com/app/uploads/Current/FY22-Workforce-Diversity-Dashboard.pdf ; Comcast EEO-1 Form, https://cmcsa.gcs-web.com/static-files/1d6d3ef6-d2d4-4c13-b452-7917b90e0032, Fox Corporation EEO-1 Form, https://media.foxcorporation.com/wp-content/uploads/prod/2023/11/29230427/2022-EEO-1-Consolidated-Report.pdf; Paramount Workforce Demographics, https://www.paramount.com/inclusion-2021/our-culture. Similarly, tech companies are making information about the composition of their workforces publicly available. *See, e.g.*, Inclusion & Diversity, Apple, https://www.apple.com/diversity/ (last visited Dec.15, 2023); Our Workplace, Google, https://diversity.google/commitments/ (last visited Dec. 15, 2023); Meta Diversity Report, https://about.fb.com/news/2022/07/metas-diversity-report-2022/(last visited Dec. 15, 2023); Corporate Social Responsibility, Intel, https://www.intel.com/content/www/us/en/diversity/diversity-at-intel.html (last visited Dec. 15, 2023).  *See also* Kavya Vaghul, Just Over Half of the Largest U.S. Companies Share Workforce Diversity Data as Calls for Transparency from Investors and Regulators Grow, JUST Capital (Feb. 6, 2022), https://justcapital.com/reports/share-of-largest-us-companies-disclosing-race-and-ethnicity-data-rises/.

[10] There is movement towards more open access to data collected by federal agencies, as shown in the Foundations for Evidence Based Policymaking Act, which directs agencies to account for their data collections and to make such data available in readable formats to support government transparency and evidence-based rulemaking.  Foundations for Evidence Based Policymaking Act of 2018, Pub. L. 115-435 § 202(c), 132 Stat. 5529 (2019), *codified as* 44 U.S.C § 3506(b)(6).

[11] *See Order on Reconsideration*, *infra* at Section IV; *see also* Joint Petition of the State Broadcasters Associations for Reconsideration and/or Clarification of Third Report and Order and Fourth NPRM, MM Docket No. 98-204, at 2-3 (filed July 23, 2004), https://www.fcc.gov/ecfs/document/5511438304/1 (State Associations 2004 Petition).

[12] *See Second Further Notice of Proposed Rulemaking*, *infra* Section V.

[13] *See Further Notice*, 36 FCC Rcd at 12056, para. 2 (citing *Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Employment Practices*, Docket No. 18244, Rm 1144, Report and Order, 18 FCC 2d 240 (1969)).

[14] 47 CFR § 73.2080(a).

[15] 47 CFR § 73.2080.  Among other things, the Commission's EEO recruitment rules require an employment unit to

(continued....)

broadcasters through the annual submission of Form 395-B.

5.        Between 1970 and 1992, the Commission, pursuant to its public interest authority, required broadcasters to submit annual employment reports listing the composition of the broadcasters' workforce in terms of race, ethnicity, and gender.[16]  In 1992, after finding that, among other things, "increased numbers of females and minorities in positions of management authority in the cable and broadcast television industries advances the Nation's policy favoring diversity in the expression of views in the electronic media,"[17] Congress amended the Act, affirming the Commission's authority in this area. Specifically, Congress added a new section 334, which required the Commission to maintain its existing EEO regulations and forms as applied to television stations.[18]  These forms included the Commission's collection of workforce diversity information from broadcasters on Form 395-B.[19]  Submission of Form

---

use recruitment sources for each full-time vacancy that, in its reasonable and good faith judgment, are sufficient to disseminate information widely about the job opening.  47 CFR § 73.2080(c)(1)(i).  Broadcasters must use a three-pronged approach to ensure broad outreach regarding employment opportunities:  (1) widely disseminate information concerning each full time (30 hours or more) job vacancy, except for a vacancy filled in exigent circumstances; (2) provide vacancy notices to recruiting organizations that request them; and (3) depending upon the size of the unit and market in which it operates, complete two or four of the longer-term recruitment initiatives enumerated in the rule within a two-year period.  47 CFR § 73.2080(c).  In 2017, in response to a broadcaster petition that received wide support from the industry, the Commission updated its EEO policy to allow online job postings to be used as a sole means of advertising a vacancy to satisfy the "wide dissemination" prong of the recruitment rules.  *See Petition for Rulemaking Seeking to Allow the Sole Use of Internet Sources for FCC EEO Recruitment Requirement*, MB Docket No. 16-410, Declaratory Ruling, 32 FCC Rcd 3685 (2017).

[16] In 1969, when the Commission adopted rules prohibiting broadcast stations from discriminating against any person in employment on the basis of race, color, religion, or national origin, and requiring stations to maintain a program designed to ensure equal opportunity in every aspect of station employment, the Commission relied on sections 4(i), 303, 307, 308, 309, and 310 of the Act.  *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies,* MM Docket No. 98-204, Second Report and Order and Third Notice of Proposed Rulemaking, 17 FCC Rcd 24018, 24028, para. 28 (2002) (*Second Report and Order and Third NPRM*); *see also id.*, 17 FCC Rcd at 24030, para. 31.

[17] 1992 Cable Act, *codified as* 47 U.S.C. § 334(a).

[18] 47 U.S.C. § 334.  Section 334(a) of the Act states that "except as specifically provided in this section, the Commission shall not revise (1) the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080) as such regulations apply to television broadcast station licensees and permittees; or (2) the forms used by such licensees and permittees to report pertinent employment data to the Commission."  47 U.S.C. § 334(a).  Section 334(c) authorizes the Commission to make only "nonsubstantive technical or clerical revisions" to the regulations described in Section 334(a) "as necessary to reflect changes in technology, terminology, or Commission organizations."  47 U.S.C. § 334(c).  Congress's action did not supplant the Commission's existing public interest authority, but rather ratified its authority to act in this area.  As the Commission stated in the *Second Report and Order and Third NPRM*, when discussing the companion requirement for MVPDs in Section 634, 47 U.S.C. § 554, the "legislative history of Section 634 makes it unmistakably clear that Congress believed that the Commission already possessed authority to regulate EEO practices of mass media entities – broadcast as well as cable."  *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24030-31, para. 33; *see also Second Report and Order and Third NPRM*, 17 FCC Rcd at 24030-31, paras. 31-35 (describing a similar, earlier congressional action ratifying EEO rules promulgated by the Commission prior to 1984).  The *Second Report and Order and Third NPRM* also found additional evidence of congressional ratification of the Commission's authority to promulgate EEO rules in the 1992 Cable Act.  *See Second Report and Order and Third NPRM,* 17 FCC Rcd at 24031-33, paras. 36-39.

[19] *See* 1992 Cable Act.  While section 334 of the Act did not codify the Commission's previously existing EEO requirements for radio broadcast licensees, the Commission has found that Congress ratified the Commission's authority to promulgate EEO rules for radio as well as television licensees.  *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*; *Termination of EEO Streamlining Proceeding*, MM Docket Nos. 98-204, 96-16, Notice of Proposed Rulemaking, 13 FCC Rcd 23004, 23014-15, para. 28 (1998) (*1998 NPRM*); *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies,* MM

(continued....)

395-B, however, was subsequently suspended in 2001 following two decisions by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacating certain aspects of the Commission's EEO rules.[20]

6.       With its decision in 1998, the D.C. Circuit in *Lutheran Church-Missouri Synod v. FCC* (*Lutheran Church*) reversed and remanded a Commission action finding that a broadcast licensee had failed to make adequate efforts to recruit minorities.[21] The court found the Commission's EEO outreach rules, which required comparison of the race and sex of a station's full-time employees with the overall availability of minorities and women in the relevant labor force, to be unconstitutional.[22] Specifically, the court concluded that the use of broadcaster employee data to assess EEO compliance in the context of a license renewal pressured broadcasters to engage in race-conscious hiring in violation of the equal protection component of the Due Process Clause of the Fifth Amendment of the Constitution.[23] The court applied strict constitutional scrutiny in reaching its decision, finding that standard of review was applicable to racial classifications imposed by the federal government. And pursuant to that standard, it determined that the Commission's stated purpose of furthering programming diversity was not compelling, nor were its EEO rules narrowly tailored to further that interest.[24] The court made clear, however, that "[i]f the regulations merely required stations to implement racially neutral recruiting and hiring programs, the equal protection guarantee would not be implicated."[25] In reaching its decision, the court referenced the Form 395-B only tangentially in its analysis.[26]

7.       On remand, the Commission crafted new EEO rules requiring that broadcast licensees undertake an outreach program to foster equal employment opportunities in the broadcasting industry.[27] The Commission also reinstated the requirement that broadcasters annually file employment data on Form 395-B with the Commission,[28] which it had suspended after *Lutheran Church*.[29] In adopting these revised rules and reinstating the information collection, the Commission vowed to no longer use workforce composition data when reviewing license renewal applications or assessing compliance with EEO program requirements.[30] Rather, the Commission stated that going forward it would only use this

---

Docket Nos. 98-204, 96-16, Report and Order, 15 FCC Rcd 2329, 2344-45, paras. 38-39 (2000) (*First Report and Order*), *recon denied*, 15 FCC Rcd 22548 (2000), *reversed and remanded in part on other grounds sub nom. MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (2001) (*MD/DC/DE Broadcasters*), *pet. for reh'g denied*, 253 F.3d 732 (D.C. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002).

[20] *See Suspension Order*, 16 FCC Rcd at 2872.

[21] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 347-48 (D.C. Cir. 1998) (*Lutheran Church*), *pet. for reh'g denied*, 154 F.3d 487, *pet. for reh'g en banc denied*, 154 F.3d 494 (D.C. Cir. 1998).

[22] *Id.* at 352-53.

[23] *Id.* at 349-56.

[24] *Id.* at 350-351 (citing *Adarand Constructors Inc. v. Pena*, 515 U.S. 200 (1995)). The Court stated that it also could not uphold the Commission's action under rational basis scrutiny, which requires only that a regulation have a substantial relation to the government interest it furthers. *Id.* at 356.

[25] *Id.* at 351. In response to the Commission's rehearing petition, the D.C. Circuit reiterated that it had not held that a regulation "encouraging broad outreach to, as opposed to the actual hiring of, a particular race would necessarily trigger strict scrutiny." *Id.* at 492.

[26] *Id.* at 352-53.

[27] *See First Report and Order*, 15 FCC Rcd at 2363-93, paras. 76-161.

[28] *Id.* at 2394-97, paras. 163-171.

[29] *Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports and Program Reports*, 13 FCC Rcd 21998 (1998).

[30] *First Report and Order*, 15 FCC Rcd at 2332, 2395, paras. 6, 165.

information "to monitor industry employment trends and report to Congress,"[31] and codified that position in the governing regulations contained in section 73.3612.[32]

8.      Following adoption of the new EEO outreach rules, which offered licensees two "Options" for establishing an EEO program, several state broadcaster associations challenged the revised EEO rules.  Upon review, the D.C. Circuit in *MD/DC/DE Broadcasters Associations v. FCC* (*MD/DC/DE Broadcasters*) found that one element of the new rule, namely Option B, which allowed broadcasters to design their own outreach programs but required reporting of the race and sex of each *applicant*, was constitutionally invalid.[33]  The court determined that Option B violated the equal protection component of the Due Process Clause of the Fifth Amendment because, by examining the number of applicants and investigating any broadcasters with "few or no" minority applicants, the Commission "pressured" broadcasters to focus resources on recruiting minorities.[34]  Because the court found that Option B was not severable from Option A of the rule, it vacated the entire EEO outreach rule.[35]

9.      Although the D.C. Circuit in *MD/DC/DE Broadcasters* vacated and remanded the Commission's revised EEO outreach rules, it did not rule on the validity or constitutionality of Form 395-B.  Nor did the court specifically identify Form 395-B or the collection of workforce diversity data as a core part of the rule at issue in its analysis.[36]  The court's only mention of the collection of workforce data was in the Background section of its decision.[37]  Thus, notably, in neither *Lutheran Church* nor *MD/DC/DE Broadcasters* did the D.C. Circuit find the collection of workforce composition data itself to be invalid on constitutional or any other grounds.[38]  After the decision, the Commission suspended its EEO rules in 2001, including Form 395-B, in order to analyze the effects of *MD/DC/DE Broadcasters* on the Commission's rules.[39]

10.     On November 20, 2002, the Commission released its *Second Report and Order and Third NPRM*, establishing new race-neutral EEO rules, eliminating the Option B rule previously invalidated by the court.[40]  The Commission's new EEO rules, which remain in place today,[41] were divorced from any data concerning the composition of a broadcaster's workforce or applicant pool.  The Commission explained that the annual employment report is "unrelated to the implementation and enforcement of our EEO program" and "data concerning the entity's workforce is no longer pertinent to the administration of

---

[31] *Id.*

[32] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies and Termination of the EEO Streamlining Proceeding*, MM Docket Nos. 98-204, 96-16, Memorandum Opinion and Order, 15 FCC Rcd 22548, 22560, 22575, para. 40, App. B (2000) (*2000 Reconsideration Order*); *see* 47 CFR § 73.3612 Note ("Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the Equal Employment Opportunity requirements of § 73.2080.").

[33] *MD/DC/DE Broadcasters*, 236 F.3d at 17.

[34] *Id.* at 18-21.  The court found the rule was not narrowly tailored because investigations were not predicated on a finding of past discrimination or reasonable expectation of future discrimination.  *Id.* at 21-22.

[35] *Id.* at 22-23.

[36] *Id.*

[37] *Id.* at 17.

[38] *See Further Notice*, 36 FCC Rcd at 12057, para. 4 (citing *Suspension Order*, 16 FCC Rcd at 2872).

[39] *See Suspension Order*, 16 FCC Rcd at 2872.

[40] *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24043-53, 24074, paras. 72-105, 180.

[41] 47 CFR § 73.2080 (requiring, inter alia, that broadcast licensees widely recruit for each full-time vacancy at their stations using recruitment sources that, in the licensee's reasonable and good faith judgment, are sufficient to widely disseminate information about the job opening).

our EEO outreach requirements."[42]  The Commission, however, deferred action on issues relating to the annual employment report form, in part because it needed to incorporate new standards for classifying data on race and ethnicity adopted by the Office of Management and Budget (OMB) in 1997.[43]

11.     On June 4, 2004, the Commission released its *Third Report and Order and Fourth NPRM* readopting the requirement that broadcasters file Form 395-B.[44]  In addition, the Commission readopted the Note to section 73.3612 of its rules that it had previously adopted in 2000, stating that the data collected would be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of a broadcaster's compliance with the EEO rules.[45]  The Commission stated that it did not "believe that the filing of annual employment reports will unconstitutionally pressure entities to adopt racial or gender preferences in hiring,"[46] but it acknowledged the concerns raised by broadcasters and sought comment on whether data reported on the Form 395-B should be kept confidential.[47]  Accordingly, while the Commission acted at that time to adopt revised regulations regarding the filing of Form 395-B and updated the form, the requirement that broadcasters once again submit the form to the Commission remained suspended until the agency further explored the issue of whether employment data could, or should, remain confidential.[48]

12.     Given the passage of time since the *Third Report and Order and Fourth NPRM*, the Commission released a *Further Notice* on July 26, 2021, seeking to refresh the 2004 record with regard to Form 395-B.[49]  The *Further Notice* asked for additional input on relevant developments in the law relating to public disclosure of employment data, as well as the practical and technical limitations associated with implementing a system that could afford varying degrees of station-level anonymity.[50] Interested parties filed comments, including public interest organizations and representatives of the

---

[42] *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24067-68, 24072, paras. 159, 173.

[43] *Id.* at 24024-25, 24074, paras. 17, 180.  The Commission's decision in January 2001 to suspend the filing of Form 395-B remained in effect at the time of the *Second Report and Order and Third NPRM.*

[44] *See Third Report and Order and Fourth NPRM,* 19 FCC Rcd at 9975, para. 4.  The Commission allowed a one-time filing grace period "until a date to be determined in the Commission's Order addressing the issues raised in the *Fourth Notice of Proposed Rulemaking. . . .*"  *Id.* at 9978, para. 13.  Because such an order had not been adopted before today, the Commission has not resumed collecting the Form 395-B.

[45] 47 CFR § 73.3612 Note ("Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the Equal Employment Opportunity requirements of § 73.2080.").

[46] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9976, para. 9.

[47] *See id.* at 9973, 9979, paras. 14-17.

[48] *See id.* at 9978, para. 13; *see also* 47 CFR §§ 73.3612, 76.1802.  Although the requirement to file the forms on an annual basis remained suspended after 2004, the Commission regularly sought approval from the Office of Management and Budget (OMB) for the collection of information on Form 395-B, consistent with the Paperwork Reduction Act.  The Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (1995).  OMB has recently approved the information collection for Form 395-B through August 31, 2026.  Under the terms of OMB's approval, the Commission "should not initiate using or collecting information with . . . Form 395-B until [it] decides whether the data collected from each form will be held confidential or not on an individual basis.  Following such a decision, the Commission should consult with OMB prior to initiating usage of these forms to determine whether the decision regarding confidentiality results in a substantive change to the collections warranting formal review by OMB of the proposed revisions."  *See* OMB Control Number: 3060-0390, https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202304-3060-010 (last visited Dec. 7, 2023).

[49] *See Further Notice*, 36 FCC Rcd at 12061, para. 11.

[50] *See id.* at 12062-63, paras. 14-16.

broadcast industry.[51]  Their arguments range from asking that Form 395-B data be made publicly available to contending that reinstating the form would amount to an unconstitutional violation of race-based protections.  Many of these assertions largely reiterate arguments addressed in the Commission's earlier orders, including whether the filing requirement constitutes unconstitutional pressure, the ramifications of the D.C. Circuit rulings, the directives of section 334, and the potential substitutability of the Equal Employment Opportunity Commission's (EEOC) EEO-1 form.[52]

## III.  DISCUSSION

13.  Consistent with the Commission's authority pursuant to section 334, as well as the public interest provisions of the Act, we reinstate the collection of FCC Form 395-B.[53]  In doing so, we affirm the Commission's prior determination that the earlier court decisions in no way invalidated our authority to collect this data, which remains critical for analyzing industry trends and making reports to Congress.  Further, we find that reinstatement of this information collection on a publicly available basis is consistent with the protections afforded to broadcasters by the Constitution and relevant case law, as detailed further below.  The clear separation of this information collection from the Commission's long-standing EEO program requirements mitigates any concerns that might be raised by the broadcasters as to the collection of this workforce data.  In addition, the Commission's unequivocal statement that it will not use station-specific employment data for the purpose of assessing a licensee's compliance with the EEO regulations and the codification of that same stricture further underscore the dissociation between the EEO requirements and the form's data.

### A.  Reinstatement of the Form 395-B Collection

14.  The Commission has a public interest in collecting Form 395-B in order to report on and analyze employment trends in the broadcast sector and also to compare trends across other sectors regulated by the Commission.  In taking this action today, we note that Congress has long authorized the Commission to collect this data[54] and that the Commission is uniquely positioned to undertake such a collection.[55]  While the National Association of Broadcasters (NAB) and others have evinced an interest in improving the level of diversity in the broadcasting industry workforce,[56] the lack of industry-wide employment data over the last 22 years makes it difficult to measure the extent of any such progress.  While we do not anticipate that this more than two-decade long gap in data can ever be filled, with the reinstatement of this information collection the Commission can ensure that the lack of data persists no further, thereby providing it, the industry, Congress, and the public with a better understanding of, or insight into, the full scope of the broadcast industry workforce.  Accordingly, in this Order, we reinstate

---

[51] The EEO Supporters, the Leadership Conference, and the Foster Garvey Coalition filed comments in support of Form 395-B.  NAB, the State Broadcasters Associations (State Associations), and the Center for Workplace Compliance (CWC) oppose the form's reinstatement.

[52] *See generally Second Report and Order and Third NPRM*, 17 FCC Rcd at 24026-74, paras. 21-181; *see also First Report and Order,* 15 FCC Rcd at 2336-58, 2394-97, paras. 20-64, 163-71; *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9974-77, paras. 3-10.

[53] 47 U.S.C. §§ 334(a), 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 403.

[54] *See* 47 U.S.C. § 334; *see also Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9974, para. 3 (stating that "[the Commission is] directed by statute to require the submission of such reports by broadcast television stations . . ."); *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24030, para. 31 (stating that Congress ratified the Commission's authority to collect broadcast workforce data).

[55] *See* American Federation of Television and Radio Artists Comments at 21 (filed April 15, 2002) (acknowledging that the reporting of industry employment trends is a valuable public resource and that the Commission is well-positioned to maintain and disseminate data on the demographics of employment in broadcasting); *see also* Asian Americans Advancing Justice -AAJC et al. Supp. Comments at 15-16 (filed Aug. 10, 2022) (AAJC et al. *Ex Parte*) (describing the inadequacy of private sector employment surveys for meeting the Commission's purposes).

[56] NAB Comments at 6-10.

collection of Form 395-B in the manner described below and require the form to be submitted in an electronic format.[57]  Once submitted, the form will be accessible to the public via the Commission's website.

15.     Reinstating the collection of the Form 395-B data in a publicly available format, as they were collected prior to 2001, remains the best approach for achieving our ultimate goal of preparing meaningful and accurate analyses of workforce trends in the broadcast industry.  First, public disclosure will increase the likelihood that erroneous data will be discovered and corrected, and it will incentivize stations to file accurate data to avoid third-party claims that submitted data is incorrect.[58]  Whether intentionally or inadvertently, a station might misreport its data or misidentify the racial, ethnic, or gender group for particular employees.  Individuals or entities with a connection to the station will be in a position to correct such errors if the data are made public.  Second, making the Form 395-B data publicly available is consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public.[59]  Third, making the data public bolsters our ability to conduct analyses of trends across different communications sectors,[60] within individual sectors, and by region or market, without being unnecessarily hampered by concerns about inadvertent disclosures of identifiable information.  We believe the utility of our reports is greatly enhanced by our ability to "slice, dice, and display" granular data about the broadcast sector.[61]  Our ability to produce the most meaningful reports possible for Congress rests, in turn, on the ability to produce the most granular reports possible (e.g., the number of employees in a particular demographic group in a specific job category among a certain class of stations [AM, FM, TV, etc.] in a specific geographic area).  If we were required, however, to keep confidential the underlying station-specific data, we would feel compelled to report our findings at a more general, and thus less useful, level to avoid the risk of inadvertently facilitating any reverse engineering of station-

---

[57] As CWC noted in the record, the version of Form 395-B that the Commission referenced in the *Further Notice* was outdated.  CWC Comments at 6-7.  *See Further Notice*, 36 FCC Rcd at 12055, para. 1 n.1.  The *Further Notice* inadvertently provided a link to the 2000 version of the form, but the Commission made minor revisions to the form in 2008 to conform its racial/ethnicity classifications and employment categories to the updated classifications and categories that the EEOC had made to the EEO-1 form.  *See Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9977-78, para. 12 (stating that the Commission would wait to revise its form until the EEOC had finalized the EEO-1 form to comply with OMB's updated racial classification standards); *see also Media Bureau Seeks Comment on Possible Changes to FCC Forms 395-A and 395-B*, Public Notice, 23 FCC Rcd 5441 (MB 2008) (seeking comment on incorporating the EEOC's revised racial and employment categories into FCC Forms 395-A and 395-B).  Examples of conforming edits made to the updated form include  allowing employees to identify as being of two or more races, and the form differentiates senior level officials from mid-level officials.  The correct version of the form that we reinstate, and which has OMB approval, can be found at https://omb.report/icr/202004-3060-047/doc/100723701.

[58] *See* National Organization of Women (NOW) et al. 2004 Comments at 10 (asserting that "requiring filers to disclose their identity will help insure the accuracy of the data").

[59] *See* The OPEN Government Data Act, Pub. L. No. 115-435 (2019) §§ 201-202, Title II of the Foundations for Evidence-Based Policymaking Act of 2018, 44 U.S.C. § 3501(2), (4) (setting forth the goals to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "improve the quality and use of Federal information to strengthen decision-making, accountability, and openness in Government and society").

[60] Form 395-A for MVPDs, if its collection is reinstituted, contains similar fields to the Form 395-B.  *See Second Further Notice of Proposed Rulemaking, infra* at Section V.

[61] Consequently, we also reject NAB's claim that the Commission's goal of issuing reports and analyzing trends would not be hindered through confidential treatment of the data.  *See* NAB Comments at 4 (claiming that collecting Form 395-B data on an anonymous, aggregated basis "would have no effect on the FCC's ability to fulfill its expressed, permitted purposes for the data, namely, to 'monitor industry employment trends and report to Congress'").

specific information.  This problem would be especially acute in smaller markets, where the identity of stations could be discerned more easily.

16.     In addition, allowing public access to datasets allows others to review the accuracy of an agency's data analyses and to question its methods for data collection with the benefit of actual datasets.[62] We find this level of transparency to be consistent with the overall trend toward making government data more accessible, and we note that many government agencies collect and publish demographic data as part of their analysis of markets, trends, and other factors.[63]  The *Further Notice* sought comment on the logistics associated with collecting and maintaining the Form 395-B data completely anonymously, or where station specific information is available to the Commission, but not to the public.[64]  Only one commenter addressed this issue by stating that the Commission's Licensing and Management System (LMS) enables the shielding of certain exhibits attached forms.[65]  Irrespective of whether LMS can shield station-attributable data, we conclude for the reasons stated above that maintaining this data in a publicly available format is the most appropriate policy.

17.     While broadcasters have expressed concerns with how the form's data might be used if publicly disclosed, such concerns have been addressed by the Commission's repeated statements on the appropriate use of such data and its amendment of the rules to prohibit use of the data to assess a broadcaster's compliance with Commission EEO rules.  Notwithstanding the Commission's statements and actions, broadcasters were troubled in 2004 by comments made at that time by the National Organization of Women (NOW) et al. positing that public disclosure of employment data would enable "citizens . . . to work closely with their local broadcaster to ensure that stations are meeting their needs and to resolve any problems with the companies in their communities."[66]  Broadcasters pointed to those comments as evidence that third parties would misuse Form 395-B data to pressure stations to engage in preferential hiring practices.[67]  As an initial matter, as the Commission has committed to previously and we reiterate here again, we will quickly and summarily dismiss any petition, complaint, or other filing submitted by a third party to the Commission based on Form 395-B employment data.[68]  We also note that any attempt by a non-governmental third party to use the publicly available Form 395-B data to pressure stations in a non-governmental forum would not implicate any constitutional rights of the station. In any event, we find such concerns to be speculative.  Despite the public availability of Form 395-B data for more than 20 years prior to 2001, the record contains no evidence of use of such data in this manner. Nonetheless, we encourage broadcasters to bring to the Commission's attention any evidence that a third party has misused or attempted to misuse Form 395-B employment data.  If evidence of such misuse of

---

[62] OMB has stated that, "[t]o operate efficiently and effectively, the Nation relies on the flow of objective, credible statistics to support the decisions of individuals, households, governments, businesses, and other organizations." OMB, Proposals from the Federal Interagency Working Group for Revision of the Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity, 82 Fed. Reg. 12242, 12243 (2017).

[63] *See, e.g.,* U.S. Bureau of Labor Statistics, Labor force characteristics by race and ethnicity, 2020 (Nov. 2021), https://www.bls.gov/opub/reports/race-and-ethnicity/2020/home.htm; National Institutes of Health, NIH RCDC Inclusion Statistics Report, https://report.nih.gov/RISR/#/; U.S. Department of Education, The 2020-21 Civil Rights Data Collection, https://ocrdata.ed.gov/ (last visited Nov. 30, 2023); U.S. Department of Commerce, National Telecommunications and Information Administration, Digital Nation Data Explorer (Oct. 5, 2022), https://www.ntia.doc.gov/data/digital-nation-data-explorer (includes race, ethnicity, and gender among other data).

[64] *Further Notice*, 36 FCC Rcd at 12063, paras. 16-17.

[65] State Associations Reply at 17.

[66] NOW et al. 2004 Comments at 5-7.

[67] NAB 2004 Reply at 5-7, 9-10; Virginia Association of Broadcasters 2004 Reply at 4-6 (stating that what the Commission may not do directly, "it also may not do indirectly through a 'wink and nod' with third-party interest groups"); *see also* State Associations 2004 Reply at 2-5, 8-14; *but see* NOW et al. 2004 Reply at 4-8 (contending that broadcasters had not shown that the data would be used in ways that would violate equal protection).

[68] *See infra* para. 45.

the data emerges, the Commission can reconsider its approach to collection of the Form 395-B data. Based on the record before us, we find no basis to conclude that the demographic data on a station's annual Form 395-B filing would lead to undue public pressure. We find broadcasters' concerns with the public collection and availability of this workforce data to be overstated, outweighed by the promotion of data accuracy and other benefits of public disclosure noted above, and therefore not an impediment to our reinstatement of this collection.

18.    Consistent with the limitations placed on our use of the Form 395-B data, we reject the EEO Supporters' recommendation that the Enforcement Bureau use the data as evidence when investigating a discrimination claim against a station.[69] We find that such use does not comport with the Commission's public interest goal behind collection of this data. The Commission has stated previously, and we reiterate here, that "we will summarily dismiss any petition filed by a third party based on Form 395-B employment data" and "will not use this data as a basis for conducting audits or inquiries."[70]

19.    Some broadcasters have raised a concern that the Commission could decide at a later date to waive its rule regarding how the Form 395-B data can be used.[71] We believe that the combination of the Commission's consistent position over two decades about how this data may be used, the established principle that "an agency is bound by its own regulations,"[72] our rejection of the EEO Supporters' proposed contrary use, and our determination in the attached *Order on Reconsideration* should assuage concerns on this point. We will not further delay reinstatement of the form based on unfounded conjecture about what the Commission may or may not do in the future.

20.    Further, we reject the argument that we should retain Form 395-B data on a confidential basis given the EEOC's confidential treatment of similar employment data collected on its EEO-1 form.[73] Unlike the Commission, the EEOC's authorizing statute specifically limits its ability to make its collected data publicly available.[74] In the Civil Rights Act of 1964, which created the EEOC, Congress included a provision making it unlawful for an EEOC officer or employee to disclose such information.[75] However, when Congress adopted section 334 in 1984, despite the fact that in the preceding 20 years Congress had not lifted the prohibition on public disclosure by the EEOC, Congress imposed no such limitation for publishing the broadcast workforce data collected by the Commission. Indeed, when Congress adopted section 334 in 1984, the Commission had been collecting broadcast workforce data and making it available publicly for decades, a practice Congress endorsed in passing Section 334 without any limitation on public disclosure. In addition, the manner in which the two agencies may use their data differs significantly. The EEOC may use its EEO-1 data for investigatory and enforcement purposes,[76]

---

[69] *See* EEO Supporters Comments at 3-4.

[70] *2000 Reconsideration Order*, 15 FCC Rcd at 22558-59, para. 35.

[71] State Associations Reply at 12.

[72] *Erie Boulevard Hydropower, LP v. FERC,* 878 F.3d 258, 269 (D.C. Cir. 2017).

[73] *See* CWC Comments at 9-11.

[74] 42 U.S.C. § 2000e-8(e).

[75] Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 264, § 709(e) (1964) (providing that "[i]t shall be unlawful for any officer or employee of the [EEOC] to make public in any manner whatever any information obtained by the [EEOC] pursuant to its authority under this section prior to the institution of any proceeding under this title involving such information").

[76] *See* EEO-1 Component 1 Data Collection, U.S. Equal Emp. Opportunity Comm'n, https://www.eeoc.gov/employers/eeo-1-data-collection (last visited Nov. 27, 2023) (stating that the filing of EEO-1 reports is required under section 709(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 29 CFR 1602.7-.14 and 40 CFR 60-1.7(a)); *see also* Frequently Asked Questions: EEO-1 Component 1 Data Collection, U.S. Equal Emp. Opportunity Comm'n, https://eeocdata.org/pdfs/EEO-1%20Component%201%20FAQ.pdf (last visited Nov. 27, 2023) (stating that "[the data] may not be made public by
(continued….)

but by contrast, we will not use Form 395-B data for enforcement purposes.

21.     Some commenters assert that the Commission should rely on other data sources in lieu of Form 395-B.[77]  Yet, section 334(a) of the Act states that "except as specifically provided in this section, the Commission shall not revise . . . the forms used by [television broadcast station] licensees and permittees to report pertinent employment data to the Commission."[78]  Pursuant to section 334 of the Act, we may change the form's provisions only "to make nonsubstantive technical or clerical revisions . . . as necessary to reflect changes in technology, terminology, or Commission organization."[79]  As we discuss further below, the alternative data sources suggested by commenters would both violate the section 334 prohibition on changes to the form and impede our general public interest goal of providing useful reports about employment in the broadcast sector.

22.     In particular, we continue to reject the proposal, initially made nearly two decades ago and dismissed by the Commission at that time as being inadequate, to rely on the EEOC's EEO-1 form in lieu of Form 395-B.[80]  We reaffirm the Commission's prior conclusion that the EEO-1 form is not an appropriate substitute for Form 395-B, as the two forms differ greatly in the data they collect.[81]  First, unlike the EEO-1, Form 395-B distinguishes between full and part-time employees, consistent with our other employment data collections, providing a more comprehensive picture of the broadcast industry workforce.  Second, and more importantly, reliance on the EEO-1 form would significantly reduce the amount of employment data available to the Commission as the vast majority of broadcast licensees do not file an EEO-1 form.  While the Form 395-B collection applies to *all* broadcast station employment units with five or more full-time employees, the submission of an EEO-1 form is required only for entities with 100 or more employees.  In 2004, in response to the same proposal to substitute the EEO-1 form for Form 395-B, the Commission calculated that the EEOC data "would not include 6,592 employment units (79%) out of a total of 8,395 units and would exclude 136,993 full-time employees (84%) out of the 163,868 full-time employees in broadcasting working at employment units employing five or more full-

---

the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 Component 1 data"); EEOC Data Collection, U.S. Equal Emp. Opportunity Comm'n at 6, https://eeocdata.org/ (last visited Nov. 27, 2023) (stating that "[EEOC] processes employer information data that are used by the EEOC to investigate charges of discrimination against private employers . . ." and that "[t]he data are used for a variety of purposes including enforcement, self-assessment by employers, and research").

[77] State Associations Reply at 8-10 (suggesting the use of employment information collected by the EEOC and the Radio Television Digital News Association (RTDNA)); NAB Comments at 23-24 (arguing that the Commission should use broadcasters' EEO-1 filings instead of requiring Form 395-B); CWC Comments at 6 (asking the Commission to explore the possibility of using data already collected on the EEO-1 form before deciding to reinstate Form 395-B).

[78] 47 U.S.C. § 334(a)(2).  Even NAB has noted that "Section 334(a) may bar the Commission from making major changes to its EEO forms . . . ."  NAB Comments at 18.

[79] 47 U.S.C. § 334(c).

[80] State Associations Reply at 9 (asking the Commission to utilize already existing EEO-1 aggregate data); NAB Comments at 23-24 (asking the Commission to let those broadcasters that are required to file form EEO-1 with the EEOC to submit that data to the Commission in lieu of Form 395-B); CWC Comments at 6 (asking the Commission to consider using publicly available aggregate EEO-1 data, and also suggesting that the EEOC and the Commission work together to produce a Special Report on Broadcasting).

[81] In 2004, various commenters contended that Form 395-B is unnecessary because the Commission could obtain statistically relevant information from reviewing EEO-1 alone.  The Commission considered and rejected this argument in the *Third Report and Order and Fourth NPRM.  Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9977, para. 10 (rejecting the suggestion that the Commission rely on EEO-1 data and finding that the two forms differ in the data they collect and that the EEO-1 data would not provide the information specified by Congress in sections 334 and 634 of the Act).

time employees."[82]  Consequently, we determine that replacing Form 395-B either partly or wholly with the EEO-1 form does not constitute a permitted non-substantive modification of the form itself under section 334.  Nor would such a substitution meet our public interest goal of providing a comprehensive report of employment in the broadcast sector and comparing employment trends across our regulatees. For the reasons provided above, we conclude that the EEO-1 form is an unsatisfactory replacement for Form 395-B.[83]

23.     Similarly, we find to be inapposite the suggestion to use the Radio Television Digital News Association (RTDNA) diversity survey as a substitute for the Form 395-B collection.[84]  As an initial matter, the RTDNA data pertains only to TV and radio newsrooms and not to the full spectrum of the broadcast industry workforce covered by Form 395-B.[85]  Moreover, the RTDNA survey ultimately is based on valid responses from those broadcasters that *choose* to participate in the survey, and, hence, the pool of participants is essentially a self-selected one.[86]  By contrast, *all* broadcast station employment units with five or more full-time employees must file the Form 395-B.  Consequently, substituting Form 395-B with the RTDNA survey would be inconsistent with the section 334 prohibition on changes and would provide a less complete view of the broadcast sector.

24.     Since we have determined that the benefits of making these reports public outweigh the speculative harm from doing so in light of the clear policy of the Commission about how they may and may not be used, we see no reason to afford them confidentiality.  We note, however, that there is a question whether they would in fact warrant confidential treatment under the Freedom of Information Act (FOIA) or whether the Commission could satisfy the requirements of the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA).  The *Further Notice* sought comment on the

---

[82] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9977, para. 10.  The Commission derived these calculations based on data collected from the Form 395-B filings submitted in 2000.  *Id.* at 9977, para. 10 n.34.  In 2004, when the Commission reinstated the Form 395-B, although it deferred recommencement of the form's collection, the Commission sought to reduce filing burdens by permitting broadcasters to file only one Form 395-B for all commonly-owned stations in the same market that share at least one employee.  *Id.* at 9977, para. 10.  We reaffirm this procedural practice.

[83] Given our determination above about the lack of substitutability between Form 395-B and the EEO-1 form, we find there is no benefit in using EEO-1 data or attempting to work with the EEOC to produce a "Special Report" in lieu of collecting information on the Form 395-B.  *See* CWC Comments at 6; NAB Comments at 23-24; State Associations Reply at 9.

[84] *See* State Associations Reply at 9-10.

[85] *See, e.g.*, RTDNA, *Local News Diversity Reaches Records, but Representation Gap Shrinks Slowly* (June 23, 2021), https://www.rtdna.org/news/local-news-diversity-reaches-records-but-representation-gap-shrinks-slowly (referring only to the employment makeup of broadcast television and radio newsrooms in the presentation of demographic data).

[86] *See id.* (explaining that the survey responses represent only 75.1% of all non-satellite television stations and 2,310 radio stations out of a random sample of 3,379 radio stations).

potential applicability of the CIPSEA[87] or the FOIA exemptions[88] to the Form 395-B data collection. As discussed below, the record and our own analysis demonstrate that CIPSEA is ill-suited for an agency such as the Commission. Similarly, the Form 395-B data does not fit neatly within FOIA Exemption 4, and in any event Exemption 4 does not prevent the Commission from disclosing information after an appropriate balancing of the interests. Accordingly, for the reasons discussed below, we find neither CIPSEA nor FOIA affords an appropriate basis to collect Form 395-B information in a confidential manner.

### 1. CIPSEA is Ill-Suited to the Commission's Collection of the Form 395-B Data

25. The Commission sought comment on CIPSEA in 2004 and again in 2021, in particular, seeking to explore whether the confidentiality afforded by CIPSEA to government-collected data could apply to the Form 395-B data.[89] Commenters responding in 2004 disagreed regarding CIPSEA's applicability.[90] When the Commission initially sought comment in 2004, the statute was barely two years old and relatively untested.[91] Given the passage of time and the desire to obtain as complete a record as possible, the Commission sought comment anew on CIPSEA in 2021. The *Further Notice* sought input regarding the potential avenues under CIPSEA to collect and maintain data on a confidential basis.[92] The

---

[87] *See* E-Government Act of 2002, Pub. L. No. 107-347, §§ 501-504, 116 Stat. 2899, Title V (2002). OMB is responsible for the implementation of CIPSEA, which seeks to harmonize the confidentiality processes across federal agencies that collect data for statistical purposes. OMB has issued detailed guidance that must be followed when invoking CIPSEA. *See* OMB, Implementation Guidance for Title V of the E-Government Act, Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA), Notice of Decision, 72 Fed. Reg. at 33362 (June 15, 2007) (OMB 2007 Guidance) (noting that CIPSEA "establish[es] a uniform policy for all Federal statistical collections . . . reduc[ing] public confusion, uncertainty, and concern about the treatment of confidential statistical information by different Federal agencies"). In 2018, Congress reauthorized CIPSEA under the Foundations for Evidence-Based Policymaking Act, enhancing security requirements for statistical agencies tasked with sharing data with other agencies or publicly disclosing certain data assets. *See* Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435, §§ 301-303, 132 Stat. 5529, 5544-5556, Title III (2019). In August 2023, OMB issued a notice of proposed rulemaking for new regulations that would provide further direction to statistical agencies and units, as well as to their parent agencies "to enable, support, and facilitate statistical agencies and units in carrying out four fundamental responsibilities . . . ." OMB has yet to adopt finalized rules pursuant to this proceeding. *See* OMB, Fundamental Responsibilities of Recognized Statistical Agencies and Units, Notice of Proposed Rulemaking, 88 Fed. Reg. 56708 (Aug. 18, 2023).

[88] *See* 5 U.S.C. § 552(b)(4) (providing that the disclosure requirements of FOIA do not apply to "trade secrets and commercial or financial information obtained from a person and privileged or confidential").

[89] *See Further Notice*, 36 FCC Rcd at 12065, para. 21; *see also Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 14-17.

[90] Broadcasters argued that CIPSEA authorizes the Commission to collect Form 395-B filings on a confidential basis and that doing so would be good public policy. NAB 2004 Comments at 2-11; State Associations 2004 Comments at 11-13; Virginia Association of Broadcasters 2004 Reply at 2-5. On the other hand, NOW et al. contended that neither CIPSEA nor the Communications Act permits the use of CIPSEA for Form 395-B filings. They argued further that confidential treatment would not serve CIPSEA's purpose of promoting public confidence in an agency's pledge of confidentiality, given that the Commission never made such a pledge with respect to Form 395-B, nor would it serve important policy objectives, such as ensuring the accuracy of Form 395-B data. NOW et al. 2004 Comments at 3-11; *but see* NAB 2004 Reply at 1-3 (arguing that nothing in CIPSEA "would preclude a federal agency from updating its policies to invoke the statute and grant confidentiality to information that it previously disclosed to the public").

[91] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 14-17.

[92] *Further Notice*, 36 FCC Rcd at 12065, para. 21 (seeking comment on the application of CIPSEA, including whether the Commission or one of its subordinate offices or bureaus could qualify as a federal "statistical agency or unit"; whether the agency could avail itself of CIPSEA's provision as a non-statistical agency; or whether it could coordinate with another entity for collection of data).

two comments in 2021 addressing CIPSEA provide insufficient discussion or analysis.[93]  As discussed further below, we find that CIPSEA is not an appropriate fit for the Commission's Form 395-B data collection.

26.    NAB suggests that the Commission could utilize any one of CIPSEA's three approaches for confidential collection and retention of the Form 395-B data: (1) have the Commission's Office of Economics and Analytics (OEA) seek recognition as a "Federal statistical agency or unit"[94] pursuant to CIPSEA and have OEA alone collect and analyze the Form 395-B data, which would then be released in conformance with the CIPSEA confidentiality protections; (2) have the Commission collect this data independently as a "nonstatistical agency" or "unit;" or (3) as a nonstatistical agency or unit, enter into an agreement with an already recognized "Federal statistical agency or unit" and have that agency collect the data on behalf of the Commission.[95]  While NAB asserts that these approaches are "reasonable mechanism[s]" for safeguarding Form 395-B data,[96] it does not specify how its proposals could be satisfied under the requirements established in OMB's 2007 Guidance).[97]  For example, NAB does not discuss how the Commission, or even a subpart of the Commission, could qualify as a "statistical agency or unit" given that OMB accords that designation only when the *predominant* activities of the agency or unit are the use of information for statistical purposes.[98]  The Commission plainly does not fit that description.  Furthermore, NAB does not address the costs and burdens involved with applying for and obtaining from OMB the designation needed for CIPSEA protection.  Nor does it address the cost and burdens associated with adherence to CIPSEA and whether the benefit of retaining the Form 395-B data in conformance with CIPSEA outweighs these costs and burdens.  Below, we address these points.

27.    Contrary to NAB's suggestion, our detailed review of CIPSEA, OMB's 2007 Guidance, and examples of other agencies that have obtained designation as a "statistical agency or unit" demonstrates that neither the Commission nor OEA would qualify for such a designation.  An agency, or agency unit, seeking such a designation must demonstrate to the OMB Chief Statistician that its activities are "*predominantly* the collection, compilation, processing, or analysis of information for statistical purposes."[99]  Although OEA conducts significant data analyses,[100] its activities do not meet the "predominantly" standard laid out by OMB.[101]  Rather, OEA's regular work also includes administrative,

---

[93] *See* State Associations Reply at 16 (providing two sentences on how this complex and still relatively new statutory construct could apply); NAB Comments at 19-22 (repeating the three CIPSEA options laid out in the *Further Notice* and stating that each might be possible without analyzing how these approaches might work in practice).

[94]  *See* OMB 2007 Guidance, 72 FR at 33364.  OMB defines statistical purpose as "the description, estimation, or analysis of the characteristics of groups, without identifying the individuals or organizations that comprise such groups," and nonstatistical purpose to include "any administrative, regulatory, law enforcement, adjudicatory, or other purpose that affects the rights, privileges, or benefits of a particular respondent."  *Id.*

[95] NAB Comments at 19-22.

[96] NAB Reply at 7.

[97] *See* OMB 2007 Guidance, 72 FR 33362-77.

[98] *Id*. at 33364, 33368.  In their 2004 comments, NAB and the State Associations focus on the statistical nature and purpose of Form 395-B data, without addressing the issue of whether the Commission, or its sub-part, could qualify as a statistical agency or unit.  NAB 2004 Comments at 3-7; State Associations 2004 Comments at 11-12; *see also* State Associations 2004 Reply at 5-7.

[99] OMB 2007 Guidance, 72 FR at 33374 (emphasis added).

[100] NAB Comments at 21.

[101] OMB 2007 Guidance, 72 FR at 33364-65; *see also* 44 U.S.C. § 3572(e) (providing that "A statistical agency or unit may designate agents, by contract or by entering into a special agreement containing the provisions required under section 3561(2) for treatment as an agent under that section, who may perform exclusively statistical activities, subject to the limitations and penalties described in this subchapter.").

regulatory, and adjudicative functions, as well as the administration of the Commission's various spectrum auctions.[102]  For these reasons, we determine OEA could not satisfy the requirements for "statistical agencies or units" and, therefore, this approach is not a viable option.

28.      NAB next suggests that the Commission could collect the Form 395-B data as a "nonstatistical agency" pursuant to CIPSEA,[103] provided it complied with CIPSEA's restriction preventing nonstatistical agencies from using "agents," including contractors, to collect or use the protected information, and if it ensured that only internal agency staff had access to the protected information.[104]  NAB identifies no agency that has successfully invoked this provision of CIPSEA in the more than 20 years since the passage of the act.  Nor have we been able to identify one.  As discussed in the *Further Notice*, the Commission relies extensively on information technology (IT) contractors to develop and maintain electronic filing systems, assist filers with questions, and compile reports and other information based on data in Commission forms.[105]  Moreover, the Commission currently relies on multiple IT contracts to maintain and operate its systems.  Therefore, it would be extremely complex and burdensome from an administrative perspective to bring functions in-house solely for one form.  For these reasons, we find that collecting Form 395-B data as a nonstatistical agency under CIPSEA is not a viable option.

29.      We similarly find that the final approach under CIPSEA, namely that the Commission, acting as a "nonstatistical agency," partner with a "statistical agency," which would collect the Form 395-B data on the Commission's behalf, is not a realistic—or even workable—one.  Our detailed review of CIPSEA and OMB's 2007 Guidance shows that this is a complex process involving various logistical steps, as well as significant additional burdens and costs.  Partnering with a "statistical agency" involves identifying a possible partner agency, engaging in negotiations with that agency to establish an agreement for the collection of the data, negotiating and drafting an agreement stipulating the terms associated with collection, processing, and sharing of the Form 395-B data.[106]  Any such agreement would have to

---

[102] *See, e.g.,* 47 CFR §§ 0.21 (a), (b) (the functions of OEA include identifying and evaluating significant communications policy issues, based on the principles and methods of economics and data analysis; and collaborating with and advising other Bureaus and Offices in the areas of economic and data analysis and with respect to the analysis of benefits, costs, and regulatory impacts of Commission policies, rules and policies).

[103] NAB Comments at 21-22.

[104] OMB 2007 Guidance, 72 FR at 33365.  CIPSEA defines "agents" as "contractors and their employees, researchers, and employees of private organizations or institutions of higher learning who have a contract or agreement with the Federal agency."  *Id.*

[105] *Further Notice*, 36 FCC Rcd at 12065, para. 21.  The Commission has outsourced these tasks for decades consistent with a broader federal government initiative to ensure that those jobs that can be conducted in a more economically efficient manner by the private sector through competitive bidding be outsourced.  *See* OMB, OMB Circular No. A-76 Revised, Performance of Commercial Activities (2003), available at https://obamawhitehouse.archives.gov/omb/circulars_a076_a76_incl_tech_correction/ (stating that "The longstanding policy of the federal government has been to rely on the private sector for needed commercial services.  To ensure that the American people receive maximum value for their tax dollars, commercial activities should be subject to the forces of competition."); *see also* OMB, Frequently Asked Questions, OMB Circular A-76 https://oma.od.nih.gov/forms/A76-fair/Documents/A-76%20FAQ.pdf (last visited Nov. 27, 2023) (noting that the federal government can save billions of dollars by distinguishing between "commercial" and "government" services and allowing competitive bids for "commercial" services).

[106] Under a nonstatistical agency designation, before the Commission may invoke a pledge of confidentiality through another federal statistical agency, the Commission and the willing partnering agency would be required to draft a detailed collection agreement, which would stipulate each party's compliance responsibilities, agent designations, and other security requirements and training certifications, among other things.  OMB 2007 Guidance, 72 FR 33375 § VI.  OMB's 2007 Guidance states further that the nonstatistical agency seeking a partnership with a federal statistical agency should be prepared to provide to the statistical agency with the resources necessary to carry out these responsibilities.  *Id.*

comport with OMB's requirements and might also necessitate OMB review. The Commission would have to compensate any such partner agency for the costs of collecting and storing the data, educate the partner agency about the broadcast sector, and ensure that the information is collected in an appropriate manner. Under this approach, the Commission also would have to designate specific staff who would have permission to access the data and potentially restrict access to just those individuals. Moreover, broadcasters would have the additional burden of familiarizing themselves with a different agency's document filing system. As OMB has not yet issued guidance on such a partnership approach, however, the potential logistical problems going forward are not even fully known. In addition, pursuing the approach of partnering with a "statistical agency" would lead to further delay in reinstituting this collection, which has already lagged for far too long, while also unduly increasing the complexity and cost of the collection. Going forward, such an approach would lend complexity to the process and potentially hamper the Commission's ability to review, analyze, and report on the underlying data on an ongoing basis. Consequently, we conclude that the significant time, complexity, and cost associated with formulating a partnership with a statistical agency outweigh any speculative harm that might arise from public availability of this data.[107]

> **2.    Even if FOIA Exemption 4 Applies, the Strong Public Interest in Disclosure Outweighs Any Private Interest In Confidential Treatment**

30.    The *Further Notice* sought comment on whether any Freedom of Information Act (FOIA) exemptions might apply to our collection of Form 395-B data.[108] Both the Center for Workplace Compliance (CWC) and NAB assert that Form 395-B data reported by broadcasters should not be publicly disclosed because doing so would reveal trade secrets and commercial information to competitors.[109] While FOIA Exemption 4 protects trade secrets and confidential commercial information from mandatory public disclosure by the Commission, its applicability to the information collected on Form 395-B is questionable. Further, even if we were to find FOIA Exemption 4 applicable, the Commission is not compelled to keep data covered by Exemption 4 confidential. The Commission has authority to make records that fall within Exemption 4 public if it determines that the public interest in disclosure outweighs the private interests in preserving the data's confidentiality.[110]

31.    FOIA Exemption 4 protects from mandatory disclosure information that is "obtained from a person," as we recognize would be the case here, and that is both (1) "commercial or financial" in character and (2) "privileged or confidential."[111] In their comments, CWC and NAB assert that Form

---

[107] Given our decision, we need not reach the argument by NOW et al. that section 334 prohibits confidential treatment of Form 395-B filings because, they allege, concealing the identity of the filing party would constitute a substantive revision of the form under the statute. NOW et al. 2004 Comments at 9-10; NOW et al. 2004 Reply at 2-3. *But see* NAB 2004 Comments at 7-8 (arguing that confidential treatment of the filings would not require any change to the forms and "would be nothing more than a 'nonsubstantive technical' revision of the procedure for collecting the reports"); NAB 2004 Reply at 8-9; State Associations 2004 Reply at 7-8.

[108] *Further Notice*, 36 FCC Rcd at 12065-66, para. 22.

[109] CWC Comments at 8. NAB in its Reply reiterates CWC's position. NAB Reply at 5-6.

[110] *See Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations*, 30 FCC Rcd 10360, 10365-67, paras. 13, 15 (2015) (*Charter Order*); *see also* 47 CFR § 0.461(f)(4) ("If it is determined that the Commission has authority to withhold [records requested under the FOIA] from public inspection, the considerations favoring disclosure and non-disclosure will be weighed in light of the facts presented, and the Commission may, at its discretion, grant the request in full or in part, or deny the request."); *FCC v. Schreiber*, 381 U.S. 279, 291-92 (holding that a disclosure authorized by the Commission after balancing the public and private interests under section 4(j) of the Communications Act, 47 U.S.C. § 154(j), is "authorized by law" within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905).

[111] *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019). FOIA Exemption 4 also protects "trade secrets" from mandatory disclosure. 5 U.S.C. § 552(b)(4). Courts have defined a "trade secret" as "a secret,

(continued....)

395-B demographic data are "commercial information."[112]  The case law, however, is not definitive on this question.  Courts have sometimes defined commercial information broadly to include information submitted to an agency in which the submitter has a commercial interest,[113] or to encompass information that has intrinsic commercial value, the disclosure of which would jeopardize a submitter's commercial interests or ongoing operations.[114]  Those definitions might arguably apply to the demographic information of employees.  However, in a recent case very closely on point, *Center for Investigative Reporting v. U.S. Department of Labor* (*Center for Investigative Reporting*), the U.S. District Court for the Northern District of California held that the federal government failed to prove that EEO-1 Consolidated Report (Type 2) employee demographic data were "commercial."[115]  Similar to Form 395-B data, the EEO-1 Type 2 Reports do not include "salary information, sales figures, departmental staffing levels, or other identifying information."[116]  Although the Type 2 Reports "require companies [that do business at two or more physical addresses] to report the total number of employees across all their establishments," whereas the Form 395-B breaks down this information by station employment units, neither form links job categories to specific departments; rather, both require information aggregated by type of job across all departments.  Furthermore, the EEO-1 reports utilize the same job title, gender, and ethnicity categories as the information to be provided in Form 395-B.  Given these similarities between the EEO-1 reports and information to be provided in Form 395-B, *Center for Investigative Reporting* suggests that the Form 395-B data is at least arguably not correctly considered to involve commercial information.

    32.    It is likewise not entirely clear whether the data at issue here would be properly considered "privileged or confidential."  Information is confidential within the meaning of Exemption 4

---

commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983); *accord Herrick v. Garvey*, 298 F.3d 1184, 1190 (10th Cir. 2002).  No commenter has explained how the data at issue here could meet that definition, and we conclude that they do not.  Facially, employee demographic information is not a "trade secret" because such employment information does not directly relate to the production and processing of a trade "commodity."  Black's Law Dictionary defines a "commodity" as "[a]n article of trade or commerce."  *Commodity*, Black's Law Dictionary (11th ed. 2019) (stating that the term "embraces only tangible goods, such as products or merchandise, as distinguished from services").  We are not aware of any instance in which the Commission has characterized broadcast programming as a commodity.  And even if radio broadcasting were a commodity, the demographic information of those who produce it is not "used" in its preparation.

[112] CWC Comments at 8; NAB Reply at 5-6.

[113] *See Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  *See also San Juan Citizens All. v. United States Dep't of Interior*, 70 F. Supp. 3d 1214, 1219 (D. Colo. 2014) (adopting the D.C. Circuit's "commercial interest" standard).

[114] *See New York Pub. Interest Research Grp. v. U.S. E.P.A.*, 249 F. Supp. 2d 327, 334 (S.D.N.Y. 2003).  *See also FlightSafety Servs. Corp. v. U.S. Dep't of Labor*, No. CIV.A. 300CV1285P, 2002 WL 368522, at 5 (N.D. Tex. Mar. 5, 2002), *aff'd sub nom. Flightsafety Servs. Corp. v. Dep't of Labor*, 326 F.3d 607, 612 (5th Cir. 2003) (finding, *inter alia*, that raw salary data submitted to the Bureau of Labor Statistics qualified as commercial information).  *But see Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*, 58 F.4th 1255, 1262-69 (D.C. Cir. 2023) (holding that identities of suppliers under government contracts were not commercial information because the information was not commercial in and of itself, regardless of whether its disclosure might have commercial or financial repercussions).

[115] *See Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 776-779 (N.D. Cal. 2019) (holding that information contained in federal contractors' employment diversity [EEO] reports requested from the Department of Labor under FOIA was not "commercial," and thus did not fall under Exemption 4, and further questioning whether the information was "confidential"), *app. dismissed sub nom. Evans v. Synopsys, Inc.*, 34 F.4th 762 (9th Cir. 2022).

[116] *See id.* at 777.

"whenever it is customarily kept private, or at least closely held, by the person imparting it."[117]  What matters is "how [a] particular party customarily treats the information, not how the industry as a whole treats [it]."[118]  Here, CWC acknowledges that "many employers choose to publicly disclose workforce demographic data" in "a variety of forms."[119]  And although CWC distinguishes between Form 395-B data and the EEO-1 data that companies often elect to disclose, we see similarities between the two data sets, as discussed above.

33.        In addition, as discussed further below, we note that commenters have failed to show that competitive harm would result from the collection and public release of the information provided in Form 395-B.  While the Supreme Court held in *Food Marketing Institute* that a showing of competitive harm is not required to protect information from disclosure under Exemption 4, some courts have since declined to allow agencies to withhold information covered by Exemption 4 without showing an articulable harm from disclosure.[120]  These decisions rest on the theory that under the FOIA Improvement Act of 2016— which did not apply to the *Food Marketing Institute* case because it had not yet become effective at the time that case was filed—agencies must produce information otherwise covered by a FOIA exemption unless it is reasonably foreseeable that disclosure would harm an interest protected by the exemption (or disclosure is prohibited by law).[121]  However, the FOIA Improvement Act has alternatively been interpreted in the Exemption 4 context to require no demonstration of harm beyond the loss of confidentiality itself, and therefore the relevance of competitive harm to the Exemption 4 analysis remains an unsettled issue.[122]

34.        Ultimately, however, we need not decide whether Exemption 4 covers the information collected on Form 395-B or assess the relevance of the FOIA Improvement Act.  The Commission has well-established authority under section 4(j) of the Act[123] to publicly disclose even trade secrets or confidential business information if, after balancing the public and private interests at stake, we determine that it is in the public interest to do so.[124]

---

[117] *Argus Leader*, 139 S. Ct. at 2362.  No party argues here that the information on Form 395-B is privileged.

[118] *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001).

[119] CWC Comments at 9.

[120] *See, e.g., Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 235, 241-42 (2d Cir. 2022).  At least one court has rejected that theory, however.  *Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019).

[121] 5 U.S.C. § 552(a)(8)(A)(I); *see Seife*, 43 F.4th at 241-42 ("[T]he interests protected by Exemption 4 are the submitter's commercial or financial interests in information that is of a type held in confidence and not disclosed to any member of the public by the person to whom it belongs.  An agency in a FOIA case can therefore meet the foreseeable harm requirement of the [FOIA Improvement Act] by showing foreseeable commercial or financial harm to the submitter upon release of the contested information."); *see also Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.,* 436 F. Supp. 3d 90, 113 (D.D.C. 2019) (opining that the foreseeable harm requirement applies to Exemption 4 after *Food Marketing Institute,* and that, in order to withhold information covered by the exemption, agencies must explain how disclosure would harm an interest protected by the exemption); *Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, 424 F. Supp. 3d at 780 (acknowledging and engaging in a foreseeable harm analysis under Exemption 4).

[122] *See Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019) (rejecting the argument that the FOIA Improvement Act, in effect, reinstates the competitive harm test the Court overruled in *Food Marketing Institute*).

[123] 47 U.S.C. § 154(j) ("The Commission may conduct its proceedings in such a manner as will best conduce to the proper dispatch of business and to the ends of justice.").

[124] *See Schreiber*, 381 U.S. at 291-92 (holding that a disclosure authorized by the Commission after balancing the public and private interests under section 4(j) of the Communications Act is "authorized by law" within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905); *American Broadband & Telecommunications Company Jeffrey S.*

(continued....)

35.    In assessing the respective interests in the disclosure or non-disclosure of Form 395-B data, we determine that the public interest in disclosing Form 395-B data outweighs broadcasters' claims that such disclosure might cause unspecified harm.  As outlined above, there are significant public interest benefits from public disclosure of Form 395-B data.[125]  Public disclosure of Form 395-B data promotes a more accurate collection and recordation process.  It increases the likelihood that incomplete or inaccurate filings will be discovered and corrected, and it will incentivize stations to file accurate data to avoid third-party claims that submitted data are incorrect.  It is also consistent with Congress's goal to maximize the utility of the data an agency collects for the benefit of the public.[126]  Public disclosure also allows us to produce the most granular reports possible for the benefit of Congress and the public, without being unnecessarily hampered by concerns about inadvertent disclosures of identifiable information.  And public disclosure allows others to review the accuracy of our data analyses and to question our methods for data collection with the benefit of actual datasets.

36.    In contrast to these significant public benefits, CWC and NAB have failed to demonstrate that availability of the Form 395-B data would cause meaningful competitive harm.  For example, CWC asserts that if Form 395-B data were disclosed, a broadcaster's competitors could exploit such information to gain competitive insights into the broadcaster's business practices.[127]  Nothing in the record, however, realistically demonstrates how the public release of Form 395-B data might afford a competitor tangible insights into another broadcaster's business practices that would lead to competitive harm.  CWC and NAB have not provided any actual instances of harm related to the Commission's previous collection and public disclosure of demographic data, but rather largely project a speculative, worst-case scenario.  CWC posits that competitors would be able to draw more detailed insights by comparing published data over a stretch of years; however, we fail to understand how any such result would have a negative commercial impact on broadcasters.[128]  Further, guided in part by the court's

---

*Ansted, Order on Reconsideration*, 35 FCC Rcd 3762, 3764, para. 6 (2020); *Charter Order*, 30 FCC Rcd at 10365-67, paras. 13, 15; *Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission*, GC Docket No. 96-55, Notice of Inquiry and Notice of Proposed Rulemaking, 11 FCC Rcd 12406, 12414-15, para. 15 (1996).

[125] *See supra* paras. 15-16.

[126] *See* Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435, §§ 201-202, 132 Stat. 5529, 5534-44, Title II (2019); 44 U.S.C. § 3501(2), (4) (setting forth the goals to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society").

[127] CWC Comments at 9.

[128] Moreover, the fact that a number of broadcasters have begun to disclose workforce demographic data, albeit not at the level of detail as would be reported on Form 395-B, also calls into question the extent of the competitive harm that would result if that information were to be publicly released.  In this regard, we note the growing availability online of workforce demographic information related to media and broadcast employees.  *See, e.g.,* Hearst 2023 RISE Report, https://www.hearst.com/documents/33329/890300/2023+Hearst+RISE+DE%26I+Overview.pdf/14d1c825-8209-867d-f9dd-10d527d189a6?t=1679517544494 (providing ethnicity and gender percentages); *see also* Tegna 2022 Diversity, Equity & Inclusion Annual Report, https://www.tegna.com/social-responsibility/ (providing ethnicity and gender percentages); Nexstar Media Group, HR Management; Workforce Diversity, Equity, and Inclusion, https://www.nexstar.tv/corporate-social-responsibility/human-resource-management/ (providing ethnicity and gender percentages, in addition to EEO-1 data for separate stations); Gray Television 2022 ESG Report, https://www.responsibilityreports.com/HostedData/ResponsibilityReports/PDF/NYSE_GTN_2022.pdf (providing ethnicity and gender percentages); Sinclair Broadcast Group 2022 ESG Report, https://d2ghdaxqb194v2.cloudfront.net/2732/190259.pdf (providing ethnicity and gender percentages); Cumulus Media 2022 Sustainability Report, https://www.cumulusmedia.com/wp-content/uploads/2022/12/2022-Cumulus-Sustainability-Report.pdf (providing ethnicity and gender percentages).  The varying approaches of broadcasters about whether to, and how to, release employee demographic information on a voluntary basis at least indicates a lack of agreement among broadcasters with respect to their treatment of such information, as well as a lack of consensus on whether they

(continued….)

analysis in *Center for Investigative Reporting*, we remain unconvinced that knowing the number of employees assigned to a particular job title or category in a company without knowing other details—for example, the duties of the employees, the structure of the company, salary information—can provide any significant information to a competitor that results in reasonably foreseeable or substantial competitive harm.[129]

37.     We conclude that the public benefits of releasing the information contained in Form 395-B are significant, while the harms would be slight.  Thus, balancing the public interests in disclosure against the private interests at stake here, we find that there are strong public interests in favor of disclosure and that, accordingly, section 4(j) authorizes the Commission to publicly disclose Form 395-B data.

38.     *Timing of Form Submission*.  As directed by section 73.3612 of the Commission's rules, broadcasters will be required to file Form 395-B annually on or before September 30 of each year, after the Order becomes effective.[130]  The Commission established the September 30 deadline to align with the deadline for EEO-1 filings to enable licensees and permittees that also file similar data with the EEOC to conserve resources by using the same pay period record information for both filings.[131]  Broadcasters may report employment figures from any payroll period in July, August, or September of the relevant year, but that same payroll period must be used in each subsequent year's report by the licensee.  Consistent with previous practice, the Form 395-B  will be due on or before September 30 of each calendar year.  To provide broadcasters adequate notice regarding the details of the electronic filing process, the Media Bureau will issue a Public Notice with instructions about how to submit the filings, prior to the first filing after the Order becomes effective.  This Public Notice will provide broadcasters ample time to put into place whatever data collection processes they require, including, for example, the development of employee surveys and instructions for employees regarding which job classification to report.  It also will afford the Commission time to create and test an electronic version of Form 395-B.

39.     *Identification of Non-Binary Gender Categories*.  Finally, in reinstating the collection of Form 395-B, some commenters urge us to incorporate into the form a mechanism that will enable identification of non-binary gender categories.[132]  While the EEOC has incorporated a comment box on the EEO-1 form allowing for submission of gender non-binary information, both the EEOC and the Commission traditionally track the definitions and standards on race  ethnicity and gender set forth by

---

would suffer any significant competitive harm from the public knowing this information.  In addition, the increasing public availability of employee demographic information may cast doubt on whether it can be considered "confidential" under Exemption 4.  *See supra* paras. 32-33.

[129] In *Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, the federal district court emphasized that an EEO-1 form for government contractors "does not ask submitting companies to explain how resources are allocated across a company's 'segments.'"  *Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, 424 F.Supp.3d at 777.  "Rather, the report is organized by job category, such as 'Professionals,' 'Sales Workers,' 'Operatives,' 'Craft Workers,' 'Laborers and Helpers,' etc.," and "does not request demographic information by division, department, or 'segment.'"  *Id.*  As noted by various commenters in the instant proceeding, Form 395-B uses the same reporting methodology in terms of job categories as the EEO-1.  The grid sections of the two forms, where respondents are instructed to enter their workforce data, are identical in that respect, as both forms follow OMB-issued standards on reporting.

[130] 47 CFR § 73.3612.  Authority is delegated to the Media Bureau  to announce and provide filing instructions before the first window opens.  *See* 47 CFR § 0.283.

[131] *1998 Biennial Regulatory Review – Amendment of Sections 73.3612 and 76.77 of the Commission's Rules Concerning Filing Dates for the Commission's Equal Employment Opportunity Annual Employment Reports*, Memorandum Opinion and Order, 13 FCC Rcd 6973, para. 5 (1998) (*1998 Biennial Review Order*) (agreeing with broadcasters that the annual filing deadline should be moved from May to September to avoid unnecessary duplication of efforts).

[132] Foster Garvey Coalition Comments at 3-4; NAB Reply at 7.

OMB and used widely by the federal government.[133]  To date, OMB has not prescribed conclusive classifications to capture non-binary gender data.  Federal guidance, however, recognizes the "need to be flexible and adapt over time" in developing measures to collect such data.[134]  Consistent with that guidance and our record, we believe it is appropriate that the Form 395-B include a mechanism to provide further specificity about broadcaster employees' gender identities.

40.      We find that such an update fits within the latitude granted to the Commission pursuant to section 334(c) of the Act to revise the forms "to reflect changes in . . . terminology."[135]  We also find that the *Further Notice* provided sufficient public notice and opportunity for comment to allow us to incorporate this change to the form.  The *Further Notice* encouraged commenters "to provide any new, innovative, and different suggestions for collecting and handling employment information on Form 395-B" and asked if there were "any other issues or developments that [the Commission] should consider."[136]  We conclude that the suggestion to include within the Form 395-B a mechanism to account for those who identify as gender non-binary is a logical outgrowth from the *Further Notice's* requests for comment.  Accordingly, and after receiving only support for and no opposition to the idea, we will include such a mechanism in the reinstituted Form 395-B.[137]  We delegate to the Media Bureau the authority to implement this change to the Form.

### B.      Constitutional Issues

41.      Reinstatement of the Form 395-B data collection in a publicly available manner is wholly consistent with the equal protection guarantee contained in the Fifth Amendment of the Constitution.[138]  As discussed below, collection of workforce data from broadcast licensees on Form 395-B is race- and gender-neutral, and no race- or gender-based government action flows from collection of the data or its public availability.  Accordingly, collection and publication of Form 395-B data need only be rationally related to a legitimate governmental interest to pass constitutional muster.  Since the Commission has a legitimate public interest in collecting Form 395-B data and doing so on a transparent basis is rationally related to this interest, reinstatement of Form 395-B as we propose is constitutionally permissible.  Finally, we find that the limitations the Commission has placed on its own use of the data obviate the concerns raised in the record about the potential for undue pressure being placed on, or "raised eyebrow" regulation of, broadcasters.

42.      As the court in *Lutheran Church* acknowledged, the Constitution's equal protection

---

[133] *See* OMB, Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58,782 (Oct. 30, 1997) (stating in Background that "For more than 20 years, the current standards in OMB's Statistical Policy Directive No. 15 have provided a common language to promote uniformity and comparability for data on race and ethnicity for the population groups specified in the Directive.").

[134] *Recommendations on the Best Practices for the Collection of Sexual Orientation and Gender Identity Data on Federal Statistical Surveys*, Office of the Chief Statistician of the United States, https://www.whitehouse.gov/wp-content/uploads/2023/01/SOGI-Best-Practices.pdf (last visited Nov. 14, 2023).

[135] 47 U.S.C. § 334(c).  We note that the addition of the "gender non-binary" category is a "non-substantive technical or clerical revision" as required by section 334(c).  The change is consistent with section 334(c) because it provides an option for employees to identify as non-binary, if they so choose, but does not impose any new requirement on stations that did not exist under the prior version of Form 395-B, which already required reporting on gender.

[136] *Further Notice*, 36 FCC Rcd at 12061, 12066, paras. 12, 23.

[137] NAB Reply at 7 (supporting an update to the form to enable the reporting of non-binary options and observing that "[s]uch a change would be consistent with steps by other federal agencies and serve the public interest in accurate data").

[138] U.S. Const. amend. V.

guarantee is not implicated if the regulation at issue is neutral with respect to protected categories.[139] This standard is satisfied here, because both on its face and in application, the collection of workforce data from broadcast licensees on Form 395-B is race- and gender-neutral. Regardless of the demographic makeup of a particular broadcast station employment unit, all units with five or more full-time employees are required to file their workforce data with the Commission. At no point does the Commission use race and gender categories to direct units on whether they must file the form; the number of employees within a given unit is the sole criterion. Further reflecting the neutrality of the application of the form, all units required to file with the Commission use an identical Form 395-B to report their respective demographic and job category data. By using employment size as the exclusive factor to direct units to file broadcast workforce data, the completion of the form in this regard is a neutral activity, "devoid of ultimate preferences" for hiring on the basis of race or gender.[140]

43.    Furthermore, there is no race- or gender-based government action that flows from collection of the data or its public availability. Unlike the collection of this data 20 years ago, there is no connection between the Form 395-B collection at issue here and the EEO program requirements applicable to broadcasters. The court's finding in *Lutheran Church* that the Commission's rules impermissibly pressured broadcasters to engage in race-conscious hiring decisions stemmed from the set of criteria that the Commission had created in 1980 to determine whether its review of a station's license renewal application should include a closer examination of the station's EEO program.[141] Under those 1980 screening guidelines, the Commission would review the adequacy of a station's EEO program if minorities and/or women employed by the station were underrepresented as compared to the available workforce.[142] That requirement to compare the racial composition of a station's workforce with that of the local population, and not the requirement to report employment data that we reinstate today, was the trigger for the court's strict scrutiny in that case.[143]

44.    While the Commission revised the EEO program requirements after the *Lutheran Church* ruling, the *use* of race, ethnicity, and gender information (albeit not Form 395-B data) was still linked to the Commission's EEO program. The new EEO program allowed stations to choose between two options for their recruiting programs.[144] In *MD/DC/DE Broadcasters*, the D.C. Circuit struck down the Commission's revised, two-option EEO program because it found that broadcasters proceeding under

---

[139] For example, in the context of employee recruitment, the *Lutheran Church* court stated, "[i]f the regulations merely required stations to implement racially neutral recruiting and hiring programs, the equal protection guarantee would not be implicated." *See Lutheran Church*, 141 F.3d at 351.

[140] *See, e.g., Sussman v. Tanoue*, 39 F.Supp.2d 13, 27 (D.D.C. 1999) (holding that an FDIC workforce data collection that was part of a greater EEO program, including outreach, recruitment, and self-evaluation components, was constitutional and not deserving of strict scrutiny analysis, because it "falls within the category of programs, those conscious of race but devoid of ultimate preferences . . ."); *see also Lutheran Church*, 141 F.3d at 351 ("[]neither the Supreme Court nor any other court has ever applied strict scrutiny to programs that require nothing more than recruitment, outreach, self-evaluation, and data collection"). As noted below, what triggered strict scrutiny in the *Lutheran Church* case was the comparison of the racial composition of the station's workforce with that of the local population and, where "underrepresentation" of minorities or women was found, requiring broadcasters to take appropriate action where necessary. *Lutheran Church*, 141 F.3d at 351-52.

[141] *See Lutheran Church*, 141 F.3d at 351-53.

[142] *See id.* at 352-53. Specifically, stations with five to ten full-time employees would have their EEO program reviewed if minority groups and/or women were not employed on their full-time staffs at a ratio of 50% of their workforce availability overall and 25% in the upper-four Form 395 job categories. *Id.* at 353. The same was true for stations with 11 to 49 full-time employees, except that a 50% ratio was required for the upper-four Form 395 job categories. *Id.* Stations with fewer than five full-time employees were not required to record EEO programs, and the Commission reviewed the EEO program of all stations with 50 or more full-time employees. *Id.*

[143] *Id.* at 351-54; *but see* NAB Comments at 11-12 (attempting to link the Form 395-B filing requirement with the court's decision in *Lutheran Church*).

[144] *First Report and Order*, 15 FCC Rcd at 2363-79, paras. 76-122.

Option B of the program were pressured to engage in race-conscious recruiting practices, given that Option B required annual reporting of race, ethnicity, and gender information for each job applicant.[145] The court found that such pressure would lead to outreach programs targeted at minority groups, to the potential disadvantage of non-minority groups, and thus constituted a racial classification that triggered strict scrutiny.[146] Following the court's decision, the Commission suspended both its EEO outreach requirements and its Form 395-B filing requirement.[147]

45.    When the Commission later adopted new EEO program requirements, it deferred action on requiring the collection of workforce data, and the Form 395-B data collection has been on hold ever since.[148] Thus, these EEO program requirements have existed independently of Form 395-B for the past 20 years.[149] That the Commission's EEO program continued to operate even as the Form 395-B collection was held in abeyance highlights the separation of these two requirements.  And we reiterate that going forward, these two requirements—the filing of annual workforce data and compliance with an EEO program—will continue to be divorced from one another.  As the Commission has recognized consistently for more than 20 years, the *Lutheran Church* and *MD/DC/DE Broadcasters* decisions do not prohibit the collection of employment data for the purpose of analyzing industry trends.[150]  The Commission concluded more than two decades ago that collecting employment data solely for monitoring purposes would not violate *Lutheran Church*, and we affirm that conclusion.[151]  The D.C. Circuit never took issue with the Commission's collection of station-specific employment data from broadcasters and making this data publicly-available.  We continue to find the collection of this information to be consistent with the Constitution and the public interest.  The Commission has stated unequivocally and emphatically that it will not use the Form 395-B for assessing a licensee's compliance with EEO program requirements.  The agency even went so far as to codify that policy in the Code of Federal Regulations, amending section 73.3612 of its rules in 2004 to prohibit explicitly the use of the Form 395-B data for EEO compliance purposes.[152]  We reaffirm the

---

[145] *MD/DC/DE Broadcasters*, 236 F.3d at 19-22.

[146] *Id.* at 20-21.  The court did not find similar constitutional flaws in Option A but nonetheless struck it down because the Commission had stressed the value of giving broadcasters a choice in compliance actions—and the court's elimination of Option B left broadcasters with no alternative except Option A.  *Id.* at 22.

[147] *Suspension Order*, 16 FCC Rcd at 2872, para. 1 & n.1.

[148] *Second Report and Order and Third NPRM*, 17 FCC Rcd at 24024-25, 24077, paras. 17, 198 (deferring action on the form pending the incorporation of OMB's revised race and ethnicity classifications and explaining that such deferral need not delay adoption of the revised EEO rules because "[t]he data collected in the employment reports will be used only to compile trend reports and report to Congress" and "will not be used to determine compliance with the EEO rules").

[149] *See* NAB Comments at 18 (noting that "the form has been suspended for approximately two decades, during which time the FCC has effectively fulfilled its statutory obligations regarding EEO and vigorously enforced its EEO rules").

[150] *See, e.g.*, *1998 NPRM*, 13 FCC Rcd at 23023, para. 49 (stating that "[t]he court in *Lutheran Church* did not conclude that the Commission lacks authority to collect statistical employment data to analyze industry trends, or to prepare annual trend reports" and that "the Commission has broad authority to collect information and prepare reports."); *First Report and Order*, 15 FCC Rcd at 2358, paras. 63-64 (concluding that the Commission has continued authority to require annual employment reports for the purpose of monitoring employment trends); *2000 Reconsideration Order*, 15 FCC Rcd at 22558-60, paras. 35-40 (rejecting the argument that collecting employment data solely for monitoring purposes would violate *Lutheran Church*).

[151] *2000 Reconsideration Order*, 15 FCC Rcd at 22559-60, paras. 36-40 (rejecting the argument that collecting employment data solely for monitoring purposes would violate *Lutheran Church*).

[152] Note to section 73.3612 currently states:

Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to

(continued....)

Commission's previous determination that workforce data collected on Form 395-B will be used only for purposes of analyzing industry trends and reports by the Commission, and that the use of such data to assess an individual broadcast licensee's compliance with our EEO requirements will be prohibited. Moreover, in the attached *Order on Reconsideration*, we grant a previous request filed by the State Broadcasters Associations (State Associations) asking that we modify the prohibition on our use of the form's data to explicitly bar the Commission from employing this data to assess compliance with the nondiscrimination requirement contained in section 73.2080 of our rules.[153]  Our granting of the State Associations' request further demonstrates our commitment to use this data only for industry analysis and reporting.

46.     We disagree with NAB's and the State Associations' assertion that collection or publication of the data on a licensee- or station-attributable basis will still somehow result in unconstitutional "*sub silentio*" pressures or "raised-eyebrow" regulation.[154]  We have stated repeatedly and unequivocally, and codified the proposition in our rules, that we will not use Form 395-B data for any purpose other than for analyzing and reporting trends in the broadcast industry.  Nonetheless, NAB and the State Associations attempt to employ dicta from the D.C. Circuit in *MD/DC/DE Broadcasters* and *Lutheran Church* about implicit pressures by claiming that, despite the limitations the Commission has placed on its own use of the data, third parties may use the data to place improper pressure on a licensee to engage in preferential hiring practices to avoid having frivolous complaints filed against it with the Commission.[155]  As an example, NAB claims that some loan agreements would require broadcasters to disclose even frivolous petitions to their lenders, thereby adding an element of risk to funding acquisitions.[156]  To address this concern, we will make every effort to dismiss as quickly as possible any petitions, complaints, or other filings that rely on a station's Form 395-B filing as the basis of the petition, complaint, or other filing.  Moreover, broadcasters in that situation may apprise lenders of our intent to dismiss such complaints and point to our rule disallowing the use of the data for compliance purposes.

47.     Broadcaster groups mistakenly assert that reinstating a public collection of Form 395-B violates D.C. Circuit precedent, which the State Associations argue effectively invalidated the use of the Form 395-B for all purposes.[157]  In arguing that the *Lutheran Church* decision invalidated Form 395-B, however, the State Associations erroneously treat all the EEO requirements in effect at the time of *Lutheran Church* as one inseparable rule that the D.C. Circuit vacated.[158]  The State Associations are

---

Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the equal employment opportunity requirements of § 73.2080.

47 CFR § 73.3612 Note.

[153] *See Order on Reconsideration*, *infra* at Section IV.

[154] *See MD/DC/DE Broadcasters*, 236 F.3d at 19 (stating that "[a] regulatory agency may be able to put pressure upon a regulated firm in a number of ways, some more subtle than others"); *see also Lutheran Church*, 141 F.3d at 353 (stating that statistics reflecting underrepresentation are "often the impetus . . . for the filing of a petition to deny").

[155] NAB Comments at 15; State Associations Reply at 11-12; *see also* NAB 2004 Comments at 8-11; State Associations 2004 Comments at 4-7, 8-11.

[156] NAB Comments at 15; State Associations Reply at 14-15.

[157] State Associations Reply at 6-8.

[158] *Id.* at 6-7.  The State Associations reference reply comments they filed in 2019 in another FCC proceeding.  *See id.* at 6-7, n.13.  In that proceeding, after setting forth their analysis of the D.C. Circuit decisions, the State Associations make the argument that *Lutheran Church* invalidated Form 395-B.  Their argument regarding the form's validity rests on the court's observation that "a hard-edged factor like statistics is bound to be one of the more noticed screening criteria" and likely would attract the attention of third parties in addition to the Commission. State Associations Reply, MB Docket No. 19-177, at 5-10, 28-30 (Nov. 4, 2019) (quoting *Lutheran Church*, 141 F.3d at 353).  The State Associations repeat their point about third-party attention in this proceeding.  State

(continued....)

incorrect in asserting[159] that the court's finding of unconstitutional pressure when the collection was combined with the then-existing EEO program somehow invalidated the Form 395-B itself for any and all other purposes.  In fact, as noted above, what the *Lutheran Church* court found to be problematic was the requirement to compare the racial composition of a station's workforce with that of the local population,[160] and not the requirement to report employment data to the Commission.  The court's finding of unconstitutionality did not reach the Commission's use of the form to gather data purely for statistical purposes and without regard to a station's EEO compliance.  Indeed, the court did not even speak to the form's use in collecting employment data for the purpose of analyzing industry trends, let alone invalidate it for that purpose.

48.     Furthermore, we reject the suggestion that the finding in the *MD/DC/DE Broadcasters* case somehow casts doubt on the legitimate use of Form 395-B data for industry trend reporting, given that the Form 395-B was not even at issue in that case.  The Form 395-B was only mentioned in the background section of that decision, as the collection of the *employee* diversity data was irrelevant to the data at issue in that case (i.e., *applicant* data).  Rather, the court found the Commission's revised EEO program problematic because it determined that broadcasters proceeding under one aspect of the program (Option B) could feel pressured to engage in race-conscious recruiting practices, given that Option B required an annual reporting of the race, ethnicity, and gender information for each job applicant.[161]

49.     Therefore, unlike applicant data required under Option B of the former EEO program, the Form 395-B workforce data played no role in assessing a broadcaster's compliance with the recruiting rules at issue in *MD/DC/DE Broadcasters*.  In the current situation no unconstitutional use of racial or gender classifications arises from the Commission's collection of annual employee data because we will not use the collection of Form 395-B demographic data for purposes of assessing or enforcing a broadcaster's compliance our EEO rules.[162]  Further, we find NAB's argument that the court in *MD/DC/DE Broadcasters* disparaged the use of "outputs" to measure "inputs" to be misplaced.[163]  First, as noted above, the court was referring to *applicant* data—i.e., those applying to open job positions at the station—as the output in that case, which was being used to evaluate a broadcaster's outreach efforts and

---

Associations Reply at 6-7.  However, the screening criteria under review in *Lutheran Church* were jettisoned two decades ago and are no longer operative.  Further, as repeatedly stated throughout this *Order*, the Commission has made it clear that it will dismiss any third-party EEO complaints, petitions, or other filings that rely on Form 395-B data.

[159] *See* State Associations Reply at 6-7 (claiming that the linchpin for both the *Lutheran Church* and *MD/DC/DE Broadcasters* decisions was the Form 395-B itself); *see also* NAB Comments at 11-14 (conflating collection of the form's data with concerns that the D.C. Circuit had about how such data was used).

[160] *Lutheran Church*, 141 F.3d at 351-52.

[161] *MD/DC/DE Broadcasters*, 236 F.3d at 19-20, 21-22.

[162] *2000 Reconsideration Order*, 15 FCC Rcd at 22560, para. 40 (assuring "that data concerning the gender, race and ethnicity of a broadcaster's or cable entity's workforce will be used only for purposes of analyzing industry trends and reporting to Congress, and that it will not be used for the purpose of assessing any aspect of an individual broadcaster's or cable entity's compliance with our EEO rules"); *see also* 47 CFR § 73.3612 Note.

[163] In support, NAB quotes *MD/DC/DE Broadcasters* that "[m]easuring outputs to determine whether readily measurable inputs were used . . . is evidence that the agency with life and death power over the [license (of a broadcaster)] is interested in results, not process, and is determined to get them."  NAB Comments at 12-13 (quoting *MD/DC/DE Broadcasters,* 236 F.3d at 19-20).  The Court's focus at the time, however, was the incentives such measurement might create for broadcasters to "focus their recruiting efforts upon women and minorities, at least until those groups generate a safe proportion of the licensee's job *applications*," which, as discussed above, is no longer an element of the Commission's EEO rules.  *See MD/DC/DE Broadcasters,* 236 F.3d at 19-20 (emphasis added); *see also* AAJC et al. Ex Parte at 20-23 (arguing that the Commission should "interpret *MD/DC/DE Broadcasters* narrowly and not accede to questionable efforts to extend it").

the success of its EEO program in recruiting potential job applicants.[164]  Employee data—i.e., the composition of the station's workforce, which is captured by the Form 395-B—was not the "output" of concern.  Second, to the extent that employee data might be considered an output, the Commission now explicitly prohibits the use of such data as a tool to measure a broadcaster's "inputs" to its EEO program.  Furthermore, the court in *MD/DC/DE Broadcasters* never suggested that the collection of employee data for statistical purposes factored into its analysis regarding the unconstitutionality of the outreach rules.

50.    Based on the above, we conclude that reinstating collection of Form 395-B in a public manner, where the form's data can only be used for reporting and analyzing industry trends, is fully consistent with the determinations in *Lutheran Church* and *MD/DC/DE Broadcasters*.  The proposed action is race- and gender-neutral and crucial to Congress's and the Commission's interest in understanding broadcast employment trends.  Because the Commission is the only entity with the resources and expertise to expeditiously collect and compile this data, it is vital that the agency restart this collection.  With current data, the Commission, Congress, and the general public can better understand developments in the broadcast sector.

51.    Although no commenter raised a First Amendment issue, we clarify that requiring stations to publicly disclose their workforce composition data does not constitute "compelled speech" on matters of race and gender, in violation of the First Amendment.   A requirement to report information to the government fundamentally differs from the typical compelled speech case, which generally involves situations where "the complaining speaker's own message [is] affected by the speech it [is] forced to accommodate."[165]  Conversely, the Form 395-B report requires reporting of factual information to the Commission—the station's own employment figures—to allow the Commission to analyze trends.  There is no message being forced by the government.[166]

52.    Even assuming, *arguendo*, that broadcaster's speech rights are implicated, our Form 395-B requirement is consistent with the First Amendment, as it entails disclosure of "purely factual and uncontroversial" information in a commercial context.[167]  The D.C. Circuit has ruled that government interests in addition to correcting deception can be invoked to sustain a mandate for disclosure of purely factual information in the commercial context.[168]  The *Zauderer* test is satisfied here because disclosure of workforce data is reasonably related to a substantial governmental interest (ensuring maximum accuracy and utility of the data on which the government relies for analysis and reporting purposes), which outweighs the "minimal" interest in not disclosing purely factual, uncontroversial information.[169]  In the

---

[164] *See MD/DC/DE Broadcasters,* 236 F.3d at 19-20.

[165] *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 61 (2006).  *See, e.g., Pac. Gas & Elec. Co. v. Pub. Util. Comm'n,* 475 U.S.1, 20 (1986) (requiring a utility company to distribute a third party's newsletter in its own billing envelopes is unconstitutional); *Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241 (1974) (requiring newspapers to publish replies from political candidates is unconstitutional).

[166] *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) (applying strict scrutiny to a law requiring professional fund-raisers to disclose to potential donors the percentage of charitable contributions actually turned over to charity, but explaining that a permissible alternative that would not raise First Amendment concerns would be for the State to collect the same data from fundraisers and then publish it because this would not "burden[] a speaker with unwanted speech during the course of a solicitation").

[167] *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985); *see also id.* at 652 n. 14.  As noted above, case law is not definitive on the question of whether workforce data constitutes "commercial information," although broadcasters contend it is, and courts have sometimes defined commercial information broadly to include information submitted to an agency in which the submitter has a commercial interest.  Order, *supra,* para. 31

[168] *American Meat Inst. v. USDA,* 760 F.3d 18, 20 (D.C. Cir. 2014) (en banc).  Other circuits have also held "under *Zauderer* that the prevention of consumer deception is not the only governmental interest that may permissibly be furthered by compelled commercial speech."  *See, e.g., CTIA-The Wireless Ass'n v. City of Berkeley, Cal.,* 928 F.3d 832, 845 (9th Cir. 2019).

[169] *CTIA-The Wireless Association,* 928 F.3d at 845-48.

alternative, even assuming, *arguendo,* that our requirement is subject to heightened First Amendment review, we find that our disclosure requirement satisfies even this higher standard.[170]  The government has a substantial interest in analyzing broadcast industry workforce information to support greater understanding of the broadcast industry and to report to Congress about the same.  Collecting this data and making broadcasters' Form 395-B filings publicly available directly advance this governmental interest because without the data it would be impossible to assess changes, trends, or progress in the industry and making the information public ensures maximum accuracy of the submitted data by increasing the likelihood that erroneous data will be discovered and corrected and incentivizing stations to file accurate data and thereby maximizes the utility of the data.  Moreover, the requirement is not more extensive than is necessary to serve that interest, because the data will be collected in a manner consistent with the Commission's previous, long-standing method of collecting the data and because, as this order has made clear, the data collected will be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of a broadcaster's compliance with the EEO rules.[171]

### C.    The Commission Has Broad Authority to Collect Form 395-B

53.    We find sufficient authority to reinstate the collection of Form 395-B, both pursuant to the public interest provisions of the Act and section 334.[172]  The Commission's adoption of Form 395-B preceded Congress's passage of section 334 by more than two decades.  As discussed above in Section II, the form and the Commission's EEO rules were rooted firmly in the Commission's public interest mandate under the Communications Act.[173]  By codifying the Commission's then existing EEO requirements, as well as the collection of Form 395-B, Congress, in 1992, ratified the Commission's pre-existing authority to adopt such rules and forms.[174]  As the Commission discussed extensively in the

---

[170] *Central Hudson v. Public Service Commission of New York,* 447 U.S. 557, 566 (1980) (requiring the regulation to directly advance the substantial governmental interest asserted, and is not more extensive than is necessary to serve that interest).

[171] We note that requiring stations to submit their own workplace data is not putting any words into broadcasters' mouths and cannot be construed as "mandat[ing] speech that 'a speaker would not otherwise make," such that it might be argued we are imposing "a content-based regulation of speech."  *Riley,* 487 U.S. at 795.  Thus strict scrutiny does not apply here.

[172] *See supra* para. 45 (describing the Commission's legal authority to collect workforce data for industry monitoring purposes independent of its authority to regulate its EEO *program*).

[173] *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24028-29, para. 28 (stating that when the Commission adopted rules in 1969 prohibiting broadcast stations from engaging in employment discrimination and requiring them to maintain a program designed to ensure equal employment opportunities, the Commission drew its authority from its public interest mandate and relied on sections 4(i), 303, 307, 308, 309, and 310 of the Act); *see also id.* at 24030, para. 31 (noting that the Commission had adopted and enforced its EEO rules under its public interest mandate for more than 30 years at that point).

[174] *See id.* at 24030, para. 31 (noting that there is a substantial body of case law establishing the principle that congressional approval and ratification of administrative interpretations of statutory provisions, including those granting jurisdiction to regulate, can be inferred from congressional acquiescence in a long-standing agency policy or practice); *see also id.* at n.62 (citing *Haig v. Agee*, 453 U.S. 280, 300-06 (1981) (long-standing interpretation by the Secretary of State of its power under Passport Act of 1926 as encompassing the power to revoke passports to prevent damage to national security or foreign policy was ratified by congressional acquiescence, even though Secretary exercised power infrequently); *Lorillard v. Pons*, 434 U.S. 575, 580-85 (1978) (Congress is presumed to be aware of administrative and judicial interpretations of a statute and to adopt and ratify those interpretations when it re-enacts a statute without change or incorporates in a new law sections of a prior law that have a settled interpretation); *Zemel v. Rusk*, 381 U.S. 1, 9-13 (1965) (Secretary of State's interpretation of Passport Act of 1926 as authorizing him to impose area restrictions was ratified by Congress when it left untouched the Secretary's broad rulemaking authority when it later enacted legislation relating to passports); *Norwegian Nitrogen Products Co. v. U.S.*, 288 U.S. 294, 313-15 (1933) ("administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful").

*Second Report and Order and Third NPRM* in this proceeding, the limitation imposed by section 334 regarding changes to the Commission's then-existing EEO rules and forms evidenced Congress's approval of the Commission's EEO approach (including the information collection) and its desire to ensure its continuance.[175]  Lawmakers' express endorsement of the rules 30 years ago did not in any way undermine the Commission's pre-existing public interest authority.  Moreover, the Commission also has broad authority under the Communications Act to collect information and prepare reports.[176]

54.     Despite this settled law, the State Associations challenge our authority to reinstate the form's collection, reviving arguments that the Commission rejected 20 years ago.[177]  First, they assert that, rather than a grant of EEO authority, section 334 is a limitation on the Commission's authority to revise its EEO regulations and forms.[178]  They suggest that the Commission is constrained from reinstating Form 395-B because, in setting forth the permissible exceptions to its restriction on EEO changes, Congress did not include, or later add, the situation where some provisions of the EEO rules are deemed unenforceable, as occurred in *Lutheran Church* and *MD/DC/DE Broadcasters*.[179]  Second, the State Associations posit that the Commission is taking inconsistent positions on the current force of section 334.[180]  They argue that, if section 334 is still in force and dictates reinstatement of Form 395-B, then the Commission's current EEO outreach rules violate the statutory provision because those rules have undergone substantial revision.[181]  The State Associations assert that the Commission "cannot have it both ways" by rejecting the constraints of section 334 when it previously revised its EEO rules, but now invoking the same provision to reinstate Form 395-B.[182]

55.     We find that State Associations' assertions unsound as a matter of law and logic.  They disregard the Commission's public interest authority under the Act, which was the underpinning of the Commission's EEO rules and Form 395-B long before the passage of section 334.  Further, the commenters also misconstrue the impact of the court decisions on our section 334 authority.  While the *Lutheran Church* court invalidated elements of the EEO program requirements in effect in 1992, thereby terminating their enforceability, it did not address the constitutionality of section 334 itself.  Moreover, the subsequent decision in *MD/DC/DE Broadcasters* did not imply that the unconstitutionality of the previous regulations rendered section 334 inoperative.

56.     We therefore continue to reject the State Associations' false premise that section 334 was somehow "neutered" by the D.C. Circuit decisions.[183]  Section 334 continues to provide authority for reinstating Form 395-B.  Moreover, as discussed above, we find ample legal authority separate from

---

[175] *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24032, para. 38 (noting that Congress would not have directed the Commission in section 22(g) of the 1992 Cable Act to review the effectiveness of its broadcast and cable EEO policies and regulations then in effect, and recommend whether further legislative action was necessary, had Congress not believed that those policies and regulations were within the Commission's lawful authority).

[176] *See, e.g.*, 47 U.S.C. §§ 154(i) and (k), 303(r), and 403; *see also Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9974, para. 3.

[177] *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24026-35, paras. 21-44.

[178] State Associations Reply at 5-6.

[179] *Id.*; *but see* 47 U.S.C. § 334(c) (allowing the Commission "to revise the regulations described in subsection (a) to make nonsubstantive technical or clerical revisions in such regulations as necessary to reflect changes in technology, terminology, or Commission organization").

[180] *See* State Associations Reply at 6.

[181] *Id.*

[182] *Id.*

[183] *Id.*

section 334 to reinstate collection of the form.[184]

## IV.    ORDER ON RECONSIDERATION

57.    In 2004, the State Associations filed a petition seeking reconsideration of the *Third Report and Order and Fourth NPRM*.[185]  The petition asks the Commission:  (1) to amend the Note to section 73.3612 to, in their view, clarify and strengthen the Commission's pledge to refrain from using Form 395-B data for compliance or enforcement purposes; (2) to address the issue of confidential treatment for Form 395-B; and (3) to issue a Fourth Report and Order resolving issues raised in the *Third Report and Order and Fourth NPRM* and in petitions for reconsideration filed in response to the *Second Report and Order and Third NPRM*.[186]  Numerous parties jointly filed an opposition to the petition.[187]  We hereby grant the State Associations' petition in part, deny it in part, dismiss it in part, and defer it in part.

58.    The State Associations seek an expansion of the Commission's pledge to not use Form 395-B data to assess an individual broadcast licensee's compliance with the EEO rules to read as follows, with their proposed changes shown in italics:

> Note to Section 73.3612:  Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's *or permittee's* compliance with the *nondiscrimination or* equal employment opportunity requirements of Section 73.2080.  *Accordingly, the Commission will not entertain any allegation or showing that a broadcast licensee or permittee has violated any aspect of Section 73.2080 on the basis that the station's workforce does not reflect a certain number of persons of a particular gender, race or ethnicity either overall or in any one or more job categories*.[188]

59.    Based on the record stemming from the State Associations' 2004 petition for reconsideration and the determinations made in the *Fourth Report and Order* above, we find it appropriate to make certain changes to the language of section 73.3612 of our rules.  With regard to the first of the State Associations' proposed changes, the opposing parties do not object to adding the phrase "or permittee's," and we agree to make that change because permittees also are required to file Form 395-B.[189]  We also find that explicitly stating in the rule itself that we will not use Form 395-B data to assess

---

[184] We also find to be spurious State Associations' assertion that the specific language of section 634 of the Act regarding the obligations the Act places on MVPDs regarding their annual employment filing requirements somehow undermines our authority to reinstate the Form 395-B collection, which both preceded the statutory MVPD requirement and our authority for which has been ratified by Congress, as described in Section II above.  *See id.* at 7-8.

[185] Joint Petition of State Broadcasters Associations for Reconsideration and/or Clarification of Third Report and Order and Fourth NPRM, MM Docket No. 98-204, (filed July 23, 2004), https://www.fcc.gov/ecfs/document/5511438304/1 (State Associations 2004 Petition).

[186] *Id.* at 2-3.  The State Associations filed a petition for reconsideration also in 2003 in response to the *Second Report and Order and Third NPRM*, as did the Alaska Broadcasters Association et al. Joint Petition of State Associations for Reconsideration and Clarification, MM Docket No. 98-204, at 20, https://www.fcc.gov/ecfs/document/5508559479/1 (filed Feb. 6, 2003) (State Associations 2003 Petition); Petition of Alaska Broadcasters Association, et al. for Reconsideration, MM Docket No. 98-204, https://www.fcc.gov/ecfs/document/5508736233/1 (filed Feb. 6, 2003).

[187] Opposition of NOW et al. to Petition for Reconsideration and/or Clarification, MM Docket No. 98-204, https://www.fcc.gov/ecfs/document/5511635880/1 (filed Sept. 7, 2004) (NOW et al. Opposition).

[188] State Associations 2004 Petition at 2-3.

[189] *See* NOW et al. Opposition at 2 n.4 (expressing a lack of objection to the phrase "or permittee's").

compliance with both the equal employment opportunity requirements *and nondiscrimination* requirements of section 73.2080 of our rules is consistent with our statements in the *Fourth Report and Order* above and with statements made by the Commission over the past two decades.[190]

60.    While the opponents to this change argue that we should not "categorically limit [our] discretion to use EEO data as one of many factors in assessing a complaint of discrimination," these same opponents also acknowledge that the "Note itself, along with the text of [the] *3rd R&O*, make it plain that the FCC will *not* use annual employment data to assess compliance with the EEO rules of any individual broadcast licensee."[191]  Hence, codifying the limitation is nothing more than memorializing in another form a prohibition that the Commission has had in place for more than 20 years.  This approach minimizes confusion about our position.  We do not, however, see any need to include the final sentence suggested by the State Associations, as we find that it is essentially a repetition of the preceding sentence now that we have added "nondiscrimination or" to the preceding sentence.  Finally, to conform to the publishing conventions of the National Archives and Records Administration's Office of the Federal Register, we will now incorporate what currently appears as a Note to Section 73.3612 into the rule itself. The revised rule will read as follows:

> Each licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395-B. Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress.  Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of Section 73.2080.

61.    With regard to the State Associations' petition on the issue of confidential treatment of the Form 395-B data, we respond by adopting the *Fourth Report and Order* above, which reinstates the Form 395-B data collection in a public manner.  Most of the remaining issues raised in State Associations' petition for reconsideration of the *Second Report and Order and Third NPRM* are unrelated to the Form 395-B filing requirement and, hence, we defer action on them here because they are beyond the scope of this *Order on Reconsideration*.[192]  We dismiss as moot two specific issues raised in the petition: (1) the ability to recruit via the internet, which the Commission addressed in the intervening time period,[193] and (2) a modification to the effective date of the then new rules.[194]

## V.    SECOND FURTHER NOTICE OF PROPOSED RULEMAKING

62.    Having addressed the issues concerning the reinstatement of the Form 395-B data collection, we now seek, by this Second Further Notice of Proposed Rulemaking (*Second FNPRM*), to

---

[190] *See, e.g., 2000 Reconsideration Order*, 15 FCC Rcd 22548, 22558-59, para. 35 (stating that "we will summarily dismiss any petition filed by a third party based on Form 395-B employment data" and "will not use this data as a basis for conducting audits or inquiries."); *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9976, para. 9.

[191] NOW et al. Opposition at 2.

[192] State Associations 2003 Petition at 14-19 (putting forth arguments related to the Commission's recruitment rules); *id.* at 23-34 (addressing issues related to FCC Forms 396 and 397).  In their 2004 petition, the State Associations urge the Commission to address various issues raised by the State Associations in their 2003 petition. *See* State Associations 2004 Petition at 7-8.

[193] State Associations 2003 Petition at 4-8.  This issue was addressed by the Commission in 2017.  *See Petition for Rulemaking Seeking to Allow the Sole Use of Internet Sources for FCC EEO Recruitment Requirement*, MB Docket No. 16-410, Declaratory Ruling, 32 FCC Rcd 3685 (2017).

[194] State Associations 2003 Petition at 12.

refresh the existing record[195] regarding the statutorily mandated collection of Form 395-A data.[196]  Similar to the Form 395-B collected from broadcasters, Form 395-A seeks to gather workforce composition data from multichannel video programming distributors (MVPDs) on an annual basis.[197]  The Commission suspended the filing of Form 395-A in 2001 in the wake of the *MD/DC/DE Broadcasters* decision that vacated certain aspects of the Commission's EEO requirements for broadcasters.[198]  While the similar requirements for MVPDs have never been challenged, the Commission suspended the collection of both Forms 395-A and B, along with various EEO requirements, in order to analyze the impact of the *MD/DC/DE Broadcasters* decision.[199]  In the *Third Report and Order and Fourth NPRM*, the Commission reinstated Forms 395-A and B pending resolution of questions about confidential collection and use.[200]  As the Commission had not resolved those questions before today, however, the collection of the Form 395-A remained suspended along with the Form 395-B.  Despite that suspension, the Commission from 2004 to 2021 continued to seek OMB approval for the information collection, and during that time, OMB approved both Forms 395-A and B, subject to the agency's resolution of confidentiality issues regarding the forms' collection and use.[201]

63.    We now seek by this *Second FNPRM* to refresh the record stemming from the *Third Report and Order and Fourth NPRM* regarding the collection of MVPD workforce composition data. Consistent with the analysis provided in the *Fourth Report and Order* above for making Form 395-B data public, we tentatively conclude that the collection of Form 395-A also should be reinstated and made available for public review.  We seek comment as to whether Congress's directive that MVPD operators make Form 395-A available for public inspection at their own facilities would be consistent with our amending our rules to require that MVPD operators instead make Form 395-A publicly available through the Commission-hosted Online Public Inspection File (OPIF).  While section 634(d)(3)(B) of the Act states that a MVPD should make Form 395-A available for public inspection at the MVPD's central office and at every office where five or more full-time employees are regularly assigned to work,[202] section 634(d)(4) of the Act permits the Commission to amend the requirements associated with Form 395-A as needed.[203]  We tentatively conclude that requiring the Form 395-A to be placed in the OPIF would be more efficient for the public that wishes to review such reports, as OPIF provides one online site for such review.  We also tentatively conclude that hosting the reports in OPIF will reduce the burdens placed on MVPDs, as this will relieve the MVPD of maintaining such reports at individual

---

[195] *See Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 14-17.

[196] 47 U.S.C. § 554(d)(3)(A)-(B).

[197] The Multi-Channel Video Programming Distributor Annual Employment Report, Form 395-A can be found at https://omb.report/icr/202301-3060-020/doc/128149601.  Pursuant to section 634 of the Communications Act, since 1984 the Commission has required that MVPDs with six or more full-time employees file the FCC Form 395-A. Section 634(d)(3)(A) of the Communications Act requires MVPDs with six or more full-time employees to "file with the Commission an annual statistical report identifying by race, sex, and job title the number of employees in each of [specifically identified full-time and part-time job categories]."  47 U.S.C. § 554 (d)(3)(A).

[198] *Suspension Order*, 16 FCC Rcd at 2872-73.

[199] *Id*.

[200] *Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9978-79, paras. 13-17.

[201] We note that although the filing of the Form 395-A has been suspended since 2001, OMB has most recently approved the information collection through January 31, 2026.  *See* Multi-Channel Video Programming Distributor Annual Employment Report, FCC Form 395-A, https://omb.report/icr/202301-3060-020/doc/128149601 (last visited Dec. 15, 2023).

[202] 47 U.S.C. § 554(d)(3)(B).

[203] 47 U.S.C. § 554(d)(4) (stating that the "Commission may amend such rules from time to time to the extent necessary to carry out the provisions of this section.").  *See Second Report and Order and Third NPRM*, 17 FCC Rcd at 24025, para. 19 (discussing the Commission's flexibility to modify the MVPD EEO requirements).

central offices, including providing sufficient staffing for such offices. We also tentatively conclude that our proposal to change the location of where the Form 395-A data will be housed from the MVPD's central office to the OPIF website is consistent with the basic intent of section 634(d)(3)(B), which is to ensure that the public has access to the Form 395-A data. We seek comment on these tentative conclusions. Alternatively, if section 634(d)(3)(B) were to be read to compel availability of Form 395-A at MVPD offices, would it be within our authority and consistent with sound policy to additionally require availability through OPIF?

64.     As noted above in the *Order on Reconsideration*, we are modifying section 73.3612 of our rules to specifically state that the Form 395-B data will not be used in assessing any aspect of an individual broadcast licensee's or permittee's compliance with *both* the nondiscrimination and equal employment opportunity requirements of section 73.2080. Despite the slight variation in the underlying statutory authority for the collection of the workforce employment data from MVPDs versus broadcasters, the Commission traditionally has treated both data collections in a similar manner. In this regard, the Commission has imposed the same restrictions on the use of workforce composition data stemming from both Forms 395-A and B.[204]  Consequently, we tentatively conclude that section 76.1802 of our rules concerning the MVPD annual employment report should be modified so as to align with the modifications made to section 73.3612 of our rules for broadcasters in the *Order on Reconsideration* above. In the *Order on Reconsideration* above, we incorporated what appears as a Note to section 73.3612 into the rule itself to conform to the publishing conventions of the National Archives and Records Administration's Office of the Federal Register. We seek comment on our tentative conclusion to do the same with regard to the language that currently appears as a Note to section 76.1802, to read as follows:

> Each employment unit with six or more full-time employees shall file an annual employment report on the FCC Form 395-A with the Commission on or before September 30 of each year. Data concerning the gender, race and ethnicity of an employment unit's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual employment unit's compliance with our nondiscrimination or EEO rules for multi-channel video program distributors.

65.     As stated above in the *Fourth Report and Order*, the Form 395-B will include a mechanism to provide further specificity about broadcaster employees' gender identities.[205]  We seek comment on whether we should adopt a similar mechanism for the Form 395-A.

66.     We also seek comment on the attendant costs and benefits of any proposals advanced in response to this item.

67.     *Digital Equity and Inclusion*.  Finally, the Commission, as part of its continuing effort to advance digital equity for all,[206] including people of color, persons with disabilities, persons who live in

---

[204] *See Third Report and Order and Fourth NPRM*, 19 FCC Rcd at 9989, App. B. In that order, the Commission adopted a Note to Section 76.1802, identical to the Note in the relevant EEO rule for broadcasters, stating that the data collected would be used exclusively for the purpose of compiling industry employment trends and making reports to Congress, and not to assess any aspect of an employment unit's compliance with the EEO rules for multi-channel video programming distributors. 47 CFR § 73.3612 Note ("Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the Equal Employment Opportunity requirements of § 73.2080."); 47 CFR § 76.1802 Note (same).

[205] *See supra* paras. 39-40.

[206] Section 1 of the Communications Act of 1934 as amended provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to

(continued….)

rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality, invites comment on any equity-related considerations[207] and benefits (if any) that may be associated with the proposals and issues discussed herein. Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility, as well the scope of the Commission's relevant legal authority.

## VI.    PROCEDURAL MATTERS

68.    *Ex Parte Rules - Permit-But-Disclose*. With respect to the *Second Further Notice of Proposed Rulemaking*, this proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[208] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

69.    *Filing Requirements—Comments and Replies*. Pursuant to Sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.145, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: https://apps.fcc.gov/ecfs/.

- Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing. Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commissions Secretary, Office of the Secretary, Federal Communications

---

all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

[207] The term "equity" is used here consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality. *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

[208] 47 CFR § 1.1200 *et seq.*

Commission.

- o Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.U.S.

- o Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street, NE, Washington DC 20554.

- Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19.[209]

- During the time the Commission's building is closed to the general public and until further notice, if more than one docket or rulemaking number appears in the caption of a proceeding, paper filers need not submit two additional copies for each additional docket or rulemaking number; an original and one copy are sufficient.

70.     *Regulatory Flexibility Act.*  The Regulatory Flexibility Act of 1980, as amended (RFA)[210] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[211]  Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the potential impact of rule and policy changes adopted in the *Fourth Report and Order* on small entities.  The FRFA is set forth in Appendix C.  We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of rule and policy change proposals on small entities in the *Second Further Notice of Proposed Rulemaking*.  The IRFA is set forth in Appendix D.  Additionally, we have prepared a Final Regulatory Flexibility Certification (FRFC) certifying that the rule and policy changes contained in the *Order on Reconsideration* will not have a significant economic impact on a substantial number of small entities.  The FRFC is set forth in Appendix E.

71.     *Paperwork Reduction Act.*  Final Paperwork Reduction Act Analysis for Fourth Report and Order and Order on Reconsideration in MB Docket No. 98-204.  This Fourth Report and Order and Order on Reconsideration may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  All such changes will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA.  OMB, the general public, and other Federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.  In this present document, we have assessed the effects of reinstating the collection of information on Form 395-B from broadcasters with five or more full-time employees and adding language to our rules clarifying that restrictions regarding the Commission's use of the collected data protect broadcast permittees as well as licensees.  We find that, with respect to businesses with fewer than 25 employees, the paperwork burden associated with the completion and submission of Form 395-B will be minimal and the collection is necessary to

---

[209] *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Filing*, Public Notice, 35 FCC Rcd 2788 (2020).

[210] *See* 5 U.S.C. § 604.  The RFA, 5 U.S.C. §§ 601–612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996).

[211] 5 U.S.C. § 605(b).

serve the purpose of obtaining complete information on employment trends in the broadcast industry. As it is customary for companies to routinely maintain employee information for various purposes, including payroll, broadcasters should not have to engage in extensive research to complete and submit their Form 395-B.

72.     *Initial Paperwork Reduction Act Analysis for Second Further Notice of Proposed Rulemaking in MB Docket No. 98-204.* This Second Further Notice of Proposed Rulemaking may contain proposed new or modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on these information collection requirements, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. § 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

73.     *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is non-major under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

74.     *People with Disabilities.* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice, 202-418-0432 (tty)).

75.     *Providing Accountability Through Transparency Act.* The Providing Accountability Through Transparency Act of 2023 requires each agency, in providing notice of a rulemaking, to post online a brief plain-language summary of the proposed rule.[212] Accordingly, the Commission will publish the required summary of this *Second Further Notice of Proposed Rulemaking* on https://www.fcc.gov/proposed-rulemakings.

76.     *Additional Information.* For additional information on this proceeding, please contact Christopher Sova of the Media Bureau, Industry Analysis Division, christopher.sova@fcc.gov, (202) 418-1868.

## VII.     ORDERING CLAUSES

77.     Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 4(i), 4(k), 303(r), 307, 308, 309, 310, 334, 403, and 634 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 334, 403, and 554, this *Fourth Report and Order, Order on Reconsideration, and* Second *Further Notice of Proposed Rulemaking* **IS ADOPTED**.

78.     **IT IS FURTHER ORDERED** that this *Fourth Report and Order and Order on Reconsideration* SHALL BE EFFECTIVE 30 days after publication in the Federal Register. Compliance with section 73.3612 of the Commission's rules, 47 CFR § 73.3612, which may contain new or modified information collection requirements, will not be required until the Office of Management and Budget completes review of any information collection requirements that the Office of Management and Budget determines is required under the Paperwork Reduction Act. The Commission directs the Media Bureau to announce the compliance date for the *Fourth Report and Order and Order on Reconsideration* by subsequent Public Notice.

79.     IT IS FURTHER ORDERED that the Joint Petition of the State Broadcasters Associations for Reconsideration and/or Clarification the Third Report and Order and Fourth NPRM, MM Docket No. 98-204 (filed July 23, 2004), is GRANTED IN PART, DENIED IN PART,

---

[212] 5 U.S.C. § 553(b)(4). The Providing Accountability Through Transparency Act of 2023, Pub. L. No. 118-9, 137 Stat. 55 (2023), amended section 553(b) of the Administrative Procedure Act.

DISMISSED IN PART, and DEFERRED IN PART.

80.    IT IS FURTHER ORDERED that the Media Bureau is hereby directed to make the necessary changes to Form 395-B to provide for inclusion of gender non-binary information.

81.    IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking including the Final Regulatory Flexibility Analysis and the Initial Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.

82.    **IT IS FURTHER ORDERED** that the Office of the Managing Director, Performance Program Management, **SHALL SEND** a copy of this Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A)

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**Final Rules**

The Federal Communications Commission amends Part 73 of Title 47 of the Code of Federal Regulations as follows:

1. Delete Note to Section 73.3612.

2. Revise Section 73.3612 to read as follows:

    Each licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395-B. Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of Section 73.2080. Compliance with this section will not be required until this sentence is removed or contains a compliance date, which will not occur until after the Office of Management and Budget completes review of any information collection requirements pursuant to the Paperwork Reduction Act or until after the Office of Management and Budget determines that such review is not required. The Commission directs the Media Bureau to announce a compliance date for this section 73.3612 by subsequent Public Notice and to cause this section 73.3612 to be revised accordingly.

**APPENDIX B**

**Proposed Rules**

The Federal Communications Commission proposes to amend Part 76 of Chapter 5 of Title 47 of the Code of Federal Regulations (CFR) as follows:

    1.   The authority citation for part 76 continues to read as follows:

Authority:  47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

    2.   Amend § 76.1802 to read as follows:

Each employment unit with six or more full-time employees shall file an annual employment report on the FCC Form 395-A with the Commission on or before September 30 of each year. Data concerning the gender, race and ethnicity of an employment unit's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual employment unit's compliance with our nondiscrimination or EEO rules for multi-channel video program distributors.

### APPENDIX C

### Final Regulatory Flexibility Act Analysis

1.    As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the 2021 *Further Notice of Proposed Rulemaking* (*Further Notice*) to this proceeding.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *Further Notice*, including comment on the IRFA.  The Commission received no comments on the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.

**A.    Need for, and Objectives of, the Report and Order**

2.    This *Fourth Report and Order* reinstates the Commission's annual collection of broadcast workforce composition data by race and gender on FCC Form 395-B.  We will use the collected data to analyze industry trends and make reports to Congress.  Before the form's prolonged suspension beginning in 2001,[3] the Commission made the collected workforce data publicly available.  As stated in the *Fourth Report and Order*, we will continue with the public collection and dissemination of the data, which is in alignment with the public interest.  Other than the inclusion of a mechanism allowing broadcasters to account in the Form 395-B for those employees who identify as gender non-binary, the reinstated collection does not change the form's reporting requirements.  The inclusion of this mechanism, which will allow for accurate data gathering, will incur only a minimal economic impact on a substantial number of small entities.

3.    The reinstatement arrives after a significant period of delay in collection, which created a material gap in workforce composition data to be collected and analyzed by the Commission.  Without the data, the Commission is prevented from analyzing important industry trends and reporting to Congress its analyses on the broadcast sector.  A reinstituted collection of Form 395-B will allow us to carry out the public interest authority of this agency, and to implement section 334 of the Act, which instructs the Commission to collect broadcast workforce data.[4]

**B.    Legal Basis**

4.    The *Fourth Report and Order* is authorized under sections 1, 4(i), 4(k), 303(r), 307, 308, 309, 310, 334, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 334, and 403.

---

[1] *See* 5 U.S.C. § 603. The RFA, see 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996). The SBREFA was enacted as Title II of the Contract With America Advancement Act of 1996 (CWAAA).

[2] 5 U.S.C. § 601(6); *see infra* note 9 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[3] *Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements,* Memorandum Opinion and Order, 16 FCC Rcd 2872 (2001) (*Suspension Order*).

[4] 47 U.S.C. § 334.

**C.**        **Summary of Significant Issues Raised by Public Comments in Response to IFRA**

5.        There were no comments in response to IRFA notice**.**

**D.**        **Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

6.        Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[5]  The Chief Counsel did not file any comments in response to the *Further Notice* in this proceeding**.**

**E.**        **Description and Estimate of the Number of Small Entities to Which the Rules Apply**

7.        The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted herein.[6]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small government jurisdiction."  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[7]  A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[8]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

8.        *Television Broadcasting*.  This industry is comprised of "establishments primarily engaged in broadcasting images together with sound."[9]  These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[10]  These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.  The SBA small business standard for this industry classifies businesses having $41.5 million or less in annual receipts as

---

[5] 5 U.S.C. § 604(a)(3).

[6] 5 U.S.C. § 603(b)(3).

[7] 5 U.S.C. § 601(6); *see infra* note 9 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[8] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." *Id.*

[9] *See* U.S. Census Bureau, *2017 NAICS Definitions, "515120 Television Broadcasting,"* https://www.naics.com/naics-code-description/?code=515120.

[10] *Id.*

small.[11]  2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year.[12]  Of that number, 657 firms had revenue of less than $25,000,000.[13]  Based on this data we estimate that the majority of television broadcasters are small entities under the SBA small business size standard.

9.     As of September 30, 2023, there were 1,377 licensed commercial television stations.[14]  Of this total, 1,258 stations (or 91.4%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates as of September 30, 2023, there were 383 licensed noncommercial educational (NCE) television stations, 380 Class A TV stations, 1,889 LPTV stations and 3,127 TV translator stations.[15]  The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

10.     *Radio Stations*.  This industry is comprised of "establishments primarily engaged in broadcasting aural programs by radio to the public."[16]  Programming may originate in their studio, from an affiliated network, or from external sources.[17]  The SBA small business size standard for this industry classifies firms having $41.5 million or less in annual receipts as small.[18]  U.S. Census Bureau data for 2017 show that 2,963 firms operated in this industry during that year.[19]  Of this number, 1,879 firms operated with revenue of less than $25 million per year.[20]  Based on this data and the SBA's small business size standard, we estimate a majority of such entities are small entities.

---

[11] *See* 13 CFR § 121.201; NAICS Code 515120 (as of 10/1/22 NAICS Code 516120).

[12] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 515120, https://data.census.gov/cedsci/table?y=2017&n=515120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[13] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[14] *Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023) (*October 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[15] *Id.*

[16] U.S. Census Bureau, *2017 NAICS Definitions, "515112 Radio Stations,"* https://www.naics.com/naics-code-description/?code=515112.

[17] *Id.*

[18] *See* 13 CFR § 121.201; NAICS Code 515112 (as of 10/1/22 NAICS Code 516110).

[19] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 515112, https://data.census.gov/cedsci/table?y=2017&n=515112&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.  We note that the US Census Bureau withheld publication of the number of firms that operated for the entire year.

[20] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in the individual categories for less than $100,000, and $100,000 to $249,999 to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in these categories).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher

(continued….)

11.     The Commission estimates that as of September 30, 2023, there were 4,452 licensed commercial AM radio stations and 6,670 licensed commercial FM radio stations, for a combined total of 11,122 commercial radio stations.[21]  Of this total, 11,120 stations (or 99.98 %) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates that as of September  30, 2023, there were 4,263 licensed noncommercial (NCE) FM radio stations.[22]  The Commission however does not compile, and otherwise does not have access to financial information for these radio stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of radio station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

12.     We note, however, that in assessing whether a business concern qualifies as "small" under the above definition, business (control) affiliations[23] must be included.  Our estimate, therefore, likely overstates the number of small entities that might be affected by our action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, another element of the definition of "small business" requires that an entity not be dominant in its field of operation.  We are unable at this time to define or quantify the criteria that would establish whether a specific radio or television broadcast station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and is therefore possibly over-inclusive.  An additional element of the definition of "small business" is that the entity must be independently owned and operated.  Because it is difficult to assess these criteria in the context of media entities, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and similarly may be over-inclusive.

F.     **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

13.     In this section, we identify the reporting, recordkeeping and other compliance requirements contained in the *Fourth Report and Order* and consider whether small entities are affected disproportionately by any such requirements.  By this *Fourth Report and Order*, broadcasters are required to resume filing Form 395-B, which will be available to the public. The annual filing of Form 395-B will require employment units to upload the form onto the Commission's website.  As recognized by the Office of Management and Budget (OMB), the Commission has estimated in the instructions to Form 395-B that the form's paperwork burden is minimal, taking each response, or form, approximately one hour to complete.[24]  This estimate includes the time to read the instructions, look through existing records, gather and maintain the required data, and actually complete and review the form or response.[25]  Because this *Fourth Report and Order* contains no new reporting or recordkeeping requirements, other than the option of filling in a comment box on a voluntary basis, and only resumes the filing of an existing form,

---

that noted herein.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[21] *Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023) (*October 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[22] *Id.*

[23] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has the power to control both." 13 CFR § 21.103(a)(1).

[24] Form 395-B, the broadcast station Annual Employment Report (including the instructions), can be found at https://omb.report/icr/202004-3060-047/doc/100723701.

[25] *Id.*

the reporting, recordkeeping and other compliance requirements of small entities will be no greater than under the current rules. Additionally, broadcast employment units with less than five full-time employees are exempt from filing statistical data.[26] Because of this minimal reporting burden and due to the fact that smaller station employment units are exempt, we conclude that small entities will not be disproportionately affected by the *Fourth Report and Order*.

> **G.     Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

14.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[27]

15.     This *Fourth Report and Order* reinstates the collection of broadcaster employment data on Form 395-B. Collection of the Form 395-B was suspended in 2001 following two decisions by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacating certain aspects of the Commission's equal employment opportunity rules.[28] This suspension had no relation to the impact of the collection on small entities. As noted above, the filing requirement of Form 395-B importantly does not apply to broadcast employment units with less than five full-time employees, thereby exempting a large group of smaller entities from the filing requirements.[29] The *Fourth Report and Order* only leads to a resumption of data collection efforts and imposes no new requirements for which the Commission can find alternatives that would minimize the economic burden on small entities.

> **H.     Report to Congress**

16.     The Commission will send a copy of the *Fourth Report and Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[30] In addition, the Commission will send a copy of the *Fourth Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the *Fourth Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[31]

---

[26] 47 CFR § 73.3612.

[27] *See* 5 U.S.C. § 603(c).

[28] *See Suspension Order*, 16 FCC Rcd at 2872. At that time, the Commission suspended collection of workforce data from both MVPDs and broadcasters; however, the relevant D.C. Circuit opinions discussed above involved EEO requirements pertaining only to broadcasters.

[29] 47 CFR § 73.3612.

[30] *See* 5 U.S.C. § 801(a)(1)(A).

[31] *See* 5 U.S.C. § 604(b).

## APPENDIX D

### Initial Regulatory Flexibility Act Analysis

1.     As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) concerning the possible significant economic impact on small entities of the policies and rules proposed in this Second Further Notice of Proposed Rulemaking (*Second FNPRM*).  The Commission requests written public comments on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments specified in the *Second FNPRM*.  The Commission will send a copy of the *Second FNPRM*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the *Second FNPRM* and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### I.     Need for, and Objectives of, the Proposed Rules

2.     The *Second FNPRM* seeks to refresh the record regarding the Commission's annual collection of broadcaster multichannel video programming distributor (MVPD) composition data by race and gender on FCC Form 395-A.[4]  In 2001, the Commission suspended the filing of Form 395-A after a federal court decision vacated certain aspects of the Commission's equal employment opportunity (EEO) requirements for broadcasters.[5]  Although the similar requirements for MVPDs have never been challenged, the Commission suspended the collection of both the broadcasters' Form 395-B and the MVPDs' Form 395-A, along with various EEO requirements, in order to analyze the impact of the federal court decision.  In 2004, the Commission reinstated Forms 395-A and B pending resolution of questions about confidential collection and use of the forms' data.  Today, having resolved the issues related to the confidentiality of the Form 395-B data in the *Fourth Report and Order*, the Commission now seeks public comment on the legal issues pertaining to availability and confidentiality of Form 395-A data.

3.     Consistent with the decision in the *Fourth Report and Order* above to make Form 395-B data public, the Commission tentatively concludes in the *Second FNPRM* that the collection of Form 395-A should also be reinstated in the same manner as it was previously with regard to public availability.  The Communications Act requires an MVPD to make its Form 395-A available for public inspection at the MVPD's central office and at every office where five or more full-time employees are regularly assigned to work.[6]  The Commission has traditionally treated Form 395-A and B data in the same manner with regard to confidentiality.  Consequently, the *Second FNPRM* seeks comment on whether instead of (or in addition to) maintaining the Form 395-A at a MVPD's central office, the form should now be maintained on the Commission's website similar to the requirement now established in the *Fourth Report and Order* for broadcasters' Form 395-B.  Other than a proposal to include a mechanism in the Form 395-A that would enable MVPDs to account for those employees who identify as gender non-binary, the proposed reinstatement of this collection does not change the form's reporting requirements.  We predict

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

[2] 5 U.S.C. § 603(a).

[3] *Id.*

[4] Form 395-A, the MVPD station Annual Employment Report, can be found at https://omb.report/icr/202301-3060-020/doc/128149601.

[5] *See Suspension Order*, 16 FCC Rcd at 2872. In this order, the Commission suspended the equal employment opportunity outreach program requirements applicable to broadcast licensees and MVPDs, which included the requirement that broadcasters and MVPDs file a Form 395-B and 395-A, respectively, with the Commission on an annual basis.

[6] 47 U.S.C. § 554(d)(3)(B).

that inclusion of this mechanism, which would allow for accurate data gathering, would incur only a minimal economic impact on a substantial number of small entities.

### J.    Legal Basis

4.    The proposed action is authorized under sections 1, 2(a), 4(i), 4(j), 4(k), 303, 403, and 634(d) of the Communications Act of 1934, as amended 47 U.S.C. §§ 151, 152(a), 154(i), 154(k), 303, 403, and 554(d).

### K.    Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

5.    The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed revisions, if adopted.[7]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[8]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA).[9]  A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operations; and (3) satisfies any additional criteria established by the SBA.[10]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

6.    Cable Companies and Systems (Rate Regulation). The Commission has developed its own small business size standard for the purpose of cable rate regulation.  Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers nationwide.[11]  Based on industry data, there are about 420 cable companies in the U.S.[12]  Of these, only seven have more than 400,000 subscribers.[13]  In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[14]  Based on industry data, there are about 4,139 cable systems (headends) in

---

[7] 5 U.S.C. § 603(b)(3).

[8] 5 U.S.C. § 601(6); *see infra* note 9 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[9] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." *Id.*

[10] 15 U.S.C. § 632(a)(1)-(2)(A).

[11] 47 CFR § 76.901(d).

[12] S&P Global Market Intelligence, S&P Capital IQ Pro, U.S. MediaCensus, *Operator Subscribers by Geography* (last visited May 26, 2022).

[13] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q* (last visited May 26, 2022); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (April 2022).

[14] 47 CFR § 76.901(c).

the U.S.[15]  Of these, about 639 have more than 15,000 subscribers.[16]  Accordingly, the Commission estimates that the majority of cable companies and cable systems are small.

7.    Cable System Operators (Telecom Act Standard).  The Communications Act of 1934, as amended, contains a size standard for a "small cable operator," which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[17]  For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 498,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator.[18]  Based on industry data, only six cable system operators have more than 498,000 subscribers.[19]  Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard.  We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million.[20]  Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

8.    Open Video Systems.  The open video system (OVS) framework was established in 1996 and is one of four statutorily recognized options for the provision of video programming services by local exchange carriers.  The OVS framework provides opportunities for the distribution of video programming other than through cable systems.  OVS operators provide subscription services and therefore fall within the SBA small business size standard for the cable services industry, which is "Wired Telecommunications Carriers."[21]  The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small.[22]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[23]  Of this total, 2,964 firms operated with fewer than 250 employees.[24]  Thus, under the SBA size standard the majority of firms in this industry can be considered small.  Additionally, we note that the Commission has certified some OVS operators who

---

[15] S&P Global Market Intelligence, S&P Capital IQ Pro, U.S. MediaCensus, *Operator Subscribers by Geography* (last visited May 26, 2022).

[16] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q* (last visited May 26, 2022).

[17] 47 U.S.C. § 543(m)(2).

[18] *FCC Announces Updated Subscriber Threshold for the Definition of Small Cable Operator*, Public Notice, DA 23-906 (MB 2023) (*2023 Subscriber Threshold PN*).  In this Public Notice, the Commission determined that there were approximately 49.8 million cable subscribers in the United States at that time using the most reliable source publicly available.  *Id.*  This threshold will remain in effect until the Commission issues a superseding Public Notice. *See* 47 CFR § 76.901(e)(1).

[19] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 06/23Q* (last visited Sept. 27, 2023); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (April 2022).

[20] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(e) of the Commission's rules.  *See* 47 CFR § 76.910(b).

[21] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[22] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[23] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[24] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

are now providing service and broadband service providers (BSPs) are currently the only significant holders of OVS certifications or local OVS franchises. The Commission does not have financial or employment information for the entities authorized to provide OVS however, the Commission believes some of the OVS operators may qualify as small entities.

9.      Satellite Master Antenna Television (SMATV) Systems, also known as Private Cable Operators (PCOs). SMATV systems or PCOs are video distribution facilities that use closed transmission paths without using any public right-of-way. They acquire video programming and distribute it via terrestrial wiring in urban and suburban multiple dwelling units such as apartments and condominiums, and commercial multiple tenant units such as hotels and office buildings. SMATV systems or PCOs are included in the Wired Telecommunications Carriers' industry which includes wireline telecommunications businesses.[25] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[26] U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[27] Of this total, 2,964 firms operated with fewer than 250 employees.[28] Thus under the SBA size standard, the majority of firms in this industry can be considered small.

10.     Direct Broadcast Satellite (DBS) Service. DBS service is a nationally distributed subscription service that delivers video and audio programming via satellite to a small parabolic "dish" antenna at the subscriber's location. DBS is included in the Wired Telecommunications Carriers industry which comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks.[29] Transmission facilities may be based on a single technology or combination of technologies.[30] Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution; and wired broadband internet services.[31] By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[32]

11.     The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[33] U.S. Census Bureau data for 2017 show that 3,054

---

[25] See U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[26] See 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[27] See U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[28] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[29] See U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[30] *Id.*

[31] See *id.* Included in this industry are: broadband Internet service providers (*e.g.*, cable, DSL); local telephone carriers (wired); cable television distribution services; long-distance telephone carriers (wired); closed-circuit television (CCTV) services; VoIP service providers, using own operated wired telecommunications infrastructure; direct-to-home satellite system (DTH) services; telecommunications carriers (wired); satellite television distribution systems; and multichannel multipoint distribution services (MMDS).

[32] *Id.*

[33] See 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

firms operated in this industry for the entire year.[34]  Of this number, 2,964 firms operated with fewer than 250 employees.[35]  Based on this data, the majority of firms in this industry can be considered small under the SBA small business size standard.  According to Commission data however, only two entities provide DBS service - DIRECTV (owned by AT&T) and DISH Network, which require a great deal of capital for operation.[36]  DIRECTV and DISH Network both exceed the SBA size standard for classification as a small business.  Therefore, we must conclude based on internally developed Commission data, in general DBS service is provided only by large firms.

### L.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements

12.      In this section, we identify the reporting, recordkeeping, and other compliance requirements contained in the Second FNPRM and consider whether small entities are affected disproportionately by any such requirements.  To a large degree, the Second FNPRM only seeks to reinstitute the previous reporting, recordkeeping, or compliance requirements for collection of MVPD workforce composition data on Form 395-A, as this collection was previously suspended in 2001.  The Second FNPRM, does, however, seek comment on whether to replace the existing requirement that a MVPD maintain a copy of the Form 395-A at its central office with a requirement that a MVPD instead upload a copy of its Form 395-A to the Commission's website.  Alternatively, if the statute were read to compel availability of Form 395-A at MVPD offices, the Second FNPRM seeks comment on whether it is within our authority and consistent with sound policy to additionally require availability through the OPIF.  So as to harmonize the MVPD requirements with those imposed on broadcasters, the Second FNPRM also seeks comment on whether to modify the Commission's rules so as to include a statement that the Commission will not use the Form 395-A data when assessing compliance with both the nondiscrimination and EEO requirements of its rules.  Currently, the prohibition contained in the Commission's rules only references a restriction on the use of the Form 395-A data for assessing compliance with the EEO rules.  Because the only proposed modification in the Second FNPRM with regard to reporting or recordkeeping obligations is merely a change in the location of where the Form 395-A will be housed (i.e., on the Commission's website rather than (or in addition to) the MVPDs' central office), we do not anticipate a significant change in the compliance burden for small entities.  Additionally, MVPD employment units with less than six full-time employees are exempt from filing the statistical data requested on the form.[37]  Hence, the Commission concludes that small entities will not be disproportionately affected by the *Second FNPRM*.

### M.      Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

13.      The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather

---

[34] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[35] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[36] *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Eighteenth Report,* Table III.A.5, 32 FCC Rcd 568, 595 (2017).

[37] 47 U.S.C. § 554(d).

than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[38]

14.     The Second FNPRM seeks to refresh the record regarding the Commission's annual collection of MVPD workforce composition data by race and gender on Form 395-A.  It would lead to a resumption of this data collection and would propose only to modify one of the locations where the Form 395-A should be retained, by seeking comment on whether an MVPD should retain a copy on the Commission's website in lieu of (or in addition to) at the MVPDs' central office.  To the extent MVPDs were maintaining hard copies of the Form 395-A at their central offices, we anticipate that storing an electronic copy on the Commission's website will minimize the economic burdens on MVPDs.  Where maintenance of a hard copy necessitates the use of MVPD staff time to monitor public access to the Form 395-A, retention of an electronic copy on the Commission's website presents itself as a simple and straightforward process, requiring only a minimal degree of navigating the Commission's database system to upload the information.  Further, as detailed in the Second FNPRM, the collection of MVPD workforce composition data and providing the data for public inspection are required by section 634(d) of the Act.[39]

**N.      Federal Rules that May Duplicate, Overlap, or Conflict with the Second FNPRM**

15.     None.

---

[38] *See* 5 U.S.C. § 603(c).

[39] 47 U.S.C. § 554(d).

**APPENDIX E**

**Final Regulatory Flexibility Certification Analysis**

1.    For the reasons described below, we now certify that the policies and rules adopted in the Order on Reconsideration will not have a significant economic impact on a substantial number of small entities.  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[1]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[2]

2.    In this Order on Reconsideration, we make certain changes to the language of section 73.3612 to clarify our collection and use of Form 395-B data.  We add language to the rule confirming that the collection of Form 395-B data, and restrictions on the use of the data, also applies to broadcast permittees.  The Order on Reconsideration adds an explicit statement to its rules that it will not use Form 395-B data to assess compliance with both the equal employment opportunity requirements and nondiscrimination requirements of section 73.2080.  We find that this statement is consistent with our statements in the Fourth Report and Order and other previous statements made by the Commission over the past two decades.

3.    The changes from the Order on Reconsideration will not have a significant economic impact on a substantial number of small entities because such changes do not alter the type or extent of information collected under Form 395-B.  Rather, the Order on Reconsideration does nothing more than memorialize in another form a prohibition that the Commission has had in place for more than 20 years.  Therefore, we certify that the changes provided in the Order on Reconsideration will not have a significant economic impact on a substantial number of small entities.  The Commission will send a copy of this Order on Reconsideration, including a copy of this Final Regulatory Flexibility Certification, in a report to Congress and the Government Accountability Office pursuant to the Small Business Regulatory Fairness Act of 1996.[3]

---

[1] 5 U.S.C. § 601(6); *see infra* note 2 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[2] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  *Id.*

[3] *See* 5 U.S.C. § 801(a)(1)(A).

## DISSENTING STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:      *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*; Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking; MB Docket No. 98-204.

Today's FCC Order takes two separate actions.

First, it reinstates the federal requirement that broadcasters file a document (known as Form 395-B) every year with the FCC that lists the race and gender of their employees. I would have had no objection here to an FCC decision limited to requiring broadcasters to file Form 395-B data with the agency—after all, Congress passed a statute that directs the FCC to collect this information.[1] The FCC could also have made this data available on an anonymized or otherwise aggregated basis that does not disclose information about specific broadcast stations. Indeed, the Civil Rights Act of 1964 expressly requires that the government keep this type of race and gender data confidential when it is collected by the Equal Opportunity Employment Commission.[2] But instead of confining today's decision to lawful agency action, the FCC chooses a different course—one that violates the Constitution, as the D.C. Circuit has already determined in not one but two separate FCC cases.

In particular, in the second part of today's Order, the FCC decides that it will take the Form 395-B demographic data and publish it on a station-by-station basis—meaning that the FCC will now post a race and gender scorecard for each and every TV and radio broadcast station in the country.[3] In doing so, the FCC caves to the demands of activist groups that have worked for years and across different industries to persuade the federal government to obtain—and most importantly publish—this type of data about individual businesses. This is no benign disclosure regime. The record makes clear that the FCC is choosing to publish these scorecard for one and only one reason: to ensure that individual businesses are targeted and pressured into making decisions based on race and gender. This is the exact same type of pressure that the FCC created in at least two prior cases. In both instances, the D.C. Circuit invalided the FCC's rules because they violated the equal protection guarantees of the Due Process Clause of the Fifth Amendment.[4] The only difference this time around is that the FCC has violated the First Amendment as well.

In the Further Notice portion of today's decision, the FCC proposes to extend this same approach to additional industries.

*          *          *

Let's start with the FCC's record of encouraging this type of discrimination. In *Lutheran Church*, the D.C. Circuit reviewed an earlier FCC effort to use Form 395-B (the same form that is at issue in

---

[1] *See* 47 U.S.C. § 334. Notably, however, federal law prohibits the FCC from making any changes to Form 395-B unless those changes are "nonsubstantive technical or clerical revisions," *id.* at 334(c). Nonetheless, the FCC adds an entirely new category of "gender non-binary" to Form 395-B today. In doing so, the FCC makes no argument that adding this box constitutes a lawful addition that is either a nonsubstantive technical or clerical revision.

[2] Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 264, § 709(e) (1964); *see also* 42 U.S.C. § 2000e-8(e).

[3] The only exception is for stations with four or fewer full-time employees.

[4] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1988); *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001); *see also Adarand Constructors Inc. v. Pena*, 515 U.S. 200 (1995) (overruling *Metro Broadcasting, Inc., v. FCC*, 497 U.S. 547 (1990)).

today's decision) as part of a set of agency regulations aimed at influencing broadcasters' hiring practices. As with today's new rules, those FCC regulations did not expressly require broadcasters to hire employees in accordance with fixed quotas.[5]  Instead, those earlier FCC rules required broadcasters to compare the composition of their workforce with the availability of minorities and women in its area.  On review, the D.C. Circuit found that those rules would operate, in the real world, in a manner that would "oblige stations to grant some degree of preference to minorities in hiring."[6]  In particular, the court found that the FCC's approach of mandating the comparison of employees with the general population across race and gender categories operated to "pressure license holders to engage in race-conscious hiring."[7]  The D.C. Circuit concluded that the FCC violated the Constitution because its "regulations pressure stations to maintain a workforce that mirrors the racial breakdown of their [area]."[8]

After that appellate court loss, the FCC suspended the relevant regulations and sought comment on a set of replacement rules.  Those substitute rules required broadcasters to report the race and sex of each job applicant.  The FCC made clear that if the data collected did not demonstrate that a broadcaster's outreach efforts were reaching the entire community, then the FCC expected the broadcaster to modify those efforts and in some cases face an FCC investigation.  On appeal, the FCC once again claimed that its regime did not impose any undue pressure on broadcasters to discriminate on the basis of race or gender and only sought to encourage broad outreach on a race- and gender-neutral basis.  Focusing on how the rules would operate in the real world, the D.C. Circuit disagreed and struck them down in *MD/DC/DE Broadcasters Association*.[9]  The court found that the regulations did more than encourage broad outreach—they made clear that "the agency with life and death power over the licensee is interested in results, not process, and it is determined to get them."[10]  The FCC's approach "clearly does create pressure to focus recruiting efforts upon women and minorities" in violation of the Fifth Amendment, the court determined.[11]  Ultimately, the court held that those FCC rules created "a race-based classification that is not narrowly tailored to support a compelling governmental interest and is therefore unconstitutional."[12]

The FCC's history of unconstitutional conduct is not a trivial matter.  The Supreme Court has stated that "'[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'"[13]  Likewise, the Supreme Court has written that racial classifications "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility."[14]  For this reason, the Supreme Court has said, "governmental action based on race—a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed."[15]

---

[5] *Lutheran Church*, 141 F.3d at 351.

[6] *Lutheran Church*, 141 F.3d at 351.

[7] *Lutheran Church*, 141 F.3d at 352.

[8] *Lutheran Church*, 141 F.3d at 352.

[9] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 13.

[10] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 19.

[11] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 19.

[12] *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 15.

[13] *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

[14] *Shaw v. Reno*, 509 U.S. 630, 643 (1993).

[15] *Adarand*, 515 U.S. at 227 (cleaned up).

Today, for at least the third time now, the FCC once again seeks to pressure broadcasters into making hiring decisions on the basis of race and gender. It does so, as noted above, by requiring broadcasters to publicly disclose, on a station by station basis, a scorecard that lists the racial and gender breakdown of every employee.

As a threshold matter, the FCC argues that its decision merely adopts a disclosure regime and involves no pressure at all on broadcasters to engage in race- or gender-based discrimination. But this argument ignores both the Commission's own history with Form 395-B and the rulemaking record here. Indeed, the FCC Order goes so far as to assert that, "[b]ased on the record before us, we find no basis to conclude that the demographic data on a station's annual Form 395-B filing would lead to undue public pressure."[16]

To the contrary, the record is overflowing with this type of evidence. For instance, one filer states: "We, the undersigned investors, with collective assets under management or advisement of approximately $266 billion, write to urge the . . . [FCC] to require the disclosure of equal opportunity employment statistics among the companies it regulates" because doing so "allows market participants to assess whether companies stand by their public commitments to pursue diversity, equity and inclusion."[17] You don't have to read between the lines on that one. Or, as the D.C. Circuit stated in *Lutheran Church* when it struck down one of the FCC's prior attempts at imposing unconstitutional pressure on broadcasters: "The risk lies not only in attracting the Commission's attention, but also that of third parties."[18] Like those investors, other organizations wrote that publicizing this data would be consistent with President Biden's Executive Order on Advancing Racial Equity and "allow the public to hold these companies accountable."[19] Other commenters made similar points. So the FCC's ostrich-like claim that the record is devoid of any evidence that this public scorecard will be used to pressure broadcasters into making race- and gender-based hiring decisions does not withstand even casual scrutiny; indeed, it only raises additional questions under the law.[20]

But even if the record were more opaque, the FCC would still not be in the clear. As the D.C. Circuit stated in *MD/DC/DE Broadcasters Association*, a "regulatory agency may be able to put pressure upon a regulated firm in a number of ways, some more subtle than others. The Commission in particular has a long history of employing: ['] a variety of *sub silentio* pressures and 'raised eyebrow' regulation . . . all serv[ing] as means for communicating official pressures to the licensee.'"[21] So too here. It is obvious to everyone what is going on—or it should be. By requiring the public disclosure of these race and gender scorecards, the FCC is ensuring that broadcast stations will be targeted by activist groups, media campaigns, and conceivably the government itself—unless those broadcasters hire the right (if

---

[16] Order at para. 17; *see also id.* ("the record contains no evidence of use of such data in this manner").

[17] Letter from Investors to FCC Chairwoman Jessica Rosenworcel, MB Docket Nos. 19-177, 98-204 (Nov. 16, 2022).

[18] *Lutheran Church*, 141 F.3d at 353.

[19] Letter from The Leadership Conference on Civil and Human Rights to FCC Chairwoman Jessica Rosenworcel, MB Docket Nos. 19-177, 98-204 (Sept. 29, 2022).

[20] 5 U.S.C. § 706; *see also Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 42-44 (1983) (noting that agencies have an APA obligation to make reasoned decisions that account for record-based evidence).

[21] *MC/DC/DE Broadcasters Ass'n*, 236 F.3d at 19 (quoting *Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1116 (D.C. Cir. 1978)).

unspecified) mix and type of employees.[22]  In other words, the FCC is standing up the same type of race- and gender-based pressure campaign that the D.C. Circuit invalidated twice before.  It is just doing so in a more roundabout way.  But the bank shot still counts.[23]  Particularly given the FCC's long history here, broadcasters know the message the FCC is delivering and the results it wants to see.  In cases like these, "we are 'not required to exhibit a naiveté from which ordinary citizens are free.'"[24]

This conclusion is only reinforced when one examines the reasons the FCC proffers for requiring the public disclosure of these scorecards—rather than making the data available on an anonymized or non-station-identifiable basis.  It is quite obvious that the FCC's stated rationales are nothing more than pretext.  And none of them establish a government interest sufficient to survive Fifth Amendment review.  Let's go through all three of them.

First, the FCC argues that it is requiring these scorecards to be publicly disclosed because doing so "will increase the likelihood that erroneous data will be discovered and corrected."[25]  But there is no record support at all for the agency's claim that publicizing this data will render it more reliable.  This is not surprising.  After all, how exactly does the FCC anticipate that a member of the public will verify the reported race, ethnicity, and gender of an individual employee—including those that the FCC now says can report as gender non-binary?  It doesn't.  And, in any event, I don't think the FCC should be encouraging the public to engage in that type of conduct.

Second, the FCC argues that publicly disclosing the data is consistent with Congress's goal of maximizing the utility of data an agency collects.[26]  But this argument proves too much.  It says nothing at all about the propriety of disclosing this particular set of data on a station-specific basis in light of the FCC's history of pressuring broadcasters and the agency's own rulemaking record here, which counsels against public disclosure.  Indeed, the FCC's normal practice is not to make all of the data it collects publicly available in the interest of maximizing utility; it makes decisions based on the facts and circumstances relevant to each data set.

Third, the FCC argues that by publicly disclosing all of the data about every covered broadcaster, rather than disclosing it on an anonymous or non-station-identifiable basis, the FCC avoids the problem of accidentally disclosing data about a specific station.[27]  What?  That is like deciding to sink a ship to

---

[22] The FCC makes no claim in this Order—nor could it—that government officials from State AGs to Congress to the FCC itself in a future rulemaking proceeding will not use this data to take action against broadcasters for failing to meet some as-yet undefined hiring targets.  This threat of potential future government action will naturally operate to pressure broadcasters today—pressure that is not materially different than the forms the D.C. Circuit addressed in *Lutheran Church* and *MC/DC/DE Broadcasters Association*.

[23] *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866)) ("'[W]hat cannot be done directly cannot be done indirectly.  The Constitution deals with substance, not shadows,' and the prohibition against racial discrimination is 'levelled at the thing, not the name.'"); *see also Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (cleaned up) ("It is axiomatic that [the government] may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.").

[24] *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2575–76 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2nd Cir. 1977) (Friendly, J.)).

[25] Order at para. 15.

[26] Order at para. 15 (citing The OPEN Government Data Act).

[27] Order at para. 15.  The FCC also proffers an interest in potentially using the data to run unspecified analyses or for drafting yet-to-be-conceived reports.  But that interest is not relevant to the question of posting the data publicly on a

(continued….)

avoid the risk that it might spring a leak. It makes no sense, particularly in light of the fact that the FCC regularly obtains and refrains from inadvertently disclosing a large and wide range of secret, sensitive, and/or confidential data sets.

In other words, the only rationales the FCC offers for deciding to publicly disclose individual broadcasters' race and gender scorecards are pretextual. They only serve to confirm the FCC is acting for the same reasons it did in *Lutheran Church* and in *MD/DC/DE Broadcasters Association*—to pressure broadcasters into making race- and gender-based hiring decisions.

But the Fifth Amendment is not the only portion of the Constitution that the FCC violates today. For similar reasons, today's Order also runs afoul of the First Amendment. By requiring stations to publicly disclose their workforce composition, the Order compels speech on matters of race and gender. Compelled disclosures are typically subject to heightened First Amendment scrutiny. And the exception for disclosures of "purely factual and uncontroversial information"[28] plainly does not apply here because that exception is "limited to cases in which disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[29] The FCC has made no claim that the public disclosure of these scorecards bears any resemblance to consumer protection labels upheld under *Zauderer*.

The Order also flunks heightened First Amendment review, whether intermediate or strict scrutiny. As noted above, the three governmental interests the FCC asserts for publicizing this content ring hollow. They are either generic rationales applicable to any disclosure or unsupported in the record. No other justification can save the Order, for it disclaims a governmental interest in using the data for any other purpose, whether license renewal,[30] EEO compliance,[31] audits,[32] FCC enforcement,[33] or third-party filings.[34] Even if a valid governmental interest existed, disclosure would not be narrowly tailored. The Order provides no reason why publicizing race and gender data on a station-specific basis is necessary for the Commission to conduct analysis or stay abreast of industry trends, at least compared to a less restrictive alternative, like requiring broadcasters to submit the forms to the FCC on a confidential or non-station identifiable basis. In short, the disclosures do not accomplish cognizable governmental interests in a narrowly tailored manner.

We are thus left with one of two possibilities. At worst, the Order pretextually seeks to force broadcasters into making race- and gender-based hiring decisions, a constitutionally offensive rationale that cannot justify any rules. Or at best, Order pursues disclosure for disclosure's sake, which violates the First Amendment.[35]

---

station-by-station basis because the FCC could pursue those interests while keeping the data confidential, anonymized, or aggregated.

[28] *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

[29] *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213 (D.C. Cir. 2012) (cleaned up).

[30] *See* Order at para. 7.

[31] *See* Order at para. 45.

[32] *See* Order at para. 18.

[33] *See* Order at para. 20.

[34] *See* Order at para. 17.

[35] *See, e.g.*, *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (invalidating abortion-related disclosures in medical facilities); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 524 (D.C. Cir. 2015) (invalidating conflict mineral disclosures); *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996)

(continued….)

\*        \*        \*

It did not have to be this way.  As I conveyed to my Commission colleagues before casting my vote, I would have supported today's decision if it eliminated the public disclosure component and instead required broadcasters to complete and file Form 395-B with the FCC on a non-public or non-station-identifiable basis consistent with the way the Equal Employment Opportunity Commission treats this type of data.  Narrowly tailoring what is made public would have avoided the FCC playing a part in pressuring broadcasters into making hiring decisions on the basis of race and gender in violation of the Fifth Amendment.  And it would have sidestepped a compelled disclosure that runs afoul of the First Amendment.  My suggestions were ultimately rejected, and we are now left with an item that runs headlong into the Constitution.  I dissent.

---

(invalidating hormone labeling requirement for milk) ("[W]e hold that consumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement.").

## STATEMENT OF
## COMMISSIONER GEOFFREY STARKS

Re:     *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment
        Opportunity Rules and Policies*, MB Docket No. 98-204, Fourth Report and Order, Order on
        Reconsideration, and Second Further Notice of Proposed Rulemaking

        A '98 docket number.  A fourth report and order.  Today's item has a long history.  Let me
summarize briefly: in 1970, the FCC, under its public interest authority, began requiring broadcasters to
submit annual employment reports listing the composition of their workforce in terms of race, ethnicity,
and gender.  In 1992, Congress amended the Communications Act to affirm the Commission's authority
to do so, specifically requiring the Commission to maintain its existing EEO regulations, including its
collection of workforce diversity data on Form 395-B.  In 2001, following a pair of D.C. Circuit
decisions, the Commission temporarily suspended its collection of Form 395-B data as it reconsidered its
full suite of EEO rules.  But an intended temporary suspension lasted more than 20 years.

        Some might pretend that what we do today is a radical break outside of this agency's authority.  It
is not.  Quite simply, today we reinstate a longstanding, statutorily-mandated requirement to collect
workforce diversity data from broadcasters.

        We know how critical it is to have diversity in our media organizations.  It's clear – a successful
media organization serves its viewers, listeners, and readers.  And an organization does that by ensuring
that its employees, its decisionmakers, reflect those viewers, listeners, and readers, and can speak for and
to them.[1]  Let me share an example that hits close to home.  In December 2020, the Kansas City Star
issued an apology, acknowledging that over decades through its news coverage the paper had
"disenfranchised, ignored, and scorned generations of Black Kansas Citians" and "robbed an entire
community of opportunity, dignity, justice and recognition."  The paper explained: "Like most metro
newspapers of the early to mid-20th century, The Star was a white newspaper produced by white reporters
and editors for white readers and advertisers."[2]  These poignant words capture the harm at issue here.
Certainly, individual employees and candidates are harmed by a hostile work environment.  But whole
communities are harmed when they are subjected to content that lacks balance, fairness, or accuracy.

        We must get our arms around this issue.  As always with good government, we start with data.
And data is most effective when it is available to everyone.  The rules we reinstate today require
broadcasters to file their workforce composition data publicly.  This data will enable the Commission to
monitor employment trends in the industry – as we know, a dynamic and fast-changing one – and report
to Congress on its learnings.  It will give researchers new workforce composition information to explore.
And it will grant members of the public transparency – a window into their local broadcast station, not
just as a programmer, but as an employer.

        Ultimately, the strength of this item speaks for itself.  But I am proud to have been a voice for it
over the last five years.  I'd like to thank the other voices who have joined with me.  Thank you to

---

[1] *See generally* Alicia W. Stewart, "Why Newsroom Diversity Works," Nieman Reports (June 10, 2015),
https://niemanreports.org/articles/why-newsroom-diversity-works/.

[2] Mike Fannin, "The Truth in Black and white: An apology from the Kansas City Star," The Kansas City Star (Dec.
20, 2020), https://www.kansascity.com/news/local/article247928045.html.  Other papers, including the LA Times,
have made similar public apologies.  *See* "Editorial: An examination of The Times' failures on race, our apology
and a path forward," Los Angeles Times (Sept. 27, 2020), https://www.latimes.com/opinion/story/2020-09-27/los-
angeles-timesapology-racism.

**Federal Communications Commission**                FCC 24-18

Congresswoman Yvette Clarke and Senator Chris Van Hollen, who first raised the urgent need to restart the collection of workforce diversity data in 2019, and who spoke up again last month in a letter to the FCC to ensure we finished the job.  Thank you to the Members of Congress who joined Rep. Clarke and Sen. Van Hollen in that letter, including Senators Ben Ray Luján and Raphael Warnock, Congressional Hispanic Caucus Chair Nanette Diaz Barragán, and Congressional Black Caucus Chair Steven Horsford, along with Reps. Delia C. Ramirez, Eleanor Holmes Norton, Kevin Mullin, André Carson, James P. McGovern, Dan Goldman, Paul D. Tonko, Darren Soto, Frederica S. Wilson, Jim Costa, Marc A. Veasey, Raul Ruiz, M.D., Al Green, Robin L. Kelly, Troy A. Carter, Sr.,  Alma S. Adams, Ph.D., Nydia M. Velázquez, Jerrold Nadler, Bonnie Watson Coleman, Tony Cárdenas, and Sheila Jackson Lee.

       Thank you to Chairwoman Rosenworcel, for her support and attention to this proceeding, and to Commissioner Gomez.  And I especially thank the FCC staff who worked diligently to prepare this item. From the Media Bureau: John Bat, James Elustondo, Rosemary Harold, Brendan Holland, Radhika Karmarkar, Jake Riehm, Julie Salovaara, and Chris Sova.  From the Office of General Counsel: Susan Aaron, David Konczal, Joel Rabinovitz, and Jeff Steinberg.  From the Enforcement Bureau: Elizabeth Goldin and Lynn Kalagian.  And from the Office of Economics and Analytics: Zaira Gonzalez, Kenneth Lynch, Kim Markuch, and Andy Wise.

## DISSENTING STATEMENT OF
## COMMISSIONER NATHAN SIMINGTON

Re:     *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and*
        *Policies*, Fourth Report and Order, Order on Reconsideration, and Second Further Notice of
        Proposed Rulemaking; MB Docket No. 98-204

Broadcast has a problem with minority engagement; broadcasters and their trade associations are
the first to acknowledge this unfortunate reality.  Minority ownership and participation in broadcast has
been dismal for years and remains so, not least of which due to Commission leadership's recent scuttling
of the largest proposed minority-led purchase of a broadcast station group in history.  The Commission
should be open to creative solutions to help improve minority participation in broadcast so that broadcast
workforces reflect the communities that they serve.  So, directionally, I am aligned with my colleagues on
efforts to improve minority participation by better understanding the causes of the issue, and by providing
policy incentives to solve it.

Had the Commission's Order today moved to collect and aggregate de-identified Form 395-B
data from broadcasters for public disclosure, I would have agreed with the majority and voted to approve.
Had the Commission today moved to collect attributable Form 395-B data for private Commission review
to aid in understanding the demographic contours of the broadcast marketplace and the impact of
Commission policy thereon—more akin to the extant data collection practices of the Equal Employment
Opportunity Commission—I would have agreed with the majority and voted to approve.  I joined one of
my colleagues on the Commission in asking for the Order to be reframed to accomplish either.  Our
suggested edits were rejected in favor of retaining the Order released today.  I cannot approve this Order
because I do not think it is within our authority to implement: its claims to public interest supporting the
public disclosure of attributable 395-B data are specious and undergirded by glassy legal punctilios.
Turning to authority: in both *Lutheran Church-Missouri Synod v. Federal Communications Commission*
('*Lutheran Church*') and *MD/DC/DE Broadcasters Associations vs. FCC* ('*MD/DC/DE*'), the central
consideration of the D.C. Circuit in determining whether the Commission had violated the Fifth
Amendment in its EEO policies was whether its practices, in fact, incentivized race-conscious hiring by
*pressuring* a broadcast licensee to engage in such hiring.  To the Commission's credit, the drafting of
today's Order evinces sensitivity to this issue.  It is true that, per this Order, the Commission will not
*officially* consider a station's demographic employment profile in any application pertaining to its
broadcast license.  It is true that, per this Order, the Commission will not *mandate* any particular
demographic pattern in hiring in order to satisfy the Commission's EEO requirements.  Yet, like
Frankenstein's creature, the Commission's reanimation of Form 395-B comes at the cost of its
fundamental ungovernability, *viz.*: public disclosure of attributable demographic employment data.  The
ineluctable question therefore is: ought the Commission to anticipate that its rule requiring public
disclosure of such data will *pressure* broadcast licensees to engage in race-conscious hiring practices?  If
so, is the policy not vulnerable to challenge on constitutional grounds?

My colleagues today argue, in effect if not explicitly, that pressure to engage in race-conscious
hiring from *outside* of the Commission by third parties *predictably generated by means of Commission*
*policy* is legally nugatory.  The Order contends that, so long as broadcasters are not pressured by the
Commission *itself,* pressure from third parties knowingly generated by an instrumentality of Commission
policy lacks constitutional valence.  Further, the Order contends that concerns over public pressure are
merely speculative.  I cannot say that I agree with any of that.

The public inarguably pressures every large firm for which employment data are available (and,
indeed, even for those firms electing not to publicly disclose employment data) as it relates to "equity" in
staffing decisions.  Responsive to these issues, some larger broadcasters already raise their hands and
elect to disclose demographic employment data.  Yet a government policy mandating such disclosure, at a
minimum, *implicates* Fifth Amendment guardrails around incentivizing race-conscious hiring practices,

*precisely* due to the widespread and predictable social pressure of which this Commission is, obviously, aware. While it may be true that contending with workforce demographics is a legitimate question of good corporate governance, it does not follow that a *government mandate* to disclose attributable demographic employment data automatically passes constitutional muster so long as the implementing agency takes no official notice of that data. If, predictably, regulatees are pressured to engage in race-conscious hiring as a direct consequence of this Commission's rules, I see no fine distinctions in the law as to the etiology of the pressure immunizing our decision today from constitutional scrutiny.

Were the Order subject to strict scrutiny in judicial review—it is at least possible that it will be—I am not convinced that the "collect and disclose" rules we implement today would survive constitutional challenge. *Adarand Constructors, Inc. v. Peña* ('*Adarand*') and its progeny make it clear that the Commission *may* collect this data. Yet while demographic data collection *simpliciter* does not subject governmental action to strict scrutiny, bear in mind that today's Order is at pains to discuss the social ill at which collection and *disclosure* of attributable demographic employment data is intended to address: minority participation in the broadcast workforce. In other words, when the effective *goal* of demographic data collection and disclosure is to affect the hiring behavior of regulatees (that is, to improve minority participation in the broadcast workforce), and when the only obvious modality of improvement afforded by disclosure of *attributable* demographic employment data not otherwise afforded by disclosure *non-attributable* data is public pressure, may the Commission still seek shelter beneath *Adarand*?

Even if strict scrutiny were *not* to apply, there is no *requirement* that the Commission take a maximalist position as to disclosure. This Commission ought, as a *prudential* matter, to tread lightly where matters of suspect classification arguably are implicated. That is especially true where, as here, the rules we adopt today invite comparison to actions taken by the Commission twice invalidated on Fifth Amendment grounds.

Turning to policy: even were the Commission *not* constitutionally forbidden from taking the step of public disclosure of attributable demographic employment data that it does today, it should not *anyway,* because little or no new information appropriate for *national policy* consideration by this agency will be revealed by its implementation.

Obviously, policy should rely on data: governmental collection and use of statistical data—subject to a variety of scientific infirmities though it often is—is foundational to modern regulatory rulemaking and lawmaking. And, incontrovertibly, it is possible that the collection and use of demographic employment data can be used to aid in making rules and laws. Of greater controversy is whether public analysis of policy-implicated datasets generates good rules and laws—especially as there are many a slip twixt analytical cup and regulatory lip—but let us grant it for argument's sake. It is in no way obvious that, *for the purposes of crafting national policy*, which is inherently *macro*scopic, there is a great enough delta in the informational value to the public data science community of demographic employment data that is attributable to individual stations compared to data that is de-identified so as to justify the publication of the former when the former is so constitutionally fraught. So, as regards the publication of attributable demographic employment data: what policy good is left other than "name and shame" for station owners? What is left other than the fully predictable application of public pressure on individual licensees that this Order waves off as speculative? If the Commission's collection of this data were aimed merely at informing policy, why take the additional step of disclosure we take today? Because the public disclosure of attributable demographic employment data this Order implements predictably serves to increase pressure on broadcast licensees to engage in racially conscious hiring, in violation of the Fifth Amendment and as explained by the D.C. Circuit in both *Lutheran Church* and *MD/DC/DE*, and because I can find no other legitimate purpose for the publication of attributable demographic employment data, I dissent from the Order.

As to the Second Further Notice of Proposed Rulemaking, I see nothing that would vary my thinking as it relates to the collection and disclosure of Form 395-A data, and so I dissent from that portion of the item for identical reasons.

Tab 2

**The Leadership Conference
on Civil and Human Rights**

1620 L Street, NW          202.466.3311 voice
Suite 1100                 202.466.3435 fax
Washington, DC             www.civilrights.org
20036



September 29, 2022

Officers
Chair
Judith L. Lichtman
  National Partnership for
  Women and Families
Vice Chairs
Derrick Johnson
  NAACP
Thomas A. Saenz
  Mexican American Legal
  Defense and Educational Fund
Secretary
Fatima Goss Graves
  National Women's Law Center
Treasurer
Lee A. Saunders
  American Federation of State,
  County and Municipal Employees

Board of Directors
Gloria L. Blackwell
  AAUW
Ray Curry
  International Union, UAW
Jocelyn Frye
  National Partnership for
  Women and Families
Jonathan Greenblatt
  Anti-Defamation League
Mary Kay Henry
  Service Employees International Union
Damon Hewitt
  Lawyers' Committee for
  Civil Rights Under Law
Janai Nelson
  NAACP Legal Defense and
  Educational Fund, Inc.
David H. Inoue
  Japanese American Citizens League
Benjamin Jealous
  People for the American Way
Virginia Kase Solomón
  League of Women Voters of the
  United States
Samer E. Khalaf
  American-Arab
  Anti-Discrimination Committee
Joni Madison
  Human Rights Campaign
Marc Morial
  National Urban League
Janet Murguía
  UnidosUS
Christian F. Nunes
  National Organization for Women
Rabbi Jonah Pesner
  Religious Action Center
  of Reform Judaism
Rebecca Pringle
  National Education Association
Lisa Rice
  National Fair Housing Alliance
Anthony Romero
  American Civil Liberties Union
Liz Shuler
  AFL-CIO
Fawn Sharp
  National Congress of American Indians
Maria Town
  American Association of
  People with Disabilities
Randi Weingarten
  American Federation of Teachers
John C. Yang
  Asian Americans Advancing Justice |
  AAJC

President and CEO
Maya Wiley

Jessica Rosenworcel
Chair
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re: MB Docket No. 19-177; MB Docket No. 98-204

Dear Chair Rosenworcel:

On behalf of The Leadership Conference on Civil and Human Rights, a coalition charged by its diverse membership of more than 230 national organizations to promote and protect the civil rights of all persons in the United States, and its Media/Telecommunications Task Force, we write to support the supplemental comments of the civil rights and labor advocates in the above referenced proceedings.[1]

The Leadership Conference's recent report, "Information Nation: The Need for Improved Federal Civil Rights Data Collection," highlights the importance of data collection in tackling the problems created by structural racism, inequality, and other injustices.[2] Without complete, accurate, and disaggregated data, it is impossible to develop a full understanding of how the communities we represent are faring.[3] As the report concludes, while better data collection will not solve the challenges created by systemic racism and historic levels of inequality, it is a necessary first step.[4]

The comments in the docket, including those previously filed by The Leadership Conference, reflect widespread consensus within the civil and human rights community that the Federal Communications Commission (FCC) must once again be a leader in equitable

---

[1] *See* Comments of Asian Americans Advancing Justice - AAJC, Black Women's Roundtable, Common Cause, Communications Workers of America, Hispanic Federation, National Coalition on Black Civic Participation, National Urban League, Service Employees International Union, Strategic Organizing Center, United Church of Christ Media Justice Ministry, and Multicultural Media, Telecom and Internet Council, Review of EEO Compliance and Enforcement in Broadcast and Multichannel Video Programming Industries, MB Docket 19-177; Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies, MB Docket 98-204 (Aug. 10, 2022)("Civil Rights and Labor Advocates Comments").

[2] The Leadership Conference on Civil and Human Rights, Information Nation: The Need for Improved Federal Civil Rights Data Collection at 5 (Apr. 2022), https://civilrights.org/resource/information-nation-the-need-for-improved-federal-civil-rights-data-collection/ ("Information Nation").

[3] *Id.*

[4] *Id.* at 34.



employment obligations.[5] This begins with collecting and publishing EEO-1 data by broadcasters, cable operators, and other multichannel video programming distributors and ensuring these data are made public via an easy-to-use portal that can also be used to aggregate data on state-by-state and regional bases and according to other factors, such as various demographic categories.[6]

Collecting these data would be consistent with both the FCC's Equity Action Plan and the core goals of the Biden/Harris Equity Agenda.[7] It would also be consistent with the practices of other agencies within the federal government and with recent developments in the private sector. Investors have been calling on the Securities and Exchange Commission to mandate disclosure of EEO-1 data,[8] and many private sector employers recognize the need to collect demographic data on their workforce in order to make progress toward equitable employment goals.[9]

Today, we face a historically low amount of demographic data available on the news profession, and even surveys that are able to gather a stronger sample are unable to paint a full picture of the state of newsroom diversity.[10] While broadband providers have in some cases been supportive of greater transparency for EEO-1 data[11] and the industry has produced some reports on itself,[12] the responsibility to ensure the industry, public, and federal government have a complete understanding of diversity in the communications industry falls on the FCC.

Mandatory data collection would benefit the government, industry, and civil society. The FCC can use EEO-1 data to advance the commission's Equity Action Plan,[13] and these data would allow the news and communications industry to better understand and target their diversity and inclusion efforts and also allow the public to hold these companies accountable.

Thank you for your consideration of our views. We look forward to working with you on this issue and others of importance to our country. If you have any questions about the issues raised in this letter, please

---

[5] The Federal Communications Commission initially adopted EEO rules in 1969, partially in response to the Kerner Commission's report and a 1967 petition by the United Church of Christ. U.S. Commission on Civil Rights, *Window Dressing on the Set: Women and Minorities in Television* at 74-75 (August 1977), available at https://www2.law.umaryland.edu/marshall/usccr/documents/cr12t23.pdf.
[6] Civil Rights and Labor Advocates Comments at 2.
[7] Federal Communications Commission, Equity Action Plan, https://docs.fcc.gov/public/attachments/DOC-382389A1.docx; Executive Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-orderadvancing-racial-equity-and-support-for-underserved-communities-through-the-federalgovernment/.
[8] E.g., Letter from Investors to SEC Chair Gensler (Nov. 18, 2021), https://www.bostontrustwalden.com/wp-content/uploads/2021/11/Investor-Signatory-Letter-tothe-SEC-Requesting-Mandatory-EEO-1-Disclosure_Nov-2021.pdf.
[9] Lauren Romansky, Mia Garrod, Katie Brown, and Kartik Deo, "How to Measure Inclusion in the Workplace," Harvard Business Review, May 27, 2021, https://hbr.org/2021/05/how-to-measure-inclusion-in-the-workplace.
[10] Civil Rights and Labor Advocates Comments at 15-16.
[11] Notably, AT&T, Comcast, Verizon, and Lumen all voluntarily release their EEO-1 forms.
[12] Civil Rights and Labor Advocates Comments at 15-16.
[13] Federal Communications Commission, Equity Action Plan, https://docs.fcc.gov/public/attachments/DOC-382389A1.docx.

September 29, 2022
Page 3 of 3



contact Media/Telecommunications Task Force Co-Chairs Cheryl Leanza, United Church of Christ Media Justice Ministry, at cleanza@alhmail.com; Yosef Getachew, Media & Democracy program director, Common Cause, at ygetachew@commoncause.org; or Anita Banerji, senior program director, Media and Tech, The Leadership Conference, at banerji@civilrights.org.


Sincerely,

The Leadership Conference on Civil and Human Rights
American Civil Liberties Union
Asian Americans Advancing Justice - AAJC
Black Women's Roundtable
Common Cause
Communications Workers of America
JACL
Muslim Advocates
National Coalition on Black Civic Participation
National Consumer Law Center
National Council of Asian Pacific Americans (NCAPA)
National Education Association (NEA)
National Employment Law Project
National Fair Housing Alliance
National Urban League
SEIU
Sikh American Legal Defense and Education Fund (SALDEF)
Strategic Organizing Center

Tab 3

*Before the*
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Review of EEO Compliance and | ) | MB Docket No. 19-177 |
| Enforcement in Broadcast and Multichannel | ) | |
| Video Programming Industries | ) | |
| | ) | |
| Review of the Commission's Broadcast and | ) | |
| Cable Equal Employment Opportunity Rules | ) | MB Docket No. 98-204 |
| and Policies | ) | |
| | ) | |

**JOINT SUPPLEMENTAL COMMENTS OF**

**ASIAN AMERICANS ADVANCING JUSTICE - AAJC, BLACK WOMEN'S
ROUNDTABLE, COMMON CAUSE, COMMUNICATIONS WORKERS OF AMERICA,
HISPANIC FEDERATION, NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, NATIONAL URBAN LEAGUE, SERVICE EMPLOYEES
INTERNATIONAL UNION, STRATEGIC ORGANIZING CENTER, UNITED CHURCH
OF CHRIST MEDIA JUSTICE MINISTRY, AND MULTICULTURAL MEDIA,
TELECOM, AND INTERNET COUNCIL**

Cheryl A. Leanza
United Church of Christ Media Justice
Ministry
100 Maryland Ave., NE
Suite 330
Washington, DC 20002

Emily Chi
Asian Americans Advancing Justice - AAJC
1620 L Street NW
Washington, DC 20036

Robert Branson
David Honig
Multicultural Media, Telecom and Internet
Council
1250 Connecticut Avenue NW, 7th Floor
Washington, DC 20036

Hooman Hedayati
Communications Workers of America
501 3rd Street NW
Washington, DC 20001

Michael Zucker
Strategic Organizing Center
1900 L Street NW, Suite 900
Washington, DC 20036

Alvin Velazquez
Service Employees International Union
1800 Massachusetts Avenue
Washington, DC 20036

Melanie Campbell
Black Women's Roundtable
National Coalition on Black Civic
Participation
1666 K Street NW, Suite #440
Washington, DC 20006

Brent Wilkes
Hispanic Federation
1133 19th Street NW, Suite 1035
Washington, DC 20036

Yosef Getachew
Jonathan Walter
Common Cause
805 15th Street NW
Washington, DC 20005

Joi Chaney
National Urban League
1805 7th Street NW
Washington, DC 20001

August 10, 2022

# Table of Contents

I.     The FCC should collect and publish EEO data ........................................................ 2

II.    The federal government routinely collects employment and other data for the purpose of incentivizing equity and monitoring compliance with regulations and laws. ...... 3

    A.     Federal agencies routinely collect data to increase fairness and equity and enforce federal law. ............................................................................................................... 3

    B.     The Securities and Exchange Commission is actively considering more robust disclosure for good reason. ...................................................................................... 6

    C.     The FCC has an important and different role to play from the EEOC. .................. 8

III.   Collection and monitoring of employment data is a best practice and widely sought by shareholders and experts as a means to achieve diversity and equity goals. ................... 10

    A.     Data collection and monitoring produces more profitable successful companies. . 10

    B.     Other standards promoting fairness support data collection and tracking of employees. .................................................................................................................. 12

    C.     Many companies regulated by the FCC already release their EEO data but more is needed. ..................................................................................................................... 14

IV.    The news media and broadcast and cable industries lack transparency and the data we have demonstrates a lack of representation. ..................................................................... 15

    A.     Key data is less available than before. ................................................................ 15

    B.     Privately-produced reports demonstrate a need for data and evidence that the news and communications industries are not representative of the country's diversity.  17

V.     Collecting and publishing data is constitutional. ............................................. 19

    A.     The FCC must collect EEO data and it is constitutional to do so. ......................... 19

    B.     *MD/DC/DE Broadcasters* is an outlier and not consistent with current facts. ........ 20

VI.    The FCC should adopt the pending nine diversity proposals. .................................... 24

VII.   Conclusion ............................................................................................................ 27

*Before the*

**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Review of EEO Compliance and | ) | MB Docket No. 19-177 |
| Enforcement in Broadcast and | ) | |
| Multichannel Video Programming | ) | |
| Industries | ) | |
| | ) | |
| Review of the Commission's Broadcast | ) | MB Docket 98-204 |
| and Cable Equal Employment | ) | |
| Opportunity Rules and Policies | ) | |

**JOINT SUPPLEMENTAL COMMENTS OF ASIAN AMERICANS ADVANCING JUSTICE - AAJC, BLACK WOMEN'S ROUNDTABLE, COMMON CAUSE, COMMUNICATIONS WORKERS OF AMERICA, HISPANIC FEDERATION, NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, NATIONAL URBAN LEAGUE, SERVICE EMPLOYEES INTERNATIONAL UNION, STRATEGIC ORGANIZING CENTER, UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, AND MULTICULTURAL MEDIA, TELECOM AND INTERNET COUNCIL**

Joint supplemental commenters, Asian Americans Advancing Justice - AAJC, Black Women's Roundtable, Common Cause, Communications Workers of America, Hispanic Federation, National Coalition on Black Civic Participation, National Urban League, Service Employees International Union, Strategic Organizing Center, United Church of Christ Media Justice Ministry, and Multicultural Media, Telecom and Internet Council, submit these comments to eradicate any question in the record that the Federal Communications Commission ("FCC") must enforce the law by collecting and publishing equal employment opportunity data by broadcasters and cable operators. While in the 1960s the FCC might have been a leader in equitable employment regulations, in the 2020s the FCC has fallen far behind of standard

industry practices and is depriving itself and the public of the most basic and least regulatory

tools to ensure equity of economic opportunity and a communications workforce that represents

the full diversity of our nation. In addition to providing this comprehensive analysis supporting

FCC collection of EEO data, the joint filers here endorse MMTC's nine diversity proposals.

## I.     The FCC should collect and publish EEO data

Since 2004, a wide range of civil rights and public interest organizations have been on

record requesting the FCC collect and publish equal employment opportunity data by

broadcasters and cable operators, consistent with existing federal law. The National Association

of Broadcasters agrees: "NAB … does not oppose the Commission moving forward with

collecting employment data."[1] Previous Chair Michael Powell—now President and CEO of

NCTA-- proposed collecting this data years ago.[2]

The FCC should require all broadcast licensees to submit their EEO-1 data, or

comparable data if the licensee does not submit EEO-1 data. The data should be submitted on a

market-by-market basis. The Commission should include satellite operators and other MVPDs

and other regulatees who are not currently required to supply this information. To avoid any hint

of the constitutional questions raised by broadcasters, the Commission should rule that statistical

reports alone cannot be used to initiate an inquiry into a licensee's EEO compliance. The

Commission should collect this data in an easy-to-use digital portal which can also be used to

aggregate data on a state-by-state and regional basis and according to other factors, such as

various demographic categories. The Commission must complete this rulemaking within the next

---

[1] Letter from Rick Kaplan, National Association of Broadcasters to FCC Secretary Dortch at 2,
MB Docket No. 98-204 (filed April 6, 2022).
[2] Statement of Chairman Powell, 19 FCC Rcd 9976, 9990 (2004).

six months and obtain OMB approval within one year so that the data will be collected by the end of 2023 and reports and tabulations can be produced by mid-2024.

The Commission should take these actions as part of an overall effort to ensure that the communications sector acts with equity and fairness to all people as employees, entrepreneurs and creators. It is consistent with the FCC's Equity Action Plan to promote diversity, equity, inclusion, and accessibility:

> The FCC will seek to gain a deeper understanding of how the agency's rules, policies, and programs may promote or inhibit advances in diversity, equity, inclusion, and accessibility. The FCC will pursue focused action and investments to eliminate historical, systemic, and structural barriers that perpetuate disadvantaged or underserved individuals and communities. In so doing, the FCC will work to ensure equitable and inclusive access and facilitate the ability of underserved individuals and communities to leverage and benefit from the wide range of opportunities made possible by digital technologies, media, communication services, and next-generation networks. In addition, the FCC recognizes that it is more effective when its workforce reflects the experience, judgment, and input of individuals from many different backgrounds. Advancing equity is core to the agency's management and policymaking processes and will benefit all Americans.[3]

## II. The federal government routinely collects employment and other data for the purpose of incentivizing equity and monitoring compliance with regulations and laws.

### A. Federal agencies routinely collect data to increase fairness and equity and enforce federal law.

As several parties recently explained to the Commission, collection of "race and ethnic data and reports perform a core governmental function: 'To operate efficiently and effectively,

---

[3] Federal Communications Commission, Equity Action Plan, https://docs.fcc.gov/public/attachments/DOC-382389A1.docx.

3

the Nation relies on the flow of objective, credible statistics to support the decisions of individuals, households, governments, businesses, and other organizations.'"[4]

The Biden/Harris Equity Agenda is a government-wide initiative to "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality.  Affirmatively advancing equity, civil rights, racial justice, and equal opportunity is the responsibility of the whole of our Government."[5] One of the core goals of this executive order is to build accountability for equity through data collection and reporting. The administration notes that "the Federal government's ability to collect and analyze disaggregated data is essential for advancing equitable outcomes."[6] Many agencies collect data to enforce non-discrimination laws and rules.[7] Without data it is impossible to know what rules and policies are working and what are not; it is impossible to set enforcement strategies and objectives.

---

[4] Petition for a Content Diversity Vendor Report, MB Docket 22-209 at 12 (quoting *Office of Management and Budget, Revision of Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity*, 82 Fed. Reg. 12242, 12243 (2017)).

[5] In his first day in office, President Biden signed Executive Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/;* Advancing Equity and Racial Justice Through the Federal Government, https://www.whitehouse.gov/equity/.

[6] *Id.*

[7] *E.g.*, U.S. Bureau of Labor Statistics, Labor force characteristics by race and ethnicity, 2020 (Nov. 2021), https://www.bls.gov/opub/reports/race-and-ethnicity/2020/home.htm; National Institute of Health, Inclusion of Women and Minorities in Clinical Research, NIH RCDC Inclusion Statistics Report, https://report.nih.gov/RISR/#/; U.S. Department of Education, Civil Rights Data Collection, Wide-Ranging Education Data Collected from our Nation's Public Schools, https://ocrdata.ed.gov/; U.S. Department of Commerce, National Telecommunications and Information Administration, Digital Nation Data Explorer, https://www.ntia.doc.gov/data/digital-nation-data-explorer (includes race, ethnicity, gender among other data); U.S. Equal Employment Opportunity Commission, Job Patterns For Minorities And Women In Private Industry, EEOC Explore, https://www.eeoc.gov/statistics/employment/jobpatterns/eeo1; U.S. Dept. of Labor, Federal

4

The Leadership Conference on Civil and Human Rights recently released a report explaining the critical role data collection plays in vindicating civil rights. The report explained, "Data are necessary, even though not sufficient, to advance equity and justice. … Failure to collect data on specific topics can sometimes seem like a technical matter, but it has the effect, often intentional, of making it impossible to tackle a problem by disguising its existence or its scope."[8] Similarly, the National Urban League recommended in the Lewis Latimer Plan for Digital Equity and Inclusion that the federal government should "collect information that allows the government and the public to understand and evaluate how the private sector, and particularly the technology and related sectors are improving diversity, equity, and inclusion."[9]

Transparency is a useful, least-intrusive means to evoke change. SEC Commissioner Allison Herren Lee has been a leader on this issue. For example, in September 2020 she said disclosure not only "gets investors the information they need," but it can also "drive corporate behavior:"

> For one thing, when companies have to formulate disclosure on topics it can influence their treatment of them, something known as the "what gets measured, gets managed" phenomenon. Moreover, when companies have to be transparent, it creates external pressure from investors and others who can draw comparisons company to company. The Commission has long recognized that influencing corporate behavior is an appropriate aim of our regulations, noting that "disclosure may, depending on determinations made by a company's management, directors and shareholders, influence corporate conduct"

Contract Compliance Programs Office, Obligation To Solicit Race and Gender Data for Agency Enforcement Purposes 70 Fed. Reg. 58945, https://www.federalregister.gov/documents/2005/10/07/05-20176/obligation-to-solicit-race-and-gender-data-for-agency-enforcement-purposes.

[8] The Leadership Conference on Civil and Human Rights, *Information Nation: The Need for Improved Federal Civil Rights Data Collection* at 5, 7 (April 2022), https://civilrights.org/resource/information-nation-the-need-for-improved-federal-civil-rights-data-collection/ (*Information Nation*).

[9] The Lewis Latimer Plan, National Urban League (March 30, 2021) https://nul.org/sites/default/files/2021-04/NUL%20LL%20DEIA%2004421%20Latimer%20Plan_vFINAL_1136AM.pdf.

5

and that "[t]his sort of impact is clearly consistent with the basic philosophy of the disclosure provisions of the federal securities laws."[10]

The business sector understands the value and efficacy of data. The Commission has a statutory and moral obligation to collect the data.

**B.    The Securities and Exchange Commission is actively considering more robust disclosure for good reason.**

Investors have been demanding increased disclosure with respect to human capital policies and outcomes.[11] The U.S. Securities and Exchange Commission ("SEC") has indicated in its Spring 2021 regulatory agenda that proposed rules entitled "Human Capital Management Disclosure" and "Corporate Board Diversity," are supported by many organizations.[12] In October 2021, the SEC Chair testified before Congress where he asked for staff proposals for "consistent, comparable, and decision-useful disclosures around … human capital."[13] One Commissioner suggested the agency should consider requiring companies to publicly disclose EEO-1 data.[14] Investors, including Boston Trust Walden, the Connecticut State Treasurer, Illinois State

---

[10] SEC Commissioner Allison Herron Lee, Diversity Matters, Disclosure Works, and the SEC Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference, https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922.

[11] E.g., Letter from Investors to SEC Chair Gensler (Nov. 18, 2021), https://www.bostontrustwalden.com/wp-content/uploads/2021/11/Investor-Signatory-Letter-to-the-SEC-Requesting-Mandatory-EEO-1-Disclosure_Nov-2021.pdf (Boston Trust Walden Letter); see also Kirkland & Ellis, Kirkland Alert, "Preparing for Potential Updates to Human Capital Management & Board Diversity Disclosure Requirement (Oct. 2021) ("Recent market and regulatory trends in the U.S. relating to environmental, social and governance ("ESG") matters have increased the expectation that corporations provide enhanced disclosures with respect to human capital management ("HCM") and diversity, equity and inclusion ("DEI").")

[12] E.g., Letter from Dan Mauer, Communications Workers of America to the Securities and Exchange Commission (Sept. 10, 2021), https://www.sec.gov/comments/4-711/4-711.html.

[13] Oversight of the U.S. Securities and Exchange Commission: Wall Street's Cop Is Finally Back on the Beat: Hearing Before the U.S. House Committee on Financial Services, 117 Cong. (2021) (Testimony of Gary Gensler), https://www.sec.gov/news/testimony/gensler-2021-10-05.

[14] Id.

Treasurer, and Washington State Investment Board are urging the SEC to mandate disclosure of EEO-1 data.[15] Those investors highlighted the industry-wide trends toward disclosure:

> [T]he world's largest asset managers, including BlackRock and State Street Global Advisors, have specifically asked companies to disclose workforce demographics included in EEO-1 reports. On behalf of the New York City Employee Retirement Systems, New York City's Comptroller asked 67 companies to make public their EEO-1 reports in 2020, and the majority committed to do so. According to the Sustainable Investments Institute, nearly all 29 shareholder proposals seeking EEO-1 disclosure were withdrawn in 2021, signifying agreements with proponents. Of the 3 that proceeded to a vote, earned majority votes exceeding 80% (DuPont de Nemours and Union Pacific) and 1 garnered 40.7% shareholder support (Charter Communications).[16]

In 2020, the SEC finalized changes to require companies to provide a description of the company's human capital resources, including any human capital measures or objectives that the company focuses on in managing the business to the extent it is material to an understanding of the registrant's business taken as a whole.[17] The decision was not unanimous because it did not go far enough according to two of the Commissioners who sought more specific data.

The SEC has long required public companies to disclose whether a nominating committee has a policy with regard to the consideration of diversity in identifying director nominees and, if so, how this policy is implemented and how the nominating committee or the board assesses the effectiveness of the policy. Further, if a board considers an individual nominee's self-identified diversity characteristics (e.g., race, gender, ethnicity, religion,

---

[15] Boston Trust Walden Letter.
[16] *Id.* At 1.
[17] Item 101 of Regulation S-K, 17 CFR 229, 239, and 240, https://www.sec.gov/rules/final/2020/33-10825.pdf.

nationality, disability, sexual orientation or cultural background), the SEC now expects proxy disclosures to identify such characteristics and how they were considered.[18]

The Securities and Exchange Commission has approved a rule by Nasdaq, set to go in effect this year, that will require companies listed on its exchange to disclose the ethnic and gender makeup of their boards and have at least two "diverse" members or explain why they do not.[19]

### C.    The FCC has an important and different role to play from the EEOC.

Title VII of the Civil Rights Act of 1964 requires employers to make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed and to produce such records to the EEOC.  Pursuant to its statutory authority, in 1966 the EEOC began requiring certain employers to report employee data by job category, ethnicity, race, and sex, otherwise referred to as 'EEO-1' data."[20] Pursuant to federal law, the EEOC shares this data with state and local Fair Employment Practices Agencies to enable those agencies to

---

[18] What's New in the Division of Corporation Finance, https://www.sec.gov/divisions/corpfin/cfnew/cfnew0219.shtml (Compliance & Disclosure Interpretations 116.11 & 133.13) (2019).
[19] "SEC's Lee Eyes Release of Workforce Diversity Data Sent to EEOC," Bloomberg Law (June 22, 2021). https://news.bloomberglaw.com/securities-law/secs-lee-eyes-release-of-workforce-diversity-data-sent-to-eeoc. Nasdaq Rule 5606 will require companies to disclose, in a standardized matrix set forth in the rule or in a substantially similar format, (i) the total number of company board members and (ii) how those board members self-identify regarding gender, predefined race and ethnicity categories and LGBTQ+ status. Nasdaq published sample matrix disclosures to demonstrate how companies can comply with the rule. Companies must comply by August 8, 2022. Brian V. Breheny, "SEC Approves Nasdaq Board Diversity Listing Standards," Skadden Insights (Sept. 2021),  https://www.skadden.com/insights/publications/2021/09/quarterly-insights/sec-approves-nasdaq-board-diversity-listing.
[20] EEOC, "What You Should Know about EEOC and the Publication of the Notice of Information Collection Regarding the EEO-1." https://www.eeoc.gov/wysk/what-you-should-know-about-eeoc-and-publication-notice-information-collection-regarding-eeo-1 (visited August 1, 2022).

enforce the laws in their jurisdictions that prohibit employment discrimination.[21] The data is used to "identify priorities for investigation and enforcement and also to identify employment patterns within companies, industries, or regions within their jurisdictions."[22]

　　While the EEOC is the lead agency regarding employment discrimination, it is also vastly under-resourced. The EEOC "has a smaller budget today than it did in 1980, adjusted for inflation, and 42 percent less staff. At the same time, the country's labor force increased about 50 percent, to 160 million."[23] The FCC and the EEOC have a long history of complementary collaboration.[24] Given that the FCC has concurrent jurisdiction over employment discrimination with the EEOC,[25] it is only appropriate that the FCC shoulder some portion of the burden. The FCC and EEOC have had a memorandum of understanding in place for many years which

---

[21] U.S. Equal Employment Opportunity Commission, *Fact Sheet: The EEOC and FEPA Data-Sharing*, https://www.eeoc.gov/fact-sheet-eeoc-and-fepa-data-sharing.
[22] *Id*.
[23] Maryam Jameel and Joe Yerardi, "Workplace discrimination is illegal. But our data shows it's still a huge problem," *Vox* (Feb 28, 2019), https://www.vox.com/policy-and-politics/2019/2/28/18241973/workplace-discrimination-cpi-investigation-eeoc.
[24] Since 1978, the FCC and the EEOC have had a joint Memorandum of Understanding ("MOU") under which the two agencies share EEO oversight responsibilities involving FCC licensees. Memorandum of Understanding between the FCC and EEOC, 70 FCC2d 2320 (1978). Under this MOU, the EEOC would prioritize its review of EEO violations in an industry not regulated by the FCC whose behavior diminish the FCC's ability to enforce EEO compliance in related industries that Congress expects the FCC to regulate. *Id*. at 2329 ("If the EEOC receives the charge but the broadcast employer does not fall within the jurisdiction of the EEOC pursuant to Title VII, and also not within the jurisdiction of a state or local agency to which the EEOC defers such charges … the EEOC will forward the charge to the FCC, which will process the complaint in accordance with its own rules, policies and procedures. Upon request, the EEOC shall provide technical advice and guidance to the FCC in their investigation of such complaints. The EEOC shall also notify the charging party that it has forwarded the complaint to the FCC.").
[25] Glenda G. Leatherman, Employment Discrimination in Television Broadcasting: A Study of FCC and EEOC Concurrent Jurisdiction, Hastings Communications and Entertainment Law Journal (Jan. 1979), https://repository.uchastings.edu/cgi/viewcontent.cgi?article=1030&context=hastings_comm_ent_law_journal.

recognizes the helpful role the FCC plays in terms of enforcement for its regulatees.[26] The EEOC performs different functions and works collaboratively with the FCC. While "the EEOC's objective is to eradicate discrimination and expedite disputes between employees and employers through review and litigation of individual complaints if necessary," the FCC's primary objective is to deter discrimination in the communications industry.[27] The FCC does not review individual complaints for it does not have the ability to provide compensation to an individual employee who has been the victim of discrimination."[28] The EEOC collects data from businesses with more than 100 employees and its jurisdiction is limited to businesses with fifteen or more employees.[29] The EEOC only publishes aggregate data, not company-specific data even though, as discussed below, the increasing trend is for companies to release their own EEO-1 data.

## III.    Collection and monitoring of employment data is a best practice and widely sought by shareholders and experts as a means to achieve diversity and equity goals.

### A.    Data collection and monitoring produces more profitable successful companies.

Diversity and inclusion has received increased attention in recent years by corporations, standard-setting bodies and journalists. Overwhelmingly each of these institutions are concluding that collection and monitoring of demographic employment data is essential for making any progress toward equitable employment goals. This interest is not only driven by equity, but by investors seeking maximum return on their investment:

---

[26] *Memorandum of Understanding between the FCC and EEOC*, 70 FCC2d 2320 (1978).
[27] S. Jenell Trigg, "The Federal Communications Commission's Equal Opportunity Employment Program and the Effect of *Adarand Constructors, Inc. v. Pena*," 4 COMMLAW CONSPECTUS 237, 256 (1996).
[28] *Id.*
[29] *Id*; 42 U.S.C. 2000e(b).

Numerous studies have found companies with diverse and inclusive workplaces provide a competitive advantage by encouraging varied perspectives that can better anticipate shifts in consumer preferences, reducing costly turnover, and increasing productivity and morale. Such companies are better positioned to recruit the most talented employees from the broadest possible labor pool, a particularly critical benefit in the context of the current U.S. labor shortage. Conversely, charges of discrimination can result in costly litigation and reputational damage.[30]

The Business Roundtable, an influential association of chief executives who employ 20 million people, states DEI is a business imperative and advocates for greater transparency on diversity metrics. Harvard Business Review noted, "More than 1,600 CEOs have signed onto the CEO Action for Diversity & Inclusion Pledge, and 40% of companies discussed diversity and inclusion in their Q2 2020 earnings calls versus only 4% the same quarter a year prior. According to Gartner research, the number of HR leaders identifying DEI efforts as a top priority was 1.8 times higher in 2020 than in 2019. Gartner analysis reveals an almost 800% increase in job postings for dedicated diversity recruiters."[31]  In addition, "a recent Gartner survey reveals DEI leaders indicated that 'setting goals and tracking DEI progress through metrics' was one of their two top priorities for 2021."[32] A 2020 McKinsey report, *Diversity wins: How inclusion matters*, interviewed corporate leaders amid the radically changed business landscape amid the COVID crisis found, "The most diverse companies are now more likely than ever to outperform less diverse peers on profitability." Its authors concluded, "Companies whose leaders welcome

---

[30] Boston Trust Walden Letter.
[31] Lauren Romansky, Mia Garrod, Katie Brown, and Kartik Deo, "How to Measure Inclusion in the Workplace," Harvard Business Review, May 27, 2021, https://hbr.org/2021/05/how-to-measure-inclusion-in-the-workplace.
[32] *Id.*

11

diverse talents and include multiple perspectives are likely to emerge from the crisis stronger. In short: diversity wins, now more than ever."[33]

In a major investigation and report by two leading academics in countering social inequality, the leading recommendation was monitoring data. "Set goals, collect data, and examine change over time and in comparison to other organizations: When it comes to maximizing profits and effectiveness, many businesses deploy this set of strategies. …. By collecting and analyzing data on diversity over time, comparing those numbers to the numbers at other organizations, and sharing them with key stakeholders, companies can increase accountability and transparency around diversity issues."[34]

### B.    Other standards promoting fairness support data collection and tracking of employees.

The Uniform Guidelines on Employee Selection Procedures (UGESP)[35] are mandatory for federal contractors and guidelines for other employers, which the courts frequently rely upon to determine if unlawful hiring practices were the basis of a discrimination claim. Although not required by law, applicant tracking is recommended by these guidelines for all employers covered under Title VII and can be done pre-hire when it is part of an employer's decision to

---

[33] Vivian Hunt, et al, McKinsey & Company, *Diversity wins: How inclusion matters* (May 2020), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters.
[34] David Pedulla, "Diversity and Inclusion Efforts That Really Work," Harvard Business Review,
May 12, 2020, https://hbr.org/2020/05/diversity-and-inclusion-efforts-that-really-work.
[35] 29 C.F.R. § 1607.1 *et seq.*

follow the guidelines.[36] Adherence to these guidelines would strongly suggest an employer is free from unlawfully discriminatory hiring practices.[37]

A 2021 international standard by the International Organization for Standardization (ISO), ISO 30415, Human resource management — Diversity and inclusion, provides a foundation for organizations wishing to create an inclusive workplace and optimizes all the benefits that it can bring.[38] The new standard will result in company leaders demonstrating their commitment to diversity and inclusion, with strategic opportunities applied and strong awareness of the results of their commitment by employees and external stakeholders. The standard covers actions, principles, measures, and their associated accountabilities and responsibilities, and takes into account the unique context of each workplace. ISO 30415 is intended to be scalable to the needs of all types of organizations in different sectors, whether in public, private, government or non-governmental organizations (NGO), regardless of size, type, activity, industry or sector, growth phase, external influences, and country-specific requirements.

The final draft of ISO 30415 recommends, among other things, that companies "collect data on workforce and other stakeholder perceptions about the organization's commitment to D&I, such as from focus groups, surveys, interviews and external reviews" as an action to

---

[36] Roy Maurer, "Clearing Up Misconceptions About the Uniform Guidelines on Employee Selection Procedures, SHRM (Jan. 14, 2020), https://www.shrm.org/resourcesandtools/hr-topics/talent-acquisition/pages/clearing-up-misconceptions-uniform-guidelines-employee-selection-procedures.aspx https://www.uniformguidelines.com/.

[37] *Id.*

[38] American National Standards Institute, New ISO Standard Supports Diversity and Inclusion in the Workplace, (May 4, 2021), https://www.ansi.org/news/standards-news/all-news/2021/05/5-4-21-new-iso-standard-supports-diversity-and-inclusion-in-the-workplace; *See also* International Organization for Standardization, ISO 30415: Human Resource Management - Diversity and Inclusion (Jan. 2021) https://www.iso.org/obp/ui/#iso:std:iso:30414:ed-1:v1:en.

13

achieve D&I objectives pertaining to the D&I framework.[39] The standard suggests organizational leadership use this data, as well as workforce demographic data, to highlight progress on achieving D&I objectives in annual reports, and emphasizes the role that "identifying and analyzing diversity data" plays in effective D&I.[40]

### C. Many companies regulated by the FCC already release their EEO data but more is needed.

Many companies voluntarily release their employment statistics, including some broadcasters. Alphabet, Amazon, American Tower, AT&T, Comcast, Disney, eBay, Facebook, Microsoft, Netflix, Twitter, and Verizon all voluntarily publicly release their EEO-1 data. At the same time, many more companies do not. A study by Just Capital, found that 68 percent of the companies in the Russell 1000 Index (which represents the top 1000 companies by market capitalization in the United States) do not publicly release employment data.[41] DiversIQ, a leading private provider of DEI data and tracking, reported that "In 2019, only 13 S&P 100 companies and 24 S&P 500 companies publicly released their full EEO-1 data. As of today, those figures have climbed to 93 S&P 100 companies (another 1 committed to disclose this year) and 319 S&P 500 companies (19 committed to future disclosure)."[42] DivirsIQ reports that only 47.8 percent of companies it tracks in the  communications sector voluntarily report their EEO-1

---

[39] International Organization for Standardization, ISO 30415: Human Resource Management - Diversity and Inclusion (Jan. 2021) https://www.iso.org/obp/ui/#iso:std:iso:30414:ed-1:v1:en
[40] *Id.*
[41] Kavya Vaghul, "A Small Fraction of Corporations Share Diversity Data, but Disclosure is Rapidly on the Rise," Just Capital (Jan. 19, 2021), https://justcapital.com/news/a-small-fraction-of-corporations-share-diversity-data-but-disclosure-is-rapidly-on-the-rise/.
[42] DiversIQ EEO-1 Data: Summary, https://diversiq.com/dashboards/eeo1-insights/ (visited August 1, 2022).

data, whereas 66.7 percent of the information technology sector and 86.2 percent of utilities.[43] A

shareholder proposal at Charter Communications for the release of its EEO-1 data, disclosure of

the process for assessing the effectiveness of its diversity, equity and inclusion programs and the

efficacy assessment received over 40 percent of its shareholders' support in 2021.[44]

## IV.    The news media and broadcast and cable industries lack transparency and the data we have demonstrates a lack of representation.

### A.    Key data is less available than before.

Since 1978 the American Society of News Editors and its successor organization the

News Leaders Association (NLA) has collected demographic data on the news profession.

NiemanLab reported recently on the current state of the report:

> NLA said it reached out to thousands of news organizations and planned to have 2,500 print and online organizations participate. Meredith Clark, a professor at Northeastern University who has been the survey's lead researcher since 2018, told the Associated Press in October that her goal was to reach at least 1,500 responses in order to produce a statistically solid report. In the end, just 303 news organizations responded....[45]

The survey's director said, "What has become abundantly clear to me is that diversity can never

be a measure of goodwill. You don't get to transparency about diversity by relying on people's

goodwill…."[46]  The 2018 ASNE diversity survey analyzed by Pew Research Center had a

---

[43]  DiversIQ EEO-1 Data: Summary, https://diversiq.com/dashboards/eeo1-insights/ (visited August 1, 2022). A listing of the companies they track is available here: https://diversiq.com/dashboards/eeo1-disclosures/.

[44]  As You Sow, Proxy Preview 2022, at 55-56, https://www.proxypreview.org/.

[45]  Sarah Scire, "Crushing Resistance": Yet Again, Newsrooms Aren't Showing Up to the Industry's Largest Diversity Survey, NiemanLab (Apr. 12, 2022), https://www.niemanlab.org/2022/04/crushing-resistance-yet-again-newsrooms-arent-showing-up-to-the-industrys-largest-diversity-survey/.

[46]  *Id.*

15

historically low response rate of 17% in its 2018 survey.[47] Even surveys that are able to gather a stronger sample, such as the RTDNA/Newhouse School at Syracuse University Survey's higher response rate of 77 percent, are still missing some data.[48] Surveys that are based on voluntary participation from newsrooms are much more likely to fall short of capturing a complete image of newsroom diversity statistics than EEO data.

The cable industry has historically been more supportive of EEO data collection and commendably does its own study of employment statistics. Every other year the Walter Kaitz Foundation funds a survey, administered by Mercer. Maria Brennan, WICT President said, upon the release of the last study, "Knowing where women and people of color stand is step-one in ensuring progress."[49] As NCTA explained:

> The organizations that participated in the survey represent more than 75% of the industry workforce, and the data collected every two years has proven to be a critical component to the industry's diversity and inclusion efforts. WICT and NAMIC have been measuring cable workforce demographics for over a decade, and have used the study to form best practices around diversity and inclusion, to offer a variety of mentorship and professional development opportunities for women and people of color, and to create campaigns that promote a more diverse and inclusive workplace culture.[50]

Nonetheless, the NCTA data sets as its benchmark the performance in other parts of the industry, not a goal that would improve upon current performance.[51]

---

[47] 2018 Survey, News Leader Association (2018), https://members.newsleaders.org/diversity-survey-2018.

[48] Bob Papper, "Research: Local News Diversity Reaches Records, but Representation Gap Sinks Slowly, RTDNA (June 23, 2021), https://www.rtdna.org/article/research_local_news_diversity_reaches_records_but_representation_gap_shrinks_slowly.

[49] "Survey: Cable's Diversity Efforts Exceed National Benchmarks in Several Areas," NCTA, September 26, 2019, https://www.ncta.com/whats-new/survey-cables-diversity-efforts-exceed-national-benchmarks-in-several-areas.

[50] *Id.*

[51] *Id.*

**B.    Privately-produced reports demonstrate a need for data and evidence that the news and communications industries are not representative of the country's diversity.**

Members of the academy could use the data to produce reports if the data is public. For example, in 2003, a group of authors conducted a comprehensive analysis using the FCC's employment data.[52] Many other institutions prepare reports analyzing participation by various demographic groups in the media industries because the data is important for holding the industries accountable, but clear, company-specific data from the industries subject to FCC rules is lacking. In fact, Congress was forced to resort to a GAO study to obtain more information about the participation of Hispanics in the media industry.[53] Similarly, the Women's Media Center had to aggregate research from academia, industry and professional groups, labor unions, media watchdogs, newsrooms, and other sources in order to find data on women in the media workforce.[54] The existence of these reports despite limited data reveals that members of the academy would utilize the FCC's employment data if it were to be publicly reported. Other academics that have produced reports addressing media diversity outside of broadcasting, such as UCLA's 2021 Hollywood Diversity Report, may be enticed to conduct research on broadcast data if it was readily available from the FCC.[55] Furthermore, their analysis would help generate a

---

[52] Dwight E. Brooks, et al., *Television in Living Color: Racial Diversity in the Local Commercial Television Industry*, The Howard Journal of Communications,14:123-146 (2003).

[53] U.S. Government Accountability Office, Workforce Diversity: Analysis of Federal Data Shows Hispanics Are Underrepresented in the Media Industry, GAO-21-105322 (Sept. 2021), https://www.gao.gov/assets/gao-21-105322.pdf.

[54] Women's Media Center, The Status of Women in the U.S. Media 2021, https://womensmediacenter.com/reports/the-status-of-women-in-the-u-s-media-2021-1; Frances Negrón-Muntaner, Columbia Center for the Study of Ethnicity and Race (2016), https://asit-prod-web1.cc.columbia.edu/cser/wp-content/uploads/sites/70/2020/03/The-Latino-Disconnect.pdf.

[55] *E.g.*, UCLA College Division of Social Sciences, UCLA Hollywood Diversity Report, Part 2: Television, https://socialsciences.ucla.edu/wp-content/uploads/2021/10/UCLA-Hollywood-Diversity-Report-2021-Television-10-26-2021.pdf;

public response that calls for more accountability for specific companies to examine biases within their hiring process and seek to improve their numbers in future years.

The findings of existing research indicate there are large issues of diversity in newsrooms, further justifying our call to make FCC employment data publicly available. Research by Pew Research Center reveals that newsroom employees are less diverse than U.S. workers across sectors, as 77 percent of newsroom employees are non-Hispanic whites and 61 percent are men.[56] Smaller news outlets are even less diverse, as ethnic minorities only make up 22 percent of the local television news workforce and only 13 percent of daily newspaper employees.[57] According to the Asian American Journalist Association while nearly half (48.3%) of the AAPI population in the U.S. lives in the top 20 designated market areas, 25% of the stations had no AAPIs on air and 70% of local TV stations did not have a proportion of on-air staff compared to the local AAPI population.[58] These alarming statistics reflect biases within the newsrooms' hiring process that inhibit newsrooms from reflecting the diversity of our nation, as minorities with undergraduate degrees in journalism and communications are 17 percent less likely to find a full-time newsroom position within a year of graduation.[59] Furthermore, Broadcasting and Telecommunications is the 10th ranked industry with respect to the

---

[56] Elizabeth Grieco, "Newsroom Employees are Less Diverse than U.S. Workers Overall," Pew Research Center (Nov. 2, 2018), (https://www.pewresearch.org/fact-tank/2018/11/02/newsroom-employees-are-less-diverse-than-u-s-workers-overall/.

[57] Michael Barthel, "In the News Industry, Diversity is Lowest at Smaller Outlets," (Aug. 4, 2015), https://www.pewresearch.org/fact-tank/2015/08/04/in-the-news-industry-diversity-is-lowest-at-smaller-outlets/.

[58] Daniella Ignacio, "AAJA Broadcast Snapshot Finds Underrepresentation of AAPIs in Local TV News in Top 20 Media Markets, AAJA (May 4, 2022), https://www.aaja.org/2022/05/04/aaja-broadcast-snapshot-finds-underrepresentation-of-aapis-in-local-tv-news-in-top-20-media-markets/.

[59] Michael Barthel, "In the News Industry, Diversity is Lowest at Smaller Outlets," (Aug. 4, 2015), https://www.pewresearch.org/fact-tank/2015/08/04/in-the-news-industry-diversity-is-lowest-at-smaller-outlets/.

employment of African American women overall according to a 2003 EEOC report on minority women in the workforce.[60] This lack of diversity is particularly concerning as reports indicate that Black and Hispanic viewers are an increasing share of the newsroom audience.[61] These findings indicate that it is likely the data would reveal significant issues of diversity within newsrooms.

**V.     Collecting and publishing data is constitutional.**

      **A.     The FCC must collect EEO data and it is constitutional to do so.**

As the Leadership Conference explained to the Commission, "No court has seriously questioned the constitutionality of demographic employment data collection."[62] For example, the U.S. Court of Appeals for the Second Circuit summarily dismissed constitutional challenges to such data collection in *Caulfield v. Bd. of Ed. of City of New York*, writing that "the Constitution itself does not condemn the collection of [demographic] data."[63] Demographic data collection has been approved when requiring states to comply with EEOC rules,[64] when implementing diversity and inclusion efforts in federal employment,[65] in collecting data in the U.S. Census.[66]

---

[60] Women of Color: Their Employment in the Private Sector, U.S. Equal Employment Opportunity Commission (2003), https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/statistics/reports/womenofcolor/womenofcolor.pdf.

[61] Hispanic and Black News Media Fact Sheet, Pew Research Center (July 27, 2021), https://www.pewresearch.org/journalism/fact-sheet/hispanic-and-black-news-media/.

[62] Comments of the Leadership Conference on Civil and Human Rights, Review of EEO Compliance and Enforcement in Broadcast and Multichannel Video Programming Industries, MB Docket 19-177; Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies, MB Docket 98-204, at 2 (Nov. 4, 2019).

[63] *Caulfield*, 583 F.2d at 611-12.

[64] *U.S. v. New Hampshire*, 539 F.2d 277 (1st Cir. 1976).

[65] *Sussman v. Tanoue*, 39 F.Supp. 2d 13 (D.D.C. 1999).

[66] *Department of Commerce v. New York*, 139 S.Ct. 2551, 2567 (2019).

The First Circuit concluded collecting demographic employment data "is both reasonable and fully consistent" with the goal of "achiev[ing] equality of employment opportunities and remov[ing] barriers that have operated in the past."[67]  As Justice Kennedy explained in his concurrence which tipped the balance in *Parents Involved*, "it is permissible to consider … racial makeup … and to adopt general policies to encourage" a diverse racial composition.[68]

Even if the FCC were not obligated to collect this data under the EEO obligations, it would be permitted to collect the data pursuant to its authority under the Communications Marketplace Report and the market entry barriers provisions of the Communications Act.[69] As advocates for a new content diversity vendor report recently explained, the FCC has ample authority to monitor the equity and metrics of the whole communications sector.[70]

### B.     *MD/DC/DE Broadcasters* is an outlier and not consistent with current facts.

As UCC Media Justice recently explained on the record, the two decisions overturning the FCC's prior EEO rules are no bar to the request here: to collect and publish demographic employment data, a finding that the Commission already adopted.[71] In both of those decisions, the D.C. Circuit criticized the Commission because it used the statistics in its decision-making

---

[67] *Id.* at 280 (quoting *Griggs v. Duke Power Co.*, 401 U.S 424, 429-30 (1971)).

[68] *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 788 (2007) (Kennedy, J. concurring in part).

[69] 47 U.S.C. §163, §257.

[70] Petition for a Content Diversity Vendor Report, MB Docket 22-209 at 15-17, https://www.fcc.gov/ecfs/search/search-filings/filing/105250998318693.

[71] Cheryl A. Leanza, United Church of Christ Media Justice Ministry, ex parte letter (March 9, 2022), MB Docket 98-204, https://www.fcc.gov/ecfs/search/search-filings/filing/1031038814390.

during license renewal and as a predicate for investigations and particularly because it found the race and sex of *applicants* to be an inappropriate measure for enforcement decisions.[72]

While *MD/DC/DE Broadcasters* is an essential element of the FCC's analysis, it is important to understand this decision lies on the outer edge of the widely accepted understanding of the use of quotas. *MD/DC/DE Broadcasters* was premised on the court's *surmise* about broadcaster response when the FCC indicated it would *open an investigation* (not make a finding of a rule violation) based on employment *application* data. The court found "If a licensee reports 'few or no' women and minorities in its applicant pool, then the Commission will investigate the broadcaster's recruitment efforts."[73]

There was *no* factual showing that the threat of an investigation (not the threat of action based on an infraction) was having the impact broadcasters claimed. For example, in 1979, a law review note described the extreme difficulties parties faced in their effort to make a *prima facia* case of employment discrimination sufficient to successfully mount a challenge in a license renewal proceeding.[74] If the D.C. Circuit were correct that the FCC's ability to open an investigation was such a strong influence on employment practices in broadcasting, one would expect that broadcasting would have been highly integrated at the time the FCC's rules were in place. It was not.[75]

---

[72] *MD/DC/DE Broadcasters Ass'n v. Federal Communications Commission*, 253 F.3d 732, 734 n.1 (D.C. Cir. 2001) (noting when denying rehearing the court's particular concern with "the race and sex of applicants [as a] measure of compliance.").

[73] *MD/DC/DE Broadcasters Ass'n v. Federal Communications Commission*, 236 F.3d 13, 19-20 (D.C. Cir. 2001).

[74] Glenda G. Leatherman, *Employment Discrimination in Television Broadcasting: A Study of FCC and EEOC Concurrent Jurisdiction*, 2 Hastings Comm. & Ent. L.J. 125 (1979), Available at: https://repository.uchastings.edu/hastings_comm_ent_law_journal/vol2/iss1/4.

[75] https://www.eeoc.gov/special-report/executive-summary-broadcasting.

The FCC had been clear for many years that "only a 'highly disproportional representation of minorities or women employed by a licensee in relation to their presence in the work force would constitute prima facie evidence of discriminatory practices.'"[76] For example, the FCC "assured broadcasters that although it would require the yearly submission of employment statistics in Form 395, such statistics alone would not be determinative of the issue of employment discrimination. The FCC has firmly maintained its position that statistics alone do not compromise a prima facie case of employment discrimination."[77] Moreover, the FCC maintained its data collection and relatively robust rules with regard to investigations during the 1970s and some of the 1980s, and yet there is no evidence that employment in broadcasting has remotely approached diversity that would have resulted if broadcasters took local population demographics as a mandatory quota to receive license renewal. The argument that license renewals are threatened by FCC data collection is even less credible given that, since 1996, Congress has directed the FCC to renew licenses without considering whether another licensee could better serve the public interest.[78] The FCC's practice is to almost never deny a license renewal[79] and to permit stations to operate without license renewal for as long as a full eight-year

---

[76] Evening Star Broadcasting Co., 27 F.C.C.2d 316 (1971), aff'd sub nom. Chuck Stone v. FCC, 466 F.2d 316, 322, reh. denied 466 F.2d 331 (D.C. Cir. 1972).

[77] Glenda G. Leatherman, *Employment Discrimination in Television Broadcasting: A Study of FCC and EEOC Concurrent Jurisdiction*, 2 Hastings Comm. & Ent. L.J. 125 (1979), https://repository.uchastings.edu/hastings_comm_ent_law_journal/vol2/iss1/4.

[78] 47 U.S.C. § 309(k).

[79] For example, when in 2017 and 2018 the FCC began enforcing the law which automatically cancels broadcast licenses if the licensee has been off-air for a year, a leading broadcast practitioner noted it seemed "unprecedented." David Oxenford, Broadcast Law Blog, "FCC To Hold Hearing to Determine Whether to Deny License Renewal of Radio Station that was Silent for Most of its License Term," (Aug. 14, 2017), https://www.broadcastlawblog.com/2017/08/articles/fcc-to-hold-hearing-to-determine-whether-to-deny-license-renewal-of-radio-station-that-was-silent-for-most-of-its-license-term/.

license term.[80] The FCC has only one Administrative Law Judge[81] to consider licenses

designated for hearing because there are so few.[82]

Moreover, the decision held that because a station's recruitment budget is finite, an

obligation to recruit minorities and women could divert some recruitment resources in a manner

that could deprive white people of the benefit of being recruited.[83]  The bottom line of this ruling

is remarkable, particularly given the primacy of online recruiting today: could it credibly be

argued that a company is permitted to focus its recruitment resources on whites at the expense of

people of color because it is too expensive or burdensome to recruit everyone evenhandedly?[84]

The FCC should be careful to interpret *MD/DC/DE Broadcasters* narrowly and not

accede to questionable efforts to extend it.

---

[80] *See*, for example, UCC OC Inc.'s petition to deny based on a detailed and well-documented
claim that the licensee violated the Commission's children's television rules which was filed in
2005 and not addressed until 2015. United Church of Christ, OC Inc., Petition to Deny
Application of Renewal of Broadcast Station License of Raycom National, Inc. WUAB, Lorain,
OH: File No. BRCT-20050527BIO (filed Aug. 31, 2005); Letter from Barbara Esbin to Angela
Campbell, counsel for UCC OC Inc., 30 FCC Rcd. 1978 (2015).
[81] Administrative Law Judges, Federal Communications Commission,
https://www.fcc.gov/administrative-law-judges.
[82] Sarah Barry James, "An Uncertain Future for Administrative Law Judges at the FCC," *S&P
Global Market Intelligence (2018),* https://www.spglobal.com/marketintelligence/en/news-
insights/latest-news-headlines/an-uncertain-future-for-administrative-law-judges-at-the-fcc-
45023576.
[83] *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d at 20-21.
[84] *See, e.g.*, Department of Justice, Justice Department Secures Groundbreaking Settlement
Agreement with Meta Platforms, Formerly Known as Facebook, to Resolve Allegations of
Discriminatory Advertising (June 21, 2022), https://www.justice.gov/opa/pr/justice-department-
secures-groundbreaking-settlement-agreement-meta-platforms-formerly-known.

23

## VI.    The FCC should adopt the pending nine diversity proposals.

In their September 29, 2021 Comments, the EEO Supporters group of 38 organizations

led by MMTC confirmed their endorsements of the following nine proposals (the "Nine

Proposals"), some of which have been pending since 2004:

1. Requiring certifications that job postings preceded hiring decisions.[85]
2. Auditing reform, which includes increasing audit frequency and randomly selecting some audited units for more thorough review encompassing applicant interviewing and employee selection.[86]
3. Auditing of employment units that received EEOC probable cause determinations.[87]
4. Opening a fact-finding, non-content-based investigation under 47 U.S.C. §403 into the abysmal levels of minority employment in radio news.[88]

---

[85] *See* Comments of EEO Supporters at 2 & n.8, *Review of EEO Compliance and Enforcement in MB Docket No. 19-177 and MM Docket 98-201 (September 21, 2021)* ("*2021 EEOS Comments*"); *see also* Erik Ortiz, *The 'Rooney Rule' was Supposed to Solve the NFL's Hiring Issue. The Numbers Show the Problem Runs Deep.*, NBC News (Feb. 4, 2022), https://www.nbcnews.com/news/sports/rooney-rule-was-going-solve-nfls-hiring-issue-numbers-show-problem-run-rcna14569 (reporting that the Oakland Raiders' owner admitted that the team had already agreed hire Jon Gruden, who is white, as head coach of the then-Oakland Raiders before interviews with any candidates of color were conducted.)  This kind of common behavior could be disincentivized or eliminated by requiring certifications that job postings preceded hiring decisions.

[86] *See* 2021 EEOS Comments at 2 and the previous filings referenced therein at n. 9.  Presently, annual audits are performed only on job recruitment, and on only 5% of the reporting units. *See* FCC, Enforcement Bureau Commences 2022 EEO Audits, DA 22-275, https://www.fcc.gov/sites/default/files/2022_audit_pn_letter.pdf (Mar. 21, 2022).

[87] *See* 2021 EEOS Comments at 2 and the previous filings referenced therein at n. 10.  A reporting unit that has received an EEOC probable cause determination is highly likely to have violated the equal employment laws. *See* Jamie Goetz, *Whose Opinion Really Matters? Admitting EEOC Reasonable Cause Determinations as Evidence of Discrimination*, 76 U. Cin. L. Rev. 995 (2008); *see also*, Michael D. Moberly, *The Admissibility of EEOC and Arizona Civil Rights Division Determinations in State Court Employment Discrimination Litigation*, 33 Ariz. St. L.J. 265 (2001) ("If, upon completion of its investigation, the EEOC concludes that discrimination prohibited by Title VII or another federal statute has occurred, it issues what is commonly known as a 'reasonable cause' determination. This determination is not a finding that the employer has acted unlawfully, but rather a tentative conclusion 'that preliminarily there is reason to believe that a [statutory] violation has taken place.' The EEO agencies in several states, including Arizona, follow similar procedures.").

[88] *See* 2021 EEOS Comments at 2 and the previous filings referenced therein at n. 11.  Section 403 is designed for non-punitive fact-finding.  It provides that "[t]he Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of this chapter, or concerning which any question may arise under

24

5. Providing whistleblower protections, including a confidential phone number and protections against retaliation **[unopposed].**[89]
6. Developing and disseminating compliance tools, such as an EEO Primer, Best Practices, FAQs, and Model EEO Programs **[unopposed].**[90]
7. Extending EEO scrutiny to cover promotion, retention, training, and mentoring.[91]

_____

any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter." 47 U.S.C. §403. Section 403 was affirmed in *Stahlman v. FCC*, 126 F.2d 124, 128 (D.C. Cir. 1942) (holding that "the Commission's right to grant licenses or to revoke licenses in the public interest, and likewise to make rules and regulations necessary to the carrying out of the provisions of the Act, implies the grant of all means necessary or appropriate to the discharge of the powers expressly granted."); and in *FCC v. Schreiber*, 201 F. Supp. 421 (S.D. Cal. 1962), modified, 329 F.2d 517 (9th Cir. 1964), modified, 381 U.S. 279, 291-92 (1965) (holding that "the Commission's procedural rule -- requiring public proceedings except where it is shown that the public interest, the dispatch of business, or the ends of justice would be served by nonpublic sessions -- was well within the Commission's power. Grants of agency authority comparable in scope to §4 (j) of the Communications Act as amended (47 U.S.C. §154(j)) have been held to authorize public disclosure of information, or receipt of data in confidence, as the agency may determine to be proper upon a balancing of the public and private interests involved. That §4 (j) is broad enough to empower the Commission to establish standards for determining whether to conduct an investigation publicly or in private….").

[89] *See* 2021 EEOS Comments at 3 and the previous filing referenced at n. 12. Fortunately, the FCC has vast and successful experience fielding consumer and whistleblower complaints, such as those that respond to unlawful robocalls. *See* Special Report on Robocall Scourge, Communications Daily, Apr. 26, 2022) (subscription required), p. 3 ("[t]he FCC said all its robocall and spoofing investigations involve the use of consumer complaints[.]").

[90] *See* 2021 EEOS Comments at 3 and the previous filing referenced therein at n. 13. In 2004, the Advisory Committee on Diversity for Communications in the Digital Age (predecessor to the current Communications Equity and Diversity Council (CEDC)) recommended revisions to the broadcast and cable, and multichannel video EEO rules to include training and mentoring. *See* Recommendation for a Regulatory Initiative for Career Advancement, Advisory Committee on Diversity for Communications in the Digital Age, Dec. 10, 2004) (archived on FCC.gov), https://www.fcc.gov/diversity-committee-adopted-recommendations.

[91] *See* 2021 EEOS Comments at 3 and the previous filing referenced therein at n. 14. Discrimination can occur at each of these and other personnel points of engagement, and the EEO Rule implicitly recognizes that discrimination can occur at each of several personnel points of engagement. *See* 47 C.F.R. §73.2080(b), which requires each broadcast station to "establish, maintain, and carry out a positive continuing program of specific practices designed to ensure equal opportunity and nondiscrimination in every aspect of station employment policy and practice." A licensee must:

"(1) Define the responsibility of each level of management to ensure vigorous enforcement of its policy of equal opportunity, and establish a procedure to review and control managerial and supervisory performance;

"(2) Inform its employees and recognized employee organizations of the equal employment opportunity policy and program and enlist their cooperation;

25

8. Collaborate with the Department of Labor and the EEOC to ensure that each agency's EEO enforcement measures apply equitably across the communications and technology sectors. **[unopposed]**.[92]

9. Consolidating all anti-discrimination compliance and regulatory enforcement (to include advertising, transactional, procurement and employment discrimination) in a new Civil Rights Section of the Enforcement Bureau **[unopposed].[93]**

Eight of the Nine Proposals (numbered 2, 3, 4, 5, 6, 7, 8, and 9) may be granted now.

MMTC and the proposals' supporters have explained that the Proposals numbered 5, 6, 8, and 9 above are unopposed and are grantable without the need for a notice and comment proceeding, as they relate only to agency management and operations. They explain that the Proposals numbered 2, 3, 4, and 7 are not the objects of strong opposition, and they do not require a notice and comment proceeding, as they also relate only to agency management and operations.

Further, Proposal #1 (requiring certifications that job postings preceded hiring decisions) would require a round of public comment. Such a comment round should be opened promptly by an expedited Further Notice of Proposed Rulemaking whose goal would be the production of a comprehensive Further Report and Order before the end of 2022.

---

"(3) Communicate its equal employment opportunity policy and program and its employment needs to sources of qualified applicants without regard to race, color, religion, national origin, or sex, and solicit their recruitment assistance on a continuing basis;

"(4) Conduct a continuing program to exclude all unlawful forms of prejudice or discrimination based upon race, color, religion, national origin, or sex from its personnel policies and practices and working conditions; and

"(5) Conduct a continuing review of job structure and employment practices and adopt positive recruitment, job design, and other measures needed to ensure genuine equality of opportunity to participate fully in all organizational units, occupations, and levels of responsibility."

[92] *See* 2021 EEOS Comments at 2 and the previous filings referenced therein at n. 15.

[93] *See* 2021 EEOS Comments at 3 and the previous filings referenced therein at n. 16.

26

The Leadership Conference has also requested that the FCC create a Civil Rights Office that would include some of the functions proposed for a division of enforcement within the Enforcement Bureau by MMTC and its supporters.[94]

## VII. Conclusion

The FCC should adopt rules requiring all broadcasters, cable operators and other MVPDs to file their EEO-1 data publicly at the Commission within the next six months and obtain OMB approval within one year so that the data will be collected in 2023. The FCC should adopt the nine diversity proposals on a similar timetable, prioritizing the easiest to implement.

---

[94] Letter from Wade Henderson and Jesselyn McCurdy, The Leadership Conference on Civil and Human Rights to Chair Jessica Rosenworcel, FCC (March 14, 2022), https://www.fcc.gov/ecfs/search/search-filings/filing/104292431509372.

27

Tab 4

March 9, 2022

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

Re:     MB Docket No.98-204, notice of *ex parte* communication

Dear Ms. Dortch:

I write partially to document a conversation that I held with Radhika Karmarkar of the Media Bureau and partially to respond to the National Association of Broadcasters (NAB) recent ex parte in this docket dated February 23, 2022. The NAB states that it "shares the Commission's goal to improve employment diversity in the broadcasting industry," but that there is no purpose to collecting equal employment data.[1] To the contrary, it is impossible to improve something without measuring it. Or as James Baldwin said, "Not everything that is faced can be changed, but nothing can be changed until it is faced." Without data, neither broadcasters nor the FCC nor the public can know whether broadcasters and the Commission have achieved their goal of improving employment diversity in the broadcasting industry. The purpose of the data is to know whether more work is needed, whether existing tools and policies are working and to understand successes and failures so that the Commission and the broadcast industry can increase their success and reduce their failures.

The NAB claims that "[w]hile Form 395-B may have at one time been an effective tool to address employment diversity, Supreme Court decisions have rendered the Commission's ability to use such data in that manner unlawful."[2] Although the NAB does not cite a Supreme Court opinion, in reading the NAB's prior comments in this docket, it appears the NAB is referring to two decisions of the U.S. Court of Appeals for the D.C. Circuit, *Lutheran Church* and *MD/DC/DE Broadcasters*.[3] Those decisions, however, as the Leadership Conference on Civil and Human Rights explained multiple times, and has the Commission has already concluded, *are no bar to the collection and dissemination of statistics*.[4] In both of those decisions, the D.C. Circuit criticized the Commission because it used the statistics in its decision-making during license renewal and as a predicate for investigations. Specifically, in *MD/DC/DE Broadcasters*, the court pointed out its concern with the use of data in particular decisions regarding particular broadcasters:

[1] Letter from Rick Kaplan, National Association of Broadcasters to Marlene Dortch, Secretary, FCC, MB Docket No. 98-204 (filed Feb. 23, 2022).
[2] *Id.*
[3] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998); *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001).
[4] Leadership Conference on Civil and Human Rights, MB Docket No. 19-177, MB Docket No. 98-204 at 2-3 (November 4, 2019) (*Leadership Conference 2019 Comments*) (citing *Caulfield v. Bd. Of Ed. Of City of New York*, 583 F.2d 605 (2d Cir. 1978); *U.S. v. New Hampshire*, 539 F.2d 277 (1st Cir. 1976); *Berkley v. United States*, 48 Fed. Cl. 361, 378–79 (2000)); Leadership Conference on Civil and Human Rights, MB Docket No. 19-177, MB Docket No. 18-23 at 1-2 (June 21, 2018) (citing *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Third Report & Order and Fourth NPRM, 19 FCC Rcd 9973 (2004)).

The Commission made clear, moreover, in adopting the rule, that "[i]f the data collected does [sic] not confirm that notifications are reaching the entire community, we expect a broadcaster to modify its program as warranted so that it is more inclusive." RO at ¶ 104. In determining whether recruitment efforts have reached the "entire community," the Commission considers the number of women and minorities in the applicant pool. If a licensee reports "few or no" women and minorities in its applicant pool, then the Commission will investigate the broadcaster's recruitment efforts. Id. at ¶ 120. …. [T]he Commission promises to investigate any licensee that reports "few or no" applications from women or minorities. Investigation by the licensing authority is a powerful threat, almost guaranteed to induce the desired conduct.[5]

The concern by the D.C. Circuit was an impression by broadcasters that if a broadcaster's employment application data demonstrated that women and people of color did not apply for jobs, the FCC would investigate that broadcaster. In *Lutheran Church* the concern was the FCC's decision to process license renewal applications via different mechanisms depending on whether employment data was in line with local demographic data.[6] *In neither case did the D.C. Circuit eliminate the ability of the FCC to collect the publish data.* Moreover, as explained in detail in prior filings by the Leadership Conference, other courts confronted with similar facts to those cases have found data collection to pass constitutional muster.[7]

The NAB also expresses concern that the FCC has never used employment data to issue reports to the public or Congress. Clearly the FCC could easily remedy that concern by issuing the reports. Moreover, if the FCC were to require all broadcasters complete their 395 forms and make them public, the public would not need to wait for FCC reports. The FCC would be required to do nothing and there would be no pressure, implied or otherwise, from the FCC with respect to broadcaster employment trends. For the FCC to merely release and total employment data would allow the court of public opinion to render its judgment—judgment that the NAB's clearly seeks to avoid by suppressing its members' employment data.

The efficacy of releasing employment data is clear. As the Leadership Conference explained previously, many firms also voluntarily release employment data because it is one of the simplest ways to hold themselves accountable for their commitments to improve workplace diversity.[8] Several large broadcast owners—Comcast and Disney—also voluntarily release their EEO-1 data.[9] The burden is modest compared with its benefits. Common carriers must current submit, publicly, their EEO data to the Commission. Carriers large and small comply with this obligation.[10]

---

[5] *MD/DC/DE Broadcasters Ass'n v. Federal Communications Commission*, 236 F.3d 13, 19 (D.C. Cir. 2001).

[6] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998).

[7] *E.g., Leadership Conference 2019 Comments* (citing and analyzing *Sussman v. Tanoue*, 39 F.Supp. 2d 13 (D.D.C. 1999)).

[8] Leadership Conference on Civil and Human Rights, MB Docket No. 19-177, MB Docket No. 98-204, at 2 (Sept. 30, 2021).

[9] Disney EEO-1 Form, https://impact.disney.com/app/uploads/2022/02/EEO-1-Report-2020.pdf; Comcast EEO-1 Form, https://cmcsa.gcs-web.com/static-files/1d6d3ef6-d2d4-4c13-b452-7917b90e0032.

[10] FCC WC Docket 16-233 includes filings from small companies such as Big Bend Telecom, Northeast Missouri Rural Telephone Company and more. A few of the largest carriers which inexplicably request confidential treatment of Form 395 FCC submissions also voluntarily release their EEO-1 data publicly on their websites. Verizon Common Carrier Annual Employment Report, FCC Form 395, https://ecfsapi.fcc.gov/file/1052884638913/EEO%20report%202021%20redacted%20version.p

UCC Media Justice Ministry urges the Commission to take prompt action in the docket and looks forward to working with the Commission as it considers the question in this docket.

Sincerely,

Cheryl A. Leanza
Policy Advisor

# 2020 EEO-1 Data

The table below reflects information contained in EEO-1 reports filed for Comcast Corporation and its consolidated subsidiaries with respect to 2020. The U.S. Equal Employment Opportunity Commission (EEOC) mandates the use of federally mandated job categories that differ from how we organize our U.S. workforce. To learn more about our Diversity, Equity and Inclusion (DE&I) efforts and our DE&I reporting based on our own workforce categorizations, please see our 2021 Impact Report, 2021 Impact Data Infographic and the DE&I section of our website.

| Job Categories | Hispanic or Latino | | Not Hispanic or Latino | | | | | | | | | | | | | | Overall Totals |
| | | | MALE | | | | | | | FEMALE | | | | | | | |
| | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | American Indian or Alaskan Native | Two or More Races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | American Indian or Alaskan Native | Two or More Races | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive/ Senior Level Officials and Managers | 45 | 20 | 902 | 59 | 2 | 69 | 2 | 10 | 437 | 42 | 0 | 41 | 2 | 10 | | 1,641 |
| First/Mid-Level Officials and Managers | 1,248 | 762 | 8,896 | 1,452 | 27 | 985 | 46 | 243 | 5,076 | 1,235 | 25 | 612 | 21 | 207 | | 20,835 |
| Professionals | 1,710 | 1,601 | 9,519 | 1,154 | 49 | 2,528 | 49 | 334 | 5,415 | 1,133 | 27 | 1,378 | 19 | 343 | | 25,259 |
| Technicians | 1,634 | 147 | 6,783 | 1,447 | 23 | 347 | 45 | 158 | 479 | 162 | 2 | 56 | 6 | 26 | | 11,315 |
| Sales workers | 944 | 707 | 3,240 | 958 | 33 | 272 | 24 | 234 | 2,060 | 913 | 22 | 138 | 23 | 207 | | 9,775 |
| Administrative Support Workers | 1,579 | 2,070 | 5,081 | 2,770 | 40 | 368 | 42 | 466 | 6,023 | 5,721 | 49 | 459 | 44 | 715 | | 25,427 |
| Craft workers (skilled) | 2,464 | 156 | 8,473 | 3,885 | 78 | 541 | 89 | 417 | 523 | 297 | 3 | 17 | 5 | 52 | | 17,000 |
| Operatives (semi-skilled) | 241 | 72 | 631 | 251 | 6 | 39 | 6 | 49 | 122 | 63 | 0 | 15 | 3 | 7 | | 1,505 |
| Laborers (unskilled) | 211 | 34 | 1,077 | 237 | 3 | 16 | 7 | 32 | 104 | 35 | 1 | 2 | 1 | 4 | | 1,764 |
| Service workers | 2,807 | 2,865 | 4,363 | 1,557 | 44 | 317 | 41 | 606 | 4,298 | 1,697 | 31 | 310 | 35 | 660 | | 19,631 |
| Grand Total | 12,883 | 8,434 | 48,965 | 13,770 | 305 | 5,482 | 351 | 2,549 | 24,537 | 11,298 | 160 | 3,028 | 159 | 2,231 | | 134,152 |

COMCAST

JA99

# 2020 EEO-1 Report

The EEO-1 report captures data in a manner and in categories prescribed by the U.S. government. For information and data that reflects Disney's workforce in a way we believe is more instructive, please visit our Reimagine Tomorrow website

CO=108471-2
U=108471-2
NAICS= 713110

EQUAL EMPLOYMENT OPPORTUNITY
2020 EMPLOYER INFORMATION REPORT EEO-1
ESTABLISHMENT REPORT - TYPE 2

-9999  -9999

SECTION B - COMPANY INFORMATION

2a. WALT DISNEY COMPANY THE

1. THE WALT DISNEY COMPANY
500 S. BUENA VISTA STREET
BURBANK        LOS ANGELES
CA 91521

500 South Buena Vista Street CC
Burbank        LOS ANGELES
CA        91521

b. EI = 954545390

c. Y  (WAS AN EEO-1 REPORT FILED FOR
THIS ESTABLISHMENT LAST YEAR?)

SECTION C - TEST FOR FILING REQUIREMENT

1 - Y    2 - : Y    3 - N    DUNS NO:

SECTION E - ESTABLISHMENT INFORMATION

1 - NAICS=AMUSEMENT AND THEME PARKS

| | | Hispanic or Latino | | Not-Hispanic or Latino | | | | | | | | | | | | | Total Col A-N |
| | | | | Male | | | | | | Female | | | | | | | |
| | JOB CATEGORIES | Male | Female | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian | American Indian or Alaska Native | Two or more races | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian | American Indian or Alaska Native | Two or more races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| 0 | Exe/Snr Level Officials & Mgrs | 11 | 14 | 335 | 18 | 0 | 15 | 0 | 2 | 185 | 14 | 0 | 22 | 0 | 2 | 618 |
| 1 | 1st/Mid Level Officials & Mgrs | 1058 | 968 | 8022 | 479 | 39 | 1017 | 26 | 171 | 5953 | 514 | 33 | 1022 | 23 | 181 | 19506 |
| 2 | Professionals | 1437 | 1146 | 8050 | 775 | 67 | 1384 | 21 | 305 | 5610 | 633 | 36 | 1407 | 30 | 329 | 21230 |
| 3 | Technicians | 283 | 135 | 1375 | 153 | 4 | 92 | 6 | 26 | 388 | 41 | 5 | 29 | 3 | 9 | 2549 |
| 4 | Sales Workers | 512 | 1910 | 959 | 90 | 6 | 95 | 4 | 41 | 2439 | 250 | 20 | 272 | 23 | 112 | 6733 |
| 5 | Office and clerical | 615 | 1513 | 1839 | 198 | 5 | 132 | 8 | 70 | 4396 | 570 | 29 | 384 | 20 | 181 | 9960 |
| 6 | Craft Workers (Skilled) | 1136 | 188 | 2238 | 274 | 14 | 148 | 16 | 52 | 346 | 47 | 2 | 9 | 1 | 10 | 4481 |
| 7 | Operatives (semi-skilled) | 653 | 329 | 1329 | 286 | 4 | 75 | 6 | 29 | 406 | 249 | 4 | 85 | 3 | 13 | 3471 |
| 8 | Laborers (unskilled) | 153 | 59 | 218 | 26 | 0 | 13 | 2 | 5 | 279 | 2 | 0 | 10 | 0 | 5 | 772 |
| 9 | Service workers | 6799 | 9074 | 8263 | 2281 | 187 | 1263 | 59 | 417 | 9637 | 3302 | 254 | 1223 | 78 | 537 | 43374 |
| 10 | TOTAL | 12657 | 15336 | 32628 | 4580 | 326 | 4234 | 148 | 1118 | 29639 | 5622 | 383 | 4463 | 181 | 1379 | 112694 |
| 11 | PREVIOUS YEAR TOTAL | 17231 | 21550 | 40037 | 5423 | 435 | 5099 | 194 | 1500 | 38820 | 6686 | 509 | 5350 | 234 | 1885 | 144953 |

COMMENTS/REMARKS:

* OTHER QUESTIONS *

1 - 12/27/2020 DATE OF PAYROLL PERIOD USED

JA101

CO=  H000017
u=  H000017

EQUAL EMPLOYMENT OPPORTUNITY
2020 Employer Information Report EEO-1
Case: 24-60219, Document: 64, Date Filed: 10/18/2024
CONSOLIDATED REPORT

## SECTION B - COMPANY IDENTIFICATION

1.  VERIZON CORPORATE
1095 AVE OF THE AMERICAS
NEW YORK, NY 10036

2.a.  VERIZON CORPORATE
1095 AVE OF THE AMERICAS
NEW YORK, NY 10036

c.  EIN= 131675522

## SECTION C - TEST FOR FILING REQUIREMENT

1-Y  2-Y  3-Y    DUNS= 101137586

## SECTION E - ESTABLISHMENT INFORMATION

NAICS: 551114 - Corporate, Subsidiary, and Regional Managing Offices

## SECTION D - EMPLOYMENT DATA

| JOB CATEGORIES | HISPANIC OR LATINO | | NOT-HISPANIC OR LATINO | | | | | | | | | | | | OVERALL TOTALS |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | ********** MALE ********** | | | | | | ********** FEMALE ********** | | | | | | |
| | MALE | FEMALE | WHITE | BLACK OR AFRICAN AMERICAN | NATIVE HAWAIIAN OR PACIFIC ISLANDER | ASIAN | AMERICAN INDIAN OR ALASKAN NATIVE | TWO OR MORE RACES | WHITE | BLACK OR AFRICAN AMERICAN | NATIVE HAWAIIAN OR PACIFIC ISLANDER | ASIAN | AMERICAN INDIAN OR ALASKAN NATIVE | TWO OR MORE RACES | |
| EXECUTIVE/SR OFFICIALS & MGRS | 21 | 4 | 187 | 15 | 0 | 47 | 1 | 2 | 86 | 22 | 0 | 25 | 0 | 4 | 414 |
| FIRST/MID OFFICIALS & MGRS | 1142 | 723 | 8204 | 1297 | 34 | 1700 | 51 | 266 | 4371 | 1220 | 22 | 807 | 24 | 181 | 20042 |
| PROFESSIONALS | 1183 | 771 | 8948 | 1274 | 43 | 4372 | 80 | 276 | 4410 | 1373 | 23 | 1819 | 44 | 227 | 24843 |
| TECHNICIANS | 616 | 128 | 4167 | 763 | 35 | 657 | 45 | 151 | 701 | 273 | 7 | 203 | 12 | 30 | 7788 |
| SALES WORKERS | 3122 | 1526 | 7501 | 2642 | 79 | 689 | 66 | 588 | 3250 | 1373 | 39 | 264 | 38 | 335 | 21512 |
| ADMINISTRATIVE SUPPORT | 1205 | 1523 | 3404 | 2211 | 22 | 184 | 34 | 237 | 5092 | 6536 | 30 | 200 | 51 | 455 | 21184 |
| CRAFT WORKERS | 1264 | 134 | 14295 | 3529 | 32 | 391 | 79 | 218 | 856 | 672 | 2 | 27 | 5 | 32 | 21536 |
| OPERATIVES | 31 | 4 | 189 | 66 | 0 | 2 | 2 | 4 | 52 | 33 | 0 | 0 | 1 | 3 | 387 |
| LABORERS & HELPERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SERVICE WORKERS | 27 | 5 | 28 | 63 | 0 | 1 | 0 | 6 | 24 | 39 | 0 | 0 | 0 | 4 | 197 |
| TOTAL | 8611 | 4818 | 46923 | 11860 | 245 | 8043 | 358 | 1748 | 18842 | 11541 | 123 | 3345 | 175 | 1271 | 117903 |
| PREVIOUS REPORT TOTAL | 8773 | 4725 | 48591 | 12182 | 253 | 7889 | 356 | 1734 | 19401 | 11723 | 130 | 3256 | 174 | 1238 | 120425 |

DATES OF PAYROLL PERIOD: 10/4/2020 THRU 10/17/2020

JA102

COMPID = H000080
UNITID =H000080

**EQUAL EMPLOYMENT OPPORTUNITY**
2020 EMPLOYER INFORMATION REPORT EEO-1
Consolidated Report

## SECTION B – COMPANY IDENTIFICATION

1. AT&T INC
208 SOUTH AKARD STREET
DALLAS, TX 75202

2.a. AT&T INC
208 SOUTH AKARD STREET
DALLAS, TX 75202

c.EIN=431552061

## SECTION C – TEST FOR FILING REQUIREMENT

1- Y  2- Y  3- Y      DUNS=006968523

## SECTION E – ESTABLISHMENT INFORMATION

## SECTION D – EMPLOYMENT DATA

| JOB CATEGORIES | Hispanic or Latino | | Non-Hispanic or Latino ********* Male ********* | | | | | | ********* Female ********* | | | | | | Overall Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | White | Black or African American | Native Hawaiian Or Pacific Islander | Asian | American Indian or Alaska Native | Two or More Races | White | Black or African American | Native Hawaiian Or Pacific Islander | Asian | American Indian or Alaska Native | Two or More Races | |
| Exec/Sr. Officials & Mgrs | 15 | 11 | 190 | 16 | 0 | 17 | 3 | 3 | 92 | 26 | 0 | 7 | 1 | 1 | 382 |
| First/Mid Officials & Mgrs | 584 | 372 | 5361 | 531 | 13 | 928 | 37 | 117 | 2524 | 663 | 7 | 451 | 15 | 66 | 11639 |
| Professionals | 2619 | 1497 | 18179 | 3035 | 87 | 3631 | 135 | 468 | 8155 | 3089 | 35 | 1744 | 79 | 310 | 43063 |
| Technicians | 1873 | 197 | 7398 | 1605 | 67 | 698 | 114 | 347 | 889 | 760 | 3 | 96 | 14 | 32 | 14093 |
| Sales Workers | 5942 | 3658 | 10412 | 4393 | 71 | 1214 | 144 | 953 | 5104 | 4256 | 53 | 439 | 134 | 595 | 37368 |
| Administrative Support | 1413 | 2298 | 3679 | 1700 | 16 | 261 | 52 | 227 | 5618 | 5994 | 36 | 352 | 106 | 488 | 22240 |
| Craft Workers | 4662 | 114 | 17157 | 4650 | 55 | 1015 | 227 | 495 | 407 | 375 | 3 | 41 | 7 | 14 | 29222 |
| Operatives | 40 | 1 | 452 | 211 | 0 | 3 | 6 | 13 | 19 | 59 | 0 | 1 | 1 | 1 | 807 |
| Laborers & Helpers | 25 | 1 | 57 | 12 | 1 | 6 | 2 | 6 | 11 | 3 | 0 | 1 | 1 | 1 | 127 |
| Service Workers | 7 | 2 | 39 | 7 | 0 | 2 | 0 | 1 | 38 | 18 | 0 | 0 | 1 | 1 | 116 |
| Total | 17180 | 8151 | 62924 | 16160 | 310 | 7775 | 720 | 2630 | 22857 | 15213 | 137 | 3132 | 359 | 1509 | 159057 |
| Previous Year Total | 18433 | 8473 | 70099 | 17325 | 333 | 8470 | 800 | 2696 | 25173 | 15738 | 133 | 3382 | 374 | 1424 | 172853 |

**SECTION F – REMARKS**

DATES OF PAYROLL PERIOD: 12/01/2020      THRU  12/31/2020

**SECTION G – CERTIFICATION:**      CERTIFIED DATE:

CERTIFYING OFFICIAL: ANGELICA WILLIS          TITLE: LEAD CONSULTANT DIVERSITY
EMAIL:                                        PHONE:
EEO-1 REPORT CONTACT PERSON: ANGELICA WILLIS  TITLE: LEAD CONSULTANT DIVERSITY
EMAIL: AW6990@ATT.COM                         PHONE: 2147577577

JA103

Tab 5

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Review of the Commission's Broadcast and | ) | MB Docket No. 98-204 |
| Cable Equal Employment Opportunity Rules | ) | |
| and Policies | ) | |
| | ) | |

To: The Commission

# JOINT REPLY COMMENTS OF THE
# STATE BROADCASTERS ASSOCIATIONS

Scott R. Flick
Lauren Lynch Flick

Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8000

*Their Attorneys in This Matter*

November 1, 2021

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ......................................................................... 2

I.   The Commission Cannot Justify Reinstatement of the Form 395-B Based on a Congressional Mandate that Pre-Dates the *Lutheran Church* Decision ......................................................... 5

II.  Collection and Disclosure of Form 395-B Data Will Impermissibly Insert the FCC Into Broadcasters' Employment Decisions ................................................................... 8

III. Should the FCC Reinstate the Form 395-B, It Must Maintain Confidentiality ..................... 16

CONCLUSION.................................................................................................... 17

**Before the**
## FEDERAL COMMUNICATIONS COMMISSION
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Review of the Commission's Broadcast and | ) | MB Docket No. 98-204 |
| Cable Equal Employment Opportunity Rules | ) | |
| and Policies | ) | |
| | ) | |

To: The Commission

## JOINT REPLY COMMENTS OF THE
## STATE BROADCASTERS ASSOCIATIONS

The Alabama Broadcasters Association, Alaska Broadcasters Association, Arizona Broadcasters Association, Arkansas Broadcasters Association, California Broadcasters Association, Colorado Broadcasters Association, Connecticut Broadcasters Association, Florida Association of Broadcasters, Georgia Association of Broadcasters, Hawaii Association of Broadcasters, Idaho State Broadcasters Association, Illinois Broadcasters Association, Indiana Broadcasters Association, Iowa Broadcasters Association, Kansas Association of Broadcasters, Kentucky Broadcasters Association, Louisiana Association of Broadcasters, Maine Association of Broadcasters, MD/DC/DE Broadcasters Association, Massachusetts Broadcasters Association, Michigan Association of Broadcasters, Minnesota Broadcasters Association, Mississippi Association of Broadcasters, Missouri Broadcasters Association, Montana Broadcasters Association, Nebraska Broadcasters Association, Nevada Broadcasters Association, New Hampshire Association of Broadcasters, New Jersey Broadcasters Association, New Mexico Broadcasters Association, The New York State Broadcasters Association, Inc., North Carolina Association of Broadcasters, North Dakota Broadcasters Association, Ohio Association of

Broadcasters, Oklahoma Association of Broadcasters, Oregon Association of Broadcasters,

Pennsylvania Association of Broadcasters, Radio Broadcasters Association of Puerto Rico,

Rhode Island Broadcasters Association, South Carolina Broadcasters Association, South Dakota

Broadcasters Association, Tennessee Association of Broadcasters, Texas Association of

Broadcasters, Utah Broadcasters Association, Vermont Association of Broadcasters, Virginia

Association of Broadcasters, Washington State Association of Broadcasters, West Virginia

Broadcasters Association, Wisconsin Broadcasters Association, and Wyoming Association of

Broadcasters (collectively, the "State Associations") by their attorneys in this matter, hereby file

these Joint Reply Comments in response to the Commission's Further Notice of Proposed

Rulemaking released July 26, 2021 in the above-captioned proceeding and certain of the

Comments filed in response thereto.[1]

## INTRODUCTION AND SUMMARY

The State Associations, along with the National Association of Broadcasters ("NAB"),

have been long-time active participants in this and related proceedings before the Commission.[2]

---

[1] *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Further Notice of Proposed Rulemaking, MB Docket 98-204, FCC 21-88 ("*2021 Further Notice*") (rel. July 26, 2021).

[2] The State Associations hereby incorporate by reference those prior filings, including but not limited to, Joint Reply Comments of the State Broadcasters Associations in MB Docket 19-177 (filed Nov 4, 2019) ("*2019 State Associations Comments*"); Joint Reply Comments of the Named State Broadcasters Associations in Response to Public Notice in MB Docket 17-105 (filed Aug. 4, 2017); Comments of the Named State Broadcasters Associations on the Public Information Collection Submission of the Federal Communications Commission Regarding "The Broadcast Annual Employment Report" on FCC Form 395-B, OMB Control No. 3060-0390 (filed Sept 15, 2008); Joint Comments on Form 395-B in MM Docket 98-204 (filed May 22, 2008) ("*Joint Comments on Form 395-B*"); Joint Reply Comments of the Named State Broadcasters Associations in MM Docket 98-204 (filed August 9, 2004); Joint Petition for Reconsideration and/or Clarification in MM Docket 98-204 (filed July 23, 2004); Joint Petition for Reconsideration and Clarification in MM Docket 98-204 (filed Feb 6, 2003); Joint Reply

Throughout, they have expressed their support for the goals of diversity and inclusion in the broadcasting industry and of avoiding discrimination in broadcast employment.  The State Associations and NAB have also been active proponents and leaders of industry initiatives to improve outreach, promote nondiscrimination in broadcast employment, and attract and train new leaders in the broadcast industry, particularly those from diverse backgrounds.  However, the State Associations and NAB have also stood fast against efforts to reinstitute and enable regulatory practices found by the U.S. Court of Appeals to be unconstitutional in both the *Lutheran Church*[3] and *MD/DC/DE Broadcasters*[4] cases because those efforts impermissibly pressure broadcasters when making a hiring decision to achieve an FCC-favored outcome.

In the *2021 Further Notice*, the Commission seeks to refresh the record and reimpose the requirement that broadcasters file FCC Form 395-B on an annual basis, disclosing the race, gender, ethnicity and job category of each of their employees.  The Commission again relies on Section 334 of the Communications Act as its authority to collect and disclose this data from radio and TV stations, but that section is in fact explicitly a <u>limitation</u> on the Commission's authority in this area, not a source of authority.  As the State Associations have previously noted,[5] this outcome-oriented data-gathering, even when viewed in the most favorable light, hangs at the fringes of constitutionality, and the Commission should proceed with caution to

---

Comments of the Named State Broadcasters Associations in MM Docket 98-204 (filed May 29, 2002); Joint Comments of the Named State Broadcasters Associations in MM Docket 98-204 (filed April 15, 2002).

[3] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 347-48 (D.C. Cir. 1998) ("*Lutheran Church"), rehearing denied*, 154 F.3d 487, *rehearing en banc denied*, 154 F.3d 494 (D.C. Cir. 1998).

[4] *MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13, 21 ("*MD/DC/DE Broadcasters*"), *rehearing denied* 253 F.3d 732 (D.C. Cir 2001), *cert denied sub nom. Minority Media and Telecommunications Council v. MD/DC/DE Broadcasters Assoc.*, 534 U.S. 1113 (2002).

[5] *2019 State Associations Comments* at 5-11.

avoid crossing that constitutional line or paving a path for others to do so.  Indeed, it is clear from the comments filed in this proceeding that some are already clamoring to make improper use of this data (or are urging the FCC to do so), making apparent that merely gathering such data clears the way to future abuses.

Therefore, the State Associations support the Comments of NAB which note that, particularly on a publicly-available and station-attributable basis, collection of the Form 395-B data merely for statistical and potential Congressional reporting purposes cannot survive constitutional scrutiny as it does not serve a compelling government interest, nor is it sufficiently narrowly tailored to meet whatever government interest might be posited.[6]  The State Associations therefore join with NAB in urging the Commission to consider less burdensome and more defensible alternatives.

Finally, should the FCC nevertheless proceed with collection of Form 395-B data, NAB is absolutely correct that the data should only be disclosed, if at all, on a basis that is not station-attributable, and that the mechanisms enabled by the Confidential Information Protection and Statistical Efficiency Act of 2002 ("CIPSEA")[7] be utilized to provide the Commission with the means to keep such information confidential.[8]

---

[6] Comments of National Association of Broadcasters in MB Docket 98-204 (filed September 30, 2021) ("*NAB Comments*") at 11.

[7] 44 U.S.C. §3651 *et al.*

[8] *NAB Comments* at 17-22.

## I.     The Commission Cannot Justify Reinstatement of the Form 395-B Based on a Congressional Mandate that Pre-Dates the *Lutheran Church* Decision

In the *2021 Further Notice*, the Commission again asserts that Section 334 of the Communications Act mandates that it collect and disclose on a station-attributable basis Form 395-B data from broadcast stations,[9] when that section is explicitly a limitation on, rather than a grant of, FCC authority in the area of EEO regulation.[10]  In fact, Congress took the extraordinary step of detailing in Section 334(c) the *only* circumstances under which the FCC would be permitted to make any alteration to its soon-to-be-found unconstitutional EEO regulations.  The text of Section 334(a) states that "[e]xcept as specifically provided in this section, the Commission shall not revise" its EEO forms and regulations, and then Section 334(c) sets the

---

[9] *2021 Further Notice* at 2-3, ¶¶ 2-3.

[10] Indeed, it is difficult to ignore that the most prominent word in Section 334 is "Limitation":

> Limitation on revision of equal employment opportunity regulations
>
> (a)  Limitation
>
> Except as specifically provided in this section, *the Commission shall not revise—*
>
> > (1) *the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080) as such regulations apply to television broadcast station licensees and permittees*; or
> >
> > (2) the forms used by such licensees and permittees to report pertinent employment data to the Commission.
>
> (b)  Midterm review
>
> > The Commission shall revise the regulations described in subsection (a) to require a midterm review of television broadcast station licensees' employment practices and to require the Commission to inform such licensees of necessary improvements in recruitment practices identified as a consequence of such review.
>
> (c)  Authority to make technical revisions
>
> > The Commission may revise the regulations described in subsection (a) *to make nonsubstantive technical or clerical revisions in such regulations as necessary to reflect changes in technology, terminology, or Commission organization.*

47 U.S.C. § 334 (emphasis added).

bounds of that limited exception, which is "to make *nonsubstantive* technical or clerical revisions in such regulations *as necessary to reflect changes in technology, terminology, or Commission organization.*"[11]  The courts' rulings in *Lutheran Church* and *MD/DC/DE Broadcasters*, pursuant to which the FCC abandoned Form 395-B and adopted new outreach-based rules 20 years ago, were none of those three things.  Had Congress wanted to include "or if such regulations become unenforceable" to its list of exceptions, it could have done so, but did not.  Nor has it amended Section 334 in the decades since to insert such a modification.

The FCC simply cannot have it both ways.  Either the *2021 Further Notice*'s assertion that Section 334 is still in force and dictates reinstatement of the Form 395-B is correct, in which case the FCC's current EEO rule violates that provision and is unenforceable, or Section 334 was effectively neutered by the *Lutheran Church* and *MD/DC/DE Broadcasters* courts because it forces the FCC to enforce unconstitutional regulations and associated forms, in which case it cannot be the basis now for insisting that the Form 395-B be reinstated.

Despite this, the *2021 Further Notice* asserts that "[i]mportantly, neither *Lutheran Church* nor *MD/DC/DE Broadcasters* invalidated the Congressionally mandated data collection of employment data or making the data available to the public."[12]  That is incorrect.[13]  The

---

[11] 47 U.S.C. § 334(a) and (c) (emphasis added).

[12] *2021 Further Notice* at 7, ¶ 12.  *See also Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Second Report and Order and Third Notice of Proposed Rule Making, 17 FCC Rcd 24018, 24022 (2002).

[13] The State Associations' Joint Reply Comments in the Commission's 2019 *Review of EEO Compliance and Enforcement in Broadcast and Multichannel Video Programming Industries* proceeding (34 FCC Rcd 5358 (2019)) painstakingly traced the history of the two cases, setting out which questions the courts answered and which they left unanswered, noting that "[th]e FCC took the DC Circuit's restraint in declining to reach the issue of whether the FCC had authority to promulgate *any* EEO Rule as evidence that it in fact does have such authority," despite the fact

*Lutheran Church* court found that the public availability of Form 395-B data was integral to unlawfully pressuring broadcasters to recruit and hire based on race under the first of the FCC's EEO rules, and called that fact out, saying with regard to such employee data, "[t]he risk lies not only in attracting the Commission's attention, but also that of third parties."[14]  Moreover, the *MD/DC/DE Broadcasters* court specifically questioned the Commission's counsel at oral argument why the FCC could not collect the Form 395-B data in a manner that was not station-attributable, clearly evidencing that court's grave concern with the FCC's then-existing practice.[15]

Where the principal basis for invalidating the FCC's prior EEO rules was that they explicitly and implicitly pressured broadcasters to make hiring decisions based on race and gender by comparing the racial and gender makeup of a station's workforce to that of the local population, it is pretty hard to argue that the Form 395-B—the sole informational tool that made such improper and unconstitutional pressure possible—is not the most important and integral component of that unconstitutional regulatory scheme.  In addition, as the State Associations explained in 2008:

> it is important to note that while Section 634 of the Communications Act requires the cable operators to file annual statistical reports 'identifying by race, sex, and job title the number of employees' in certain job categories, there is no comparable statutory requirement applicable to broadcast stations.  Indeed, there is no statute *at all* mandating that broadcast stations submit to the Commission the race, ethnicity, and gender of their employees on any FCC form.  This is yet further evidence that the public filing of

---

that "the court had already called the Commission's authority into question in *Lutheran Church* and did not reach the question in *MD/DC/DE Broadcasters*."  *2019 State Associations Comments* at 6-11.

[14] *See Lutheran Church,* 151 F.3d at 353.

[15] *See* Joint Reply Comments of the Named State Broadcasters Associations in MM Docket 98-204 (filed August 9, 2004) at 5.

staffing profiles, on a station-attributed bases, is not necessary to achieve a legitimate governmental interest.[16]

Lacking a statutory basis for reinstating Form 395-B data collection for broadcast stations, the *2021 Further Notice* resorts to citing a congressional finding in the *1992 Cable Act* that "increased numbers of females and minorities in positions of management authority in the cable and broadcast television industries advances the Nation's policy favoring diversity in the expression of views in the electronic media."[17]  However, the *Lutheran Church* court explicitly rejected that rationale, saying "our opinion has undermined the proposition that there is any link between broad employment regulation and the Commission's avowed interest in broadcast diversity."[18]

## II.    Collection and Disclosure of Form 395-B Data Will Impermissibly Insert the FCC Into Broadcasters' Employment Decisions

As the *NAB Comments* note, the *2021 Further Notice* "provides no evidentiary support for why such a data collection is necessary or how it will help further the goal of increased diversity in the broadcasting industry."[19]  The Commission, for its part, has previously stated that

---

[16] *Joint Comments on Form 395-B* at 8 (*citing* Section 634(d)(3)(A) of the Communications Act of 1934, as amended, 47 U.S.C. § 554(d)(3)(A)) (emphasis in original).  The *2021 Further Notice* asks how the language of Section 554 of the Act requiring that MVPDs make this data publicly available at their locations affects broadcasters.  *2021 Further Notice* at 8, ¶ 14.  As the State Associations explained in 2008, it does not affect broadcasters at all, as it explicitly does not apply to broadcasters.  *Joint Comments on Form 395-B* at 8.  Moreover, the distinction is a logical one, as the Commission does not hold the "life and death power" over cable operators that it holds over broadcast station licensees, reducing the constitutional impact of collecting employee data from cable operators.  *See MD/DC/DE Broadcasters,* 236 F.3d at 19.

[17] *2021 Further Notice* at 3, ¶ 3 (*citing* Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-385 § 22, 106 Stat. 1460 (1992) (*"1992 Cable Act"*)).

[18] *Lutheran Church,* 151 F.3d at 356.

[19] *NAB Comments* at 2.

it will only use Form 395-B data for statistical and reporting purposes.[20]  Given that the sole

report mandated by Section 22(g) of the *1992 Cable Act* was delivered almost 30 years ago,[21] and

"the form has been suspended for approximately two decades, during which time the FCC has

effectively fulfilled its statutory obligations regarding EEO and vigorously enforced its EEO

rules,"[22] the need to collect and disclose this information now is not evident.  As commenters

NAB and Center for Workplace Compliance ("CWC") each note, the Form 395-B data is

duplicative of EEO-1 data already confidentially collected by the EEOC, such that "the FCC can

achieve its stated goals without resuming data collection on Form 395-B."[23]

In addition to the aggregate reports produced by the EEOC referred to by CWC, to the

extent the Commission feels aggregate broadcast industry employment data would be useful to

some permissible FCC endeavor, the State Associations note that what would likely be the most

pertinent data, the aggregate employment data for broadcast TV and radio newsrooms, including

news management, is already collected and published on an annual basis by RTDNA, one of the

most respected organizations in the field.[24]  Using such privately-collected data would be vastly

---

[20] *2021 Further Notice* at 4, ¶ 6 (*citing Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies,* Memorandum Opinion and Order, 15 FCC Rcd 22548, 22559, ¶ 37 (2000) ("The Commission will no longer use the employment profile data in the annual employment reports in screening renewal applications or assessing compliance with EEO program requirements.  The Commission will use this information only to monitor industry employment trends and report to Congress.").

[21] *See Implementation of the Commission's Equal Employment Opportunity Rules,* Report, 9 FCC Rcd 6276 (1994).

[22] *NAB Comments* at 18.

[23] Comments of Center for Workplace Compliance in MB Docket 98-204 (filed September 30, 2021) at 6 (title capitalization omitted).  *See also NAB Comments* at 2-3.

[24] *See, e.g, Research: Local News Diversity Reaches Records, But Representation Gap Shrinks Slowly*, (June 23, 2021) available at (https://www.rtdna.org/article/research_local_news_diversity_reaches_records_but_representation_gap_shrinks_slowly) (last visited October 29, 2021).

more efficient—both from the FCC's perspective and that of every radio and television station that would otherwise be filing a Form 395-B under threat of sanction for failure to do so—while avoiding the constitutional and judicial issues otherwise faced by the Commission. It would also resolve the concerns raised in the *2021 Further Notice* about the Commission's ability to keep individual station employee data confidential if the FCC collects it.

Otherwise, the collection and particularly the public release on a station-attributable basis of the Form 395-B data would impermissibly insert the FCC into broadcasters' employment decisions, pressuring them to make race- and gender-based decisions, a fact that the *2021 Further Notice* and various commenters in this proceeding do not acknowledge. In adopting its pledge to not use Form 395-B data for purposes other than trend reporting, the Commission stated that "[s]ince we are legally obligated to comply with our own rules, this should put to rest the concerns of even the wariest broadcaster."[25] Similarly, in the Commission's 2019 *Review of EEO Compliance and Enforcement in Broadcast and Multichannel Video Programming Industries* proceeding, the EEO Supporters inexplicably asserted that: "Our proposals on the use of Form 395 data are not constitutionally controversial."[26]

However, broadcasters' concerns about reinstatement of the Form 395-B are not based on mere hypotheticals and speculation. Those who have been at the FCC long enough will readily recall when it was routine for petitions to deny to be filed against scores if not hundreds of stations at a time as stations in each state came up for renewal, with such petitions citing no evidence other than a comparison of each station's Form 395-B data against the racial, ethnic and

---

[25] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Memorandum Opinion and Order, 15 FCC Rcd 22548, 22560, ¶ 40 (2000).

[26] Comments of the EEO Supporters in MB Docket 19-177 (filed Sept. 20, 2019) ("*2019 EEO Supporters Comments*") at 29.

gender breakdown of the population in the station's market.  Regardless of outcome or any penalties imposed, each station's license renewal was delayed, often for years, as the Commission's staff struggled to process these "data dump" petitions and then draft orders responding to them with regard to each challenged station application.  In the meantime, those stations would struggle to stay in business as banks refused to lend to them—including refinancings—while a cloud hung over their license renewal.

Similarly, all transactions for such stations were frozen pursuant to the FCC's *Jefferson Radio* doctrine,[27] under which the FCC will not approve assignment and transfer applications until after a station's pending license renewal application is granted.  As a result, the licensee couldn't borrow money for station working capital, nor could it sell its cash-starved station, all the while suffering the crushing uncertainty as to when this ordeal would end.  It was for this reason that the court in *Lutheran Church* noted that unconstitutional pressures don't come solely in the form of FCC fines and enforcement proceedings:

> A regulatory agency may be able to put pressure upon a regulated firm in a number of ways, some more subtle than others.  The Commission in particular has a long history of employing:
>
>> a variety of *sub silentio* pressures and "raised eyebrow" regulation of program content. . . .  The practice of forwarding viewer or listener complaints to the broadcaster with a request for a formal response to the FCC, the prominent speech or statement by a Commissioner or Executive official, the issuance of notices of inquiry . . . all serve as means for communicating official pressures to the licensee.[28]

It is therefore easy to see why even the most ardent advocate of the FCC's current EEO rule and objectives should have serious concerns about the reinstatement of the Form 395-B.

---

[27] *Jefferson Radio Corp. v. FCC*, 340 F.2d 781 (D.C. Cir. 1964).

[28] *MD/DC/DE Broadcasters*, 236 F.3d at 19 (*quoting Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1116 (D.C. Cir. 1978) (en banc)).

Those concerns only increase where station-attributable data becomes available to third parties, whether because the Commission permits it, or third-party legal actions seek to compel it, once the FCC is in possession of that data.  While the FCC has added a Note to its rule containing a pledge not use the Form 395-B data in certain ways, it is equally true that the Commission is permitted to waive its rules where it believes the public interest requires it.  So such a statement is cold comfort for broadcasters, and merely invites third-parties to present the Form 395-B data in tandem with a public interest argument as to why the Commission should waive its rule and use the data against the station.  The licensee then has to expend its resources defending itself and opposing the requested rule waiver, meaning that even if the Commission ultimately rejects the invitation to waive the rule, the licensee has been put through a costly and stressful process that any rational business owner would go to great lengths to avoid.[29]

And in that regard, numerous proposals have already been made in this docket by various parties to actually expand the Commission's enforcement activities which rely on the data found in a Form 395-B.  In the Commission's 2019 *Review of EEO Compliance and Enforcement in Broadcast and Multichannel Video Programming Industries* proceeding, the State Associations responded to one such proposal as follows:

> Thus, the EEO Supporters propose that the FCC abandon its blanket prohibition on relying solely on Word of Mouth recruiting, and once the FCC has determined that a station has relied solely on Word of Mouth recruiting, require the station to complete and submit a Form 395 detailing the racial and gender breakdown of its staff.[30]  From the information submitted on the Form 395, the FCC would then determine whether the station is a discriminator because its staff is homogenous, or not a discriminator because its staff is comprised of some undefined mix of races and genders.  The Form 395, then, becomes the arbiter of whether the station has on staff "enough" employees of particular

---

[29] *See, e.g.*, *MD/DC/DE Broadcasters*, 236 F.3d at 21 ("Option B places pressure upon each broadcaster to recruit minorities without a predicate finding that the particular broadcaster discriminated in the past or reasonably could be expected to do so in the future.").

[30] *2019 EEO Supporters Comments* at 16.

races or genders to not be punished by the FCC. This is the very definition of an unconstitutional racial quota. . . . This disparate treatment of broadcasters based on the racial and gender composition of their staff would not only be a race-based rule subject to strict scrutiny in court, but is precisely the type of "quota-based" approach to EEO that was struck down in both *Lutheran Church* and *MD/DC/DE Broadcasters* as blatantly unconstitutional.[31]

Private parties have also stated their intention to use the Form 395-B data in ways that will necessarily pressure broadcasters to make preferential hiring and employment decisions. In 2002, the Minority Media and Telecommunications Council ("MMTC") and 47 other organizations stated that they intended to "liberally draw interferences from statistics" to determine whether stations were "discriminators," and presume discrimination is occurring where a statistical analysis shows that a station's employment profile differs from the local market by two standards deviations.[32] In 2004, MMTC, the National Organization for Women and others in their comments touted public disclosure of Form 395-B data as a preventative for discrimination and quoted Professor Cass Sunstein's statement made in connection with a proposal that broadcasters publicly disclose their public service and public interest activities: "[A] disclosure

---

[31] *2019 State Associations Comments* at 18-19. In this proceeding, the EEO Supporters reiterate this proposal, claiming use of employment profile data is "hornbook" law in discrimination review and that:

> As the Commission has long held, excessive use of word-of-mouth recruitment by members of a station's homogeneous staff is inherently discriminatory and could be disqualifying. If such a case arises, one piece of evidence that should be available to the Enforcement Bureau staff is data on the racial and gender composition of those whose "mouths" are doing the "word of mouth" recruitment. Broadcasting must not become the only industry in the country that is immune from the obligation to produce data that is useful to a finder of fact in determining whether an employer may have engaged in a discriminatory scheme.

Comments of the EEO Supporters in MB Docket 98-204 (filed Sept. 29, 2021) ("*2021 EEO Supporters Comments*") at 3-4 (footnotes omitted).

[32] Joint Comments of the Named State Broadcasters Associations in MM Docket 98-204 (filed July 29, 2004) at 5.

requirement will by itself trigger improved performance, by creating a kind of competition to do better, and by enlisting various social pressures in the direction of improved performance."[33]

The history here is clear. If the Commission puts the Form 395-B data in the public domain, third parties will use it, and that use will impermissibly pressure broadcasters in making employment decisions. As the State Associations noted in their *2019 State Association Comments*:

> [B]y now it should be obvious that, if stations are required to submit to the FCC information on their racial and gender profiles, particularly given the Commission's past practice of then using that information to assess a station's suitability for punishment, stations may reasonably feel unconstitutional pressure to make race-based hiring decisions. Even if that were not the case, if those profiles are made public, they will be open to scrutiny by third parties who, assisted by the government's forced disclosure of that information, will then file complaints at the FCC asserting the need for investigations or enforcement actions. This risk of being subjected to FCC investigations, whether there is in fact anything to find or not, impermissibly pressures broadcasters to hire preferentially so as to avoid such expensive and draining proceedings, which in turn may have to be reported to their lenders under loan covenants, creating increased risk to a station's financing or its ability to secure refinancing.

> Imposing such pressures, intentionally or not, cannot withstand strict scrutiny. The Commission has previously asked whether the fact that it publicly released data from the Form 395 prior to the *Lutheran Church* case dictates that it should continue doing so if it resumes collecting that data. There is a clear distinction that mandates that the answer to this question be a resounding "no." Prior to the *Lutheran Church* case, the FCC used statistical analysis of individual stations' staff compositions to identify stations to investigate, and private parties filed petitions to deny stations' license renewal applications citing nothing but the data in a station's Form 395. Before the Commission's practice was struck down, third parties' access to and use of the Form 395 data was consistent with the FCC's own use of that data, which the FCC believed was permissible. If the Commission were to revert to its prior practice, it would put itself in a completely untenable position, effectively outsourcing to private parties the task of imposing racial and gender quotas on broadcasters. The FCC simply cannot act on a complaint brought by a third party based on racial breakdowns of station staff where the Commission itself could not bring such an action.[34]

---

[33] Comments of NOW in MM Docket 98-204 (filed July 29, 2004) at 6.

[34] *2019 State Associations Comments* at 28-29 (footnotes omitted).

Against this backdrop, the *2021 Further Notice* asks what additional steps the Commission should take to assure that the Form 395-B data is only used for the Commission's stated purposes of monitoring trends and reporting to Congress.[35]  Sadly, there are none.  Once released to the public on a station-attributed basis, the Commission has no control over what third parties do with this information.  Moreover, if stations must keep the filed Forms 395-B in their Public Inspection Files, which are now maintained online, those third parties will have worldwide access, 24 hours a day, 7 days a week, to a total of eight years' worth of such data, and the ability to use big data techniques to scrape and manipulate it.

And it should be remembered that this will not be the only data available in the Public Inspection File.  The current version of the FCC's EEO rule requires that broadcasters place a vast amount of other employment practices data in their online Public Inspection File on an annual basis and maintain it for their eight-year license term: the number of hires per year, recruitment sources used for each hire, the number of interviewees referred by each source, and a showing of compliance with the FCC's non-vacancy specific recruitment initiatives.[36]  Adding the Form 395-B data to this trove of information inexorably leads one to the same conclusion that the *MD/DC/DE Broadcasters* court reached regarding Option B; namely that by collecting and disseminating station employment profile information, the FCC makes clear that "the agency with life and death power over the licensee is interested in results, not process, and is determined to get them."[37]

---

[35] *2021 Further Notice* at 8, ¶14.

[36] 47 C.F.R. § 73.2080.

[37] *MD/DC/DE Broadcasters,* 236 F.3d at 19.

At a minimum, taken together, the Form 395-B and annual EEO Public Inspection File Report information required under Section 73.2080(c) of the current EEO rule constitute a dossier of employment and employee information far more vast and invasive than anything reviewed by the courts in the *Lutheran Church* or *MD/DC/DE Broadcasters* cases, and most assuredly will not be seen as narrowly tailored to the Commission's stated government interest in "trends and reporting."

## III.   Should the FCC Reinstate the Form 395-B, It Must Maintain Confidentiality

If, despite the obstacles discussed above, the Commission concludes it has authority to reinstate the Form 395-B, it is imperative that the data be held and utilized in an aggregate form, and that station-attributable data in particular not be made publicly available if the Commission hopes to thread the constitutional and statutory needle it faces.  In that regard, the State Associations take note of the analysis in the *NAB Comments* suggesting that the FCC would be able to take advantage of the mechanisms available through CIPSEA as a means of at least avoiding public disclosure of the data.[38]  While the agency as a whole may not meet the definition of a "statistical" agency under CIPSEA, a necessary step if data might be handled by the agency's contractors, it appears there is a method by which the Commission can have a unit within it, such as the Office of Economics and Analytics, qualified to meet that definition, as well as other measures that could be taken to alleviate the Commission's concern about its ability to continue to use contractors while complying with CIPSEA.[39]

---

[38] *See generally NAB Comments* at 18-21.

[39] *Id*. at 21.

In addition, the *2021 Further Notice* asks for examples of existing filing approaches that would allow the Commission to confirm that a licensee has met its filing obligation without disclosing the content of the filing to the Commission or the public.[40]  With respect to that point, the State Associations note that the Commission's own LMS filing system appears able to shield exhibits attached to electronically-filed forms from public view.  Specifically, invoices attached to the Form 399 filed by broadcasters seeking reimbursement of repack-related expenses can be seen by the filer, but not by the public.  This functionality may already extend or have the capability to be extended to FCC personnel, potentially addressing that concern.

As the discussion above makes apparent, collection of the Form 395-B data raises myriad constitutional and statutory issues.  If, despite those, the Commission decides to seek reinstatement of the form, it must at a minimum ensure that the resulting requirement is narrowly tailored to reduce the burdens and pressures outlined above.  Avoiding the public disclosure of the Form 395-B data is an important first step towards meeting that imperative.

## CONCLUSION

As there is in fact no requirement to report aggregate broadcast station employment data to Congress, nor authorization for the FCC to collect it in the first place, and because the FCC has not otherwise enunciated a permissible government interest in collecting such information, particularly when the most relevant employment information is already available in aggregate form from private sources that do not create the significant constitutional and legal issues that any proposal to reinstate the Form 395-B necessarily raises, the Commission should decline here

---

[40] *2021 Further Notice* at 9, ¶ 17.

to take any such action.  Should it nevertheless push forward with such a filing obligation, it must, at a minimum, assure that the confidentiality of the data collected is preserved.

Respectfully submitted,

**THE STATE BROADCASTERS ASSOCIATIONS**

_/s/ Scott R. Flick_
Scott R. Flick
Lauren Lynch Flick

Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8000

November 1, 2021

Tab 6

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Review of the Commission's Broadcast | ) | MB Docket No. 98-204 |
| and Cable Equal Employment Opportunity | ) | |
| Rules and Policies | ) | |

**REPLY COMMENTS OF THE**
**NATIONAL ASSOCIATION OF BROADCASTERS**

## I.     INTRODUCTION AND SUMMARY

The National Association of Broadcasters ("NAB")[1] does not oppose reinstatement of

FCC Form 395-B (Annual Employment Report),[2] provided the form data remains confidential

and disassociated from any specific broadcast stations or groups, and any related analysis

or reports are published in an anonymized, aggregated format.[3] Publicly releasing such data

about the race, ethnicity, and gender of stations' employees would exceed the Commission's

legal authority by imposing unlawful pressure on stations to hire preferentially and would

thus jeopardize the entire data collection.[4] The brief record submitted in response to the

Further Notice offers no substantive counter to this position, as commenters in support of

---

[1] NAB is a nonprofit trade association that advocates on behalf of local radio and television stations and broadcast networks before Congress, the Federal Communications Commission and other federal agencies, and the courts.

[2] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Further Notice of Proposed Rulemaking, MB Docket No. 98-204 (rel. July 26, 2021) (Further Notice).

[3] Comments of the National Association of Broadcasters at 1-2, MB Docket No. 98-204 (Sep. 30, 2021) (NAB Comments).

[4] *Id*. at 1 citing *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998), pet. for reh'g denied, 154 F.3d 487, *pet. for reh'g en banc denied*, 154 F.3d 494 (D.C. 1998) and *MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13 (2001), *pet. for reh'g denied.*, 253 F.3d 732 (D.C. Cir. 2001), *cert. denied*, 122 S. Ct. 920 (2002).

restoring Form 395-B merely repeat previously refuted arguments.[5] If anything, the record supports NAB's calls for confidentiality of the form and reducing the burdens on companies that also must file the nearly identical EEO-1 Report with the U.S. Equal Employment Opportunity Commission (EEOC).[6] All parties agree that diversity is critical to broadcast service and that more needs to be done;[7] however, no one disputes NAB's view that the FCC could improve broadcasting diversity far more effectively by working with stations to attract, retain, and advance minorities and women, instead of simply imposing more rules and reports that have never proven successful.

## II.    THE FCC SHOULD SUPPORT INDUSTRY ON DIVERSITY EFFORTS

NAB has previously described broadcasters' voluntary efforts to improve the diversity, equity and inclusion (DE&I) of their workforce that go above and beyond the FCC's equal employment opportunity (EEO) rules.[8] Investing resources in such initiatives helps broadcasters attract and retain talented staff of various backgrounds who can bring their unique perspectives, experiences and viewpoints to the workplace. Diversity can help promote an engaged and respectful workplace and can offer stations  invaluable perspectives that allow them to better serve the needs and interest of their local community.[9] Such initiatives include creating a diversity committee of senior leaders to steer a company's efforts and ensure accountability,[10] guaranteeing that a certain percentage of

---

[5] Comments of the EEO Supporters at 4, MB Docket Nos. 19-11 and 98-204 (Sep. 29, 2021) (ES Comments); Comments of the Leadership Conference on Civil and Human Rights (LCCR) at 2, MB Docket Nos. 19-11 and 98-204 (Sep. 30, 2021) (LCCR Comments)
[6] Comments of the Center for Workplace Compliance (CWC) at 6-9, MB Docket No. 98-204 (Sep. 30, 2021) (CWC Comments); https://eeocdata.org/EEO1/support/faq..
[7] Comments of the National Association of Broadcasters at 2, MB Docket No. 19-177 (Sep. 20, 2019) (2019 NAB EEO Comments).
[8] NAB Comments at 7-10.
[9] *Id*. at 6 citing Graham Media Group's DE&I Commitment Statement.
[10] *Id*. at 7-9 (describing initiatives of Viacom CBS and Hearst Television).

new programming is authored by diverse creators,[11] providing inclusive internships and fellowships with a proven track of permanent employment,[12] and establishing aggressive goals to increase the diversity of senior leadership and linking executive compensation to meeting quantifiable diversity goals.[13] The success of these industry-generated endeavors is undeniable. Even the FCC's own EEO audit program has revealed only a handful of minor rules violations and paperwork mistakes out of more than 15,000 audits conducted since 2003,[14] none of which involved an allegation of discrimination.[15]

Nevertheless, the FCC seems to ignore the value of supporting such concrete, effective initiatives in favor of more command-and-control regulatory fiats that have never borne results. There is no evidence, including in the comments on the Further Notice, that more paperwork obligations or data will actually increase employment diversity in broadcasting. The wiser course is for the FCC to direct its resources toward outreach and education initiatives about opportunities in broadcasting and the benefits of working for a local radio or television station. At a minimum, the FCC should support or partner with industry on such efforts.

III.    THE FCC MUST ENSURE THE CONFIDENTIALITY OF FORM 395-B DATA

NAB has previously established that, if Form 395-B data is restored, publishing the data on a station- or group-attributable basis would violate D.C. Circuit Court of Appeals precedent rejecting earlier versions of the EEO rule as race-based measures that unlawfully

---

[11] *Id*. (describing initiatives of iHeart Media).
[12] *Id*. (describing initiatives of Hearst Television and Audacy).
[13] *Id*. (describing initiatives of TEGNA).
[14] 47 C.F.R. § 73.2080(f)(4).
[15] NAB Comments at 10.

pressured broadcasters to hire preferentially, in violation of their equal protection rights.[16] Thus, the FCC has promised to use the data only to analyze industry employment trends and draft reports to Congress, and not for enforcement purposes.[17] Commenters supporting reinstatement of Form 395-B do not offer any new facts or justifications for making the data publicly available, and in fact, further highlight their intentions to use the data to pressure broadcasters to hire based on race or gender.[18]

A self-styled group of "EEO Supporters" repeats an old canard that the FCC should restore Form 395-B so the data can be used to penalize stations that hire some employees through personal referrals and whose workforce composition does not meet some arbitrary diversity threshold.[19] However, this group ignores the fact that the FCC may not, and will not, legally use the data to assess a station's compliance with the EEO rules or to determine if a station has engaged in discrimination. The group makes no attempt to address the strict limits imposed by the D.C. Circuit on use of the data. Most galling, the EEO Supporters essentially presume that any hiring through personal referrals is tantamount to discrimination if a station's racial make-up is not up to their standards.[20] In any event, if the form is reinstated, confidentiality treatment of the data would not hinder the FCC's ability to carry out its intended use of the data.[21]

---

[16] NAB Comments at 11-14 citing *Lutheran Church*, 141 F.3d at 352; *see also MD/DC/DE Broadcasters*, 236 F.3d at 21-22.
[17] 47 C.F.R. § 73.3612 Note.
[18] ES Comments at 3-4; LCCR Comments at 3.
[19] ES Comments at 3-4.
[20] *Id*. at 4; LCCR Comments at 3.
[21] All of the proposals regarding EEO audits and other issues raised by the EEO Supporters are outside the scope of the Further Notice and fully refuted in separate proceedings. ES Comments at 2-3; Reply Comments of the National Association of Broadcasters at 7-12, MB Docket No. 19-177 (Nov. 4, 2019).

4

LCCR makes a fleeting, unsupported claim that employment data is central to the FCC's goal of preventing discrimination, and then unrelatedly urges the FCC to collect stations' mid-term EEO reviews and other EEO information in a searchable public database.[22] First, it should be obvious that broadcasters have no interest in discriminating against qualified job candidates. To the contrary, broadcasters have every incentive to nurture the most diverse, talented staff possible to help them compete in today's challenging media marketplace.[23] Again, we note that none of the EEO audits conducted since 2003 found any evidence of discrimination by a broadcaster.

Second, to the extent LCCR is implying that Form 395-B data should be publicly available in a searchable database, such an approach would only facilitate the ability of third party groups (such as the "EEO Supporters") to pressure broadcasters to hire based on race. LCCR's proposal would promote frivolous complaints seeking FCC enforcement based on the racial make-up of a station's staff, and even if there is zero evidence of untoward behavior, the risk of such investigations alone would unlawfully pressure broadcasters to hire preferentially just to avoid the legal fees and negative publicity of an FCC proceeding.

In addition, CWC explains that public disclosure of the Form 395-B employment data of stations or groups would reveal trade secrets and commercial information to competitors.[24] The form is a snapshot of the exact number of a broadcaster's employees by race, ethnicity, and gender, and in each job category. Collectively, this data could reveal information about a station's human resources strategy, such as the ratio of managers to

---

[22] LCCR Comments at 2-3.
[23] 2019 NAB Comments at 2.
[24] CWC Comments at 8.

5

employees, how many sales workers are employed, and when considered with other public data, revenue generated per worker.[25]

CWC further notes that the EEOC's EEO-1 Report is confidential, partly for the reason above, but also to encourage employees to voluntarily self-identify their race or ethnicity. Employees of companies required to file the EEO-1 Report have an understanding that their identifiable information will not be publicly available. Otherwise, for example, employees at a company's sub-location may be identifiable if the box on the company's EEO-1 Report for a particular race or ethnicity and job category displays a small number like one or two. Thus, the EEO has implemented strict disclosure limits on the publication of even aggregated, anonymized EEO-1 Reports and the data for company's physical sub-locations.[26]

Form 395-B provides no such assurances to companies or employees, even though the forms collect the same information about employees.[27] We agree with CWC that broadcasters and their employees deserve no less protection than those of companies required to file the EEO-1 Report.[28] The risk of disclosure is likely to discourage broadcast employees from self-identifying their race, ethnicity, and gender for Form 395-B, thereby reducing the quality and usefulness of the data for the FCC's analysis of industry trends.[29] If the FCC decides to restore Form 395-B, the only permissible, practical approach is for the FCC to collect Form 395-B on a confidential basis and ensure that any related information is published on an anonymized, aggregated basis.

---

[25] *Id*. at 9.
[26] *Id*. at 10.
[27] *Id*. at 9; *Commission Proposes Changes to FCC Forms 395-A and 395-B*, Public Notice, MM Docket No. 98-204, 23 FCC Rcd 13142-43 (MB 2008).
[28] CWC Comments at 9. CWC correctly equates an individual broadcast station to the sub-location of a company required to file the EEO-1 Report in describing the risk of revealing identifiable information about specific employees.
[29] CWC Comments at 10-11.

6

Finally, NAB has previously explained that Form 395-B data need not be publicly available for the FCC to fulfill its intended purposes for the data.[30] We continue to believe that collecting the data pursuant to the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA) would appear to be a reasonable mechanism.[31]

## IV. THE FCC SHOULD CONSIDER THE REQUIREMENT TO FILE EEO-1 REPORTS AND MAKE CERTAIN UPDATES TO FORM 395-B

Given that Form 395-B and the EEO-1 Report collect virtually the same data, NAB renews its request that the FCC consider exempting broadcasters that must file the EEO-1 Report from filing the Form 395-B. Such an approach would prevent duplicative burdens without reducing the FCC's ability to implements its EEO policies.[32] At a minimum, the FCC should consider CWC's proposal to at least explore the degree to which it can fulfill its purposes for the data by using the data collected by the EEOC.[33] For example, the FCC could work with the EEOC to produce a special report on the demographics of the broadcasting industry, similar to a report published by the EEOC in 2003 and more recent reports for other sectors.[34]

Finally, NAB supports the request of the Foster Garvey Coalition that Form 395-B be updated to include additional non-binary options for responding to the question of gender. Such a change would be consistent with steps by other federal agencies and serve the public interest in accurate data.[35]

---

[30] NAB Comments at 17.
[31] *Id*. at 19; Pub. L. 107-347, 116 Stat. 2962 (2002).
[32] NAB Comments at 22.
[33] CWC Comments at 6.
[34] *Id*. at 6; *Special Report: Broadcasting*, U.S. Equal Employment Opportunity Commission (Sep. 2003), available at https://www.eeoc.gov/special-report/executive-summary-broadcasting#analysis (comparing 1995-2000 EEO-1 Reports to Census data).
[35] Comments of the Foster Garvey Coalition at 2-3, MB Docket No. 98-204 (Sep. 30, 2021).

## V.     CONCLUSION

Accordingly, NAB does not object to reinstatement of Form 395-B, provided that individual filers are not publicly identifiable. Indeed, this is the only permissible approach. NAB also believes that a more effective use of Commission time in this arena would be to work with broadcasters to help them hire and retain a more diverse workforce. NAB looks forward to partnering with the Commission on measures toward our shared goal of increased diversity in broadcasting.

Respectfully submitted,

Rick Kaplan
Larry Walke

NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street SE
Washington, DC 20003
(202) 429-5430

November 1, 2021

8

Tab 7



1501 M Street, NW | Suite 1000 | Washington, DC 20005      TEL: 202.629.5650          info@cwc.org          www.cwc.org

September 30, 2021

Submitted via the FCC's Electronic Comment Filing System at: http://apps.fcc.gov/ecfs

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

> **Re: MB Docket No. 98-204; FCC 21-88; FR ID 42735; Comments of the Center for Workplace Compliance on Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies; Further Notice of Proposed Rulemaking**

Dear Ms. Dortch:

The Center for Workplace Compliance (CWC) welcomes the opportunity to submit written comments in response to the Federal Communications Commission's (FCC or Commission) Further Notice of Proposed Rulemaking (FNPRM) adopted on July 23, 2021, a summary of which was published in the *Federal Register* on August 31, 2021.[1]

The FCC's regulations state that the Commission will use workplace demographic data for two purposes: assessing industry employment trends and reporting to Congress.[2] CWC respectfully submits that the FCC can accomplish this goal without resuming use of Form 395-B by instead working with the Equal Employment Opportunity Commission (EEOC) to analyze nearly identical data that it already collects by industry on the annual EEO-1 Report, which is described below.

However, should the Commission resume collecting workforce composition data itself, then it should do so utilizing the version of Form 395-B most recently conditionally approved by the White House Office of Management and Budget (OMB) that has been harmonized with the current EEO-1 Report. The Commission should refrain from publicly disclosing data reported by individual broadcasters.

**Statement of Interest**

Founded in 1976, the Center for Workplace Compliance (CWC)[3] is the nation's leading nonprofit Association of employers dedicated exclusively to helping its members better understand and manage their workplace compliance requirements and risks. CWC's membership includes approximately 200 major U.S. employers, collectively providing employment to millions of workers.

CWC's directors and officers include many of industry's leading experts in the fields of fair employment, workplace compliance, and risk management. Their combined experience gives CWC a

---

[1] 86 Fed. Reg. 48,610 (Aug. 31, 2021).
[2] Codified at 47 C.F.R. § 73.3612 Note.
[3] Formerly the Equal Employment Advisory Council (EEAC).

Ms. Marlene H. Dortch
September 30, 2021
Page 2 of 11

unique depth of understanding of the practical, as well as legal, considerations relevant to the proper interpretation and application of workplace rules and regulations.

All CWC members are subject to the Equal Employment Opportunity Commission's (EEOC) requirement to file annual EEO-1 Reports. In addition, the vast majority of CWC members are federal contractors required to collect and utilize demographic information for the purposes of complying with the nondiscrimination and affirmative action requirements of Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Veterans' Readjustment Assistance Act of 1974. CWC's membership also includes broadcasters that would be subject to the FCC's collection of employment data, if that collection resumed. As such CWC's members have a significant interest in ensuring that data collection requirements minimize unnecessary burdens while maximizing utility.

**Background**

*The Employer Information (EEO-1) Report*

The Employer Information (EEO-1) Report is a mandatory annual federal reporting requirement that is designed to provide a "snapshot" profile of a company's workforce by race, ethnicity, sex, and job category (these categories are described more fully below). EEO-1s must be filed by: (1) any employer that is subject to Title VII of the 1964 Civil Rights Act (Title VII) and employs 100 or more employees; and (2) federal contractors and subcontractors subject to the Labor Department's Office of Federal Contract Compliance Programs' (OFCCP's) written affirmative action program (AAP) requirements.

Covered employers with multiple establishments must file: (1) a report covering the principal or headquarters office; (2) a separate report for each establishment employing 50 or more persons; and  (3) a separate report (Type 8 record) for each establishment employing fewer than 50 employees, or an Establishment List (Type 6 record) showing the name, address, and total employment for each establishment employing fewer than 50 persons. These reports are based on an employee-level snapshot pulled during any payroll period in the fourth quarter of each calendar year. Reports are scheduled to be filed by March 31 of each year.

The EEO-1 Report is the most widely used collection of workplace demographic information. According to the EEOC, in 2018 80,396 employers submitted a total of more than 1.6 million EEO-1 Reports. In the EEOC's latest request to OMB to renew approval for use of the EEO-1 Report, the agency estimated that 90,000 employers would submit a total of more than 1.9 million reports annually.[4] The EEOC aggregates reported EEO-1 data and makes it available to the public. The publicly available data may be sorted by industry code and by geographic region.

*Demographic Categories Used on the EEO-1 Report, Then and Now*

The EEO-1 Report collects employee data by sex, race, and ethnicity consistent with OMB standards. Prior to 2007, the EEO-1 Report was consistent with OMB's Statistical Policy Directive No. 15,

---

[4] The EEOC's Supporting Statement is available at
https://www.reginfo.gov/public/do/DownloadDocument?objectID=99658701.

Ms. Marlene H. Dortch
September 30, 2021
Page 3 of 11

which was issued in 1977.[5] This version of the EEO-1 Report collected demographic data by sex, male or female, and in the following race and ethnicity categories:

- White (Not of Hispanic Origin);
- Black (Not of Hispanic Origin);
- Hispanic;
- Asian or Pacific Islander; and
- American Indian or Alaskan Native.

In 1997, the OMB replaced Directive No. 15 with the Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity.[6] Two significant changes were made to the demographic categories. The first was to divide the "Asian or Pacific Islander" category into two categories, "Asian," and "Native Hawaiian or Other Pacific Islander." The second was to require demographic collections to allow for the reporting of more than one race. The 1997 Standards also changed several of the labels used to identify each category.

The EEOC revised the EEO-1 Report to comply with the 1997 Standards for use in 2007. Since that time, the EEO-1 Report has collected the following race and ethnicity categories:

- Hispanic or Latino;
- Not Hispanic or Latino:
  - White;
  - Black or African American;
  - Native Hawaiian or Other Pacific Islander;
  - Asian;
  - American Indian or Alaskan Native; and
  - Two or More Races.

*Job Categories Used on the EEO-1 Report, Then and Now*

Prior to 2007, the EEO-1 Report collected demographic information from employers in the following nine job categories:

- Officials and Managers;
- Professionals;
- Technicians;
- Sales Workers;
- Office and Clerical;
- Craft Workers (Skilled);
- Operatives (Semi-Skilled);
- Laborers (Unskilled); and
- Service Workers.

---

[5] OMB Statistical Policy Directive No. 15 (May 12, 1977), as reprinted in 62 Fed. Reg. 36,874, 36,876 (July 9, 1997).
[6] 62 Fed. Reg. 58,782 (Oct. 30, 1997).

Ms. Marlene H. Dortch
September 30, 2021
Page 4 of 11

When the EEO-1 Report was revised for use in 2007, the EEOC revised the job categories. In addition to several changes to the labels of the categories, the EEOC split the "Officials and Managers" category into two categories, "Executive/Senior Level Officials and Managers," and "First/Mid-Level Officials and Managers." Today, the EEO-1 Report utilizes the following ten job categories:

- Executive/Senior Level Officials and Managers;
- First/Mid-Level Officials and Managers;
- Professionals;
- Technicians;
- Sales Workers;
- Administrative Support Workers;
- Craft Workers;
- Operators;
- Laborers and Helpers;
- Service Workers.

*The Form 395-B Report, As Previously Utilized*

Prior to its discontinuation, the FCC required broadcasters with five or more employees to report workplace demographic information on Form 395-B. Specifically, the form collected a "snapshot" profile of a covered broadcaster's workplace by race, ethnicity, sex, and job category. Form 395-B was filed by licensees and permittees of commercial and noncommercial AM, FM, LPTV, TV, and international broadcast stations. Covered broadcasters completed Form 395-B utilizing data from any one payroll period in July, August, or September. Broadcasters were instructed to use the same reporting period in subsequent reports.

Form 395-B collected demographic information about a broadcaster's workforce in the same sex, race, and ethnicity categories and the same job categories as used in the EEO-1 Report prior to 2007 and was consistent with OMB's 1977 Statistical Policy Directive No. 15. The only major difference in the information reported was that Form 395-B required separate reporting for full-time and part-time employees. For the purposes of reporting on Form 395-B full-time employees were those employees working 30 or more hours per week.

*Congressional Limitation on the FCC's Ability To Modify Data Collection Requirements*

In 1992, Congress amended the Communications Act of 1934 by enacting a new section entitled "Limitation on Revision of Equal Employment Opportunity Regulations."[7] As codified today, this provision states that the FCC shall not revise the forms used by broadcast station licensees and permittees to report pertinent employment data to the Commission except for "nonsubstantive technical or clerical revisions … as necessary to reflect changes in technology, terminology, or Commission organization."[8]

---

[7] Pub. L. No. 102-385, § 22(f), 106 Stat. 1499.
[8] 47 U.S.C. § 334(a), (c).

Ms. Marlene H. Dortch
September 30, 2021
Page 5 of 11

*Suspension of Collection of Form 395-B*

In 2001, the FCC suspended data collection on Form 395-B in the wake of a decision by the U.S. Court of Appeals for the District of Columbia vacating certain aspects of the FCC's equal employment opportunity regulations.[9] While the FCC revised its equal employment opportunity regulations in 2004, the requirement for broadcasters to submit the form remained suspended until matters related to the confidentiality of collected data could be addressed.[10]

*The FCC's Revised Form 395-B, As Approved by OMB*

Even though the FCC discontinued collection of Form 395-B in 2001, it continued to seek approval from OMB for use of the form pursuant to the Paperwork Reduction Act (PRA). OMB continued to approve the form, on the condition that the FCC not initiate using or collecting information until the FCC decided whether information collected on each form would be held confidential or not on an individual basis and until the FCC further consulted with OMB.

In 2008, the FCC proposed revising Form 395-B to harmonize with the then-recently revised EEO-1 Report.[11] As proposed, Form 395-B included identical sex, race, and ethnicity categories and identical race categories as approved on the EEO-1 Report. The FCC proposed to continue collecting data separately for full-time and part-time employees.

As part of its submission to OMB, the Commission noted that it had solicited comments on the proposed revisions and no commenters opposed harmonizing Form 395-B with the EEO-1 Report. The FCC also stated that in its opinion the proposed revisions were consistent with the limitations imposed by Congress as non-substantive or clerical changes necessary to reflect changes in terminology. Specifically, the FCC stated that the proposed changes "do not subtract any information requested on the form, but rather seek more detail on race identification and official/manager occupations, with minor changes in terminology."

In October 2008, OMB approved the FCC's proposed revisions to Form 395-B subject to the same limitations, namely that the FCC not initiate use or collection of information on the form until making a determination about confidentiality of the data and further consultation with OMB.[12] This version of Form 395-B remains approved today, subject to the same conditions.[13] OMB's approval of the form under the PRA is currently scheduled to expire on July 31, 2023.

---

[9] *See Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements*, Memorandum Opinion and Order, 16 FCC Rcd 2872 (2001).

[10] *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Procedures,* Third Report and Order and Fourth Notice of Proposed Rulemaking, 19 FCC Rcd 9973 (2004).

[11] The FCC's 2008 Supporting Statement is available at https://www.reginfo.gov/public/do/DownloadDocument?objectID=8319701.

[12] OMB's approval notice is available at https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=200808-3060-023#.

[13] OMB's most recent approval notice is available at https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=3060-0390#.

Ms. Marlene H. Dortch
September 30, 2021
Page 6 of 11

**The FCC's Further Notice of Proposed Rulemaking**

On July 23, 2021, the FCC adopted a Further Notice of Proposed Rulemaking (FNPRM) to refresh the existing record related to the data collection on Form 395-B to obtain further input on the legal, logistical, and technical issues surrounding Form 395-B. In the FNPRM, the FCC asks many questions related to the collection of broadcaster workforce data on Form 395-B, including those related to whether potential changes to Form 395-B should be harmonized with the EEO-1 Report, whether such revisions are consistent with the limitations imposed by the Communications Act, and confidentiality concerns with respect to reported data.

The FNPRM does not reference the FCC's proposed revisions to Form 395-B that were approved by OMB in 2008. To the contrary, it contains a link to a version of Form 395-B that expired in April 2000 without any indication that a different form has since been approved.[14]

**The FCC Can Achieve Its Stated Goals Without Resuming Data Collection on Form 395-B**

The FCC has stated that it only intends to use the data that would be collected on Form 395-B for two purposes: analyzing industry trends and reporting to Congress. However, nearly all of the information that would be collected on Form 395-B is already collected by the EEOC on the EEO-1 Report. Before undertaking an additional data collection and reporting requirement, the FCC should first explore the extent to which it can accomplish its stated purposes by using data already collected by the EEOC.

Publicly available aggregated EEO-1 Report data may provide an excellent first step toward meeting these goals. If this data is not sufficient, the FCC should consider working with the EEOC to produce a Special Report on the demographics of the broadcasting industry. Working with the EEOC directly will reduce duplication and burdens and will help ensure that confidentiality concerns are appropriately addressed.

In fact, the EEOC has produced such a report before.[15] Its Special Report on Broadcasting looked at industry-specific data reported on EEO-1 Reports filed between 1995 and 2000 in comparison to Census data. The Special Report also provided additional analysis based on industry sub-sector and firm size. Finally, the Special Report analyzed charges of discrimination filed against employers in the broadcasting industry, reporting most common charges of discrimination by sub-industry.

Since publication of the Broadcasting Special Report, the EEOC has published numerous additional reports, some of which are considerably more robust.[16] The FCC may find that working with the EEOC collaboratively will not only reduce the burden on broadcasters to collect and report data, but may produce data of greater utility as the agency seeks to analyze industry trends.

CWC urges the FCC to consider such a collaborative effort before reinstating a largely duplicative reporting requirement.

---

[14] The link in the FNPRM is https://transition.fcc.gov/Forms/Form395B/395b.pdf.

[15] The Special Report is available on the EEOC's website at https://www.eeoc.gov/special-report/executive-summary-broadcasting.

[16] See, for example, the EEOC's Special Report on Diversity in High Tech, available at https://www.eeoc.gov/special-report/diversity-high-tech.

Ms. Marlene H. Dortch
September 30, 2021
Page 7 of 11

**If the FCC Resumes Collection of Workforce Data, It Should Do So Using The Version of Form 395-B Currently Conditionally Approved by OMB**

Should the FCC resume collection of broadcaster workforce reporting on Form 395-B, CWC strongly urges the FCC to utilize the version of the form that is currently conditionally approved for use by OMB. This version of the form is harmonized with the EEO-1 Report and consistent with OMB's 1997 Standards.

As summarized above, the EEO-1 Report is the most widely used federal data collection of workplace demographics utilized by some 90,000 employers filing more than 1.9 million EEO-1 Reports per year, including a significant portion of broadcasters who would be subject to reporting under Form 395-B. CWC's members, like most employers, utilize human resource information systems (HRIS) that have been developed specifically with EEO-1 compliance in mind. Employers subject to EEO-1 reporting requirements already have systems in place to invite applicants and employees to self-identify by categories that correspond to those used on the EEO-1 Report.

Employers also routinely use these same demographic categories as part of their equal employment opportunity, affirmative action, and diversity plans. Because they are consistent with the OMB's 1997 Standards, employers utilizing the demographic categories used in the EEO-1 Report are better able to compare their workforce data with other sources of demographic data relevant to employers, such as are available through the Census Bureau's EEO Tabulation or the Department of Education's Integrated Postsecondary Education Data System (IPEDS), which may be helpful for determining affirmative action and diversity benchmarks, or which may assist employers in targeting recruiting efforts.

More than 10 years ago the FCC made the decision to move forward with revisions to Form 395-B that harmonize with the EEO-1 Report and received approval to do so. Yet, this development is not even referenced in the FNPRM. Because the FNPRM links to an old version of the form, which is based on OMB standards that are nearly 45-years old, it appears that the FCC is seriously considering utilizing a woefully out-of-date reporting tool.

If the FCC moves forward with broadcaster workforce data collection, then it should not backtrack but instead utilize the current version of Form 395-B conditionally approved by OMB.

**If the FCC Lacks Statutory Authority To Harmonize Data Fields, It Has Limited Options To Mitigate Confusion and Decrease Burdens on Broadcasters**

While we strongly urge the FCC to take another approach, the FNPRM makes it clear that the FCC is at least contemplating that it may not have sufficient statutory authority to utilize the currently conditionally approved version of Form 395-B. If the FCC resumes data collecting utilizing old demographic and job categories, this will lead to the following consequences:

- Broadcasters will not be able to report the number of "Asian" or "Native Hawaiian or Other Pacific Islander" employees, but instead must combine those categories into a single category of "Asian or Pacific Islander";
- Broadcasters will not be able to report the number of "Executive/Senior Level Officials and Managers" and "First/Mid-Level Officials and Managers," but will instead have to combine these categories into a single category of "Officials and Managers"; and

Ms. Marlene H. Dortch
September 30, 2021
Page 8 of 11

- Broadcasters will have no way to categorize any employees who currently identify as "Two or More Races."

The first two consequences would have the effect of collecting data that would be less useful for equal employment opportunity, affirmative action, and diversity purposes. Thus, the FCC's ability to utilize the data to analyze trends would be more limited and the entire data collection would be of less utility. However, if the FCC is statutorily obligated to utilize these old categories, then broadcasters can comply by simply combining existing data that they already collect. Such a result would create confusion and impose some additional burdens, but is possible.

The third consequence is more problematic. For some 15 years, employers subject to EEO-1 Reporting requirements have been required to collect demographic data using the category "Two or More Races." How then should broadcasters treat demographic information on a form that contains no field for two or more races? One possibility is to simply ignore the data and allow broadcasters to complete the form without including people who identify with two or more races. Another option is to have employers complete the form using the old race and ethnicity categories, but permit broadcasters to enter a note reporting the number of employees who would otherwise be identified as being of two or more races.[17] Third, the FCC could require broadcasters to resurvey their workforce using the old demographic categories to ensure that employees are only identified with one race or ethnicity.

From CWC's perspective, none of these are good options.

**The FCC Should Not Publicly Disclose Data Reported by Individual Broadcasters**

Public disclosure of data reported by individual broadcasters would be detrimental in several respects. Disclosure would reveal trade secrets and commercial information to competitors. Disclosure will also result in disclosure of individually identifiable information about employees' sex, race, and ethnicity contrary to the pledge of confidentiality under which it was collected. Disclosure of individually identifiable personal information will create a disincentive for employees to self-identify that will in turn hamper the FCC's ability to analyze trends and undermine civil rights laws. The fact that some employers choose to disclose some types of workplace demographic data does not mitigate these concerns.

*Form 395-B, Like EEO-1 Reports, Includes Trade Secrets and Highly Confidential Data*

Many employers view the data that will be reported on Form 395-B, like the data reported on the EEO-1 Report, as containing trade secrets and commercial information the disclosure of which could be reasonably expected to cause substantial competitive harm. The information that would be collected on Form 395-B would reveal the exact number of a broadcaster's employees by race, ethnicity, and gender, in each job category as of a specific snapshot date for each requested year. This data necessarily reveals information about an employer's staffing and human resources strategy, including the ratios between and among EEO-1 job categories.

---

[17] This could be accomplished in a manner similar to that used by the EEOC with respect to EEO-1 filers who have collected non-binary employee gender information. As the EEOC explains in a Frequently Asked Question (FAQ): "Filers may choose to report employee counts for non-binary gender employees by job category and race/ethnicity in the comment box on the Certification Page in the … Online Filing System." This FAQ is available under the heading "How to Classify Employees into Categories" at https://eeocdata.org/EEO1/support/faq.

Ms. Marlene H. Dortch
September 30, 2021
Page 9 of 11

If disclosed, the information for any given year could be used by a broadcaster's competitors to identify areas of the broadcaster's business that have been deliberately staffed in a way to maximize efficiencies, operations, and profit, and to minimize unnecessary expenses. For example, the data on Form 395-B, as utilized previously, would reveal the number of Officials and Managers each broadcaster employs for each employee they collectively manage in each and all of the remaining non-management job categories. Similarly, the data would reveal the number of Sales Workers employed to generate revenue, which in combination with other available financial information could be used to calculate approximate revenue generated per Sales Worker. If the currently conditionally approved version of Form 395-B were used, the form would also reveal the number of Executive and Senior Level Officials and Managers employed for each employee classified as a First/Mid-Level Official and Manager.

The competitive harm caused by disclosing Form 395-B and its data for any given year would be significantly compounded were data for multiple consecutive years to be disclosed. This is because year-over-year data would allow competitors additional information about year-over-year staffing changes and structure, including the nature and frequency of changes resulting from highly confidential business plans.

*While Many Employers Choose To Release Some Workforce Demographic Data, the Vast Majority of Employers Do Not Release All EEO-1 Data*

Today, many employers choose to publicly disclose workforce demographic data for a variety of reasons, including to show their progress toward meeting diversity, equity, and inclusion goals. Disclosed workforce demographic data may take a variety of forms, such as the percentage of employees who self-identify by sex, race, ethnicity, disability, or veteran status, among others. Employers may also choose to release such information for particular types of jobs or job groups.

Far fewer employers publicly disclose the exact number of employees by sex, race, ethnicity, and EEO-1 job category. For those that do, they are most likely to disclose their "consolidated" EEO-1 Report, rather than any location-specific EEO-1 Report. The consolidated report reveals headcount by sex, race, ethnicity, and job group for an entire corporate entity. While many employers view this data as confidential and highly sensitive, some choose to publicly disclose the consolidated report while maintaining the confidentiality of the establishment-specific reports that they are also required to submit.

The information that the FCC is considering collecting on Form 395-B is similar to establishment-specific EEO-1 Reports and raises the same confidentiality concerns. The fact that some broadcasters may choose to disclose other forms of workforce demographic data should not be construed as disclosure of the same type of data that would be collected on Form 395-B.

*Employers Typically Collect Demographic Data Based on Assurances of Confidentiality, But Disclosure of Form 395-B Will Reveal Individually Identifiable Data*

Employers that collect workforce demographic data for purposes of complying with the requirement to submit EEO-1 Reports do so based on the assurance of confidentiality provided by Title VII of the Civil Rights Act, which generally prohibits disclosure of EEO-1 Reports.[18] An EEOC employee who violates this provision is subject to criminal sanctions, including fines and imprisonment.

---

[18] 42 U.S.C. § 2000e-8(e).

Ms. Marlene H. Dortch
September 30, 2021
Page 10 of 11

The EEO-1 Report's instructions also encourage employers to tell employees that the data will be kept confidential to encourage employees to self-identify. Specifically, the instructions provide the following sample language for employers to use so that employees understand the voluntary nature of the invitation to self-identify:

> The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. *The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual*. (emphasis added).[19]

Many employers ask employees to voluntarily self-identify sex, race, ethnicity, and other characteristics using this or similar language pledging that data reported will not reveal the identity of any specific individual.

Form 395-B, like the EEO-1 Report, will in many cases reveal the race, ethnicity, and gender of numerous individual employees. This is particularly true in all instances where a particular data cell on the Form—that is a specific race, ethnicity, gender, and job category for any given broadcaster—displays a small number such as one or two. In these cases, anyone reviewing the disclosed information would be able to identify confidential race, ethnicity, and gender information of a broadcaster simply by cross-referencing information about these employees' jobs and locations, such as information that is available on social media sites, in public reports filed by broadcasters, and the like.

This is precisely why the EEOC has implemented strict disclosure criteria to limit even the publication of aggregated EEO-1 Reports and data that comprise reports from multiple employers for multiple physical locations. For example, the EEOC's *Job Patterns For Minorities And Women In Private Industry (EEO-1)* website states as follows:

> The confidentiality provision which governs release of these data (Section 709 (e) of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972) prohibits release of individually identifiable information. Data in aggregated format for major geographic areas and by industry group for private employers (EEO-1) are available. The following tables are national aggregations by those industries with the greatest employment. With the release of EEOC data from 2016 forward, new disclosure criteria were implemented and applied at all aggregate types to ensure the protection of identifiable information of our survey respondents and maintain EEOC's commitment to protect the data confidentiality. Participation rates and certain industry aggregates are no longer published due to disclosure limitation rules.[20]

The EEOC's implementation and application of disclosure criteria for EEO-1 Reports and data spanning multiple reports and locations "to ensure the protection of identifiable information of our survey

---

[19] This language is included in Appendix 4 of the instruction booklet and is available at https://eeocdata.org/pdfs/EEO-1%20Component%201%20Instruction%20Booklet.pdf.

[20] The website is available at https://www.eeoc.gov/statistics/employment/jobpatterns/eeo1.

Ms. Marlene H. Dortch
September 30, 2021
Page 11 of 11

respondents and maintain EEOC's commitment to protect the data confidentiality" reinforces the express assurances set forth above under which employers collect such demographic data.

*Disclosure of Form 395-B Data Could Result in Lower Levels of Employee Voluntary Self-Identification Undermining Equal Employment Opportunity Laws*

As detailed above, if broadcaster-specific Form 395-B data is publicly disclosed, it will reveal individually identifiable information about the sex, race, and ethnicity of some employees. This disclosure is likely to discourage broadcaster employees from voluntarily self-identifying race, ethnicity, and gender information that is critical to broadcasters' diversity, equity, inclusion, and compliance efforts. This will have the effect of reducing the utility of the collected data not only for the FCC's purposes, but also for the purposes of the EEOC, OFCCP, and other agencies that rely on it for effective administration of the nation's federal nondiscrimination and affirmative action requirements.

**Conclusion**

CWC strongly urges the FCC to consider whether it may accomplish its stated goals of analyzing industry trends and reporting to Congress without reinstating data collection of Form 395-B. As detailed above, collaboration with the EEOC for analysis of similar data that it has collected from broadcasters may accomplish these goals at less cost to the FCC and the regulated community while preserving confidentiality of reporting broadcasters and their employees.

Should the FCC decide to resume the collection of broadcaster workplace demographic information on Form 395-B, CWC urges the FCC to utilize the version of Form 395-B that is currently conditionally approved for use in order to enhance compliance and minimize unnecessary burdens.

In addition, CWC urges the FCC to preserve the confidentiality of individual Form 395-B data as disclosure will increase the potential for competitive harm, contradict the pledge of confidentiality under which such data was collected, and create a disincentive for employees to voluntarily self-identify thus undermining the data and hindering effective administration of nondiscrimination and affirmative action requirements.

Please do not hesitate to contact me if CWC can be of further assistance to you as the Commission considers these important issues.

Sincerely yours,

Michael J. Eastman
Senior Vice President, Policy and Assistant General Counsel

Tab 8

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Review of the Commission's Broadcast | ) | MB Docket No. 98-204 |
| and Cable Equal Employment Opportunity | ) | |
| Rules and Policies | ) | |

**COMMENTS OF THE**
**NATIONAL ASSOCIATION OF BROADCASTERS**

Rick Kaplan
Larry Walke

NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street S.E.
Washington, D.C. 20003
(202) 429-5430

September 30, 2021

TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY .................................................................................... 1

II.     THE FURTHER NOTICE OFFERS NO EVIDENTIARY NEED FOR RESUMING COLLECTION
        AND PUBLIC REPORTING OF FORM 395-B EMPLOYMENT DATA .................................. 5

III.    REINSTATING FORM 395-B AND PUBLICLY REPORTING THE REQUIRED DATA WOULD
        VIOLATE COURT PRECEDENT STRIKING DOWN EARLIER VERSIONS OF THE FCC'S EEO
        RULES .......................................................................................................................... 11

IV.     IF REINSTATED, FORM 395-B MUST BE COLLECTED, ANALYZED AND REPORTED ON A
        CONFIDENTIAL BASIS AND CIPSEA WOULD SEEM TO PROVIDE A REASONABLE
        MECHANISM ................................................................................................................ 17

V.      THE FORM 395-B FILING PROCESS AND INFORMATION SHOULD BE HARMONIZED
        WITH THE EEOC'S PROCESS FOR EEO-1 REPORTS AND BROADCASTERS REQUIRED
        TO FILE THE EEO-1 REPORT EXCUSED FROM FILING FORM 395-B ........................... 22

VI.     CONCLUSION .............................................................................................................. 24

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Review of the Commission's Broadcast | )   MB Docket No. 98-204 |
| and Cable Equal Employment Opportunity | ) |
| Rules and Policies | ) |

COMMENTS OF THE
NATIONAL ASSOCIATION OF BROADCASTERS

## I.   INTRODUCTION AND SUMMARY

The National Association of Broadcasters ("NAB")[1] does not object to the

Commission reinstating FCC Form 395-B (Annual Employment Report), so long as station-

and group-level information is kept confidential, and any related information made publicly

available is provided on an anonymized, aggregated basis.[2] Making individual or group

station data public would again risk upending the entire data collection process following

the D.C. Circuit's decisions in *Lutheran Church-Missouri Synod v. FCC*[3] and *MD/DC/DE

Broadcasters Association v. FCC*.[4] NAB also requests that any reinstatement of the form also

consider the fact that many broadcasters already are required to make substantially similar

---

[1] NAB is a nonprofit trade association that advocates on behalf of local radio and television stations and broadcast networks before Congress, the Federal Communications Commission and other federal agencies, and the courts.

[2] Review of *the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Further Notice of Proposed Rulemaking, MB Docket No. 98-204 (rel. July 26, 2021) (Further Notice).

[3] 141 F.3d 344 (D.C. Cir. 1998), *pet. for reh'g denied*, 154 F.3d 487, *pet. for reh'g en banc denied*, 154 F.3d 494 (D.C. 1998).

[4] 236 F.3d 13 (2001), *pet. for reh'g denied.*, 253 F.3d 732 (D.C. Cir. 2001), *cert. denied*, 122 S. Ct. 920 (2002).

and ultimately duplicative filings with the U.S. Equal Employment Opportunity Commission (EEOC).[5]

NAB believes strongly that diversity is critical for broadcasters to compete and effectively serve local communities across the country. Radio and television stations value diversity, equity and inclusion (DE&I) as critical to building an engaged and productive workplace. That is why broadcasters have worked hard to recruit, train and retain top talent from all backgrounds.[6] As a result, broadcasting is replete with opportunities for talented individuals of every race, ethnicity or gender.

While NAB does not object to the reinstatement of FCC Form 395-B, the revitalized form is likely to merely increase paperwork burdens without offering much corresponding value. At the outset, the form is duplicative of EEOC requirements, thereby creating make work for broadcasters already required to file with the EEOC. It makes little sense for the Commission to obligate companies already collecting data and filling out one set of government forms for one agency to have to do essentially the same for another. The left hand of the government should be talking to the right one, instead of putting unnecessary additional burdens on broadcasters.

Beyond the duplicative requirements, the Further Notice provides no evidentiary support for why such a data collection is necessary or how it will help further the goal of increased diversity in the broadcasting industry.[7] No one contests whether the industry should continue to strive to hire, retain and promote more women and people of color.

---

[5] See https://eeocdata.org/EEO1/support/faq.

[6] Comments of NAB, MB Docket No. 19-177, at 2 (Sep. 20, 2019) (2019 NAB EEO Comments).

[7] Further Notice at ¶¶ 11-13.

Broadcasters share that belief. Rather than focus efforts on reporting data that is already largely apparent, a far better use of the Commission's time would be to reach out to broadcasters and ask exactly how the Commission can be helpful to our efforts to increase diversity. The Commission's EEO rules themselves demonstrate that government rules and regulations cannot achieve its' diversity aims. Strong evidence of this can be found in the Commission's unprecedented EEO audit program, which has conducted approximately 15,000-20,000 EEO audits since the current rules became effective in 2003. Notably, the Commission has uncovered only a handful of FCC paperwork violations, none of which revealed a finding of discrimination.[8] Based on that metric, one would think broadcasters have reached nearly an optimal level of diversity. But we know that is not the case. Rather, it is time for the Commission to put more sweat equity into helping the broadcasting industry achieve its diversity goals, instead of simply adding more government burdens that serve to check a box but have little or no impact.

If the Commission nevertheless moves forward with restoring the Annual Employment Report, NAB renews our concerns that making publicly available the required employment data on a station-attributable basis stations will unlawfully pressure broadcasters to adopt race- or gender-based hiring practices.[9] Given that collection of Form 395-B has been suspended for two decades,[10] we understand the Commission's interest in refreshing the record on the legal and logistical implications of restoring the form. However, despite the passage of time, there have been no changes regarding the Commission's legal authority or

---

[8] 2019 NAB EEO Comments at 8-9.

[9] Comments of NAB, MM Docket No. 98-204, at 4 (May 22, 2008) (2008 NAB Comments).

[10] *Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements*, Memorandum Opinion and Order, 16 FCC Rcd 2872 (2001).

related facts that would allow or justify publishing the form data in a station-attributable manner. Publishing the racial composition of each broadcaster's workforce would clearly exceed the FCC's authority. And this would hold true even if the FCC itself did not use the Form 395-B data for enforcement purposes, as self-styled "public interest" groups have urged the FCC to pursue stations for discriminatory hiring practices based on the racial and gender composition of their staffs, or may file complaints themselves against stations or otherwise pressure stations.[11] The FCC may not enable such "raised eyebrow" regulation.[12]

Accordingly, if the FCC elects to restore Form 395-B, it must do so confidentially and only report any analysis of the data on an anonymous, aggregated basis. Such an approach would have no effect on the FCC's ability to fulfill its expressed, permitted purposes for the data, namely, to "monitor industry employment trends and report to Congress."[13] Importantly, such an approach would also coincide with the EEOC's EEO-1 Component 1 Report (EEO-1 Report), which requires employers with 100 or more employees to annually file the same data as on Form 395-B.[14] The EEO-1 Report is collected on a confidential basis, and the EEOC may only publish aggregated data and only in a manner that does not identify any particular filer.[15] It would be illogical for the FCC to impute more need or flexibility to publish such sensitive data than the nation's leading organization on civil rights and EEO enforcement.

---

[11] *See, e.g.*, Comments of the EEO Supporters, MB Docket No. 19-177, at 4 (Sep. 20, 2019) (2019 ES EEO Comments).

[12] *MD/DC/DE Broadcasters* at 19, *quoting Community-Service Broadcasting of Mid-America v. FCC*, 593 F.2d 1102, 1116 (D.C. Cir. 1978).

[13] Further Notice at ¶¶ 6 and 19.

[14] *See* https://eeocdata.org/EEO1/home/index.

[15] *See* https://eeocdata.org/EEO1/support/faq.

There is no statutory bar to such an approach. As NAB has explained in the past and as detailed below, collecting Form 395-B pursuant to the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA) would appear to provide an option for ensuring the confidentiality of Form 395-B filings.[16] Finally, NAB requests that the FCC: (1) take steps to ensure that Form 395-B remains harmonized with the EEO-1 Report and (2) either exempt broadcast companies that must file the EEO-1 Report from the requirement to submit Form 395-B, or allow such companies to submit the EEO-1 Report to the FCC in lieu of Form 395-B.

## II.    THE FURTHER NOTICE OFFERS NO EVIDENTIARY NEED FOR RESUMING COLLECTION AND PUBLIC REPORTING OF FORM 395-B EMPLOYMENT DATA

For nearly two decades, the FCC has required broadcasters to file reams of information to document their compliance with the EEO rules,[17] and there is no evidence that piling on more rules or reports like Form 395-B will actually further what should be the FCC's primary goal: to increase employment diversity in the broadcast industry. NAB has previously urged the FCC to eschew the easy, familiar path of imposing more rules and reports in favor of more concrete, pro-active steps that will directly increase diversity in broadcasting,[18] such as increasing awareness of job opportunities in broadcasting and adopting a proposal by MMTC to help educate industry and consumers regarding EEO.[19] For

---

[16] Pub. L. 107-347, 116 Stat. 2962 (2002), *codified as* 44 U.S.C. §§ 3561-64.

[17] 2019 NAB EEO Comments at 7 (listing obligations to submit documentation of all candidates interviewed or hired for job vacancies, retain copies of vacancy announcements and send copies to requesting organizations, as well as conduct non-vacancy outreach activities); 47 C.F.R. §§ 73.2080(c).

[18] *Id*. at 3.

[19] *Id*., *citing* Letter from Maurita Coley, President and CEO, MMTC, to Rosemary Harold, Chief, Enforcement Bureau, FCC, MB Docket No. 19-177 (Sep. 3, 2019).

example, the Commission routinely holds symposiums and other events featuring opportunities for broadcasters to learn strategies for obtaining financing and develop relationships with lenders and advisors.[20] The Commission should consider creating similar opportunities focused on improving employment diversity, instead of simply adding more rules and paperwork obligations that have never had a meaningful impact on employment diversity.

Many broadcasters already go above and beyond mere compliance with the Commission's EEO rules to improve and ensure diversity, equity and inclusion. Doing so not only strengthens their mission to build a welcoming, productive work environment, but also allows stations to leverage the various experiences and strengths of their staff to produce content that reflects the needs and interests of their local communities. Graham Media Group's DE&I Commitment Statement describes it well:

> Graham Media Group is committed to a diverse employee workforce that celebrates unique perspectives, experiences and viewpoints. We foster a respectful environment where all employees feel valued, included and empowered which in turn drives innovation, solutions, and engagement. We know our diversity makes a difference in what we do, how we do it and the impact we make in the communities we serve. We demonstrate our commitment through strategic objectives that support workplace learning, engagement, community and business outreach.[21]

Programming that is produced by a diverse broadcast workforce can also cement the loyalty of viewers and listeners and translate into ratings and revenues, which have never been more critical given the ongoing economic impact of the COVID-19 pandemic and the

---

[20] *See, e.g., Path to Media Ownership and Sustainability - Symposium on Access to Capital for Small and Diverse Broadcasters*, co-hosted by the FCC's Advisory Committee on Diversity and Digital Empowerment (ACDDE) and the Media Bureau (Nov. 6, 2020).

[21] *See* https://www.grahammedia.com/careers.

increasingly competitive media marketplace. Below are a few examples of such voluntary,

successful initiatives:

- ViacomCBS:
  - ✓ CBS Television Stations (CTS) and CBS News have created a Diversity Council focused on recruitment, development and education across their recently combined division. CTS has been taking steps that reflect the goals of the Council. For example, seven of the last eight senior leadership hires at CTS have been women and/or people of color, including new General Managers at its New York, Los Angeles, Chicago and Dallas stations.
  - ✓ CTS recently announced that it will hire Executive Producers of Community Impact in each of its station newsrooms to ensure accurate representation and reflection of the communities the stations serve, including under-represented communities.
  - ✓ CBS News formed a Race and Culture Team last year, which works closely with executive producers of all ViacomCBS news platforms to help shape coverage and ensure reporting reflects diverse perspectives. CTS is partnering with the Race and Culture Team to create powerful storytelling at its stations focused on issues of racial equity and social justice.
  - ✓ Beginning with the 2021-2022 development season, the CBS network is allocating a minimum of 25% of its script development budgets to projects created or co-created by Black, Indigenous and People of Color (BIPOC), and its writers' rooms are aiming to have a minimum of 40% BIPOC representation, with a goal to increase that percentage to 50% in the 2022-2023 season. All unscripted programs will aim to have casts with at least 50% BIPOC contestants, and the network is allocating at least a quarter of its annual unscripted development budget to projects created or co-created by BIPOC producers, effective as of the 2021-2022 season.
  - ✓ During the summer of 2020, CBS Studios and the NAACP agreed on a multi-year partnership to develop and produce scripted, unscripted and documentary content for linear television networks and streaming platforms.[22]

- iHeart:
  - ✓ Invests resources to further its commitment to inclusion, and credible, sustainable efforts to foster a diverse workforce culture.[23]
  - ✓ Recently launched a DE&I Plan that includes measures committing to more diversity on our company's Board of Directors to requiring that diversity be a part of recruiting, hiring and promotion decisions. Improving its interviewing process to include a wider representation of interviewers, instituting a DE&I

---

[22] *See* https://www.viacomcbs.com/inclusion for more information. In addition, ViacomCBS discloses data about the race and gender composition of its workforce on its Diversity and Inclusion webpage. *See id*.

[23] *See* https://cdn.iheartmedia.com/documents/ESG/iHeartMedia.pdf.

Advisory Committee that will bring important and timely issues around diversity and inclusion to senior management for consideration, serve as a sounding board for company policies about diversity and inclusion and help guide efforts regarding accountability, education, mentorship and recruitment.
- ✓ Embedded diversity objectives in senior leaders' long-term performance goals.
- ✓ Pledged that 50% of all new podcasts on the iHeartPodcast Network will be from female and diverse creators.

- Graham Media Group:
  - ✓ Conducts Employee and Management Assessments to ensure understanding of DEI principles and obtain employee feedback on DEI programs.
  - ✓ Graham's Executive DEI Council, which consists of senior company leaders, meets monthly to develop and refine DEI practices to support goals to drive DEI throughout our workplace culture and operating practices.
  - ✓ Employee Resource Groups, launched in June 2021, develop programs to support education and awareness, professional development, networking, mentoring, business and community outreach. Current teams are focused on the interests of Black, Latinx, LGBTQ+, Working Parents/Adult Caregivers, Social and Emotional Wellness, with additional teams to form around Veterans, Asian, Middle Eastern and Generations in the Workplace.
  - ✓ Juneteenth and PRIDE special education efforts and community outreach.
  - ✓ Annually hosts Emma Bowen Foundation Interns and encourages participants to seek permanent employment.

- TEGNA:
  - ✓ Partnered the Poynter Institute to launch a first-of-its-kind multi-year Inclusive Journalism Program, which drives inclusivity in storytelling and community coverage. All content teams (news, digital, and marketing) at each station will participate. The program involves a self-audit, training on unconscious bias in news reporting and content development, increasing diversity of on-air issue experts, leadership coaching and a robust audit of content by a third party firm specializing in multicultural research.
  - ✓ Established aggressive goals to drive greater workforce diversity by the end of 2025, including increasing diversity of station-level content leadership roles by 50% and all management within the company by 50%.
  - ✓ Launched a program to link a meaningful portion of key leaders' bonus potential to the successful achievement of goals and implementation of diversity and inclusion activities.
  - ✓ Established a company-wide Diversity and Inclusion Working Group of employees designed to identify and elevate both opportunities and areas of improvement to drive a more inclusive environment within the company, and partner with senior leadership in creating solutions in identified areas. The team has identified and helped the company create several solutions that have led to new practices, greater cultural learning and education, and better planning and accountability to reach our inclusion and diversity goals.

- Hearst Television:

8

✓ For over 20 years, Hearst has partnered with the Emma Bowen Foundation to cultivate opportunities for diverse talent by offering multi-year paid internships at our local TV stations. Nearly all stations participated in the program in 2021, hosting 34 Fellows from 31 universities, and eight alums are currently employed with Hearst.

✓ The Fred Young Hearst Television Producing Fellowship is a 12-week, paid fellowship program at a Hearst TV station. To date, 27 Fellows have completed the program, received job offers in newscast production at one of Hearst's stations, and over half remain employed with Hearst.

✓ Veterans, reservists and military spouses are a vital part of Hearst Television. The Military Might Employee Resource Group (ERG) is a productive avenue to bring employees together from across the country and aids in recruiting veterans to the company. Since the HTV Military Might" ERG launched in November of 2020, 14 military members have joined the HTV family.

✓ In 2020, Hearst hired a Diversity and Inclusion Director and formed a D&I Advisory Council, and will shortly launch six additional Employee Resource Groups designed to attract, engage and retain a diverse talent pipeline of employees.

✓ Hearst launched Project CommUNITY in 2019 to focus storytelling on divisive issues in the communities it serves. Hearst also produces weekly public affairs programs and launched a Listening Tour to facilitate national conversations about race, equality and justice.

- Audacy:
  ✓ In partnership with Clark Atlanta University, Audacy personnel share experiences to prepare students to become the next generation of audio leaders. Students gain practical insights, and Audacy gains perspectives and connections through internships, fellowships, and job opportunities. The partnership provides a pipeline of talent for job positions and will be the catalyst to strong partnerships with other HBCUs.

  ✓ Provides yearlong fellowships that provide diverse candidates early in their career access to resources, support and professional networks they might not otherwise experience in a typical internship or entry level position. Currently, ten Fellows started work on September 13, 2021, in News, Sports Content, Digital, and Ad Sales departments.

  ✓ Channel Q provides an innovative media destination built by and for our LGBTQ+ community. Channel Q provides entertaining, informative, and empowering content to raise awareness and create constructive conversations around LGBTQ+ issues.

- NAB:
  ✓ Supports a range of initiatives that improve diversity in broadcasting and create new opportunities for women, people of color and other underrepresented communities.[24]

---

[24] *See* https://www.nab.org/about/diversity.asp.

- ✓ Created a DE&I Board Advisory Committee to the NAB Board of Directors to provide guidance on DE&I matters relating to the industry and NAB itself.
- ✓ The NAB Leadership Foundation (NABLF) has a long history of fostering diversity through such programs as the Broadcast Leadership Training program, which offers MBA-style executive training station personnel who want to advance to senior management or own their own stations, the Media Sales Academy, which provides college students with the tools and resources needed to start their career in broadcasting, and the Technology Apprentice Program, which provides diverse talent with opportunities for hands-on training to be a broadcast engineer and networking opportunities with potential employers.[25]
- ✓ Numerous graduates of these programs have secured their first jobs in broadcasting, advanced to senior leadership at stations and even graduated to station ownership.

The success of such efforts is clear and underscored by the FCC's own reviews of broadcasters' EEO programs, in which the Commission annually selects at random approximately five percent of radio and television stations for a thorough EEO audit.[26] NAB estimates that the FCC has conducted EEO audits of at least 15,000 broadcast stations since this process was launched in 2003. To our knowledge, all of these investigations have resulted in fewer than 20 Notices of Apparent Liability or Admonishments to broadcasters for EEO rules violations (0.1%), none of which involved a charge of discrimination.[27] Of these, the most common problems were related to recordkeeping mistakes like failing to track recruitment sources or recruiting only through the Internet, which is now permitted pursuant to a Commission decision in 2017.[28] Given this lack of evidence of discrimination and the successful voluntary efforts of broadcasters to increase employment diversity, it is

---

[25] *See* https://www.nabfoundation.org.

[26] 47 C.F.R. § 73.2080(f)(4).

[27] 2019 NAB EEO Comments at 8-9.

[28] *Petition for Rulemaking Seeking to Allow the Sole Use of Internet Sources for FCC EEO Recruitment Requirements*, Declaratory Ruling, 32 FCC Rcd 3865 (2017).

difficult to discern why the Commission's efforts at increasing diversity would be focused on collecting and publicly reporting the data required on Form 395-B.

### III.   REINSTATING FORM 395-B AND PUBLICLY REPORTING THE REQUIRED DATA WOULD VIOLATE COURT PRECEDENT STRIKING DOWN EARLIER VERSIONS OF THE FCC'S EEO RULES

The Further Notice seeks to refresh the FCC's record regarding collection of Form 395-B, given the passage of time since the form was suspended in 2001.[29] NAB submits that there have been no changes to the Commission's legal authority to use the form or the surrounding facts that would permit or justify reinstatement of the form and making the required data publicly available. In fact, the FCC should be more wary than ever, given the request of some third parties that the FCC use the form data to pursue broadcasters whose workforce is not diverse enough in their view.[30]

The existing EEO rule already "resides at the margins of constitutionality."[31] NAB submits that restoring Form 395-B would narrow this margin even more, and publicly reporting the data would push the FCC beyond its constitutional authority. The current rules represent the Commission's third attempt at creating legally sustainable EEO policies,[32] as the D.C. Circuit Court of Appeals rejected the first two versions as unconstitutional measures that unlawfully pressured broadcasters to make race- and gender-based hiring decisions in violation of the equal protection clause of the Fifth Amendment.

---

[29] Further Notice at ¶ 1.

[30] 2019 ES EEO Comments at 13-17.

[31] Joint Reply Comments of the State Broadcasters Associations, MB Docket No. 19-177, at 5 (Nov. 4, 2019) (2019 State Associations Comments).

[32] Second Report and Order and Third Notice of Proposed Rulemaking, MM Docket No. 98-204, 17 FCC Rcd 24018 (2002) (Second Order).

In *Lutheran Church*, the court vacated the FCC's original EEO policy, which required stations to compare the racial composition of their workforce with that of the local population and take steps to address any underrepresentation if their workforce did not meet certain thresholds of minority and female employment. The court held this requirement to be a race-based obligation that was subject to strict scrutiny and impermissibly "pressure[d] license holders to engage in race-conscious hiring."[33] Regarding the racial and gender data that was required under the rule, the court stated:

> A station would be flatly imprudent to ignore any one of the factors it knows may trigger intense review --- especially if that factor, like racial breakdown, is particularly influential. As a matter of common sense, a station can assume that a hard-edged factor like statistics is bound to be one of the more noticed screening criteria. The risk lies not only in attracting the Commission's attention, but also that of third parties. "Underrepresentation" is often the impetus (as it was in this case) for the filing of a petition to deny . . . .[34]

In response, the FCC crafted a new EEO policy consisting of two options, one of which required stations to report the gender and race of job applicants. The court in *MD/DC/DE Broadcasters* rejected this approach as a race-based policy that was subject to strict scrutiny[35] and not narrowly tailored to the FCC's purpose of preventing discrimination.[36] Like the previous EEO policy, the court found that this attempt imposed unlawful pressure on stations to focus on the race of job applicants to avoid Commission enforcement.[37] Regarding the employment data required under this rule, the court stated:

> Measuring outputs to determine whether readily measurable inputs were used . . . is evidence that the agency with life and death power over the license (of a broadcaster) is interested in results, not process, and is determined to get

---

[33] *Lutheran Church*, 141 F.3d at 352.

[34] *Id*. at 353.

[35] *MD/DC/DE Broadcasters*, 236 F.3d at 21-22.

[36] *Id*.

[37] *Id*. at 19-20.

them. As a consequence, the threat of being investigated creates an even more powerful incentive for licensees to focus their recruiting efforts upon women and minorities, at least until those groups generate a safe proportion of the licensee's job applications.[38]

In light of the court's concerns about measuring the results of stations' EEO efforts, the FCC suspended Form 395-B and crafted the existing EEO rules, which focus on race-neutral outreach requirements.[39]

FCC Form 395-B requires all television and radio stations with five or more full-time employees to annually report granular information on the ethnic, racial and gender composition of their full-time and part-time staff. The latest version of the form collects data on the number of and staff position of all male and female employees that are White, Black or African American, Native Hawaiian Other Pacific Islander, Asian, American Indian or Alaska Native, or Two or More Races.[40] The form states that: "Self-identification is the preferred method of identifying the race and ethnic information necessary for the report. Employers are required to attempt to allow employees to use self-identification to complete the report. If an employee declines to self-identify, employment records or observer identification may be used."[41]

Collecting and publishing the Form 395-B data on a station-attributable basis would be an unavoidable vehicle for the exact sort of unlawful pressure on broadcasters to make

---

[38] *Id.*

[39] Second Order, 17 FCC Rcd at 24019.

[40] *See* https://omb.report/icr/202004-3060-047/doc/100723701 (Instruction #7). This form implemented a 2008 update of Form 395-B to track the racial classification standards used by the EEOC at the time. The Office of Management and Budget (OMB) has approved this FCC information collection through June 2023, subject to the FCC's resolution of issues related to the confidentiality of the required data.

[41] *Id.*

race- and gender-based hiring decisions that was prohibited under *Lutheran Church* and *MD/DC/DE Broadcasters*. Moreover, this would hold true despite the Commission's promise to use the data to analyze industry trends and make reports to Congress, and not to assess an individual broadcaster's compliance with the EEO requirements.[42]

First, regardless of the FCC's intent or actions, unlawful pressure may come from members of the public who try to use the data to lodge complaints with the FCC or otherwise pressure stations that do not employ enough minorities or women in their view.[43] The goals of certain third parties are obvious. For example, a group calling themselves "EEO Supporters" recently urged the FCC to create a new enforcement policy that relies on Form 395-B. Under their proposal, the FCC first would identify broadcasters that hire some employees through personal referrals based on their EEO Annual Public File Reports. Next, the FCC would collect Form 395-B from such broadcasters. Finally, if a station's workforce composition as shown on the form failed to meet some arbitrary diversity threshold, the station would be sanctioned as an "intentional discriminator" and subjected to fines and other penalties for violating the FCC's rules.[44] However, disciplining, or even threatening to discipline stations based on the racial composition of their workforce is the precise use of the form's data that was twice found unconstitutional by the D.C. Circuit.[45]

---

[42] Report and Order, MM Docket Nos. 98-204, 96-16, 15 FCC Rcd 2329, 2332 (2000) (*First Report and Order*); Third Report and Order and Fourth Notice of Proposed Rulemaking, MM Docket No. 98-204, 19 FCC Rcd 9973, 9975-9978 (2004) (*Third Report and Order* or *Fourth NPRM*), *pet. for recon. pending;* 47 C.F.R. § 73.3612 Note.

[43] Joint Comments of the Ohio, Virginia and North Carolina Associations of Broadcasters Regarding FCC Form 395-B, OMB Control No. 3060-0390 (Sep. 26, 2008) (2008 OH/VA/NC Comments).

[44] 2019 ES EEO Comments at 4-5.

[45] 2019 State Associations Comments at 16-18.

Making the data publicly available would also enable third parties to file singular complaints at the FCC claiming a need for enforcement actions against certain stations based on the employment data on the form. The risk of such investigations, even if there is nothing to find or prosecute, and even if the FCC promises to immediately dismiss such petitions, would still impose pressure on broadcasters to make race-conscious hiring decisions to avoid potentially expensive, time-consuming proceedings. Also of note, such proceedings, even if unjustified and unsupported, may have to be disclosed to broadcasters' lenders under their loan arrangements, jeopardizing a station's ability to secure additional needed funding.[46]

Second, publishing the data would cause unlawful pressure to hire preferentially regardless of the FCC's intended use of the data.[47] Specific processing guidelines or quotas like those in the earlier versions of the EEO rules and rejected by the D.C. Circuit are not necessary to impose unlawful pressure on broadcasters to hire preferentially. The *MD/DC/DE* court noted that regulatory agencies can pressure licensees in several ways, and that the FCC in particular

> has a long history of employing: "a variety of *sub silentio* pressures and 'raised eyebrow' regulation of program content. . . . The practice of forwarding viewer or listener complaints to the broadcaster with a request for a formal response to the FCC, the prominent speech or statement by a Commissioner or Executive official, the issuance of notices of inquiry . . . all serve as means for communicating official pressures to the licensee."[48]

---

[46] *Id*. at 29.

[47] 2008 OH/VA/NC Comments at 10, *citing Lutheran Church*, 141 F.3d at 353.

[48] *MD/DC/DE*, 236 F.3d at 19, *quoting Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1116 (D.C. Cir. 1978).

Thus, even if the FCC tries to assure stakeholders that the employment data on Form 395-B will not be used to assess a station's EEO compliance, licensees would still be incentivized to hire preferentially to avoid any perceived risk of enforcement or the form data being used against them in some other way.[49]

The State Associations have made another important point. Third parties may support publishing the form data because such data was published for many years before the form was suspended in 2001. However, prior to *Lutheran Church*, the FCC routinely used statistical analysis of a broadcaster's workforce composition (as shown on Form 395-B) to investigate stations for potential rules violations, while it was also common for third parties to file petitions to deny a station's license renewal based on Form 395-B data. Thus, before the D.C. Circuit Court struck down this FCC practice, allowing third parties access to the form data to file petitions to deny was consistent with the FCC's own use of the form. Following *Lutheran Church*, however, the FCC is no longer permitted to use the data for enforcement purposes. Therefore, if the FCC reverts to its old practice of making the form data publicly available, it would do so knowing that it is effectively outsourcing to third parties the ability to impose pressure on broadcasters to make race- and gender-conscious hiring choices.[50]

Thus,  if the FCC still chooses to reinstate Form 395-B, the only constitutional way to avoid imposing such unlawful pressure on broadcasters is to collect the form confidentially, and analyze and report the required data on an anonymized, aggregated basis that is not attributable to any specific broadcast station or company.

---

[49] 2008 OH/VA/NC Comments at 10, *citing Lutheran Church*, 141 F.3d at 353.

[50] 2019 State Associations Comments at 29-30.

IV.    **IF REINSTATED, FORM 395-B MUST BE COLLECTED, ANALYZED AND REPORTED ON A CONFIDENTIAL BASIS AND CIPSEA WOULD SEEM TO PROVIDE A REASONABLE MECHANISM**

Pursuant to the limits placed on the FCC's legal authority in *Lutheran Church* and *MD/DC/DE Broadcasters*, the FCC may not use Form 395-B data to screen license renewal applications or in any other enforcement action against a station. The FCC has therefore tried to assure stakeholders that the data would only be used to analyze industry hiring trends and to prepare reports for Congress.

As discussed above, the D.C. Circuit rejected the FCC's previous EEO rules pursuant to a strict scrutiny analysis because rules constituted a government action based on race.[51] Resumption of Form 395-B and publishing the data would also fail such an analysis because it impose unlawful pressure on broadcasters to hire preferentially, unless doing so is narrowly tailored to achieve a compelling governmental interest.[52] However, even assuming that "analyzing industry trends and making reports to Congress" comprise such compelling interests, collecting and publishing the data on a station-attributable basis would not be narrowly tailored or necessary to fulfill those purposes.

Only a confidential process would protect broadcasters' equal protection rights and potentially survive judicial scrutiny. Moreover, to the extent the FCC needs the Form 395-B

---

[51] *Lutheran Church* invoked the *Adarand* principle that "[a]ll government action based on race – a group classification long recognized as 'in most circumstances irrelevant and therefore prohibited' – should be subject to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." Lutheran Church, 141 F.3d at 354, *citing Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995), *citing Hirabayashi v. U.S.*, 320 U.S. 81, 100 (1943).

[52] *Id.*

17

data to analyze industry trends or prepare Congressional reports,[53] confidential filing and analysis of the data would work just as well as non-confidential data.[54] Nor is public disclosure of Form 395-B data needed for the FCC to properly execute its EEO policies,[55] given that the form has been suspended for approximately two decades, during which time the FCC has effectively fulfilled its statutory obligations regarding EEO and vigorously enforced its EEO rules.

Furthermore, there is no statutory requirement to collect or publish the data on a station-attributable basis.[56] Neither the Communications Act nor the FCC's EEO rules indicate any particular mechanism for collection of Form 395-B.[57] Section 334(a) of the Communications Act merely states that the Commission "shall not revise . . . the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. § 73.2080)" as they pertain to television stations or the "forms used by such licensees to report pertinent employment data."[58] The 1992 version of the EEO rules makes no mention of how Form 395-B must be collected or used.[59] In addition, although Section 334(a) may bar the Commission from making major changes to its EEO forms, merely switching to a

---

[53] Commission Starks also implies that the data is needed to help the FCC determine whether additional regulatory actions are necessary. Further Notice, Statement of Commissioner Geoffrey Starks.

[54] 2008 NAB Comments at 4.

[55] Further Notice at ¶ 19.

[56] 2008 OH/VA/NC Comments at 10; 47 U.S.C. § 334.

[57] Further Notice at ¶ 18.

[58] 47 U.S.C. § 334(a).

[59] *See Television, AM Radio, FM Radio; Amendment to the Commission's Rules and Procedures Concerning Broadcast Equal Opportunity Practices and Reporting Requirements*, Report and Order, MM Docket No. 85-30, 52 Fed. Reg. 26683 (July 16, 1987) (attaching the EEO rule that remained in place as of 1992).

confidential process would not require any substantive changes to the form.[60] Furthermore, Section 334(c) permits the FCC to make "nonsubstantive technical or clerical revisions" to the EEO rules as of September 1, 1992.[61] Although those rules did not indicate a particular filing method for Form 395-B, this provision certainly implies FCC flexibility to make non-substantive changes to the EEO forms as well, such as switching to a confidential collection method. The data to be collected would remain unchanged, as would broadcasters' EEO obligations. The only difference would involve the public's access to the data.

Thus, if Form 395-B is reinstated, the only permissible approach requires confidential filing of the form and use of the data on an anonymized, aggregated basis. NAB submits that collecting the form under the confidentiality protections provided in the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA) would appear to be a reasonable mechanism.[62] Pursuant to CIPSEA, data collected by a government agency under a pledge of confidentiality for "exclusively statistical purposes" may not be disclosed by the agency in identifiable form, for any use other than a statistical purpose, except with the consent of the filers.[63] CIPSEA defines "statistical purpose" as the "description, estimation, or analysis of the characteristics of groups, without identifying the individuals or organizations that comprise such groups."[64] The term "nonstatistical purpose" is defined as "the use of date in identifiable form for any purpose that is not a statistical purpose,

---

[60] *See, e.g.*, Joint Reply Comments of the Named State Broadcasters Associations, MB Docket No. 98-204, at 7 (Aug. 9, 2004).

[61] 47 U.S.C. § 334(c).

[62] Further Notice at ¶¶ 10 and 21.

[63] CIPSEA, § 512(b).

[64] CIPSEA, § 502(9).

including any administrative, regulatory, law, enforcement, adjudicatory, or other purpose

that affects the rights, privileges, or benefits of a particular identifiable respondent."[65]

Form 395-B would seem to meet these parameters. The data is clearly statistical in

nature as filers must only complete a grid indicating the number of employees in various job

categories by race, ethnicity and gender. The form requires no descriptive text or other

narrative. The Commission has clarified that the form data will only be used for statistical as

opposed to nonstatistical purposes:

> The Commission will no longer use the employment profile data in the annual
> employment reports in screening renewal applications or assessing compliance
> with EEO program requirements. The Commission will use this information only
> to monitor industry employment trends and report to Congress.[66]

The information on Form 395-B is merely a compilation of data from broadcasters that, as

required under CIPSEA's definition of "statistical purpose," will be used only to "estimate"

and "analyze" the workforce of the broadcasting industry.

If the FCC elects to reinstate Form 395-B, using CIPSEA should help to assuage

confidentiality concerns without impeding the FCC's use of the data. For example, unlike

completely anonymous filings, this process would allow the FCC to connect filers with their

forms and follow-up with broadcasters who do not file or submit incomplete reports.[67]

CIPSEA may also help to increase broadcasters' trust in the process.[68]

---

[65] *Id*. at § 502(5).

[66] Further Notice at ¶ 6, *citing Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, MM Docket Nos. 98-204, 96-16, Report and Order, 15 FCC Rcd 2329, 2332 (2000). The FCC added a special note to the EEO rules to this effect to help alleviate the concerns of wary broadcasters. 47 C.F.R. § 73.3612 Note.

[67] Further Notice at ¶ 16-17.

[68] *See Office of Mgmt. & Budget, Implementation Guidance for Title V of the E-Government Act, Confidential Information Protection and Statistical Efficiency Act of 2002*, Notice of Decision, 72 Fed. Reg. 33362 (June 15, 2007) (2007 CIPSEA Guidance).

There appears to be no substantial logistical bars to the FCC's use of CIPSEA, which provides several options for confidential information collections. For example, the Commission could possibly designate the Office of Economics and Analytics or perhaps a subset of either as a "statistical agency or unit" that is allowed to collect and analyze the data pursuant to CIPSEA.[69] Under this approach, the specified unit's activities would be "predominantly the collection, compilation, processing, or analysis of [Form 395-B] information for statistical purposes," consistent with CIPSEA's requirements.[70] This approach would also favorably resolve the FCC's concern about using contractors to assist in the collection and analysis of the data.[71]

Alternatively, the FCC could collect Form 395-B pursuant to CIPSEA's requirements for the handling of data by "nonstatistical agencies or units."[72] In this case, however, CIPSEA does not authorize the agency or unit to designate contractors or other agents to assist in the collection and examination of confidential data, although the FCC could still fulfill its goals by designating in-house employees to perform exclusively statistical activities on the Form 395-B data.

CIPSEA provides yet another alternative that allows nonstatistical agencies or units, instead of collecting data directly, to enter into an agreement with a Federal statistical agency or unit that would be responsible for protecting confidential information acquired under CIPSEA.[73] In this scenario, the statistical agency or unit could designate certain FCC

---

[69] 44 U.S.C. § 3561(8).

[70] CIPSEA, § 502(8).

[71] Further Notice at ¶ 21; CIPSEA at § 512(d); *see also* 2007 CIPSEA Guidance.

[72] CIPSEA at §512(c).

[73] 2007 CIPSEA Guidance, at note 79.

staff as agents of the statistical agency or unit to help "perform exclusively statistical

activities" on the confidential information on Form 395-B.[74] Accordingly, NAB submits that

CIPSEA would seem to provide multiple workable approaches for the FCC to collect Form

395-B without compromising the confidentiality of the date and without impeding its ability

to use the data as intended.[75]

V.    **THE FORM 395-B FILING PROCESS AND INFORMATION SHOULD BE HARMONIZED WITH THE EEOC'S PROCESS FOR EEO-1 REPORTS AND BROADCASTERS REQUIRED TO FILE THE EEO-1 REPORT EXCUSED FROM FILING FORM 395-B**

The FCC adopted changes to Form 395-B in 2008 designed to track the racial and

employment categories on the EEO-1 Report.[76] Although Form 395-B was suspended, OMB

approved this updated version of the form in August 2008 and has extended approval

through June 2023,[77] subject to the FCC's resolution of the confidentiality issues described

above. NAB simply requests that the FCC continue to ensure that the categories on Form

395-B match those on the EEOC's EEO-1 Report.[78]

---

[74] *Id.*

[75] The recently enacted Foundations for Evidence Based Policymaking Act of 2018 (Evidence Act) would not seem to be an obstacle because it only applies to information collections that were created on or after January 14, 2019, and therefore would not cover Form 395-B. 44 U.S.C § 3506(b)(6); Notice at ¶ 22. The FCC itself characterizes Form 395-B as "suspended" (Further Notice at ¶ 1) and claims that neither of the D.C. Circuit Court decisions invalidated the FCC's ability to collect the form. *Id.* at ¶ 12. The FCC also seeks comment on whether to "reinstate" Form 395-B. *Id.* at ¶ 22. None of these terms can sensibly be used to describe a requirement has been newly "created" as that term is used in the Evidence Act. 44 U.S.C. § 3506(b)(2)(B)(i)(I).

[76] *Commission Proposes Changes to FCC Forms 395-A and 395-B*, MM Docket No. 98-204, Public Notice, 23 FCC Rcd 13142-43 (MB 2008).

[77] *See* https://omb.report/omb/3060-0390.

[78] Further Notice at ¶ 20.

In fact, given the EEOC's role as the nation's primary expert agency on employment discrimination laws and policy,[79] NAB submits that the FCC should follow the EEOC's lead on all matters related to collecting annual employment data. Like the permitted use of Form 395-B, the EEOC uses the data on EEO-1 Reports to analyze employment trends.[80] However, EEO-1 Reports are submitted on a confidential basis, and the EEOC is only allowed to publish aggregated data in a manner that does not identify any specific filer.[81] Information from EEO-1 Reports may not be made public unless an enforcement proceeding is started under Title VI of the Civil Rights Act of 1964.[82] If confidential data is sufficient for the EEOC to analyze employment trends, it should clearly be so for the FCC. Moreover, unlike the EEOC, the FCC may not use the Form 395-B data for enforcement purposes, essentially zeroing out any justification for the FCC to publicly disclose the data.

In the same vein, given that the forms collect the same data, there is little need for the FCC to require broadcasters who must file the EEO-1 Report to also submit the Form 395-B. Requiring companies to duplicate these efforts would be a time-consuming waste of resources. The FCC should consider exempting such broadcasters from filing Form 395-B, since the FCC could retrieve the data from the EEOC (on a confidential basis), or at most, require such companies to forward a copy of their EEO-1 Report to the FCC in lieu of filing the Form 395-B. Either of these approaches would further the Commission's long-standing

---

[79] https://www.eeoc.gov/overview.

[80] *Id*.

[81] *See* https://eeocdata.org/EEO1/support/faq.

[82] 42 U.S.C. § 2000e-8(e).

efforts to reduce administrative burdens on broadcasters and the unnecessary waste

of Commission resources, without undermining the FCC's ability to implements its policies.[83]

## VI.    CONCLUSION

For the reasons stated above, NAB does not object to the FCC reinstating Form 395-

B, as long as the individual filers cannot be publicly identified. NAB, however, encourages

the Commission to put its time and resources into actually helping broadcasters hire and

retain a more diverse workforce. The current regulatory approach adds continued burdens

on broadcasters with no corresponding benefits. NAB wholeheartedly supports the goal of

increased diversity among our workforce and would like to have the Commission take steps

that contribute to our reaching that important goal.

Respectfully submitted,

Rick Kaplan
Larry Walke

NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street SE
Washington, DC 20003
(202) 429-5430

September 30, 2021

---

[83] *See, e.g., Elimination of Obligation to File Broadcast Mid-Term Report (Form 397) Under Section 73.2080(f)(2); Modernization of Media Regulation Initiative*, MB Docket Nos. 18-23 and 17-10, 34 FCC Rcd 668 (2019).

Tab 9

**Federal Communications Commission**                    **FCC 04-103**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Review of the Commission's | ) | MM Docket No. 98-204 |
| Broadcast and Cable | ) | |
| Equal Employment Opportunity | ) | |
| Rules and Policies | ) | |

**THIRD REPORT AND ORDER AND FOURTH**
**NOTICE OF PROPOSED RULEMAKING**

**Adopted: April 19, 2004**                               **Released: June 4, 2004**

**Comment Date: 21 days after publication in the Federal Register**
**Reply Comment Date: 31 days after publication in the Federal Register**

By the Commission: Chairman Powell issuing a statement; Commissioner Martin approving in part, concurring in part, and issuing a statement; Commissioners Copps and Adelstein approving in part, dissenting in part, and issuing a joint statement.

## I. BACKGROUND

1.      The *Second Notice of Proposed Rulemaking* in this proceeding[1] proposed and requested comment on new broadcast station and multichannel video programming distributor (MVPD) equal employment opportunity (EEO) rules and new annual employment report forms to collect data on the race, ethnicity, and gender of the workforce of broadcast and MVPD[2] employment units. In the *Second Report and Order and Third Notice of Proposed Rulemaking* in this proceeding, we adopted new broadcast and MVPD EEO rules, but deferred action on the issues relating to the Annual Employment Report forms.[3]  We now address those issues and adopt revised FCC Form 395-B, the broadcast station Annual Employment Report, and FCC Form 395-A, the multichannel video programming distributor Annual Employment Report.[4]  We also seek comment in the *Fourth Notice of Proposed Rulemaking* on the Commission's policies regarding public access to data contained in FCC Forms 395-A and 395-B.

---

[1]     16 FCC Rcd 22843 (2001) (*Second NPRM).*

[2]     Section 634 of the Communications Act of 1934, as amended, generally applies to "cable operators." However, Section 634(h)(1) states that, "For purposes of this section, the term 'cable operator' includes any operator of any satellite master antenna television system, including a system described in section 602(7)(A) and any multichannel video programming distributor."

[3]     *Second Report and Order and Third Notice of Proposed Rulemaking*, 17 FCC Rcd 24018 (2002), *recon. pending (Second Report and Order and Third NPRM).*

[4]     The previous Form 395-A, adopted in *Report and Order in MM Docket Nos. 98-204 and 96-16*, 15 FCC Rcd 2329 (2000) (*Report and Order), recon. denied,* 15 FCC Rcd 22548 (2000), applied only to cable units and included an EEO program report.  The *Report and Order* also provided for an almost identical Form 395-M, which applied to wireless MVPD operators.  In the *Second Report and Order and Third NPRM,* we explained why there was no need to have separate forms for cable and wireless MVPD operators and we extracted the EEO program report portion of the old Forms 395-A and 395-M to form a new Form 396-C. *See id.* ¶ 178.  The 395-A we adopt

2.   In previously deferring action with respect to FCC Forms 395-A and 395-B, we stated that a deferral would permit us to coordinate these forms with new standards for classifying data on race, ethnicity, and job categories adopted by the Office of Management and Budget (OMB).[5]   OMB has responsibilities under the *Paperwork Reduction Act of 1995* for coordinating data collection forms adopted by the Federal government.  This deferral was also intended to provide additional time to address issues concerning the collection and processing of the forms.  The Commission indicated that the data collected in the employment reports would be used to compile industry employment trend reports and reports to Congress and would not be used to determine compliance with the substantive EEO rules adopted.[6]

## II.  DISCUSSION

3.   The information provided by the annual employment reports is important in order to ascertain industry trends, report to Congress, and respond to inquiries from Congress.  We note that Congress relied in part on media industry employment data in the 1992 Cable Act.[7]  The Commission has broad authority under the Communications Act to collect information and prepare reports.[8]  Further, as we have stated previously, collection of television broadcast and MVPD industry employment data is required by the Communications Act.  Section 634(d)(3)(A) of the Communications Act requires the Commission to adopt rules requiring MVPDs with more than 5 full-time employees to "file with the Commission an annual statistical report identifying by race, sex, and job title the number of employees" in each of specifically identified full-time and part-time job categories."[9]  Section 334(a) of the Communications Act requires the Commission to maintain EEO rules for television broadcast station licensees and provides that "except as specifically provided in this section, the Commission shall not revise--…(2) the forms used by such licensees and permittees to report pertinent employment data to the Commission."[10]  Section 334(b) authorizes the Commission to make nonsubstantive technical or clerical changes.[11]  Thus, we are directed by statute to require the submission of such reports by broadcast television stations and MVPDs.[12]  Furthermore, we have authority to require employment reports for all broadcasters and MVPDs and would exercise that authority even if not required by statute to do so.

---

today applies to all MVPD units that must file the form and contains only the annual employment report portion of the old forms.

[5]   *Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity*, 62 Fed. Reg. 58782 (1997).

[6]   *Second Report and Order and Third Notice of Proposed Rulemaking* ¶ 17.

[7]   *See Cable Television Consumer Protection and Competition Act of 1992,* Pub. L. No. 102-385, 106 Stat. 1460, 1498, Section 22(g) (1992).

[8]   *See, e.g.,* 47 U.S.C. §§ 154(i) and (k), 303(r), 403.

[9]   47 U.S.C. § 554(d)(3)(A).  The section specifies fifteen job categories.

[10]   47 U.S.C. § 334(a).

[11]   47 U.S.C. § 334(b).

[12]   An April 22, 2003, filing from the National Alliance of State Broadcasters Associations (NASBA) states that "NASBA's research has uncovered no statute mandating that the FCC now require these reports for broadcasters." NASBA, however, does not address the requirements imposed by Section 334.

2

4.     Thus, we will adopt the requirement that broadcast and MVPD employment units file Forms 395-B and 395-A, respectively.  As explained below, the forms are being readopted and will be submitted to OMB for clearance for use in the year 2004 filing substantially in the same form as those previously used and will be revised in the future, as necessary, in coordination with OMB.  The data collected in the employment reports will be used to compile industry employment trend reports and reports to Congress and will not be used to determine compliance with our EEO rules.

5.     Several commenters urge the Commission to collect ethnicity and gender information in order to analyze industry employment trends.  The American Federation of Television and Radio Artists acknowledges that the reporting of industry employment trends is a valuable public resource, and the Commission is the only entity with the resources necessary to maintain and disseminate data on the demographics of employment in broadcasting.[13]  The National Organization for Women argues that the forms do not impose an undue burden on broadcasters or cable entities, and are mandated by Sections 334 and 634 of the Communications Act.[14]  The Minority Media and Telecommunications Council asserts that no broadcaster or cable company has ever claimed that it endured a cognizable harm from the dissemination of Form 395 data.[15]

6.     Other commenters assert that collection of Form 395-B is prohibited by the decisions of the U.S. Court of Appeals for the District of Columbia Circuit in *Lutheran Church – Missouri Synod v. FCC*,[16] and *MD/DC/DE Broadcasters Association v. FCC*.[17]  The State Broadcasters Associations (StBAs), NASBA, and the National Association of Broadcasters (NAB) allege that collection and public disclosure of the data required by Form 395-B will be used to pressure broadcasters to adopt race or gender-based hiring policies in contravention of *Lutheran Church*.[18]  If the data is collected, NAB, StBAs and Radio Licensees urge the Commission to collect 395-B data on an anonymous basis.[19]  NAB and NASBA specifically propose a filing procedure whereby the Commission would "tear off" the station's identifying information from the 395-B form once filing is established.[20]  Golden Orange Broadcasting (Golden Orange) proposes that the individual data be kept confidential.[21]  StBAs, NASBA and NAB further propose that non-FCC personnel compile the data.[22]  NAB stresses that a third party would not be

---

[13]     American Federation of Television and Radio Artists Comments at 21.

[14]     National Organization for Women Comments at 28-30.

[15]     Minority Media and Telecommunications Council Comments at 122.

[16]     141 F.3d 344 (D.C. Cir. 1998), *pet. for reh'g denied*, 154 F.3d 487, (D.C. Cir.) *pet. for reh'g en banc denied*, 154 F.3d 494 (D.C. Cir.) (*Lutheran Church*).

[17]     236 F.3d 13, *rehearing den.*, 253 F.3d 732 (D.C. Cir. 2001), *cert. denied*, 122 S.Ct. 920 (2002) (*Association*).

[18]     StBAs Comments at 48-51; NASBA Comments at 2-4; NAB Comments at 62; StBAs October 15, 2003 Comments at 2; NAB October 7, 2003 Comments at 3;  StBAs January 5, 2004 Comments.

[19]     NAB August 4, 2003 Comments at 7; StBAs Comments at 51; Radio Licensees Comments at 5; NAB October 7, 2003 Comments at 7.

[20]     NAB August 4, 2003 Comments at 7; NASBA  August 4, 2003 Comments at 5; StBAs October 15, 2003 Comments at 2-3.

[21]     Golden Orange Comments at 29-30.

[22]     StBAs Comments at 51; NASBA August 4, 2003 Comments at 5; NAB August 4, 2003 Comments at 8; NAB October 7, 2003 Comments at 7.

3

subject to any federal statutes which might prevent the Commission from keeping the identity of the filer anonymous.[23]  BIA Financial Network, Inc. proposes to serve as an independent third party to collect employment trend report data for the Commission.[24]

7.    We do not agree that *Lutheran Church* invalidated the data collection process.  The court focused in that decision on the Commission's previous "processing guidelines disclosing the criteria it used to select stations for in-depth EEO review when their licenses came up for renewal."[25]  It then made clear that "[i]f the regulations merely required stations to implement racially neutral recruiting and hiring programs, the equal protection guarantee would not be implicated."[26]  And it reiterated in response to the government's rehearing petition that it had not held that a regulation "encouraging broad outreach to, as opposed to the actual hiring of, a particular race would necessarily trigger strict scrutiny."[27]  The court did not conclude that the Commission lacks authority to collect statistical employment data for the purpose of analyzing industry employment trends or preparing annual employment trend reports, or that collecting employment data for those purposes would unconstitutionally pressure broadcasters to adopt race or gender-based hiring policies.

8.    In *Association,* the court upheld all of the reporting requirements adopted by the Commission in the 2000 *Report and Order,*[28] including the requirement for filing the Form 395-B, rejecting the broadcasters' argument that those requirements were an arbitrary and capricious regulatory burden.[29]  Nothing in the court's decision suggests that collection of 395-B data for the limited purpose for which it is intended is impermissible.  The Court did find that the requirement that licensees report the race and gender of applicants, in conjunction with then existing EEO rules, pressured licensees to focus their recruiting efforts on women and minorities.[30]  Therefore, it held that such reporting was subject to strict scrutiny.  Nothing in the Court's opinion, however, suggests that the collection of the FCC Form 395-B data regarding the filer's employees for the purpose of compiling trend reports and reports to Congress is by itself subject to strict scrutiny or unconstitutional.

9.    Nor do we believe that the filing of annual employment reports will unconstitutionally pressure entities to adopt racial or gender preferences in hiring.[31]  The Commission will not use the data in the reports to screen renewal applications or to assess compliance with our EEO regulations.  Thus, the Commission is not compelled to compile or to hire outside parties to collect data on an anonymous or confidential basis, as suggested by StBAs, BIA Financial Network, Inc., NASBA, NAB, Radio Licensees and Golden Orange.  Furthermore, the Commission must preliminarily review each Form 395-B to ensure

---

[23]    NAB August 4, 2003 Comments at 7; NAB October 7, 2003 Comments at 8.

[24]    BIA Financial Network, Inc. August 4, 2003 Comments; StBAs October 15, 2003 Comments at 2.

[25]    141 F.3d at 352.

[26]    141 F.3d at 351.

[27]    154 F.3d at 492.

[28]    15 FCC Rcd 2329 (2000), *recon. denied*, 15 FCC Rcd 22548 (2000).

[29]    236 F.3d at 17.

[30]    *Id.* at 18-19.

[31]    NAB Comments at 62-63; StBAs Comments at 49-51; NASBA Comments at 2; NAB October 7, 2003 Comments at 4-6.

4

completeness and contact the filer, if necessary. If the filer's identity were unknown to the Commission's staff, it could not ensure the completeness of the data. Thereafter, the Commission may be called upon to provide trend data based on markets, size of stations, services, or other criteria that could not be reconstructed from totally anonymous forms. Thus, allowing forms to be collected so that filers would be anonymous to Commission staff could defeat or impair the Commission's data collection effort. We realize however, that some commenters believe that third party access to Form 395-B data will leave broadcast licensees vulnerable to complaints or lawsuits and induce them to change their hiring patterns to forestall such charges.[32] We believe that the record in this proceeding would benefit from further discussion on this issue and others relating to public access to Form 395-B and 395-A data. Accordingly, we will seek additional comment on these issues in the *Fourth Notice of Proposed Rulemaking* below.

10.     Some commenters argue that broadcast stations with 100 or more employees are already required to file annual gender and racial/ethnic data with the Equal Employment Opportunity Commission (EEOC) on its "Employer Information Report EEO-1" (EEO-1), so that there is no need for the Commission to duplicate these efforts by requiring the filing of FCC Form 395-B.[33] These commenters contend that the 395-B is unnecessary because the Commission can obtain statistically relevant information from reviewing the EEO-1 alone. We disagree. The two forms differ in the data they collect and the EEO-1 data would not provide the information specified by Congress in Sections 334 and 634. Unlike the EEO-1, Form 395-B distinguishes between full and part-time employees and our broadcast trend reports focus on data regarding full-time employees. Therefore the Commission could not use the EEO-1 data in lieu of the 395-B data for this purpose. Further, if we obtained trend report data only from employment units with 100 or more employees, the trend report would be significantly incomplete. It would not include 6,592 employment units (79%) out of a total of 8,395 units and would exclude 136,993 full-time employees (84%) out of the 163,868 full-time employees in broadcasting working at employment units employing five or more full-time employees.[34] In an effort to reduce filing burdens, however, we will permit broadcasters to file only one Form 395-B for all commonly owned stations in the same market that share at least one employee. Moreover, the smallest stations (fewer than five full-time employees) are exempt from filing Form 395-B.

11.     The American Cable Association (ACA), on behalf of small cable operators, requests, without further elaboration, that the Commission institute a "streamlined Form 395-A" in order to reduce administrative burdens and costs.[35] We reject this proposal. Our annual employment reports must follow the statutory requirements noted above and also must be submitted to OMB for review to conform to OMB standards for classifying data on race and ethnicity.[36]

12.     Finally, as noted above, we stated in the *Second Report and Order and Third NPRM* that we would need to revise our Forms 395-A and 395-B to comply with new OMB racial classification standards. We have attempted to parallel our classification reporting with those adopted by the Equal Employment Opportunity Commission, which is in turn addressing the OMB classification issues. Our

---

[32]     *Id.*

[33]     Radio Licensees Comments at 5; NAB Comments at 61-62; NASBA Comments at 2.

[34]     We base these data on information compiled from 395-B forms filed in 2000.

[35]     ACA Comments at 4.

[36]     *See* Race and Ethnic Standards for Federal Statistics and Administrative Reporting, OMB Statistical Policy Directive No. 15; Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782 (1997).

5

forms and reports conform to the existing EEO-1 racial and employment categories. Although the EEOC has proposed an updated EEO-1 to conform to the new OMB standards, the form has yet to be finalized.[37] Therefore, to avoid any unnecessary confusion that might result from the use of different classification standards, we will continue to use the racial and employment categories in the Forms 395-A and 395-B adopted in 2000, which conform to the current EEO-1, until the new EEO-1 is released. At that time, we will review the annual employment reports to see what changes are needed to comply with the new OMB standards, and whether we can conform our forms to those standards consistent with Sections 334 and 634 of the Act.[38] Other than deleting EEO program information, now requested in the FCC Form 396-C, as noted above,[39] the only change we have made at this time is to delete the request for system community information in Section II of the previous 395-A and replace it with a request for the employment unit's physical system identification number(s). This modification will reduce the paperwork burden for MVPD units.[40]

13.     Under the annual employment report filing requirements that we adopt, broadcasters with five or more full-time employees will be required to file Form 395-B by September 30 of each year. MVPD units with six or more full-time employees will be required to file Form 395-A by September 30 of each year. We will allow, this year only, a one-time filing grace period until a date to be determined in the Commission's Order addressing the issues raised in the *Fourth Notice of Proposed Rulemaking* below. This grace period will give entities adequate time to collect the data needed to fulfill their filing requirements and will allow us to accommodate changes, if any, to the Forms 395-A and 395-B made necessary by the comments received in response to the *Fourth Notice of Proposed Rulemaking*. Regardless of what grace period deadline we ultimately set for filing the forms, they will be required to reflect any pay period from July, August, or September 2004, as provided for in the instructions to Form 395-B and § 76.77(a) of the Commission's rules, 47 C.F.R. § 76.77(a), for Form 395-A.

## III.  FOURTH NOTICE OF PROPOSED RULEMAKING

14.     Broadcasters have filed FCC Form 395-B, the Broadcast station Annual Employment Report, with the Commission for more than thirty years. Throughout the form's long history, the Commission has made it available to the public for inspection. Indeed, there was no exemption from the disclosure requirements of the Freedom of Information Act [41] that would have permitted the Commission to keep the data confidential. MVPDs have for years filed an Annual Employment Report on FCC Form 395-A, which unlike its broadcast equivalent, is required by statute to be made available for public inspection at the MVPD's central office and at every office where five or more full time employees are regularly assigned to work.[42] The recently enacted Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA),[43] allows agencies to collect information for statistical purposes under a

---

[37]     *See* 68 Fed. Reg. 34965-6 (June 11, 2003).

[38]     At such time as the EEOC revises its forms, we direct the staff of the Media Bureau to seek public comment in this proceeding on whether those changed standards should be used in our 395-A and 395-B forms.

[39]     *See* supra text note 4.

[40]     The public will still have access to a list identifying communities served by MVPD units by checking the FCC Media Bureau web site, www.fcc.gov/mb/vax/registeredcuid.xls

[41]     *See* 5 U.S.C. § 552.

[42]     *See* 47 U.S.C. § 554 (d)(3)(B).

[43]     Pub. L. 107-347, 116 Stat  2962, Dec. 17, 2002, codified in note to 44 U.S.C. § 3501.

pledge of confidentiality. CIPSEA defines "statistical purpose" as the "description, estimation, or analysis of the characteristics of groups, without identifying the individuals or organizations that comprise such groups…" CIPSEA, Sec.502(9). The law defines "nonstatistical purpose" as "the use of data in identifiable form for any purpose that is not a statistical purpose, including any administrative, regulatory, law enforcement, adjudicatory, or other purpose that affects the rights, privileges, or benefits of a particular identifiable respondent…" CIPSEA, Sec. 502(5). If an agency collects information pursuant to CIPSEA under a pledge of confidentiality, it is exempt from release under the Freedom of Information Act and may not be disclosed in an identifiable form for any non-statistical purpose without the informed consent of the respondent.

15.    We seek comment on whether a broadcaster's Form 395-B is the type of material to which CIPSEA could pertain. As noted above, the data collected in the employment reports will be used to compile industry employment trend reports and report to Congress, and will not be used to determine compliance with our EEO rules. As such, this purpose appears to fall within the statutory definition of "statistical purpose." We seek comment on what public policy goals might be advanced by making this information publicly available even if CIPSEA allows the Commission to keep it confidential. Historically, the Commission has made the information public. We seek comment on whether altering our approach would be consistent with section 334 of the Act. We also seek comment on whether altering our approach would be appropriate given the efforts of the Advisory Committee on Diversity for Communications in the Digital Age.

16.    We seek comment as to whether Congress's clear directive that MVPD operators must make Form 395-A available for public inspection at their own facilities should be read to suggest an intent that the Commission, itself, also make Form 395-A publicly available. In light of the directive in section 554(d)(3)(B) for filers to make 395-A publicly available, we seek comment on whether CIPSEA even allows the Commission to keep MVPDs' Form 395-A confidential. In addition, does the Congressional directive that MVPDs make Form 395-A publicly available have any bearing on whether the Form 395-B should be made available to the public, as the Commission has done for more than thirty years?

17.    Were the Commission to collect such information under a pledge of confidentiality, and CIPSEA were to apply, we seek comment on whether CIPSEA allows us to keep the identity of the Form 395-B filer (i.e., name, address and station) confidential while making the station's employment data public. Finally, we seek comment on the "tear off" option proposed by NAB and NASBA[44] under which only the station's identifying information would be withheld from public inspection, and what such information would be identifying.[45] We seek comment as to what policy objectives such an approach would further. We also seek comment as to whether use of this option would be consistent with CIPSEA or would violate the Federal Records Act.[46]

## IV. PROCEDURAL MATTERS AND ORDERING CLAUSES

18.    *Final Regulatory Flexibility Analysis*. As required by the Regulatory Flexibility Act (RFA), *see* 5 U.S.C. § 603, an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the

---

[44]    *See* note 20, *supra.*

[45]    Although this is referred to as "tearing off" the information, given that the forms will be filed electronically, the information actually would be blocked before release.

[46]    44 U.S.C. §§ 2101 *et seq.*, 3101 *et seq.*, and 3301 *et seq. See also Armstrong v. Executive Office of the President,* 1 F.3d 1274 (D.C. Cir. 1993).

*Second NPRM*. The Commission sought written public comments on the possible significant economic impact of the proposed policies and rules on small entities in the *Second NPRM*, including comments on the IRFA. Pursuant to the RFA, *see* 5 U.S.C. § 604, a Final Regulatory Flexibility Analysis (FRFA) is contained in Appendix A.

19. *Paperwork Reduction Act of 1995 Analysis*. The actions herein have been analyzed with respect to the Paperwork Reduction Act of 1995 and found to impose new or modified reporting and recordkeeping requirements or burdens on the public.

20. *Ex Parte Rules*. With respect to the *Fourth Notice of Proposed Rule Making* (*Fourth NPRM*), this is a permit-but-disclose notice and comment proceeding. Ex parte presentations are permitted except during the Sunshine Agenda period, provided they are disclosed as provided in the Commission's Rules. *See generally* 47 CFR Sections 1.1202, 1.1203, and 1.1206(a).

21. *Comments and Reply Comments*. Pursuant to Sections 1.415 and 1.419 of the Commission's rules, 47 C.F.R. §§ 1.415, 1.419, interested parties may file comments on or before **(21 days after publication in the Federal Register)** and reply comments on or before **(31 days after publication in the Federal Register)**. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS) or by filing paper copies. *See Electronic Filing of Documents in Rulemaking Proceedings, 63 Fed. Reg. 24, 121 (1998).*

22. Comments filed through ECFS can be sent as an electronic file via the Internet to http://www.fcc.gov/e-file/ecfs.html. Generally, only one copy of an electronic submission must be filed. If multiple docket or rulemaking numbers appear in the caption of this proceeding, however, commenters must transmit one electronic copy of the comments to each docket or rulemaking number referenced in the caption. In completing the transmittal screen, commenters should include their full name, Postal Service mailing address, and the applicable docket or rulemaking number. Parties may also submit an electronic comment by Internet e-mail. To get filing instructions for e-mail comments, commenters should send an e-mail to ecfs@fcc.gov, and should include the following words in the body of the message, get form <your e-mail address>. A sample form and directions will be sent in reply. Parties who choose to file by paper must file an original and four copies of each filing. If more than one docket or rulemaking number appears in the caption of this proceeding, commenters must submit two additional copies for each additional docket or rulemaking number. All filings must be sent to the Commission's Secretary, Marlene H. Dortch, Office of the Secretary, Federal Communications Commission, 445 Twelfth Street, S.W., TW-A325, Washington, D.C. 20554.

23. Parties who choose to file by paper should also submit their comments on diskette. These diskettes should be submitted to: Wanda Hardy, 445 Twelfth Street, S.W., Room 3-A669, Washington D.C. 20554. Such a submission should be on a 3.5 inch diskette formatted in an IBM compatible format using Word 97 or compatible software. The diskette should be accompanied by a cover letter and should be submitted in "read only" mode. The diskette should be clearly labeled with the commenter's name, proceeding (including the docket number in this case, MM Docket No. 98-204), type of pleading (comment or reply comment), date of submission, and the name of the electronic file on the diskette. The label should also include the following phrase "Disk Copy-Not an Original." Each diskette should contain only one party's pleadings, preferably in a single electronic file. In addition, commenters must send diskette copies to the Commission's copy contractor, Best Copy and Printing, Inc., Portals II, 445 12th Street, S.W., Room CY-B402, Washington, D.C. 20554.

24. Comments and reply comments will be available for public inspection during regular hours in the FCC Reference Center, Federal Communications Commission, 445 Twelfth Street, S.W., CY-A257, Washington, D.C. 20554, or at www.fcc.gov/searchtools.html. Persons with disabilities who

need assistance in the FCC Reference Center may contact Bill Cline at (202)418-2555 TTY, or bill.cline@fcc.gov.

25.     To request materials in accessible formats for people with disabilities (electronic files, large print, audio format and Braille), send an email to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0531 (voice), 418-7365 (tty).

26.     *Initial Regulatory Flexibility Certification*.  The Regulatory Flexibility Act of 1980, as amended (RFA),[47] requires that an initial regulatory flexibility analysis be prepared for notice-and-comment rule making proceedings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[48]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[49]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[50]  A "small business concern" is one which (1) is independently owned and operated; (2) is not dominant in the field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[51]

27.     In the *Fourth Notice of Proposed Rulemaking*, the Commission seeks comments on the Commission's policies regarding public access to data contained in FCC Forms 395-A and 395-B.  The policy changes proposed relate exclusively to the issue of whether the Commission should make the data in these forms available for public inspection.  Any change made as a result of the comments received in response to this notice will have not have a significant economic impact on a substantial number of small entities because it will not change the data collected from broadcasters or MVPDs.  Therefore, we certify that the proposals in this Notice, if adopted, will not have a significant economic impact on a substantial number of small entities.

28.     *Authority*.  This *Fourth NPRM* is issued pursuant to authority contained in Sections 1, 4(i), 4(k), 257, 301, 303(r), 307, 308(b), 309, 334, 403 and 634 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(k), 257, 301, 303(r), 307, 308(b), 309, 334, 403 and 554.

29.     Accordingly, IT IS ORDERED that, pursuant to the authority contained in Sections 1, 4(i), 4(k), 303(r), 334, 403, and 634 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(k), 303(r), 334, 403, and 554, this *Third Report and Order and Fourth Notice of Proposed Rulemaking* IS ADOPTED, and Part 73 and Part 76 of the Commission's Rules ARE AMENDED as set forth in attached Appendix B.

---

[47]     *See* 5 U.S.C. §§ 603.  The RFA, see 5 U.S.C. § 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[48]     5 U.S.C. § 605(b).

[49]     5 U.S.C. § 601(6).

[50]     5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business Concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the  activities of the agency and publishes such definition(s) in the Federal Register."

[51]     15 U.S.C. § 632.

9

**Federal Communications Commission**                    **FCC 04-103**

30.    IT IS FURTHER ORDERED that the new rules and amendments set forth in Appendix B, and the information collection contained in these rules, WILL BECOME EFFECTIVE the latter of (i) 30 days after publication of the text or a summary thereof in the Federal Register or (ii) publication in the Federal Register of an announcement of OMB approval.

31.    IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this *Third Report and Order* and *Fourth Notice of Proposed Rulemaking* including the Final Regulatory Flexibility Analysis and the Initial Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

10

APPENDIX A

FINAL REGULATORY FLEXIBILITY ANALYSIS

As required by the Regulatory Flexibility Act (RFA),[52] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated into the *Second Notice of Proposed Rule Making (Second NPRM)* in this proceeding.[53] The Commission sought written public comments on the possible significant economic impact of the proposed policies and rules on small entities in the *Second NPRM*, including comments on the IRFA. This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[54]

**A.  Need for, and Objectives of, the Proposed Rule Changes:**

This *Third Report and Order* adopts new rules and forms for broadcasters and multi-channel video program distributors (MVPDs) that enable the Commission to collect data on the race, ethnicity and gender of the workforce of broadcast and MVPD employment units.  *See* Section C., *infra*.

**B.  Summary of Significant Issues Raised by the Public Comments in Response to the IRFA:**

One comment on annual employment reports was filed specifically in response to the IRFA.  The American Cable Association (ACA) proposes that the Commission generally "streamline" FCC Form 395-A.  The ACA also filed these same comments in response to the *Second NPRM*.  The *Third Report and Order* considers ACA's comments, and determines that the Commission's annual employment reports must follow the standards issued by the Office of Management and Budget for classifying data on race and ethnicity.

**C.  Recording, Recordkeeping, and Other Compliance Requirements:**

This rulemaking adopts FCC Form 395-B, the broadcast Annual Employment Report, and FCC Form 395-A, the multichannel video programming distributors (MVPD) Annual Employment Report.  Forms 395-B and 395-A collect data on the ethnicity and gender of a reporting entity's workforce.  Broadcasters with five or more full-time employees will be required to file Form 395-B by September 30 of each year. MVPD units with six or more full-time employees must file Form 395-A by September 30 of each year. Broadcast entities are not required to place copies of their annual employment reports in their public file. Generally, no special skills will be necessary to comply with the requirements.[55]

---

[52]    *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601 *et. seq.*, has been amended by the Contract With America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat. 847 (1996) (CWAAA).  Title II of the CWAAA is the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA).

[53]    *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policy*, 16 FCC Rcd 22843, 22862 (2001).

[54]    *See* 5 U.S.C. § 604.

[55]    These requirements will be codified at 47 C.F.R. § 73.3612 (broadcasting), 47 C.F.R. § 76.1702 (MVPDs) and 47 C.F.R. § 76.1802 (MVPDs).

11

**D. Description and Estimate of the Number of Small Entities to Which the Rules Would Apply:**

The new rules would apply to broadcast stations and MVPDs. The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[56] Under the RFA, small entities may include small organizations, small businesses, and small governmental jurisdictions.[57] The RFA, 5 U.S.C. § 601(3), generally defines the term "small business" as having the same meaning as the term "small business concern" under the Small Business Act, 15 U.S.C. § 632. A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

A small organization is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[58] Nationwide, there are approximately 1.6 million small organizations.[59] The term "small governmental jurisdiction" is defined as "governments of cities, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.[60] As of 1997, there were about 87,453 governmental jurisdictions in the United States.[61] This number includes 39,044 county governments, municipalities, and townships; of which 37,546, (approximately 96.2 %), have populations of fewer than 50,000, and of which 1,498 have populations of 50,000 or more. Thus we estimate the number of small governmental jurisdictions overall to be 84,098 or fewer.

In this context, the application of the statutory definition to television stations is of concern. An element of the definition of "small business" is that the entity not be dominant in its field of operation. We are unable at this time to define or quantify the criteria that would establish whether a specific television station is dominant in its field of operation. Accordingly, the estimates that follow of small businesses to which rules may apply do not exclude any television station from the definition of a small business on this basis and are therefore over-inclusive to that extent. An additional element of the definition of "small business" is that the entity must be independently owned and operated. We note that it is difficult at times to assess these criteria in the context of media entities and our estimates of small businesses to which they apply may be over-inclusive to this extent.

The Small Business Administration defines a television broadcasting station that has no more than $12 million in annual receipts as a small business.[62] Business concerns included in this industry are those "primarily engaged in broadcasting images together with sound."[63] According to Commission staff

---

[56] 5 U.S.C. § 603(b)(3).

[57] 5 U.S.C. § 601(6).

[58] 5 U.S.C. § 601(4).

[59] Independent Sector, The New Nonprofit Almanac & Desk Reference (2002).

[60] 5 U.S.C. 601(5).

[61] U.S. Census Bureau, Statistical Abstract of the United States:2000, Section 9, pages 299-300, Tables 490 and 492.

[62] *See* OMB, North American Industry Classification System: United States, 1997 at 509 (1997) (NAICS code 513120, which was changed to code 515120 in October 2002).

[63] OMB, North American Industry Classification System: United States, 1997, at 509 (1997) (NAICS code 513120, which was changed to code 51520 in October 2002). This category description continues, "These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming

12

review of the BIA Publications, Inc. Master Access Television Analyzer Database as of May 16, 2003, about 814 of the 1,220 commercial television stations in the United States have revenues of $12 million or less. We note, however, that, in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[64] must be included. Our estimates, therefore, likely overstates the number of small entities that might be affected by any changes to the ownership rules, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.

The SBA defines a radio broadcast entity that has $6 million or less in annual receipts as a small business.[65] Business concerns included in this industry are those "primarily engaged in broadcasting aural programs by radio to the public.[66] According to Commission staff review of the BIA Publications, Inc., Master Access Radio Analyzer Database, as of May 16, 2003, about 10,427 of the 10,945 commercial radio stations in the United States have revenue of $6 million or less. We note, however, that many radio stations are affiliated with much larger corporations with much higher revenue, and that in assessing whether a business concern qualifies as small under the above definition, such business (control) affiliations[67] are included.[68] Our estimate therefore likely overstates the number of small businesses that might be affected by any changes to the ownership rules.

The *Third Report and Order* also amends EEO rules applicable to MVPDs. SBA has developed a definition of a small entity for cable and other program distribution, which includes all such companies generating $12.5 million or less in annual receipts.[69] This definition includes direct broadcast satellite services (DBS), multipoint distribution systems (MDS), and local multipoint distribution service (LMDS). According to Census Bureau data for 1997, there were 1,311 firms within the industry category Cable and Other Program Distribution, total, that operated for the entire year.[70] Of this total, 1,180 firms had annual receipts of $9,999,990.00 or less, and an additional 52 firms had receipts of $10 million to $24,999,999.00.[71] Below we discuss these services to provide a more succinct estimate of small entities.

---

may originate in their own studios, from an affiliated network, or from external sources." Separate census categories pertain to businesses primarily engaged in producing programming. *See id.* at 502-05, NAICS code 51210. Motion Picture and Video Production: code 512120, Motion Picture and Video Distribution, code 512191, Teleproduction and Other Post-Production Services, and code 512199, Other Motion Picture and Video Industries.

[64] "Concerns are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has to power to control both." 13 C.F.R. § 121.103(a)(1).

[65] *See* OMB, North American Industry Classification System: United States, 1997, at 509 (1997) (Radio Stations) (NAICS code 513111, which was changed to code 515112 in October 2002).

[66] *Id.*

[67] "Concerns are affiliates of each other when one concern controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.103(a)(1).

[68] "SBA counts the receipts or employees of the concern whose size is at issue and those of all its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit, in determining the concern's size." 13 C.F.R. § 121(a)(4).

[69] 13 C.F.R. § 121.201 (NAICS codes 513210 and 513220).

[70] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Receipts Size of Firms Subject to Federal Income Tax: 1997," Table 4, NAICS code 513220 (issued Oct. 2000).

[71] *Id.* The census data do not provide a more precise estimate.

13

*Cable Systems*:  The Commission has developed, with SBA's approval, its own definition of small cable system operators.  Under the Commission's rules, a "small cable company" is one serving fewer than 400,000 subscribers nationwide.[72]  Based on our most recent information, we estimate that there were 1,439 cable operators that qualified as small cable companies at the end of 1995.[73]  Since then, some of those companies may have grown to serve more than 400,000 subscribers, and others may have been involved in transactions that caused them to be combined with other cable operators.  Consequently, we estimate that there are 1,439 or fewer small entity cable system operators that may be affected by the rules proposed herein.

The Communications Act also contains a definition of a small cable system operator, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1% of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenue in the aggregate exceeds $250,000,000."[74]  The Commission has determined that there are 67,700,000 subscribers in the United States.[75]  Therefore, we found that an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all of its affiliates, do not exceed $250 million in the aggregate.[76]  Based on available data, we find that the number of cable operators serving 677,000 subscribers or less totals approximately 1,450.[77]  Since we do not request nor collect information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250,000,000, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

*MDS:*  MDS involves a variety of transmitters, which are used to relay programming to the home or office.[78]  The Commission has defined "small entity" for purposes of the 1996 auction of MDS as an entity that, together with its affiliates, has average gross annual revenues that are not more than $40 million for the preceding three calendar years.[79]  This definition of a small entity in the context of MDS auctions has been approved by the SBA.[80]  These stations were licensed prior to implementation of Section 309(j) of the

---

[72] 47 C.F.R. § 67.901(3).  The Commission developed this definition based on its determination that a small cable system operator is one with annual revenues of $100 million or less.  *Implementation of Sections of the 1992 Cable Act:  Rate Regulation, Sixth Report and Order and Eleventh Order on Reconsideration*, 10 FCC Rcd 6393 (1995).

[73] Paul Kagan Associates, Inc., Cable TV Investor, Feb. 29, 1996 (based on figures for Dec. 30, 1995).

[74] 47 U.S.C. § 543(m)(2).

[75] FCC Announces New Subscriber Count for the Definition of Small Cable Operator, Public Notice DA 01-158 (January 24, 2001).

[76] 47 C.F.R. § 76.1403(b).

[77] Paul Kagan Associates, Inc., Cable TV Investor, Feb. 29, 1996 (based on figures for Dec. 30, 1995).

[78] For purposes of this item, MDS includes the single channel Multipoint Distribution Service (MDS) and the Multichannel Multipoint Distribution Service (MMDS).

[79] 47 C.F.R. § 1.2110(a)(1).

[80] *See Amendment of Parts 21 and 74 of the Commission's Rules With Regard to Filing Procedures in the Multipoint Distribution Service and in the Instructional Television Fixed Service and Implementation of Section 309(j) of the Communications Act - Competitive Bidding,* MM Docket No. 94-131 and PP Docket No. 93-253, Report and Order, 10 FCC Rcd 9589 (1995).

14

Communications Act of 1934, as amended.[81]  Licenses for new MDS facilities are now awarded to auction winners in Basic Trading Areas (BTAs) and BTA-like areas.[82]  The MDS auctions resulted in 67 successful bidders obtaining licensing opportunities for 493 BTAs.  Of the 67 auction winners, 61 met the definition of a small business.

*LMDS*:  The auction of the 1,030 LMDS licenses began on February 18, 1998, and closed on March 25, 1998.  The Commission defined "small entity" for LMDS licenses as an entity that has average gross revenues of less than $40 million in the three previous calendar years.[83]  An additional classification for "very small business" was added and is defined as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[84]  These regulations defining "small entity" in the context of LMDS auctions have been approved by the SBA.[85]  There were 93 winning bidders that qualified as small entities in the LMDS auctions.  A total of 93 small and very small business bidders won approximately 277 A Block licenses and 387 B Block licenses.  On March 27, 1999, the Commission reauctioned 161 licenses; there were 40 winning bidders.  Based on this information, we conclude that the number of small LMDS licenses will include the 93 winning bidders in the first auction and the 40 winning bidders in the reauction, for a total of 133 small entity LMDS providers as defined by the SBA and the Commission's auction rules.

*DBS:*  Because DBS provides subscription services, it falls within the SBA-recognized definition of "Cable and Other Program Distribution."[86]  This definition provides that a small entity is one with $12.5 million or less in annual receipts.[87]  Currently, there are nine DBS authorizations, though there are only two DBS companies in operation at this time.  We neither request nor collect annual revenue information for DBS services, and are unable to determine the number of DBS operators that would be considered a small business under the SBA definition.

An alternative way to classify small entities is by the number of employees.  Based on available data, we estimate that in 1997 the total number of full-service broadcast stations with four or fewer employees was 5186, of which 340 were television stations.[88]  Similarly, we estimate that in 1997, 1900 cable employment units employed fewer than six full-time employees.  Also, in 1997, 296 "MVPD" employment units employed fewer than six full-time employees.[89]  We also estimate that in 1997, the total number of full-

---

[81]    47 U.S.C. § 309(j).  (Hundreds of stations were licensed to incumbent MDS licensees prior to implementation of Section 309(j) of the Communications Act of 1934, 47 U.S.C. § 309(j).  For these pre-auction licenses, the applicable standard is SBA's small business size standard for "other telecommunications" (annual receipts of $11 million or less).  *See* 13 C.F.R. § 121.201.

[82]    *Id.*  A BTA is the geographic area by which the MDS is licensed.   *See* Rand McNally, *1992 Commercial Atlas and Marketing Guide*, 123rd Edition, pp. 36-39.

[83]    *See Local Multipoint Distribution Service, Second Report and Order*, 12 FCC Rcd 12545 (1997).

[84]    *Id.*

[85]    *See* Letter to Daniel Phythyon, Chief, Wireless Telecommunications Bureau, FCC, from A. Alvarez, Administrator, SBA (January 6, 1998).

[86]    13 C.F.R. § 121.201, NAICS codes 513210 and 513220.

[87]    *Id.*

[88]    We base these estimates on a compilation performed by the Equal Employment Opportunity staff, Policy Division, Media Bureau, FCC.

[89]    At that time, we considered '"MVPDs" to be all multichannel video programming distributors that were not cable operators.

15

service broadcast stations with five to ten employees was 2145, of which 200 were television stations. Similarly, we estimate that in 1997, 322 cable employment units employed six to ten full-time employees. Also, in 1997, approximately 65 MVPD employment units employed six to ten full-time employees.[90]

**E.    Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered:**

The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):    (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[91]

This *Third Report and Order* sets forth the Commission's new annual employment reports, and considers the significant alternatives presented in the comments.  We have determined that our finalized rules fulfill our public interest goals while maintaining minimal regulatory burdens and ease and clarity of administration.

The *Third Report and Order* adopts relief for small entities.  Broadcasters with fewer than five full-time employees will not be required to file Form 395-B.  MVPD units with fewer than six full-time employees will not be required to file Form 395-A.  Thus, the EEO Rule does not impose unreasonable burdens on small broadcasters or MVPDs.  We provide this relief because entities with small staffs have limited personnel and financial resources.  The exceptions for small business provides them with some relief of any recordkeeping and reporting costs.

A noted, the ACA asks for a generally "streamlined" FCC Form 395-A.[92]  As explained in the *Third Report and Order,* the Commission's annual employment reports must follow Section 634 of the Act and the standards issued by the Office of Management and Budget for classifying data on race and ethnicity.

**Report to Congress**:  The Commission will send a copy of the *Third Report and Order,* including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).  In addition, the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, will send a copy of this *Third Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  A copy of the *Third Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.  *See* 5 U.S.C. § 604(b).

---

[90]    We note that SBA has approved the EEO small business size standards discussed in the *Third Report and Order.*

[91]    5 U.S.C. § 603(c).

[92]    ACA Comments and IRFA Comments.

16

## APPENDIX B

**I.     Part 73 of Chapter 1 of Title 47 of the Code of Federal Regulations is amended as follows:**

The authority citation for Part 73 continues to read as follows:

AUTHORITY:  47 U.S.C. 154, 303, 334, 336, 403.

**Subpart H - Rules Applicable to All Broadcast Stations**

Section 73.3612 is amended to read as follows:

**§ 73.3612.  Annual employment report.**

Each licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395-B.

Note to § 73.3612:  Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the equal employment opportunity requirements of § 73.2080.

**II.     Part 76 of Chapter 1 of the Code of Federal Regulations is amended as follows:**

The authority citation for Part 76 continues to read as follows:

AUTHORITY:  47 U.S.C. 151, 152, 153, 154, 301, 302, 303, 303a, 307, 308, 309, 312, 317, 325, 338, 339, 503, 521, 522, 531, 532, 533, 534, 535, 536, 537, 543, 544, 544a, 545, 548, 549, 552, 554, 556, 558, 560, 561, 571, 572, 573.

**Subpart V – Reports and Filings**

Section 76.1802 is amended to read as follows:

**§ 76.1802.  Annual employment report.**

Each employment unit with six or more full-time employees shall file an annual employment report on FCC Form 395-A with the Commission on or before September 30 of each year.

Note to § 76.1802:  Data concerning the gender, race and ethnicity of an employment unit´s workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual employment unit´s compliance with our EEO rules for multi-channel video program distributors.

17

**STATEMENT OF**
**CHAIRMAN MICHAEL K. POWELL**

*Re: Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*

I am proud to support this item, which revises and re-implements annual employment reports from broadcasters and MVPDs. This data will allow the Commission to accurately identify and report industry trends and have been collected by the Commission for years. In addition, I support asking questions about recent changes in administrative law and its impact on how we collect and disseminate this data.

Finally, I would note that the Commission seeks comment on whether our approach to these forms should be altered given the efforts of the Diversity Committee for Communications in the Digital Age. I note only that several members of the Diversity Committee have asked that the Commission not invoke its name as a reason for changing some of our policies, especially prior to the completion of their vitally important work. As we move to an Order on the open questions in this proceeding, I will keep this request in mind.

18

**JOINT STATEMENT OF**
**COMMISSIONERS MICHAEL J. COPPS AND JONATHAN S. ADELSTEIN**
**APPROVING IN PART AND DISSENTING IN PART**

*Re: Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies, Third Report and Order and Fourth Notice of Proposed Rulemaking*

We support the readoption of annual employment reporting forms. The Commission has an obligation under the Act to collect these data from broadcasters and MVPDs. The Commission uses this information to ascertain industry trends, report to Congress, and respond to inquiries from Congress, while it has made clear that it will not use these data to screen renewal applications.

We are concerned, however, that today's decision prolongs the actual filing of the data by seeking additional comment on whether we can or should modify our procedures to collect the data confidentially. We recognize that some may believe additional comment is necessary out of an abundance of caution. We believe, however, that given the fundamental importance of this information, additional comment is not needed. The Commission has never sought this information under a pledge of confidentiality. In fact, broadcasters have filed these employment forms for decades knowing that the Commission would make the information available to the public for inspection. Later, when Congress adopted requirements for MVPDs, it required that their forms be made available for public inspection at their offices. This is a strong indication of Congress's desire that these forms be publicly accessible.

We are also concerned how a change in policy to make this information confidential could affect the work of the Commission's Advisory Committee on Diversity for Communications in the Digital Age. This Committee's express purpose is to create opportunities for minorities and women to advance to managerial positions and participate in new and emerging technologies in the communications sector.

In addition, although not specifically addressed in today's Order, we also express our concern about the manner in which the Commission has implemented the EEO rules it adopted in November 2002. In that Order, the Commission emphasized its commitment to examine and act upon licensee's compliance with our EEO rules at license renewal time. The Commission stated that it would audit five percent of all licensees each year in order to monitor compliance with our rules. Yet, even as this Order is adopted, the Commission has yet to conduct a single audit. This issue takes on added importance because we are in the middle of a license renewal cycle. It now appears that the Commission is beginning some type of audit procedure. We support *full* implementation of the steps outlined in our November 2002 Order. Equal employment opportunity is an essential part of the obligation to serve the public interest. Broadcasters and multichannel video programming distributors should draw upon the strength and vibrancy that flows from the diversity of the American people.

19

**STATEMENT OF**
**COMMISSIONER KEVIN J. MARTIN**
**APPROVING IN PART, CONCURRING IN PART**

*Re:     Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies, Third Report and Order and Fourth Notice of Proposed Rulemaking*

Every citizen should have the opportunity to advance professionally based on his or her own merit, regardless of race, religion, or sex.  Discrimination in the workplace is anathema to this principle, and Congress has charged us with prohibiting such discrimination in the broadcast and cable industries.

I strongly support equal employment opportunity principles, and I supported our most recent attempt to craft EEO rules that would be both effective *and* constitutional.  I hope we have succeeded.

Our past attempts, however, were not so successful; the courts struck them down on constitutional grounds twice.  The most recent court case vacated our second attempt at an EEO rule because it determined that what was known as "Option B" created race-based classifications that did not survive strict scrutiny.[1]  That court specifically mentioned the Annual Employment Report at issue here, which required stations to identify each employee by race and sex.[2]  Although the court did not pass on the constitutionality of this requirement, it did vacate the entire EEO rule, including this provision.[3]  Because the court was skeptical of race-based classifications, I have concerns with reinstating the requirement that parties classify employees in such a manner and file the information with us on a regular basis.  I would have less concern if the data were supplied to us anonymously.  If our goal is truly only to monitor industry trends and not to use the data (or allow others to do so) to determine EEO compliance, anonymous information would seem to fulfill that need while eliminating the constitutional concern.

I therefore am concerned that we are adopting this form without first determining whether the information may be submitted anonymously.

---

[1] *MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13, *rehearing den.* 253 F.3d 732 (D.C. Cir. 2001), *cert. denied*, 122 S.Ct. 920 (2002).

[2] *See* 236 F.3d at 17 (noting that "the new EEO rule" included the filing of annual reports which require stations to identify each employee by race and sex).

[3] *Id.* at 23 (determining that "the rule is vacated in its entirety").

20