**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

| | | |
|---|---|---|
| **NATIONAL RELIGIOUS BROADCASTERS; AMERICAN FAMILY ASSOCIATION,** | ) ) ) | Case No. 24-60219 |
| *Petitioners,* | ) ) | |
| ***v.*** | ) ) | |
| **FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,** | ) ) ) | |
| *Respondents.* | ) ) | |
| *Consolidated with* **TEXAS ASSOCIATION OF BROADCASTERS,** | ) ) ) | Case No. 24-60226 |
| *Petitioner,* | ) ) | |
| ***v.*** | ) ) | |
| **FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,** | ) ) ) | |
| *Respondents.* | ) ) | |

On Petition for Review of an Order of the
Federal Communications Commission
Agency No. 24-18

**REPLY BRIEF FOR PETITIONERS NATIONAL RELIGIOUS
BROADCASTERS, AMERICAN FAMILY ASSOCIATION, AND
TEXAS ASSOCIATION OF BROADCASTERS**

Scott R. Flick
Matthew J. MacLean
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth St NW
Washington, DC 20036
(202) 663-8167
scott.flick@pillsburylaw.com
matthew.maclean@pillsburylaw.com

Jessica T. Nyman
  *Counsel of Record*
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
401 Congress Ave, Suite 1700
Austin, TX 78701
(512) 580-9645
jessica.nyman@pillsburylaw.com

*Counsel for Petitioner Texas Association
of Broadcasters*

Jonathan Berry
R. Trent McCotter
Jared M. Kelson
  *Counsel of Record*
Laura B. Ruppalt*
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave SE, No. 231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for Petitioners National
Religious Broadcasters and American
Family Association*

*Admitted only in Virginia; practice
limited to matters before federal
agencies and federal courts.

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners**

1.      National Religious Broadcasters. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.      American Family Association. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.      Texas Association of Broadcasters. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Others who are not participants in this matter but may be financially interested in its outcome include members of National Religious Broadcasters, American Family Association, and Texas Association of Broadcasters.

**Respondents**

4.      Federal Communication Commission

5.      United States of America

**Counsel**

*Counsel for Petitioners National Religious Broadcasters and American Family Association*

Jonathan Berry
R. Trent McCotter
Jared M. Kelson
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006

Gene P. Hamilton
AMERICA FIRST LEGAL
 FOUNDATION
611 Pennsylvania Ave SE, No. 231
Washington, DC 20003

*Counsel for Petitioner Texas Association of Broadcasters*

Scott R. Flick
Matthew J. MacLean
PILLSBURY WINTHROP SHAW
 PITTMAN LLP
1200 Seventeenth St NW
Washington, DC 20036

Jessica T. Nyman
PILLSBURY WINTHROP SHAW
 PITTMAN LLP
401 Congress Ave, Suite 1700
Austin, TX 78701

*Counsel for Respondent Federal Communications Commission*

Jacob Matthew Lewis
Rachel Proctor May
P. Michele Ellison
William Scher
FEDERAL COMMUNICATIONS
 COMMISSION
Office of General Counsel
45 L Street, NE
Washington, DC 20554

*Counsel for Respondent United States of America*

Merrick Garland
Robert J. Wiggers
Robert B. Nicholson
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530

Dated: October 18, 2024                  Respectfully submitted,

*/s/ Jessica T. Nyman*                    */s/ Jared M. Kelson*
Jessica T. Nyman                          Jared M. Kelson

*Counsel for Petitioner Texas*            *Counsel for Petitioners National*
*Association of Broadcasters*             *Religious Broadcasters and American*
                                          *Family Association*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.............................................i

TABLE OF CONTENTS ..........................................................iv

TABLE OF AUTHORITIES ........................................................v

INTRODUCTION ...............................................................1

ARGUMENT ...................................................................2

    I.     THE ORDER EXCEEDS THE FCC'S AUTHORITY....................2

        A.    The Public Interest Provisions of the Communications Act Do Not Justify the Order .............................................. 2

        B.    The Order Is Not Authorized By the Cable Act of 1992 ...............4

    II.    THE ORDER VIOLATES THE FIFTH AMENDMENT...............9

        A.    Heightened Scrutiny Applies ........................................9

        B.    The Order Fails Rational Basis Review ...................................18

    III.   THE ORDER VIOLATES THE FIRST AMENDMENT .............20

        A.    The Order Compels Speech and Is Not Within a Government-Operations Exception.......................................... 20

        B.    *Zauderer* Does Not Apply ...........................................25

    IV.   THE ORDER IS ARBITRARY AND CAPRICIOUS...................28

CONCLUSION .................................................................31

CERTIFICATE OF SERVICE ....................................................33

CERTIFICATE OF COMPLIANCE ...............................................34

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995)...............................................................9, 10

*Airlines for Am. v. Dep't of Trans.*,
    110 F.4th 672 (5th Cir. 2024) .................................................. 8

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024)...............................................23, 24

*Caufield v. Bd. of Educ. of City of N.Y.*,
    583 F.2d 605 (2d Cir. 1978) ............................................15, 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ................................................................ 26

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)................................................................ 8

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)................................................................ 11

*Craig v. Boren*,
    429 U.S. 190 (1976)................................................................ 10

*Crawford v. Bd. of Educ. of City of L.A.*,
    458 U.S. 527 (1982)...................................................... 10, 14, 15

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019).................................................................. 2

*EEOC v. ACORN*,
    83 F.3d 418, 1996 WL 197411 (5th Cir. 1996)........................ 24

*FCC v. Schreiber*,
    381 U.S. 279 (1965).................................................................. 3

*Friedman v. Rogers*,
    440 U.S. 1 (1979) .................................................................. 26

*Full Value Advisors, LLC v. SEC*,
    633 F.3d 1101 (D.C. Cir. 2011)................................................................ 24

*Grutter v. Bollinger*,
    539 U.S. 306 (2003).............................................................................9, 10

*Harris Cnty. v. CarMax Auto Superstores Inc.*,
    177 F.3d 306 (5th Cir. 1999) ................................................................ 18

*Hines v. Quillivan*,
    982 F.3d 266 (5th Cir. 2020) ................................................................ 18

