No. 24-60219

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL RELIGIOUS BROADCASTERS;
AMERICAN FAMILY ASSOCIATION,
*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,
*Respondents,*

consolidated with

No. 24-60226

TEXAS ASSOCIATION OF BROADCASTERS,
*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,
*Respondents.*

On Petitions for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

P. Michele Ellison
   *General Counsel*

Jacob M. Lewis
   *Deputy General Counsel*

Jonathan S. Kanter
   *Assistant Attorney General*

Sarah E. Citrin
   *Deputy Associate General Counsel*

Robert B. Nicholson
Robert J. Wiggers
   *Attorneys*

William J. Scher
Rachel May
   *Counsel*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

FEDERAL COMMUNICATIONS
   COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

(ii)

## STATEMENT REGARDING ORAL ARGUMENT

Respondents respectfully submit that oral argument would assist the Court's resolution of this case. Oral argument will enable counsel to answer any questions the Court might have regarding the Federal Communications Commission's decision to resume its longstanding collection of employment data from broadcast licensees.

# CERTIFICATE OF INTERESTED PERSONS

Under Fifth Circuit Rule 28.2.1, Respondents, as governmental parties, need not furnish a certificate of interested persons.

Dated: September 27, 2024    */s/ William J. Scher*

William J. Scher
Counsel for Respondent Federal
Communications Commission

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ vii

STATEMENT OF THE ISSUES ................................................................ 1

PERTINENT STATUTES AND REGULATIONS ..................................... 1

STATEMENT OF THE CASE ................................................................... 1

    A.    Statutory and Regulatory Background ................................. 1

        1.    The Form 395-B Annual Employment Report ............. 1

        2.    *Lutheran Church* and *MD/DC/DE* ............................. 3

    B.    The Order on Review ........................................................... 8

STANDARD OF REVIEW ........................................................................ 10

SUMMARY OF THE ARGUMENT ........................................................ 11

ARGUMENT ............................................................................................. 15

I.    THE COMMISSION HAS STATUTORY AUTHORITY TO COLLECT
AND DISCLOSE FORM 395-B DATA, AND ITS MINOR
REVISIONS TO THE FORM WERE WITHIN THAT AUTHORITY. ....... 15

    A.    The Form 395-B Data Collection Is Authorized under
the Commission's Broad Authority to Regulate
Broadcast Media in the Public Interest. ................................ 15

    B.    Section 334(a) Expressly Authorizes the Data
Collection from Television Broadcasters. ............................ 19

    C.    Nonsubstantive Revisions to Form 395-B Are
Permitted under Section 334(c). .......................................... 23

II.    THE COMMISSION REASONABLY REINSTATED THE FORM 395-
B DATA COLLECTION AND DETERMINED THAT
BROADCASTERS' SUBMISSIONS SHOULD BE PUBLIC. ................... 26

    A.    The FCC Reasonably Decided to Resume Collecting
Broadcaster Employment Data. ........................................... 26

    B.    The FCC Reasonably Justified Its Decision to Make
Form 395-B Data Publicly Available. .................................. 31

III.  COLLECTION AND DISCLOSURE OF FORM 395-B DATA IS
      CONSTITUTIONAL. ................................................................ 39

      A.  The Form 395-B Data Collection Comports With the
          Fifth Amendment. ................................................. 39

      B.  The Data Collection Comports With the First
          Amendment. .......................................................... 49

CONCLUSION ..................................................................................... 57

CERTIFICATE OF COMPLIANCE ......................................................... 58

# TABLE OF AUTHORITIES*

## Cases

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)..................................................................4, 44

*Adventure Commc'ns, Inc. v. Kentucky Registry of Election Fin.,*
191 F.3d 429 (4th Cir. 1999)..............................................................54

*Alexander v. Alexandria,*
9 U.S. 1 (1809)..............................................................................20

*Alexander v. City of Round Rock,*
854 F.3d 298 (5th Cir. 2017)............................................................52

Bechtel v. FCC,
10 F.3d 875 (D.C. Cir. 1993) ...........................................................28

*Book People, Inc. v. Wong,*
91 F.4th 318 (5th Cir. 2024) ......................................................50, 53

*Bragdon v. Abbott,*
524 U.S. 624 (1998)..........................................................................17

*Caulfield v. Bd. of Ed. of City of New York,*
583 F.2d 605 (2d Cir. 1978) .............................................................43

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557 (1980) ...................................................50

*CFTC v. Schor,*
478 U.S. 833 (1986)..........................................................................17

*Crawford v. Bd. of Educ.,*
458 U.S. 527 (1982) .........................................................................42

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Duarte v. City of Lewisville, Tex.,*
858 F.3d 348 (5th Cir. 2017)............................................................. 49

*EEOC v. ACORN,*
83 F.3d 418, 1996 WL 197411 (5th Cir. 1996) ................................ 53

*Erie Boulevard Hydropower, LP v. FERC,*
878 F.3d 258 (D.C. Cir. 2017) ......................................................... 47

*FCC v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993)........................................................................ 41

*FCC v. Nat'l Citizens Comm. for Broad.,*
436 U.S. 775 (1978)................................................................... 15, 56

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021)................................................................ *passim*

*FCC v. Schreiber,*
381 U.S. 279 (1965)................................................................... 18, 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010)........................................................................ 23

*Full Value Advisors, LLC v. SEC,*
633 F.3d 1101 (D.C. Cir. 2011) ...................................................... 53

*Henderson ex rel. Henderson v. Shinseki,*
562 U.S. 428 (2011)........................................................................ 21

*Honadle v. Univ. of Vt. & State Agric. Coll.,*
56 F. Supp. 2d 419 (D. Vt. 1999) ................................................... 43

*Huawei Techs. USA, Inc. v. FCC,*
2 F.4th 421 (5th Cir. 2021) ................................................... 10, 15, 30

*John Doe No. 1 v. Reed,*
561 U.S. 186 (2010)........................................................................ 32

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Loper Bright Enters. v. Raimondo*,
603 U.S. ___, 144 S. Ct. 2244 (2024)...................................................10

*Lutheran Church-Missouri Synod v. FCC*,
141 F.3d 344 (D.C. Cir. 1998) ...................................................*passim*

*Lutheran Church-Missouri Synod v. FCC*,
154 F.3d 487 (1998) ......................................................................4

*MD/DC/DE Broad. Ass'n v. FCC*,
236 F.3d 13 (2001) .........................................................5, 41, 45, 48

*Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023), *reversed on other
grounds*, *Murthy v. Missouri*, 144 S. Ct. 1972 (2024) .......................49

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) ..............................................................45, 46

*Morales v. Daley*, 116 F. Supp. 2d 801 (S.D. Tex. 2000),
*aff'd*, 275 F.3d 45 (5th Cir. 2001) (per curiam) ...........................43, 55

*Nat'l Fed'n of the Blind of Tx., Inc. v. Abbott*,
647 F.3d 202 (5th Cir. 2011)............................................................52

*Nat'l Rifle Ass'n v. Vullo*,
602 U.S. 175 (2024)........................................................................48

*Parents Involved in Cmty Sch. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)........................................................................42

*Pennzoil v. Fed. Power Comm'n*,
534 F.2d 627 (5th Cir. 1976)............................................... 13, 31, 36

*Pharm. Care Mgmt. Ass'n v. Rowe*,
429 F.3d 294 (1st Cir. 2005) ...........................................................54

*Prometheus Radio Project v. FCC*,
652 F.3d 431 (3d Cir. 2011) .......................................................27, 47

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*R.J. Reynolds Tobacco Co. v. FDA,*
96 F.4th 863 (5th Cir. 2024) ............................................................. 55

*Red Lion Broad. Co., Inc. v. FCC,*
395 U.S. 367 (1969) ........................................................................... 18

*Reno v. ACLU,*
521 U.S. 844 (1997) ........................................................................... 54

*Rice v. Cayetano,*
528 U.S. 495 (2000) ........................................................................... 44

*Riley v. Nat'l Fed'n of the Blind of N. Car., Inc.,*
487 U.S. 781 (1988) ........................................................................... 52

*Roy v. City of Monroe,*
950 F.3d 245 (5th Cir. 2020) ............................................................. 46

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
547 U.S. 47 (2006) ............................................................................. 51

*Scahill v. Dist. of Columbia,*
909 F.3d 1177 (D.C. Cir. 2018) ......................................................... 53

*Schuette v. Coal. to Defend Affirmative Action,*
572 U.S. 291 (2014) ...................................................................... 42, 44

*Shaw v. Reno,*
509 U.S. 630 (1993) ........................................................................... 44

*Stahlman v. FCC,*
126 F.2d 124 (D.C. Cir. 1942) ........................................................... 18

*State v. Biden,*
10 F.4th 538 (5th Cir. 2021) ............................................................. 10

*Sussman v. Tanoue,*
39 F. Supp. 2d 13 (D.D.C. 1999) ....................................................... 43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Texas Ass'n of Mfrs. v. CPSC,*
989 F.3d 368 (5th Cir. 2021) ............................................................. 10

*United States v. Arnold,*
740 F.3d 1032 (5th Cir. 2014) ........................................................... 53

*United States v. New Hampshire,*
539 F.2d 277 (1st Cir. 1976) ......................................................... 43, 55

*United States v. Salerno,*
481 U.S. 739 (1987) ........................................................................ 46

*Verizon v. FCC,*
740 F.3d 623 (D.C. Cir. 2014) ......................................................... 20

*Voting for Am., Inc. v. Steen,*
732 F.3d 382 (5th Cir. 2013) ........................................................... 45

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ........................................................................ 51

*Walker v. City of Mesquite,*
169 F.3d 973 (5th Cir. 1999) ........................................................... 44

*Weyerhaeuser Co. v. Burlington Ins. Co.,*
74 F.4th 275 (5th Cir. 2023) ........................................................... 51

*Worldcall Interconnect, Inc. v. FCC,*
907 F.3d 810 (5th Cir. 2018) ........................................................... 24

*Xcaliber Int'l Ltd. LLC v. Atty. Gen. State of La.,*
612 F.3d 368 (5th Cir. 2010) ........................................................... 41

*Zauderer v. Off. of Disciplinary Counsel,*
471 U.S. 626 (1985) ............................................................... 50, 54, 55

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**Statutes**

28 U.S.C. § 1869(h) ................................................................. 40

42 U.S.C. § 2000e-8(e) ............................................................ 18

44 U.S.C. § 3501 Note ............................................................. 7

47 U.S.C. § 154 .................................................................. 2, 18

47 U.S.C. § 303 ............................................................... 1, 2, 18

47 U.S.C. § 307 .................................................................... 2

47 U.S.C. § 308 .................................................................... 2

47 U.S.C. § 309 .................................................................... 2

47 U.S.C. § 310 .................................................................... 2

47 U.S.C. § 334 .............................................................. *passim*

47 U.S.C. § 403 ............................................................ 11, 18, 19

47 U.S.C. § 405 ............................................................... 12, 24

47 U.S.C. § 608 ................................................................... 23

Cable Television Consumer Protection and Competition Act of
    1992, Pub. L. No. 102–385, 106 Stat. 1460 (1992) ................... *passim*

E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899
    (2002) ........................................................................ 7

**Regulations**

7 C.F.R. § 1944.266 .............................................................. 40

10 C.F.R. § 1040.102 ............................................................. 40

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

12 C.F.R. § 203.4 (2018) ..................................................... 40

23 C.F.R. § 200.9 ............................................................. 40

24 C.F.R. § 107.30 ........................................................... 40

29 C.F.R. § 1602.7 ........................................................... 40

41 C.F.R. § 60-1.12 .......................................................... 40

47 C.F.R. § 73.2080 ...................................................... 2, 27

47 C.F.R. § 73.2080 (1992) .................................................. 22

47 C.F.R. § 73.3526 ..................................................... 7, 47

47 C.F.R. § 73.3612 ................................................ 2, 28, 37

47 C.F.R. § 73.3612 Note (2001)............................................. 5

47 C.F.R. § 73.3615 .................................................... 30, 47

## Administrative Materials

*2014 Quad. Reg. Rvw.,*
   31 FCC Rcd 9864 (2016) ................................................. 33

*Application of Dontron, Inc.,*
   6 FCC Rcd 2560 (1991) .................................................. 31

*Broadcast Localism,*
   23 FCC Rcd 1324 (2007) ................................................. 38

*Commission Proposes Revisions to FCC Forms 395-A and 395-B,*
   Public Notice, 23 FCC Rcd 13142 (rel. Aug. 26, 2008)......................24

*Petition for Rulemaking to Require Broadcast Licensees to Show*
   *Nondiscrimination in Their Employment Practices,*
   23 F.C.C.2d 430 (1970) ........................................... *passim*

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Review of the Commission's Broadcast and Cable Equal*
  *Employment Opportunity Rules and Policies,*
  15 FCC Rcd 2329 (2000) ........................................................... *passim*

*Review of the Commission's Broadcast and Cable Equal*
  *Employment Opportunity Rules and Policies,*
  17 FCC Rcd 24018 (2002) ....................................................... 6, 22, 27

*Review of the Commission's Broadcast and Cable Equal*
  *Employment Opportunity Rules and Policies,*
  19 FCC Rcd 9973 (2004) ......................................................... 6, 7, 36

*Review of the Commission's Broadcast and Cable Equal*
  *Employment Opportunity Rules and Policies,*
  36 FCC Rcd 12055 (2021) .............................................................. 7

*Suspension of Broadcast and Cable Equal Employment*
  *Opportunity Outreach Program Requirements,*
  16 FCC Rcd 2872 (2001) ............................................................... 6

*Suspension of Requirement for Filing of Broadcast Station Annual*
  *Employment Reports and Program Reports,*
  13 FCC Rcd 21998 (1998) .............................................................. 4

**Legislative Materials**

H.R. Conf. Rep. No. 102-862, 1992 U.S.C.C.A.N. 1231 (1992) ............... 20

H.R. Rep. No. 628, 102d Cong., 2d Sess. 111 (1992) ............................. 17

**Other Materials**

Brief of Petitioners MD/DC/DE Broadcasters Association in Case
  No. 00-1094 (D.C. Cir. June 9, 2000) ........................................... 6

Information Nation: The Need for Improved Federal Civil Rights
  Data Collection (April 2022) ...................................................... 33

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Jt. Suppl. Comments of Asian Americans Seeking Justice, MB
    Docket No. 98-204 at 5 (Aug. 10, 2022) .............................................. 34

*Recommendations on the Best Practices for the Collection of Sexual*
    *Orientation and Gender Identity Data on Federal Statistical*
    *Surveys*, Office of the Chief Statistician of the United States ........... 25

## STATEMENT OF THE ISSUES

The Federal Communications Commission order on review requires broadcasters with five or more full-time employees to annually report to the Commission—and so to make public—the gender, race, and ethnicity of their workforces. This case presents these issues:

1) Whether there is statutory authority for the order;

2) Whether the order is arbitrary and capricious;

3) Whether the order violates the Fifth Amendment; and

4) Whether the order violates the First Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the statutory addendum bound with this brief.

## STATEMENT OF THE CASE

**A.     Statutory and Regulatory Background**

**1.     The Form 395-B Annual Employment Report**

Congress has vested the Commission with "broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires.'" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303(r)). Invoking that authority, the FCC adopted the requirement that radio and television stations with

five or more full-time employees file an "annual employment report" of the "gender, race and ethnicity of a broadcast station's workforce." 47 C.F.R. § 73.3612. *See Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 23 F.C.C.2d 430, 435 ¶ 10 (1970) ("1970 Order") (citing 47 U.S.C. §§ 154(i), 303, 307, 308, 309, and 310). The FCC adopted the requirement concurrently with regulations prohibiting employment discrimination and requiring broadcast licensees to provide equal employment opportunities. 47 C.F.R. § 73.2080. In doing so, the FCC stated that it would use the information collected from these annual reports—on what is known as "Form 395-B"—both "to ensure that licensees focus[ed] on the best method[s] of assuring effective equal employment [opportunity ("EEO")] practices," *id.* at ¶ 1, and—independently of that enforcement function—to monitor and report on industry trends. *See* 1970 Order at 431-32 ¶ 4 (data will be "useful to show industry employment patterns").

In 1992, Congress found that, "despite the existence of regulations governing equal employment opportunity, females and minorities [were] not employed in significant numbers in positions of management authority in the cable and broadcast television industries." Cable

Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102–385, 106 Stat. 1460 (1992) ("1992 Cable Act"), § 22(a). Accordingly, Congress directed:

> Except as specifically provided in this section, the Commission shall not revise—
>
> (1)    the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080) as such regulations apply to television broadcast station licensees and permittees; or
>
> (2)    the forms used by such licensees and permittees to report pertinent employment data to the Commission.

*Id.* § 22(f), codified in 47 U.S.C. § 334(a). Although directing the FCC to maintain its existing forms, Congress allowed for "nonsubstantive technical or clerical revisions … as necessary to reflect changes in technology, terminology, or Commission organization." *Id.* § 334(c).

### 2.    *Lutheran Church* and *MD/DC/DE*

**a**. Years later, a radio station licensee with a religious affiliation brought constitutional challenges to the FCC's EEO program regulations in the D.C. Circuit. *See generally Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998). Among other contentions, the petitioner claimed that the criteria the FCC used "to select stations for in-depth EEO review when their licenses came up for renewal" violated

- 3 -

the equal protection guarantee of the Fifth Amendment. *Id.* at 352. Stations were selected for review if "minority groups and/or women [were] not employed . . . at a ratio of 50% of their availability in the workforce." *Id.* at 353 (quotation marks omitted).

The D.C. Circuit held that this screening device required—and failed—strict scrutiny under *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200 (1995), because it "pressure[d] ... stations to make race-based hiring decisions," "even if [it did] not explicitly direct or require" such decisions. *Lutheran Church-Missouri Synod v. FCC*, 154 F.3d 487, 491 (1998) (denying petition for rehearing).

