## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **NATIONAL RELIGIOUS BROADCASTERS; AMERICAN FAMILY ASSOCIATION,** | ) Case No. 24-60219 |
| *Petitioners,* | ) |
| *v.* | ) |
| **FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,** | ) |
| *Respondents.* | ) |
| *Consolidated with* **TEXAS ASSOCIATION OF BROADCASTERS,** | ) Case No. 24-60226 |
| *Petitioner,* | ) |
| *v.* | ) |
| **FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,** | ) |
| *Respondents.* | ) |

On Petition for Review of an Order of the
Federal Communications Commission
Agency No. 24-18

## OPENING BRIEF FOR PETITIONERS NATIONAL RELIGIOUS BROADCASTERS, AMERICAN FAMILY ASSOCIATION, AND TEXAS ASSOCIATION OF BROADCASTERS

Scott R. Flick
Matthew J. MacLean
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth St NW
Washington, DC 20036
(202) 663-8167
scott.flick@pillsburylaw.com
matthew.maclean@pillsburylaw.com

Jessica T. Nyman
  *Counsel of Record*
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
401 Congress Ave, Suite 1700
Austin, TX 78701
(512) 580-9645
jessica.nyman@pillsburylaw.com

*Counsel for Texas Association of
Broadcasters*

Jonathan Berry
R. Trent McCotter
Jared M. Kelson
  *Counsel of Record*
Laura B. Ruppalt*
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave SE, No. 231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for National Religious
Broadcasters and American Family
Association*

*Admitted only in Virginia; practice
limited to matters before federal
agencies and federal courts.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners**

1. National Religious Broadcasters. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. American Family Association. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3. Texas Association of Broadcasters. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Others who are not participants in this matter but may be financially interested in its outcome include members of National Religious Broadcasters, American Family Association, and Texas Association of Broadcasters.

**Respondents**

4. Federal Communication Commission

5. United States of America

i

## Counsel

*Counsel for Petitioners National Religious Broadcasters and American Family Association*

Jonathan Berry
R. Trent McCotter
Jared M. Kelson
Laura B. Ruppalt
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave SE, No. 231
Washington, DC 20003

*Counsel for Petitioner Texas Association of Broadcasters*

Scott R. Flick
Matthew J. MacLean
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036

Jessica T. Nyman
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
401 Congress Ave, Suite 1700
Austin, TX 78701

*Counsel for Respondent Federal Communications Commission*

Jacob Matthew Lewis
Rachel Proctor May
P. Michele Ellison
William Scher
FEDERAL COMMUNICATIONS
  COMMISSION
Office of General Counsel
45 L Street, NE
Washington, DC 20554

*Counsel for Respondent United States of America*

Merrick Garland
Robert J. Wiggers
Robert B. Nicholson
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave, NW
Washington, DC 20530

Dated: August 28, 2024              Respectfully submitted,

*/s/ Jessica T. Nyman*              */s/ Jared M. Kelson*
Jessica T. Nyman                   Jared M. Kelson

*Counsel for Petitioner Texas*     *Counsel for Petitioners National*
*Association of Broadcasters*       *Religious Broadcasters and American*
                                    *Family Association*

iii

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rules of Appellate Procedure 34(a) and 34(f) and Fifth Circuit Rule 28.2.3, Petitioners respectfully request oral argument because this case involves a complex history of agency action, and important issues of constitutional and statutory law.

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT .............................................................. xv

STATEMENT OF THE ISSUES................................................................ xvi

INTRODUCTION....................................................................................... 1

STATEMENT OF THE CASE ...................................................................6

    A.    The FCC Introduces Form 395-B as Part of Its EEO Rule ...........6

    B.    The FCC Suspends Form 395-B Collection After *Lutheran Church* and *MD/DC/DE* .................................................................8

    C.    The FCC Reinstates Form 395-B Collection............................. 11

    D.    Petitioners Seek Review........................................................... 16

SUMMARY OF THE ARGUMENT ........................................................ 21

ARGUMENT ........................................................................................... 22

    I.    THE ORDER EXCEEDS THE FCC'S AUTHORITY.................. 22

    II.    THE ORDER VIOLATES THE FIFTH AMENDMENT............ 28

    A.    Heightened Scrutiny Applies ..................................................... 29

    B.    The Order Fails Strict Scrutiny ................................................. 40

    C.    The Order Fails Intermediate Scrutiny ...................................... 46

    III.    THE ORDER VIOLATES THE FIRST AMENDMENT ............ 48

    IV.    THE ORDER IS ARBITRARY AND CAPRICIOUS................... 51

CONCLUSION ........................................................................................ 56

CERTIFICATE OF SERVICE ................................................................. 58

CERTIFICATE OF COMPLIANCE ........................................................ 59

## <u>TABLE OF AUTHORITIES</u>

C<small>ASES</small>                                                                                    **Page(s)**

*303 Creative LLC v. Elenis*,
  <u>600 U.S. 570</u> (2023) ................................................................ 48

*Adarand Constructors, Inc. v. Peña*,
  <u>515 U.S. 200</u> (1995) ....................................................28, 29, 30, 39

*Am. Library Ass'n v. FCC*,
  <u>406 F.3d 689</u> (D.C. Cir. 2005) ............................................... 26

*Am. Meat Inst. v. USDA*,
  <u>760 F.3d 18</u> (D.C. Cir. 2014) (en banc) ................................... 42

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  <u>447 U.S. 557</u> (1980) ....................................................50, 51

*City of Richmond v. J.A. Croson Co.*,
  <u>488 U.S. 469</u> (1989) ............................................................ 45

*Clean Water Action v. EPA*,
  <u>936 F.3d 308</u> (5th Cir. 2019) ....................................................22, 24

*Columbia Broad. Sys. v. United States*,
  <u>316 U.S. 407</u> (1942) ........................................................... xvi

*Contender Farms, L.L.P. v. USDA*,
  <u>779 F.3d 258</u> (5th Cir. 2015) ....................................................18, 19

*Craig v. Boren*,
  <u>429 U.S. 190</u> (1976) ....................................................47, 48

*Crowell v. Benson*,
  <u>285 U.S. 22</u> (1932) ............................................................ 28

*Dep't of Com. v. New York*,
  <u>588 U.S. 752</u> (2019) ........................................................... 51

*Edenfield v. Fane*,
  <u>507 U.S. 761</u> (1993) ........................................................... 41

vi

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................18, 19

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................. 26

*Friedman v. Rogers*,
  440 U.S. 1 (1979) ..................................................................... 51

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
  968 F.3d 454 (5th Cir. 2020) ...............................................23, 26

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ................................................................. 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ................................................................. 49

*Janus v. AFSCME*,
  585 U.S. 878 (2018) ................................................................. 48

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ...............................................................24, 27

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ...............................................................22, 24

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ............................................................. 22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................. 18

*Lutheran Church-Missouri Synod v. FCC*,
  141 F.3d 344 (D.C. Cir. 1998) ... 2, 4, 9, 26, 29, 30, 32, 35, 37, 39, 40, 41, 52

*MD/DC/DE Broads. Ass'n v. FCC*,
  236 F.3d 13 (D.C. Cir. 2001) .................... 2, 4, 11, 26, 30, 32, 35, 39, 40, 46

*Michigan v. EPA*,
  576 U.S. 743 (2015) ................................................................. 51

*Miss. Univ. for Women v. Hogan,*
    458 U.S. 718 (1982) ........................................................47, 48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................ 51

*Nat'l Ass'n of Mfrs. v. SEC,*
    748 F.3d 359 (D.C. Cir. 2014) ............................................ 49

*Nat'l Ass'n of Mfrs. v. SEC,*
    800 F.3d 518, 522-23 (D.C. Cir. 2015) ................................ 49

*Nat'l Ass'n of Priv. Fund Managers v. SEC,*
    103 F.4th 1097 (5th Cir. 2024) ........................................... 19

*Nat'l Rifle Ass'n v. Vullo,*
    608 U.S. 175 (2024) .......................................................... 39

*NIFLA v. Becerra,*
    585 U.S. 755 (2018) ......................................................48, 49

*Plessy v. Ferguson,*
    163 U.S. 537 (1896) .......................................................... 41

*Rice v. Cayetano,*
    528 U.S. 495 (2000) ................................................. 29, 30, 39

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) .......................................................... 49

*RJ Reynolds Tobacco Co. v. FDA,*
    96 F.4th 863 (5th Cir. 2024) ............................................49, 51

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ......................................................27, 28

*Schuette v. BAMN,*
    572 U.S. 291 (2014) .......................................................... 29

*Sessions v. Morales-Santana,*
    582 U.S. 47 (2017) .......................................................29, 46

*SGCI Holdings III LLC v. FCC*,
No. 23-1083 (D.C. Cir. Apr. 3, 2023) (per curiam) ................................. 31

*Shaw v. Reno*,
509 U.S. 630 (1993)..................................................................... 29, 30, 39

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
600 U.S. 181 (2023)............................................................... 40, 41, 44

*Tex. Ent. Ass'n, Inc. v. Hegar*,
10 F.4th 495 (5th Cir. 2021)....................................................... 19

*Texas v. NRC*,
78 F.4th 827 (5th Cir. 2023)......................................................20, 21

*Tuan Anh Nguyen v. INS*,
533 U.S. 53 (2001) ..................................................................... 47

*United States v. Heinszen*,
206 U.S. 370 (1907)................................................................... 26

*United States v. Virginia*,
518 U.S. 515 (1996)..................................................................46, 47

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)................................................................... 51

*W.H. Scott Constr. Co. v. City of Jackson*,
199 F.3d 2065 (5th Cir. 1999) ................................................ 28

*Walker v. City of Mesquite*,
169 F.3d 973 (5th Cir. 1999) ............................................30, 39

*Weinberger v. Wiesenfeld*,
420 U.S. 636 (1975)................................................................... 28

*West Virginia v. EPA*,
597 U.S. 697 (2022)..................................................................22, 23

*Zauderer v. Off. of Disciplinary Counsel of Sup. Ct. of Ohio*,
471 U.S. 626 (1985)................................................................... 48

ix

# AGENCY PROCEEDINGS

*Amendment of Part 73 of the Commission's Rules Concerning EEO in the Broadcast Radio and Television Services*, 2 FCC Rcd. 3967 (1987) .............. 6, 7

*Application of Dontron, Inc.*, 6 FCC Rcd. 2560 (1991) .................................................................... 44, 55

*Applications for Renewal of License of KFUO-AM/FM et al.*, MM Docket No. 94-10, NAACP Petition to Deny (Jan. 2, 1990) ..................... 8

*Applications of Certain Broadcast Stations Serving Communities in the States of Alabama and Georgia*, 95 F.C.C.2d 1 (1983) .................................... 7

*Applications of Certain Broadcast Stations Serving Communities in the States of Louisiana and Mississippi*, 94 F.C.C.2d 275 (1983) ........................... 7

*Applications of the Lutheran Church/Missouri Synod*, 10 FCC Rcd. 9880 (1995) ......................................................................... 37

*Comments of the Ctr. for Workplace Compliance*, MB Docket No. 98-204 (Sept. 30, 2021) ................................................. 14

*Comments of Nat'l Ass'n of Broadcasters*, MB Docket No. 98-204 (Sept. 30, 2021) ................................................. 14

*Comments of Nat'l Religious Broadcasters*, MM Docket No. 98-204 (Apr. 15, 2002) ........................................... 12, 20

*Comments of Nat'l Religious Broadcasters*, MM Docket No. 98-204 (Mar. 1, 1999) .................................................. 10

*Hispanic Christian Cmty. Network*, MB Docket No. 23-267, 2023 WL 5197159 (MB 2023) ........................... 34

