

800 Connecticut Ave NW, Suite 900
Washington, D.C. 20006
+1 (202) 955 0620

December 17, 2024

Honorable Lyle W. Cayce
Clerk of the Court
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

Re:  Rule 28(j) Letter in *National Religious Broadcasters v. FCC*, No. 24-60219, and *Texas Association of Broadcasters v. FCC*, No. 24-60226

Dear Mr. Cayce:

In *Alliance for Fair Board Recruitment v. SEC*, No. 21-60626 (Dec. 11, 2024) (Ex.A), this Court recently held en banc that the SEC lacked authority under the Securities Exchange Act of 1934 to approve an exchange rule compelling listed companies to publicly disclose information about the race, gender, and LGBTQ+ demographics of their boards of directors. Ex.A.2. The rule also required companies that did not meet certain demographic objectives to provide an explanation for their failure. *Id.*

The en banc Court was unmoved by the SEC's repeated assertion that it had approved only a "disclosure-based framework," and that disclosure was related to the "public interest." Ex.A.7, 27–31. Instead, this Court explained:

> SEC's efforts "raise an eyebrow" by stepping outside its ordinary regulatory domain of market manipulation and proxy voting and intruding into the province of other agencies. SEC does not ordinarily regulate companies' commitments "to diversity and inclusion." If Congress had granted a diversity mandate to any agency (an altogether unclear assumption), we would have expected Congress to give it to the Equal Employment Opportunity Commission or even the Department of Justice. Of course, even the agencies that regulate diversity in the workplace have not asserted the power SEC does in this case.

Ex.A.34–35 (citations omitted).

1

Similarly, the FCC lacks authority under the Communications Act to compel broadcasters to report their workforce demographics using Form 395-B. *See* Opening.Br.22–28 (Dkt. 77-2); Reply.Br.2–9 (Dkt. 65). Invoking a generic "disclosure" or "public interest" rationale—whether to monitor industry trends or possibly submit reports to Congress (that Congress has not asked for), or because third parties want the information—is unavailing. *See, e.g.*, Opening.Br.22–28, 51–56; Reply.Br.2–9, 28–31.

The FCC is also "stepping outside its ordinary regulatory domain" of broadcast regulation to pursue "diversity" objectives. Ex.A.34–35; *see* Opening.Br.3, 29–38; Reply.Br.11–13. And while the FCC insists public disclosure of that information is appropriate, "even the agencies that regulate diversity in the workplace have not asserted" such power. Ex.A.35; *see* Opening.Br.43; Reply.Br.19–20.

Respectfully,

*/s/ Jessica T. Nyman*

Jessica T. Nyman
Pillsbury Winthrop Shaw
  Pittman LLP
401 Congress Ave, Suite 1700
Austin, TX 78701
(512) 580-9645
jessica.nyman@pillsburylaw.com

*Counsel for Petitioner Texas Association of Broadcasters*

*/s/ Jared M. Kelson*

Jared M. Kelson
Boyden Gray PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com

*Counsel for Petitioners National Religious Broadcasters and American Family Association*

# Exhibit A

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2024

Lyle W. Cayce
Clerk

No. 21-60626

Alliance for Fair Board Recruitment; National Center for Public Policy Research,

*Petitioners,*

*versus*

Securities and Exchange Commission,

*Respondent.*

Petition for Review of an Order of
the Securities & Exchange Commission
Agency No. 34-92590

Before Elrod, *Chief Judge,* and Jones, Smith, Stewart, Dennis, Richman, Southwick, Haynes, Graves, Higginson, Willett, Duncan, Engelhardt, Oldham, Wilson, Douglas, and Ramirez, *Circuit Judges.* [*]

[*] Judge Ho is recused and did not participate in this decision.

Andrew S. Oldham, *Circuit Judge*, joined by Elrod, *Chief Judge*, and Jones, Smith, Richman, Willett, Duncan, Engelhardt, and Wilson, *Circuit Judges*:

Nasdaq proposed rules that compel the companies listed on its exchange to disclose information about the racial, gender, and sexual characteristics of their directors, and to have (or explain why they do not have) at least two directors who meet Nasdaq's definition of "diverse." SEC approved those rules. We hold, however, that the diversity rules cannot be squared with the Securities Exchange Act of 1934.

I

This case arises from three rules proposed by Nasdaq and approved by SEC. We (A) explain the statutory framework governing exchange rule changes. Next, we (B) explain the rule changes Nasdaq proposed. Then we (C) explain SEC's approval decisions. Last, we (D) explain the background to these proceedings.

A

An SEC-registered stock exchange like Nasdaq is a self-regulatory organization ("SRO"). *See* 15 U.S.C. § 78c(a)(26). SROs have historically exercised substantial market power. *See* Gregg A. Jarrell, *Change at the Exchange: The Causes and Effects of Deregulation*, 27 J.L. & Econ. 273, 275 (1984) (explaining that the New York Stock Exchange was "a resilient natural monopoly" because of "the scale economies of providing a continuous auction market for stocks"). In 1975, Congress concluded that SROs left to their own devices might wield their market power for purposes that would not comport with the public interest. *See infra*, Part II.B.2. So it amended the Securities Exchange Act of 1934 to provide that SROs may not change their rules without SEC approval. *See* Securities Acts Amendments of 1975, Pub.

No. 21-60626

L. No. 94-29, § 16, 89 Stat. 97, 147–49 (codified as amended at 15 U.S.C. § 78s(b)).

Under § 78s(b), an SRO that wants to adopt "any proposed rule or any proposed change in, addition to, or deletion from [its] rules" must file the proposed change with SEC. *Id.* § 78s(b)(1). When an SRO files a proposed rule change, SEC is statutorily required to publish the proposal for notice and comment. *Ibid.* After the notice-and-comment period (and additional proceedings, if SEC deems them necessary), SEC must approve the SRO's proposal if—but only if—"it finds [the proposal] is consistent with the requirements of" the Exchange Act. *Id.* § 78s(b)(2)(C)(i). If SEC does not make that finding, it must disapprove the proposal. *See id.* § 78s(b)(2)(C)(ii) ("[SEC] shall disapprove a proposed rule change of a self-regulatory organization if it does not make a finding described in clause (i).").

The requirements that the Exchange Act imposes on SROs include the requirements contained in 15 U.S.C. § 78f(b). That subsection provides:

> (b) An exchange shall not be registered as a national securities exchange unless the Commission determines that . . . (5) The rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.

No. 21-60626

For this case, the most relevant clause in § 78f(b) is the last one in paragraph (5): An exchange may not "regulate by virtue of any authority conferred by this chapter matters not related to the purposes of [the Exchange Act] or the administration of the exchange." That means a proposed exchange rule is not "consistent with the requirements of" the Exchange Act, *id.* § 78s(b)(2)(C)(i), if it "regulate[s] . . . matters not related to the purposes of" the Exchange Act, *id.* § 78f(b)(5). Accordingly, before SEC approves a proposed exchange regulation, it must find that the regulation is related to the purposes of the Exchange Act.

B

"[W]ith more than 3,300 companies listed," Nasdaq is the second largest stock exchange in the world. *See NASDAQ: Company Listings*, ADVFN, https://perma.cc/FDE9-N6U8. Following the riots of 2020, "Nasdaq conducted an internal study of the current state of board diversity among Nasdaq-listed companies based on public disclosures." JA690. On Nasdaq's telling, it did so in response to "the social justice movement," which "brought heightened attention to the commitment of public companies to diversity and inclusion." JA689. Nasdaq also recognized that "investors and investor groups [were] calling for diversification in the boardroom and legislators at the federal and state level [were] increasingly taking action to encourage or mandate corporations to diversify their boards and improve diversity disclosures." JA724.

Nasdaq said its study revealed that "while some companies already have made laudable progress in diversifying their boardrooms, the national market system and the public interest would best be served by an additional regulatory impetus for companies to embrace meaningful and multi-dimensional diversification of their boards." JA690. So Nasdaq fashioned a "Diversity Imperative for Corporate Boards." JA689. Pursuant to that

No. 21-60626

"Diversity Imperative," in 2020 alone, Nasdaq submitted for SEC approval three rules it explained were designed "to advance board diversity among its listed companies." JA724; *see* JA692 ("Nasdaq further believes that a listing rule designed to encourage listed companies to increase diverse representation on their boards will result in improved corporate governance . . . ."); JA713 ("Nasdaq believes" the rules "may influence corporate conduct" and "will help increase opportunities for Diverse candidates.").

*First*, Nasdaq submitted proposed Rule 5606 (the "Disclosure Rule"). It explained this rule "would require Nasdaq-listed companies . . . to provide statistical information in a proposed uniform format on the company's board of directors related to a director's self-identified gender, [self-identified] race, and self-identification as LGBTQ+." JA689.

*Second*, Nasdaq submitted proposed Rule 5605(f) (the "Diversity Rule"). It explained this rule would generally

> require Nasdaq-listed companies . . . (A) to have at least one director who self-identifies as a female, and (B) to have at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+, or (C) to explain why the company does not have at least two directors on its board who self-identify in the categories listed above.

JA689. Nasdaq emphasized that the Diversity Rule "set[] forth aspirational diversity ***objectives***—not quotas, mandates, or set asides. Companies that do not meet the diversity objectives need only explain why they do not." JA611 (emphasis in original). But even as Nasdaq stressed the modesty of the Rule's requirements, it recognized those requirements might sometimes prove unduly burdensome. So Nasdaq crafted exceptions to give certain kinds of companies "more flexibility." JA690. Specifically, Nasdaq provided that

foreign issuers and smaller reporting companies could satisfy the Rule by having two directors who self-identified as female. *Ibid.* And Nasdaq provided that companies with smaller boards (*i.e.*, five or fewer directors) could satisfy the Rule by having one board member who self-identifies as either female or an underrepresented racial or sexual minority. JA201–02.

