# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 24-60219

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

May 19, 2025

Lyle W. Cayce
Clerk

NATIONAL RELIGIOUS BROADCASTERS; AMERICAN FAMILY ASSOCIATION,

*Petitioners,*

*versus*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents,*

CONSOLIDATED WITH

———————————

No. 24-60226

———————————

TEXAS ASSOCIATION OF BROADCASTERS,

*Petitioner,*

*versus*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents.*

Petition for Review from an Order of the
Federal Communications Commission
Agency No. 24-18

Before ELROD, *Chief Judge*, and JONES and STEWART, *Circuit Judges*.
JENNIFER WALKER ELROD, *Chief Judge*:

     The Federal Communications Commission issued an order requiring most television and radio broadcasters to compile employment-demographics data and to disclose the data to the FCC, which the agency will then post on its website on a broadcaster-identifiable basis. Petitioners, a group of radio and television broadcasters and associations that represent broadcasters, petitioned for review of the FCC's order in this court under the Hobbs Act, 28 U.S.C. § 2344. They contend that the FCC lacks statutory authority to require these disclosures, that requiring disclosure and publication violates Petitioners' First and Fifth Amendment rights, and that the order is arbitrary and capricious under the Administrative Procedure Act. Because we agree with Petitioners that the FCC lacks statutory authority, we GRANT the petition and VACATE the order.

I

     In February 2024, the FCC reinstated the collection of employment-demographics data for most television and radio broadcasters. *Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules & Policies*, MB Docket No. 98-204, Fourth Report and Order and Order on Reconsideration, FCC 24-18 (Feb. 22, 2024) [hereinafter Order]. Under the Order, covered broadcasters must annually file a so-called Form 395-B, which collects race, ethnicity, and gender data for each covered broadcaster's employees within specified job categories. *Id.* ¶ 1. The Order ends a 22-year hiatus on the collection of Form 395-B, which the FCC collected periodically

before 2002. *See Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules & Policies*, 17 FCC Rcd. 24018, 24024 (2002) (suspending collection). Before addressing the contents of the Order, we first provide a brief history of the FCC's efforts to collect this data.

The FCC first required broadcasters to disclose employment-demographics data in 1970 using a precursor to Form 395-B. *Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 23 F.C.C.2d 430, 430, 436 (1970). The FCC concurrently adopted regulations that prohibited broadcasters from engaging in employment discrimination and that required broadcasters to implement equal employment opportunity programs with recruiting efforts tailored to minorities and women. *Id.* at 430–31, 435–38 (codified as amended in scattered sections of 47 C.F.R.). The FCC stated that it would use collected employment data both to "ensure that licensees focus on the best method of assuring effective equal employment practices"—what the FCC calls an "enforcement function"—and to monitor and report on industry trends. *Id.* at 430–32. The FCC also required that broadcasters make available their forms for public viewing at local stations. *Id.* at 436 (codified at 47 C.F.R. § 1.526 (1970)).

Two decades later, Congress passed the Cable Television Consumer Protection and Competition Act ("1992 Cable Act"). Pub. L. No. 102-385, 106 Stat. 1460 (1992). In the 1992 Cable Act, Congress declared that "despite the existence of regulations governing equal employment opportunity, females and minorities are not employed in significant numbers" in management in the broadcast industry. *Id.* § 22(a)(1). It found also that "rigorous enforcement of equal employment opportunity rules and regulations" was necessary to "deter racial and gender discrimination." *Id.* § 22(a)(3). So, Congress directed the FCC not to amend its regulations that required broadcasters to implement equal employment opportunity

24-60219
c/w No. 24-60226

programs or the forms that broadcasters used to report employment data
pertinent to those programs:

> **SEC. 334. Limitation on revision of equal employment
> opportunity regulations.**
>
> (a)    **LIMITATION**.—Except as specifically provided in this
> section, the Commission shall not revise—
>
> > (1)    the regulations concerning equal employment
> > opportunity as in effect on September 1, 1992 (47
> > C.F.R. 73.2080) as such regulations apply to television
> > broadcast station licensees and permittees; or
> >
> > (2)    the forms used by such licensees and permittees to
> > report pertinent employment data to the Commission.