*Honadle v. Univ. of Vt. & State Agric. Coll.*,
    56 F. Supp. 2d 419 (D. Vt. 1999) ......................................................... 16

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ..................................................................... 2

*Louisiana v. U.S. Dep't of Educ.*,
    __ F. Supp. 3d. __, 2024 WL 2978786 (W.D. La. June 13, 2024)............. 27

*Lutheran Church-Missouri Synod v. FCC*,
    141 F.3d 344 (D.C. Cir. 1998) ...................................... 1, 5, 11, 12, 13, 17

*MD/DC/DE v. Broads. Ass'n v. FCC*,
    236 F.3d 13 (D.C. Cir. 2001) .......................................................5, 14, 17

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010)............................................................................... 25

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982)............................................................................... 11

*Morales v. Daley*,
    116 F. Supp. 2d 801 (S.D. Tex. 2000) ......................................... 16, 17, 24

*NAM v. SEC*,
    748 F.3d 359 (D.C. Cir. 2014) .............................................................. 26

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)............................................................................... 14

*NIFLA v. Becerra*,
    585 U.S. 755 ............................................................. 25

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ........................................... 27

*Omnipoint Corp. v. FCC*,
    78 F.3d 620 (D.C. Cir. 1996) ................................. 28

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ................................................. 15

*Pennzoil Co. v. Fed. Power Comm'n*,
    534 F.2d 627 (5th Cir. 1976) .......................... 29, 30, 31

*Proctor & Gamble Co. v. Amway Corp.*,
    376 F.3d 496 (5th Cir. 2004) .............................. 17, 28

*RJ Reynolds Tobacco Co. v. FDA*,
    96 F.4th 863 (5th Cir. 2024) ........................... 25, 26, 27

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) .............................................. 21, 22

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006) ................................................ 21, 22

*Schuette v. Coal. to Defend Affimative Action*,
    572 U.S. 291 (2014) ................................................. 15

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .................................................. 23

*Simmons v. Himmelreich*,
    578 U.S. 621 (2016) ................................................... 8

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ................................. 18

*Stahlman v. FCC*,
    126 F.2d 124 (D.C. Cir. 1942) ............................. 3, 4

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ................................................................ 16

*Sussman v. Tanoue*,
39 F. Supp. 2d 13 (D.D.C. 1999) ............................................ 16

*Texas v. Becerra*,
__ F. Supp. 3d __, 2024 WL 3297147 (E.D. Tex. Jul. 3, 2024) ................ 27

*United States v. Arnold*,
740 F.3d 1032 (5th Cir. 2014) ............................................... 24

*United States v. New Hampshire*,
539 F.2d 277 (1st Cir. 1976) ............................................ 15, 16

*United States v. Sindel*,
53 F.3d 874 (8th Cir. 1995) ................................................. 24

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ........................................................ 26

*W.H. Scott Constr. Co. v. City of Jackson*,
199 F.3d 206 (5th Cir. 1999) ............................................... 12

*Wages & White Lion Invs., LLC v. FDA*,
90 F.4th 357 (5th Cir. 2024) ............................................... 23

*Walker v. City of Mesquite*,
169 F.3d 973 (5th Cir. 1999) ............................................... 10

*Wooley v. Maynard*,
430 U.S. 705 (1977) ........................................................ 23

*Xcaliber Int'l Ltd. LLC v. Att'y Gen. State of La.*,
612 F.3d 368 (5th Cir. 2010) ............................................... 11

*Zauderer v. Off. of Disciplinary Counsel of the Sup. Ct. of Ohio*,
471 U.S. 626 (1985) ........................................................ 20

**STATUTES**

47 U.S.C. § 334 ........................................................4, 6, 7

47 U.S.C. § 403 ................................................................. 4

47 U.S.C. § 405 ............................................................... 27

Cable Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 ............................ 4, 7

AGENCY PROCEEDINGS

*Leadership Conference on Civil & Human Rights Comment*,
    MB Docket No. 98-204 (Sept. 29, 2022)................................... 12

*N. Cnty. Broad. Corp.*,
    9 FCC Rcd. 871 (Feb. 1, 1994) ............................................. 13

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*,
    MB Docket No. 98-204, Fourth Report and Order and Order
    on Reconsideration, FCC 24-18
    (rel. Feb. 22, 2024) .......................................2, 3, 4, 6, 13, 19, 24, 27, 28, 30

*State Ass'ns Letter Responding to MMTC October 1, 2002* Ex Parte *Filing*,
    MM Docket No. 98-204 (Oct. 28, 2002)................................... 12

*Suspension of Broadcast & Cable EEO Outreach Program Requirements*,
    16 FCC Rcd. 2872 (2001) ............................................... 5

*Suspension of Requirement for Filing of Broadcast Station Annual Employment
    Reports & Program Reports*, 13 FCC Rcd. 21998 (1998)............................ 5

OTHER AUTHORITIES

47 C.F.R. § 73.2080 ........................................................ 5

47 C.F.R. § 73.3612 ........................................................ 6

EEOC, *Employment Statistics*,
    https://www.eeoc.gov/data/employment-statistics ............................... 20

EEOC, *Special Reports*,
    https://www.eeoc.gov/data/special-reports ........................................ 20

Form 395-B Instructions ..................................................... 22

## INTRODUCTION

Petitioners have demonstrated that the Order exceeds the FCC's statutory authority, violates the Fifth and First Amendments, and is arbitrary and capricious. The FCC does not plausibly rebut these arguments.

The FCC fails to identify any statutory provision or function furthered by the Order, relying on inapplicable "public interest" provisions, an atexutal reading of section 334 of the Communications Act, and unjustified inferences from the Cable Act of 1992. That alone is fatal. The FCC also makes no attempt to show that its Order withstands strict or intermediate scrutiny under the Fifth or First Amendments, thereby conceding it cannot satisfy those standards. Instead, the FCC incorrectly insists such heightened scrutiny does not apply.