*Lutheran Church* did not address the constitutionality of the Form 395-B data collection. Following the decision, the FCC nonetheless voluntarily suspended the data collection while it considered the adoption of new EEO program regulations on remand. *Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports and Program Reports*, 13 FCC Rcd 21998, 21009 ¶ 2 (1998).

The Commission adopted revised EEO program regulations in 2000. *See generally Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 15 FCC Rcd 2329 (2000) ("2000 Order"). It also reinstated the Form 395-B data collection

to "monitor industry [employment] trends," *id.* at 2394-95 ¶ 164; *id.* at 2358 ¶ 64, but not to assess compliance with its EEO program regulations or review broadcast license renewal applications. *Id.* at 2332, 2395 ¶¶ 6, 165. The agency codified that limitation in its regulations. *See* 47 C.F.R. § 73.3612 Note (2001).

**b**. Before the collection of Form 395-B data resumed, the D.C. Circuit addressed challenges to the FCC's revised EEO program regulations. *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001). The revised regulations provided two options for an EEO program. Under "Option A," a broadcaster could choose from 13 recruitment options, two of which "pa[id] special attention to women and minorities." *MD/DC/DE*, 236 F.3d at 18. Under "Option B," a broadcaster would report the race, sex, and source of referral for each *applicant*, and if it reported "'few or no' women and minorities in its applicant pool, then the Commission [would] investigate the broadcaster's recruitment efforts." *Id.* at 19.

The court upheld the constitutionality of Option A. *Id.* It invalidated Option B, however, on equal protection grounds. *Id.* at 19-21. And although the petitioners in *MD/DC/DE* also challenged the Form 395-B data collection on equal protection grounds, *see* Brief of Petitioners

MD/DC/DE Broadcasters Association in Case No. 00-1094 (D.C. Cir. June 9, 2000), at 10-11, 26, Form 395-B played no part in the court's decision.

Nevertheless, in the wake of *MD/DC/DE*, the Commission again suspended the data collection while it assessed the effects of that decision on the agency's rules. *See Suspension of Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements*, 16 FCC Rcd 2872, 2872 ¶ 1 n.1 (2001).

**c**. In 2002, the Commission adopted new, "race and gender neutral" EEO program regulations that remain in place today. *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 17 FCC Rcd 24018, 24075 ¶ 180 (2002) ("2002 Order"). It left the data collection suspended, however, to allow time for the agency to incorporate new federal standards for reporting race and ethnicity. *Id.* at 24025 ¶ 17.

In 2004, the Commission reaffirmed the data collection's importance "to ascertain industry trends, report to Congress, and respond to inquiries from Congress." *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 19 FCC Rcd 9973, 9974 ¶ 3 (2004) ("2004 Order"). The FCC deferred resumption of the data collection, however, to address some broadcasters'

concerns that public availability of Form 395-B data would expose them to pressure to engage in race- or gender-based employment practices. *See id.* at 9976-77 ¶ 9.

Acknowledging these concerns, the Commission observed that Form 395-B data had always been included in station public inspection files. *Id.* at 9978 ¶ 14. *See* 47 C.F.R. § 73.3526. It also acknowledged, however, that "[t]he [then-]recently enacted Confidential Information Protection and Statistical Efficiency Act of 2002 allows . . . agencies to collect information for statistical purposes under a pledge of confidentiality," in which case the information "is exempt from release under the Freedom of Information Act." 2004 Order, 19 FCC Rcd at 9978-79 ¶ 14 (citing E-Government Act of 2002, Pub. L. No. 107-347, §§ 501-504, 116 Stat. 2899, Title V (2002), codified in 44 U.S.C. § 3501 Note). The FCC sought comment on the applicability of these statutes to Form 395-B data. *Id.* at 9978-79 ¶¶ 14-17. It again sought comment, to refresh the record, in 2021. *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 36 FCC Rcd 12055 (2021).

### B.    The Order on Review

In the challenged order, the Commission reinstated the collection and disclosure of Form 395-B data. *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, FCC 24-18, 2024 WL 770889 (2024) ("Order") (JA 1-62). Resuming the data collection, the FCC explained, is faithful to the agency's statutory mandate—including the directive in the 1992 Cable Act to maintain the agency's 1992-era forms for collecting employment data. *Id.* ¶ 14 (JA 8). *See supra* page 3. Resuming the data collection is also necessary to understanding whether "the level of diversity in the broadcasting industry workforce" has improved since Congress's recognition of barriers to equal employment opportunities in the communications industry prompted it to enact the 1992 Cable Act. Order ¶ 14 (JA 8).

Additionally, the FCC concluded that "maintaining this data in a publicly available format is the most appropriate policy." *Id.* ¶ 16 (JA 10). Adhering to the historical practice of making this data public is likely to result in more reliable and useful data, consistent with Congressional policy and public and private trends towards data transparency. *Id.* ¶¶ 2, 15-16 (JA 2-3, 9-10). Moreover, "neither [the Confidential Information Protection and Statistical Efficiency Act] nor [the Freedom of

Information Act] affords an appropriate basis to collect Form 395-B information in a confidential manner." *Id.* ¶¶ 24-37 (JA 13-21).

In response to concerns that "third parties would misuse Form 395-B data to pressure stations to engage in preferential hiring practices," the FCC underscored its decades-old, binding commitment to use the data solely to monitor and report on industry employment trends. *Id.* ¶ 17 (JA 10); *id.* ¶ 45 (JA 24-25). *See id.* ¶¶ 57-60 (JA 30-31) (granting petition to amend the rules to "clarify and strengthen" the prohibition adopted in the 2000 Order). The FCC also made clear that it will "quickly and summarily dismiss any petition, complaint, or other filing submitted by a third party to the Commission based on Form 395-B employment data." *Id.* ¶ 17  (JA 10). *See id.* ¶ 46 (JA 25). In light of these commitments, the agency rejected arguments that disclosure of Form 395-B data risks the kind of official pressure that triggered strict scrutiny in *Lutheran Church* and *MD/DC/DE. Id. See id.* ¶¶ 43-50 (JA 23-27).

In the Commission's judgment, arguments that third parties will use broadcast employment data "to pressure stations in a non-governmental forum" were "speculative." *Id.* ¶ 17 (JA 10). "Despite the public availability of Form 395-B data for more than 20 years prior to 2001," the FCC found "no evidence" in the record that "such data" had

been used in this manner. *Id.* Accordingly—and recognizing, too, that the agency can revisit its decision if improper use of the data does unexpectedly occur—the FCC concluded that broadcasters' concerns about possible "misuse" of Form 395-B data were "overstated" and "outweighed by the … benefits of public disclosure." *Id.*

Finally, in reinstating the Form 395-B, the Commission made a minor change in the form's terminology, adding "gender non-binary" to the reportable categories of gender on the form. *See id.* ¶ 40 (JA 22).

## STANDARD OF REVIEW

The Court reviews de novo issues of constitutional law and statutory construction. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 438 (5th Cir. 2021); *Loper Bright Enters. v. Raimondo*, 603 U.S. ___, 144 S. Ct. 2244, 2262 (2024).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *State v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021) (quoting *Prometheus*, 592 U.S. at 423). "This standard is highly deferential; [courts] apply a presumption of validity and may not substitute [their] judgment for that of the agency." *Texas Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 389 (5th Cir. 2021).

## SUMMARY OF THE ARGUMENT

**I.** Congress has expressly approved—and directed the Commission to continue—the agency's longstanding collection and disclosure of broadcast employment data in Form 395-B. The FCC's decision to reinstate the data collection and make minor form revisions thus was authorized.

**A.** In the 1992 Cable Act, Congress ratified the agency's longtime assertion of public interest authority for the Form 395-B data collection. Therefore, the FCC was not required to tie reinstatement of the data collection in the Order to any specific action authorized in the Communications Act. In any event, the agency's decision falls within its recognized authority under 47 U.S.C. § 403 to collect information and prepare reports on subjects within its regulatory purview.

**B.** Independently, the Act expressly authorizes the Form 395-B data collection as to television broadcasters. 47 U.S.C. § 334(a). In directing the FCC "not [to] revise … the forms used by … licensees" as of 1992 "to report pertinent employment data to the Commission"— which included Form 395-B—Congress made clear that the FCC should continue the Form 395-B in force. *Id.* And contrary to Petitioners' claim,

*Lutheran Church* did not address Form 395-B nor invalidate or diminish the continued applicability of section 334(a)(2).

**C.** The Commission likewise was permitted, under 47 U.S.C. § 334(c), to make minor revisions to the Form 395-B. Petitioners' cursory challenges to two revisions adopted in 2008 are foreclosed because neither Petitioners nor any other party challenged them before the FCC. 47 U.S.C. § 405(a). In any event, those changes, and the Order's addition of a non-binary gender category, were minor changes in terminology allowed under section 334(c).

**II.** The Order is reasonable and reasonably explained.

**A.** The Commission requires objective, industry-wide data to fulfill its responsibility to monitor and analyze broadcast industry workforce diversity, and report, as may be necessary, on its findings to Congress. Form 395-B data provides a more comprehensive picture of the broadcast workforce than any other data source that commenters identified in the record. And while the FCC has not collected this information for many years, that does not undermine the agency's recognition that the information is useful and that the statute requires the FCC to collect it. 47 U.S.C. § 334(a)(2).

**B.** The Commission likewise reasonably concluded that the benefits of making Form 395-B data publicly available—as it has been since the data collection originated in 1970—would outweigh any harm to broadcasters. In reaching this determination, the FCC carefully considered each of the factors this Court has identified as relevant to the reasonableness of an agency decision to disclose information. *See Pennzoil v. Fed. Power Comm'n* , 534 F.2d 627, 631-32 (5th Cir. 1976). There is no merit to Petitioners' claims that the FCC ignored evidence that Form 395-B data will be used to pressure broadcasters to engage in discriminatory employment practices.

**III**. Finally, there is no constitutional problem with the Order, whether under the equal protection guarantee of the Fifth Amendment or the protection of free speech in the First Amendment.

**A**. The equal protection guarantee is not implicated when a challenged regulation is neutral with respect to protected categories and does not lead to unequal treatment. The mere fact that a regulation takes account of race or sex does not make it suspect. Thus, numerous courts have recognized that the government's collection of demographic data

should receive rational basis review. The FCC's reinstated data collection readily satisfies that standard.

**B**. As the Commission recognized in the Order (at ¶ 51 (JA 27)), because Form 395-B merely requires regulated parties to disclose information to the government for ordinary regulatory purposes, it warrants rational basis review under the government-operations exception to the First Amendment. Nothing about the collection or disclosure of Form 395-B data interferes with a broadcaster's ability to communicate its own message or suggests the broadcaster agrees with the FCC's views. By ignoring this analysis in the Order, Petitioners have waived any challenge to it for purposes of this appeal.

In addition, regardless whether the "commercial speech" doctrine strictly applies here, the FCC appropriately analogized Form 395-B data to the type of "purely factual and uncontroversial information" that receives relaxed scrutiny under that doctrine. *See* Order ¶ 52 (JA 27).

# ARGUMENT

## I. THE COMMISSION HAS STATUTORY AUTHORITY TO COLLECT AND DISCLOSE FORM 395-B DATA, AND ITS MINOR REVISIONS TO THE FORM WERE WITHIN THAT AUTHORITY.

### A. The Form 395-B Data Collection Is Authorized under the Commission's Broad Authority to Regulate Broadcast Media in the Public Interest.

**1.** The FCC has "broad statutory authority to regulate broadcast media" in the public interest. *Prometheus*, 592 U.S. at 418 (quotation marks omitted). *See, e.g.*, *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 793 (1978) (FCC's "general rule-making authority supplies a statutory basis for the Commission to issue regulations codifying its view of the public-interest licensing standard"). *Cf. Huawei*, 2 F.4th at 437 (Congress's use of the "open-textured term" "'public interest'" in the Communications Act's broadcast licensing provisions "suggests 'an express delegation of authority to the agency to elucidate'" those provisions).

More than 50 years ago, the Commission determined that the public interest in regulation of broadcaster activities authorized the Form 395-B data collection. 1970 Order, 23 F.C.C.2d at 435 ¶ 10. And—contrary to Petitioners' claim (Br. 26) that "prior to 1992" the "FCC did not … claim or exercise" the ability to collect and disclose workforce data for reasons

other than enforcing the EEO rules—the FCC recognized from the inception of the Form 395-B that one reason collecting workforce data serves the public interest is that doing so enables the agency to monitor "industry employment patterns." 1970 Order, 23 FCC 2d at 431-32 ¶ 4.[1] Moreover, as the FCC made clear in 1970, that function is separate and distinct from enforcement of the FCC's EEO rules. *See id.* at 430, 431 ¶¶ 1, 4 (data submitted in a given year would not "demonstrate the existence of discrimination," but would "provide useful statistical data" and "show industry employment patterns").

When enacting the 1992 Cable Act, Congress was aware of the FCC's longstanding assertion of authority to collect and disclose Form 395-B data, and built upon it. Notably, Congress expressly "cited the Commission's employment trend reports[,] in the legislative history of the 1992 Cable Act[,] as evidence that barriers to employment of women and minorities continued to exist, and that additional legislative action was warranted." 2000 Order, 15 FCC Rcd at 2395 ¶ 164 (citing H.R. Rep.

---

[1] This data collection requirement applied to all broadcasters—television and radio alike. And while Congress in the 1992 Cable Act (now 47 U.S.C. § 334) highlighted the importance of data collection from television broadcasters, it did not—as Petitioners seem to suggest (Br. 25)—relieve radio broadcasters of their pre-existing data disclosure obligation.

No. 628, 102d Cong., 2d Sess. 111 (1992)). And Congress directed the FCC to continue its data collection and reporting function—both in section 22(f) (codified as section 334(a)) with respect to Form 395-B specifically, *see infra* Part I.B.1, and in section 22(g), which "required the Commission to report to Congress on 'the effectiveness of [FCC] procedures, regulations, policies, standards, and guidelines'" for workforce diversity—and advise whether further legislative action was needed. 2000 Order, <u>15 FCC Rcd at 2342</u> ¶ 33.

The 1992 Cable Act thus is an "affirmative ratification" of the FCC's longstanding assertion of public interest authority to collect and disclose broadcast industry workforce data. *Bragdon v. Abbott*, <u>524 U.S. 624, 646</u> (1998). *See* Order ¶ 53 (JA 28-29). *See also CFTC v. Schor*, <u>478 U.S. 833, 846</u> (1986) ("Where, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive." (quoting *Red Lion Broad. Co., Inc. v. FCC*, <u>395 U.S. 367, 381-</u>

82 (1969))). In view of that ratification, Petitioners' challenge to the FCC's reliance on its public interest authority is unavailing.[2]

**2.** Wholly apart from section 334, the Commission has "broad authority under the Communications Act to collect information and prepare reports" on subjects in its regulatory purview. Order ¶ 53 (JA 29) (citing 47 U.S.C. §§ 154(i), (k), 303(r), 403). *See also* 2000 Order, 15 FCC Rcd at 2358, 2395 ¶¶ 63, 165. Multiple courts have recognized that authority. *See FCC v. Schreiber*, 381 U.S. 279, 291–92 (1965) (recognizing FCC authority under 47 U.S.C. § 154(j) to disclose such information as it deems proper upon a balancing of the interests involved); *Stahlman v. FCC*, 126 F.2d 124, 127 (D.C. Cir. 1942) (recognizing FCC authority under 47 U.S.C. § 403 "to obtain the information necessary to discharge its proper functions").[3] Here, at a minimum, broadcast industry

---

[2] Petitioners note that "analogous data collected by the EEOC is protected from public disclosure" by statute. Br. 43 (citing 42 U.S.C. § 2000e-8(e)). Congress was well aware of this protection in Title VII of the Civil Rights Act of 1964 when it codified Form 395-B in 1992, and that "the Commission had been collecting broadcast workforce data and making it available publicly for decades," yet Congress "imposed no such limitation" on the FCC. Order ¶ 20 (JA 11).

[3] To the extent Petitioners contend that section 403 is limited to information gathering in support of FCC enforcement functions, *see* Br. 27, that contradicts the statutory text, which authorizes inquiry by the
(cont'd)

employment data are relevant to the Commission's role, as the industry's regulator, in understanding "industry employment patterns," 1970 Order, 23 F.C.C.2d at 431-32 ¶ 4, and reporting on industry trends to Congress. The FCC thus appropriately regarded reinstatement of the data collection to serve the execution of those functions.

**B.   Section 334(a) Expressly Authorizes the Data Collection from Television Broadcasters.**

**1.** When Congress enacted what became section 334(a) in 1992, the Commission had been using Form 395-B to collect employment data from broadcasters—which they were required to make publicly available in their station files—for over twenty years. Order ¶ 5 (JA 4). Section § 334(a) provides:

> Except as specifically provided in this section, the Commission shall not revise—
>
> (1)   the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080) as such regulations apply to television broadcast station licensees and permittees; or
>
> (2)   the forms used by such licensees and permittees to report

---

FCC "as to any matter or thing … concerning which any question may arise under any of the provisions of this chapter." 47 U.S.C. § 403. Thus, for example, the investigation in *Schreiber*, 381 U.S. at 281, gathered information in service of the FCC's broadcast rulemaking authority.

pertinent employment data to the Commission.
47 U.S.C. § 334(a).

By codifying the existing data collection, Congress expressly authorized it as to television stations. *See* Order ¶¶ 53, 56 (JA 28-29); 2000 Order, 15 FCC Rcd at 2337, 2358 ¶¶ 22, 64. *See also Verizon v. FCC*, 740 F.3d 623, 638 (D.C. Cir. 2014) ("one might reasonably think that Congress, in directing the Commission to undertake certain acts, necessarily invested the Commission with the statutory authority to carry out those acts"); *Alexander v. Alexandria*, 9 U.S. 1, 8 (1809) (Marshall, C.J.) (statute that relies for operability on a particular construction of an earlier law "is either a legislative exposition of a power formerly granted, or the grant of a new power").