*Joint Comments of 46 Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (Mar. 1, 1999) .................................................. 10

*Joint Comments of Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (Apr. 15, 2002) ................................................. 12

*Joint Petition By 50 Named State Broadcasters Ass'ns for Stay of New Broadcast EEO Rules*, MM Docket No. 98-204 (Mar. 16, 2000) ............................... 10

*Joint Petition for Reconsideration & Motion for Stay of Catholic Radio Ass'n et al.*, MB Docket No. 98-204 (June 3, 2024) ..................................................... 50

*Joint Reply Comments of Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (May 29, 2002) ................................................. 12

*Joint Reply Comments of State Broadcasters Ass'ns*, MB Docket No. 98-204 (Nov. 1, 2021)............................. 13, 20, 32, 37, 44

*Joint Stay Request of National Religious Broadcasters et al.*, MB Docket No. 98-204 (June 27, 2024) ............................................17, 20

*Joint Supplemental Comments of Asian Americans Advancing Justice et al.*, MB Docket No. 98-204 (Aug. 10, 2022) ................................................... 38

*Leadership Conference on Civil & Human Rights Comment*, MB Docket No. 98-204 (Sept. 29, 2022) .................................................. 37

*Lutheran Church/Missouri Synod*, 11 FCC Rcd. 5275 (Rev. Bd. 1996) ........................................................... 8

*Lutheran Church/Missouri Synod*, Hearing Designation Order, 9 FCC Rcd. 914 (1994)................................. 8

*MMTC Notice of Ex Parte Communications*, MM Docket No. 98-204 (Mar. 3, 2022)................................................... 33

*MMTC Notice of Ex Parte Communications*, MM Docket No. 98-204 (Oct. 1, 2002) ................................................... 33

*Nat'l Religious Broadcasters' Notice of Permitted Ex Parte Presentation*, MM Docket No. 98-204 (Mar. 13, 2002)...........................................12, 20

*North County Broadcasting Corp.*, 9 FCC Rcd. 871 (1994).......................................................................7, 35

*Petition for Partial Reconsideration of Nat'l Ass'n of Broadcasters*, MB Docket No. 98-204 (June 3, 2024) ................................................... 15

*Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Employment Practices*, 23 F.C.C.2d 430 (1970) ..... 6, 7, 36

*Reply Comments of 46 Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (Apr. 15, 1999) ................................................. 10

*Reply Comments of Nat'l Ass'n of Broadcasters*, MB Docket No. 98-204 (Nov. 1, 2021) ....................................... 14, 15, 32

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*, Further NPRM, 36 FCC Rcd. 12055 (2021) ............................................ 13

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*, 13 FCC Rcd. 23004 (1998) ........................................................................ 7

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*, First Report and Order, 15 FCC Rcd. 2329 (2000) ................................................................... 9, 10

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*, Second Report and Order and Third NPRM, 17 FCC Rcd. 24018 (2002) ................................................................... 12

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*, Third Report and Order and Fourth NPRM, 19 FCC Rcd. 9973 (2004) ........................................................ 12, 13, 53

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*, MB Docket No. 98-204, Fourth Report and Order and Order on Reconsideration, FCC 24-18 (rel. Feb. 22, 2024) ................................. 1

*State Ass'ns Letter Responding to MMTC October 1, 2002 Ex Parte Filing*, MM Docket No. 98-204 (Oct. 28, 2002) .................................................. 33

*State Broadcasters Ass'ns Joint Petition for Reconsideration and/or Clarification*, MM Docket No. 98-204 (Feb. 6, 2003) ...................... 1, 13, 20

*Suspension of the Broadcast & Cable EEO Outreach Program Requirements*, 16 FCC Rcd. 2872 (2001) ....................................................................... 11

*Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports & Program Reports*, 13 FCC Rcd. 21998 (1998) ................................ 9

xii

*United Church of Christ Media Justice Ministry Notice of* Ex Parte *Communication*, MB Docket No. 98-204 (Mar. 9, 2022) ..................................................... 38

**STATUTES**

5 U.S.C. § 706 ............................................................................... 51

28 U.S.C. § 2342 ......................................................................... xvi

28 U.S.C. § 2343 ......................................................................... xvi

28 U.S.C. § 2344 ....................................................................xvi, 20

42 U.S.C. § 2000e-8 ................................................................43, 47

47 U.S.C. § 154 ....................................................................23, 26, 27

47 U.S.C. § 303 ........................................................................23, 26

47 U.S.C. § 307 ............................................................................. 23

47 U.S.C. § 308 ........................................................................23, 31

47 U.S.C. § 309 ........................................................................23, 31

47 U.S.C. § 310 ........................................................................23, 31

47 U.S.C. § 334 ........................................................................24, 25

47 U.S.C. § 402 ......................................................................... xvi

47 U.S.C. § 403 ............................................................................. 27

47 U.S.C. § 554 ............................................................................. 27

**REGUALATIONS**

47 C.F.R. § 1.4 ............................................................................. xvi

47 C.F.R. § 1.103 ......................................................................... xvi

47 C.F.R. § 1.526 (1970) ............................................................. 7

47 C.F.R. § 73.2080 ..................................................................... 53

47 C.F.R. § 73.2080 ................................................................... 46

47 C.F.R. § 73.3584 ................................................................... 35

47 C.F.R. § 73.3612 ..............................................................30, 45

47 C.F.R. § 73.3615 ................................................................... 54

**OTHER AUTHORITIES**

A. Scalia & B. Garner, *Reading Law* (2012) ................................... 24

EEOC, *EEO-1 Component 1 Data Collection Fact Sheet: Who Must File* .............. 43

FCC Form 395-B (2000) ............................................................... 6

Form 395-B Instructions ............................................................. 42

Letter from Sen. Chris Van Hollen and Rep. Yvette Clarke to FCC
    Chairman Ajit Pai (May 10, 2019) ............................................ 2

Letters from FCC Chairman Ajit Pai to Sen. Chris Van Hollen
    and Rep. Yvette Clarke (May 28, 2019) ....................................2, 13

Nat'l Religious Broads., *Membership*, https://nrb.org/membership .............. 17

Peter Whoriskey & Julian Mark, *DEI Programs Toppled Amid Surge
    of Conservative Lawsuits*, Wash. Post (June 27, 2024) ................... 36

*Review of the Commission's Broadcast & Cable EEO Rules & Policies*,
    89 Fed. Reg. 36705 (May 3, 2024) ....................................xvi, 16

Tex. Ass'n of Broads., *About TAB*, https://www.tab.org/about..............17, 18

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 2342 to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" any final order of the Federal Communications Commission ("FCC") made reviewable under 47 U.S.C. § 402(a). The order at issue here is reviewable under § 402(a) because it is not among the decisions or orders listed in § 402(b), which are reviewed by the U.S. Court of Appeals for the District of Columbia Circuit.

The FCC entered its final order in the Federal Register on May 3, 2024. *Review of the Commission's Broadcast & Cable EEO Rules & Policies*, 89 Fed. Reg. 36705. Petitioners National Religious Broadcasters and American Family Association timely filed for review in this Court on May 3, 2024, and Petitioner Texas Association of Broadcasters timely filed for review in this Court on May 9, 2024. *See* 28 U.S.C. § 2344; 47 U.S.C. § 402(a); 47 C.F.R. §§ 1.4, 1.103; *see also Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416–20 (1942). Venue is proper because American Family Association and Texas Association of Broadcasters have their principal places of business in the Fifth Circuit. 28 U.S.C. § 2343; *see* Ex.1 ¶¶ 2–3 (Hamilton Decl.).

## STATEMENT OF THE ISSUES

1.    Whether the Order exceeds the FCC's authority under the Communications Act.

2.    Whether the Order violates the equal protection component of the Fifth Amendment.

3.    Whether the Order violates the Free Speech Clause of the First Amendment.

4.    Whether the Order is arbitrary and capricious.

**INTRODUCTION**

On February 22, 2024, the Federal Communications Commission ("FCC") "reinstated" the collection and public disclosure of Form 395-B, which requires most television and radio broadcasters to categorize their employees by race, ethnicity, and sex. *Review of the Commission's Broadcast & Cable Equal Employment Opportunity* ("*EEO*") *Rules & Policies*, MB Docket No. 98-204, Fourth Report and Order and Order on Reconsideration, FCC 24-18 (rel. Feb. 22, 2024) ("Order"), JA1.[1] The FCC has not collected Form 395-B in more than 25 years because of significant constitutional concerns.

In the same Order, the FCC also denied a petition for reconsideration that had been pending before it for 20 years, which requested that any collected Form 395-B responses remain confidential. *See State Broadcasters Ass'ns Joint Petition for Reconsideration and/or Clarification*, MM Docket No. 98-204 (Feb. 6, 2003) ("State Broadcasters Reconsideration Petition"), https://www.fcc.gov/ecfs/document/5508559479/1. The Order instead newly compels broadcasters to publish their Form 395-B responses through the FCC's website on a non-anonymized, station-attributable basis. FCC 24-18, ¶¶ 2, 14, JA2–3, 8–9.

---

[1] The Order included a Second Further Notice of Proposed Rulemaking ("NPRM") to impose similar requirements on multi-channel video programming providers using Form 395-A, FCC 24-18, ¶¶ 62–76, JA31–36, which is not at issue here.

1

The Order caps a decades-long attempt by some to salvage Form 395-B as a tool for pressuring broadcasters to engage in race- and sex-conscious employment decisions. The effort is remarkable, because the D.C. Circuit has *twice* held that FCC attempts to scrutinize the level of employee diversity in broadcaster recruitment and hiring violated the Fifth Amendment. *See MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001); *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998). As then-FCC Chairman Ajit Pai explained to members of Congress in 2019, requests to reinstate Form 395-B raise "serious constitutional and statutory concerns." Letters from FCC Chairman Ajit Pai to Sen. Chris Van Hollen and Rep. Yvette Clarke (May 28, 2019), https://docs.fcc.gov/public/attachments/DOC-357897A1.pdf ("Pai Letter").[2] He continued that "[t]hese concerns have been shared by Commission leadership under both Democratic and Republican Administrations, which is why the Commission has not adopted these reforms over the past decade and a half." *Id.*

In abruptly changing course, the Order casts aside those concerns despite intensifying them by mandating online publication of Form 395-B responses.

---

[2] *See also* Letter from Sen. Chris Van Hollen and Rep. Yvette Clarke to FCC Chairman Ajit Pai (May 10, 2019), https://docs.fcc.gov/public/attachments/DOC357897A2.pdf.

2

FCC 24-18, ¶ 41, JA22. The purpose of online publication is obvious—to pressure broadcasters to engage in race- or sex-based hiring practices.

The FCC contends that such unconstitutional pressure is alleviated by its promise to use Form 395-B data exclusively for compiling industry employment trends and making reports to Congress, not to assess compliance with the FCC's EEO requirements. *Id.* ¶ 2, 14, JA2–3, 8–9. The Order defends the reporting requirement as "a neutral activity, 'devoid of ultimate preferences' for hiring on the basis of race or gender." *Id.* ¶ 42, JA23. At the same time, however, the Order laments that the current absence of such "workforce diversity data" makes it difficult to "measure the extent of … progress" in "improving the level of diversity in the broadcasting industry workforce." *See id.* ¶¶ 2, 9, JA2–3, 6; *see also id.* at 58, JA58 (Starks, Comm'r, concurring) ("We know how critical it is to have diversity in our media organizations.… We must get our arms around this issue. As always … we start with data.").

The Order is fatally flawed in multiple respects and should be vacated. *First*, the FCC lacks statutory authority for the Order. While the FCC cites myriad provisions of the Communications Act ("Act"), none authorizes the collection of Form 395-B, let alone allows public disclosure of that information.