*Third*, Nasdaq submitted proposed Rule IM-5900-9 (the "Recruiting Rule"). Nasdaq explained this rule would enable it to offer companies who did not meet the "aspirational diversity objectives" contained in the Diversity Rule, JA611 (quotation omitted), complimentary access "to a board recruiting solution, which would provide access to a network of board-ready diverse candidates, allowing companies to identify and evaluate diverse board candidates, and a tool to support board benchmarking," JA724. *See* JA725 (explaining which companies would be provided with complimentary access to the service). On Nasdaq's telling, the Recruiting Rule would "aid" companies in "compl[ying] with the Nasdaq Diversity Proposal," JA724, because companies failing to meet the Proposal's "Diverse" director requirement would "need to identify diverse board candidates if they wish[ed] to satisfy that requirement instead of explaining why they had not satisf[ied] it," JA725.

## C

SEC approved all three rules in separate but related orders. We (1) explain SEC's order approving the Disclosure Rule and the Diversity Rule. Then we (2) explain SEC's order approving the Recruiting Rule.

### 1

First, the Disclosure Rule and the Diversity Rule. Nasdaq submitted these rules in one proposal, and SEC analyzed them jointly under the rubric of Nasdaq's "Board Diversity Proposal." JA1–2. It found that the Proposal was consistent with the requirements of the Exchange Act—most relevantly,

the requirement that exchange rules be related to the purposes of the Exchange Act. We call this SEC's "related-to" finding.

Nasdaq said it designed its Board Diversity Proposal in part "to encourage listed companies to increase diverse representation on their boards." JA692. But SEC did not base its related-to finding on the ground that the Exchange Act permits exchanges to adopt rules designed to alter the composition of company boards. Instead, SEC explained, information about the racial, gender, and sexual characteristics of the directors of public companies was "important to" large institutional investors and investment managers such as Blackrock, Vanguard, State Street, the California Public Employees' Retirement System, the Teachers Insurance and Annuity Association of America–College Retirement Equities Fund, and Goldman Sachs. JA2; *see also* JA7; *id.* nn.91–92. On SEC's telling, the Proposal would establish "a disclosure-based framework" that would make board diversity information available to these and other investors on a consistent and comparable basis. JA5; *see also* JA7. SEC accordingly reasoned that the Proposal was "designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest." JA2, 7.

One commenter argued that SEC's disclosure rationale could not justify the Diversity Rule because it did not merely establish a disclosure-based framework. It also imposed "aspirational diversity objectives" and compelled every Nasdaq-listed company to meet those objectives or explain why it failed. *See* JA5 n.54 (acknowledging the comment). But SEC found that "a better understanding of why a company [had] not [met] the proposed objectives would contribute to investors' investment and voting decisions." JA2; *see also* JA5 n.54. It therefore declined to distinguish between the components of Nasdaq's Proposal. It found that both components—the Disclosure Rule and the Diversity Rule—were related to the purposes of the Act. *See* JA16.

No. 21-60626

Commissioners Roisman and Peirce dissented. Commissioner Roisman faulted SEC for failing to "undertake its own reasoned analysis to evaluate the merits of" the Proposal. JA27 (quotation omitted). Commissioner Peirce maintained that SEC's decision to approve the Proposal was substantively indefensible. In her view, the purposes of the Exchange Act "boil[ed] down to regulating securities transactions with an eye toward protecting interstate commerce and the financial system and ensuring the maintenance of fair and honest markets in securities transactions." JA37. But "[t]he Board Diversity Proposal d[id] not advance any of these purposes." *Ibid.* The Proposal instead represented an attempt by Nasdaq and SEC to use their "leverage over market participants" to remedy a societal challenge that bore no relation to "the authority granted them in the Exchange Act." *Ibid.*

2

Next, the Recruiting Rule. SEC found that the Recruiting Rule was consistent with the requirements of the Exchange Act. It did so in part because the Rule would "assist Eligible Companies . . . to increase diverse representation on their boards and would help Eligible Companies to meet . . . the proposed diversity objectives under the Board Diversity Proposal." JA21.

SEC acknowledged that an exchange might violate the Act by offering a benefit to some companies and not others because the Act forbids exchanges from engaging in "unfair discrimination between customers, issuers, brokers, or dealers." 15 U.S.C. § 78f(b)(5); *see* JA21. But SEC concluded that the Recruiting Rule did not unfairly discriminate among issuers—*i.e.*, listed companies—because it made sense for Nasdaq to offer the service to companies that failed to meet Nasdaq's diversity objectives. It made sense because those non-diverse companies are "differently situated." JA21 n.330. They "may have a greater interest or feel a greater need to identify diverse

board candidates by utilizing the board recruiting service than" do companies who satisfy Nasdaq's understanding of diversity. JA21. SEC also explained that "offering the one-year complimentary service would help [Nasdaq] compete to attract and retain listings, particularly in light of the diversity objective in the separately approved Board Diversity Proposal." *Ibid.*[1]

## D

Alliance for Fair Board Recruitment ("AFBR") immediately filed a petition for review in this court. Nasdaq intervened to defend its rules. Separately, the National Center for Public Policy Research ("NCPPR") filed a petition for review in the Third Circuit. The Third Circuit transferred NCPPR's petition to this court pursuant to 28 U.S.C. § 2112(a)(5). We consolidated the petitions.

## II

We start with the Board Diversity Proposal. SEC found that the proposal was "related to" the purposes of the Exchange Act. Both petitioners contend that SEC's related-to finding was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[2]

---

[1] SEC did not seriously consider whether the Recruiting Rule was related to the purposes of the Act, likely because it concluded that the Rule is not a regulation. *Cf.* JA21 (simply asserting, in conclusory fashion, such a relationship). Because the Act provides only that exchanges may not "*regulate . . .* matters not related to the purposes" of the Act, 15 U.S.C. § 78f(b)(5) (emphasis added), it appears SEC concluded that the Recruiting Rule could be consistent with the requirements of the Act even if it was not related to the purposes of the Act.

[2] The parties also challenge SEC's approval on constitutional grounds. We need not reach those arguments because we resolve the case on statutory grounds. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

No. 21-60626

We (A) begin, as always, with jurisdiction. After finding it, we turn to the merits. We (B) explain that an exchange rule is not related to the purposes of the Exchange Act simply because it is a disclosure rule. The Act exists primarily to protect investors and the macroeconomy from speculative, manipulative, and fraudulent practices, and to promote competition in the market for securities transactions. A disclosure rule is related to the purposes of the Act if it has some connection with those purposes, but not otherwise. We (C) conclude that SEC did not explain how the Board Diversity Proposal has any connection with those purposes. All it said was that the Proposal is designed to advance three of the purposes contained in § 78f(b)(5). But those purposes bear no relationship to the disclosure of information about the racial, gender, and sexual characteristics of the directors of public companies. Furthermore, (D) the major questions doctrine confirms our interpretation of the plain meaning of these three provisions. And (E) SEC's and Nasdaq's counterarguments are unavailing.

A

We start, as always, with jurisdiction. AFBR has Article III standing to invoke our jurisdiction because one of AFBR's members is a Nasdaq-listed company and so is directly regulated by Nasdaq's rules. *See* Company Doe Affidavit at ¶ 2. AFBR may bring suit on behalf of the member because the member's interest is "germane to [AFBR's] purpose" and "neither the claim asserted nor the relief requested requires the participation of [the] members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Because "at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).

No. 21-60626

B

Turning to the merits, SEC found that *any* disclosure-based exchange rule is related to the purposes of the Exchange Act. *See* SEC EB Br. 2 ("The Commission's conclusion that Nasdaq's rules are related to, and designed to promote, the Exchange Act's core disclosure purpose is well grounded in the record."); *see also id.* at 14, 25; Nasdaq EB Br. 52–53. So we first consider whether SEC could conclude that a proposed exchange rule is related to the purposes of the Act simply because it would compel disclosure of information about exchange-listed companies.

It could not. Congress enacted the original Exchange Act in 1934. In 1975, it undertook an "extensive rewriting." Richard W. Jennings et al., Securities Regulation: Cases and Materials 535 (7th ed. 1992). The history makes clear the Act is primarily about limiting speculation, manipulation, and fraud, and removing barriers to exchange competition. There are other, ancillary purposes, but disclosure of any and all information is not among them. The obvious implication is that a disclosure rule is related to the purposes of the Act if and only if it has some connection to the ails Congress designed the Act to eradicate.

We (1) provide background on the original Exchange Act. Then we (2) explain the effect of the 1975 Amendments.[3]

---

[3] The Act has been amended on other occasions, too. *See, e.g.*, Philip A. Loomis, Jr., *The Securities Exchange Act of 1934 and the Investment Advisers Act of 1940*, 28 Geo. Wash. L. Rev. 214, 219 & n.17 (1959). But those amendments left "the essential structure" of the Act in place. *Id.* at 219. We accordingly focus on the 1975 Amendments, both because they are the most significant amendments and because they inserted into the Act all the statutory provisions at issue in this case.

No. 21-60626

1

The Exchange Act regulates stock exchanges. Stock exchanges have been a staple of the American securities industry since the New York Stock Exchange ("NYSE") was founded in 1792. *See* Jonathan R. Macey & David D. Haddock, *Shirking at the SEC: The Failure of the National Market System*, 1985 U. Ill. L. Rev. 315, 316. The basic function of a stock exchange is to provide a secondary market for trading in stocks—a market where investors buy stocks from other investors. Secondary markets complement primary markets, where investors buy stocks directly from companies making public offerings. *See* Norman S. Poser, *Restructuring the Stock Markets: A Critical Look at the SEC's National Market System*, 56 N.Y.U. L. Rev. 883, 886 (1981).

The NYSE facilitated the dominant secondary stock market from its inception through the twentieth century. *See id.* at 891. In the process, it functioned as a private, *de facto* regulator. It did so in two ways. *First*, it created rules to govern its members—those admitted to trade on the exchange. It also created an adjudicatory system to resolve disputes related to securities transactions. *See* William A. Birdthistle & M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1, 15 (2013). *Second*, it required companies listed on the exchange to meet certain financial and disclosure requirements. *See* Macey & Haddock, *supra*, at 318. All this regulation helped to instill confidence in stock markets. And that benefited the NYSE because confident investors are more willing to buy and sell stocks. *See* Birdthistle & Henderson, *supra*, at 15 ("[E]xtragovernmental regulation increased public confidence in brokers associated with the Board and thereby attracted business.").