*Id.* § 22(f) (codified at 47 U.S.C. § 334(a)).

Thereafter, the FCC continued to collect Form 395-B until the D.C.
Circuit held several of the Commission's equal employment opportunity
regulations (but not the Form itself) unconstitutional. *See Lutheran Church-
Mo. Synod v. Fed. Commc'ns Comm'n*, 141 F.3d 344 (D.C. Cir. 1998). In that
case, the FCC fined a broadcaster after finding that its minority recruitment
efforts were inadequate. *Id.* at 346–48. The D.C. Circuit reversed the FCC.
Under the then-existing regulations, the court explained, the FCC undertook
"in-depth EEO review" of any broadcasters who reported poor minority
recruitment efforts on their Form 395-B. *Id.* at 352–53. Such scrutiny
improperly "pressure[d broadcasters] to engage in race-conscious hiring" in
violation of the equal protection component of the Fifth Amendment, even
though the regulations did not explicitly direct or require such decisions. *Id.*
at 352–56. After *Lutheran Church*, the FCC voluntarily suspended the use of
Form 395-B while it considered new equal employment opportunity rules.
*Suspension of Requirement for Filing of Broadcast Station Annual Employment
Reports & Program Reports*, 13 FCC Rcd. 21998, 21998 (1998).

24-60219
c/w No. 24-60226

The FCC published its new regulations in 2000.  *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 15 FCC Rcd. 2329, 2332 (2000).  The new equal employment opportunity regulations, designed to achieve "broad outreach" to women and minority candidates, gave broadcasters two choices:  either implement several of thirteen FCC-approved recruitment initiatives (Option A), or report demographics for each applicant and face FCC investigation if a broadcaster listed "few or no" women or minorities in its applicant pool (Option B).  *Id.* at 2364–65, 2378.  The new regulations also reinstated the collection of Form 395-B, which the Commission promised to use "only to monitor industry employment trends and report to Congress," not for any enforcement function.  *Id.* at 2332.

Broadcasters challenged the new rule.  The D.C. Circuit concluded that Option B's requirement to report the race and sex of job applicants unconstitutionally "create[d] pressure to recruit women and minorities." *MD/DC/DE Broads. Ass'n v. Fed. Commc'ns Comm'n*, 236 F.3d 13, 18 (D.C. Cir. 2001).  The "threat of being investigated" by the agency with "life and death power" over broadcasters, the court reasoned, impermissibly incentivized broadcasters to tailor their recruitment efforts to certain classes of people in violation of the Fifth Amendment's equal protection component. *Id.* at 19, 22.  As before, the FCC suspended Form 395-B collection while it again drafted new regulations.  *Suspension of the Broadcast & Cable Equal Employment Opportunity Outreach Program Requirements*, 16 FCC Rcd. 2872, 2872 & n.1 (2001).

In 2002, the FCC adopted the "race and gender neutral" equal employment opportunity regulations that are in place today.  *See Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules & Policies*, 17 F.C.C. Rcd. at 24018, 24074.  The FCC, though, left suspended Form 395-B collection after several commenters raised confidentiality and

24-60219
c/w No. 24-60226

constitutional concerns over the FCC's planned public disclosure of collected data. *See id.* at 24024–25, 24025 n.36, 24074.

Two years later, the FCC considered reinstating Form 395-B data collection. *Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules & Policies*, 19 FCC Rcd. 9973, 9974 (2004). Ultimately, in response to further concerns over disclosing the data on a station-identifiable basis, the FCC granted a "one-time filing grace period until a date to be determined" while it sought further comments. *Id.* at 9978.

For the next 20 years, the FCC took no further action to require Form 395-B disclosure. Finally, in 2021, the FCC proposed resuming Form 395-B collection and invited public comment to refresh the administrative record. *Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules & Policies*, 36 FCC Rcd. 12055, 12055 (2021).