Amici's brief fares no better. It merely attacks strawmen: Petitioners do not contend that the Order "imposes differential treatment" among broadcasters, Am.Br.3, or that "licensee[s] will use demographic data unlawfully," Am.Br.10. Rather, the Order is unlawful because *the government* requires race- and sex-based classifications, and seeks to pressure broadcasters to treat applicants differently based on race and sex or risk "fall[ing] short of the desired outcome." *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 352 (D.C. Cir. 1998). And Amici confirm what the FCC claimed was a "speculative"

harm. They view perceived "underrepresentation of certain communities" as "indicative of unfair barriers to equal opportunity," Am.Br.10, and compelled public disclosure as a way to "promot[e] … accountability," Am.Br.18 (quoting *Doe v. Reed*, 561 U.S. 186, 199 (2010)).

This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (cleaned up). "[T]he FCC is standing up the same type of race- and gender-based pressure campaign that the D.C. Circuit invalidated twice before. It is just doing so in a more roundabout way. But the bank shot still counts." FCC 24-18, at 55 (Carr, Comm'r, dissenting), JA55. Accordingly, this Court should enjoin and set aside the Order.

## ARGUMENT

## I.   THE ORDER EXCEEDS THE FCC'S AUTHORITY

### A.   THE PUBLIC INTEREST PROVISIONS OF THE COMMUNICATIONS ACT DO NOT JUSTIFY THE ORDER

The FCC repeatedly asserts broad authority to regulate broadcasters in the "public interest." Resp.Br.15. That "open-textured term" indicates only a "delegation of authority to the agency to elucidate the provision" to which it is attached. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 437 (5th Cir. 2021)

(cleaned up). It does not grant the FCC a universal "public interest mandate." FCC 24-18, ¶ 53 & n.173, JA28; *see* Opening.Br.23–24.

Even the authorities cited by the FCC underscore that its actions taken in the "public interest" must be tethered to some statutory provision or delegated function. *See* Resp.Br.18; *FCC v. Schreiber*, 381 U.S. 279, 290–91 (1965) (requiring that hearings be public, unless confidentiality serves the public interest, is within the FCC's authority over agency proceedings under 47 U.S.C. § 154(j)); *Stahlman v. FCC*, 126 F.2d 124, 126–27 (D.C. Cir. 1942) (formal investigation and subpoena powers are within the FCC's authority under 47 U.S.C. § 403 to initiate an inquiry "in connection with its licensing functions under Section 309(a) of the [Communications] Act").

The FCC fails to identify any statutory provision or delegated function furthered by the Order. The FCC quotes itself to invoke "broad authority under the Communications Act to collect information and prepare reports," Resp.Br.18 (quoting FCC 24-18, ¶ 53, JA29), but noticeably absent is any quote from statutory text. That's because none exists. The FCC cites section 403, Resp.Br.11, 18, but that provision only permits the FCC "to institute an inquiry" into matters "concerning which complaint is authorized to be made, to or before the [FCC] by any provision" of the Communications Act, "concerning … any

question [that] may arise under any of the provisions" of the Communications Act, "or relating to the enforcement of any of the provisions" of the Communications Act. 47 U.S.C. § 403.

Form 395-B data does not fall within these categories. The FCC disclaims using Form 395-B for Equal Employment Opportunity ("EEO") enforcement or prosecuting complaints, FCC 24-18, ¶ 13, JA8, and has not tied its Order to questions about any particular provision of the Communications Act. Instead, the FCC says that Form 395-B data is relevant to the agency's interests "in understanding industry employment patterns" and "reporting on industry trends to Congress." Resp.Br.19 (cleaned up). Self-declared agency interests are not congressionally delegated functions within the scope of section 403. *Stahlman*, 126 F.2d at 127.

## B. THE ORDER IS NOT AUTHORIZED BY THE CABLE ACT OF 1992

The FCC is incorrect that its Order is authorized by section 334 of the Communications Act, added by section 22(f) of the Cable Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460, 1499–1500. *See* Opening.Br.24–26. Section 334 relates only to collecting data "pertinent" to "the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080)." 47 U.S.C. § 334(a). Those EEO regulations were held

4

unconstitutional and are no longer in effect, *Lutheran Church*, 141 F.3d at 351–56, so any implied authority to collect related data no longer applies.

The FCC responds that Form 395-B data remains "pertinent" to the nondiscrimination requirement in 47 C.F.R. § 73.2080(a) that survived. Resp.Br.22. That is wrong three times over.

*First*, when Congress added section 334 in 1992, Form 395-B data was tied to the EEO program regulations in § 73.2080, not to its nondiscrimination requirement. The FCC has long understood this. *See, e.g.*, Resp.Br.2 (stating FCC adopted Form 395-B "to ensure that licensees focused on the best methods of assuring effective EEO practices," and "to monitor and report on industry trends" (cleaned up)). That's why the FCC suspended Form 395-B after its EEO program regulations were held unconstitutional in 1998. *Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports & Program Reports*, 13 FCC Rcd. 21998, 21998 (1998); *see Lutheran Church*, 141 F.3d at 351–56. It is also why the FCC suspended collection *again* after a new set of EEO program regulations were also invalidated in 2001. *Suspension of Broadcast & Cable EEO Outreach Program Requirements*, 16 FCC Rcd. 2872 (2001); *see MD/DC/DE v. Broads. Ass'n v. FCC*, 236 F.3d 13, 18–22 (D.C. Cir. 2001).

*Second*, section 334(a) says nothing about collecting data related to the nondiscrimination requirement, only "the regulations concerning equal employment opportunity." 47 U.S.C. § 334(a)(1); *see also* 47 C.F.R. § 73.3612 (distinguishing between the "nondiscrimination" and "equal employment opportunity requirements of § 73.2080"). The Order itself disclaims relevance of Form 395-B data to the nondiscrimination requirement, specifying that such data "will not be used for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of Section 73.2080." FCC 24-18, ¶ 60, JA31. Form 395-B data was not—and is not—"pertinent" to the nondiscrimination requirement and so could not be impliedly authorized by section 334(a).

*Third*, Congress limited section 334 to "television broadcast station licensees and permittees," 47 U.S.C. § 334(a)(1), as the FCC concedes, Resp.Br.19. It therefore has no relevance to radio broadcasters, and so cannot reasonably be read to ratify or authorize Form 395-B data collection that includes those entities.