The legislative history of the 1992 Cable Act confirms this understanding. As explained in the legislation's House Conference Report: "The agreement of the conferees … incorporates into the Communications Act the … FCC Form 395-B annual employment report … for television broadcast stations." H.R. Conf. Rep. No. 102-862 at 97, 1992 U.S.C.C.A.N. 1231, 1279 (1992). The Report also documents the conferees' intent that Form 395-B "continue to be filed with the FCC by

television broadcast licensees and permittees." *Id.*

**2.** Despite these clear indications that Congress directed the Commission to continue its Form 395-B data collection, Petitioners rely on the language that the FCC "shall not revise" its existing practices (47 U.S.C. § 334(a)) to argue that the statute "explicitly *restricts* the FCC's power; it authorizes nothing." Br. 24.

That argument ignores the chronology surrounding section 334's enactment. There was no need for Congress to affirmatively direct or authorize the FCC to begin a data collection that was already longstanding. By limiting the agency's ability to "revise" Form 395-B (and other "forms used by … licensees" at the time of the law's enactment), Congress necessarily recognized that the existing data collection was authorized. That the statute is phrased in negative terms does not change that it is a grant (and a reaffirmation) of authority. *See* 2000 Order, 15 FCC Rcd at 2343 ¶ 36. Congress "need not use magic words in order to speak clearly." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 436 (2011).

**3.** Petitioners also argue that section 334 "applies only to collecting data 'pertinent' to 'the regulations concerning equal employment

opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080),'" which "were held unconstitutional in *Lutheran Church*." Br. 25. Because those specific EEO rules are "are no longer in effect," Petitioners contend, "Form 395-B has … ceased to be 'pertinent' to them." *Id.*

The premise of this argument, that *Lutheran Church* invalidated the Commission's 1992 regulations in their entirety, is mistaken. Section 334(a)(1) refers to section 73.2080 of the FCC's rules, which in 1992 consisted not only of the EEO program requirements in subsections (b) and (c) but also included the nondiscrimination requirement or "General EEO policy" of subsection (a). *See* 47 C.F.R. § 73.2080 (1992). The D.C. Circuit invalidated "'the Commission's EEO program requirements'" in 73.2080(b) and (c), "but did not invalidate the nondiscrimination requirement in [] 73.2080(a)," 2002 Order, 17 FCC Rcd at 24027  ¶ 26  (quoting *Lutheran Church*, 141 F.3d at 356). That nondiscrimination requirement remains in place today.

The Communications Act contains an express severability clause, which provides: "If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons or

circumstances shall not be affected thereby." 47 U.S.C. § 608.

Accordingly, to whatever extent *Lutheran Church* is understood to have

abrogated section 334(a)(1) as to the EEO program requirements that

were in place in 1992, (a)(1) continues in force as to the

nondiscrimination requirement of the Commission's EEO regulations.

*Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508

(2010) ("[W]hen confronting a constitutional flaw in a statute, we try to

limit the solution to the problem,' severing any 'problematic portions

while leaving the remainder intact.'" (quotation marks omitted)). The

data collection is "pertinent" to the nondiscrimination requirement. *See*

*infra* Part II.A.1.

### C. Nonsubstantive Revisions to Form 395-B Are Permitted under Section 334(c).

Finally, Petitioners contend that, even if the FCC could reinstate

the Form 395-B data collection, it could not add "a new 'non-binary'

gender category" to the form or leave in place two other changes that the

FCC had first adopted in 2008. Br. 24. They point out that 47 U.S.C.

§ 334(c) allows only "nonsubstantive technical or clerical revisions," and

they argue that these are not such revisions.

**1**. As a threshold matter, this argument is not properly before the

Court as to the 2008 revisions. In the agency proceeding here, neither
Petitioners nor any other party argued that the FCC lacked authority to
adopt those changes. Judicial review of Petitioners' arguments is thus
foreclosed under section 405(a) of the Communications Act. 47 U.S.C.
§ 405(a). *See, e.g.*, *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 820
(5th Cir. 2018) (party may not obtain judicial review where it "relies on
questions of fact or law upon which the Commission … has been afforded
no opportunity to pass" (quoting 47 U.S.C. § 405(a))).

In any event, the Commission explained why the 2008 revisions are
authorized when it adopted them. The changes did "not subtract any
information requested on the form, but rather [sought] more detail on
race identification and official/manager occupations, with minor changes
in terminology." *Commission Proposes Revisions to FCC Forms 395-A
and 395-B*, Public Notice, 23 FCC Rcd 13142, 13143 (rel. Aug. 26, 2008).
Accordingly, the changes amounted to "nonsubstantive technical [and]
clerical revisions … to reflect changes in … terminology"—as permitted
under section 334(c). *Id.* (quoting 47 U.S.C. § 334(c)). Petitioners here
raise only conclusory assertions to the contrary, contending that the 2008
revisions "add[ed] further complexity" to the Form 395-B and "are not

clerical or nonsubstantive." Br. 24. Those passing claims in no way undermine the FCC's contrary conclusion.

**2.** The Commission likewise correctly concluded that the non-binary gender category "fits within the latitude" Congress afforded the agency in section 334(c) "to revise the forms 'to reflect changes in … terminology.'" Order ¶ 40 (JA 22) (quoting 47 U.S.C. § 334(c)). *See id.* ¶ 39, n.135 (JA 22) (federal guidance "recognizes the 'need to be flexible and adapt over time'" in collecting data on gender).[4] As explained in the Order, the revision "provides an option for employees to identify as non-binary … but does not impose any new requirement on stations that did not exist under the prior version of Form 395-B, which already required reporting on gender." *Id.* In other words, the form formerly offered binary categories, "male" or "female," and now allows individuals not identifying as either category to be identified under a third category, "non-binary."

Petitioners do not contest the agency's reasoning; they only claim, borrowing from their subsequent First Amendment argument, that the

---

[4] *Accord Recommendations on the Best Practices for the Collection of Sexual Orientation and Gender Identity Data on Federal Statistical Surveys*, Office of the Chief Statistician of the United States, https://www.whitehouse.gov/wp-content/uploads/2023/01/SOGI-Best-Practices.pdf (quoted by the Commission).

revision is "controversial." Br. 25. But their assertion that "some broadcasters have expressed … a religious objection to recognizing any non-binary gender," Br. 50, does not change that the "non-binary" option is a change in "terminology" for a category of information that the Form 395-B already collected in 1992. Its inclusion by the FCC in the Order was thus within the agency's authority under section 334(c).

## II.  THE COMMISSION REASONABLY REINSTATED THE FORM 395-B DATA COLLECTION AND DETERMINED THAT BROADCASTERS' SUBMISSIONS SHOULD BE PUBLIC.

### A.  The FCC Reasonably Decided to Resume Collecting Broadcaster Employment Data.

**1**. The Commission reasonably concluded that reinstatement of the Form 395-B data collection will provide important public benefits. Order ¶ 1 (JA 1-2). The FCC has broad authority and responsibility to regulate broadcast licensees. *Prometheus*, 592 U.S. at 418. As the FCC recognized in the Order, "broadcasters and other stakeholders" regard "workforce diversity [as] critical to the ability of broadcast stations … to effectively serve local communities across the country." *Order* ¶ 2 (JA 2). And it is well established (as we do not understand Petitioners to dispute) that the FCC's authority extends to ensuring nondiscrimination in the broadcast industry—which is a necessary

prerequisite to workforce diversity. 2002 Order, 17 FCC Rcd at 24026-33 ¶¶ 21-39. *See* 47 U.S.C. § 334(a); *supra* pages 22-23 (discussing 47 C.F.R. § 73.2080(a)).

"Without objective and industry-wide data," however, "it is impossible to assess changes, trends, or progress in the industry," Order ¶ 2 (JA 2); *id.* ¶ 14 (JA 8), or to assess the efficacy of the Commission's EEO regulations in "deterring discrimination." 2000 Order, 15 FCC Rcd at 2394 ¶ 164. *See* 47 C.F.R. § 73.2080(a). *Cf. Prometheus Radio Project v. FCC*, 652 F.3d 431, 468 (3d Cir. 2011) ("Without accurate data on minority (and female) ownership, it is impossible to perform … analysis" of "the impact of changes in [the] media ownership rules on minority ownership" (quotation marks omitted)).

Thus, the FCC reasonably recognized that it "has a public interest in collecting Form 395-B in order to report on and analyze employment trends in the broadcast sector." Order ¶ 14 (JA 8). That interest encompasses the agency's need for the data to "compare trends across other sectors regulated by the Commission." *Id.* That interest also reasonably includes the utility of the data for "assess[ing] whether" the

agency's nondiscrimination "policies are working" on an industrywide level to promote workforce diversity. 2000 Order, 15 FCC Rcd at 2395 ¶ 164; 1970 Order, 23 F.C.C.2d at 431 ¶ 4.[5] *Cf. Bechtel v. FCC*, 10 F.3d 875, 881 (D.C. Cir. 1993). And as the FCC further recognized, it will not be able to report on broadcast industry employment trends to Congress—as Congress has requested before—without the Form 395-B data. *See* Order n.6 (JA 2) (citing a 1994 report to Congress pursuant to section 22(g) of the 1992 Cable Act); *id.* at ¶¶ 2, 14 (JA 2, 8). The FCC thus reasonably regarded reinstituting the data collection as "critical" to the agency's execution of its responsibilities as regulator. Order ¶ 2 (JA 2). And in any event, the FCC acknowledged, reinstatement of the Form 395-B was "statutorily required" under section 334(a) of the Act. *Id.* ¶ 1 (JA 2).

**2.a.** Challenging the data collection, Petitioners criticize an isolated statement in the Order that "the Commission is the only entity with the resources and expertise" to collect broadcaster demographic

---

[5] As the amended data collection rule provides, Form 395-B "data will not be used for the purposes of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of Section 73.2080." 47 C.F.R. § 73.3612; Order App. A (JA 38).

data. Br. 52 (quoting Order ¶ 50 (JA 27)). Taken in context, this statement merely references the agency's earlier determination that other data sources, like the Equal Employment Opportunity Commission's ("EEOC") "EEO-1 form," were not "appropriate substitute[s] for Form 395-B." Order ¶ 22 (JA 12). *See also id.* ¶ 23 (JA 13) (rejecting "the suggestion to use the Radio Television Digital News Association … diversity survey as a substitute").

**b.** Petitioners' related argument (Br. 53-54) that the Commission arbitrarily rejected existing collections of workforce data as a substitute for Form 395-B is also unavailing. As the FCC explained, the Form 395-B data collection provides "a more comprehensive picture of the broadcast industry workforce" than data collected by the EEOC because it "distinguishes between full and part-time employees" and "applies to *all* broadcast station employment units with five or more full-time employees," whereas the EEOC collects data "only for entities with 100 or more employees." Order ¶ 22 (JA 12-13) (citing a 2004 calculation that EEOC data would not capture 84 percent of full-time broadcast

station employees).[6] Similarly, data collected as part of the News

Association diversity survey "would provide a less complete view" of the

broadcast workforce because it "pertains only to TV and radio

newsrooms" and because survey responses are voluntary. *Id.* ¶ 23 (JA

13).[7]

    **c.** Petitioners further argue that "Form 395-B is not a reliable

tool" because it provides only a "snapshot" of a broadcast station's

workforce and does not "reflect the stability or hiring practices at [the]

… station completely." Br. 44 (quotation marks omitted). That Form

395-B is not "a precise measure of a station's year-round employment

---

[6] Petitioners contend (Br. 54) the EEOC data would "capture a higher percentage of broadcast employees than the Order suggests, and certainly enough for . . . trend analysis," because it covers companies with over 100 employees collectively, regardless whether they form an individual unit. But no commenter offered the Commission any estimate, under that theory, of the percentage of broadcast employees supposedly covered. Without such information, "the FCC reasonably relied on the evidence it had." *Huawei*, 2 F.4th at 453.

[7] As to Petitioners' related complaint (Br. 54) that the Order fails to explain why "the combination of" the News Association data and data from broadcast ownership reports collected by the Commission would be inadequate, there was no cause for the FCC to do so. Broadcast ownership reports do not collect employee demographic information, *see* 47 C.F.R. § 73.3615, and no commenter argued that combining these data sets would solve the independent failings of the News Association data that the FCC identified.

stability or hiring practices," *Application of Dontron, Inc.*, 6 FCC Rcd 2560, 2564 (1991), does not detract from its utility for year-to-year trend analysis.

**d.** Petitioners also challenge the Order on a theory that "Congress never asked for" broadcast industry workforce reports. Br. 52. But as we have explained, *see supra* page 17, Congress *has* asked for such a report. And the FCC long ago recognized that Congress "contemplated continued Commission monitoring of employment trends." 2000 Order, 15 FCC Rcd at 2395 n.262.

**e.** Petitioners argue that "the Order points to no legitimate basis" for resuming the data collection when "the FCC has not collected this information for more than two decades." Br. 52. Congress, however, has charged the Commission with regulation of the broadcast industry, and the passage of time since the FCC last collected Form 395-B data does not negate the agency's reasonably explained grounds for resuming the collection now. *See* Order ¶¶ 1, 14 (JA 1-2, 8); *supra* Part I.B.1.

**B.     The FCC Reasonably Justified Its Decision to Make Form 395-B Data Publicly Available.**

**1.** This Court in *Pennzoil*, 534 F.2d at 632, set out a three-part test for the propriety of agency disclosure of confidential information: (1) the

extent to which disclosure would "significantly aid the [agency] in fulfilling its functions," (2) the harm from disclosure to producers and the public generally, and (3) "whether there are alternatives to full disclosure" that would fulfill the agency's goals while protecting the interests of the producers. The Order fully satisfies this test.

*First*, the Commission predicted that disclosure would have significant benefits. Order ¶¶ 15, 35 (JA 9-10, 20). The FCC collects data on many topics within its responsibility, and it benefits from public input on the data's accuracy.[8] The FCC explained that disclosure of Form 395-B data will promote a "more accurate collection and recordation process" by encouraging stations to report accurate data and enabling "[i]ndividuals or entities with a connection to the station" to point out any errors. *Id.* ¶ 15  (JA 9). *Cf. John Doe No. 1 v. Reed*, 561 U.S. 186, 198 (2010) (recognizing that disclosure of ballot initiative signatures "can help to cure the inadequacies of the verification and

---

[8] For example, the FCC collects data regarding the geographic availability of broadband through self-reporting by Internet providers, posts detailed availability maps online, and asks the public to "help verify the accuracy" of the data. https://www.fcc.gov/BroadbandData.

canvassing processes").[9]

Disclosure also will "allow[] others to review the accuracy of [the FCC's] data analyses and to question [its] methods for data collection with the benefit of actual datasets." Order ¶ 35 (JA 20). *See 2014 Quad. Reg. Rvw.*, 31 FCC Rcd 9864, 9972-74 ¶¶ 259-64 (2016) (summarizing data collection improvements intended to "assist efforts to study and analyze issues related to minority and female ownership, by both the Commission and third parties").

In addition, the FCC concluded that disclosure will maximize the utility of Form 395-B data. "[T]he utility of our reports is greatly enhanced by our ability to 'slice, dice, and display' granular data about the broadcast sector." Order ¶ 15 (JA 9). *See* Information Nation: The Need for Improved Federal Civil Rights Data Collection (April 2022), https://civilrights.org/resource/information-nation-the-need-for-improved-federal-civil-rights-data-collection/, at 16 ("When data are disaggregated, researchers can analyze the relationship between multiple variables" (cited in Jt. Suppl. Comments of Asian Americans

---

[9] The Commission did not decide that "the public is better able to audit Form 395-B responses than broadcasters or the FCC." Br. 55.

Seeking Justice, MB Docket No. 98-204 at 5 (Aug. 10, 2022) (JA 73))).

If Form 395-B data were confidential, the FCC would have to "report [its] findings at a more general, and thus less useful, level to avoid the risk of inadvertently facilitating any reverse engineering of station-specific information." Order ¶ 15 (JA 9-10). This, in turn, would undermine the data's utility in "providing [the FCC], the industry, Congress, and the public with a better understanding of, or insight into, the full scope of the broadcast industry workforce." *Id.* ¶ 14 (JA 8). *See id.* ¶ 35 & n.126 (JA 20) (recognizing "Congress' goal to maximize the utility of the data an agency collects for the benefit of the public").[10]

*Second*, the FCC considered the harm to broadcasters from disclosure. *Id.* ¶¶ 17-19, 35-37 (JA 10-11, 20-21). Some broadcasters argued that Form 395-B data would be used as a basis for complaints and harassing filings with the agency. But the FCC explained that "such concerns have been addressed by the Commission's repeated

---

[10] Petitioners argue (Br. 56) the FCC's reasoning was "illogical[]" because if "inadvertently disclosing some information" is bad, then "intentionally disclosing all information" must be worse. A risk of harm from inadvertent disclosure might be worse for individual stations, as they could be singled out and prevented from comparing their data to other broadcasters' data.

statements on the appropriate use of such data and its amendment of the rules to prohibit use of the data" for any purpose other than monitoring and reporting on industry employment trends. Order ¶ 17 (JA 10). *See id.* ¶ 45 (JA 24-25).

The Commission reasonably regarded as "overstated" concerns that third parties would "attempt … to use the publicly available Form 395-B data to pressure stations in a non-governmental forum." *Id.* ¶ 17 (JA 10). "Despite the public availability of Form 395-B data for more than 20 years prior to 2001," the FCC explained, "the record contain[ed] no evidence of use of such data in this manner" outside of official government proceedings. *Id.* There was only evidence of third parties filing petitions to deny or complaints with the FCC, which are now foreclosed. The FCC made clear, however, that, "[i]f evidence of such misuse of the data emerges, the Commission can reconsider its approach" to disclosure then. Order ¶ 17 (JA 10-11).