*Second*, the Order violates the Fifth Amendment because it compels broadcasters to categorize employees on the basis of race, ethnicity, and sex, and

further pressures them to engage in race- and sex-conscious employment decisions. When "the agency with life and death power over" broadcasters collects racial information to scrutinize workforce diversity, that alone provides an "incentive" for race-based decisionmaking. *MD/DC/DE*, 236 F.3d at 19; *see Lutheran Church*, 141 F.3d at 352. Collecting information to scrutinize station employees by sex is no different. *MD/DC/DE*, 236 F.3d at 18, 22–23.

*Third*, the Order violates the First Amendment by compelling controversial speech. Considerations of race and sex in the workplace—particularly in the context of employment decisions—is a hotly debated political issue, and the FCC has not demonstrated a sufficient governmental interest to collect or force online disclosure of that speech.

*Fourth*, the Order is arbitrary and capricious. The FCC incorrectly claims that it "is the only entity with the resources and expertise to expeditiously collect and compile this data." FCC 24-18, ¶ 50, JA27. Not only has this issue languished at the FCC for more than two decades, but the Equal Employment Opportunity Commission ("EEOC") and similar state agencies are vastly more qualified to deal with EEO matters (and, unlike the FCC, have the statutory authority to do so). The FCC similarly presents no rational justification for why station demographic data already available (i.e., EEOC EEO-1 reports, FCC ownership reports, and the Radio Television Digital News Association annual

4

diversity surveys) are insufficient for assessing and reporting on industry-wide trends. *See id.* ¶ 21–23, JA12–13. And the FCC inexplicably ignored record evidence—and common sense—that third parties will use Form 395-B responses to pressure broadcasters to engage in race- and sex-based decisionmaking, and instead offered facially implausible justifications for requiring public disclosure of each station's Form 395-B responses. *Id.* ¶ 17, JA10–11.

As Commissioner Brendan Carr explained in dissent:

> [T]he FCC will now post a race and gender scorecard for each and every TV and radio broadcast station in the country. In doing so, the FCC caves to the demands of activist groups that have worked for years and across different industries to persuade the federal government to obtain—and most importantly publish—this type of data about individual businesses. This is no benign disclosure regime. The record makes clear that the FCC is choosing to publish these scorecard[s] for one and only one reason: to ensure that individual businesses are targeted and pressured into making decisions based on race and gender. This is the exact same type of pressure that the FCC created in at least two prior cases. In both instances, the D.C. Circuit invalid[at]ed the FCC's rules because they violated the equal protection guarantees of the Due Process Clause of the Fifth Amendment. The only difference this time around is that the FCC has violated the First Amendment as well.

FCC 24-18, at 52, JA52.

Accordingly, this Court should enjoin and set aside the Order.

## STATEMENT OF THE CASE

### A.    THE FCC INTRODUCES FORM 395-B AS PART OF ITS EEO RULE

In 1970, the FCC adopted a requirement that all radio and television broadcast stations with five or more full-time employees must file an annual employment report using what is now designated Form 395-B. *Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Employment Practices*, 23 F.C.C.2d 430 (1970). Form 395-B generally required broadcasters to report the race, ethnicity, and sex of each of their employees and place them in one of nine employment categories (e.g., officials and managers, technicians, sales workers, service workers, etc.). *See* FCC Form 395-B (2000), https://transition.fcc.gov/Forms/Form395B/395b.pdf.

The FCC used Form 395-B to measure compliance with its EEO rule, which both prohibited discrimination based on protected characteristics and required broadcasters to implement "EEO programs" with minority- and women-specific recruiting efforts. *See Amendment of Part 73 of the Commission's Rules Concerning EEO in the Broadcast Radio and Television Services*, 2 FCC Rcd. 3967, 3967, 3973–74 (1987). Using Form 395-B, the FCC would review the demographics of a broadcaster's staff to determine whether it had achieved "parity" with the local labor force. *Id.* at 3974. The FCC considered failure to achieve sufficient "parity" indicative of an inadequate EEO program, which

6

resulted in additional FCC scrutiny and the risk of adverse action against the broadcaster. *Id.*; *see also Review of the Commission's Broadcast & Cable EEO Rules & Policies*, 13 FCC Rcd. 23004, 23006–08 (1998).

The FCC required broadcasters to maintain a copy of their Form 395-B reports at their local studios and permit visiting members of the public to review them upon request. *Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 23 F.C.C.2d at 436 (amending 47 C.F.R. § 1.526 (1970)); *see also Amendment of Part 73*, 2 FCC Rcd. at 3992. Third parties routinely used this data to challenge broadcasters' license-renewal applications, often targeting multiple stations in a single filing, asserting that a lack of parity with the local labor force by itself indicated a violation of the FCC's EEO rule. *See, e.g., North County Broadcasting Corp.*, 9 FCC Rcd. 871 (1994) (petition to deny filed against 32 stations by the National Black Media Coalition ("NBMC") et al.); *Applications of Certain Broadcast Stations Serving Communities in the States of Alabama and Georgia*, 95 F.C.C.2d 1 (1983) (petition to deny filed against 15 stations by NBMC et al.); *Applications of Certain Broadcast Stations Serving Communities in the States of Louisiana and Mississippi*, 94 F.C.C.2d 275 (1983) (petition to deny filed against 19 stations by NBMC et al.).

**B.     THE FCC SUSPENDS FORM 395-B COLLECTION AFTER *LUTHERAN CHURCH* AND *MD/DC/DE***

In 1990, a third party petitioned the FCC to deny license-renewal applications filed by the Lutheran Church-Missouri Synod ("Church") for its two radio stations. *Applications for Renewal of License of KFUO-AM/FM et al.*, MM Docket No. 94-10, NAACP Petition to Deny (Jan. 2, 1990), https://www.fcc.gov/ecfs/document/128196/1 (also challenging the license-renewal applications of two other broadcasters). In relevant part, the challenge alleged that the Church's Form 395-B data from 1983 to 1989 demonstrated insufficient minority employment and therefore its stations "do not appear to be operating under meaningful EEO programs." *Id.* at 1.

After *years* of administrative investigation into the employment practices of those stations, the FCC designated the Church's applications for an evidentiary hearing before an administrative law judge, proposing to revoke the licenses for EEO rule violations. *Lutheran Church/Missouri Synod*, Hearing Designation Order, 9 FCC Rcd. 914 (1994). The FCC ultimately renewed the licenses but penalized the Church for what it concluded were insufficient efforts to recruit minorities in violation of the FCC's EEO rule. *Lutheran Church/Missouri Synod*, 11 FCC Rcd. 5275 (Rev. Bd. 1996), *aff'd with modifications*, 12 FCC Rcd. 2152 (1997).

In *Lutheran Church*, the D.C. Circuit reversed the FCC in relevant part because its "entire scheme is built on the notion that stations should aspire to a workforce that attains, or at least approaches, proportional representation." 141 F.3d at 351–52. The court continued that the FCC's EEO rule—which relied on Form 395-B for enforcement—worked to unconstitutionally "pressure license holders to engage in race-conscious hiring" and "maintain a workforce that mirrors the racial breakdown of their 'metropolitan statistical area,'" in violation of the Fifth Amendment. *Id.* at 352; *see id.* at 350–56. The FCC subsequently suspended collection of Form 395-B "while it consider[ed] adoption of new EEO rules that address the concerns of the Court of Appeals and ma[de] any appropriate revisions to its data collection procedures." *Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports & Program Reports*, 13 FCC Rcd. 21998, 21998 (1998).

In 2000, the FCC amended its EEO rule to require broadcasters to achieve "broad outreach" in their recruiting efforts by either implementing FCC-approved recruiting initiatives ("Option A"), or using their own strategies and reporting the race, ethnicity and sex of each job applicant to demonstrate their strategies' effectiveness ("Option B"). *Review of the Commission's Broadcast & Cable EEO Rules & Policies*, First Report and Order, 15 FCC Rcd. 2329, 2332–33, 2364–

65 (2000). The FCC also "reinstate[d] the requirement that broadcasters file annual employment reports (Form 395-B)." *Id.* at 2332.

The FCC tried to avoid the constitutional concerns raised by its prior EEO rule by asserting it would use Form 395-B data "only to monitor industry employment trends and report to Congress," not for "screening renewal applications or assessing compliance with EEO program requirements." *Id.* Petitioner National Religious Broadcasters participated in the proceedings and filed comments about the application of the proposed rule to religious broadcasters.[3] Petitioner Texas Association of Broadcasters, together with 45 other state broadcasters associations, also filed comments raising constitutional concerns.[4] All fifty state broadcasters associations, including Texas Association of Broadcasters, then asked the FCC for a stay and petitioned the D.C. Circuit for review of the revised EEO rule.[5]

---

[3] *Comments of Nat'l Religious Broadcasters*, MM Docket No. 98-204 (Mar. 1, 1999), https://www.fcc.gov/ecfs/document/5001603832/1.

[4] *Joint Comments of 46 Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (Mar. 1, 1999), https://www.fcc.gov/ecfs/document/5001603884/2; *Reply Comments of 46 Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (Apr. 15, 1999), https://www.fcc.gov/ecfs/document/5001904453/1.

[5] *See Joint Petition By 50 Named State Broadcasters Ass'ns for Stay of New Broadcast EEO Rules*, MM Docket No. 98-204 (Mar. 16, 2000), https://www.fcc.gov/ecfs/document/5006214031/1.

In *MD/DC/DE*, the D.C. Circuit held that the FCC's new EEO rule violated the Fifth Amendment because requiring broadcasters to report the race and sex of job applicants under Option B unconstitutionally "create[s] pressure to recruit women and minorities." 236 F.3d at 18. The court observed that the FCC's "focus upon the race and sex of applicants belies its statement—or so a licensee reasonably might (and prudently would) conclude—that its only goal is that licensees recruit with a 'broad outreach.' … [I]t is evidence that the agency with life and death power over the licensee is interested in results, not process, and is determined to get them." *Id.* at 19. "[T]he threat of being investigated creates an even more powerful incentive for licensees to focus their recruiting efforts upon women and minorities," the court continued, "at least until those groups generate a safe proportion of the licensee's job applications." *Id.* at 19–20.

Recognizing the obvious implications of this decision for Form 395-B, the FCC again suspended the reporting requirement while it worked on a new version of the EEO rule. *Suspension of the Broadcast & Cable EEO Outreach Program Requirements*, 16 FCC Rcd. 2872 (2001).

## C.    THE FCC REINSTATES FORM 395-B COLLECTION

In response to *MD/DC/DE*, the FCC in 2002 adopted its current EEO rule by jettisoning the problematic Option B. The FCC chose not to reinstate

11

Form 395-B at that time, in part due to concerns about the constitutionality of gathering and publicly disclosing that data. *Review of the Commission's Broadcast & Cable EEO Rules & Policies*, Second Report and Order and Third NPRM, 17 FCC Rcd. 24018, 24025 n.36, 24074 (2002). Texas Association of Broadcasters and National Religious Broadcasters filed comments in the proceedings.[6]

In 2004, however, the FCC continued its efforts to reinstate Form 395-B, incorporating new race, ethnicity, and job categories to align with Office of Management and Budget terminology and definitions. *Review of the Commission's Broadcast & Cable EEO Rules & Policies*, Third Report and Order and Fourth NPRM, 19 FCC Rcd. 9973, 9974–79 (2004) ("Third Report and Order"), JA170–75. Ultimately, in response to a petition for reconsideration filed by Texas Association of Broadcasters and other state broadcasters associations requesting that Form 395-B data remain confidential, or at least be disclosed only in an aggregate, anonymized manner, the FCC offered a "one-time filing

---

[6] *Joint Reply Comments of Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (May 29, 2002), https://www.fcc.gov/ecfs/document/5508347618/1; *Joint Comments of Named State Broadcasters Ass'ns*, MM Docket No. 98-204 (Apr. 15, 2002), https://www.fcc.gov/ecfs/document/5508336237/1; *Comments of Nat'l Religious Broadcasters*, MM Docket No. 98-204 (Apr. 15, 2002) ("2002 NRB Comments"), https://www.fcc.gov/ecfs/document/5508337826/1; *see also Nat'l Religious Broadcasters' Notice of Permitted* Ex Parte *Presentation*, MM Docket No. 98-204 (Mar. 13, 2002) ("NRB Ex Parte Presentation"), https://www.fcc.gov/ecfs/document/5508234597/1.

grace period until a date to be determined" while it sought additional comments on that issue. *Id.* at 9978, JA174; *see* State Broadcasters Reconsideration Petition.