This predominantly private regime lasted for over a century. But as securities markets grew in the early 1900s, problems emerged that private ordering could not handle.

No. 21-60626

The first problem was rampant fraud. In the decade after the Great War, Americans paid $50 billion for securities, half of which were worthless. Elisabeth Keller & Gregory A. Gehlmann, *Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*, 49 Ohio St. L.J. 329, 334 (1988). An exchange could police fraudulent dealing in stocks listed on its own platform, but some stocks traded only "over the counter"—*i.e.*, not on any exchange. Exchanges obviously could do nothing to prevent fraudulent dealing in those stocks. States tried to solve the fraud problem with "blue sky" laws, but those proved insufficient, in part because they were easily gameable. *See id.* at 332–34. So eventually, Congress stepped in with the Securities Act of 1933, which required companies offering securities in primary markets to disclose certain financial and management information. *See id.* at 342–47.

Second, policymakers worried about investors who used speculation and market manipulation to make short-term profits. Speculation generally involved betting on short-term stock price movements through short selling or margin trading. *See* John E. Tracy & Alfred Brunson MacChesney, *The Securities Exchange Act of 1934*, 32 Mich. L. Rev. 1025, 1027–31 (1934). Manipulation involved inducing short-term price movements through wash sales, matched orders, rumor mongering, or pool operations. Often, manipulators capitalized on those price movements using options. *Id.* at 1031–33.

These practices often proved harmful to investors. Speculation is like gambling because "[i]t distracts [the speculator's] mind from his regular work or business. If successful, it leads him to improvident excesses of spending. If unsuccessful, it leads him to breaches of trust and theft, bankrupts his business and results in loss and degradation to him and his dependents." *Id.* at 1030–31. And manipulation harmed investors for the obvious reason that "[p]rice manipulations are the result of the deliberate efforts of dishonest traders to make profits for themselves at the expense of the investing public

No. 21-60626

by artificially raising or lowering the price of a particular security." *Id.* at 1031. Thus, in the run-up to the passage of the Exchange Act, President Franklin D. Roosevelt urged Congress to regulate exchanges for the purpose of protecting the "average investor" who frequently risked his "pay envelop" or "meager savings" to buy stocks even though he had no means to discern their "true value." S. Rep. No. 73-792, at 1–2 (1934); H.R. Rep. No. 73-1383, at 1–2 (1934).

Policymakers thought the combination of speculation and manipulation sucked "a vast and unhealthy volume of credit [] into securities markets to the deprivation of agriculture, commerce, and industry, which made possible the inflation of prices of securities out of all proportion to their value." S. Rep. No. 73-792, at 3. The exchanges nonetheless refused to step in. *See id.* at 4. And no legislation at the time compelled ongoing disclosures to ensure that stock prices represented companies' intrinsic values, nor combatted secondary market speculation or manipulation. *See* Keller & Gehlmann, *supra*, at 347–52. So Congress stepped in to reform the secondary markets.

The result: the Exchange Act of 1934. In light of the problems that spurred Congress into action, it is no surprise that the Act evinced an overriding concern with investor protection and the promotion of stock market stability. The Act's preamble and its legislative purpose section suggest Congress had two primary goals: *First*, "to prevent inequitable and unfair practices on [securities] exchanges and markets." Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881, 881; *see also* 15 U.S.C. § 78b (legislation necessary "to insure the maintenance of fair and honest markets in [securities] transactions"). *Second*, to stamp out "excessive speculation," which causes "unreasonable fluctuations" in "the volume of credit available for trade, transportation, and industry in interstate commerce" and "hinder[s] the proper appraisal of the value of securities." 15 U.S.C. § 78b(3).

No. 21-60626

Most of the Act's substantive provisions evince these goals in their plain text. For example, subject to some exceptions, the Act:

- Limited the amount of money that could be loaned for the purchase of securities;

- Required brokers and dealers to comply with SEC rules in short selling, options trading, and related matters;

- Banned wash sales and other fictitious trades;

- Banned pool operations and banned brokers and dealers from disseminating information about the likely effect of pool operations on the price of any stock;

- Banned brokers and dealers from disseminating fraudulent information to induce purchase of a stock;

- Banned brokers and dealers from using manipulative or deceptive devices or contrivances in contravention of SEC rules;

- Required exchanges to register with SEC and to enact rules for the discipline of members who behave in a manner inconsistent with "just and equitable principles of trade";

- Prohibited exchange members from dealing in an unlisted security, unless approved by SEC; and

- Curtailed insider trading by imposing reporting requirements and allowing shareholders to sue corporate officers and directors for disgorgement of short swing profits.

*See* 48 Stat. at 885–96; *see also* Tracy & MacChesney, *supra*, at 1039–44, 1051, 1056.

The Act also required companies listed on a registered stock exchange to comply with SEC disclosure regulations. *See* 48 Stat. at 892–93. But Congress did not authorize SEC to mandate disclosure of any information whatsoever. Rather, it vested SEC with a limited power to compel disclosure of basic corporate and financial information. For example:

No. 21-60626

- Articles of incorporation and bylaws;
- Information about the organization, financial structure, and nature of the business;
- Information about the terms of the securities offered to the public;
- Information about the compensation of directors and officers and their ownership of outstanding securities; and
- Balance sheets and other financial statements.

*See ibid.*

Congress enacted these disclosure provisions to protect investors and prevent speculation. *See* Tracy & MacChesney, *supra*, at 1048 (noting the "obvious and close connection between the publicity requirements of this Act and the proper regulation of exchange practices"). *First*, it thought disclosure would prevent companies from hiding financial problems from investors. *See, e.g.*, S. Rep. No. 73-792, at 10 ("[C]orporations [] have heretofore managed to withhold from investors their true financial condition."); *id.* at 11 (noting issuers frequently "present[ed] to the investing public a false or misleading appearance as to financial condition"). *Second*, it thought disclosure would facilitate "the evaluation of prices of securities" and therefore promote the efficient "direction of the flow of savings into industry." Tracy & MacChesney, *supra*, at 1048. Or put differently, disclosure would stabilize markets by curbing speculation. *See* S. Rep. No. 73-792, at 3 (noting that "the failure of corporations to publish full and fair reports of their financial conditions" fueled speculation).

That makes sense. If companies could hide their financial conditions, they could defraud investors or whip them into a speculative frenzy. Disclosure of basic corporate and financial information was a sound antidote. But it was not an end in itself; it served a purpose—essentially the same purpose

served by restrictions on margin loans and short sales. That much is clear from the fact that Congress carefully limited SEC's power to compel disclosure to the kinds of information that are most likely to eliminate fraudulent and speculative behavior.

Thus, the text and history of the original Exchange Act indicate Congress enacted it to protect investors and tackle the manipulation and speculation that Congress thought fueled the Great Depression. The Act did a few other things, too. Most notably, it placed limits on the solicitation of proxies. *See* 48 Stat. at 895. Those limits were "certainly collateral to the regulation of exchange practices," Tracy & MacChesney, *supra*, at 1055, which suggests that one of Congress's ancillary purposes was to ensure "[f]air corporate suffrage," *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (quoting H.R. Rep. No. 73-1383, at 13). *See also* Tracy & MacChesney, *supra*, at 1055 (noting the proxy limitations "apparently aim[] at reform of abuses of proxies"). But nothing in the original Act required disclosure for disclosure's sake. The statute was uniformly directed at preventing market abuses.

2

In 1975, Congress made its most significant amendments to the Exchange Act. The primary purpose of those amendments was to facilitate the development of a national securities market. *See* Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97, 97 ("An Act [t]o amend the Securities Exchange Act of 1934 to remove barriers to competition, to foster the development of a national securities market system and a national clearance and settlement system, . . . and for other purposes."). To understand what that means, it is necessary to understand something about how a stock exchange worked in 1975.

No. 21-60626

a

In 1975, a stock exchange had three primary components. First, it had members: the persons or firms admitted to trade on the exchange. Members were usually brokers; they traded on behalf of investors. Poser, *supra*, at 889. There were lots of exchanges, and brokers were often members of more than one. *Id.* at 891. Next, there were specialists: members admitted to an exchange for the specific purpose of making a market in a particular stock. *See id.* at 889. An exchange would typically admit just one specialist to trade a particular stock. *Id.* at 895. Last, there were the stocks. A company would list its stock on an exchange, and its stock would be traded there. Companies could list their stock on more than one exchange, and investors could trade the stock listed on one exchange on other exchanges, too. *Id.* at 888–89.

Now consider the mechanics of a trade. A customer would call a broker and place an order. Then the broker would execute that order in one of two ways. The broker could transact with another broker. *Id.* at 889–90. But sometimes it would be too hard or costly to find another broker willing to take the other side of the customer's transaction. That is where specialists came in. To promote liquidity, exchange rules required specialists to buy stock from brokers trying to sell and to sell stock to brokers trying to buy. *See id.* at 890.

Investors paid to trade stocks in two ways. First, they paid their brokers a commission. *See id.* at 889. Second, they indirectly paid specialists in the form of the bid–ask spread—the difference between the price at which the specialists were willing to buy and the price at which they were willing to sell:

> For example, a specialist may bid for a stock at a price of fifty and offer stock at a price of fifty and one-half. In that case he will buy when requested to do so at fifty and he will sell at fifty

and one-half. His profit is the fifty-cents-per-share difference between the bid and the offer.

*Id.* at 890. Competition between brokers and specialists would drive down commissions and bid–ask spreads, thus making the trading markets more efficient and more attractive to investors.

The problem confronting policymakers in the 1970s was that the market for securities transactions was not very competitive. The NYSE was the dominant exchange, and it leveraged its dominance like a cartel. *Id.* at 891. Its membership agreement contained a price-fixing provision that required its members to charge fixed minimum commissions on every transaction. *See id.* at 896. To make that provision effective, the NYSE imposed other restrictions. For example, it forbade its members from trading exchange-listed stocks in over-the-counter markets. *See id.* at 897. It did so because if brokers could agree to execute a transaction over the counter, they could engage in price competition, which would undermine the minimum-commission rules. The NYSE also barred big customers (*i.e.*, institutional investors such as mutual funds) from obtaining exchange membership and with it the ability to trade without brokers or specialists. *See ibid.* These anticompetitive practices helped brokers and specialists but hurt investors and market efficiency.

b

Enter the national market system (the "NMS"). The goal of the NMS was to disrupt these anticompetitive trading practices by "alter[ing] the structure and dynamics of the securities markets so that different markets trading the same securities [would] for the first time engage in price competition with each other." *Id.* at 884. The idea originated with SEC, which began taking steps to implement an NMS policy in the early 1970s. *See id.* at 902, 905.