Then, in 2024, the Commission issued the Order challenged here. In addition to reinstating Form 395-B collection, the FCC simultaneously denied-in-part a petition for reconsideration that it had left pending for nearly two decades, which requested, among other things, that Form 395-B data remain confidential. Order ¶¶ 14, 57, 61. As the FCC explained, it chose to publish the data on its website, on a non-confidential, broadcaster-identifiable basis, to "incentivize stations to file accurate data," remain "consistent with Congress's goal to maximize the utility" of the data for public benefit, and alleviate "concerns about inadvertent disclosures of identifiable information." *Id.* ¶¶ 14–15.

In denying the petition, the FCC dismissed as speculative broadcasters' concerns that third parties would misuse this data to *de facto* pressure stations to engage in preferential hiring practices as the agency had unconstitutionally done *de jure*. *Id.* ¶ 17. It also guaranteed to "quickly and summarily dismiss" any third-party filings challenging broadcasters' license

24-60219
c/w No. 24-60226

renewals based on Form 395-B data, but it reserved the right to reevaluate its decision to publicly post the data should misuse occur. *Id.*

In the Order, the FCC also amended three portions of Form 395-B. First, it amended Form 395-B to include "non-binary gender categories" at the request of some commenters. *Id.* ¶¶ 39–40.[1] Second, the FCC expanded Form 395-B to include ten job categories instead of nine. *Id.* ¶ 14 n.57. And third, it added "two or more races" as one of the race categories that broadcasters may select when categorizing their employees. *Id.*

The FCC published the Order in the Federal Register on May 3, 2024, and it took effect one month later. Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies, 89 Fed. Reg. 36705, 36705 (May 3, 2024). The National Religious Broadcasters, Texas Association of Broadcasters, and American Family Association (Petitioners) then timely sought review in the Fifth Circuit under the Hobbs Act, 28 U.S.C. § 2344.

## II

The FCC does not contest Petitioners' theories of Article III standing. Nevertheless, the court has an "obligation to assure itself of its own jurisdiction, *sua sponte* if necessary." *Elldakli v. Garland*, 64 F.4th 666, 669 (5th Cir. 2023).

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). To establish associational

---

[1] After oral argument, the FCC submitted a letter to the court that retracted its arguments in support of these two paragraphs, citing recent Executive Orders from President Trump.

standing, an association must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Because American Family Association is a broadcaster now required to annually file a Form 395-B, it is "an object of the [FCC's] action," which ordinarily means that the standing requirements are met. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Preparing and submitting Form 395-B will increase the "regulatory burden" on the Association, satisfying "the injury in fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). Causation and redressability "flow naturally" from this injury because the Association will not face its injury if we vacate the Order, as Petitioners request. *Id.* at 266–67; *see also Lujan*, 504 U.S. at 561–62 (explaining that when the "plaintiff is himself an object of the action (or forgone action) at issue . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it").

Similarly, the two associations of broadcasters, National Religious Broadcasters and Texas Association of Broadcasters, meet the first prong of associational standing because they represent broadcasters who, like American Family Association, are objects of the Order. *Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, 103 F.4th 1097, 1109 (5th Cir. 2024). Further, the purposes of these associations—providing broadcasters "strategic representation in important legislative, legal, and regulatory arenas"—are germane to the broadcasters' interests sought to be protected here. *United Food & Com. Workers Union Local 751*, 517 U.S. at 555–56, 556

24-60219
c/w No. 24-60226

n.6; *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (explaining that the germaneness requirement is an "undemanding" standard). Finally, the participation of individual association members is "not normally necessary when an association seeks prospective or injunctive relief for its members," as Petitioners do here. *United Food & Com. Workers Union Local 751*, 517 U.S. at 546.

Each of the three Petitioners has submitted affidavits to the court substantiating their claims for standing, as they must do at this stage. *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020) (explaining that in direct review of agency action, petitioners must support their claims for standing with record evidence). Accordingly, Petitioners have Article III standing to challenge the Order.

### III

Petitioners ask the court to enjoin and set aside the Order for four independent reasons: (1) the FCC lacks statutory authority to require broadcasters to submit Form 395-B, (2) the Order violates the Fifth Amendment's equal protection component, (3) the Order violates the First Amendment by compelling speech, and (4) the Order is arbitrary and capricious under the Administrative Procedure Act. We begin, and end, with Petitioners' first argument.