The FCC is similarly incorrect that section 334 permits changes to Form 395-B. Resp.Br.12, 24–25. Section 334(a) prohibits the FCC from revising (1)

the "regulations concerning equal employment opportunity as in effect on September 1, 1992" as applied to "television broadcast station licensees and permittees," and (2) "the forms used by such licensees and permittees." 47 U.S.C. § 334(a). Section 334(c) permits the FCC to "revise the *regulations* described in subsection (a)" for "nonsubstantive technical or clerical revisions … to reflect changes in technology, terminology, or [FCC] organization." *Id.* § 334(c) (emphasis added). It says nothing about allowing revisions to Form 395-B, so the FCC's modifications violate the plain text of section 334. The addition of a new "non-binary" category also is not some "minor chang[e] in terminology." Resp.Br.12, 25–26. The FCC did not merely replace an outdated term with a more contemporary one, it created a category that dives headlong into a controversial topic of contemporary debate. Such a shift in reporting is anything but "minor." Opening.Br.24–25, 49–50.

The FCC also wrongly infers an ongoing "reporting function" from section 22(g) of the Cable Act. Resp.Br.17. Section 22(g) required the FCC, "[n]ot later than 2 years after the date of enactment," to "submit to the Congress a report pursuant to a proceeding to review and obtain public comment on the effect and operation of the amendments made" in section 334. Pub. L. No. 102-385, 106 Stat. at 1500. The reasonable inference is the opposite of what the FCC

proposes—Congress requested a report in section 22(g) precisely because the FCC has no ongoing reporting function.

Nor does the fact that Congress "has requested [a report] before" mean that the FCC can preemptively collect data in perpetuity, just in case Congress requests another report in the future. Resp.Br.28. Congress could easily have directed the FCC to prepare regular reports, but it did not. Furthermore, an implied authority to collect data does not include the authority to disclose that data publicly. *Chrysler Corp. v. Brown*, 441 U.S. 281, 306 (1979) ("federal statute that implies some authority to collect information" does not "grant *legislative* authority to disclose that information to the public").

Finally, the Cable Act did not otherwise ratify the FCC's authority to collect and require publication of Form 395-B. Resp.Br.15–18. That argument rests on anything but the actual text of the statute passed by Congress, and "we presume Congress says what it means and means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016). The FCC's resort to "'legislative history is not the law,' … nor can it 'muddy clear statutory language.'" *Airlines for Am. v. Dep't of Trans.*, 110 F.4th 672, 676 (5th Cir. 2024) (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019); *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011)).

No statutory provision authorizes the FCC to collect or require publication of Form 395-B data, and section 334 affirmatively prohibits the FCC's revisions to the form. The FCC thus lacks authority for the Order.

## II. THE ORDER VIOLATES THE FIFTH AMENDMENT

The FCC argues the Order does not violate the Fifth Amendment because it is subject only to rational basis review. Resp.Br.39–49. That is wrong. The Order is subject to heightened scrutiny under the Fifth Amendment because it compels broadcasters to categorize employees by race and sex, and pressures them to consider those factors in decisionmaking. Opening.Br.40–48. The FCC makes no attempt to show that its Order survives strict or intermediate scrutiny, and for good reason—it clearly cannot. Nor does it satisfy even rational basis review.

### A. HEIGHTENED SCRUTINY APPLIES

The FCC claims that race- or sex-based regulations that do not discriminate on their face are subject to rational basis review. Resp.Br.41–42. But the Supreme Court and this Court have "held that all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'" *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); *see also, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) ("[A]ll racial classifications,

imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *Crawford v. Bd. of Educ. of City of L.A.*, 458 U.S. 527, 536–37 (1982) ("A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979))); *Walker v. City of Mesquite*, 169 F.3d 973, 981 (5th Cir. 1999) ("Any explicit racial classification, regardless of the burdens or benefits it imposes, is suspect and subject to strict scrutiny."). Sex-based classifications are similar. *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("[S]tatutory classifications that distinguish between males and females are 'subject to scrutiny under the Equal Protection Clause.'" (quoting *Reed v. Reed*, 404 U.S. 71, 75 (1971))).

It doesn't matter that a regulation purportedly "addresses race and sex in a neutral manner." Resp.Br.40. "[R]acial classifications are not acceptable simply because they are perceived to have little impact." *Walker*, 169 F.3d at 973; *see also Adarand*, 515 U.S. at 226 (strict scrutiny applies to even seemingly "benign" uses of race). Courts "apply strict scrutiny to all racial classifications to 'smoke out' illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant use of a highly suspect tool." *Grutter*, 539 U.S. at 326 (cleaned up). Alleged neutrality is not enough "because

classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505 (1989) (cleaned up). Sex-based classifications are similarly subject to "searching analysis," even if they have a "benign" purpose. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982).

Because Form 395-B "'proceeds along suspect lines'" by compelling employee categorization by race and sex, it is "subject to heightened scrutiny on an Equal Protection challenge." *Xcaliber Int'l Ltd. LLC v. Att'y Gen. State of La.*, 612 F.3d 368, 381 (5th Cir. 2010) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

The Order then goes further by requiring publication of Form 395-B data. As the D.C. Circuit observed, one foreseeable consequence of that disclosure is "attracting the … attention … of third parties," who can then "pressure license holders to engage in" race- and sex-conscious employment decisions. *Lutheran Church*, 141 F.3d at 352–53. Here, Amici have signaled that they will use Form 395-B reports to determine whether "certain communities" are "underrepresented" at any particular station, which they consider "indicative of unfair barriers to equal opportunity." Am.Br.4; *see also id.* at 10–11; *cf. Lutheran*

*Church*, 141 F.3d at 352 ("[T]he very term 'underrepresentation' necessarily implies that if such a situation exists, the station is behaving in a manner that falls short of the desired outcome."). The predictable pressure for race-and sex-based decisionmaking removes any doubt that the Order is subject to heightened scrutiny. *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 215 (5th Cir. 1999) (strict scrutiny applies to "policies that merely encourage" race-based decisionmaking).