*Third*, the FCC also considered keeping the information confidential under the Confidential Information Protection and Statistical Efficiency Act or the Freedom of Information Act as possible alternatives to Form 395-B public disclosure, but it concluded that

doing so would not serve the agency's goals while protecting broadcasters' interests. Order ¶¶ 24-37 (JA 13-21).[11]

In light of these factors, the FCC reasonably concluded that the benefits of disclosure significantly outweigh any harm. *Id.* ¶ 37 (JA 21). *See Pennzoil*, 534 F.2d at 631-32.

**2**. Challenging the reasonableness of the Commission's decision, Petitioners contend that the FCC ignored "abundant" evidence, Br. 54, that Form 395-B will be used to pressure broadcasters to engage in employment practices that may lead to unequal treatment. *See* Br. 54-55. *See also id.* at 29-38.

**a.** The material on which Petitioners rely includes comments that, "before the FCC discontinued its Form 395-B requirement, it was routine for petitions to deny to be filed" against license renewal applications based on "comparison of each station's Form 395-B data against the racial, ethnic and gender breakdown of the population in the station's market." Br. 37 (quotation marks omitted). But the EEO regulations in

---

[11] Petitioners argue the FCC "could collect Form 395-B data anonymously, keep the data confidential, or disclose it only in an aggregated, non-station-attributable form," Br. 45, but they do not engage with the FCC's findings in the Order or its rationale for rejecting anonymous data collection. *See* 2004 Order, 19 FCC Rcd at 9977 ¶ 9.

effect at the time, which relied on "underrepresentation" to trigger "intense EEO review," *Lutheran Church*, 141 F.3d at 353, were invalidated in 1998. There is no dispute that the current rules merely require stations to implement race- and gender-neutral recruitment and hiring programs. Moreover—and significantly—the FCC's regulations now "prohibit explicitly the use of the Form 395-B data" for any purpose other than monitoring and reporting on industry employment trends. Order ¶ 45 (JA 24); 47 C.F.R. § 73.3612 (2024). There is thus no reason to suppose the historical practices about which Petitioners complain will resume under the Order here.

Resisting that conclusion, Petitioners argue (Br. 33-34) that third parties may seek to evade the current limitations on the use of Form 395-B data and harass broadcasters with bad faith challenges to the accuracy of their employment reports. Contrary to Petitioners' repeated assertions, however, the FCC has not at all "invit[ed] the public to file complaints finding fault with a licensee's Form 395-B responses." Br. 34. Rather, it will "quickly and summarily dismiss any petition, complaint, or other filing submitted by a third party … based on Form 395-B employment data." Order ¶ 17 (JA 10). The FCC also recognized

that "[i]f evidence of … misuse of the data" does unexpectedly "emerge[], the Commission can reconsider its approach to collection of the Form 395-B data." *Id.* ¶ 17 (JA 10-11).

**b**. Petitioners also cite comments that they interpret as threatening public pressure campaigns for broadcasters to meet certain workforce diversity goals. *See* Br. 37-38. But as the Order states, the record does not show that pressure campaigns of this kind—i.e., independent of any government forum or pressure—have happened historically. *See* Order ¶ 17 (JA 10). And indeed, that is not what the cited comments indicate would happen here. *See, e.g.*, Information Nation at 5 (third-party advocacy may include publishing research and reports, or advocating for legislative or regulatory change). While local civic groups could discuss employment data with broadcasters, such voluntary dialogue—which the Commission seeks to foster, *see Broadcast Localism*, 23 FCC Rcd 1324, 1326 ¶ 2 (2007) ("the centerpiece of localism is the communication between broadcasters and the members of the public that they are licensed to serve")—is free of pressure without an FCC forum. In any event, it was entirely reasonable for the FCC to regard such concerns as "overstated" and

"outweighed by … [the] benefits of public disclosure." Order ¶ 17  (JA 11).

**3**. Finally, because the Commission identified sound reasons for public disclosure of the data collected on Form 395-B, Petitioners' claim that the FCC's rationale for disclosure is mere pretext (Br. 38, 55-56) is unsound. *See supra* Part II.B.1.

In sum, the Commission's stated reasons for resuming both the collection and disclosure of Form 395-B data were "reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423.

## III. COLLECTION AND DISCLOSURE OF FORM 395-B DATA IS CONSTITUTIONAL.

Finally, there is no constitutional problem with the Commission's Order, whether under the equal protection guarantee of the Fifth Amendment or the protection of free speech in the First Amendment.

### A. The Form 395-B Data Collection Comports With the Fifth Amendment.

The importance to federal agencies of having access to data on race and gender is reflected by the widespread collection of such data by those agencies.[12] Like the many other, routine instances in which government

---

[12] For example, the EEOC has adopted regulations under Title VII of the
(cont'd)

entities collect demographic data, the Form 395-B addresses race and sex in a neutral manner. Neither the data collection itself, nor the Commission's decision that the data will be publicly available, requires or encourages broadcasters to engage in discriminatory employment practices. Order ¶¶ 41-42 (JA 22-23). Contrary to Petitioners' claim (Br. 28), their equal protection challenge thus does not trigger heightened

---

Civil Rights Act of 1964 requiring employers to report the race of employees. 29 C.F.R. § 1602.7. *See also, e.g.,* Jury Selection and Service Act of 1968, 28 U.S.C. § 1869(h) (requirement to "elicit" the race of all individuals considered for jury duty); 7 C.F.R. § 1944.266(d)(3) (Department of Agriculture grant recipients "must maintain current data on the race, ethnicity and gender of program applicants and beneficiaries"); 10 C.F.R. § 1040.102(b) (recipients of assistance from Department of Energy must make available "data on program participants, identified by race, color, national origin, sex, age and handicap status"); 12 C.F.R. § 203.4(b) (banks must collect "data about the race or national origin and sex" of home loan applicants) (2018); 23 C.F.R. § 200.9(b)(4) (state highway agency compliance with Title VI requires "collection of statistical data (race, color, religion, sex, and national origin) of participants in, and beneficiaries of State highway programs"); 24 C.F.R. § 107.30(b) (lenders participating in federal mortgage insurance programs must "maintain data regarding the race, religion, national origin and sex of each applicant … for assistance"); 41 C.F.R. § 60-1.12(c) (Office of Federal Contract Compliance Programs requires Government contractors, depending on their size, to document "(i) [t]he gender, race, and ethnicity of each employee; and (ii) where possible, the gender, race, and ethnicity of each applicant.").

scrutiny and should receive rational basis review, which it readily satisfies.

**1**. "A statute is only subject to heightened scrutiny on an Equal Protection challenge if it 'proceeds along suspect lines [or] infringes fundamental constitutional rights.'" *Xcaliber Int'l Ltd. LLC v. Atty. Gen. State of La.*, 612 F.3d 368, 381 (5th Cir. 2010) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "As the court in *Lutheran Church* acknowledged, the Constitution's equal protection guarantee is not implicated if the regulation at issue is neutral with respect to protected categories" and does not lead to unequal treatment. Order ¶ 42 (JA 22-23). *See also MD/DC/DE*, 236 F.3d at 20 ("*Adarand* requires strict scrutiny only of governmental actions that lead to people being treated unequally on the basis of their race.").

**2**. Although Petitioners claim (Br. 28-30, 39) that the Order should receive heightened scrutiny merely "because it compels broadcasters to categorize employees by race, ethnicity, and sex," Br. 29, that is wrong. The fact that a regulation takes account of race or sex does not make it constitutionally suspect. The Supreme Court has repeatedly "recognized that a distinction may exist between state action that discriminates on

the basis of race and state action that addresses, in neutral fashion, race-related matters." *Crawford v. Bd. of Educ.*, 458 U.S. 527, 538 (1982). For example, the Court refused to apply strict scrutiny to a voter-approved state constitutional amendment prohibiting race-based preferences in university admissions, reasoning that it was not "used, or … likely to be used, to encourage infliction of injury by reason of race." *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 314 (2014). Similarly, in *Parents Involved in Community Schools v. Seattle School District No. 1*, a concurring justice recognized that mechanisms such as "tracking enrollments, performance, and other statistics by race" do not "demand strict scrutiny" because they "are race conscious but do not lead to different treatment" based on race. 551 U.S. 701, 789 (2007) (Kennedy, J., concurring).

Consistent with these decisions, many other courts have held, more particularly, that collecting information on race and gender does not trigger heightened scrutiny. In a decision affirmed by this Court, for example, a District Court in Texas rejected an equal protection challenge to the collection of census data on race, explaining that there is a "distinction between collecting demographic data so that the government

may have the information it believes … it needs in order to govern," on the one hand, "and governmental use of suspect classifications" on the other. *Morales v. Daley*, 116 F. Supp. 2d 801, 814-15 (S.D. Tex. 2000), *aff'd*, 275 F.3d 45 (5th Cir. 2001) (per curiam). *See, e.g.*, *Caulfield v. Bd. of Ed. of City of New York*, 583 F.2d 605, 611 (2d Cir. 1978) ("the Constitution itself does not condemn the collection of" workforce data pertaining to race and gender); *United States v. New Hampshire*, 539 F.2d 277, 280-82 (1st Cir. 1976) (upholding a federal requirement that the state provide racial and ethnic employee data); *Honadle v. Univ. of Vt. & State Agric. Coll.*, 56 F. Supp. 2d 419, 428 (D. Vt. 1999) (collecting demographic information on faculty does not trigger strict scrutiny); *Sussman v. Tanoue*, 39 F. Supp. 2d 13, 27 (D.D.C. 1999) (declining to apply strict scrutiny to workforce data collection that was "conscious of race but devoid of ultimate preferences").

By contrast, Petitioners do not identify a single case (Br. 29-30)—and we are aware of none—in which a court has treated the mere collection of demographic information as requiring heightened scrutiny. As stated above, the Supreme Court in *Schuette* refused to apply strict scrutiny to a state action that took account of race because it would not

lead to unequal treatment. 572 U.S. at 314. In *Adarand*, the program at issue triggered strict scrutiny because it gave bonuses to contractors that utilized minority subcontractors, directly enhancing the competitive position of minority-owned firms relative to non-minority-owned firms in bidding for subcontracts. 515 U.S. at 205-10. *Accord Rice v. Cayetano*, 528 U.S. 495 (2000) (voter eligibility qualification based on Hawaiian ancestry); *Shaw v. Reno*, 509 U.S. 630 (1993) (redistricting boundaries that are unexplainable on grounds other than race are subject to strict scrutiny); *Walker v. City of Mesquite*, 169 F.3d 973 (5th Cir. 1999) (remedial order requiring that new public housing units be located in predominantly white neighborhoods).

In particular, neither *Lutheran Church* nor *MD/DC/DE* addressed, or cast doubt on, the constitutionality of the FCC's "collection of employment data for the purpose of analyzing industry trends." Order ¶ 45 (JA 24); *id.* ¶¶ 47, 49 (JA 25-26, 26-27). In both cases, heightened scrutiny was triggered by the threat of official action, *see Lutheran Church*, 141 F.3d at 353 ("[n]o rational firm—particularly one holding a government-issued license—welcomes a government audit"), combined with EEO regulations that emphasized race- or gender-based numerical

goals. *See MD/DC/DE*, 236 F.3d at 19 ("Under Option B the Commission promises to investigate any licensee that reports 'few or no' applications from women or minorities."); *Lutheran Church*, 141 F.3d at 352 ("The regulations pressure stations to maintain a workforce that mirrors the racial breakdown of their 'metropolitan statistical area.'"). Those concerns are not implicated by the mere collection of demographic data.

**3**. The real thrust of Petitioners' equal protection claim is that, by reinstating the Form 395-B and deciding that broadcasters' submissions should not be confidential, the FCC has signaled that it will assert "sub silentio pressure," or engage in "raised eyebrow regulation," "to coerce broadcasters" to make discriminatory hiring decisions. Br. 39 (quotation marks and internal alterations omitted). This theory, too, is meritless.

**a**. To begin with, by bringing a facial challenge to the Order, Petitioners have elected to shoulder a high burden. *See, e.g.*, *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) ("This Court has . . . made facial challenges hard to win."). "With the exception of First Amendment cases, a facial challenge will succeed only if the plaintiff establishes that the act is invalid under all of its applications." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *United States v. Salerno*,

481 U.S. 739, 745 (1987)). Courts disfavor facial challenges for "a host of good reasons," including that "[c]laims of facial invalidity often rest on speculation about the law's coverage and its future enforcement." *Moody*, 144 S. Ct. at 2397 (quotation marks omitted). *Accord Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020).

**b**. Here, Petitioners' claims regarding the likely effects of the reinstated data collection are all but entirely speculative and run counter to the text of the Order and the Commission's rules.

The Order could hardly be more clear that the rules "prohibit … the use of the Form 395-B data" for any purpose other than monitoring and reporting on industry employment trends. Order ¶ 45 (JA 24). *See id.* ¶¶ 17, 57-60 (JA 10, 30-31). For example, the FCC expressly rejected the suggestion that its Enforcement Bureau would be permitted to "use the data as evidence when investigating a discrimination claim against a station." *Id.* ¶ 18 (JA 11). And it reaffirmed that "any petition, complaint, or other filing submitted by a third party to the Commission based on Form 395-B employment data" will be "quickly and summarily dismiss[ed]." *Id.* ¶ 17 (JA 10). *Accord id.* ¶ 46 (JA 25). The FCC further

explained that it "will not use this data as a basis for conducting audits or inquiries." *Id.* ¶ 18 (JA 11).

Given the Commission's express commitment not to use Form 395-B data except to monitor and report on workforce employment trends, there is no reason to infer that, because the Order characterizes "workforce diversity [as] critical," Br. 31 (quoting Order ¶ 2 (JA 2)), the agency will exert coercive pressure on broadcasters to change their hiring practices.[13] To be sure, as Petitioners stress (Br. 30-31), the FCC has considerable authority over its licensees. But that is no reason to doubt that the FCC will adhere to its own regulations. *See* Order ¶ 19 (JA 11) ("an agency is bound by its own regulations" (quoting *Erie Boulevard Hydropower, LP v. FERC,* 878 F.3d 258, 269 (D.C. Cir. 2017)).

**c**. Invoking "the long history of … pressure campaigns" in the era before *Lutheran Church*, Br. 37, Petitioners characterize their concern that Form 395-B data will be abused in Commission proceedings as more

---

[13] Like workforce diversity, broadcast ownership diversity is a longstanding FCC policy goal. *See, e.g., Prometheus,* 652 F.3d at 472. Notably, reports disclosing the race, ethnicity, and sex of everyone with a cognizable broadcast ownership interest (*e.g.*, 5%+ voting shareholders, officers, directors, etc.) have long been available online in each station's public inspection file. *See* 47 C.F.R. §§ 73.3526(e)(5), 73.3615. Yet there is no evidence or allegation of "pressure" on broadcasters as a result.

than "speculative." *Id.* (quoting Order ¶ 17 (JA 10)). But again, the regulations at issue in *Lutheran Church* and *MD/DC/DE* emphasized race- or gender-based numerical goals and threatened official agency action against broadcasters that failed to meet them. *See supra* pages 43-44. By contrast, the FCC's current EEO regulations are race- and gender-neutral, with no "statistical test" for broadcasters to meet, Br. 33 (quotation marks omitted), and without any threat of Commission action tied to the regulations. *See supra* pp.45-46.

**4.** Petitioners also complain that, even if third parties can no longer use Form 395-B data to exert hiring pressure on broadcasters through FCC processes, they will do so "in the court of public opinion." Br. 38 (quotation marks omitted). *See* Br. 35-36. The FCC "'cannot do indirectly,'" they say, "'what [it] is barred from doing directly.'" Br. 39 (quoting *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024)).

But that principle again hinges on the existence of some underlying *government* action. For example, *National Rifle Association* addressed "claims that the government has coerced a third party to violate the First Amendment rights of another." 602 U.S. at 190. Absent governmental coercion or such a "close nexus" with the conduct of a private party that

the government is practically "*responsible*," a private party's conduct is not attributable to the government. *Missouri v. Biden*, 83 F.4th 350, 380 (5th Cir. 2023) (quotation marks omitted), *reversed on other grounds*, *Murthy v. Missouri*, 144 S. Ct. 1972 (2024). Here, that cannot fairly be said of the FCC, which had independent reasons for collecting the Form 395-B data and declining to keep it confidential. *See supra* Part II. Any such pressure from third parties, therefore, does not implicate the Fifth Amendment. Order ¶¶ 17, 46 (JA 10, 25).

**5**. For all of these reasons, the Order should receive rational basis review, and it readily passes muster. The Commission "has a legitimate public interest in collecting Form 395-B data" to facilitate analysis and reporting on broadcast industry workforce trends. And for reasons already explained, *see supra* Part II, the reinstated collection and disclosure of Form 395-B data "rationally promote [that] … objective." *Duarte v. City of Lewisville, Tex.*, 858 F.3d 348, 354 (5th Cir. 2017) (quotation marks omitted); Order ¶ 41 (JA 22).

## B.   The Data Collection Comports With the First Amendment.

Petitioners also argue that the data collection compels speech in violation of the First Amendment. Br. 48-51. The Order offers two

alternative explanations for why that is wrong. First, the Commission recognized that "[t]here is no message being forced [on broadcasters] by the government" in the data collection. Order ¶ 51 (JA 27). Moreover, the data collection "requires reporting of factual information … to allow the Commission to analyze trends." *Id*. In other words, to the extent that it compels speech, the FCC recognized that the data collection warrants rational basis review under the "government-operations exception." *Book People, Inc. v. Wong*, 91 F.4th 318, 338 (5th Cir. 2024). In the alternative—without expressly asserting or deciding that the employment data in Form 395-B is "commercial speech"—the FCC compared that data to the kind of "purely factual and uncontroversial" information that receives lesser First Amendment scrutiny, in commercial speech cases, under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). Order ¶ 52 (JA 27).