In 2021, after nearly two decades of intentional inaction,[7] the FCC proposed resuming collection of Form 395-B. *Review of the Commission's Broadcast & Cable EEO Rules & Policies,* Further NPRM, 36 FCC Rcd. 12055 (2021). Numerous parties raised concerns, including by challenging the FCC's statutory authority to collect and disclose broadcaster employment data in the first place. Texas Association of Broadcasters and others also reiterated their constitutional objections, arguing that requiring collection and public disclosure of such employment data on a station-attributable basis will "pressur[e] them to make race- and gender-based decisions." *Joint Reply Comments of State Broadcasters Ass'ns* at 10, MB Docket No. 98-204 (Nov. 1, 2021) ("2021 State Broadcasters Reply Comments"), https://www.fcc.gov/ecfs/document/1102244635714/1, JA115. They explained that even if the FCC does not use the data to determine compliance with its EEO rule, third parties have already "stated their intention to use … Form 395-B data" to "pressure broadcasters to make preferential hiring and employment decisions." *Id.* at 13–14, JA118–19 (citing, as an example, statements made by Minority Media and Telecommunications Council

---

[7] *See* Pai Letter at 1.

13

("MMTC") and other organizations that a "disclosure requirement will by itself trigger improved performance"); *Reply Comments of Nat'l Ass'n of Broadcasters* at 3–7, MB Docket No. 98-204 (Nov. 1, 2021) ("NAB Reply Comments"), https://www.fcc.gov/ecfs/document/11011196614117/1, JA126–30.[8]

The FCC released the Order on February 22, 2024, reinstating the collection of Form 395-B for the claimed purpose of "compiling industry employment trends and making reports to Congress." FCC 24-18, ¶ 52, JA28. The Order also introduced a new requirement that each broadcaster publicly disclose its Form 395-B responses on the FCC's website. *Id.* ¶ 14, JA8–9. The FCC alleged that public disclosure on a station-attributable basis would "increase the likelihood that erroneous data will be discovered and corrected," be "consistent with Congress's goal to maximize the utility" of collected data for the public benefit, and alleviate "concerns about inadvertent disclosures of identifiable information" by the FCC (as all disclosures would now be intentional). *Id.* ¶ 15, JA9.

The FCC also dismissed concerns of third-party pressure campaigns as "speculative," *id.* ¶ 17, JA10–11, despite the extensive history of such campaigns

---

[8] *See also Comments of Nat'l Ass'n of Broadcasters* at 5–11, 17–24, MB Docket No. 98-204 (Sept. 30, 2021), https://www.fcc.gov/ecfs/document/10930468719021/1, JA149–55, 161–66; *Comments of the Ctr. for Workplace Compliance* at 6–11, MB Docket No. 98-204 (Sept. 30, 2021), https://www.fcc.gov/ecfs/document/100171351859/1, JA137–42.

that ultimately led to *Lutheran Church*, and entirely ignoring that online disclosure will make the information available to a significantly larger, non-local population than it was more than two decades ago when the information was physically located at each broadcaster's studio.

Finally, without notice, the FCC amended Form 395-B to include "non-binary gender categories," because "some commenters" requested the change. *Id.* ¶¶ 39–40, JA21–22 (citing Foster Garvey Coalition comments). In claiming that it received "only support for and no opposition to the idea," the FCC cited reply comments filed by the National Association of Broadcasters ("NAB") but failed to note that NAB's support was expressly conditioned on Form 395-B data remaining confidential and disassociated from any specific broadcast stations or groups. *Id.*; *see* NAB Reply Comments at 1, JA124 ("Publicly releasing such data about the race, ethnicity, and gender of stations' employees would exceed the Commission's legal authority by imposing unlawful pressure on stations to hire preferentially and would thus jeopardize the entire data collection."). Notably, NAB has petitioned the FCC for reconsideration of the Order, arguing in part that "the FCC's choice to make the form publicly available could help facilitate the 'doxxing' of [gender non-binary] employees." *See Petition for Partial Reconsideration of Nat'l Ass'n of Broadcasters* at 22, MB Docket No. 98-204 (June 3, 2024), https://www.fcc.gov/ecfs/document/1060330781410/1.

Two Commissioners dissented from the Order. Commissioner Carr assailed the FCC's justifications for requiring public disclosure of Form 395-B responses, explaining that "[b]y requiring the public disclosure of these race and gender scorecard[s], the FCC is ensuring that broadcast stations will be targeted by activist groups, media campaigns, and conceivably the government itself— unless … broadcasters hire the right (if unspecified) mix and type of employees," which is "the same type of race- and gender-based pressure campaign that the D.C. Circuit invalidated twice before." FCC 24-18, at 54–55, JA54–55 (Carr, Comm'r, dissenting). Commissioner Nathan Simington similarly criticized the FCC's "claims to public interest supporting the public disclosure of attributable 395-B data" as "specious and undergirded by glassy legal punctilios." *Id.* at 60, JA60 (Simington, Comm'r, dissenting).

The FCC published the Order in the Federal Register on May 3, 2024, effective June 3, 2024. *See* 89 Fed. Reg. at 36705.

### D.   PETITIONERS SEEK REVIEW

Petitioners National Religious Broadcasters, American Family Association, and Texas Association of Broadcasters (collectively, "Petitioners") timely filed for review in this Court. Petitioners also asked the FCC to stay the Order pending review because of the serious statutory and constitutional issues raised, and the irreparable nature of preparing and publicly disclosing Form 395-

16

B. *Joint Stay Request of National Religious Broadcasters et al.*, MB Docket No. 98-204 (June 27, 2024) ("Joint Stay Request"), https://www.fcc.gov/ecfs/document/106271975408377/1. The FCC has not acted on that stay request.

National Religious Broadcasters is a non-profit association whose members include radio and television broadcasters that "rely on the association for professional education, training, networking, and support, as well as for strategic representation in important legislative, legal, and regulatory arenas." Nat'l Religious Broads., *Membership*, https://nrb.org/membership (visited Aug. 26, 2024).

American Family Association is a nonprofit organization that transmits programming to radio stations across the nation through its broadcast division, American Family Radio. Ex.1 ¶ 3 (Hamilton Decl.). American Family Association is a member of National Religious Broadcasters. Ex.2 ¶ 4 (Farris Decl.).

Texas Association of Broadcasters is a trade association that represents the interests of Texas's more than 1,200 free over-the-air radio and television broadcast stations. Tex. Ass'n of Broads., *About TAB*, https://www.tab.org/about (visited Aug. 26, 2024). Among other initiatives, Texas Association of Broadcasters strives to promote broadcast service to the public by protecting its member stations from excessive or improper regulatory burdens; promoting

employment in the broadcast industry, including fair employment practices and the privacy rights of broadcast employees; and protecting the ability of its members to compete against their many unregulated media competitors. *See id.*

Petitioners have constitutional standing to challenge the Order. When a Petitioner "is himself an object of the action (or forgone action) at issue … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) ("Government regulations that require or forbid some action by the [petitioner] almost invariably satisfy both the injury in fact and causation requirements."). American Family Association is subject to the Order, Ex.1 ¶ 4 (Hamilton Decl.), leaving "little question" about its standing, *Lujan*, 504 U.S. at 561–62. It will incur costs to collect workforce data, prepare Form 395-B reports, and submit those reports to the FCC. This "increased regulatory burden … satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015). It will also suffer constitutional injuries under the Fifth and First Amendments because the Order pressures broadcasters to consider race and sex in their employment decisions and compels controversial workforce disclosures. *See All. for Hippocratic Med.*, 602 U.S. at 381 ("An injury in fact can be … an injury to one's constitutional

rights."); *infra* Parts II, III. Causation and redressability "flow naturally from" these injuries because the Order is the source of the added regulatory burden and constitutional harms, which will be alleviated when the Order is enjoined or set aside. *Contender Farms*, 779 F.3d at 266.

National Religious Broadcasters and Texas Association of Broadcasters similarly have associational standing because the Order regulates broadcasters, and they represent broadcasters. *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1109 (5th Cir. 2024). Both associations have members who are subject to the Order and would have standing to challenge it,[9] each association's purpose includes protecting the legal interests of their members, and neither the claims asserted nor the relief requested requires the participation of individual members because Petitioners seek only equitable relief. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504–05 (5th Cir. 2021).

Petitioners likewise have statutory standing under the Hobbs Act because they are "part[ies] aggrieved" by the Order. 28 U.S.C. § 2344. "Party" status means "that petitioners participated in the proceeding before the agency." *Texas*

---

[9] *See, e.g.*, Ex.2 ¶¶ 2–4 (Farris Decl.); Ex.3 ¶¶ 3–11 (Gleiser Decl.); *see also Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1109 (explaining associations "need not identify particular members when all the members of an organization are affected because the challenged rule targets an entire industry" (cleaned up)).

*v. NRC*, 78 F.4th 827, 837 (5th Cir. 2023) (quoting *Reyblatt v. NRC*, 105 F.3d 715, 720 (D.C. Cir. 1997)). Texas Association of Broadcasters and National Religious Broadcasters "participated—in some way—in the agency proceedings," including "through comments," and American Family Association is a member of National Religious Broadcasters. *Id.* at 838.[10] Texas Association of Broadcasters and other state broadcasters associations filed the petition for reconsideration that the Order denied. *See* State Broadcasters Reconsideration Petition. And Petitioners requested a stay of the Order from the FCC. *See* Joint Stay Request.

Furthermore, Petitioners claim the Order exceeds the FCC's statutory authority and is unconstitutional, which falls within the well-established "*ultra vires* exception to the party-aggrieved status requirement." *Texas*, 78 F.4th at 839. The ultra vires exception recognizes that even persons "not a party to the original agency proceeding" may nonetheless "appeal an agency action … as exceeding [its] power" and "challeng[e] the constitutionality of the statute conferring authority on the agency." *Id.* (quoting *Am. Trucking Ass'ns, Inc. v. ICC*, 673 F.2d 82, 85 n.4 (5th Cir. 1982)). The Court would be able to consider the

---

[10] *See, e.g.*, 2021 State Broadcasters Reply Comments, JA104; 2002 NRB Comments; NRB Ex Parte Presentation.

statutory and constitutional claims here even absent Petitioners' prior participation in the agency proceedings. *Id.*

## SUMMARY OF THE ARGUMENT

This Court should enjoin and set aside the Order for four independent reasons. *First,* the FCC fails to identify any statutory authority to collect Form 395-B, let alone to compel public disclosure of that information, especially for its asserted purpose of compiling industry trends and making reports to Congress. *Second*, the Order violates the Fifth Amendment because it compels broadcasters to categorize employees on the basis of race, ethnicity, and sex, and—particularly given consistent FCC actions and messaging over the past 50 years regarding minority and female recruitment—pressures broadcasters to consider race and sex in employment decisions. *Third*, the Order violates the First Amendment by compelling controversial speech about the race and sex of broadcast station employees. *Fourth*, the Order is arbitrary and capricious because the FCC (1) wrongly claimed that it is the only entity capable of collecting station workforce data, (2) discounted other existing data collections that can be used to assess broadcast workforce diversity trends, (3) ignored record evidence—and common sense—showing that third parties have used, and intend to use, Form 395-B to coerce broadcasters into race- and sex-based

decisionmaking, and (4) relied on facially implausible justifications for publicly disclosing that information.