No. 21-60626

SEC's actions spurred Congress to amend the Exchange Act in 1975. Those amendments in large part constituted a "legislative mandate to establish an NMS." *Id.* at 906; *see* S. REP. NO. 94-75, at 3 (1975) (explaining that "rapid attainment of a national market system as envisaged by this bill is important . . . to assure that the country maintains a strong, effective and efficient capital raising and capital allocating system in the years ahead"). That mandate is reflected in § 78k–1(a)(1):

> (C)   It is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure—
>
> > (i)   economically efficient execution of securities transactions;
> >
> > (ii)   fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets;
> >
> > (iii)   the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities;
> >
> > (iv)   the practicability of brokers executing investors' orders in the best market; and
> >
> > (v)   an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer.
>
> (D)   The linking of all markets for qualified securities through communication and data processing facilities will foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors, facilitate the offsetting of investors' orders, and contribute to best execution of such orders.

No. 21-60626

15 U.S.C. § 78k–1(a)(1); *see also* Poser, *supra*, at 906 ("[T]he five qualities of markets set forth [in § 78k–1(a)] are the closest that the legislators came to explaining the concept of the NMS."); Macey & Haddock, *supra*, at 321–22 (similar).

As reflected in the statutory text, the NMS promotes competition in the market for securities transactions. Congress itself took several steps to produce that kind of competition. It:

- Abolished minimum fixed-rate commissions, *see* 15 U.S.C. § 78f(e);
- Eliminated exchange rules that prevented institutional investors from obtaining exchange membership, *see id.* § 78f(b)(2), (c);
- Directed SEC to review every existing exchange rule limiting members' ability to trade in over-the-counter markets, *see id.* § 78k–1(c)(4); and
- Forbade SEC and exchanges from adopting rules that would unnecessarily burden competition, *see id.* § 78w(a)(2) (SEC); *id.* § 78f(b)(8) (exchanges).

To produce inter-exchange competition, Congress also directed SEC to establish NMS facilities. *See id.* § 78k–1(a)(2). To implement that directive, SEC identified several major elements of the NMS. For example, SEC identified a need for systems that publicly reported cross-market information about securities transactions and quotations, and systems that routed orders to buy and sell securities across markets. Poser, *supra*, at 916.

The 1975 Amendments did a few other things, too. Most notably, they included several provisions designed to clip SRO authority—the provisions at issue in this case. For example, the original Exchange Act gave registered exchanges power to regulate matters "not inconsistent with" the Act. 48 Stat. at 886. The 1975 Congress revised that provision to limit exchange

No. 21-60626

regulatory power to matters "related to the purposes" of the Act. *See* 15 U.S.C. § 78f(b)(5). It also established procedures for SEC review of SRO rule changes, *see id.* § 78s(b), and gave SEC authority to amend SRO rules, *see id.* § 78s(c).

\*

In sum, Congress passed the original Exchange Act primarily to protect investors and the American economy from speculative, manipulative, and fraudulent practices. In 1975, it amended the Exchange Act to further those goals and, additionally, to remove barriers to the development of a national market system. No doubt the Act has ancillary purposes—for example, protection of corporate suffrage. *See supra*, at 17. There may be other purposes buried in the Exchange Act's voluminous text, but our review of the Act's history makes clear that disclosure of any and all information about listed companies is not among them.

So before SEC approves an SRO rule, it must do more than posit that the rule furthers some "core disclosure purpose" that is found nowhere in the Act. SEC EB Br. 2, 14, 25. SEC may not approve even a disclosure rule unless it can establish the rule has some connection to an actual, enumerated purpose of the Act.

C

In its attempt to connect the Board Diversity Proposal to some actual purpose of the Exchange Act, SEC made a few passing citations to the provisions of 15 U.S.C. § 78f(b)(5). On SEC's telling, the Proposal is "designed to promote [1] just and equitable principles of trade, [2] remove impediments to and perfect the mechanism of a free and open market and a national market system, and [3] protect investors and the public interest" because it will make available information that some investors want. JA2, 7, 15; *see also* Nasdaq EB Br. 54–55, 57 (explaining that SEC found the Proposal related to the

No. 21-60626

purposes of the Act because it furthers the purposes of the provisions contained in § 78f(b)(5)). SEC's explanation fails for the obvious reason that "the [Proposal] is not actually intended or designed to address any matter relevant to the scope or purposes of" those provisions. *See* JA36 (dissent of Commissioner Peirce). We address each of SEC's three contentions in turn.

1

SEC first contended that Nasdaq's Proposal is related to the purpose of the Act's mandate that exchanges adopt rules "designed to . . . promote just and equitable principles of trade." 15 U.S.C. § 78f(b)(5) (the "J & E provision"). That is wrong.

When Congress passed the Exchange Act, it recognized that prospective legislation was incapable of stamping out every kind of securities-related misconduct. *See* Birdthistle & Henderson, *supra*, at 62–63; *see also Heath v. SEC*, 586 F.3d 122, 132 (2d Cir. 2009) ("Securities trading is a highly complex field in which it is not always feasible to define by statute or by administrative rules having the effect of law every practice which is inconsistent with the public interest or with the protection of investors." (quoting *Avery v. Moffatt*, 55 N.Y.S.2d 215, 228 (1945)) (alteration omitted)). So Congress supplemented the rules contained in the Act with the J & E provision, which requires exchanges to self-regulate "methods of doing business which, while technically outside the area of definite illegality, are nevertheless unfair both to customer and to decent competitor." *Heath*, 586 F.3d at 132 (quoting 6 Louis Loss & Joel Seligman, Securities Regulation 2796 (3d ed. 2002)).

The J & E provision has an easily discernible purpose: It requires exchanges to promote ethical behavior. That is obvious from the ethics-laden terms Congress used: "just" and "equitable." To be "just" is to conform "to what is righteous"—*i.e.*, what is morally right. Webster's New

International Dictionary 1348 (2d ed. 1934; 1950). To be "equitable" is to possess or exhibit "equity," or to be "fair"—*i.e.*, "[c]onformed to, or in conformity with, the established rules and customs." *Id.* at 865, 910. So the J&E provision simply requires exchanges to promote behavior that is morally right and in conformity with the rules and customs of the securities profession. *See id.* at 2683 (defining "trade" as "[c]ollectively, those connected with . . . a trade" in the occupational sense).

That is how the J&E provision has been applied in practice. To comply with the provision, SROs (including exchanges) have adopted broadly worded "J&E rules"—general rules that require exchange members to abide by just and equitable principles of trade. *See Heath*, 586 F.3d at 132 ("[I]n accordance with the Exchange Act, the NYSE adopted . . . the J&E Rule, which prohibits registered members from engaging in conduct or proceeding inconsistent with just and equitable principles of trade." (quotation and citation omitted)); *see also, e.g.*, Nasdaq Rules, General 9, § 1(a) ("A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."), https://perma.cc/WA66-EE22. SEC and courts have uniformly emphasized that these SRO J&E rules "state[] a broad *ethical* principle [that] implements the requirements of [the J&E provision]." *In re Werner*, 44 S.E.C. 622, at *2 n.9 (July 9, 1971) (emphasis added); *see also, e.g.*, *Heath*, 586 F.3d at 132 ("It has long been the view that [J&E Rules are] designed to enable SROs to regulate the *ethical* standards of [their] members." (emphasis added)); *In re Burkes*, 51 S.E.C. 356, at *3 (Apr. 14, 1993) (similar).

With SEC approval, SROs have frequently applied them to discipline exchange members for conduct that is unethical, such as: violating the securities laws, *see In re L.H. Alton & Co.*, S.E.C. Release No. 40886 (Jan. 6, 1999); charging unreasonable rates, *see In re Nat'l Ass'n of Sec. Dealers*, 5 S.E.C. 627 (Aug. 7, 1939); unjustifiably failing to live up to contractual

obligations, *see In re Samuel B. Franklin & Co.*, 38 S.E.C. 113 (Nov. 18, 1957); withholding customer money, *see In re Alderman*, 52 S.E.C. 366 (July 20, 1995); and failing to prioritize a customer's order over a proprietary trade, *see In re E.F. Hutton & Co.*, S.E.C. Release No. 25887 (July 6, 1988).

The Board Diversity Proposal is far removed from these ordinary applications of the concept of just and equitable principles of trade. It is obviously unethical to violate the law or to disregard a contractual promise. It is not unethical for a company to decline to disclose information about the racial, gender, and LGTBQ+ characteristics of its directors. We are not aware of any established rule or custom of the securities trade that saddles companies with an obligation to explain why their boards of directors do not have as much racial, gender, or sexual orientation diversity as Nasdaq would prefer.[4] If there is such a custom, SEC did not cite it in its approval order. It said only that the Board Diversity Proposal would satisfy some apparently important investors who demand diversity information. *See* JA7. That is irrelevant to the purposes of the J & E provision.

### 2

SEC next contended that Nasdaq's Board Diversity Proposal is related to the Act's purposes because exchanges must have rules "designed . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system." 15 U.S.C. § 78f(b)(5) (the "NMS provision"). That too is wrong.

The NMS promotes free and open markets. Specifically, the NMS promotes:

---

[4] Nothing prevents companies from voluntarily disclosing—or even advertising—their directors' social, demographic, political, or any other characteristics. So if certain investors want to know that information, companies can choose to disclose it.

No. 21-60626

   (i)   economically efficient execution of securities transactions;

   (ii)   "fair competition" between brokers, dealers, and markets;

   (iii)   information with respect to quotations for and transactions in securities;

   (iv)   the practicability of brokers executing investors' orders in the best market; and

   (v)   opportunities to execute certain orders "without the participation of a dealer."