In the Order, the FCC claimed statutory authority to require broadcasters to file Form 395-B pursuant to its mandate to act in the "public interest" under the Communications Act of 1934. Order ¶ 13. It also contended that Congress "ratified" Form 395-B collection in 1992 when it passed the Cable Act. Order ¶ 5 & n.19. The FCC's brief re-urges each of these arguments. We first address the public-interest provisions, and then turn to the Cable Act.

24-60219
c/w No. 24-60226

A

Before Congress created the FCC, "the allocation of [radio] frequencies was left entirely to the private sector, and the result was chaos." *Red Lion Broad. Co. v. Fed. Commc'ns Comm'n*, 395 U.S. 367, 375 (1969). Individuals jostled for finite space on the airwaves, resulting in a "cacophony of competing voices" and revealing a clear need for regulation to protect the utility of radio and the public's access to it. *Id.* at 376–77. So, Congress acted, and vested the FCC with the authority to grant licenses to broadcasters, regulate wired connections between carriers, and take several other actions related to the furnishing of broadcast services, all "in the public interest." Communications Act of 1934, Pub. L. No. 73-416, §§ 201(a), 309(a), 48 Stat. 1064, 1070, 1085 (codified in scattered sections of Title 47). Since then, Congress has authorized the FCC to take several additional actions in the public interest. *See, e.g.*, 47 U.S.C. §§ 201(a), 254(b)(7), 303, 319(d); *see also Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021).

Public-interest authority, though cast in broad terms, is not "unlimited." *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943). Public interest is merely the "touchstone" for FCC action, guiding the exercise of its discretion in carrying out its statutorily prescribed functions. *Fed. Commc'ns Comm'n v. Pottsville Broad. Co.*, 309 U.S. 134, 137–38 (1940). This touchstone does not grant freewheeling authority: the FCC may not act in the public interest "if the agency does not otherwise have the authority" to act. *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n*, 309 F.3d 796, 806 (D.C. Cir. 2002). Put another way, "the Commission may not rely" on its "public-interest provisions without mooring its action to a distinct grant of authority" from Congress. *Cellco P'ship v. Fed. Commc'ns Comm'n*, 700 F.3d 534, 542 (D.C. Cir. 2012).

24-60219
c/w No. 24-60226

Indeed, we recently explained, in the context of the Securities and Exchange Commission's public-interest provision, that public-interest provisions must be interpreted against the backdrop of the broader statutory scheme in which that provision is placed. *All. for Fair Bd. Recruitment v. Sec. & Exch. Comm'n*, 125 F.4th 159, 178 (5th Cir. 2024) (en banc). Under *Alliance for Fair Board Recruitment*, a public-interest provision authorizes an agency to protect the public from the kinds of harms that the agency's statutory scheme "explicitly lists as its targets." *Id.* ("[A securities] exchange could not enact a rule designed to protect investors or the public from the perils of tobacco.").

Invoking public interest, the FCC here cites an array of statutory provisions that, in its view, grant it public-interest authority to reinstate Form 395-B collection: 47 U.S.C. §§ 151, 154(i), 154(k), 303(r), 307, 308, 309, 310, 403. Order ¶ 13 n.53.

At the outset, we note that, under *Alliance for Fair Board Recruitment*, the FCC's public-interest authority must be interpreted in light of the "targets" of the Communications Act of 1934. 125 F.4th at 178. That Act, as subsequently amended, created the FCC and directed it to undertake several actions touching on regulating broadcast networks, protecting the public utility of those networks, issuing licenses to broadcasters, and other related tasks. *See, e.g.*, 47 U.S.C. §§ 151, 303, 307. The FCC does not explain how compiling data on sex- and racial-employment trends in the broadcast industry serves any of those targets. *See All. for Fair Bd. Recruitment*, 125 F.4th at 179–80; *see also Cellco P'ship*, 700 F.3d at 542 (explaining that the FCC must "moor[] its action to a distinct grant of authority" from Congress). Nevertheless, we proceed through each of the FCC's cited statutory provisions.