The FCC claims third-party pressure is "all but entirely speculative." Resp.Br.46. But the record includes multiple statements from third-party groups stating their intent to use Form 395-B data "to hold [broadcasters] accountable" and pressure race-based decisionmaking[1]—a "dialogue" the FCC concedes it "seeks to foster," Resp.Br.38. The FCC also ignores the comments warning that "rational broadcasters will surely be pressured into hiring minorities in sufficient numbers"[2] and the history of third-party campaigns using Form 395-B data to

---

[1] *Leadership Conference on Civil & Human Rights Comment* at 2, MB Docket No. 98-204 (Sept. 29, 2022), https://www.fcc.gov/ecfs/document/ 10929052325782/1, JA64; *see* Opening.Br.37–38.

[2] *State Ass'ns Letter Responding to MMTC October 1, 2002* Ex Parte *Filing*, at 2, MM Docket No. 98-204 (Oct. 28, 2002), https://www.fcc.gov/ecfs/ document/5508448803/1; *see* Opening.Br.33.

pressure broadcasters. *See, e.g.*, *N. Cnty. Broad. Corp.*, 9 FCC Rcd. 871 (Feb. 1, 1994). Amici reconfirm this point—they clamor for Form 395-B data but conspicuously do not disclaim using it for the purpose of pressuring broadcasters.

Public disclosure also invites third parties to prompt FCC investigations against broadcasters who fail to meet preferred race and sex employment targets. The FCC claims "it will not use station-specific employment data for the purpose of assessing a licensee's compliance with the EEO regulations," FCC 24-18, ¶ 13, JA8, but Form 395-B data *can* be used against licensees in other ways, including to determine the "public interest" when exercising the FCC's other powers and exposing broadcasters to investigation and potential license revocation. Opening.Br.30–31, 33–35. Indeed, by claiming sections 303, 307, 309, 310, and 403 of the Communications Act provide authority for the Order, the FCC signals its view that Form 395-B data is relevant to granting and renewing station licenses, permitting, license transfers, and inquiries. FCC 24-18, ¶ 77, JA36. Broadcasters will feel pressure to adjust employment practices to avoid the risk of an FCC investigation or adverse action, because "[n]o rational firm—particularly one holding a government-issued license—welcomes a government audit." *Lutheran Church*, 141 F.3d at 353.

13

The FCC insists there is no "underlying *government* action" that gives rise to third-party pressure. Resp.Br.48–49. But compelled disclosure of employment data *is* government action and a but-for cause of foreseeable third-party conduct. The FCC also has a "long history" of using "a variety of *sub silentio* pressures and 'raised eyebrow' regulation." *MD/DC/DE*, 236 F.3d at 19 (cleaned up). "[V]iewed in context," the Order is clearly an attempt to "do indirectly what [the FCC] is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190–91 (2024). The Order is therefore subject to strict scrutiny under the Fifth Amendment.

The cases cited by the FCC are not to the contrary. Resp.Br.41–43. In *Crawford*, the Supreme Court found no need to apply strict scrutiny because the state constitutional amendment at issue—which prohibited state courts from ordering student busing in the absence of a Fourteenth Amendment violation—did "not embody a racial classification." 458 U.S. at 537. The Court was clear, however, that if the amendment "employed a racial classification it would be unconstitutional unless necessary to further a compelling state interest." *Id.* at

536.[3] Similarly, in *Schuette v. Coalition to Defend Affirmative Action*, strict scrutiny did not apply to a state constitutional amendment prohibiting discrimination in public college admissions based on race, sex, and other characteristics. 572 U.S. 291, 299, 307, 314 (2014). Both cases stand for the unremarkable proposition that *prohibiting* race discrimination does not require strict scrutiny. That would turn strict scrutiny upside down. The Order, by contrast, unambiguously and affirmatively *requires* race- and sex-based classifications and so is subject to heightened scrutiny.[4]

The FCC's citations to *United States v. New Hampshire*, 539 F.2d 277, 279–81 (1st Cir. 1976), and *Caufield v. Board of Education of City of New York*, 583 F.2d 605, 611 (2d Cir. 1978), fare no better because neither addressed the standard of

---

[3] The FCC, Resp.Br.41, points to *Crawford*'s observation that "a distinction *may* exist between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters," 458 U.S. at 538 (emphasis added). But the Court meant only that "the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification," not that race- or sex-based classifications escape heightened scrutiny. *Id.* at 538–39.

[4] The FCC, Resp.Br.42, also cites Justice Kennedy's concurrence-in-part in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007). A single-justice concurrence is neither binding nor persuasive, especially when in direct conflict with other precedent.

review that applied to demographic data collection and reporting. Both also involved enforcement of antidiscrimination statutes—an interest that may well survive heightened scrutiny under the facts in those cases, but one the FCC expressly disclaims here. *See New Hampshire*, 539 F.2d at 279–81; *Caufield*, 583 F.2d at 611.

The FCC's two decades-old, out-of-circuit district court cases are similarly inapplicable. Both involved the voluntary, internal collection of information for affirmative-action programs. *See Honadle v. Univ. of Vt. & State Agric. Coll.*, 56 F. Supp. 2d 419, 428 (D. Vt. 1999); *Sussman v. Tanoue*, 39 F. Supp. 2d 13, 25–26 (D.D.C. 1999). Neither case considered what level of scrutiny applies to compelled collection and public disclosure of employee demographics. It is also unlikely either decision survives *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023).

The FCC's sole in-circuit case, *Morales v. Daley*, arose in the unique context of the constitutionally mandated census. 116 F. Supp. 2d 801, 814–15 (S.D. Tex. 2000), *aff'd*, 275 F.3d 45 (5th Cir. 2001) (per curiam). Unlike Form 395-B, the census does not encourage discrimination: census questions do not involve an employment relationship, census respondents are not regulated parties, and "census information … cannot be published in any format in which

individual respondent information can be identified." *Id.* at 816. Additionally, the government in *Morales* invoked "the historical use of such information recognized by the courts [to prevent discrimination], coupled with the historical use of the census to obtain answers to those questions." *Id.* at 814. Neither consideration is present here, since the FCC has disclaimed using Form 395-B responses to enforce compliance with nondiscrimination provisions, and the two times a court considered the historical use of such information, it found the program unconstitutional. *See Lutheran Church*, 141 F.3d at 351–56; *MD/DC/DE*, 236 F.3d at 15–16.

Finally, whether other federal agencies require participants in agency programs to report demographic data, Resp.Br.39 & n.12, says nothing about what level of scrutiny applies to the Order, or whether compelling broadcasters to report and publish the race- and sex-demographics of their workforces— detached from enforcing EEO requirements—violates the Fifth Amendment.