Beyond a bare assertion that "[t]he First Amendment protects the right *not* to speak," Br. 48, Petitioners devote the entirety of their First Amendment argument to seeking to distinguish this case from *Zauderer* and *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980)—a commercial speech case that

requires intermediate scrutiny for restrictions on speech where *Zauderer* does not apply. *See* Br. 48-51.

Because Petitioners nowhere address the Commission's analysis in paragraph 51 of the Order that the data collection does not compel speech and, in any event, falls within the government-operations exception, they have waived any challenge to that analysis for purposes of this appeal. *E.g.*, *Weyerhaeuser Co. v. Burlington Ins. Co.*, 74 F.4th 275, 282 n.8 (5th Cir. 2023). If the Court agrees, the First Amendment analysis in this case can end there. In any event, on the merits, the FCC correctly concluded that heightened scrutiny does not apply, and that the data collection comports with the First Amendment.

**1**. The compelled speech doctrine protects a private speaker from being "compel[led] to utter what is not in his mind." *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 634 (1943). *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 49 (2006) ("This Court has found compelled-speech violations where the complaining speaker's own message was affected by the speech it was forced to accommodate."); *Order* n.165 (JA 27) (citing *Rumsfeld*). Thus, the doctrine has "been limited to the context of government-compelled speech with respect to a

particular political or ideological message." *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017).

Nothing about the collection or disclosure of Form 395-B data interferes with a broadcaster's ability to communicate its own message or suggests that it agrees with the Commission's policy views. *See* Order ¶ 51 (JA 27). Rather, the data collection is analogous to a constitutionally permissible alternative that the Supreme Court identified in striking down a disclosure requirement that applied to professional fundraisers "during the course of a solicitation." *Riley v. Nat'l Fed'n of the Blind of N. Car., Inc.*, 487 U.S. 781, 800 (1988) (cited in Order n.166 (JA 27)). The Court explained that "the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Id. See Nat'l Fed'n of the Blind of Tx., Inc. v. Abbott*, 647 F.3d 202, 213-14 (5th Cir. 2011) (similar).

**2**. Even approaching the data collection here as compelling broadcaster speech, "'[t]here is no right to refrain from speaking when essential operations of government require it for the preservation of an

orderly society.'" *Book People*, <u>91 F.4th at 339</u> (quoting *United States v. Arnold*, <u>740 F.3d 1032, 1035</u> (5th Ci<u>r. 2014</u>) (internal quotations omitted))). "This exception has been applied to sex offender registration requirements, disclosures on IRS forms, and demographic information for the census." *Id.* (citing cases). *See Scahill v. Dist. of Columbia*, <u>909 F.3d 1177, 1185</u> (D.C. Ci<u>r. 2018</u>) (applying rational basis review to requirement to report violation of liquor license conditions); *Full Value Advisors, LLC v. SEC*, <u>633 F.3d 1101, 1108-09</u> (D.C. Ci<u>r. 2011</u>) (applying rational basis review to mandatory disclosure of investment information).

Form 395-B falls squarely within this exception. It "requires reporting of factual information … to allow the Commission to analyze trends." Order ¶ 51 (JA 27). And as this Court previously ruled regarding similar requirements, the data collection "merely requires an employer to report the number of its employees and identify its employees' racial and gender classifications." *EEOC v. ACORN*, <u>83 F.3d 418</u>, <u>1996 WL 197411</u>, at *4 (5th Ci<u>r. 1996</u>). *Cf. Book People*, <u>91 F.4th at 339</u> (government-operations exception did not apply to regulation that went "beyond a mere disclosure of demographic or similar factual information"

by requiring vendors to "decide whether library materials [were] sexually explicit or sexually relevant according to guidelines that require[d] them to undertake a contextual analysis"). "What is at stake here ... is simply routine disclosure of … information designed to forward ordinary regulatory purposes." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, C.J., concurring).

**3**. Regardless whether the "commercial speech" doctrine and *Zauderer* strictly apply in this case, the Commission appropriately analogized the Form 395-B data to the type of "'purely factual and uncontroversial' information" that receives relaxed scrutiny under that line of precedent. Order ¶ 52 (JA 27).[14]

This Court has described "purely factual" information under *Zauderer* as encompassing "(1) statements composed of only (a) information supported by facts and (b) conclusions driven by those facts," when those statements are "(2) not akin to unfalsifiable statements of opinion." *See R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th

---

[14] It also bears mention that the Supreme Court "has typically applied a relaxed form of scrutiny to general regulation of over-the-air broadcasters." *Adventure Commc'ns, Inc. v. Kentucky Registry of Election Fin.*, 191 F.3d 429, 439-40 (4th Cir. 1999); *Reno v. ACLU*, 521 U.S. 844, 868 (1997).

863, 879 (5th Cir. 2024). The basic demographic data at issue in this case is purely factual. Petitioners contend that "issues about race and sex (or gender)—particularly in the context of employment decisions—are among the most hotly debated contemporary issues." Br. 49. But "[a] fact does not become 'value-laden' merely because the fact drives a reaction." *R.J. Reynolds*, 96 F.4th at 880.

The Form 395-B data is likewise not "controversial," as this Court has interpreted the *Zauderer* test. "A factual statement is 'controversial' under *Zauderer* where the truth of the statement is not settled or is overwhelmingly disproven or where the inherent nature of the subject raises a live, contentious political dispute." *Id.* at 881. "Statistical information as such"—the information collected on Form 395-B—"is … neutral" and "only becomes meaningful when it is interpreted." *New Hampshire*, 539 F.2d at 280; Order ¶ 51 (JA 27). *See Morales*, 116 F. Supp. 2d at 816 (rejecting First Amendment claim that reporting racial information for the census compelled an endorsement of racial categorization).[15]

---

[15] Petitioners' argument regarding the non-binary gender category, Br. 49-50, is barred under 47 U.S.C. § 405(a). *See* Part I.C.1 *supra*. No party
(cont'd)

For all of these reasons, if the Court reaches the merits of Petitioners' First Amendment challenge, it need only determine whether the collection and disclosure of Form 395-B data is "a reasonable means of promoting the public interest." *Nat'l Citizens Comm.,* 436 U.S. at 802 (applying rational basis review to rule prohibiting common ownership of a broadcast station and a daily newspaper in the same community). For reasons already explained, it is. *See supra* Part II; *id.* page 48. In sum, the Order has no constitutional infirmity.

---

raised an objection to the category before the Commission, Order ¶ 40 (JA 20), and Commissioner Carr objected on statutory grounds. *Id.*, Dissenting Statement of Commissioner Carr n.1 (JA 52).

## CONCLUSION

The petition for review should be denied.

Dated:  September 27, 2024

/s/ *Robert B. Nicholson*


Jonathan S. Kanter
*Assistant Attorney General*




Robert B. Nicholson
Robert J. Wiggers
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
*United States of America*

Respectfully submitted

/s/  *William J. Scher*

P. Michele Ellison
*General Counsel*

Jacob M. Lewis
*Deputy General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

William J. Scher
*Counsel*

FEDERAL COMMUNICATIONS
COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
*Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒   this document contains 11,254 words, *or*

    ☐   this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using _____ with _____.

                                        */s/ William J. Scher*
                                        William J. Scher
                                        *Counsel for Respondents*

## CERTIFICATE OF FILING AND SERVICE

I, William J. Scher, hereby certify that on November 1, 2024, I filed the foregoing FINAL Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ William J. Scher*

William J. Scher
Counsel

Federal Communications
Commission
Washington, D.C. 20554
(202) 418-1740

**STATUTORY ADDENDUM**

# Table of Contents

47 U.S.C. § 154 ................................................................ Add. 1

47 U.S.C. § 303 ................................................................ Add. 1

47 U.S.C. § 307 ................................................................ Add. 8

47 U.S.C. § 308 .............................................................. Add. 10

47 U.S.C. § 309 .............................................................. Add. 11

47 U.S.C. § 310 .............................................................. Add. 18

47 U.S.C. § 334 .............................................................. Add. 20

47 U.S.C. § 403 .............................................................. Add. 20

47 U.S.C. § 405 .............................................................. Add. 21

47 U.S.C. § 608 .............................................................. Add. 22

47 C.F.R. § 73.2080 ....................................................... Add. 22

47 C.F.R. § 73.2080 (1992) ............................................ Add. 28

47 C.F.R. § 73.3526 ....................................................... Add. 31

47 C.F.R. § 73.3612 ....................................................... Add. 38

47 C.F.R. § 73.3612 Note (2001) ................................... Add. 38

47 C.F.R. § 73.3615 ....................................................... Add. 39

# 47 U.S.C. § 154

## § 154. Federal Communications Commission

\* \* \*

### (i) Duties and powers

The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

### (j) Conduct of proceedings; hearings

The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. No commissioner shall participate in any hearing or proceeding in which he has a pecuniary interest. Any party may appear before the Commission and be heard in person or by attorney. Every vote and official act of the Commission shall be entered of record, and its proceedings shall be public upon the request of any party interested. The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense.

### (k) Record of reports

All reports of investigations made by the Commission shall be entered of record, and a copy thereof shall be furnished to the party who may have complained, and to any common carrier or licensee that may have been complained of.

\* \* \*

# 47 U.S.C. § 303

## § 303. Powers and duties of Commission

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall--

**(a)** Classify radio stations;

**(b)** Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

**(c)** Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

**(d)** Determine the location of classes of stations or individual stations;

**(e)** Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

**(f)** Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: *Provided, however*, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;

**(g)** Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

**(h)** Have authority to establish areas or zones to be served by any station;

**(i)** Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

**(j)** Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

**(k)** Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

**(l)(1)** Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to persons who are found to be qualified by the Commission and who otherwise are legally eligible for employment in the United States, except that such requirement relating to eligibility for employment in the United States shall not apply in the case of licenses issued by the Commission to (A) persons holding United States pilot certificates; or (B) persons holding foreign aircraft pilot certificates which are valid in the United States, if the foreign government involved has entered into a reciprocal agreement under which such foreign government does not impose any similar requirement relating to eligibility for employment upon citizens of the United States;

**(2)** Notwithstanding paragraph (1) of this subsection, an individual to whom a radio station is licensed under the provisions of this chapter may be issued an operator's license to operate that station.

**(3)** In addition to amateur operator licenses which the Commission may issue to aliens pursuant to paragraph (2) of this subsection, and notwithstanding section

301 of this title and paragraph (1) of this subsection, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of Title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

**(m)(1)** Have authority to suspend the license of any operator upon proof sufficient to satisfy the Commission that the licensee--

**(A)** has violated, or caused, aided, or abetted the violation of, any provision of any Act, treaty, or convention binding on the United States, which the Commission is authorized to administer, or any regulation made by the Commission under any such Act, treaty, or convention; or

**(B)** has failed to carry out a lawful order of the master or person lawfully in charge of the ship or aircraft on which he is employed; or

**(C)** has willfully damaged or permitted radio apparatus or installations to be damaged; or

**(D)** has transmitted superfluous radio communications or signals or communications containing profane or obscene words, language, or meaning, or has knowingly transmitted--

**(1)** false or deceptive signals or communications, or

**(2)** a call signal or letter which has not been assigned by proper authority to the station he is operating; or

**(E)** has willfully or maliciously interfered with any other radio communications or signals; or

**(F)** has obtained or attempted to obtain, or has assisted another to obtain or attempt to obtain, an operator's license by fraudulent means.

**(2)** No order of suspension of any operator's license shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed suspension, has been given to the operator licensee who may make written application to the Commission at any time within said fifteen days for a hearing upon such order. The notice to the operator licensee shall not be effective until actually received by him,

and from that time he shall have fifteen days in which to mail the said application. In the event that physical conditions prevent mailing of the application at the expiration of the fifteen-day period, the application shall then be mailed as soon as possible thereafter, accompanied by a satisfactory explanation of the delay. Upon receipt by the Commission of such application for hearing, said order of suspension shall be held in abeyance until the conclusion of the hearing which shall be conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of suspension.

**(n)** Have authority to inspect all radio installations associated with stations required to be licensed by any Act, or which the Commission by rule has authorized to operate without a license under section 307(e)(1) of this title, or which are subject to the provisions of any Act, treaty, or convention binding on the United States, to ascertain whether in construction, installation, and operation they conform to the requirements of the rules and regulations of the Commission, the provisions of any Act, the terms of any treaty or convention binding on the United States, and the conditions of the license or other instrument of authorization under which they are constructed, installed, or operated.

**(o)** Have authority to designate call letters of all stations;

**(p)** Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this chapter;

**(q)** Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation. The permittee or licensee, and the tower owner in any case in which the owner is not the permittee or licensee, shall maintain the painting and/or illumination of the tower as prescribed by the Commission pursuant to this section. In the event that the tower ceases to be licensed by the Commission for the transmission of radio energy, the owner of the tower shall maintain the prescribed painting and/or illumination of such tower until it is dismantled, and the Commission may require the owner to dismantle and remove the tower when the Administrator of the Federal Aviation Agency determines that there is a reasonable possibility that it may constitute a menace to air navigation.

**(r)** Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or

regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

**(s)** Have authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting when such apparatus is shipped in interstate commerce, or is imported from any foreign country into the United States, for sale or resale to the public.

**(t)** Notwithstanding the provisions of section 301(e) of this title, have authority, in any case in which an aircraft registered in the United States is operated (pursuant to a lease, charter, or similar arrangement) by an aircraft operator who is subject to regulation by the government of a foreign nation, to enter into an agreement with such government under which the Commission shall recognize and accept any radio station licenses and radio operator licenses issued by such government with respect to such aircraft.

**(u)** Require that, if technically feasible--

**(1)** apparatus designed to receive or play back video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States and uses a picture screen of any size--

**(A)** be equipped with built-in closed caption decoder circuitry or capability designed to display closed-captioned video programming;

**(B)** have the capability to decode and make available the transmission and delivery of video description services as required by regulations reinstated and modified pursuant to section 613(f) of this title; and

**(C)** have the capability to decode and make available emergency information (as that term is defined in section 79.2 of the Commission's regulations (47 CFR 79.2)) in a manner that is accessible to individuals who are blind or visually impaired; and

**(2)** notwithstanding paragraph (1) of this subsection--

**(A)** apparatus described in such paragraph that use a picture screen that is less than 13 inches in size meet the requirements of subparagraph (A), (B), or (C) of such paragraph only if the requirements of such subparagraphs are achievable (as defined in section 617 of this title);

**(B)** any apparatus or class of apparatus that are display-only video monitors with no playback capability are exempt from the requirements of such paragraph; and

**(C)** the Commission shall have the authority, on its own motion or in response to a petition by a manufacturer, to waive the requirements of this subsection for any apparatus or class of apparatus--

**(i)** primarily designed for activities other than receiving or playing back video programming transmitted simultaneously with sound; or

**(ii)** for equipment designed for multiple purposes, capable of receiving or playing video programming transmitted simultaneously with sound but whose essential utility is derived from other purposes.

**(v)** Have exclusive jurisdiction to regulate the provision of direct-to-home satellite services. As used in this subsection, the term "direct-to-home satellite services" means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite.

**(w)** Omitted.

**(x)** Require, in the case of an apparatus designed to receive television signals that are shipped in interstate commerce or manufactured in the United States and that have a picture screen 13 inches or greater in size (measured diagonally), that such apparatus be equipped with a feature designed to enable viewers to block display of all programs with a common rating, except as otherwise permitted by regulations pursuant to section 330(c)(4) of this title.

**(y)** Have authority to allocate electromagnetic spectrum so as to provide flexibility of use, if--

**(1)** such use is consistent with international agreements to which the United States is a party; and

**(2)** the Commission finds, after notice and an opportunity for public comment, that--

**(A)** such an allocation would be in the public interest;

**(B)** such use would not deter investment in communications services and systems, or technology development; and

**(C)** such use would not result in harmful interference among users.

**(z)** Require that--

**(1)** if achievable (as defined in section 617 of this title), apparatus designed to record video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States, enable the rendering or the pass through of closed captions, video description signals, and emergency information (as that term is defined in section 79.2 of title 47, Code of Federal Regulations) such that viewers are able to activate

and de-activate the closed captions and video description as the video programming is played back on a picture screen of any size; and

**(2)** interconnection mechanisms and standards for digital video source devices are available to carry from the source device to the consumer equipment the information necessary to permit or render the display of closed captions and to make encoded video description and emergency information audible.

**(aa)** Require--

**(1)** if achievable (as defined in section 617 of this title) that digital apparatus designed to receive or play back video programming transmitted in digital format simultaneously with sound, including apparatus designed to receive or display video programming transmitted in digital format using Internet protocol, be designed, developed, and fabricated so that control of appropriate built-in apparatus functions are accessible to and usable by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

**(2)** that if on-screen text menus or other visual indicators built in to the digital apparatus are used to access the functions of the apparatus described in paragraph (1), such functions shall be accompanied by audio output that is either integrated or peripheral to the apparatus, so that such menus or indicators are accessible to and usable by individuals who are blind or visually impaired in real-time;

**(3)** that for such apparatus equipped with the functions described in paragraphs (1) and (2) built in access to those closed captioning and video description features through a mechanism that is reasonably comparable to a button, key, or icon designated for activating the closed captioning or accessibility features; and

**(4)** that in applying this subsection the term "apparatus" does not include a navigation device, as such term is defined in section 76.1200 of the Commission's rules (47 CFR 76.1200).

**(bb)** Require--

**(1)** if achievable (as defined in section 617 of this title), that the on-screen text menus and guides provided by navigation devices (as such term is defined in section 76.1200 of title 47, Code of Federal Regulations) for the display or selection of multichannel video programming are audibly accessible in real-time upon request by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

**(2)** for navigation devices with built-in closed captioning capability, that access to that capability through a mechanism is reasonably comparable to a button, key, or icon designated for activating the closed captioning, or accessibility features; and

**(3)** that, with respect to navigation device features and functions--

**(A)** delivered in software, the requirements set forth in this subsection shall apply to the manufacturer of such software; and

**(B)** delivered in hardware, the requirements set forth in this subsection shall apply to the manufacturer of such hardware.