## ARGUMENT

### I.   THE ORDER EXCEEDS THE FCC'S AUTHORITY

"Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *see La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). They are "mere creatures of statute" that "must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019). Courts do not defer to agency interpretations of even ambiguous statutes about the scope of their authority. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

Here, there is no ambiguity. The FCC identifies no authority to collect and compel public disclosure of Form 395-B. The Order invokes "the public interest provisions of the Act," citing sections 4(i), 303, 307, 308, 309, and 310. *See* FCC 24-18, ¶ 53 & n.173, JA28 & n.173. None apply.

Sections 303, 307, 309, and 310 direct or permit the FCC only to take *specific actions*—e.g., classifying radio stations; prescribing frequency bands; preventing interference between stations; requiring recordkeeping of energy transmissions, communications, and signals; and conducting inspections—in

the "public … interest." 47 U.S.C. § 303.[11] Section 308 doesn't mention the public interest at all. *Id.* § 308. And section 4(i) is a general rulemaking provision that likewise says nothing about the public interest, but rather allows the FCC to regulate in furtherance of its statutory "functions," 47 U.S.C. § 154(i), which cannot be used to enlarge other provisions of the Act, *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) ("The grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carry[ing] out.'"). None of those authorities provide for "compiling industry employment trends and making reports to Congress" or publicly disclosing station employment data. FCC 24-18, ¶ 52, JA28.

The FCC then draws from these provisions a general "public interest mandate" to justify the Order. *Id.* ¶ 53 & n.173, JA28 & n.173. But nothing in the Act gives the FCC general "public interest" power beyond the Act's specific provisions, and the FCC cannot simply assume it. *West Virginia*, 597 U.S. at

---

[11] *See also, e.g.*, 47 U.S.C. § 307(a) ("shall grant … a station license" if "public … interest … will be served thereby"); *id.* § 307(c)(1) ("may" renew licenses if the "public interest … would be served"); *id.* § 309(a) ("shall grant" certain permit and license applications if "public interest … would be served"); *id.* § 309(f) ("may" grant "temporary authorization" if "in the public interest"); *id.* § 309(k) ("shall" renew a license if, among other things, "the station has served the public interest" during the preceding license term); *id.* § 310(d) (shall not transfer a license unless "the public interest … will be served").

722–23; *La. Pub. Serv. Comm'n*, 476 U.S. at 374. The FCC must instead "point to explicit Congressional authority," which it fails to do. *Clean Water Action*, 936 F.3d at 313 n.10. Indeed, by authorizing specific actions in the "public interest," Congress strongly indicates that it didn't authorize others. *See Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018); A. Scalia & B. Garner, *Reading Law* 107 (2012).

The Order next cites section 334 of the Act, which provides that the FCC "shall not revise … the forms used by [television broadcast station] licensees and permittees to report pertinent employment data" concerning the FCC's EEO regulations "as in effect on September 1, 1992." 47 U.S.C. § 334(a); *see* FCC 24-18, ¶ 53 & n.174, JA28 & n.174. But that explicitly *restricts* the FCC's power; it authorizes nothing. To the extent it does apply, it limits the FCC's ability to revise Form 395-B except for "nonsubstantive technical or clerical revisions," 47 U.S.C. § 334(c), which bars the FCC's addition of a new "non-binary" gender category, FCC 24-18, ¶ 40, JA22, its expansion of the prior nine job categories to ten, *see id.* ¶ 14 n.57, JA9 n.57, and its addition of "two or more races" as one of the race categories broadcasters are forced to sort their employees into, *id.*, adding further complexity to this mandated categorization of employees. These additions are not clerical or nonsubstantive, especially because choices surrounding whether and how to report employees in the gender non-binary

category raise concerns on various sides of a controversial topic subject to an ongoing public debate. *See infra* Part III.

Section 334 is also limited to "television broadcast station licensees and permittees," and therefore has no relevance to radio broadcasters like American Family Association and the many radio station members of both National Religious Broadcasters and Texas Association of Broadcasters. 47 U.S.C. § 334(a)(1). And it applies only to collecting data "pertinent" to "the regulations concerning equal employment opportunity as in effect on September 1, 1992." *Id.* Those regulations—i.e., the FCC's EEO rule applicable in 1992, which relied on Form 395-B data to assess "parity"—were held unconstitutional in *Lutheran Church*. As a result, they are no longer "in effect," and Form 395-B has therefore ceased to be "pertinent" to them. The FCC has conceded as much, specifically disclaiming use of Form 395-B to assess broadcaster compliance with even subsequent EEO requirements. FCC 24-18, ¶¶ 45–46, JA24–25.

The FCC insists that Congress's addition of section 334 in 1992 at least "ratified" the collection of Form 395-B. *Id.* ¶¶ 45–46, 53, JA24–25, 28–29. That is wrong for at least three reasons. To the extent Congress ratified anything, it would be collecting data "pertinent" to "the regulations concerning equal employment opportunity as in effect on September 1, 1992," 47 U.S.C. § 334(a), which no longer applies. The FCC also never used Form 395-B to collect or

disclose workforce data separate from enforcing its EEO rule prior to 1992, and Congress cannot ratify an authority that the FCC did not previously claim or exercise. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 157–58 (2000); *Am. Library Ass'n v. FCC*, 406 F.3d 689, 705–07 (D.C. Cir. 2005). And the EEO regulations in effect in 1992 were held unconstitutional. *Lutheran Church*, 141 F.3d at 354–56; *see also MD/DC/DE*, 236 F.3d at 18. Congress only has "power to ratify the acts which it might have authorized" in the first place, which excludes unconstitutional agency action. *United States v. Heinszen*, 206 U.S. 370, 384 (1907).

The FCC finally claims "broad authority under the … Act to collect information and prepare reports" for "compiling industry employment trends and making reports to Congress," citing sections 4(i), (k), 303(r), and 403. FCC 24-18, ¶¶ 52–53 & n.176, JA28–29 & n.176. But Congress has neither authorized nor required the FCC to collect Form 395-B information or report on broadcaster workforces, either in those cited provisions of the Act or elsewhere.

Sections 4(i) and 303(r), discussed above, allow the FCC to regulate in furtherance of its statutory "functions," 47 U.S.C. § 154(i), or other "provisions" of the Act, *id.* § 303(r). The FCC cites no relevant statutory function or provision furthered by Form 395-B, and disclaims any relevance to its EEO rule. *See* FCC 24-18, ¶¶ 45–46, JA24–25; *Gulf Fishermens Ass'n*, 968 F.3d at 465. Section 4(k)

simply states that "reports of investigations made by the [FCC] shall be entered of record" and provided to the complaining and complained-of parties, which does nothing to authorize data collection or reporting unrelated to investigations. 47 U.S.C. § 154(k). And section 403 allows the FCC to institute inquiries concerning a "complaint," "question," or "relating to … enforcement" under provisions of the Act, not to collect and disclose information unrelated to those statutory functions. *Id.* § 403.

The FCC has identified no valid statutory authority for collecting Form 395-B, let alone compelling online public disclosure of each broadcaster's responses. Congress, by contrast, has authorized the FCC to collect information about employment practices in the cable industry, *id.* § 554(a), (d), but has conspicuously not done so for broadcasters. This further reaffirms that the FCC lacks such power here. *See Jennings*, 583 U.S. at 300; Scalia & Garner, *supra*, at 107.

Finally, the Supreme Court has been clear that "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *Rust v. Sullivan*, 500 U.S. 173, 190 (1991) (quoting *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 500 (1979)). Thus "the elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* (cleaned up) (quoting *Edward J. DeBartolo Corp. v. Fla.*

*Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). Courts follow this canon of interpretation "out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Id.* at 191; *see also Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). As discussed below, interpreting the Act to allow the collection and public disclosure of Form 395-B would violate the equal protection component of the Fifth Amendment and the Free Speech Clause of the First Amendment. *See infra* Parts II, III.

## II.    THE ORDER VIOLATES THE FIFTH AMENDMENT

The equal protection component of the Fifth Amendment generally prohibits government action that even considers race, ethnicity, or sex. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 215–18 (1995); *see Weinberger v. Wiesenfeld*, 420 U.S. 636, 642–43 (1975); *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 214–15 (5th Cir. 1999). Racial and ethnic classifications imposed by governmental entities are thus subject to strict scrutiny, *Adarand*, 515 U.S. at 227, while sex classifications are subject to intermediate scrutiny, *Sessions v. Morales-Santana*, 582 U.S. 47, 57–58 (2017). The Order satisfies neither standard.

28

### A.   HEIGHTENED SCRUTINY APPLIES

The Order is subject to heightened Fifth Amendment scrutiny because it compels broadcasters to categorize employees by race, ethnicity, and sex, and to publicly report those categorizations online. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). Racial and ethnic classifications "stimulate our society's latent race consciousness," *Shaw v. Reno*, 509 U.S. 630, 643 (1993), "perpetuat[e] the very racial divisions the polity seeks to transcend," *Schuette v. BAMN*, 572 U.S. 291, 308 (2014), and "delay the time when race will become … truly irrelevant." *Adarand*, 515 U.S. at 229. Accordingly, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Id.* at 227. Sex-based classifications raise analogous concerns.

Reporting these categorizations will also invariably "pressure license holders to engage in" race- and sex-conscious employment decisions. *Lutheran Church*, 141 F.3d at 352. As the D.C. Circuit has twice recognized, when "the agency with life and death power over" broadcasters collects information to scrutinize the racial results of their employment practices, that alone provides an "incentive" for race-based decisionmaking. *MD/DC/DE*, 236 F.3d at 19; *see Lutheran Church*, 141 F.3d at 352. Collecting information to scrutinize the sex of

29

employees has the same effect. *See MD/DC/DE*, 236 F.3d at 18, 22–23. The pressure resulting from the FCC's latest attempt to resurrect Form 395-B "is not materially different than the forms the D.C. Circuit addressed in *Lutheran Church* and *MC/DC/DE*." FCC 24-18, at 55 n.22 (Carr, Comm'r dissenting).

The FCC insists "it will not use station-specific employment data for the purpose of assessing a licensee's compliance with the EEO regulations." FCC 24-18, ¶ 13, JA8; *see also* 47 C.F.R. § 73.3612. That claim is irrelevant because "racial classifications are not acceptable simply because they are perceived to have little impact. Any explicit racial classification, regardless of the burdens or benefits it imposes, is suspect and subject to strict scrutiny." *Walker v. City of Mesquite*, 169 F.3d 973, 981 (5th Cir. 1999); *see Rice*, 528 U.S. at 517; *Adarand*, 515 U.S. at 227; *Shaw*, 509 U.S. at 642–44.