*Id.* § 78k–1(a)(1)(C)(i)–(v); *see also* Poser, *supra*, at 915–16 (noting that the NMS consists primarily "of a linkage of the markets that would enable customers to receive the best available execution of their orders and market makers and specialists to compete"); *supra*, at 17–222.

     A free and open market is closely related to the NMS concept. A "free market" is "[a] condition of unrestricted competition." WEBSTER'S, *supra*, at 1004. An "open market" is "a market open to all buyers and sellers." *Id.* at 1706. Before 1975, competition in the market for securities transactions was restricted because the NYSE's membership agreement contained several anticompetitive provisions. The market for securities transactions was not meaningfully open to all sellers because the market system lacked the kinds of facilities necessary to enable non–NYSE specialists to compete for transactions. The goal of the NMS was to alleviate those conditions and so to "perfect the mechanism of a free and open market." 15 U.S.C. § 78f(b)(5).

     In the context of the NMS provision, then, what Congress meant by a "free and open market" was a free and open market for securities transactions. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 n.4 (2024) ("[S]tatutes can be sensibly understood only 'by reviewing text in context.'" (quoting *Pulsifer v. United States*, 601 U.S. 124, 133 (2024))); *see also* Brett M.

No. 21-60626

Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2121 (2016) (explaining that the best reading of a statute must be informed by context). Congress gave SEC broad discretion to flesh out the contours of the NMS. *See, e.g.*, 15 U.S.C. § 78k–1(a)(2) ("The Commission is directed . . . to use its authority under [the Exchange Act] to facilitate the establishment of a national market system for securities . . . in accordance with the findings and to carry out the objectives set forth in [§ 78k–1(a)(1)]."). The NMS provision is an extension of that discretion. It gives SEC power to ensure that exchanges have rules designed to promote the NMS policy that SEC develops in accordance with Congress's § 78k–1(a)(2) directive.

An exchange rule would presumably relate to the purpose of the NMS provision if it did anything that might plausibly reduce the transaction costs associated with executing a securities trade—*e.g.*, by lowering broker commissions or bid-ask spreads. But SEC did not contend that the Board Diversity Proposal does anything like that. All it said was that the Proposal would make available information that might contribute to some investors' investment and voting decisions. *See* JA7. Equipping investors to make investment and voting decisions might be a good idea, but it has nothing to do with the execution of securities transactions. That means SEC failed to justify its finding that Nasdaq's Proposal is related to the purpose of the NMS provision.

3

Last, SEC contended that Nasdaq's Board Diversity Proposal is related to the purpose of the Act's mandate that exchanges adopt rules "designed . . . in general, to protect investors and the public interest." 15 U.S.C. § 78f(b)(5) (the "public interest provision"). That is also wrong.

The public interest provision is a catch-all at the end of a list of things an exchange must do to obtain and maintain national registration status. The

No. 21-60626

Supreme Court has explained that such provisions should be interpreted by reference to the canons of *noscitur a sociis* and *ejusdem generis. See Fischer v. United States*, 144 S. Ct. 2176, 2183–84 (2024). Under the canon of *noscitur a sociis*, a phrase "is given more precise content by the neighboring words with which it is associated." *Id.* at 2183 (quotation omitted). Similarly, *ejusdem generis* instructs that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific [items] that precede it." *Id.* at 2184 (quotation omitted).[5] That makes sense. An exchange could not enact a rule designed to protect investors or the public from the perils of tobacco. So in determining whether Nasdaq's Proposal is designed to protect investors and the public interest, the question is whether it protects investors or the public from the kinds of harms that the Exchange Act explicitly lists as its targets—that is, speculation, manipulation, fraud, anticompetitive exchange behavior, &c. *See supra*, at 11–22.

Lots of exchange listing standards are related to those stated purposes. For example, Nasdaq requires listed companies to have a majority-independent board. *See* Nasdaq EB Br. 11–12 & n.1. That rule at least plausibly prevents fraud by ensuring that directors are insulated from officers so they can effectively guard against financial malfeasance. In fact, the Exchange Act itself sometimes imposes a board independence requirement: It requires board audit committees to be composed entirely of independent directors. *See* 15 U.S.C. § 78j–1(m)(3)(A) ("Each member of the audit committee of

---

[5] The Supreme Court has said on occasion that courts should interpret catch-all phrases in light of "the purposes that Congress had in mind when it enacted [the] legislation." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976); *see also Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 439 (5th Cir. 2021) (citing *NAACP* and reading a public interest provision in light of the purposes of the relevant statute). Here, the text (especially as understood through the relevant canons) reveals Congress's purposes and obviates a separate purposivist inquiry under *NAACP*.

the issuer shall be a member of the board of directors of the issuer, and shall otherwise be independent."). Congress enacted that requirement in 2002, in response to a series of corporate scandals involving outright financial fraud, such as at Enron and WorldCom. *See* S. Burcu Avci et al., *Do Independent Directors Curb Financial Fraud? The Evidence and Proposals for Further Reform*, 93 Ind. L.J. 757, 758 (2018). It did so for the express purpose of "protect[ing] investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 745. If Congress thinks an independent audit committee requirement prevents financial fraud, it is not hard to see how an exchange could conclude a majority-independent board requirement does, too.

What is the public interest here? Nasdaq told SEC that the Board Diversity Proposal targeted Exchange Act–related harms because there is an established link between the racial, gender, and LGTBQ+ identities of a company's board members and "the quality of a company's financial reporting, internal controls, public disclosures, and management oversight." JA8.

But Nasdaq offered little support for its assertion that there is an empirically established—or even logical—link between the racial, gender, and sexual composition of a company's board and the quality of its governance. It proffered some studies that suggest "a positive association between gender diversity and important investor protections," JA8, but SEC canvassed all the evidence Nasdaq submitted and concluded it was "mixed," JA9.[6] And even supposing that Nasdaq's gender-diversity evidence was

---

[6] Moreover, SEC may have asked the wrong question. SEC considered evidence respecting the effects of diversity on firm performance. *See* JA9. But it is not clear what firm performance has to do with the Exchange Act. Of course, investors generally like it when firms make more money, but Congress did not pass the Exchange Act for the purpose

sufficient, Nasdaq offered only the barest speculation to support the proposition that there is any link between investor protection and racial and sexual diversity. *See* JA8 ("[S]ome academics assert that such findings [regarding gender diversity] may extend to other forms of diversity, including racial and ethnic diversity."); JA9 ("With respect to commenters' view that there is insufficient evidence to establish a positive relationship between LGBTQ+ diversity and board performance, the Exchange reiterates that it is reasonable and in the public interest to treat LGBTQ+ status as 'inextricably' intertwined with gender identity."). It may be true that an exchange need not produce conclusive empirical evidence to show that a proposed rule is related to the purpose of investor protection, but SEC cannot approve a rule simply because an exchange declared the existence of some fact. If it could, the statutory limitations on exchange authority would be dead letters. *Cf. Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017) (holding assertions of "independent outside financial experts" insufficient to justify SEC approval of an exchange rule).

Moreover, a link between racial, gender, and sexual diversity could justify only the disclosure component of the Diversity Proposal. The Proposal also imposes an explanation requirement—it requires companies to explain *why* they failed to be as diverse as Nasdaq would prefer. That requirement would serve the goal of investor protection only if there were some link between the *reason* for the lack of racial, gender, and sexual diversity on a company's board and the quality of its governance. That is, Nasdaq would have to show a corporate-governance delta between (A) non-diverse boards that have no explanation for their non-diversity and (B) non-diverse

---

of maximizing shareholder wealth. It passed the Act to protect investors from fraud, manipulation, speculation, and anticompetitive exchange behavior. *See supra*, at 11–22. Firm performance has little to do with those objectives.

boards that have "good" reasons for their non-diversity. Nasdaq offered no reason to believe such a delta exists.

That is why SEC did not justify its related-to finding by contending that the Board Diversity Proposal would protect investors from fraud or some other Exchange Act–related harm. SEC justified that finding *only* on the ground the Proposal would satisfy the demand of some important investors for board diversity information. *See* JA7. But the public interest provision must be interpreted in light of the more specific purposes Congress listed prior to the general catch-all purpose. *See Fischer*, 144 S. Ct. at 2183–84. The purpose of satisfying investor demand for any and every kind of information about exchange-listed companies is not remotely similar to any of those stated purposes. Accordingly, SEC failed to justify its finding that the Board Diversity Proposal is related to the purpose of the public interest provision.

## D

The major questions doctrine confirms our interpretation of the statute's ordinary meaning. To quote Judge Sentelle, finding a hidden disclosure mandate in the Exchange Act and its amendments requires concluding that "Congress not only had hidden a rather large elephant in a rather obscure mousehole, but had buried [it] beneath an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence." *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005). We (1) explain the doctrine and then (2) hold that no part of the Exchange Act even hints at SEC's purported power to remake corporate boards using diversity factors.

## 1

The major questions doctrine is as old as the administrative state itself. *See, e.g.*, Louis J. Capozzi III, *The Past and Future of the Major Questions Doctrine*, 84 Ohio St. L.J. 191, 196–226 (2023). To understand the

No. 21-60626

doctrine, consider a case involving the very first modern administrative agency, the Interstate Commerce Commission ("ICC").[7] *See ICC v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 167 U.S. 479 (1897) ("*The Queen and Crescent Case*"). In *The Queen and Crescent Case*, ICC asserted the power to use administrative law to affect "[b]illions of dollars [that were] invested in railroad properties," "[m]illions of passengers," and "millions of tons of freight [that were] moved each year by the railroad companies." *Id.* at 494. Those were major questions, affecting a "vast and comprehensive" swath of American life. *Ibid.* So to decide them, ICC needed clear and express authorization from Congress: "The grant of such a power is never to be implied." *Ibid.* While Congress gave ICC plenty of far-reaching powers, "nowhere in the interstate commerce act do we find words" expressly giving ICC the power to remake future railroad rates. *Id.* at 500. That was enough to invalidate ICC's decision.