24-60219
c/w No. 24-60226

Two of the FCC's cited provisions allow it to take "necessary" acts "in the execution of its functions." 47 U.S.C. § 154(i); *accord id.* § 303(r). As we have explained previously, § 154(i) grants "ancillary authority" for the FCC to "fulfill its primary directives contained elsewhere in the statute." *Tex. Off. of Pub. Util. Counsel v. Fed. Commc'ns Comm'n*, 183 F.3d 393, 444 (5th Cir. 1999) (citation omitted). Similarly, § 303(r) grants the FCC the authority to carry out its statutorily delegated tasks contained within the "provisions of this chapter." *See Motion Picture Ass'n of Am., Inc.*, 309 F.3d at 806. The FCC, however, does not cite any statutory provisions showing that collecting this data is one of its functions, as it must. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) ("The grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carry[ing] out.'").

Two of the FCC's cited provisions provide for certain investigatory powers. Section 154(k), for example, directs the FCC to retain records of investigations into licensees and broadcasters. But it does not grant the FCC a freewheeling investigatory power. The other provision, § 403, does authorize "inquir[ies]," but only into "case[s]" or "matter[s] or thing[s]" permissible under "this chapter."

Assuming that Form 395-B collection qualifies as an investigation or inquiry, the FCC cannot show that investigations into employment demographics are permissible under "this chapter." *See id.* As noted above, the FCC does not cite any provision authorizing it to collect employment data from broadcasters. This case is thus unlike the cases involving § 403 that the FCC cites favorably in its brief, which concern the procedures of investigations undertaken pursuant to the FCC's statutorily prescribed licensing function. *See Fed. Commc'ns Comm'n v. Schreiber*, 381 U.S. 279, 280–82, 282 n.4, 291–92 (1965) (affirming rule concerning the confidentiality of information on "acquisition, ownership, production, distribution,

12

selection, sale and licensing of programs for television"); *Stahlman v. Fed. Commc'ns Comm'n*, 126 F.2d 124, 126–27 (D.C. Cir. 1942) (similar).

Here, unlike in *Schreiber* and *Stahlman*, the FCC does not appear to assert that Form 395-B collection will help it carry out its licensing function. Instead, it states that collection of this data "will allow for analysis and understanding of the broadcast industry workforce, as well as the preparation of reports to Congress about the same." Order ¶ 2. Insofar as the FCC does assert that Form 395-B collection will serve its licensing function, the applicable licensing statutes do not direct the FCC to condition the issuance of licenses on the submission of employment-demographics data. *See* 47 U.S.C. §§ 307 ("Licenses"), 308 ("Requirements for license"), 309 ("Application for license"), 310 ("License ownership restrictions"). And although those licensing statutes (with the exception of § 308) do permit the FCC to issue licenses in the public interest, the FCC's authority to act in the "public interest" does not extend outside of the statutorily prescribed tasks that Congress has instructed the FCC to carry out. *See All. for Fair Bd. Recruitment*, 125 F.4th at 178–80. Accordingly, the licensing statutes cannot support the FCC's authority to collect Form 395-B.

The Order, but not the FCC's brief, also claims statutory authority from 47 U.S.C. § 151, Congress's general statement of purpose for creating the FCC. There, Congress charged the FCC with several duties, one of which is to "make available" communications services to all Americans "without discrimination on the basis of race, color, religion, national origin, or sex." The FCC, however, has historically employed Form 395-B to help it eradicate *employment* discrimination, not the discriminatory provision of communications services to Americans. And in any event, the Order disclaims any present intent to use Form 395-B data for this historical purpose. Order ¶ 18. Having parsed the remainder of § 151, we see no other language to which the FCC may moor its Order.

24-60219
c/w No. 24-60226

The FCC undoubtedly has broad authority to act in the public interest. That authority, however, must be linked "to a distinct grant of authority" contained in its statutes. *Cellco P'ship*, 700 F.3d at 542; *see also All. for Fair Bd. Recruitment*, 125 F.4th at 178–80. The FCC has not shown that it is authorized to require broadcasters to file employment-demographics data or to analyze industry employment trends, so it cannot fall back on "public interest" to fill the gap. *See NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976) ("The use of the words 'public interest' in the Gas and Power Acts is not a directive to the Commission to seek to eradicate discrimination . . . ."); *see also All. for Fair Bd. Recruitment*, 125 F.4th at 178–80 (concluding that the Security and Exchange Commission's public-interest provision did not support a rule requiring board-diversity disclosures).