The Order is therefore subject to heightened review. Opening.Br.40–48. The FCC makes no attempt to argue that its Order can survive either strict or intermediate scrutiny and has therefore forfeited any argument that it can. *See, e.g.*, *Proctor & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) (collecting cases).

## B.   THE ORDER FAILS RATIONAL BASIS REVIEW

The FCC is also wrong that the Order "readily passes muster" under rational basis review. Resp.Br.49. Although less stringent than strict or intermediate scrutiny, "the rational basis test 'is not a toothless one.'" *Harris Cnty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 323–24 (5th Cir. 1999) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). Petitioners can "negate a seemingly plausible basis" for the action "by adducing evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

The Order fails rational basis review because its justifications are pretextual and irrational, in other words "a matter of fiction." *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020); *see* Opening.Br.51–56. The FCC argues that it needs Form 395-B data "to report on broadcast industry employment trends to Congress," Resp.Br.28, but ignores that Congress has not asked for those reports or given the FCC authority to collect data for them. *See supra* Part I. The FCC says "other data sources" are "not appropriate substitutes" because Form 395-B data provides "a more comprehensive picture of the broadcast industry workforce," Resp.Br.29 (cleaned up), but does not explain why such minute detail is necessary to establish industry trends. And the FCC claims that "the passage of time since the FCC last collected Form 395-B data" is irrelevant,

18

Resp.Br.31, but does not explain why it waited more than two decades to resume collection of data that it now claims is "vital" to agency operations, FCC 24-18, ¶ 50, JA27, or how the agency functioned without it in the meantime.

As Commissioner Carr observed, the FCC's reasons for disclosing Form 395-B data on a station-attributable basis are implausible. FCC 24-18, at 55–56 (Carr, Comm'r, dissenting), JA55–56. There is "no record support at all for the agency's claim that publicizing [Form 395-B] data will render it more reliable." *Id.* at 55, JA55. The FCC has identified no credible way in which public disclosure will "maximiz[e] the utility" of the data, a fact underscored by the agency's "normal practice" of "not ... mak[ing] all of the data it collects publicly available." *Id.*, JA55. And the FCC's claim that public disclosure on a station-attributable basis will mitigate risks associated with "accidentally disclosing data about a specific station" is illogical, "like deciding to sink a ship to avoid the risk that it might spring a leak." *Id.* at 55–56, JA55–56. Indeed, the FCC has provided no evidence that the possibility of inadvertent disclosure is anything more than negligible. The Equal Employment Opportunity Commission, for example, has collected and kept confidential similar demographic data for decades, while simultaneously issuing public reports and analytical tools based

on that data.[5] The FCC's contention that it needs *more* information about race and sex demographics than the agency specifically tasked by Congress to monitor and enforce EEO requirements is mindboggling.

The Order thus fails even rational basis review.

## III.  THE ORDER VIOLATES THE FIRST AMENDMENT

The FCC makes no attempt to show that its Order survives strict scrutiny under the First Amendment. The FCC instead posits, Resp.Br.49–56, that its Order "warrants rational basis review under the 'government-operations exception'" or "lesser First Amendment scrutiny" under *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985). The FCC is wrong in both regards.

### A.  THE ORDER COMPELS SPEECH AND IS NOT WITHIN A GOVERNMENT-OPERATIONS EXCEPTION

As a threshold matter, the FCC claims that "Petitioners nowhere address the Commission's analysis in paragraph 51 of the Order that the data collection does not compel speech and, in any event, falls within the government-

---

[5] *See, e.g.*, EEOC, *Special Reports*, https://www.eeoc.gov/data/special-reports (reports "based on data from the EEO-1 survey" and other sources); EEOC, *Employment Statistics*, https://www.eeoc.gov/data/employment-statistics (online tool to explore non-identifiable employee demographic data).

operations exception" and so "have waived any challenge to that analysis." Resp.Br.51. The patent falsity of that statement underscores the weakness of the FCC's arguments.

Petitioners clearly responded, Opening.Br.48–50, to the FCC's argument in paragraph 51 asserting that the Order doesn't compel speech because it requires reporting only factual information. The Order self-evidently compels speech. It requires broadcasters to publicly disclose information about their workforce—the total number of employees, the number of employees in each work category, and the race and sex of those employees, either as self-reported by the employee or based on the employer's observation—that they would otherwise keep private. The FCC's characterization of that information as "factual" does not change that the Order forces broadcasters to share it publicly. Opening.Br.49 ("That a disclosure is factual, standing alone … does not immunize it from scrutiny." (quoting *NAM v. SEC*, 748 F.3d 359, 371, *aff'd*, 800 F.3d 518 (D.C. Cir. 2014)). That is textbook "compelled speech." *See, e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) ("[C]ompelled statements of fact … , like compelled statements of opinion, are subject to First Amendment scrutiny."); *Riley v. Nat'l Fed'n of the Blind of N.C.*,

*Inc.*, 487 U.S. 781, 797–98 (1988) (both "compelled statements of opinion" and "compelled statements of 'fact' … burde[n] protected speech").[6]

Even if that were not the law, a broadcaster's statement of opinion as to whether, based on "observer identification,"[7] an employee is of "two or more races" or "non-binary" is exactly that—a "compelled statemen[t] of *opinion*" which the Order then invites the public to challenge, *Rumsfeld*, 547 U.S. at 62 (emphasis added).

The FCC's desperate claim that Petitioners waived these arguments and never addressed the "government-operations exception" is especially ironic because nothing in the entire Order—including paragraph 51—references the "government-operations exception," Resp.Br.51, and so the FCC cannot rely on

---

[6] The FCC's analogy to *Riley* is misplaced. Resp.Br.52. The Supreme Court in *Riley* applied "exacting" scrutiny and struck down a state law requiring professional fundraisers to disclose to potential donors the percentage of collections they would take as fees. 487 U.S. at 786, 798. The Court reasoned, in part, that there were "more benign and narrowly tailored options" available, including that the "State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file." *Id.* at 800. The Court did not hold that such an arrangement was necessarily "a constitutionally permissible alternative" or that the arrangement is immune from First Amendment scrutiny, as the FCC suggests. Resp.Br.52.