# 47 U.S.C. § 307

**§ 307. Licenses**

**(a) Grant**

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

**(b) Allocation of facilities**

In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

**(c) Terms of licenses**

**(1) Initial and renewal licenses**

Each license granted for the operation of a broadcasting station shall be for a term of not to exceed 8 years. Upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed 8 years from the date of expiration of the preceding license, if the Commission finds that public interest, convenience, and necessity would be served thereby. Consistent with the foregoing provisions of this subsection, the Commission may by rule prescribe the period or periods for which licenses shall be granted and renewed for particular classes of stations, but the Commission may not adopt or follow any rule which would preclude it, in any case involving a station of a particular class, from granting or renewing a license for a shorter period than that prescribed for stations of such class if, in its judgment, the public interest, convenience, or necessity would be served by such action.

**(2) Materials in application**

In order to expedite action on applications for renewal of broadcasting station licenses and in order to avoid needless expense to applicants for such renewals, the Commission shall not require any such applicant to file any information which previously has been furnished to the Commission or which is not directly material to the considerations that affect the granting or denial of such application, but the Commission may require any new or additional facts it deems necessary to make its findings.

**(3) Continuation pending decision**

Pending any administrative or judicial hearing and final decision on such an application and the disposition of any petition for rehearing pursuant to section 405 or section 402 of this title, the Commission shall continue such license in effect.

**(d) Renewals**

No renewal of an existing station license in the broadcast or the common carrier services shall be granted more than thirty days prior to the expiration of the original license.

**(e) Operation of certain radio stations without individual licenses**

**(1)** Notwithstanding any license requirement established in this chapter, if the Commission determines that such authorization serves the public interest, convenience, and necessity, the Commission may by rule authorize the operation of radio stations without individual licenses in the following radio services: (A) the citizens band radio service; (B) the radio control service; (C) the aviation radio service for aircraft stations operated on domestic flights when such aircraft are not otherwise required to carry a radio station; and (D) the maritime radio service for ship stations navigated on domestic voyages when such ships are not otherwise required to carry a radio station.

**(2)** Any radio station operator who is authorized by the Commission to operate without an individual license shall comply with all other provisions of this chapter and with rules prescribed by the Commission under this chapter.

**(3)** For purposes of this subsection, the terms "citizens band radio service", "radio control service", "aircraft station" and "ship station" shall have the meanings given them by the Commission by rule.

**(f) Areas in Alaska without access to over the air broadcasts**

Notwithstanding any other provision of law, (1) any holder of a broadcast license may broadcast to an area of Alaska that otherwise does not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery even if

Add. 9

another holder of a broadcast license begins broadcasting to such area, (2) any holder of a broadcast license who has broadcast to an area of Alaska that did not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery may continue providing such service even if another holder of a broadcast license begins broadcasting to such area, and shall not be fined or subject to any other penalty, forfeiture, or revocation related to providing such service including any fine, penalty, forfeiture, or revocation for continuing to operate notwithstanding orders to the contrary.

# 47 U.S.C. § 308

### § 308. Requirements for license

### (a) Writing; exceptions

The Commission may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor received by it: *Provided*, That (1) in cases of emergency found by the Commission involving danger to life or property or due to damage to equipment, or (2) during a national emergency proclaimed by the President or declared by the Congress and during the continuance of any war in which the United States is engaged and when such action is necessary for the national defense or security or otherwise in furtherance of the war effort, or (3) in cases of emergency where the Commission finds, in the nonbroadcast services, that it would not be feasible to secure renewal applications from existing licensees or otherwise to follow normal licensing procedure, the Commission may grant construction permits and station licenses, or modifications or renewals thereof, during the emergency so found by the Commission or during the continuance of any such national emergency or war, in such manner and upon such terms and conditions as the Commission shall by regulation prescribe, and without the filing of a formal application, but no authorization so granted shall continue in effect beyond the period of the emergency or war requiring it: *Provided further*, That the Commission may issue by cable, telegraph, or radio a permit for the operation of a station on a vessel of the United States at sea, effective in lieu of a license until said vessel shall return to a port of the continental United States.

### (b) Conditions

All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which

the station is to be used; and such other information as it may require. The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or licensee in any manner or form, including by electronic means, as the Commission may prescribe by regulation.

**(c) Commercial communication**

The Commission in granting any license for a station intended or used for commercial communication between the United States or any Territory or possession, continental or insular, subject to the jurisdiction of the United States, and any foreign country, may impose any terms, conditions, or restrictions authorized to be imposed with respect to submarine-cable licenses by section 35 of this title.

**(d) Summary of complaints**

Each applicant for the renewal of a commercial or noncommercial television license shall attach as an exhibit to the application a summary of written comments and suggestions received from the public and maintained by the licensee (in accordance with Commission regulations) that comment on the applicant's programming, if any, and that are characterized by the commentor as constituting violent programming.

# **47 U.S.C. § 309**

**§ 309. Application for license**

**(a) Considerations in granting application**

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

**(b) Time of granting application**

Except as provided in subsection (c) of this section, no such application--

**(1)** for an instrument of authorization in the case of a station in the broadcasting or common carrier services, or

**(2)** for an instrument of authorization in the case of a station in any of the following categories:

**(A)** industrial radio positioning stations for which frequencies are assigned on an exclusive basis,

**(B)** aeronautical en route stations,

**(C)** aeronautical advisory stations,

**(D)** airdrome control stations,

**(E)** aeronautical fixed stations, and

**(F)** such other stations or classes of stations, not in the broadcasting or common carrier services, as the Commission shall by rule prescribe,

shall be granted by the Commission earlier than thirty days following issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof.

**(c) Applications not affected by subsection (b)**

Subsection (b) of this section shall not apply--

**(1)** to any minor amendment of an application to which such subsection is applicable, or

**(2)** to any application for--

**(A)** a minor change in the facilities of an authorized station,

**(B)** consent to an involuntary assignment or transfer under section 310(b) of this title or to an assignment or transfer thereunder which does not involve a substantial change in ownership or control,

**(C)** a license under section 319(c) of this title or, pending application for or grant of such license, any special or temporary authorization to permit interim operation to facilitate completion of authorized construction or to provide substantially the same service as would be authorized by such license,

**(D)** extension of time to complete construction of authorized facilities,

**(E)** an authorization of facilities for remote pickups, studio links and similar facilities for use in the operation of a broadcast station,

**(F)** authorizations pursuant to section 325(c) of this title where the programs to be transmitted are special events not of a continuing nature,

**(G)** a special temporary authorization for nonbroadcast operation not to exceed thirty days where no application for regular operation is contemplated to be filed or not to exceed sixty days pending the filing of an application for such regular operation, or

**(H)** an authorization under any of the proviso clauses of section 308(a) of this title.

**(d) Petition to deny application; time; contents; reply; findings**

**(1)** Any party in interest may file with the Commission a petition to deny any application (whether as originally filed or as amended) to which subsection (b) of this section applies at any time prior to the day of Commission grant thereof without hearing or the day of formal designation thereof for hearing; except that with respect to any classification of applications, the Commission from time to time by rule may specify a shorter period (no less than thirty days following the issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof), which shorter period shall be reasonably related to the time when the applications would normally be reached for processing. The petitioner shall serve a copy of such petition on the applicant. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license). Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. The applicant shall be given the opportunity to file a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit.

**(2)** If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license), it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license), it shall proceed as provided in subsection (e).

**(e) Hearings; intervention; evidence; burden of proof**

If, in the case of any application to which subsection (a) of this section applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining and shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue but not including issues or requirements phrased generally. When the Commission has so designated an application for hearing the parties in interest, if any, who are not notified by the Commission of such action may acquire the status of a party to the proceeding thereon by filing a petition for intervention showing the basis for their interest not more than thirty days after publication of the hearing issues or any substantial amendment thereto in the Federal Register. Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate. The burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, except that with respect to any issue presented by a petition to deny or a petition to enlarge the issues, such burdens shall be as determined by the Commission.

**(f) Temporary authorization of temporary operations under subsection (b)**

When an application subject to subsection (b) has been filed, the Commission, notwithstanding the requirements of such subsection, may, if the grant of such application is otherwise authorized by law and if it finds that there are extraordinary circumstances requiring temporary operations in the public interest and that delay in the institution of such temporary operations would seriously prejudice the public interest, grant a temporary authorization, accompanied by a statement of its reasons therefor, to permit such temporary operations for a period not exceeding 180 days, and upon making like findings may extend such temporary authorization for additional periods not to exceed 180 days. When any such grant of a temporary authorization is made, the Commission shall give expeditious treatment to any timely filed petition to deny such application and to any petition for rehearing of such grant filed under section 405 of this title.

**(g) Classification of applications**

The Commission is authorized to adopt reasonable classifications of applications and amendments in order to effectuate the purposes of this section.

**(h) Form and conditions of station licenses**

Such station licenses as the Commission may grant shall be in such general form as it may prescribe, but each license shall contain, in addition to other provisions, a statement of the following conditions to which such license shall be subject: (1) The station license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized therein; (2) neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of this chapter; (3) every license issued under this chapter shall be subject in terms to the right of use or control conferred by section 606 of this title.

**(i) Random selection**

**(1) General authority**

Except as provided in paragraph (5), if there is more than one application for any initial license or construction permit, then the Commission shall have the authority to grant such license or permit to a qualified applicant through the use of a system of random selection.

**(2)** No license or construction permit shall be granted to an applicant selected pursuant to paragraph (1) unless the Commission determines the qualifications of such applicant pursuant to subsection (a) and section 308(b) of this title. When substantial and material questions of fact exist concerning such qualifications, the Commission shall conduct a hearing in order to make such determinations. For the purpose of making such determinations, the Commission may, by rule, and notwithstanding any other provision of law--

**(A)** adopt procedures for the submission of all or part of the evidence in written form;

**(B)** delegate the function of presiding at the taking of written evidence to Commission employees other than administrative law judges; and

**(C)** omit the determination required by subsection (a) with respect to any application other than the one selected pursuant to paragraph (1).

**(3)(A)** The Commission shall establish rules and procedures to ensure that, in the administration of any system of random selection under this subsection used for granting licenses or construction permits for any media of mass communications, significant preferences will be granted to applicants or groups of applicants, the grant to which of the license or permit would increase the diversification of ownership of the media of mass communications. To further diversify the ownership of the media of mass communications, an additional significant preference shall be granted to any applicant controlled by a member or members of a minority group.

**(B)** The Commission shall have authority to require each qualified applicant seeking a significant preference under subparagraph (A) to submit to the Commission such information as may be necessary to enable the Commission to make a determination regarding whether such applicant shall be granted such preference. Such information shall be submitted in such form, at such times, and in accordance with such procedures, as the Commission may require.

**(C)** For purposes of this paragraph:

**(i)** The term "media of mass communications" includes television, radio, cable television, multipoint distribution service, direct broadcast satellite service, and other services, the licensed facilities of which may be substantially devoted toward providing programming or other information services within the editorial control of the licensee.

**(ii)** The term "minority group" includes Blacks, Hispanics, American Indians, Alaska Natives, Asians, and Pacific Islanders.

**(4)(A)** The Commission shall, after notice and opportunity for hearing, prescribe rules establishing a system of random selection for use by the Commission under this subsection in any instance in which the Commission, in its discretion, determines that such use is appropriate for the granting of any license or permit in accordance with paragraph (1).

**(B)** The Commission shall have authority to amend such rules from time to time to the extent necessary to carry out the provisions of this subsection. Any such amendment shall be made after notice and opportunity for hearing.

**(C)** Not later than 180 days after August 10, 1993, the Commission shall prescribe such transfer disclosures and antitrafficking restrictions and payment schedules as are necessary to prevent the unjust enrichment of recipients of licenses or permits as a result of the methods employed to issue licenses under this subsection.

**(5) Termination of authority**

**(A)** Except as provided in subparagraph (B), the Commission shall not issue any license or permit using a system of random selection under this subsection after July 1, 1997.

**(B)** Subparagraph (A) of this paragraph shall not apply with respect to licenses or permits for stations described in section 397(6) of this title.

**\* \* \***

**(k) Broadcast station renewal procedures**

**(1) Standards for renewal**

If the licensee of a broadcast station submits an application to the Commission for renewal of such license, the Commission shall grant the application if it finds, with respect to that station, during the preceding term of its license--

**(A)** the station has served the public interest, convenience, and necessity;

**(B)** there have been no serious violations by the licensee of this chapter or the rules and regulations of the Commission; and

**(C)** there have been no other violations by the licensee of this chapter or the rules and regulations of the Commission which, taken together, would constitute a pattern of abuse.

**(2) Consequence of failure to meet standard**

If any licensee of a broadcast station fails to meet the requirements of this subsection, the Commission may deny the application for renewal in accordance with paragraph (3), or grant such application on terms and conditions as are appropriate, including renewal for a term less than the maximum otherwise permitted.

**(3) Standards for denial**

If the Commission determines, after notice and opportunity for a hearing as provided in subsection (e), that a licensee has failed to meet the requirements specified in paragraph (1) and that no mitigating factors justify the imposition of lesser sanctions, the Commission shall--

**(A)** issue an order denying the renewal application filed by such licensee under section 308 of this title; and

**(B)** only thereafter accept and consider such applications for a construction permit as may be filed under section 308 of this title specifying the channel or broadcasting facilities of the former licensee.

**(4) Competitor consideration prohibited**

In making the determinations specified in paragraph (1) or (2), the Commission shall not consider whether the public interest, convenience, and necessity might be served by the grant of a license to a person other than the renewal applicant.

**(l) Applicability of competitive bidding to pending comparative licensing cases**

With respect to competing applications for initial licenses or construction permits for commercial radio or television stations that were filed with the Commission before July 1, 1997, the Commission shall--

**(1)** have the authority to conduct a competitive bidding proceeding pursuant to subsection (j) to assign such license or permit;

**(2)** treat the persons filing such applications as the only persons eligible to be qualified bidders for purposes of such proceeding; and

**(3)** waive any provisions of its regulations necessary to permit such persons to enter an agreement to procure the removal of a conflict between their applications during the 180-day period beginning on August 5, 1997.

# 47 U.S.C. § 310

### § 310. License ownership restrictions

**(a) Grant to or holding by foreign government or representative**

The station license required under this chapter shall not be granted to or held by any foreign government or the representative thereof.

**(b) Grant to or holding by alien or representative, foreign corporation, etc.**

No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by--

**(1)** any alien or the representative of any alien;

**(2)** any corporation organized under the laws of any foreign government;

**(3)** any corporation of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any corporation organized under the laws of a foreign country;

**(4)** any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

**(c) Authorization for aliens licensed by foreign governments; multilateral or bilateral agreement to which United States and foreign country are parties as prerequisite**

In addition to amateur station licenses which the Commission may issue to aliens pursuant to this chapter, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his

government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of Title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

**(d) Assignment and transfer of construction permit or station license**

No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby. Any such application shall be disposed of as if the proposed transferee or assignee were making application under section 308 of this title for the permit or license in question; but in acting thereon the Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee.

**(e) Administration of regional concentration rules for broadcast stations**

**(1)** In the case of any broadcast station, and any ownership interest therein, which is excluded from the regional concentration rules by reason of the savings provision for existing facilities provided by the First Report and Order adopted March 9, 1977 (docket No. 20548; 42 Fed. Reg. 16145), the exclusion shall not terminate solely by reason of changes made in the technical facilities of the station to improve its service.

**(2)** For purposes of this subsection, the term "regional concentration rules" means the provisions of sections 73.35, 73.240, and 73.636 of title 47, Code of Federal Regulations (as in effect June 1, 1983), which prohibit any party from directly or indirectly owning, operating, or controlling three broadcast stations in one or several services where any two of such stations are within 100 miles of the third (measured city-to-city), and where there is a primary service contour overlap of any of the stations.

# 47 U.S.C. § 334

**§ 334. Limitation on revision of equal employment opportunity regulations**

**(a) Limitation**

Except as specifically provided in this section, the Commission shall not revise--

**(1)** the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. 73.2080) as such regulations apply to television broadcast station licensees and permittees; or

**(2)** the forms used by such licensees and permittees to report pertinent employment data to the Commission.

**(b) Midterm review**

The Commission shall revise the regulations described in subsection (a) to require a midterm review of television broadcast station licensees' employment practices and to require the Commission to inform such licensees of necessary improvements in recruitment practices identified as a consequence of such review.

**(c) Authority to make technical revisions**

The Commission may revise the regulations described in subsection (a) to make nonsubstantive technical or clerical revisions in such regulations as necessary to reflect changes in technology, terminology, or Commission organization.

# 47 U.S.C. § 403

**§ 403. Inquiry by Commission on its own motion**

The Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter. The Commission shall have the same powers and authority to proceed with any inquiry instituted on its own motion as though it had been appealed to by complaint or petition under any of the provisions of this chapter, including the power to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had, excepting orders for the payment of money.

# 47 U.S.C. § 405

## § 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order

**(a)** After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

**(b)(1)** Within 90 days after receiving a petition for reconsideration of an order concluding a hearing under section 204(a) of this title or concluding an investigation under section 208(b) of this title, the Commission shall issue an order granting or denying such petition.

**(2)** Any order issued under paragraph (1) shall be a final order and may be appealed under section 402(a) of this title.

## 47 U.S.C. § 608

### § 608. Separability

If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby.

## 47 C.F.R. § 73.2080

### § 73.2080 Equal employment opportunities (EEO).

(a) General EEO policy. Equal opportunity in employment shall be afforded by all licensees or permittees of commercially or noncommercially operated AM, FM, TV, Class A TV or international broadcast stations (as defined in this part) to all qualified persons, and no person shall be discriminated against in employment by such stations because of race, color, religion, national origin, or sex. Religious radio broadcasters may establish religious belief or affiliation as a job qualification for all station employees. However, they cannot discriminate on the basis of race, color, national origin or gender from among those who share their religious affiliation or belief. For purposes of this rule, a religious broadcaster is a licensee which is, or is closely affiliated with, a church, synagogue, or other religious entity, including a subsidiary of such an entity.