Pressure to engage in race- and sex-conscious employment practices is also inherent here. Broadcasters are keenly aware that the FCC "in particular has a long history of employing … a variety of *sub silentio* pressures and 'raised eyebrow' regulation." *MD/DC/DE*, 236 F.3d at 19 (cleaned up). The extent of the FCC's influence on broadcast licensees and their operations cannot be overstated. It alone has the power to grant broadcast licenses. 47 U.S.C. §§ 307–309. It also has significant discretion to initiate lengthy and expensive investigations or evidentiary hearings to take licenses away through revocation

or non-renewal. *Id.* §§ 308(b), 309(e). Those interested in buying or selling stations must also satisfy an amorphous "public interest" standard, *id.* § 310(d), and failure to do so may result in a hearing designation order or other non-final agency action on the relevant applications, which effectively operates as a denial insulated from judicial review. *See, e.g.*, Order Granting FCC Motion to Dismiss, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr. 3, 2023) (per curiam) ("An appeal 'filed after a bureau decision but before resolution by the full Commission is subject to dismissal as incurably premature.'" (quoting *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999) (per curiam))).

The Order proclaims "that workforce diversity is critical to the ability of broadcast stations both to compete with one another and to effectively serve local communities across the country." FCC 24-18, ¶ 2, JA2. It adds "that continuing to collect this information in a transparent manner is consistent with a broader shift towards greater openness regarding diversity, equity, and inclusion across both corporate America and government." *Id.*, JA3. Commissioner Geoffrey Starks, the necessary third vote to approve the Order, similarly expressed in his concurring statement an "urgent need" to resume data collection because of "how critical it is to have diversity in our media organizations." FCC 24-18, at 58–59, JA58–59 (Starks, Comm'r, concurring).

31

Any rational broadcaster knows what the FCC expects and the price of noncompliance.

In case that implicit pressure wasn't enough to achieve the FCC's desired result, by forcing each broadcaster to publicly disclose its Form 395-B responses, the FCC invites third parties—whether located in a station's market or elsewhere—to file complaints against disfavored broadcasters, engage in public campaigns, and otherwise pressure broadcasters into considering race and sex in their employment decisions. As the D.C. Circuit observed, "[t]he risk" in disclosing this data "lies not only in attracting the [FCC]'s attention, but also that of third parties." *Lutheran Church*, 141 F.3d at 353.

It makes no difference that the FCC says it will "make every effort to dismiss" third-party complaints that rely on Form 395-B data "as quickly as possible." FCC 24-18, ¶ 46, JA25. That does nothing to cure the inherent constitutional concerns. The mere potential for those filings—and the associated risk of negative publicity, subsequent investigations, and obligations to report complaints to lenders—unlawfully pressures broadcasters "in a number of ways, some more subtle than others," to adjust their employment practices. *MD/DC/DE*, 236 F.3d at 19; *see* 2021 State Broadcasters Reply Comments at 11, JA116; NAB Reply Comments at 5, JA128.

Throughout these proceedings, activist groups have loudly proclaimed

that they view Form 395-B results as "statistical evidence … probative of whether the employer discriminated."[12] And broadcasters in response have consistently warned that "rational broadcasters will surely be pressured into hiring minorities in sufficient numbers to meet the statistical test—tantamount to quotas—so as to avoid petitions to deny and complaints, and the resulting investigations and threats to their licenses."[13]

The Order claims that one of the principal reasons for compelling broadcasters to post Form 395-B responses online is to "incentivize stations to file accurate data to avoid third-party claims that submitted data is incorrect." FCC 24-18, ¶ 15, JA9. Setting aside the lack of record evidence that broadcasters ever submitted incorrect Form 395-B data, even when the FCC explicitly used that information to determine EEO compliance, the FCC has mapped a path for

---

[12] *MMTC Notice of* Ex Parte *Communications*, MM Docket No. 98-204, at 28 (Oct. 1, 2002), https://www.fcc.gov/ecfs/document/5508445240/1; *see MMTC Notice of* Ex Parte *Communications*, MM Docket No. 98-204, at 2 (Mar. 3, 2022), https://www.fcc.gov/ecfs/document/103041367528640/1 ("[C]ertainly Form 395 data should be made public (unless shielded by a protective order) so the [FCC] may determine whether a violator of the broad outreach rules has also done inherently discriminatory 'word of mouth recruitment' through the 'mouths' of a homogeneous staff.").

[13] *State Ass'ns Letter Responding to MMTC October 1, 2002* Ex Parte *Filing*, MM Docket No. 98-204, at 2 (Oct. 28, 2002), https://www.fcc.gov/ecfs/document/5508448803/1 ("[U]nderrepresentation complaints will put stations under precisely the sort of illicit pressure to hire minorities that caused the court to find the EEO Rules unconstitutional in *Lutheran Church* and *[MD/DC/DE] Broadcasters*.").

33

third parties to weaponize Form 395-B against broadcasters they perceive as having the wrong number of employees of a particular race, ethnicity, or sex. The third party need only claim that a station's Form 395-B responses are incorrect.

Broadcasters will then need to defend not only the accuracy of their Form 395-B responses, but also against the claim that they misrepresented facts to the FCC—something the FCC views as a threat to the "integrity of [its] processes" that can warrant license revocation for "even the most insignificant misrepresentation." *Hispanic Christian Cmty. Network*, MB Docket No. 23-267, 2023 WL 5197159, ¶ 112 (MB 2023) (cleaned up). Confronted with the reality that the licensee's best case scenario is exoneration at great legal expense and the diversion of its resources to defend itself for an extended period of time, and a worst case scenario of large fines and the potential loss of its broadcast license, it is fanciful to assert that Form 395-B will not be used to pressure broadcasters into race- and sex-conscious hiring to avoid being targeted by such a complaint. The FCC cannot claim that it will immediately dismiss any complaint based on a Form 395-B and "will not use this data as a basis for conducting audits or inquiries," while simultaneously inviting the public to file complaints finding fault with a licensee's Form 395-B responses. *See* FCC 24-18, ¶ 18, JA11.

Alternatively, third parties can simply use Form 395-B to screen for their preferred levels of minority and female employment, target stations that do not meet those levels, and then purport to base their EEO allegations on other publicly available data sources (e.g., EEO Public File Reports or EEO audit responses). How will the FCC "quickly and summarily" dismiss such complaints, *id.* ¶ 17, JA10, which may never utter the phrase "Form 395-B," without requiring a target station to raise this argument in a written opposition? As history demonstrates, such petitions could be filed in opposition to the license-renewal applications of dozens of stations at the same time. *See, e.g.*, *North County Broadcasting Corp.*, 9 FCC Rcd. 871. It will be impossible for the FCC to dismiss such petitions quickly enough to assure each station that it need not retain counsel and prepare a response within the 30-day opposition deadline. *See* 47 C.F.R. § 73.3584. Once again, "[n]o rational firm—particularly one holding a government-issued license—welcomes a government audit." *Lutheran Church*, 141 F.3d at 353; *see also MD/DC/DE*, 236 F.3d at 19–20 ("[T]he threat of being investigated creates an even more powerful incentive for licensees to focus their recruiting efforts upon women and minorities.").

The Order also fails to account for the numerous paths for third parties to exert pressure outside the FCC. Collection and public disclosure of Form 395-B responses increase the risk of private lawsuits by employees, shareholders, and

others outside the FCC's control, each potentially with a conflicting viewpoint.[14] It takes little imagination to discern that posting Form 395-B data online will enable third parties to pressure broadcasters to engage in race- and sex-conscious hiring, including through boycotts, protests, publicity campaigns, "doxxing," etc.

From the very beginning, the FCC has not only recognized, but advertised these effects. The FCC made clear in 1970 that reports "have value by their preparation and public filing in forcing attention to a matter of vital national concern." *Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 23 F.C.C.2d at 443 n.4. The Order actually invites these outside forces, assuring them that "any attempt by a non-governmental third party to use the publicly available Form 395-B data to

---

[14] The Order creates a "heads you win, tails I lose" situation for broadcasters. Being perceived as hiring "too few" minority or female employees risks pressure from organizations seeking increased representation, while being perceived as hiring "too many" invites the ire of those opposed to affirmative action or "diversity, equity, and inclusion" policies. *See, e.g.*, Peter Whoriskey & Julian Mark, *DEI Programs Toppled Amid Surge of Conservative Lawsuits*, Wash. Post (June 27, 2024), https://www.washingtonpost.com/business/2024/06/27/conservative-lawsuits-topple-affirmative-action-dei/ ("Right-leaning public interest groups have filed a barrage of federal lawsuits intended to dismantle long-standing corporate and government programs that consider race in awarding jobs and other perks.… Through social media, the conservative legal groups are urging anyone with a gripe about racial preferences to give them a call.").

pressure stations in a non-governmental forum would not implicate any constitutional rights of the station." FCC 24-18, ¶ 17, JA10.

Despite the long history of such pressure campaigns—including by and at the FCC—the Order calls that prospect "speculative" and claims there is "no evidence of use of [broadcaster employment] data in this manner." *Id.* That blatantly ignores the record. Commenters explained that, before the FCC discontinued its Form 395-B requirement, "it was routine for petitions to deny to be filed against scores if not hundreds of stations at a time as stations in each state came up for [license] renewal, with such petitions citing no evidence other than a comparison of each station's Form 395-B data against the racial, ethnic and gender breakdown of the population in the station's market." 2021 State Broadcasters Reply Comments at 10–11, JA115–16. *Lutheran Church* itself involved a third party petitioning the FCC to deny license-renewal applications because the challenged broadcasters allegedly hired too few minority employees, citing Form 395-B data. 141 F.3d at 346; *see Applications of the Lutheran Church/Missouri Synod*, 10 FCC Rcd. 9880, 9890 (1995).

Other commenters openly expressed their intent in the record to use Form 395-B data "to hold [broadcasters] accountable" to certain diversity goals.[15]

---

[15] *Leadership Conference on Civil & Human Rights Comment* at 2, MB Docket No. 98-204 (Sept. 29, 2022), https://www.fcc.gov/ecfs/document/10929052325782/1, JA64.

They argued that public disclosure of Form 395-B "would allow the court of public opinion to render its judgment,"[16] and "would help generate a public response that calls for more accountability for specific companies to examine biases within their hiring process and seek to improve their numbers in future years."[17]

In the words of Commissioner Carr, the "FCC's ostrich-like claim that the record is devoid of any evidence that this public scorecard will be used to pressure broadcasters into making race- and gender-based hiring decisions does not withstand even casual scrutiny." FCC 24-18, at 54, JA54 (Carr, Comm'r, dissenting). He described the FCC's "stated rationales" as "nothing more than pretext," *id.* at 55, JA55, emphasizing that the FCC chose to compel online disclosure of Form 395-B for "one and only one reason: to ensure that individual businesses are targeted and pressured into making decisions based on race and gender," *id.* at 52, JA52.

\*     \*     \*

---

[16] *United Church of Christ Media Justice Ministry Notice of* Ex Parte *Communication* at 2, MB Docket No. 98-204 (Mar. 9, 2022), https://www.fcc.gov/ecfs/document/1031038814390/1, JA97.

[17] *Joint Supplemental Comments of Asian Americans Advancing Justice et al.* at 17–18, MB Docket No. 98-204 (Aug. 10, 2022), https://www.fcc.gov/ecfs/document/1081095209335/1, JA85–86.

The FCC maintains that "no race- or gender-based government action flows from collection of the data or its public availability," and thus the Order is subject only to rational basis review. FCC 24-18, ¶ 41, JA22. But, as discussed above, a requirement to classify workers by race, alone, triggers Fifth Amendment scrutiny. *See, e.g.*, *Rice*, <u>528 U.S. at 517</u>; *Adarand*, <u>515 U.S. at 227</u>; *Shaw*, <u>509 U.S. at 642</u>–44; *Walker*, <u>169 F.3d at 981</u>. The FCC's intense focus on demanding and publishing race and sex categorizations of each broadcaster's employees—undoubtedly government action—also inherently shapes behavior. *MD/DC/DE*, <u>236 F.3d at 19</u>; *see Lutheran Church*, <u>141 F.3d at 352</u>. This is especially true given admissions that collection of Form 395-B is merely the "start" of the FCC's revived efforts to promote race- and sex-conscious hiring practices. FCC 24-18 at 58, JA58 (Starks, Comm'r concurring).