By the turn of the twentieth century, the rule was firmly ensconced in treatises discussing administrative law. *See, e.g.*, Frank J. Goodnow, The Principles of the Administrative Law of the United States 326–27 (1905) ("[T]he general rule in this country is that the administrative authorities . . . may issue ordinances only where the power to issue such ordinances has been *expressly* given to them by the legislature." (emphasis added)); *accord id.* at 168–69; J.G. Sutherland, Statutes and Statutory Construction § 68 (1891). And even during the

---

[7] Congress created ICC in 1887. Interstate Commerce Act of 1887, Pub. L. No. 49-104, 24 Stat. 379, 383. "It is well-nigh universally recognized that the Interstate Commerce Commission is not only the oldest but the most powerful of the many federal agencies now operative which exercise some measure of authoritative control of economic conduct." I.L. Sharfman, *The Interstate Commerce Commission: An Appraisal*, 46 Yale L.J. 915, 915 (1937). ICC was the archetype for twentieth-century administrative agencies. *See* Bernard Schwartz, Administrative Law 22 (2d ed. 1984).

No. 21-60626

headiest days of administrative power in the second half of the twentieth century, the Supreme Court continued to invoke the doctrine to limit administrative actions over major questions in the absence of express congressional authorization. *See* Capozzi, *supra*, at 209–16.

In its modern formulation, the major questions doctrine rests on the principle that administrative agencies have no independent constitutional provenance. They "are creatures of statute. They accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). So when an agency asserts the power "to substantially restructure the American energy market," it must point to "clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022) (quotation omitted); *see also Nebraska*, 143 S. Ct. at 2372. Because the agency has no inherent or implied authority, its powers to make major decisions must come only from unequivocal statutory text.

2

Under Supreme Court precedent, "this is a major questions case." *West Virginia*, 597 U.S. at 724. Put simply, the "economic and political significance" of SEC's action is "staggering by any measure." *Nebraska*, 143 S. Ct. at 2373 (quotation omitted). SEC "claimed to discover in a long-extant statute an unheralded power" that it "located . . . in the vague language of an ancillary provision of the Act." *West Virginia*, 597 U.S. at 724 (quotation omitted). In doing so, SEC has intruded into territory far outside its ordinary domain.

Start with economic significance. As explained above, Nasdaq is the second-largest stock exchange in the *world*. As of today, the market cap of companies traded on the Nasdaq exchange exceeds $25 *trillion*, greater than the real GDP of the United States. *Largest Stock Exchange Operators Worldwide*, Statista, https://perma.cc/873E-EUT3. That is not to say that

everything SEC does to regulate Nasdaq automatically implicates a major question. But prescribing rules such as these, which attempt to transform the internal structure of many of the largest corporations in the world, surely does. Such rules come close to regulating "the entire economy." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001).

The political significance is likewise staggering. These rules came in response to "the social justice movement," as an attempt to increase "diversity and inclusion" across "public companies." JA689. We can think of few more politically divisive issues in the Nation. *Compare, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 258 (2023) (Thomas, J., concurring) ("[I]t has long been apparent that 'diversity [was] merely the current rationale of convenience' to support racially discriminatory admissions programs." (quoting *Grutter v. Bollinger*, 539 U.S. 306, 393 (2003) (Kennedy, J., dissenting))), *with id.* at 384 (Sotomayor, J., dissenting) ("Diversity is now a fundamental American value, housed in our varied and multicultural American community that only continues to grow.").

SEC's proposed exercise of power is novel, too. The relevant statutory provisions date either to 1934 or 1975. Either way, these qualify as "long-extant statute[s]." *West Virginia*, 597 U.S. at 724; *see id.* at 733–34 (relevant provision amended in 1990); *NFIB*, 595 U.S. at 114 (relevant provisions dated to 1970). In all that time, SEC has never claimed the authority to impose diversity requirements, or anything resembling them, on corporate boards.

Further, SEC's efforts "raise an eyebrow" by stepping outside its ordinary regulatory domain of market manipulation and proxy voting and intruding into the province of other agencies. *West Virginia*, 597 U.S. at 730 (quotation omitted). SEC does not ordinarily regulate companies' commitments "to diversity and inclusion." JA689. If Congress had granted a diver-

sity mandate to any agency (an altogether unclear assumption), we would have expected Congress to give it to the Equal Employment Opportunity Commission or even the Department of Justice. *Cf.* Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Of course, even the agencies that regulate diversity in the workplace have not asserted the power SEC does in this case. That makes SEC's burden under the major questions doctrine all the heavier.

But it is not just other agencies that ordinarily regulate in this field; it is primarily the *States*.[8] The Supreme Court has long recognized that a corporation is a "mere creation of local law." *Paul v. Virginia*, 75 U.S. 168, 181 (1868); *see also Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819) (Marshall, C.J.) ("A corporation is an artificial being, invisible, intangible, and existing only in contemplation of [state] law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence."). Furthermore, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations," because "regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). As the Court explained:

---

[8] That is not to say, of course, that corporate governance is *exclusively* the province of state regulation. The federal government can regulate (and in the past has regulated) certain aspects of corporate governance. The important point for present purposes, however, is that this task falls primarily to the States—and hence is one factor triggering the major questions doctrine. For example, there are plenty of examples of federal regulation over the landlord–tenant relationship: The Fair Housing Act and the Department of Housing and Urban Development are just the most obvious. Still, the landlord–tenant relationship is "the particular domain of state law," so the major questions doctrine applies when federal agencies use implied powers to regulate it. *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (per curiam).

No. 21-60626

> [It] is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters . . . .

*Id.* at 91.

Thus, by unsettling the "stable relationships among parties involved" in corporate boards, *ibid.*, SEC has "intrude[d] into an area that is the particular domain of state law," *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (per curiam); *see also West Virginia*, 597 U.S. at 742 (Gorsuch, J., concurring) (suggesting that the major questions doctrine serves in part to protect federalism). That provides another reason to think that SEC's exercise of purported authority presents a major question.

In situations like this, the major questions doctrine "counsels skepticism" toward SEC's exercise of this unprecedented power. *West Virginia*, 597 U.S. at 732. "To overcome that skepticism, the Government must . . . point to 'clear congressional authorization' to regulate in that manner." *Ibid.* (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). And that clear authorization is sorely lacking. All SEC can do is point to "a vague statutory grant" in the Exchange Act. *Ibid.* It gestures to language such as "just and equitable principles of trade," or to its mandates to "perfect the mechanism of a free and open market" and adopt rules "designed . . . , in general, to protect investors and the public interest." 15 U.S.C. § 78f(b)(5). "[S]horn of all context," these provisions could be rendered "empty vessel[s]" for SEC to exercise nearly unlimited regulatory authority. *West Virginia*, 597 U.S. at 732. That unlikely result bolsters our reading of the statute: Such "vague statutory grant[s]" fall far short of "the sort of clear authorization required by [Supreme Court] precedents." *Ibid.*

No. 21-60626

E

SEC and Nasdaq offer five principal responses. *First*, they say exchanges should have broad leeway to formulate rules governing listed companies because exchanges are private institutions that were in operation long before Congress passed the Exchange Act. *See* Oral Arg. 45:44–47:35. But it is hard to see why that matters. In 1975, Congress limited the regulatory power of exchanges to matters that are related to the purposes of the Act. *See* 15 U.S.C. § 78f(b)(5). We cannot ignore what Congress did in those Amendments just because exchanges once operated free from federal oversight.

*Second*, SEC and Nasdaq tell us that exchanges have long imposed substantive corporate governance rules, even after the 1975 Amendments. *See* Nasdaq EB Br. 11–12; *see also* Corporate Governance Scholars Br. 13 (explaining that the NYSE imposed an independent board requirement "only two years after the 1975 amendments"). That the NYSE imposed an independent board requirement is not surprising because there is no doubt that exchanges may adopt corporate governance rules that are related to the purposes of the Exchange Act. *See supra*, at 288–29 (explaining Nasdaq's independent board requirement relates to the purposes of the Act because it is designed to prevent fraud).[9] It does not follow, however, that exchanges may adopt corporate governance rules that are *not* related to those purposes.

---

[9] SEC cited other Nasdaq listing standards in its approval order. For example, Nasdaq's quorum requirement, which provides that listed companies must obtain votes from the shareholders of one-third of the issuer's outstanding shares on any matter that requires a shareholder vote. *See* JA15; *see also* Nasdaq Listing Rule 5620(c). We need not definitively decide the question here, but it seems obvious that quorum requirements have some connection with the purpose of investor protection. The whole point of requiring shareholders to approve certain corporate actions is to ensure that investors have the means to protect themselves from harms that approximate fraud—*e.g.*, to prevent the directors of a corporation from using corporate funds (which for all practical purposes belong to the

No. 21-60626

*Third*, it is true that SEC has violated the 1975 Amendments in the past. For example, SEC approved a rule proposed by the Long-Term Stock Exchange ("LTSE") that requires LTSE-listed companies to adopt and publish a policy on the company's approach to diversity and inclusion. *See* JA15 n.202 (citing LTSE Rule 14.425(a)(1)(C)). But SEC cannot nullify the statutory criteria governing exchange rules by repeatedly ignoring them. "[T]he Executive can[not] acquire authority forbidden by law through a process akin to adverse possession." *Biden v. Texas*, 597 U.S. 785, 830 (2022) (Alito, J., dissenting).

*Fourth*, SEC and Nasdaq contend the Board Diversity Proposal is merely a disclosure requirement and that it does not actually remake the boardrooms of America's corporations. This contention is flatly inconsistent with the administrative record. Nasdaq described the Board Diversity Proposal to impose "aspirational diversity objectives." JA611. And corporations that do not meet those objectives must explain why they failed. That is not a disclosure requirement. That is a public-shaming penalty for a corporation's failure to abide by the Government's diversity requirements.

*Fifth*, SEC and Nasdaq contend that Supreme Court precedent establishes that full disclosure is the "core" purpose of the Exchange Act. *See* SEC EB Br. 2, 14, 25; Nasdaq EB Br. 52. But that is not true. What the Court has actually said is that the Act "embrace[s] a fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor

---

shareholders) to pay corporate officers unjustifiable salaries. But if corporations could satisfy shareholder approval requirements by holding votes that do not involve even some minimal number of investors, shareholder approval requirements would be pointless. And if that were not enough, the Supreme Court has said that the Act's proxy solicitation requirements demonstrate that the Act has as a purpose the protection of "fair corporate suffrage." *Borak*, 377 U.S. at 431. There is little doubt that a quorum requirement has at least some connection with that purpose.