Accordingly, the FCC lacks statutory authority to require broadcasters to disclose Form 395-B in the public-interest provisions that it cites.

B

We next turn to 47 U.S.C. § 334(a), which Congress passed as part of the 1992 Cable Act. The FCC contends that § 334(a) grants it the authority to resume Form 395-B data collection. Order ¶ 13. It also argues that, even if the FCC was not previously authorized to collect Form 395-B, Congress "ratified" its authority by passing the 1992 Cable Act. Order ¶ 53 & n.174.

We are unpersuaded. While § 334(a) explicitly mentions the collection of employment data, it is not an affirmative grant of authority; indeed, it is a restriction on the FCC's power. Titled a "Limitation," § 334(a) mandates that "the Commission shall not revise . . . the forms used by" broadcasters to submit employment data. It does not otherwise grant any authority to the FCC to collect this data. When Congress's language is plain, we must enforce it. *United States v. Lauderdale County*, 914 F.3d 960,

24-60219
c/w No. 24-60226

964 (5th Cir. 2019); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion) ("The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" (citation omitted)).

The FCC's ratification argument, however, warrants closer inspection. Congressional action can ratify or "give the force of law to official action unauthorized when taken." *Kovac v. Wray*, 109 F.4th 331, 340 (5th Cir. 2024) (citation omitted), *cert. denied sub nom. Kovac v. Patel*, 145 S. Ct. 1181 (2025). Ratification may occur, for example, when "Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986); *see also Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*, 97 F.4th 938, 946 (D.C. Cir. 2024).

According to the FCC, Congress was aware of its "longstanding assertion of authority to collect and disclose Form 395-B data." The FCC cites the legislative history of the 1992 Cable Act, which reveals that Congress reviewed Form 395-B data, concluded that women and minorities were not employed in the broadcast industry at a sufficient level, and, in passing § 334(a), instructed the FCC to continue its data collection and reporting functions. Thus, the FCC asserts, § 334(a) constitutes positive legislation that ratified its authority to collect Form 395-B data.

We need not decide whether the 1992 Cable Act ratified the FCC's authority to collect Form 395-B data because, to the extent that Congress ratified anything, it expressly tethered the FCC's authority to collect Form 395-B to the equal employment opportunity regulations that are no longer in effect. Consider first § 334(a)(1), which instructs the FCC not to revise the equal employment opportunity regulations, codified at 47 C.F.R. § 73.2080, "in effect on September 1, 1992." Section 334(a)(2) expresses a similar

command, instructing the FCC not to revise its equal employment opportunity forms like Form 395-B. Crucially, though, § 334(a)(2) explains that those forms are to be used to report data "*pertinent*" to the equal employment opportunity regulations that were in effect on September 1, 1992. 47 U.S.C. § 334(a)(2) (emphasis added). In other words, ratification exists only insofar as Form 395-B is supportable under (or "pertinent" to) those regulations. The FCC does not dispute this reading of § 334(a)(2).

The problem for the FCC is that 47 C.F.R. § 73.2080—the equal employment opportunity regulation that was in effect on September 1, 1992—can no longer support this authority. In *Lutheran Church*, the D.C. Circuit held unconstitutional subsections (b) and (c) of § 73.2080, which required broadcasters to adopt equal employment opportunity outreach programs for minority and women candidates.[2] 141 F.3d at 346. The FCC agrees that these subsections cannot support ratification. It instead maintains that Form 395-B collection is "pertinent" to subsection (a) of § 73.2080, sometimes called the FCC's "nondiscrimination" requirement, which demands equal opportunity in employment and prohibits broadcasters from discriminating in employment decisions on the basis of race, color, religion,

---

[2] Subsection (b), for example, required that, "Each broadcast station shall establish, maintain, and carry out a positive continuing program of specific practices designed to ensure equal opportunity in every aspect of station employment policy and practice." 47 C.F.R. § 73.2080(b) (1992). Subsection (c) provided specific program requirements, such as using "minority organizations, organizations for women, media, educational institutions, and other potential sources of minority and female applicants, to supply referrals" for job vacancies; evaluating a broadcaster's "employment profile" against "the availability of minorities and women in its recruitment area"; and offering "promotions of qualified minorities and women in a nondiscriminatory fashion to positions of greater responsibility." *Id.* § 73.2080(c)(2)–(4) (1992).

national origin, or sex.  47 C.F.R. § 73.2080(a).[3]  *Lutheran Church* declined to address that provision.  141 F.3d at 356.