[7] Form 395-B Instructions at 1, https://omb.report/icr/202004-3060-047/doc/100723701 (last visited Oct. 18, 2024).

that reasoning now, *SEC v. Chenery Corp.*, 318 U.S. 80, 93–94 (1943); *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 371 (5th Cir. 2024) (an "agency is not free to defend its decision by supplying new, *post hoc* rationalizations for it when sued").

The government-operations exception also clearly doesn't apply. While the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), this Court has concluded that "there is no right to refrain from speaking when essential operations of government require it for the preservation of an orderly society," *Book People, Inc. v. Wong*, 91 F.4th 318, 339 (5th Cir. 2024) (cleaned up). That exception does not apply here because Form 395-B data collection is not "part of an essential government operation." *Id.* The FCC cites no authority indicating that the ability "to analyze trends" in broadcast employment is an essential operation, Resp.Br.53 (quoting FCC 24-18, ¶ 51, JA27), especially when Congress has not authorized the FCC to collect demographic data from broadcasters or instructed the FCC to provide reports, *see supra* Part I. Also, functions that lapse for over two decades clearly aren't essential to agency operations.

Form 395-B data—especially its public disclosure—is also not necessary

to "the preservation of an orderly society." *Book People*, 91 F.4th at 339 (cleaned up). Although there is "'limited' precedent on the [government-operations] exception," *id.*, courts have applied it to securing public safety, *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (sex offender registration requirements); preventing unlawful conduct, *United States v. Sindel*, 53 F.3d 874, 876, 878 (8th Cir. 1995) (IRS disclosures); conducting the census, *Morales*, 116 F. Supp. 2d at 815–16 (confidential answers to census questions); and regulating the market for securities, *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108–09 (D.C. Cir. 2011). The FCC's self-declared interest in "analyzing industry trends," FCC 24-18, ¶ 13, JA8, is far afield from such efforts.[8]

Lastly, the FCC asserts that heightened scrutiny doesn't apply because "[n]othing about the collection or disclosure of Form 395-B data interferes with a broadcaster's ability to communicate its own message." Resp.Br.52. Yet even if that were the relevant standard, that claim is contradicted by Amici, who state

---

[8] The FCC cites the unpublished decision in *EEOC v. ACORN*, 83 F.3d 418, 1996 WL 197411 (5th Cir. 1996), to argue that the Order falls within the government-operations exception. Resp.Br.53. *ACORN*, however, did not address a compelled speech claim, *ACORN*, 1996 WL 197411, at *3–5, and it arose in the context of EEO-1 reporting. Confidentially collecting information to enforce nondiscrimination statutes, which play no role here, is a far cry from doing so to compile data and analyze industry trends.

that Form 395-B information "enables employees and investors to make educated, economic decisions when deciding whether to work at, finance, *or consume their media from a particular broadcaster.*" Am.Br.18 (emphasis added). "[G]overnment-compelled speech" also "inherently regulates speech on the basis of its content." *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 876 (5th Cir. 2024).

### B. *ZAUDERER* DOES NOT APPLY

The Order also is not subject to lesser First Amendment scrutiny under *Zauderer*, which applies only to certain types of "government-*compelled* commercial speech," such as speech related to "advertising," "compelled-speaker-provided services," and similar consumer-facing disclosures. *RJ Reynolds*, 96 F.4th at 876–77; *see also NIFLA v. Becerra*, 585 U.S. 755, 768–69 (disclosures "about the terms under which services will be available" (cleaned up)); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249–50 (2010) (regulation "intended to combat the problem of inherently misleading commercial advertisements"). Moreover, *Zauderer* applies only where the compelled disclosure is "purely factual" and "uncontroversial." *RJ Reynolds*, 96 F.4th at 877 (cleaned up).

Form 395-B responses are not the type of commercial speech—i.e., consumer-facing disclosures related to products or services—to which *Zauderer* applies. Opening.Br.48–49. The FCC implicitly conceded this point when it could only "*analogiz*[*e*] the Form 395-B data" to the type of speech that "receives relaxed scrutiny." Resp.Br.54 (emphasis added). Indeed, Form 395-B responses are not "commercial speech" at all because they are not "related solely to the economic interests of [a broadcaster] and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); *see also Friedman v. Rogers*, 440 U.S. 1, 10 (1979) ("relates to a particular product or service"); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) ("'propose a commercial transaction'"); Opening.Br.50–51.

Form 395-B responses are also not "uncontroversial." *RJ Reynolds*, 96 F.4th at 877. A statement is "controversial" at least "where the inherent nature of the subject raises a live, contentious political dispute." *Id.* at 881. This includes, for example, disclosures related to "the labor conditions of [a company's] factories abroad or the political ideologies of [corporate] board members." *NAM*, 748 F.3d at 372. Given the contemporary debate over the relevance of race and the nature of sex, compelled disclosure of those

demographics for a broadcaster's entire workforce "inherent[ly] … raises a live, contentious political dispute." *RJ Reynolds*, 96 F.4th at 881.

This is particularly true regarding Form 395-B's new "non-binary" category. Whether "sex" encompasses "non-binary gender categories," FCC 24-18, ¶ 39, JA21, is an issue of animated, ongoing debate. *See, e.g.*, *Louisiana v. U.S. Dep't of Educ.*, __ F. Supp. 3d. __, 2024 WL 2978786, at *1, *13 (W.D. La. June 13, 2024) (whether Title IX's prohibition on "sex discrimination" includes discrimination on the basis of "gender identity" is "a polarizing political issue" and "of vast political significance"); *Texas v. Becerra*, __ F. Supp. 3d __, 2024 WL 3297147, at *8 (E.D. Tex. Jul. 3, 2024) (similar). Implementing the use of a "non-binary" category forces broadcasters into the middle of this contentious public issue. *See* Opening.Br.49–50.[9]

---

[9] The FCC claims this "argument regarding the non-binary gender category … is barred under 47 U.S.C. § 405(a)" because the agency never had the opportunity to "pass" on the issue. Resp.Br.55 n.15. But the FCC clearly argued in its Order that the "Form 395-B requirement is consistent with the First Amendment, as it entails disclosure of 'purely factual and uncontroversial' information." FCC 24-18, ¶ 52, JA27; *see also Ohio v. EPA*, 144 S. Ct. 2040, 2055 (2024) (rejecting "a hair-splitting approach" to exhaustion).