(b) General EEO program requirements. Each broadcast station shall establish, maintain, and carry out a positive continuing program of specific practices designed to ensure equal opportunity and nondiscrimination in every aspect of station employment policy and practice. Under the terms of its program, a station shall:

(1) Define the responsibility of each level of management to ensure vigorous enforcement of its policy of equal opportunity, and establish a procedure to review and control managerial and supervisory performance;

(2) Inform its employees and recognized employee organizations of the equal employment opportunity policy and program and enlist their cooperation;

(3) Communicate its equal employment opportunity policy and program and its employment needs to sources of qualified applicants without regard to race, color, religion, national origin, or sex, and solicit their recruitment assistance on a continuing basis;

(4) Conduct a continuing program to exclude all unlawful forms of prejudice or discrimination based upon race, color, religion, national origin, or sex from its personnel policies and practices and working conditions; and

(5) Conduct a continuing review of job structure and employment practices and adopt positive recruitment, job design, and other measures needed to ensure genuine equality of opportunity to participate fully in all organizational units, occupations, and levels of responsibility.

(c) Specific EEO program requirements. Under the terms of its program, a station employment unit must:

(1) Recruit for every full-time job vacancy in its operation. A job filled by an internal promotion is not considered a vacancy for which recruitment is necessary. Religious radio broadcasters who establish religious affiliation as a qualification for a job position are not required to comply with these recruitment requirements with respect to that job position or positions, but will be expected to make reasonable, good faith efforts to recruit applicants who are qualified based on their religious affiliation. Nothing in this section shall be interpreted to require a broadcaster to grant preferential treatment to any individual or group based on race, color, national origin, religion, or gender.

(i) A station employment unit shall use recruitment sources for each vacancy sufficient in its reasonable, good faith judgment to widely disseminate information concerning the vacancy.

(ii) In addition to such recruitment sources, a station employment unit shall provide notification of each full-time vacancy to any organization that distributes information about employment opportunities to job seekers or refers job seekers to employers, upon request by such organization. To be entitled to notice of vacancies, the requesting organization must provide the station employment unit with its name, mailing address, e-mail address (if applicable), telephone number, and contact person, and identify the category or categories of vacancies of which it requests notice. (An organization may request notice of all vacancies).

(2) Engage in at least four (if the station employment unit has more than ten full-time employees and is not located in a smaller market) or two (if it has five to ten full-time employees and/or is located entirely in a smaller market) of the following initiatives during each two-year period beginning with the date stations in the

station employment unit are required to file renewal applications, or the second, fourth or sixth anniversaries of that date.

(i) Participation in at least four job fairs by station personnel who have substantial responsibility in the making of hiring decisions;

(ii) Hosting of at least one job fair;

(iii) Co-sponsoring at least one job fair with organizations in the business and professional community whose membership includes substantial participation of women and minorities;

(iv) Participation in at least four events sponsored by organizations representing groups present in the community interested in broadcast employment issues, including conventions, career days, workshops, and similar activities;

(v) Establishment of an internship program designed to assist members of the community to acquire skills needed for broadcast employment;

(vi) Participation in job banks, Internet programs, and other programs designed to promote outreach generally (i.e., that are not primarily directed to providing notification of specific job vacancies);

(vii) Participation in scholarship programs designed to assist students interested in pursuing a career in broadcasting;

(viii) Establishment of training programs designed to enable station personnel to acquire skills that could qualify them for higher level positions;

(ix) Establishment of a mentoring program for station personnel;

(x) Participation in at least four events or programs sponsored by educational institutions relating to career opportunities in broadcasting;

(xi) Sponsorship of at least two events in the community designed to inform and educate members of the public as to employment opportunities in broadcasting;

(xii) Listing of each upper-level category opening in a job bank or newsletter of media trade groups whose membership includes substantial participation of women and minorities;

(xiii) Provision of assistance to unaffiliated non-profit entities in the maintenance of web sites that provide counseling on the process of searching for broadcast employment and/or other career development assistance pertinent to broadcasting;

(xiv) Provision of training to management level personnel as to methods of ensuring equal employment opportunity and preventing discrimination;

(xv) Provision of training to personnel of unaffiliated non-profit organizations interested in broadcast employment opportunities that would enable them to better refer job candidates for broadcast positions;

(xvi) Participation in other activities designed by the station employment unit reasonably calculated to further the goal of disseminating information as to employment opportunities in broadcasting to job candidates who might otherwise be unaware of such opportunities.

(3) Analyze its recruitment program on an ongoing basis to ensure that it is effective in achieving broad outreach to potential applicants, and address any problems found as a result of its analysis.

(4) Periodically analyze measures taken to:

(i) Disseminate the station's equal employment opportunity program to job applicants and employees;

(ii) Review seniority practices to ensure that such practices are nondiscriminatory;

(iii) Examine rates of pay and fringe benefits for employees having the same duties, and eliminate any inequities based upon race, national origin, color, religion, or sex discrimination;

(iv) Utilize media for recruitment purposes in a manner that will contain no indication, either explicit or implicit, of a preference for one race, national origin, color, religion or sex over another;

(v) Ensure that promotions to positions of greater responsibility are made in a nondiscriminatory manner;

(vi) Where union agreements exist, cooperate with the union or unions in the development of programs to ensure all persons of equal opportunity for employment, irrespective of race, national origin, color, religion, or sex, and include an effective nondiscrimination clause in new or renegotiated union agreements; and

(vii) Avoid the use of selection techniques or tests that have the effect of discriminating against any person based on race, national origin, color, religion, or sex.

(5) Retain records to document that it has satisfied the requirements of paragraphs (c)(1) and (2) of this section. Such records, which may be maintained in an electronic format, shall be retained until after grant of the renewal application for the term during which the vacancy was filled or the initiative occurred. Such records need not be submitted to the FCC unless specifically requested. The following records shall be maintained:

(i) Listings of all full-time job vacancies filled by the station employment unit, identified by job title;

(ii) For each such vacancy, the recruitment sources utilized to fill the vacancy (including, if applicable, organizations entitled to notification pursuant to paragraph (c)(1)(ii) of this section, which should be separately identified), identified by name, address, contact person and telephone number;

(iii) Dated copies of all advertisements, bulletins, letters, faxes, e-mails, or other communications announcing vacancies;

(iv) Documentation necessary to demonstrate performance of the initiatives required by paragraph (c)(2) of this section, including sufficient information to fully disclose the nature of the initiative and the scope of the station's participation, including the station personnel involved;

(v) The total number of interviewees for each vacancy and the referral source for each interviewee; and

(vi) The date each vacancy was filled and the recruitment source that referred the hiree.

(6) Annually, on the anniversary of the date a station is due to file its renewal application, the station shall place in its public file, maintained pursuant to § 73.3526 or § 73.3527, and on its website, if it has one, an EEO public file report containing the following information (although if any broadcast licensee acquires a station pursuant to FCC Form 2100 Schedule 314 or FCC Form 2100 Schedule 315 during the twelve months covered by the EEO public file report, its EEO public file report shall cover the period starting with the date it acquired the station):

(i) A list of all full-time vacancies filled by the station's employment unit during the preceding year, identified by job title;

(ii) For each such vacancy, the recruitment source(s) utilized to fill the vacancy (including, if applicable, organizations entitled to notification pursuant to paragraph (c)(1)(ii) of this section, which should be separately identified), identified by name, address, contact person and telephone number;

(iii) The recruitment source that referred the hiree for each full-time vacancy during the preceding year;

(iv) Data reflecting the total number of persons interviewed for full-time vacancies during the preceding year and the total number of interviewees referred by each recruitment source utilized in connection with such vacancies; and

(v) A list and brief description of initiatives undertaken pursuant to paragraph (c)(2) of this section during the preceding year.

(d) Small station exemption. The provisions of paragraphs (b) and (c) of this section shall not apply to station employment units that have fewer than five full-time employees.

(e) Definitions. For the purposes of this rule:

(1) A full-time employee is a permanent employee whose regular work schedule is 30 hours per week or more.

(2) A station employment unit is a station or a group of commonly owned stations in the same market that share at least one employee.

(3) A smaller market includes metropolitan areas as defined by the Office of Management and Budget with a population of fewer than 250,000 persons and areas outside of all metropolitan areas as defined by the Office of Management and Budget.

(f) Enforcement. The following provisions apply to employment activity concerning full-time positions at each broadcast station employment unit (defined in this part) employing five or more persons in full-time positions, except where noted.

(1) All broadcast stations, including those that are part of an employment unit with fewer than five full-time employees, shall file a Broadcast Equal Employment Opportunity Program Report (Form 2100 Schedule 396) with their renewal application. Form 2100 Schedule 396 is filed on the date the station is due to file its application for renewal of license. If a broadcast licensee acquires a station pursuant to FCC Form 2100 Schedule 314 or FCC Form 2100 Schedule 315 during the period that is to form the basis for the Form 2100 Schedule 396, information provided on its Form 2100 Schedule 396 should cover the licensee's EEO recruitment activity during the period starting with the date it acquired the station. Stations are required to maintain a copy of their Form 2100 Schedule 396 in the station's public file in accordance with the provisions of §§ 73.3526 and 73.3527.

(2) The Commission will conduct a mid-term review of the employment practices of each broadcast television station that is part of an employment unit of five or more full-time employees and each radio station that is part of an employment unit of eleven or more full-time employees, four years following the station's most recent license expiration date as specified in § 73.1020. If a broadcast licensee acquires a station pursuant to FCC Form 2100 Schedule 314 or FCC Form 2100 Schedule 315 during the period that is to form the basis for the mid-term review, that review will cover the licensee's EEO recruitment activity during the period starting with the date it acquired the station.

(3) If a station is subject to a time brokerage agreement, the licensee shall file Forms 2100 Schedule 396 and EEO public file reports concerning only its own

recruitment activity. If a licensee is a broker of another station or stations, the licensee-broker shall include its recruitment activity for the brokered station(s) in determining the bases of Forms 2100 Schedule 396 and the EEO public file reports for its own station. If a licensee-broker owns more than one station, it shall include its recruitment activity for the brokered station in the Forms 2100 Schedule 396 and EEO public file reports filed for its own station that is most closely affiliated with, and in the same market as, the brokered station. If a licensee-broker does not own a station in the same market as the brokered station, then it shall include its recruitment activity for the brokered station in the Forms 2100 Schedule 396 and EEO public file reports filed for its own station that is geographically closest to the brokered station.

(4) Broadcast stations subject to this section shall maintain records of their recruitment activity necessary to demonstrate that they are in compliance with the EEO rule. Stations shall ensure that they maintain records sufficient to verify the accuracy of information provided in Form 2100 Schedule 396 and EEO public file reports. To determine compliance with the EEO rule, the Commission may conduct inquiries of licensees at random or if it has evidence of a possible violation of the EEO rule. In addition, the Commission will conduct random audits. Specifically, each year approximately five percent of all licensees in the television and radio services will be randomly selected for audit, ensuring that, even though the number of radio licensees is significantly larger than television licensees, both services are represented in the audit process. Upon request, stations shall make records available to the Commission for its review.

(5) The public may file complaints throughout the license term based on the contents of a station's public file. Provisions concerning filing, withdrawing, or non-filing of informal objections or petitions to deny license renewal, assignment, or transfer applications are delineated in §§ 73.3584 and 73.3587–3589 of the Commission's rules.

(g) Sanctions and remedies. The Commission may issue appropriate sanctions and remedies for any violation of this rule.

## 47 C.F.R. § 73.2080 (1992)

**§73.2080 Equal employment opportunities.**

(a) General EEO policy. Equal opportunity in employment shall be afforded by all licensees or permittees of commercially or noncommercially operated AM, FM, TV, or international broadcast stations (as defined in this part) to all qualified persons, and no person shall be discriminated against in employment by such stations because of race, color, religion, national origin, or sex.

(b) EEO program. Each broadcast station shall establish, maintain, and carry out a positive continuing program of specific practices designed to ensure equal opportunity in every aspect of station employment policy and practice. Under the terms of its program, a station shall:

(1) Define the responsibility of each level of management to ensure a positive application and vigorous enforcement of its policy of equal opportunity, and establish a procedure to review and control managerial and supervisory performance;

(2) Inform its employees and recognized employee organizations of the positive equal employment opportunity policy and program and enlist their cooperation;

(3) Communicate its equal employment opportunity policy and program and its employment needs to sources of qualified applicants without regard to race, color, religion, national origin, or sex, and solicit their recruitment assistance on a continuing basis;

(4) Conduct a continuing program to exclude all unlawful forms of prejudice or discrimination based upon race, color, religion, national origin, or sex from its personnel policies and practices and working conditions; and

(5) Conduct a continuing review of job structure and employment practices and adopt positive recruitment, job design, and other measures needed to ensure genuine equality of opportunity to participate fully in all organizational units, occupations, and levels of responsibility.

(c) EEO program requirements. A broadcast station's equal employment opportunity program should reasonably address itself to the specific areas set forth below, to the extent possible, and to the extent that they are appropriate in terms of the station's size, location, etc.:

(1) Disseminate its equal opportunity program to job applicants and employees. For example, this requirement may be met by:

(i) Posting notices in the station's office and other places of employment, informing employees, and applicants for employment, of their equal employment opportunity rights. Where it is appropriate, such equal employment opportunity notices should be posted in languages other than English;

(ii) Placing a notice in bold type on the employment application informing prospective employees that discrimination because of race, color, religion, national origin, or sex is prohibited;

(iii) Seeking the cooperation of labor unions, if represented at the station, in the implementation of its EEO program and the inclusion of non-discrimination provisions in union contracts;

(iv) Utilizing media for recruitment purposes in a manner that will contain no indication, either explicit or implicit, of a preference for one sex over another and that can be reasonably expected to reach minorities and women.

(2) Use minority organizations, organizations for women, media, educational institutions, and other potential sources of minority and female applicants, to supply referrals whenever job vacancies are available in its operation. For example, this requirement may be met by:

(i) Placing employment advertisements in media that have significant circulation among minorities residing and/or working in the recruiting area;

(ii) Recruiting through schools and colleges, including those located in the station's local area, with significant minority-group enrollments;

(iii) Contacting, both orally and in writing, minority and human relations organizations, leaders, and spokesmen and spokeswomen to encourage referral of qualified minority or female applicants;

(iv) Encouraging current employees to refer minority or female applicants;

(v) Making known to recruitment sources in the employer's immediate area that qualified minority members and females are being sought for consideration whenever you hire and that all candidates will be considered on a nondiscriminatory basis.

(3) Evaluate its employment profile and job turnover against the availability of minorities and women in its recruitment area. For example, this requirement may be met by:

(i) Comparing the composition of the relevant labor area with composition of the station's workforce;

(ii) Where there is underrepresentation of either minorities and/or women, examining the company's personnel policies and practices to assure that they do not inadvertently screen out any group and take appropriate action where necessary. Data on representation of minorities and women in the available labor force are generally available on a metropolitan statistical area (MSA) or county basis.

(4) Undertake to offer promotions of qualified minorities and women in a nondiscriminatory fashion to positions of greater responsibility. For example, this requirement may be met by:

(i) Instructing those who make decisions on placement and promotion that qualified minority employees and females are to be considered without discrimination, and that job areas in which there is little or no minority or female representation should be reviewed;

(ii) Giving qualified minority and female employees equal opportunity for positions which lead to higher positions. Inquiring as to the interest and skills of all lower paid employees with respect to any of the higher paid positions.

(5) Analyze its efforts to recruit, hire, and promote minorities and women and address any difficulties encountered in implementing its equal employment opportunity program. For example, this requirement may be met by:

(i) Avoiding use of selection techniques or tests that have the effect of discriminating against qualified minority groups or females;

(ii) Reviewing seniority practices to ensure that such practices are nondiscriminatory;

(iii) Examining rates of pay and fringe benefits for employees having the same duties, and eliminating any inequities based upon race or sex discrimination.

## 47 C.F.R. § 73.3526

### § 73.3526 Online public inspection file of commercial stations.

(a) Responsibility to maintain a file. The following shall maintain for public inspection a file containing the material set forth in this section.

(1) Applicants for a construction permit for a new station in the commercial broadcast services shall maintain a public inspection file containing the material, relating to that station, described in paragraphs (e)(2) and (e)(10) of this section. A separate file shall be maintained for each station for which an application is pending. If the application is granted, paragraph (a)(2) of this section shall apply.

(2) Every permittee or licensee of an AM, FM, TV or Class A TV station in the commercial broadcast services shall maintain a public inspection file containing the material, relating to that station, described in paragraphs (e)(1) through (e)(10) and paragraph (e)(13) of this section. In addition, every permittee or licensee of a commercial TV or Class A TV station shall maintain for public inspection a file containing material, relating to that station, described in paragraphs (e)(11) and (e)(15) of this section, and every permittee or licensee of a commercial AM or FM station shall maintain for public inspection a file containing the material, relating to that station, described in paragraphs (e)(12) and (e)(14) of this section. A separate file shall be maintained for each station for which an authorization is

outstanding, and the file shall be maintained so long as an authorization to operate the station is outstanding.

(b) Location of the file. The public inspection file shall be located as follows:

(1) An applicant for a new station or change of community shall maintain its file at an accessible place in the proposed community of license.

(2)(i) A television or radio station licensee or applicant shall place the contents required by paragraph (e) of this section of its public inspection file in the online public file hosted by the Commission.

(ii) A station must provide a link to the public inspection file hosted on the Commission's website from the home page of its own website, if the station has a website, and provide contact information on its website for a station representative that can assist any person with disabilities with issues related to the content of the public files. A station also is required to include in the online public file the station's address and telephone number, and the email address of the station's designated contact for questions about the public file.