The FCC "cannot do indirectly what [it] is barred from doing directly," *Nat'l Rifle Ass'n v. Vullo*, <u>608 U.S. 175, 190</u> (2024), which includes "*sub silentio* pressur[e]" and "'raised eyebrow' regulation[s]" to coerce broadcasters, *MD/DC/DE*, <u>236 F.3d at 19</u>, or public disclosure to facilitate the same end through third parties. The FCC's "focus upon the race and sex" of individual broadcaster workforces, and its implausible justifications, "belies its statement— or so a licensee reasonably might (and prudently would) conclude—that its only

goal" is compiling industry employment trends and making reports to Congress (that Congress never requested). *Id.*

The D.C. Circuit has twice concluded—without any difficulty—that the FCC's attempts to compel disclosure of race-based employment data is subject to strict scrutiny under the Fifth Amendment. *See id.* at 20–21; *Lutheran Church*, 141 F.3d at 351–54. The D.C. Circuit has similarly indicated that FCC attempts to compel disclosure of sex-based employment data is subject to intermediate scrutiny under the Fifth Amendment. *MD/DC/DE*, 236 F.3d at 22–23. So, too, here.

## B.   THE ORDER FAILS STRICT SCRUTINY

Government-imposed racial classifications are subject to a "daunting two-step examination." *Students for Fair Admissions, Inc.* ("*SFFA*") *v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 206–07 (2023). They must "further compelling governmental interests" and be "narrowly tailored—meaning necessary—to achieve that interest." *Id.* (cleaned up). The Order fails both criteria.

*First*, the FCC has not identified a compelling governmental interest for the Order. The FCC says Form 395-B data is "critical" for the "analysis and understanding of the broadcast industry workforce," and "workforce diversity is critical to the ability of broadcast stations … to compete … and to effectively

serve local communities." FCC 24-18, ¶ 2. But the court in *Lutheran Church* put the FCC on notice that it did "not think diversity can be elevated to the 'compelling' level," 141 F.3d at 354, and, more recently, the Supreme Court has affirmed that an "amorphous" interest in "diversity" is not a compelling governmental interest, *SFFA*, 600 U.S. at 214–15. That is, in part, because such vague gestures to the benefits of diversity inevitably "devolve into illegitimate stereotyping." *Id.* at 211 (cleaned up).

The FCC continues that Form 395-B data is necessary for potential "reports to Congress" about the broadcast industry workforce, but nowhere identifies where Congress asked for those reports. The FCC cannot rest on "speculation or conjecture" about a future interest that Congress did not prescribe. *Edenfield v. Fane*, 507 U.S. 761, 770 (1993); *cf. Plessy v. Ferguson*, 163 U.S. 537, 554 (1896) (Harlan, J., dissenting) ("The constitution of the United States does not … permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights.").

Requiring public disclosure of Form 395-B responses, especially online and on a station-attributable basis, is even more problematic. The FCC contends that public disclosure "will increase the likelihood that erroneous data will be discovered and corrected." FCC 24-18, ¶ 15, JA9. But despite the use of Form 395-B for decades before *Lutheran Church*, the FCC points to no prior history of

broadcasters submitting incorrect Form 395-B data. There is no sudden need for the public to begin policing the accuracy of that data, assuming it even could. The FCC provides no basis to assume that broadcasters would begin providing erroneous data in the absence of online publication or that members of the public would be in a position to correct a station's responses, which the FCC instructs should be based on employee self-identification or, where an employee has declined to self-identify, an employer's observations of the employee. *See* Form 395-B Instructions, https://omb.report/icr/202004-3060-047/doc/100723701; FCC 24-18 at 55, JA55 (Carr, Comm'r, dissenting) ("[H]ow exactly does the FCC anticipate that a member of the public will verify the reported race, ethnicity, and gender of an individual employee—including those that the FCC now says can report as gender non-binary?"). Publicizing the information to invite allegations of inaccuracy also undercuts the FCC's assurance that it will not entertain or consider any complaints relating to Form 395-B data. *See* FCC 24-18, ¶¶ 17–18, JA10–11; *supra* Part II.A.

The FCC continues that public disclosure will "maximize the utility of the data an agency collects for the benefit of the public." FCC 24-18, ¶ 15, JA9. How? The FCC doesn't say. Merely "giving consumers information" or satisfying "'consumer curiosity alone is not a strong enough state interest' to sustain a compelled commercial disclosure." *Am. Meat Inst. v. USDA*, <u>760 F.3d</u>

18, 31–32 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in judgment) (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996)).

The FCC concludes that public disclosure will also mitigate the risk of "inadvertent disclosures of identifiable information." FCC 24-18, ¶ 15, JA9. As Commissioner Carr explained, "[t]hat is like deciding to sink a ship to avoid the risk that it might spring a leak. It makes no sense, particularly in light of the fact that the FCC regularly obtains and refrains from inadvertently disclosing a large and wide range of secret, sensitive, and/or confidential data sets." *Id.* at 55–56, JA55–56 (Carr, Comm'r, dissenting).

It's particularly notable that analogous data collected by the EEOC is protected from public disclosure by criminal sanctions prior to an enforcement proceeding. 42 U.S.C. § 2000e-8(e). Congress has recognized that workplace race and sex demographics are particularly sensitive. Yet the FCC inexplicably seeks to do what Congress has prohibited the EEOC from doing, choosing to make the data public, and for a much larger group of enterprises—those with as few as 5 local full-time (and therefore highly identifiable) employees, not those with 100 or more nationwide employees that fall within the EEOC's rule. *See* EEOC, *EEO-1 Component 1 Data Collection Fact Sheet: Who Must File* at 1, https://www.eeocdata.org/pdfs/WHO_MUST_FILE.pdf.

43

None of these interests is anything like the "only two compelling interests" the Supreme Court has identified as permitting race-based action—"remediating specific, identified instances of past discrimination" and "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207. The lack of a compelling interest is dispositive.

*Second*, the Order is not narrowly tailored to these interests, even if they were compelling. Form 395-B is not a reliable tool for the purported task at hand. It provides only a glimpse into station employment during a single pay period each year, which will vary from station to station. FCC 24-18, ¶ 38, JA21. As even the FCC has recognized, "the 'snapshot' nature of [the] employment report" makes it "impossible for annual employment reports to reflect the stability or hiring practices at a broadcast station completely." *Application of Dontron, Inc.*, 6 FCC Rcd. 2560, 2564 (1991).

The FCC also has other means to monitor industry workforce trends, including using data that is already collected by the FCC with regard to the race and sex of officers, directors, and owners of broadcast stations through its required biennial broadcast ownership reports; data collected confidentially by the EEOC; or data aggregated by private industry groups. 2021 State Broadcasters Reply Comments at 9, JA114.

44

Even if the FCC could marshal a compelling government interest in collecting Form 395-B data, posting it online is not narrowly tailored to its collection. The FCC could collect Form 395-B data anonymously, keep the data confidential, or disclose it only in an aggregated, non-station-attributable form, any one of which—alone or in combination—would be more narrowly tailored than the Order. Any of these options would allow the FCC to "report on and analyze employment trends in the broadcast sector" while creating a lesser risk of pressuring broadcasters to adopt race-conscious employment practices. FCC 24-18, ¶ 14, JA8.

The FCC says that EEOC and trade association data is insufficiently granular for its purposes, and that keeping data confidential would impose "costs and burdens" on the agency. *Id.* ¶¶ 26–29, JA15–17. But the Order itself noted that the FCC "would only use this information 'to monitor industry employment trends and report to Congress,' and codified that position in the governing regulations contained in [47 C.F.R. § 73.3612]." *Id.* ¶ 7, JA5–6. By definition, "industry employment trends" require no granular information or disclosures, as they relate to general trends affecting an entire industry. The FCC does not explain what benefit more granular data provides—especially for speculative future reports to Congress—nor does the "interest in avoiding … bureaucratic effort" justify rejecting more tailored alternatives. *City of Richmond*

*v. J.A. Croson Co.*, 488 U.S. 469, 508 (1989); *see also* FCC 24-18, at 56, JA56 (Carr, Comm'r, dissenting) ("The Order provides no reason why publicizing race and gender data on a station-specific basis is necessary for the Commission to conduct analysis or stay abreast of industry trends, at least compared to a less restrictive alternative.").

The Order thus fails strict scrutiny.

## C.    THE ORDER FAILS INTERMEDIATE SCRUTINY

Government-imposed sex-based classifications "requir[e] an exceedingly persuasive justification," *Morales-Santana*, 582 U.S. at 58 (cleaned up), meaning they must "serv[e] important governmental objectives" and be "substantially related to the achievement of those objectives," *United States v. Virginia*, 518 U.S. 515, 524 (1996) (cleaned up). The Order fails both requirements for the same reasons explained above, even under this less demanding standard. *See MD/DC/DE*, 236 F.3d at 22–23; *supra* Part II.B.

*First*, a generic desire to understand the broadcast industry workforce and prepare unsolicited congressional reports is not a sufficiently important governmental objective. The FCC has disclaimed any ability to use such data to prevent real or perceived discrimination, and already has other rules to those ends. *See* 47 C.F.R. § 73.2080(a). Such information is therefore relevant only to "overbroad generalizations about the different talents, capacities, or

46

preferences" of individuals of a particular sex, which is prohibited. *Virginia*, 518 U.S. at 533.

Again, analogous data collected by the EEOC is protected from public disclosure by criminal sanctions prior to an enforcement proceeding. 42 U.S.C. § 2000e-8(e). If there's any important interest here, it's keeping such information confidential, not disclosing it near and far.

*Second*, the FCC has not shown that the Order is "substantially and directly related" to its analysis or reporting aims. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982). Heightened scrutiny requires more than "loose-fitting generalities" even if "statistically measured," *Craig v. Boren*, 429 U.S. 190, 208–09 (1976), and the availability of workable alternatives "is often highly probative," *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 78 (2001) (O'Connor, J., dissenting).

The FCC could collect Form 395-B data anonymously and keep it confidential, or disclose it only in aggregated, non-station-attributable form. Either option would allow the FCC to analyze industry trends and report to Congress with a lesser risk of pressuring broadcasters to adopt sex-conscious employment practices. *See* FCC 24-18, ¶ 14, JA8–9. The FCC's reasons for collecting and disclosing station-attributable data are, at most, tenuously related to industry analysis or reporting, and thus rely on "loose-fitting generalities,"

47

*Craig*, <u>429 U.S. at 208</u>–09, that are not "substantially and directly related" to the proposed interest, *Univ. for Women*, <u>458 U.S. at 730</u>. The problem isn't that the FCC could have adopted more tailored means to accomplish its ends, it's the absence of tailoring whatsoever. The availability of such obvious alternatives underscores that the stated rationale is pretextual.

The Order thus fails intermediate scrutiny as well.

## III.   THE ORDER VIOLATES THE FIRST AMENDMENT

The First Amendment protects the right *not* to speak. *303 Creative LLC v. Elenis*, <u>600 U.S. 570, 586</u> (2023); *Janus v. AFSCME*, <u>585 U.S. 878, 892</u> (2018). The compelled disclosure of controversial information or opinions is thus a content-based regulation of speech and subject to strict scrutiny. *NIFLA v. Becerra*, <u>585 U.S. 755, 766</u>–67 (2018). As explained above, the FCC has not demonstrated a compelling governmental interest to collect and disclose Form 395-B responses, especially when comparable information is available elsewhere, nor is the requirement narrowly tailored to the FCC's alleged analysis and reporting interests. *See supra* Part II.B.

Citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, <u>471 U.S. 626</u> (1985), the FCC insists strict scrutiny doesn't apply because Form 395-B "entails disclosure of 'purely factual and uncontroversial' information in a commercial context." FCC 24-18, ¶ 52 & n.167, JA27 & n.167 (quoting *Zauderer*,

471 U.S. at 651). But as the Supreme Court recently affirmed, the *Zauderer* test applies only to disclosures of "purely factual and uncontroversial information *about the terms under which … services will be available.*" *NIFLA*, 585 U.S. at 768–69 (emphasis added) (quoting *Zauderer*, 471 U.S. at 651); *see also RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 876–77 (5th Cir. 2024); *Nat'l Ass'n of Mfrs.* ("*NAM*") *v. SEC*, 800 F.3d 518, 522–23 (D.C. Cir. 2015). Workforce employee race and sex categorizations do not relate to terms of service.

"That a disclosure is factual, standing alone," also "does not immunize it from scrutiny." *NAM v. SEC*, 748 F.3d 359, 371 (D.C. Cir. 2014), *aff'd* 800 F.3d 518; *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988). Along with politics, issues about race and sex (or gender)—particularly in the context of employment decisions—are among the most hotly debated contemporary issues. If requiring companies "to disclose the labor conditions of their factories abroad or the political ideologies of their board members" is "obviously repugnant to the First Amendment," *NAM*, 748 F.3d at 372, so is requiring them to publish a categorization of the race, ethnicity, and sex of their entire workforce by job category.

Making broadcasters sort employees into "non-binary gender categories," FCC 24-18, ¶ 39–40, JA21–22, only further forces them to take a stance on

contentious social issues. For example, some broadcasters have expressed to the FCC a religious objection to recognizing any non-binary gender. *See, e.g.*, *Joint Petition for Reconsideration & Motion for Stay of Catholic Radio Ass'n et al.* at 8–10, MB Docket No. 98-204 (June 3, 2024), https://www.fcc.gov/ecfs/document/1060497327184/1. Others may be reluctant to identify such employees and publicize where they work when doing so could subject both employer and employee to harassment by third parties. Still others might simply wish to avoid taking a position or making a guess as to the race, ethnicity, or sex identification of employees who decline to provide it.[18]

Alternatively, the FCC says the Order is subject to the intermediate review standard for commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). That is wrong. Form 395-B responses are not "commercial speech" under *Central Hudson* because the disclosures are not "related solely to the economic interests of [a broadcaster] and its audience." *Id.* at 561. Nor do they "propose a commercial transaction,"

---

[18] The Form 395-B Instructions provide that "[s]elf-identification is the preferred method of identifying" an employee's race and ethnicity, but that if an employee declines to self-identify, the employer must use employment records or "observer identification" to complete the report. Form 395-B Instructions, *supra*. In other words, if an employee has refused to self-identify, an employer is forced to either submit an incomplete Form 395-B, inviting complaints from third parties and FCC enforcement action, or risk the legal or other consequences of misidentifying an employee's protected characteristics.

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976), or "relat[e] to a particular product or service," *Friedman v. Rogers*, 440 U.S. 1, 10 (1979). The *Central Hudson* test also applies only to speech restrictions, not compelled speech like that at issue here. *See RJ Reynolds*, 96 F.4th at 876–77.

In any event, the Order doesn't survive intermediate scrutiny, either. As explained above, the FCC's "asserted … interest" in collecting and publishing workforce data is not "substantial" because alternative data is available elsewhere, Form 395-B data—and particularly its public disclosure on a station-attributable basis—does not "directly advance" that interest, and the requirements are "more extensive than is necessary." *Central Hudson*, 447 U.S. at 564–66; *see supra* Part II.C.

## IV.  THE ORDER IS ARBITRARY AND CAPRICIOUS

The Order is also arbitrary and capricious. 5 U.S.C. § 706(2)(A). "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015). An agency cannot offer "an explanation … that runs counter to the evidence before [it]," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or rely on "contrived reasons" or a "pretextual basis" for its decision, *Dep't of Com. v. New York*, 588 U.S. 752, 780, 785 (2019). The FCC does just that.

*First*, the Order claims that "it is vital that the agency restart" collection of Form 395-B data "[b]ecause the Commission is the only entity with the resources and expertise" to do so. FCC 24-18, ¶ 50, JA27. This reasoning is flawed. Even if the FCC *were* the sole agency capable of collecting workforce data, that would not justify collection and online publication of sensitive employee data to prepare reports that Congress never asked for. And, of course, the statement ignores that nothing in the Act authorizes the FCC to collect and compel online disclosure of such data, the FCC has not collected this information for more than two decades, and the EEOC and similar state agencies are vastly more qualified to address EEO matters than the FCC. *See Lutheran Church*, 141 F.3d at 354 ("As we have observed elsewhere, 'the FCC is not the Equal Employment Opportunity Commission … and a license renewal proceeding is not a Title VII suit.'"). Nothing in the record indicates that employment discrimination is unique to or more prevalent in the broadcasting industry, and the Order points to no legitimate basis warranting additional scrutiny or regulation. *See id.* at 355 ("'[T]he interest in diversity of viewpoints provides *no legitimate*, much less important, reason to employ race classifications

apart from generalizations impermissibly equating race with thoughts and behavior.'").[19]

*Second*, the FCC's insistence that existing collections of workforce demographic data are inadequate for assessing trends is unreasonable. Form 395-B is modeled after the EEOC's EEO-1 report, FCC 24-18, ¶¶ 14 n.57, 32, JA9 n.57, 18–19, and the FCC therefore already has access to this information for broadcasters with 100 or more employees nationwide. The Order's claim that EEO-1 data excludes 79% of broadcast "station employment units" (i.e., employees of commonly owned stations within a *local* television or radio market) is misleading. *Id.* ¶ 22, JA12–13; Third Report and Order, 19 FCC Rcd at 9977, JA173 ("[I]f we obtained trend report data only from *employment units* with 100 or more employees, the trend report would …. not include 6,592 *employment units* (79%) out of a total of 8,395 units[.]" (emphasis added)). EEO-1 requirements apply based on a company's aggregate number of employees nationwide, whether they are in a single unit with more than 100 employees or

---

[19] Regardless of whether "workforce diversity is critical to the ability of broadcast stations both to compete with one another and to effectively serve local communities," FCC 24-18, ¶ 2, JA2, the FCC already has mechanisms that prohibit discrimination and require broad recruitment, 47 C.F.R. § 73.2080; *see also* FCC 24-18, ¶ 4, JA3 ("In addition to broadly prohibiting employment discrimination, the Commission's rules also require that all but the smallest of broadcast licensees develop and maintain an EEO program.").

multiple smaller units that collectively exceed 100 employees, including units with fewer than 5 employees that would be exempt from the Form 395-B requirement. EEO-1 reports are therefore certain to capture a higher percentage of broadcast employees than the Order suggests, and certainly enough for industry-trend analysis.

In addition, the FCC already collects data on the race, ethnicity, and sex of everyone with a cognizable interest in a broadcast station (e.g., 5%+ voting shareholders, officers, directors, etc.) through ownership reports that broadcasters are required to file every two years. 47 C.F.R. § 73.3615. The agency also has access to TV and radio newsroom demographic data through Radio Television Digital News Association's annual diversity surveys. The Order fails to explain why the combination of such data would be insufficient for its stated purpose of reporting on industry trends. It instead resorts to a strawman argument that reliance on such data would constitute a revision of Form 395-B in violation of section 334's prohibition on changes. *Id.* ¶¶ 21–23, JA12–13.

*Third*, the FCC dismissed concerns over public pressure as "speculative," claiming "the record contain[ed] no evidence" that Form 395-B data has been or will be used for that purpose. FCC 24-18, ¶ 17, JA10–11. The evidence before the FCC in this regard was in fact abundant, *see supra* Part II.A, and the FCC's

54

"ostrich-like claim … does not withstand even casual scrutiny," FCC 24-18, at 54, JA54 (Carr, Comm'r, dissenting). Moreover, such pressure will only increase because Form 395-B data under the reinstated rule will be far more widely accessible than it was prior to suspension of the form in 1998.

*Fourth*, the FCC's reasons for publicly disclosing Form 395-B data on a station-attributable basis are—to again quote Commissioner Carr—"nothing more than pretext." FCC 24-18, at 55, JA55 (Carr, Comm'r, dissenting). The FCC provides no reason why the public is better able to audit Form 395-B responses than broadcasters or the FCC, nor does the record indicate any history of broadcasters submitting false Form 395-B data in the first place, eliminating any need or basis for the public to police that data.

The FCC also doesn't explain how disclosing employee data on a station-attributable basis "maximizes the utility of the data," apart from the implausible claim that the public will discover and correct errors. *Id.* ¶ 52, JA28 (majority). After all, "the FCC's normal practice is *not* to make all of the data it collects publicly available in the interest of maximizing utility." *Id.* at 55, JA55 (Carr, Comm'r, dissenting) (emphasis added). And because Form 395-B would provide only "a 'snapshot' of a station's employment of female and minority employees and [is] not meant as a precise measure of a station's year-round employment stability or hiring practices," *Dontron*, 6 FCC Rcd. at 2564, it is

unrealistic to expect members of the public to be in a position to accurately detect—let alone correct—errors in a station's employment figures during that moment in time.

The FCC then illogically claims that the risk of harm from inadvertently disclosing some information somehow justifies maximizing that harm by intentionally disclosing all information. That's "like deciding to sink a ship to avoid the risk that it might spring a leak." FCC 24-18, at 55–56, JA55–56 (Carr, Comm'r, dissenting). And it is irrational given that the sole purpose the FCC claims it will use the data for is to "monitor industry employment trends and report to Congress," which in no way requires the public release of any granular data. *Id.* ¶ 7, JA6 (majority).

The implausibility of these justifications undermines the Order and exposes the true motivation for collecting and compelling public disclosure of station-attributable Form 395-B responses—to pressure broadcasters into race- and sex-conscious decisionmaking, whether directly or indirectly.

## CONCLUSION

This Court should enjoin and set aside the Order.

Dated: August 28, 2024

Respectfully submitted,

*/s/ Jessica T. Nyman*

*/s/ Jared M. Kelson*

Scott R. Flick
Matthew J. MacLean
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth St NW
Washington, DC 20036
(202) 663-8167
scott.flick@pillsburylaw.com
matthew.maclean@pillsburylaw.com

Jessica T. Nyman
  *Counsel of Record*
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
401 Congress Ave, Suite 1700
Austin, TX 78701
(512) 580-9645
jessica.nyman@pillsburylaw.com

*Counsel for Texas Association of
Broadcasters*

Jonathan Berry
R. Trent McCotter
Jared M. Kelson
  *Counsel of Record*
Laura B. Ruppalt
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave SE, No. 231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for National Religious
Broadcasters and American Family
Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2024, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: August 28, 2024

Respectfully submitted,

*/s/ Jessica T. Nyman*
Jessica T. Nyman

*/s/ Jared M. Kelson*
Jared M. Kelson

*Counsel for Petitioner Texas Association of Broadcasters*

*Counsel for Petitioners National Religious Broadcasters and American Family Association*

58

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,916 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in CalistoMT and 14-point font.

Dated: August 28, 2024                      Respectfully submitted,

*/s/ Jessica T. Nyman*                      */s/ Jared M. Kelson*
Jessica T. Nyman                            Jared M. Kelson

*Counsel for Petitioner Texas Association*   *Counsel for Petitioners National*
*of Broadcasters*                            *Religious Broadcasters and American*
                                             *Family Association*