*and thus to achieve a high standard of business ethics in the securities industry.*" *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (emphasis added) (quotation omitted); *compare post*, at 45 (Higginson, J., dissenting). In other words, the Court has acknowledged that disclosure is not an end in itself but rather serves other purposes, such as the purpose of promoting ethical behavior or "the purpose of avoiding frauds." *Ibid.* Thus, nothing in the Court's precedents undermines our conclusion that a disclosure rule is related to the purposes of the Act only if it is related to the elimination of fraud, speculation, or some other Exchange Act–related harm. *See supra*, at 11–22.

Even Nasdaq acknowledges that there is some limit on the kinds of disclosure rules an exchange could adopt. It says an exchange could adopt a disclosure rule only if there is (1) investor demand for the information that the rule would make available, (2) a demonstrated link between that information and corporate governance or investor protection, and (3) an evidentiary record that establishes both those things. *See* Oral Arg. at 50:40–52:05.[10] But even if Supreme Court precedent establishes that "full disclosure" is the core purpose of the Act, it is hard to see why an exchange rule would have to comply with Nasdaq's three-part test to be related to that purpose. Would not every disclosure rule be related to the purpose of full disclosure? For example, a rule that compelled disclosure of the religious affiliations of companies' directors. Or the presidential candidate they voted for in the most recent election. Or their position on the hottest political issue of the day. Or whether they recycle, drive electric vehicles, and take public transit. We see no basis to derive such an unlimited principle from *Affiliated Ute Citizens*.

---

[10] Ironically, the Proposal fails Nasdaq's own test. *See supra*, at 29–31.

No. 21-60626

\*

In sum, SEC's related-to finding was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That means SEC failed to justify its determination that Nasdaq's Board Diversity Proposal is consistent with the requirements of the Exchange Act. *See* 15 U.S.C. § 78s(b)(2)(C).

## III

Finally, the Recruiting Rule. In that Rule, Nasdaq proposed to offer companies that do not meet the "aspirational diversity objectives," JA611, contained in the Board Diversity Proposal access to a complimentary board-recruiting service that would provide "access to a network of board-ready diverse candidates," JA20. Nasdaq said it proposed the Recruiting Rule in part to "aid" companies in "compliance with the Nasdaq Diversity Proposal." JA724. It explained that companies that do not meet the Diversity Proposal's "aspirational diversity objectives," JA611, "will need to identify diverse board candidates if they wish to satisfy that requirement instead of explaining why they do not satisfy it," JA725.

SEC found the Recruiting Rule consistent with the requirements of the Exchange Act. It did so in part because the Rule would "assist Eligible Companies . . . to increase diverse representation on their boards and would help Eligible Companies to meet (or exceed, in the case of a Company with a Smaller Board) the proposed diversity objectives under the Board Diversity Proposal." JA21. SEC acknowledged that an exchange might violate the Act by offering a benefit to some companies and not others because the Act forbids exchanges from engaging in "unfair discrimination between customers, issuers, brokers, or dealers." 15 U.S.C. § 78f(b)(5); *see* JA21.

But it concluded that the Recruiting Rule did not unfairly discriminate among issuers—*i.e.*, listed companies. In doing so, SEC reasoned that it

No. 21-60626

made sense for Nasdaq to offer the service to companies that do not meet the objectives contained in the Board Diversity Proposal because those companies "may have a greater interest or feel a greater need to identify diverse board candidates by utilizing the board recruiting service than" companies who do meet those objectives. JA21. And, it explained, "offering the one-year complimentary service would help [Nasdaq] compete to attract and retain listings, particularly in light of the diversity objective in the separately approved Board Diversity Proposal." *Ibid.*

NCPPR contends SEC's decision to approve the Recruiting Rule was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). But Nasdaq's authority to offer benefits pursuant to the Recruiting Rule before this court expired on December 1, 2023. *See* JA173. And Nasdaq represents that no company is receiving service under the Recruiting Rule as of September 30, 2024. Nasdaq Supp. Ltr. Br. at 1 (July 24, 2024). NCPPR's challenge is accordingly moot.

\*     \*     \*

For the foregoing reasons, we GRANT the consolidated petitions for review and VACATE SEC's order approving Nasdaq's Board Diversity Proposal. And we DENY AS MOOT NCPPR's petition for review of the Recruiting Rule.

No. 21-60626

Stephen A. Higginson, *Circuit Judge*, joined by Stewart, Dennis, Southwick, Haynes, Graves, Douglas, and Ramirez, *Circuit Judges*, dissenting:

As intervenor Nasdaq observed, "[i]ssues of diversity in the boardroom raise important questions on which people of good faith can disagree." Nasdaq Reh'g Response Br. 21. Here, a wide range of investors and listed companies told Nasdaq that information about board composition wasn't standardized or efficient to procure, but that investors were seeking it, nonetheless. Nasdaq responded with a rule (the "Disclosure Rule") that standardizes access to this information, which the market said was relevant, and that requires companies without at least two diverse board members to state why—an explanation that would never be assessed for substance.[1]

The SEC, in its limited reviewing role, concluded after independent study that Nasdaq's Rule was consistent with the purposes of the Exchange Act and therefore approved it. The SEC relied on its finding that substantial evidence supported the conclusion that investors sought this information in the face of inaccuracies, inefficiencies, and asymmetries (while carefully noting that Nasdaq had not offered substantial evidence to support a conclusion *from the SEC* that boardroom diversity improved corporate performance). The SEC expressly concluded that this was a disclosure-based rule, not a

---

[1] The Disclosure Rule requires each Nasdaq-listed company to disclose information on the voluntarily provided gender and racial characteristics and LGBTQ+ identity of the company's board of directors. Subject to certain exceptions, each Nasdaq-listed company is also required to have, or explain why it does not have, at least one board member who is a woman and one board member who is an underrepresented racial minority or LGBTQ+. Nasdaq does not evaluate the substance of a company's explanation of why it does not have two diverse board members; Nasdaq merely confirms that the explanation has been submitted. For example, a company might state that it "doesn't consider the information useful to investors" or "prioritizes diversity of thought or geography." With that, the company has complied with Nasdaq's Disclosure Rule.

hiring quota. Indeed, Nasdaq modeled its Disclosure Rule on the form that EEOC already requires companies to use to report employee demographic information. The SEC approved the Rule because the reviewing scheme that Congress created doesn't permit the SEC to displace Nasdaq's private business judgment—informed by investor behavior—with agency policy priorities.

## I

Nasdaq is a private, limited liability company. *See* Second Amended Limited Liability Company Agreement of The Nasdaq Stock Market LLC (July 9, 2009), https://tinyurl.com/2s3vt8nw. It enters into voluntary contractual agreements with companies, under which Nasdaq agrees to facilitate the listing and trading of securities and the listed companies agree to abide by Nasdaq's rules. *See* Nasdaq, *Initial Listing Guide* (Jan. 2022), https://tinyurl.com/bdh8794f; Nasdaq, *Listing Agreement*, https://tinyurl.com/2whjhzt3. Nasdaq competes with other exchanges for these listings, regularly refining its rules so that companies will choose to list with it rather than with competitors like the New York Stock Exchange.

Under the Exchange Act, the SEC "shall" approve a rule proposed by an exchange "if it finds" that the rule is "consistent with the requirements" of the Act. 15 U.S.C. § 78s(b)(2)(C)(i). So, an exchange's proposed rule *must be* approved if it is consistent with the requirements that "[t]he rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest" and "are not designed to permit unfair

No. 21-60626

discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange." *Id.* § 78f(b)(5).[2]

This limited role that Congress carved out for the SEC in overseeing *private ordering* through rules proposed by *self-regulatory organizations* (SROs) does *not* permit the SEC to displace business judgment with its own policy priorities. As corporate law scholars and practitioners forcefully explain, "[u]nlike nations where innovation occurs primarily by national mandate, our corporate governance system encourages private experimentation by stock exchanges and companies, so that new approaches can be tested, refined, and either become the basis for broader market practices or abandoned as unwise." Nonpartisan Group of Academics & Practitioners in Corporate Governance in Support of Intervenor-Nasdaq Br. 31. In this system, the even more limited role of courts is to ask whether the SEC's decision *not to intervene* in this private ordering—and thus to approve the SRO-proposed rule—was arbitrary, capricious, or an abuse of discretion. *See Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 248 (D.C. Cir. 2003). "The petitioner[s] ha[ve] the burden of proving that the agency's determination was arbitrary and capricious." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) (citation omitted). The SEC's factual determinations are reviewed for substantial evidence. 15 U.S.C. § 78y(a)(4).

The majority, however, overlooks this limited SEC role, fixed by Congress, and instead creates a new, mandatory and enlarged role for SEC intervention, ordering the SEC to displace largely private ordering with alternate

---

[2] The SEC must also find that the proposed rule would "not impose any burden on competition not necessary or appropriate," 15 U.S.C. § 78f(b)(8).

No. 21-60626

policy priorities. The majority interprets the Exchange Act to require the SEC "to clip SRO authority" whenever an SRO does not sufficiently show "some connection to the ails Congress designed the Act to eradicate." *Ante* at 11, 21. These are described variously by the majority as "prevent[ing] market abuses," "eliminat[ing] fraudulent and speculative behavior," and "promot[ing] ethical behavior," as well as other "ancillary purposes."[3] "*Ante* at 16-17, 22-23." But, according to the majority, *see ante* at 11, these purposes do *not* include the elimination of information asymmetries regarding corporate board leadership—the very leaders entrusted with investors' money and whose identity investors across the full spectrum of our economy seek. This conclusion does not find support in well-established caselaw. *See Kokesh v. SEC*, 581 U.S. 455, 458 (2017) (Exchange Act "serves the fundamental purpose of substituting a philosophy of full disclosure for the philosophy of caveat emptor" (cleaned up)); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977) ("fundamental purpose of the 1934 Act [is] to substitute a philosophy of full disclosure for the philosophy of caveat emptor" (internal quotation marks and citation omitted)); *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 940 (5th Cir. 1971) ("The requirement of full disclosure of all corporate information which might influence investment decisions is the very heart of the federal securities regulations.").