Subsection (a) cannot support ratification for two reasons.  First, § 334(a) speaks only to the "regulations concerning equal employment opportunity," meaning subsections (b) and (c).  When discussing § 73.2080, the FCC has consistently distinguished between subsections (b) and (c) and subsection (a) by referring to them as the "equal employment opportunity requirements" and the "nondiscrimination requirement," respectively.  *See* Order ¶ 59; *Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules & Policies*, 17 FCC Rcd. at 24027 (discussing "the nondiscrimination requirement in Section 73.2080(a) of the rules").  Congress applied this distinction, as well, and referred only to the "equal employment opportunity" regulations contained in § 73.2080, meaning subsections (b) and (c).  Indeed, Congress made clear that the 1992 Cable Act was tailored towards improving the efficacy of the regulations that "promot[ed] equality of employment opportunity" and, specifically, the programs to increase "employment opportunity for women and minorities"—*i.e.*, subsections (b) and (c).  *See* 1992 Cable Act, § 22(g), 106 Stat. 1500.  Congress thus linked Form 395-B data collection only to those now-unconstitutional subsections, and not to subsection (a)'s nondiscrimination requirement.

---

[3] In full, subsection (a) stated, "Equal opportunity in employment shall be afforded by all licensees or permittees of commercially or noncommercially operated AM, FM, TV, or international broadcast stations (as defined in this part) to all qualified persons, and no person shall be discriminated against in employment by such stations because of race, color, religion, national origin, or sex."  47 C.F.R. § 73.2080(a) (1992).  The current version of this subsection is largely identical but adds that religious broadcasters "may establish religious belief or affiliation as a job qualification for all station employees."  47 C.F.R. § 73.2080(a) (2024).

24-60219
c/w No. 24-60226

Second, the Order itself specifically disclaims any connection between the nondiscrimination requirement contained in subsection (a) and the FCC's decision to reinstitute Form 395-B collection. The Order explains:

> Data concerning the gender, race and ethnicity of a broadcast station's workforce collected in the annual employment report will be used only for purposes of analyzing industry trends and making reports to Congress. Such data *will not be used* for the purpose of assessing any aspect of an individual broadcast licensee's or permittee's compliance with the *nondiscrimination* or equal employment opportunity requirements of Section 73.2080.

Order ¶ 60 (emphasis added). The FCC also revised its regulations on Form 395-B to include this language, formally severing any connection between Form 395-B collection and the nondiscrimination requirement found in § 73.2080(a). *See* 47 C.F.R. § 73.3612.

"Agency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity." *Texas v. Env't Prot. Agency*, 829 F.3d 405, 430 (5th Cir. 2016). Currently, subsections (b) and (c) are not in effect. And although subsection (a) still is, both Congress, in the text of § 334(a), and the FCC, in the Order, have severed Form 395-B data collection from that subsection. Thus, assuming *arguendo* that Congress ratified anything, it ratified only the FCC's power to collect Form 395-B under the regulations in place on September 1, 1992, which cannot now support the FCC's claimed authority.

*         *         *

The FCC lacks statutory authority to require broadcasters to submit employment data under Form 395-B. While its authority to act in the public interest is broad, the FCC cannot invoke public interest to expand the scope of its authority to act in ways Congress has not authorized it to act. Further,

24-60219
c/w No. 24-60226

even if the 1992 Cable Act ratified the FCC's ability to collect this data, Congress expressly tied that authority to equal employment opportunity regulations that are no longer in effect. Because we conclude that the FCC lacks statutory authority, we do not reach the Petitioners' alternative constitutional arguments, or the argument that the FCC's action was arbitrary and capricious under the Administrative Procedure Act.

We GRANT the petition and VACATE the Order.