The FCC also did not provide notice of the new "non-binary" category, and "a reviewing court may consider arguments where issues by their nature

Because the Order compels speech and does not fall within the government-operations exception or *Zauderer*, it is subject to strict scrutiny under the First Amendment. Opening.Br.40–51. The FCC makes no attempt to meet that standard and forfeits any claim to the contrary. *See, e.g.*, *Proctor & Gamble*, 376 F.3d at 499 n.1. In any event, the Order fails even rational basis review. *See supra* Part II.B.

## IV. THE ORDER IS ARBITRARY AND CAPRICIOUS

The Order is arbitrary and capricious because it is not reasonable or reasonably explained, and relies on a contrived rationale, especially for its public disclosure requirement. Opening.Br.51–56. The FCC has no persuasive response to these critiques. *See supra* Part II.B.

The FCC now argues, Resp.Br.31–36, that its decision to publicly disclose Form 395-B data on a station-attributable basis satisfies the "three-part test for

_____

could not have been raised … before the agency.*" Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996). The FCC instead concluded the non-binary category "is a logical outgrowth" of the proposal to resume collection of Form 395-B data. FCC 24-18, ¶ 40, JA22. If so, any relevant First Amendment analysis is likewise a logical outgrowth of arguments about the disclosure of controversial information. If not, the FCC's alteration of Form 395-B admittedly failed to comply with the notice-and-comment requirements of the Administrative Procedure Act. The FCC cannot have it both ways.

the propriety of agency disclosure of confidential information" in *Pennzoil Co. v. Federal Power Commission* ("*FPC*"), 534 F.2d 627, 632 (5th Cir. 1976). That case did not create a comprehensive three-part test. Rather, in applying the arbitrary-and-capricious standard, this Court identified "three additional factors" that the FPC failed to consider when deciding to release private data. *Id.* at 631–32. Petitioners have already shown that the Order is unlawful under the arbitrary-and-capricious standard, so the Court need not consider those additional factors. Opening.Br.51–56; *supra* Part II.B.

In any event, *Pennzoil*'s factors do not help the FCC. First, the FCC has not shown that public disclosure on a station-attributable basis "will significantly aid the Commission in fulfilling its functions." 534 F.2d at 632. The FCC has *no* ongoing reporting function and has disclaimed using the information to assess compliance with its EEO regulations. *See supra* Part I. And the FCC's claim that the public might "point out any errors" in Form 395-B data, Resp.Br.32, is speculative, and thus unlikely to "significantly" affect analysis of industry trends.

Second, the FCC has not adequately considered "the harm done to [broadcasters] by releasing" Form 395-B data, or "the harm to the public generally." *Pennzoil*, 534 F.2d at 632. The FCC summarily dismissed

broadcasters' concerns as "'overstated'" because "'[d]espite the public availability of Form 395-B data for more than 20 years prior to 2001 … the record contain[ed] no evidence of use of'" Form 395-B data "outside of official government proceedings." Resp.Br.35 (quoting FCC 24-18, ¶ 17, JA10). As a preliminary matter, Form 395-B data posted online will be vastly more accessible than Form 395-B data that, prior to 2001, interested parties had to physically visit a local station to request. Because third parties previously could use data in FCC proceedings, they also had less reason to work outside of them. Now that use of Form 395-B data in official proceedings has been ostensibly limited, third parties have indicated their intent to use the data through other means to pressure broadcasters. Opening.Br.37–38; *supra* Part II.A. The FCC ignores this record evidence.

Third, "and most importantly," the FCC has not adequately considered "whether there are alternatives to full disclosure" that meet the FCC's objectives "but at the same time protect the interests" of broadcasters. *Pennzoil*, 534 F.2d at 632. Concluding that the public benefit outweighed the harm, the FCC saw "no reason to afford [Form 395-B data] confidentiality," FCC 24-18, ¶ 24, JA13, and so did not seriously consider alternatives that might address broadcaster concerns, *see, e.g.*, *id.* ¶¶ 34–35, JA19–20 (refusing to consider a Freedom of

Information Act exemption because the FCC determined "that the public interest in disclosing Form 395-B data outweighs broadcasters' claims" of harm). The FCC decided the first two factors (benefits and harms) rendered consideration of the third and "most importan[t]" factor (alternatives) unnecessary. *Pennzoil*, 534 F.2d at 632. That is inconsistent with *Pennzoil*.

The Order is therefore arbitrary and capricious.

## **CONCLUSION**

This Court should enjoin and set aside the Order.

Dated: October 18, 2024

Respectfully submitted,

*/s/ Jessica T. Nyman*

Scott R. Flick
Matthew J. MacLean
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth St NW
Washington, DC 20036
(202) 663-8167
scott.flick@pillsburylaw.com
matthew.maclean@pillsburylaw.com

Jessica T. Nyman
  *Counsel of Record*
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
401 Congress Ave, Suite 1700
Austin, TX 78701
(512) 580-9645
jessica.nyman@pillsburylaw.com

*Counsel for Petitioner Texas Association
of Broadcasters*

*/s/ Jared M. Kelson*

Jonathan Berry
R. Trent McCotter
Jared M. Kelson
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave SE, No. 231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for Petitioners National
Religious Broadcasters and American
Family Association*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: October 18, 2024                    Respectfully submitted,

*/s/ Jessica T. Nyman*                      */s/ Jared M. Kelson*
Jessica T. Nyman                            Jared M. Kelson

*Counsel for Petitioner Texas Association*   *Counsel for Petitioners National Religious*
*of Broadcasters*                            *Broadcasters and American Family*
                                            *Association*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,495 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT and 14-point font.

Dated: October 18, 2024                     Respectfully submitted,

*/s/ Jessica T. Nyman*                       */s/ Jared M. Kelson*
Jessica T. Nyman                            Jared M. Kelson

*Counsel for Petitioner Texas Association*   *Counsel for Petitioners National*
*of Broadcasters*                            *Religious Broadcasters and American*
                                            *Family Association*