(3) The Commission will automatically link the following items to the electronic version of all licensee and applicant public inspection files, to the extent that the Commission has these items electronically: authorizations, applications, contour maps; ownership reports and related materials; portions of the Equal Employment Opportunity file held by the Commission; "The Public and Broadcasting"; Letters of Inquiry and other investigative information requests from the Commission, unless otherwise directed by the inquiry itself; Children's television programming reports; and DTV transition education reports. In the event that the online public file does not reflect such required information, the licensee will be responsible for posting such material.

(c) Access to material in the file. For any applicant described in paragraph (b)(1) of this section that does not include all material described in paragraph (e) of this section in the online public file hosted by the Commission, the portion of the file that is not included in the online public file shall be available for public inspection at any time during regular business hours at an accessible place in the community of license. The applicant must provide information regarding the location of the file, or the applicable portion of the file, within one business day of a request for such information. All or part of the file may be maintained in a computer database, as long as a computer terminal is made available, at the location of the file, to members of the public who wish to review the file. Material in the public inspection file shall be made available for printing or machine reproduction upon request made in person. The applicant may specify the location for printing or reproduction, require the requesting party to pay the reasonable cost thereof, and may require

guarantee of payment in advance (e.g., by requiring a deposit, obtaining credit card information, or any other reasonable method). Requests for copies shall be fulfilled within a reasonable period of time, which generally should not exceed 7 days.

(d) Responsibility in case of assignment or transfer.

(1) In cases involving applications for consent to assignment of broadcast station construction permits or licenses, with respect to which public notice is required to be given under the provisions of § 73.3580 or § 73.3594, the file mentioned in paragraph (a) of this section shall be maintained by the assignor. If the assignment is consented to by the FCC and consummated, the assignee shall maintain the file commencing with the date on which notice of the consummation of the assignment is filed with the FCC. The assignee shall retain public file documents obtained from the assignor for the period required under these rules.

(2) In cases involving applications for consent to transfer of control of a permittee or licensee of a broadcast station, the file mentioned in paragraph (a) of this section shall be maintained by the permittee or licensee.

(e) Contents of the file. The material to be retained in the public inspection file is as follows:

(1) Authorization. A copy of the current FCC authorization to construct or operate the station, as well as any other documents necessary to reflect any modifications thereto or any conditions that the FCC has placed on the authorization. These materials shall be retained until replaced by a new authorization, at which time a copy of the new authorization and any related materials shall be placed in the file.

(2) Applications and related materials. A copy of any application tendered for filing with the FCC, together with all related material, and copies of Initial Decisions and Final Decisions in hearing cases pertaining thereto. If petitions to deny are filed against the application and have been served on the applicant, a statement that such a petition has been filed shall be maintained in the file together with the name and address of the party filing the petition. Applications shall be retained in the public inspection file until final action has been taken on the application, except that applications for a new construction permit granted pursuant to a waiver showing and applications for assignment or transfer of license granted pursuant to a waiver showing shall be retained for as long as the waiver is in effect. In addition, license renewal applications granted on a short-term basis shall be retained until final action has been taken on the license renewal application filed immediately following the shortened license term.

(3)(i) Citizen agreements. A copy of every written citizen agreement. These agreements shall be retained for the term of the agreement, including any renewal or extension thereof.

(ii) For purposes of this section, a citizen agreement is a written agreement between a broadcast applicant, permittee, or licensee, and one or more citizens or citizen groups, entered for primarily noncommercial purposes. This definition includes those agreements that deal with goals or proposed practices directly or indirectly affecting station operations in the public interest, in areas such as—but not limited to—programming and employment. It excludes common commercial agreements such as advertising contracts; union, employment, and personal services contracts; network affiliation, syndication, program supply contracts, etc. However, the mere inclusion of commercial terms in a primarily noncommercial agreement—such as a provision for payment of fees for future services of the citizen-parties (see "Report and Order," Docket 19518, 57 FCC 2d 494 (1976))—would not cause the agreement to be considered commercial for purposes of this section.

(4) Contour maps. A copy of any service contour maps, submitted with any application tendered for filing with the FCC, together with any other information in the application showing service contours and/or transmitter location (State, county, city, street address, or other identifying information). These documents shall be retained for as long as they reflect current, accurate information regarding the station.

(5) Ownership reports and related materials. A copy of the most recent, complete ownership report filed with the FCC for the station, together with any statements filed with the FCC certifying that the current report is accurate, and together with all related material. These materials shall be retained until a new, complete ownership report is filed with the FCC, at which time a copy of the new report and any related materials shall be placed in the file. The permittee or licensee must retain in the public file either a copy of the station documents listed in § 73.3613(a) through (c) or an up-to-date list of such documents. If the permittee or licensee elects to maintain an up-to-date list of such documents, the list must include all the information that the permittee or licensee is required to provide on ownership reports for each document, including, but not limited to, a description of the document, the parties to the document, the month and year of execution, the month and year of expiration, and the document type (e.g., network affiliation agreement, articles of incorporation, bylaws, management consultant agreement with independent contractor). Regardless of which of these two options the permittee or licensee chooses, it must update the inventory of § 73.3613 documents in the public file to reflect newly executed § 73.3613 documents, amendments, supplements, and cancellations within 30 days of execution thereof. Licensees and permittees that choose to retain a list of § 73.3613 documents must provide a copy of any § 73.3613 document(s) to requesting parties within 7 days. In maintaining copies of such documents in the public file or providing copies upon request, confidential or proprietary information may be redacted where appropriate.

(6) Political file. Such records as are required by § 73.1943 to be kept concerning broadcasts by candidates for public office. These records shall be retained for the period specified in § 73.1943 (2 years).

(7) Equal Employment Opportunity file. Such information as is required by § 73.2080 to be kept in the public inspection file. These materials shall be retained until final action has been taken on the station's next license renewal application.

(8) The public and broadcasting. At all times, a copy of the most recent version of the manual entitled "The Public and Broadcasting."

(9) [Reserved by 82 FR 11412]

(10) Material relating to FCC investigation or complaint. Material having a substantial bearing on a matter which is the subject of an FCC investigation or complaint to the FCC of which the applicant, permittee, or licensee has been advised. This material shall be retained until the applicant, permittee, or licensee is notified in writing that the material may be discarded.

(11)(i) TV issues/programs lists. For commercial TV and Class A broadcast stations, every three months a list of programs that have provided the station's most significant treatment of community issues during the preceding three month period. The list for each calendar quarter is to be filed by the tenth day of the succeeding calendar quarter (e.g., January 10 for the quarter October—December, April 10 for the quarter January—March, etc.) The list shall include a brief narrative describing what issues were given significant treatment and the programming that provided this treatment. The description of the programs shall include, but shall not be limited to, the time, date, duration, and title of each program in which the issue was treated. The lists described in this paragraph shall be retained in the public inspection file until final action has been taken on the station's next license renewal application.

(ii) Records concerning commercial limits. For commercial TV and Class A TV broadcast stations, records sufficient to permit substantiation of the station's certification, in its license renewal application, of compliance with the commercial limits on children's programming established in 47 U.S.C. 303a and § 73.670. The records for each calendar year must be filed by the thirtieth day of the succeeding calendar year. These records shall be retained until final action has been taken on the station's next license renewal application.

(iii) Children's television programming reports. For commercial TV broadcast stations on an annual basis, a completed Children's Television Programming Report ("Report"), on FCC Form 2100 Schedule H, reflecting efforts made by the licensee during the preceding year to serve the educational and informational needs of children. The Report is to be electronically filed with the Commission by the

thirtieth (30) day of the succeeding calendar year. A copy of the Report will also be linked to the station's online public inspection file by the FCC. The Report shall identify the licensee's educational and informational programming efforts, including programs aired by the station that are specifically designed to serve the educational and informational needs of children. The Report shall include the name of the individual at the station responsible for collecting comments on the station's compliance with the Children's Television Act, and it shall be separated from other materials in the public inspection file. These Reports shall be retained in the public inspection file until final action has been taken on the station's next license renewal application.

(12) Radio issues/programs lists. For commercial AM and FM broadcast stations, every three months a list of programs that have provided the station's most significant treatment of community issues during the preceding three month period. The list for each calendar quarter is to be filed by the tenth day of the succeeding calendar quarter (e.g., January 10 for the quarter October—December, April 10 for the quarter January—March, etc.). The list shall include a brief narrative describing what issues were given significant treatment and the programming that provided this treatment. The description of the programs shall include, but shall not be limited to, the time, date, duration, and title of each program in which the issue was treated. The lists described in this paragraph shall be retained in the public inspection file until final action has been taken on the station's next license renewal application.

(13) Local public notice announcements. Each applicant for renewal of license shall, within 7 days of the last day of broadcast of the local public notice of filing announcements required pursuant to § 73.3580(c)(3), place in the station's online public inspection file a statement certifying compliance with this paragraph (e)(13). The dates and times that the on-air announcements were broadcast shall be made part of the certifying statement. The certifying statement shall be retained in the public file for the period specified in § 73.3580(e)(2) (for as long as the application to which it refers).

(14) Radio and television time brokerage agreements. For commercial radio and television stations, a copy of every agreement or contract involving time brokerage of the licensee's station or of another station by the licensee, whether the agreement involves stations in the same markets or in differing markets, with confidential or proprietary information redacted where appropriate. These agreements shall be placed in the public file within 30 days of execution and retained in the file as long as the contract or agreement is in force.

(15) Must-carry or retransmission consent election. Statements of a commercial television or Class A television station's election with respect to either must-carry or

re-transmission consent, as defined in §§ 76.64 and 76.1608 of this chapter. These records shall be retained for the duration of the three year election period to which the statement applies. Commercial television stations shall, no later than July 31, 2020, provide an up-to-date email address and phone number for carriage-related questions and respond as soon as is reasonably possible to messages or calls from multichannel video programming distributors (MVPDs). Each commercial television station is responsible for the continuing accuracy and completeness of the information furnished.

(16) Radio and television joint sales agreements. For commercial radio and commercial television stations, a copy of agreement for the joint sale of advertising time involving the station, whether the agreement involves stations in the same markets or in differing markets, with confidential or proprietary information redacted where appropriate. These agreements shall be placed in the public file within 30 days of execution and retained in the file as long as the contract or agreement is in force.

(17) Class A TV continuing eligibility. Documentation sufficient to demonstrate that the Class A television station is continuing to meet the eligibility requirements set forth at § 73.6001.

(18) Shared service agreements. For commercial television stations, a copy of every Shared Service Agreement for the station (with the substance of oral agreements reported in writing), regardless of whether the agreement involves commercial television stations in the same market or in different markets, with confidential or proprietary information redacted where appropriate. For purposes of this paragraph, a Shared Service Agreement is any agreement or series of agreements in which:

(1) A station provides any station-related services, including, but not limited to, administrative, technical, sales, and/or programming support, to a station that is not directly or indirectly under common de jure control permitted under the Commission's regulations; or

(2) Stations that are not directly or indirectly under common de jure control permitted under the Commission's regulations collaborate to provide or enable the provision of station-related services, including, but not limited to, administrative, technical, sales, and/or programming support, to one or more of the collaborating stations. For purposes of this paragraph, the term "station" includes the licensee, including any subsidiaries and affiliates, and any other individual or entity with an attributable interest in the station.

(19) Foreign sponsorship disclosures. Documentation sufficient to demonstrate that the station is continuing to meet the requirements set forth at § 73.1212(j)(7).

(f)(1) For purposes of this section, action taken on an application tendered with the FCC becomes final when that action is no longer subject to reconsideration, review, or appeal either at the FCC or in the courts.

(2) For purposes of this section, the term "all related material" includes all exhibits, letters, and other documents tendered for filing with the FCC as part of an application, report, or other document, all amendments to the application, report, or other document, copies of all documents incorporated therein by reference and not already maintained in the public inspection file, and all correspondence between the FCC and the applicant pertaining to the application, report, or other document, which according to the provisions of §§ 0.451 through 0.461 of this chapter are open for public inspection at the offices of the FCC.

## 47 C.F.R. § 73.3612

### § 73.3612 Annual employment report.

Each licensee or permittee of a commercially or noncommercially operated AM, FM, TV, Class A TV or International Broadcast station with five or more full-time employees shall file an annual employment report with the FCC on or before September 30 of each year on FCC Form 395–B. Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the nondiscrimination or equal employment opportunity requirements of § 73.2080. Compliance with this section will not be required until this sentence is removed or contains a compliance date, which will not occur until after the Office of Management and Budget completes review of any information collection requirements pursuant to the Paperwork Reduction Act or until after the Office of Management and Budget determines that such review is not required.

## 47 C.F.R. § 73.3612 Note (2001)

### § 73.3612 Annual employment report.

* * *

Note to § 73.3612: Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data will not be used for the purpose of assessing any aspect of an individual broadcast licensee's compliance with the equal employment opportunity requirements of § 73.2080.

# 47 C.F.R. § 73.3615

**§ 73.3615 Ownership reports.**

(a) The Ownership Report for Commercial Broadcast Stations (FCC Form 323) must be filed electronically every two years by each licensee of a commercial AM, FM, or TV broadcast station and any entity that holds an interest in the licensee that is attributable pursuant to § 73.3555 (each a "Respondent"). The ownership report shall be filed by December 1 in all odd-numbered years. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323 (including all instructions for the form and schedule) that is current on October 1 of the year in which the ownership report is filed. The information provided on each ownership report shall be current as of October 1 of the year in which the ownership report is filed. A Respondent with a current and unamended biennial ownership report (i.e., an ownership report that was filed pursuant to this subsection) on file with the Commission that is still accurate and which was filed using the version of FCC Form 323 that is current on October 1 of the year in which its biennial ownership report is due may electronically validate and resubmit its previously filed biennial ownership report.

(b)(1) Each permittee of a commercial AM, FM or TV broadcast station and any entity that holds an interest in the permittee that is attributable pursuant to § 73.3555 (each a "Respondent") shall file an ownership report on FCC Form 323 within 30 days of the date of grant by the FCC of an application by the permittee for original construction permit. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323 (including all instructions for the form and schedule) that is current on the date on which the ownership report is filed.

(2) Except as specifically noted below, each permittee of a commercial AM, FM or TV broadcast station and any entity that holds an interest in the permittee that is attributable pursuant to § 73.3555 (each a "Respondent") shall file an ownership report on FCC Form 323 on the date that the permittee applies for a station license. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323 (including all instructions for the form and schedule) that is current on the date on which the ownership report is filed. If a Respondent has a current and unamended ownership report on file with the Commission that was filed pursuant to paragraphs (b)(1) or (c) of this section, was submitted using the version of FCC Form 323 that is current on the date on which the ownership report due pursuant to paragraph(b)(2) is filed, and is still accurate, the Respondent may certify that it has reviewed such ownership report and that it is accurate, in lieu of filing a new ownership report.

(c) Each permittee or licensee of a commercial AM, FM or TV broadcast station and any entity that holds an interest in the permittee or licensee that is attributable pursuant to § 73.3555 (each a "Respondent"), shall file an ownership report on FCC Form 323 within 30 days of consummating authorized assignments or transfers of permits and licenses. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323 (including all instructions for the form and schedule) that is current on the date on which the ownership report is filed.

(d) The Ownership Report for Noncommercial Broadcast Stations (FCC Form 323–E) must be filed electronically every two years by each licensee of a noncommercial educational AM, FM or TV broadcast station and any entity that holds an interest in the licensee that is attributable pursuant to § 73.3555 (each a "Respondent"). The ownership report shall be filed by December 1 in all odd-numbered years. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323–E (including all instructions for the form and schedule) that is current on October 1 of the year in which the ownership report is filed. The information provided on each ownership report shall be current as of October 1 of the year in which the ownership report is filed. A Respondent with a current and unamended biennial ownership report (i.e., an ownership report that was filed pursuant to this subsection) on file with the Commission that is still accurate and which was filed using the version of FCC Form 323–E that is current on October 1 of the year in which its biennial ownership report is due may electronically validate and resubmit its previously filed biennial ownership report.

(e)(1) Each permittee of a noncommercial educational AM, FM or TV broadcast station and any entity that holds an interest in the permittee that is attributable pursuant to § 73.3555 (each a "Respondent") shall file an ownership report on FCC Form 323–E within 30 days of the date of grant by the FCC of an application by the permittee for original construction permit. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323–E (including all instructions for the form and schedule) that is current on the date on which the ownership report is filed.

(2) Except as specifically noted below, each permittee of a noncommercial educational AM, FM or TV broadcast station and any entity that holds an interest in the permittee that is attributable pursuant to § 73.3555 (each a "Respondent") shall file an ownership report on FCC Form 323–E on the date that the permittee applies for a station license. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323–E (including all instructions for the form and schedule) that is current on the date on which the ownership report is filed. If a Respondent has a current and

unamended ownership report on file with the Commission that was filed pursuant to paragraphs (e)(1) or (f) of this section, was submitted using the version of FCC Form 323–E that is current on the date on which the ownership report due pursuant to this subsection is filed, and is still accurate, the Respondent may certify that it has reviewed such ownership report and that it is accurate, in lieu of filing a new ownership report.

(f) Each permittee or licensee of a noncommercial educational AM, FM or TV broadcast station, and any entity that holds an interest in the permittee or licensee that is attributable pursuant to § 73.3555 (each a "Respondent"), shall file an ownership report on FCC Form 323–E within 30 days of consummating authorized assignments or transfers of permits and licenses. Each ownership report shall provide all information required by, and comply with all requirements set forth in, the version of FCC Form 323–E (including all instructions for the form and schedule) that is current on the date on which the ownership report is filed.

(g) A copy of all ownership and supplemental ownership reports and related materials filed pursuant to this section shall be maintained and made available for public inspection in the online public inspection file as required by §§ 73.3526 and 73.3527.