Crucially, this case concerns a rule *proposed by Nasdaq*, a private company that, in a competitive market with other exchanges, contracts with other companies to facilitate the listing and trading of securities. Nasdaq updates its rules regularly, competing with other exchanges for listings. The Exchange Act requires that the SEC approve these exchange-proposed rules but encourages self-regulation by sharply limiting SEC review such that the SEC

---

[3] The majority does not explain what these "ancillary purposes" might be, other than the example of "protection of corporate suffrage." *Ante* at 21.

No. 21-60626

*must approve* rules if certain requirements are met. Consistent with Congress's scheme, the SEC's authority to impose *its own judgment* on exchanges and the companies that list on them is, unlike that of the exchanges themselves, extremely limited. *See* Nonpartisan Group of Academics & Practitioners in Corporate Governance Br. 24-25 (noting that "petitioners ignore settled requirements of statutory interpretation" to "gut this key distinction," "reversing 30 years of settled understanding by corporations, exchanges, regulators, and courts").[4] The majority mis-equates the SEC's federal government disclosure-mandating authority with private sector SRO self-regulating authority. *Ante* at 15-17.

## II

It was not arbitrary or capricious for the SEC to allow, as consistent with the purposes of the Act, this private ordering disclosure rule about corporate leadership composition. The SEC concluded that the Disclosure Rule is "designed to . . . remove impediments to and perfect the mechanism of a free and open market and a national market system," among other objectives, because the Disclosure Rule would "contribute to the maintenance of fair

---

[4] The majority perceives a major questions doctrine friction. "*Ante* at 31-36." But for good reason, petitioners themselves abandoned that argument at the en banc stage. As explained at length in the panel opinion, this is not a major questions case. *All. for Fair Bd. Recruitment v. Sec. & Exch. Comm'n*, 85 F.4th 226, 256-58 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, No. 21-60626, 2024 WL 670403 (5th Cir. Feb. 19, 2024); *see also, e.g., Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 616-17 (5th Cir. 2024) (holding that a Department of Labor rule that increased by 50% the minimum salary required to qualify for a FLSA exemption did not implicate the major questions doctrine and further observing that, "even once triggered, whether the doctrine is one interpretative tool among many or a clear-statement rule is the subject of ongoing debate"). Moreover, throughout its opinion, the majority seems to suggest that the SEC should have exercised *more*, not less, of its statutorily limited authority to disapprove Nasdaq's Disclosure Rule.

No. 21-60626

and orderly markets." 86 Fed. Reg. at 44,425. AFBR argues that this determination is not supported by substantial evidence.

The statutory objective to "remove impediments to and perfect the mechanism of a free and open market and a national market system," 15 U.S.C. § 78f(b)(5), concerns the "maintenance of fair and orderly markets." 15 U.S.C. § 78k-1(a)(1)(C); *see NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (explaining that the Exchange Act "makes plain that maintenance of fair and orderly markets is the animating goal of federal securities law" and that the "remov[ing] impediments" is a means to "this end" (internal quotation marks and citation omitted)).[5] As AFBR acknowledged at the panel stage, fair and orderly markets assure economically efficient securities transactions and fair competition among market participants. *See* 15 U.S.C. § 78k-1(a)(1)(C)(i)-(ii).

The SEC's finding that the Disclosure Rule would "contribute to the maintenance of fair and orderly markets" and is therefore "designed to . . . remove impediments to and perfect the mechanism of a free and open market and a national market system," 86 Fed. Reg. at 44,425, is supported by substantial evidence. The SEC found that "[b]oard-level diversity statistics are currently not widely available on a consistent and comparable basis, even though [Nasdaq] and many commenters argue that this type of information is important to investors." *Id.* In making this finding, the SEC relied on numerous comments from market participants. *See, e.g., id.* at 44,429 nn.72 & 79.

Importantly, it is unrebutted in this administrative record, or in this litigation, that a wide range of investors seek corporate board composition

---

[5] The "fair and orderly market" that Nasdaq operates is the exchange itself. *See NASDAQ OMX*, 770 F.3d at 1021.

information. Indeed, petitioners never contend that the SEC lacked substantial evidence for its conclusion that investors wanted the information, nor do they challenge the SEC's conclusion that the lack of information that investors found relevant to their investing decisions created both inefficiencies (as investors sought it out) and asymmetries (as only large, sophisticated investors could secure it). JA 2, 7-8. Nasdaq pointed to evidence, credited by the SEC, from listed companies like Microsoft, business organizations like the U.S. Chamber of Commerce, small investors, and large investment management firms like Goldman Sachs and Vanguard, that board composition information was highly sought after but inefficient to acquire, especially accurately and usefully. JA 6-7 & nn.73-77, 91-92. As the SEC noted, this evidence included comments from "[s]ome of the largest and most sophisticated asset managers, who operate in competitive markets and are subject to a fiduciary duty to their clients," and have shared a desire for this information. SEC Reh'g Response Br. 16 (citing JA 7 & nn.91-92). Nasdaq, therefore, cannot be characterized as responding only to the whims of a few activist institutional investors.

Petitioners didn't establish that the SEC was without substantial evidence for its conclusion that Nasdaq's proposed rule "would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions." JA 7. Nasdaq pointed to evidence from studies and commenters that "current board diversity disclosures are insufficient and noncomparable," JA 638, leaving investors "struggl[ing] to get uniform and transparent data," JA 652.[6] This created

---

[6] Because the Disclosure Rule standardizes disclosures of board diversity information, including the format and timing of disclosures, the SEC reasonably found that the Disclosure Rule "would make it more efficient and less costly for investors to collect, use, and compare information on board diversity" and would "mitigate any concerns regarding

"information asymmetries between larger stakeholders, who are able to collect [diversity] data directly from companies, and smaller investors, who must rely on incomplete public disclosures," JA 210, and are prevented from getting information that could inform investment and proxy-voting, JA 5-8, nn.73, 78, 80; JA 44; JA 205; JA 646-47, regardless of a particular investor's views, JA 8.

It is especially clear that the SEC's approval of Nasdaq's Disclosure Rule was not arbitrary or capricious when that decision is viewed in the context of both the information that companies must already submit to the government and the SRO-proposed rules that the SEC has previously approved as consistent with the Act. Companies with over 100 employees must report demographic information about their workforce composition to EEOC, via the EEO-1 form. JA 703 n.159 (citing U.S. Equal Employment Opportunity Commission, EEO–1: Who Must File, https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-who-must-file (now available at https://www.eeocdata.org/pdfs/WHO_MUST_FILE.pdf (last accessed Dec. 6, 2024))). Nasdaq took the categories of information that companies are already reporting and, after adding LGBTQ+ identity, asked that the same information be collected from directors, who aren't considered employees. JA 703. Listing companies are already asked, by the SEC, whether the

---

unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who could obtain the information and other (likely smaller) investors who may not be able to do so." 86 Fed. Reg. at 44,430. As the SEC explained, under the Disclosure Rule, companies must "make board-level diversity disclosures in a substantially similar format"; "following the first year of disclosure, disclose the current year and immediately prior year" information; provide the information "in a searchable format"; and "provide the required disclosures in a proxy statement or information statement . . . in advance of the company's annual shareholders meeting or provide the required disclosures on the company's website concurrently with the filing of the company's proxy statement or information statement." 86 Fed. Reg. at 44,430 n.90.

No. 21-60626

"nominating committee [for the board] (or the board) considers diversity in identifying nominees for director," and, if so, to describe whether there is a policy and how effective that policy is. 17 CFR 229.407(c)(2)(vi). And other SROs, with which Nasdaq must compete globally for listings, have been allowed to enact similar rules without SEC intervention to override them as inconsistent with the Act's purposes. JA 720 (citing Long-Term Stock Exchange Rule Book, Rule 14.425, under which listed companies must adopt and publish policies that explain their "approach to diversity and inclusion").[7]

Instead of calling any of these conclusions into question to argue that the SEC lacked substantial evidence that the Disclosure Rule would remove market information impediments, petitioners instead argue that the Exchange Act *requires* the SEC to question whether investors *should have wanted* that information. AFBR Opening Br. 13-15; NCPPR Opening Br. 4-8. The requirement that the SEC interrogate investors' motivations is nowhere in the Exchange Act and is contrary to the SEC's limited role in reviewing private exchange-proposed rules for consistency with the Act, rather than for adherence to the SEC's preferred business judgment. "Judicial intrusion into this private space would require a ruling with no limiting principle and would trample on space traditionally left to private ordering." Nonpartisan Group of Academics & Practitioners in Corporate Governance Br. 31. Setting aside the SEC's approval of Nasdaq's Rule is "effectively asking this [c]ourt to rule as a matter of law that managers with more than $18 trillion under management are behaving irrationally." Prof. Joseph Grundfest Br. 19.

---

[7] Indeed, had the SEC disapproved of the Disclosure Rule, Nasdaq would have had a compelling case that the SEC had acted arbitrarily and capriciously, given both its limited supervisory role and also the precept of administrative law that like cases be treated alike.

No. 21-60626

This administrative record shows the SEC's limited reviewing role in action. The SEC carefully observed that studies on the impact of diversity in boardrooms were mixed—in part because most of the studies it was presented with relied on a quota system, which it found was not comparable to the proposed disclosure system—such that the SEC could not rely on this explanation from Nasdaq as an independent justification for approving the Rule. But the SEC concluded that Nasdaq's Rule "would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions," JA 7, even though the SEC couldn't say independently whether investors were making the right call in doing so.

\*     \*     \*

Congress created a unique, limited role for the SEC that didn't permit it to reach a different conclusion here, regardless of whatever good faith disagreement might exist in policy debates about disclosure of corporate board leadership composition. If Nasdaq misapprehended investor appetite for this information and the willingness of the listed companies it contracts with to provide it, the marketplace of competing exchanges—and not the policy preferences of this court or a federal agency—will resolve that. I respectfully dissent.